UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
One Communications Corp., as successor in                   :
interest to CTC Communications Group, Inc. and              :
CTC Communications Acquisition Corp.,                       :
                                                            :   Index No. 07 Civ. 3905 (LTS)
                                    Plaintiff,               :
                                                            :   ECF
                -against-                                    :
                                                            :
JP Morgan SBIC LLC, Sixty Wall Street                       :
SBIC Fund, L.P., The Megunticook Fund II,                   :
L.P., The Megunticook Side Fund II, L.P.,                   :
Kevin O'Hare, Jeffrey Koester, Mellon                       :
Investor Services LLC as nominal defendant                  :
as escrow agent and Verizon New England Inc.                :
as defendant on a declaratory judgment claim,               :
                                                            :
                                    Defendants.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## MEMORANDUM OF LAW IN SUPPORT OF JP MORGAN DEFENDANTS' MOTION TO DISMISS THE COMPLAINT


ROBINSON & McDONALD LLP
61 Broadway, Suite 1415
New York, New York  10006
Tel.: 212 953-3400
Fax.: 212 953-3690

Attorneys for Defendants
JP Morgan SBIC LLC and
Sixty Wall Street SBIC Fund, L.P.

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

Summary of Grounds for Dismissal .....................................................................3

ARGUMENT ...........................................................................................................6

    I.      PLAINTIFF HAS FAILED TO STATE
            SECURITIES FRAUD CLAIMS
            AGAINST THE JP MORGAN DEFENDANTS ...................................6

            The Legal Standards ...............................................................................6

            A.     The Complaint Fails to Allege a False or
                      Misleading Statement by the JP Morgan Defendants ...................9

            B.     The Complaint Fails to Allege Reasonable
                      Reliance on Any Alleged Representation
                      of the JP Morgan Defendants.................................................16

            C.     The Complaint Fails to Allege that the
                      JP Morgan Defendants Acted with Scienter ...............................18

            D.     The Allegations Regarding GWI Fail to State a Claim ...............24

            E.     The Complaint Fails to Allege Control Person Liability.............28

                 1.     The Complaint Fails to Allege that the
                        JP Morgan Defendants "Controlled" Lightship .............28

                 2.     The Complaint Fails to Allege "Culpable
                        Participation" by the JP Morgan Defendants.................31

    II.     THE "BILLING PRACTICES" CLAIMS MAY NOT BE
           ADJUDICATED BY THIS COURT IN THE FIRST INSTANCE ......................33

            The Legal Standards .............................................................................33

            The Maine Interconnection Agreement ................................................41

            A.     The Local Calling Area Issue.................................................43

B.      The VNXX Issue .......................................................................................49

C.      "Double Billing".......................................................................................52

III.    PLAINTIFF HAS FAILED TO STATE A COMMON LAW
        FRAUD CLAIM AGAINST THE JP MORGAN DEFENDANTS .........................54

IV.     PLAINTIFF HAS FAILED TO STATE A NEGLIGENT
        MISREPRESENTATION CLAIM AGAINST THE
        THE JP MORGAN DEFENDANTS .......................................................................55

V.      THE INDEMNIFICATION CLAIM SHOULD BE
        DISMISSED IN FAVOR OF THE PRIOR PENDING SRC ACTION...................57

VI.     THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL
        JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIMS ...........................59

CONCLUSION..............................................................................................................60

TABLE OF AUTHORITIES

Page

CASES:

Adler v. Berg Harmon Assocs., 790 F. Supp. 1222 (S.D.N.Y. 1992) ...............................9

Askanase v. Fatjo, 130 F.3d 657 (5th Cir. 1997)......................................................51

Atlantic Alliance Telecomms. v. Bell Atlantic,
2000 U.S. Dist. LEXIS 19649 (E.D.N.Y. 2000)......................................................36

ATSI Communications, Inc. v. The Shaar Fund, Ltd.,
493 F.3d 87 (2d Cir. 2007)........................................................................6, 15, 17

AT&T Commc'ns of Illinois v. Illinois Bell Tel. Co.,
1998 U.S. Dist. LEXIS 12925 (N.D. Ill. 1998) .....................................................34, 36

AT&T Commc'ns of Ohio, Inc. v. Ohio Bell Tel. Co.,
29 F. Supp. 2d 855 (S.D. Ohio 1998) .................................................................36

AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366 (1999) ..............................................34

Bell Atl. Md., Inc. v. MCI WorldCom, 240 F.3d 279 (4th Cir. 2001),
vacated on other grounds, Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,
535 U.S. 635 (2002).....................................................................................36

Bell Atlantic-Virginia v. WorldCom Techs. of Virginia, Inc.,
70 F. Supp. 2d 620 (E.D. Va. 1999) ..................................................................36

BellSouth Tel. Co. v. Brooks Fiber Commc'ns of Okla, Inc.,
235 F.3d 493 (10th Cir. 2000) ......................................................................36, 38

Boguslavsky v. Kaplan, 159 F.3d 715 (2d Cir. 1998) .............................................31

Castellano v. Young & Rubicam, Inc., 257 F.3d 171 (2d Cir. 2001) ...........................26

Chambers v. Time Warner, Inc., 282 F.3d 147 (2d Cir. 2002).....................................2

Chevron U.S.A., Inc. v. Natural Resources Defense Council,
467 U.S. 837 (1984)......................................................................................38

Contact Commc'ns v. Qwest Corp., 246 F. Supp. 2d 1184
(D. Wyo. 2003) ...........................................................................................36

Core Communications, Inc. v. Verizon Pennsylvania, Inc.,
493 F.3d 333 (3d Cir. 2007)..................................................................................35, 37, 38, 39

CPC Int'l Inc. v. McKesson Corp., 70 N.Y.2d 268,
519 N.Y.S.2d 804 (1987).............................................................................................56

Cromer Finance Ltd. v. Berger, 137 F. Supp.2d 452, 484 (S.D.N.Y. 2001) ...................32

Curtis v. Citibank, N.A., 226 F.3d 133 (2d Cir 2000) ....................................................58

Deutsche Telekom AG Sec. Litig., 2002 WL 244597 (S.D.N.Y. 2002) ...........................31

Di Vittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242 (2d Cir. 1987) .............8

Dresner v. Utility.com, Inc., 371 F. Supp.2d 476 (S.D.N.Y. 2005) ...............................50

Drexel Burnham Lambert Inc. v. Saxony Heights Realty Associates,
777 F. Supp. 228 (S.D.N.Y. 1991) ..............................................................................49

Dura Pharm., Inc. v. Proudo, 544 U.S. 336 (2005)........................................................6

Emergent Capital Investment Management, LLC v.
Stonepath Group, Inc., 343 F.3d 189 (2d Cir. 2003) ...................................................18

Food and Allied Service Trades Dept. v. Millfield Trading Co.,
841 F. Supp. 1386 (S.D.N.Y. 1994)...........................................................................29

Gabriel Capital, L.P. v. Natwest Fin., Inc.,
122 F. Supp.2d 407, 426-28 (S.D.N.Y. 2000) .............................................................32

Ganino v. Citizens Utils. Co., 228 F.3d 154, 168 (2d Cir. 2000) ....................................6

Gavish v. Revlon, 2004 WL 2210269 (S.D.N.Y. 2004)..................................................53

Glidepath Holding B.V. v. Spherion Corp.,
2007 WL 2176072 (S.D.N.Y.  2007)......................................................................54, 55

Greenwald v. Orb Communications & Marketing, Inc.,
192 F. Supp.2d 212 (S.D.N.Y. 2002).....................................................................26, 60

Harsco Corp. v. Segui, 91 F.3d 337 (2d Cir 1996) ..........................................17, 18, 24

Homburger v. Venture Minerals, Inc.,
1985 WL 549 (S.D.N.Y. 1985).....................................................................................8

Hydro Investors, Inc. v. Trafalgar Power, Inc., 227 F.3d 8 (2d Cir. 2000) ...................................55

Ill. Bell Tel. Co. v. Worldcom Techs., Inc., 179 F.3d 566 (7th Cir. 1999) ...................................36

Indiana Bell Tel. Co. v. McCarty, 30 F. Supp.2d 1100 (S.D. Ind. 1998) .....................................36

In re Alstom SA, 406 F. Supp.2d 433 (S.D.N.Y. 2005) ...............................................................29

In re BYSIS, 397 F. Supp.2d 430  (S.D.N.Y 2005).......................................................................29

In re Emex Corp. Sec. Litig., 2002 WL 31093612 (S.D.N.Y. 2002) ...........................................31

In re Leslie Fay Companies, Inc. Sec. Litig.,
918 F. Supp. 749 (S.D.N.Y. 1996) .................................................................................................29

In re Livent, Inc. Sec. Litig., 78 F. Supp.2d 194 (S.D.N.Y. 1999)..........................................30, 51

In re Friedman's Inc. Sec. Litig.,
385 F. Supp.2d 1345 (2d Cir. 1996) ...............................................................................................29

In re Philip Services Corp., 383 F. Supp. 2d 463 (S.D.N.Y. 2004)...............................................30

In re Nokia Oyj (Nokia Corp.) Sec. Litig.,
423 F. Supp.2d 364 (S.D.N.Y. 2006)..............................................................................................53

Intermedia Commc'ns v. BellSouth Telecomms., Inc.,
173 F. Supp. 2d. 1282 (M.D. Fla. 2000)..........................................................................................36

Iowa Utils. Bd. v. FCC, 120 F.3d 753 (8th Cir. 1997),
rev'd in part on other grounds, AT&T Corp. v. Iowa Utils. Bd.,
525 U.S. 366 (1999).........................................................................................................................36

Kalin v. Xanboo, Inc., 2007 WL 273546 (S.D.N.Y. 2007) ............................................8, 16, 29, 31

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001) ..............................................................................20

Lapin v. Goldman Sachs Group, Inc.,
2006 WL 2850226 (S.D.N.Y. 2006)..................................................................................................7

Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005).........................................................6

Lewis v. Rosenfeld, 138 F. Supp. 466 (S.D.N.Y. 2001).................................................................56

Malmsteen v. Berdon, LLP, F. Supp.2d 655 (S.D.N.Y. 2007)........................................................54

Mishkin v. Ageloff, 1998 WL 651065 (S.D.N.Y. 1998) .................................................................32

Nanopierce Technologies, Inc. v. Southridge Capital Management LLC,
2003 WL 22052894 (S.D.N.Y. 2003)................................................................56, 57

Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000) ...........................................................54

Polycast Technology Corp. v. Uniroyal, Inc.,
1988 WL 96586 at (S.D.N.Y. 1988)..............................................................................56

P.R. Tel. Co. v. Telecomms. Regulatory Bd., 189 F.3d 1 (1st Cir. 1999).................36

Rahl v. Bande, 328 B.R. 387 (S.D.N.Y. 2005).............................................................8

Rapture Shipping Ltd. v. Allround Fuel Trading B.V.,
2006 WL 2474869 (S.D.N.Y. 2006)..............................................................................59

Rich v. Maidstone Financial, Inc., 2002 WL 31867724 (S.D.N.Y. 2002) ............30, 31

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004)........................................................7

Rubinstein v. Skyteller, Inc., 48 F. Supp. 2d 315 (S.D.N.Y. 1999)...........................30

S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450 (2d Cir. 1996)................................28

Sloane Overseas Fund, LTD v. Sapiens International Corp.,
941 F. Supp. 1369 (S.D.N.Y. 1996)..............................................................................30

Southwestern Bell Tel. Co. v. Pub. Util. Comm'n of Tx.,
208 F.3d 475 (5th Cir. 2000) .........................................................................................36

Southwestern Bell Tel. Co. v. Brooks Fiber Commc'ns of Okla., Inc.,
235 F.3d 493 (10th Cir. 2000) .......................................................................................36

Suez Equity Investors, L.P. v. Toronto-Dominion Bank,
250 F.3d 87 (2d Cir. 2001)..........................................................................27, 54, 56

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007) .................3, 7, 19

Trustees of the Plumbers and Pipefitters Nat'l Pension Fund v.
De-Con Mech. Contractors, 896 F. Supp. 342 (S.D.N.Y. 1995)...................................8

Verizon New York v. Choice One Commc'ns of New York,
2007 WL 927530 (S.D.N.Y. 2007)..............................................................................40

Wilson v. Mobil Oil Corp., 940 F. Supp. 944 (E.D. La. 1996) ...................................51

vi

Wynn v. AC Rochester, 273 F.3d 153 (2d Cir. 2001) ....................................................54

STATUTES AND RULES:

15 U.S.C. § 78j ...................................................................................................................6

15 U.S.C. § 78t(a) ............................................................................................................28

15 U.S.C. § 78u-4(b)(1) .....................................................................................................7

15 U.S.C. § 78u-4(b)(2) .....................................................................................................7

28 U.S.C. § 1331 ..............................................................................................................59

28 U.S.C. § 1367(c) ...................................................................................................3, 6, 59

47 U.S.C. § 251(b)(5) ...................................................................................................34, 41

47 U.S.C. § 251(c)(2) .......................................................................................................34

47 U.S.C. § 252(e) ............................................................................................................35

Federal Telecommunications Act of 1996,
Pub. L. No. 104-404, 110 Stat. 56 (1996) ........................................................................33

Fed.R.Civ.P. Rule 9(b) ............................................................................................. passim

Fed.R.Civ.P. Rule 12(b)(1) ................................................................................................3

Fed.R.Civ.P. Rule 12(b)(6) ................................................................................................3

Fed.R.Civ.P. Rule 12(b)(7) ................................................................................................3

Fed.R.Civ.P. Rule 19 .......................................................................................................59

Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) ........................................................6

New York Martin Act, N.Y. General Business Law § 352-c (2003) ...............................56

REGULATORY ORDERS:

Implementation of the Local Competition Provisions in the
Telecommunications Act of 1996; Intercarrier Compensation
for ISP-Bound Traffic, Order on Remand and Report and Order,
16 F.C.C.R. 9151, 9168 (2001), remanded without vacatur,
WorldCom v. FCC, 288 F.3d 429 (D.C. Cir. 2002),
cert. denied, 538 U.S. 1012 (2003) ..................................................................34

In the Matter of Implementation of the Local Competition
Provisions in the Telecommunications Act of 1996,
Memorandum Opinion and Order, 11 F.C.C.R. 15,499 (1996).....................38

In re Starpower Communications LLC, 15 F.C.C.R. 11277 (2000)........................39, 40

Order Adopting Amended Rule; Statement of Factual and
Policy Basis, Docket No. 2001-865 (Me. PUC Dec. 12, 2002)..................47, 48

Order Closing Investigation, Investigation of Compensation by
Global NAPs to Verizon and Other LECs for Interexchange
Internet Traffic and Use of NXX Codes by Global NAPs,
Docket No. 2002-578 (Me. PUC Rel. Nov. 2, 2005)....................................50

Starpower Communications, LLC v. Verizon South Inc.,
Memorandum Opinion and Order, 18 F.C.C.R. 23625 (2003)....................51

Starpower Communications, LLC v. Verizon South Inc.,
Order, 19 F.C.C.R. 7592 (2004) .................................................................51

OTHER:

Global Naps, Inc. v. Verizon New England, Inc.,
No. 05-2657 (1st Cir.), Brief for Amicus Curiae
Federal Communication Commissions (March 13, 2006)............................40

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

One Communications Corp., as successor in
interest to CTC Communications Group, Inc. and
CTC Communications Acquisition Corp.,

                         Plaintiff,

          -against-

JP Morgan SBIC LLC, Sixty Wall Street
SBIC Fund, L.P., The Megunticook Fund II,
L.P., The Megunticook Side Fund II, L.P.,
Kevin O'Hare, Jeffrey Koester, Mellon
Investor Services LLC as nominal defendant
as escrow agent and Verizon New England Inc.
as defendant on a declaratory judgment claim,

                     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Index No. 07 Civ. 3905 (LTS)

ECF

## MEMORANDUM OF LAW IN SUPPORT OF JP MORGAN DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

      Defendants JP Morgan SBIC LLC and Sixty Wall Street SBIC Fund, L.P.

(collectively, "JP Morgan Defendants"), by their undersigned attorneys, respectfully submit this

Memorandum of Law in support of their motion to dismiss the Complaint.

### PRELIMINARY STATEMENT

      This is a textbook case of buyer's remorse, using the familiar ploy of dressing

contract issues up as fraud claims.  In May 2005, the predecessors in interest to plaintiff One

Communications Corp. (collectively, "Plaintiff"), the largest privately held local exchange carrier

(telephone company) in the U.S., acquired a small New England telecommunications company,

Lightship Holding, Inc. and its subsidiary Lightship Telecom LLC (collectively, "Lightship"), after

months of due diligence and vigorous arm's-length bargaining.  The transaction took the form of a

stock purchase and reverse merger, for a purchase price of $67 million, pursuant to an Agreement and Plan of Merger ("Merger Agreement") and other transaction documents. JSR Aff. Exs. 1-4.[1] In connection with the transaction, certain Lightship stockholders, including the JP Morgan Defendants (none of whom were parties to the Merger Agreement), agreed to indemnify Plaintiff against third party claims arising from breaches by Lightship of the representations and warranties it made in the Merger Agreement, under the specific terms and conditions set forth in the Merger Agreement and a related Indemnification Escrow Agreement. JSR Aff. Exs. 1, 3.[2] An "Indemnification Escrow" of $7 million of the purchase price was placed in an escrow account with nominal defendant Mellon Investor Services LLC ("Mellon") to satisfy any bona fide indemnification claims. The Indemnification Escrow was to be released to the Stockholder Representative Committee (which is not a party to this action) in three tranches: $2 million on November 20, 2005; $3 million on November 20, 2006; and the final $2 million on May 20, 2008. JSR Aff. Ex. 1 § 8(x) (p. 52-53).

Shortly before each of the two escrow release dates that have occurred so far, Plaintiff purported to give notice of so-called "indemnification" claims far exceeding the amount of escrow to be released, including a purported notice of the Verizon "Billing Practices" claims raised

---

[1] The Merger Agreement and other documents referenced in the Complaint, on which Plaintiff's claims are based, are exhibits to the Affirmation of Jayne S. Robinson submitted herewith ("JSR Aff. Ex. ___"). The Court is entitled to consider such documents on a motion to dismiss under Fed.R.Civ.P. 12(b)(6). Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002), quoting International Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (on Rule 12(b)(6) motion, court should consider "any statements or documents incorporated . . . by reference" in complaint and any document not incorporated but that is, nevertheless, "integral" to the complaint because the "complaint 'relies heavily upon its terms and effect'"). It is particularly important here for the Court to have the actual documents on which Plaintiff relies, because there are repeated instances in the Complaint where those documents are mischaracterized as to material matters.

[2] In the Merger Agreement, Plaintiff agreed that a Stockholder Representative Committee would be appointed as agent and attorney-in-fact with full authority to act for the stockholders in connection with the indemnity. JSR Aff. Ex. 1 § 8(c)(i) (p. 48-49); Cplt. ¶103.

in this action <u>three days</u> before the November 20, 2006 escrow release date. JSR Aff. Ex. 12; Cplt. ¶ 141. Verizon had <u>never</u> made these claims. As a result of Plaintiff's bogus indemnification claims, no part of the $7 million escrow has been released. Then, having taken no action on its "claims" for six months, Plaintiff filed this lawsuit alleging federal securities fraud only <u>after</u> the Stockholder Representative Committee sued for release of the escrow.[3] And, in a move cynically designed only to bolster its fraud claim, Plaintiff has now <u>invited</u> Verizon to sue it for millions of dollars.[4]

## Summary of Grounds for Dismissal

The JP Morgan Defendants now move to dismiss all claims against them under Fed.R.Civ.P. Rules 9(b), 12(b)(1), 12(b)(6) and 12(b)(7), and 28 U.S.C. § 1367(c), on the following grounds:

The federal securities law claims (Counts I and II) must be dismissed because they utterly fail to meet the heightened pleading requirements for such claims, including those necessary to establish a strong and compelling inference of scienter as to the JP Morgan Defendants under the Private Securities Litigation Reform Act of 1995 ("PSLRA") and the Supreme Court's recent decision in <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 127 S. Ct. 2499 (2007). In addition, <u>none</u> of the purported misrepresentations are alleged with the requisite particularity to have been made by the JP Morgan Defendants, and <u>all</u> of the alleged misrepresentations prior to the Merger Agreement are not actionable as a matter of law under controlling Second Circuit authority. The Complaint also wholly fails to explain with particularity why the representations in the Merger Agreement

---

[3]  The Stockholder Representative Committee suit, <u>Stockholder Representative Committee v. One Communications Corp.</u>, 07 Civ. 3905 (LTS), was commenced in New York State Supreme Court on April 30, 2007, and then removed, and is before this Court as a related action.

[4]  Plaintiff apparently thinks it is going to pass off through the indemnity any claim that Verizon may make against it. <u>See</u> Cplt. ¶ 142.

made by Lightship -- not the JP Morgan Defendants -- were fraudulent, or even how they were

breached. Furthermore, the Complaint fails to allege loss causation as required under Second

Circuit case law.[5] For these and other reasons, the Complaint also fails to state a claim for control

person liability as to the JP Morgan Defendants.

       Similarly, the common law fraud claim (Count III) must be dismissed for failure to

state fraud with particularity. Both the federal and common law fraud claims, based as they are on

purported breaches of contract, must also be dismissed under the settled principle that a fraud claim

cannot be based on a breach of contract.

       Moreover, with the exception of the Great Works Internet ("GWI") customer

concentration issue (discussed at Point I.D, below), as to which no representations were made and

which also fails for lack of causation, the fraud and all other claims rest entirely on purported

"Billing Practices" that allegedly breached "interconnection agreements" between Lightship and

defendant Verizon. The Court lacks jurisdiction to adjudicate that underlying dispute in the first

instance. Under the regulatory scheme established by the Federal Telecommunications Act of 1996

and FCC precedent -- as affirmed by myriad circuit and district courts -- state pubic utility

commissions that approve interconnection agreements <u>must</u> adjudicate disputes arising under those

agreements in the first instance. Here, no party -- including Verizon -- has ever filed a claim with

any state public utility commission alleging any breach of a Lightship-Verizon interconnection

agreement, and this Court is precluded from adjudicating the dispute until that occurs. Indeed, the

need for a predicate state commission finding that Lightship breached its interconnection

agreements with Verizon is self-evident. A state commission finding that Lightship satisfied its

---

[5]  In the interests of avoiding overly duplicative submissions, the JP Morgan Defendants adopt the
arguments made by the other moving defendants, including the arguments of the Megunticook
defendants with respect to the issue of control person liability under the federal securities laws, and
the arguments of the individual defendants with respect to causation issues under Rule 10b-5.

obligations under the interconnection agreement would be fatal to all of Plaintiff's claims. Thus, even if any of Plaintiff's claims were otherwise viable at the pleading stage, which they are not, they would be dismissible for this reason alone.

In addition to the foregoing reasons, the negligent misrepresentation claim (Count IV) must be dismissed under the familiar principle of New York law that a negligent misrepresentation is actionable only when made in the context of a special relationship of confidence and trust. The arm's-length negotiation of this multimillion dollar acquisition transaction by sophisticated parties represented by experienced counsel and investment bankers is, as a matter of law, the antithesis of any such relationship. For a further, overarching reason, the claim must be dismissed because there is no private right of action in New York for negligent misrepresentation arising from a securities transaction; such a claim is preempted by the Martin Act.

The indemnification claim (Count V) must also be dismissed because it is entirely duplicative of the prior pending Stockholder Representative Committee action (the "SRC Action") which is before this Court as a related case, because it raises a host of issues that are not otherwise the subject of this action, and because the Stockholder Representative Committee, which is not a defendant here, is a necessary party to any indemnification claim.

As to both the indemnification claim (Count V) and the declaratory judgment claim (Count VI), the purported dispute under the Verizon interconnection agreements, when and if raised by Verizon, must be adjudicated in the state regulatory commissions in the first instance. Finally, to the extent any state law claims otherwise survive this motion, with the dismissal of the federal

securities law claims, those state law claims (Counts III-VI) should be dismissed under 28 U.S.C.

§ 1367(c)(1) and (3) as well.[6]

**ARGUMENT**

**I.**

**PLAINTIFF HAS FAILED TO STATE**
**SECURITIES FRAUD CLAIMS**
**AGAINST THE JP MORGAN DEFENDANTS**

**The Legal Standards**

      In order to survive a Rule 12(b)(6) motion to dismiss, "the plaintiff must provide

grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief

above the speculative level.'" ATSI Communications, Inc. v. The Shaar Fund, Ltd., 493 F.3d 87, 98

(2d Cir. 2007), quoting Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007). At a

minimum, a plaintiff must plead "enough facts to state a claim for relief that is plausible on its face"

and not merely "conceivable." Bell Atlantic Corp., 127 S. Ct. at 1974.

      To state a claim for relief under Section 10(b) of the Securities Exchange Act of

1934, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, a plaintiff must adequately allege:

(1) that defendants made misstatements or omissions of material fact, (2) with scienter, (3) in

connection with the purchase or sale of securities, (4) upon which plaintiff reasonably relied, and

(5) that plaintiff's reliance was the proximate cause of his injury. Dura Pharm., Inc. v. Proudo, 544

U.S. 336, 341 (2005); Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005), citing In re

IBM Securities Litigation, 163 F.3d 102, 106 (2d Cir. 1998). Scienter requires "'an intent to

deceive, manipulate or defraud.'" Ganino v. Citizens Utils. Co., 228 F.3d 154, 168 (2d Cir. 2000),

quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).

---

[6]  Plaintiff removed the SRC Action from New York State Supreme Court solely on the basis of its
purported Rule 10b-5 claim. With the dismissal of that claim, the alleged basis for federal
jurisdiction is absent, and the SRC Action should be remanded.

In addition, securities fraud claims are subject to the heightened pleading standards of Rule 9(b). See Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004). Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. Rule 9(b). The Second Circuit has established that to state a claim under Section 10(b) and Rule 10b-5, Rule 9(b) requires a complaint to: "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Rombach, 355 F.3d at 170, quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993).

PSLRA further intensifies the scrutiny of a securities fraud complaint on a motion to dismiss. Under PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Lapin v. Goldman Sachs Group, Inc., 2006 WL 2850226 at *5 (S.D.N.Y. 2006).

Indeed, the Supreme Court recently ruled that under PSLRA "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509 (2007):

> It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind. Rather, to determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by [PSLRA] §21D(b)(2) must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, as the Seventh Circuit did, but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct. To qualify as

-7-

>"strong" within the intendment of §21D(b)(2), we hold, an inference of scienter must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

Id. at 2504-05. Therefore, a Rule 10b-5 complaint will survive only if a reasonable person, taking the particularized facts set forth in the complaint as a whole, "would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 2510. The "inference of scienter must be more than merely 'reasonable' or 'permissible' -- it must be cogent and compelling, thus strong in light of other explanations." Id. at 2509-10.

Where, as here, multiple defendants are named in a securities fraud action, Rule 9(b) further "requires that plaintiffs specifically state what each particular defendant did or said, by what means, when, to whom and with what intent." Homburger v. Venture Minerals, Inc., 1985 WL 549 at *2 (S.D.N.Y. 1985); see also Di Vittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987); Rahl v. Bande, 328 B.R. 387, 414 (S.D.N.Y. 2005); Adler v. Berg Harmon Assocs., 790 F. Supp. 1222, 1227 (S.D.N.Y. 1992). Thus a plaintiff "may not rely on sweeping references to acts by all or some of the defendants." Trustees of the Plumbers and Pipefitters Nat'l Pension Fund v. De-Con Mech. Contractors, 896 F. Supp. 342, 347 (S.D.N.Y. 1995); see also Kalin v. Xanboo, Inc., 2007 WL 273546 at *7 (S.D.N.Y. 2007).

Plaintiff's Complaint does not meet any of the pleading requirements set forth above. Plaintiff fails to allege with particularity: that the JP Morgan Defendants made any false statement of material fact to Plaintiff; that Plaintiff reasonably relied on any purported false statement alleged to be attributable to the JP Morgan Defendants; or that the JP Morgan Defendants acted with scienter. Accordingly, the Complaint fails as a matter of law.

-8-

A.    **The Complaint Fails to Allege a False or**
      **Misleading Statement by the JP Morgan Defendants**

The gravamen of the Complaint is that certain of Lightship's alleged "Billing Practices" breached highly complex and technical "interconnection agreements" with Verizon,[7] that Lightship therefore collected revenue that was too high, that Lightship's EBITDA from that revenue was therefore too high, and that Plaintiff therefore paid too much for the company.[8]   The Complaint fails to allege that the JP Morgan Defendants made any false statement to Plaintiff, whether about the interconnection agreements, the alleged "Billing Practices" or otherwise.

Paragraph 111 of the Complaint lists all of the specific communications that Plaintiff asserts were materially false and misleading: a November 2004 Confidential Information Memorandum; Lightship's December 10, 2004 responses to questions; a January 17, 2005 PowerPoint Presentation; telephone conference calls and discussions with members of Plaintiff's due diligence team; March 9, May 11 and May 13, 2005 e-mails transmitting financial and income statements; a March 10, 2005 e-mail; and the Merger Agreement's representations and warranties. None of these specifically identified communications is alleged to be attributable to the JP Morgan Defendants or their representative on the Lightship Board, Stephan Oppenheimer.  Specifically, the JP Morgan Defendants were not parties to the Merger Agreement,[9] did not make the representations

---

[7]   These agreements are discussed at Point II, below.

[8]   For the reasons stated in the brief of the individual defendants, these allegations fail to establish loss causation as a matter of law.

[9]   The Merger Agreement is between CTC Communications Group, Inc. and CTC Communications Acquisition Corp., and Lightship Holding, Inc.  See JSR Aff. Ex. 1 (preamble and p. 59).

and warranties contained in the Merger Agreement,[10] and are not alleged to have authored or participated in any of the other specifically identified communications.

While the Complaint purports to describe the contractual representations and warranties at issue (Cplt. ¶¶ 92-95), it does not state fraud with particularity under PSLRA and Rule 9(b) because it fails to "specify . . . the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), or "explain why the statements were fraudulent." Rombach, 355 F.3d at 170. Two examples illustrate the insufficiency of Plaintiff's conclusory allegations that Lightship's representations in the Merger Agreement were false -- allegations that rest on gross distortions of the representations themselves.

First, paragraph 94 of the Complaint alleges that the representation contained in "Section 4(e)(v) provided that as of the closing date none of the Lightship Companies had any liability to any affiliate of Verizon Communications, Inc. for CABS-related billing of intercarrier compensation." CABS billing[11] to Verizon is at the heart of the Complaint. This allegation materially misstates the representation, which Plaintiff paraphrases but does not quote. The actual representation that Lightship made in Section 4(e)(v) regarding CABS billing to Verizon states in full:

> As of the Closing Date, none of the Lightship Companies has any Liability: (A) to any Affiliate of Verizon Communications, Inc. related to billing for CABS with respect to any intra-LATA toll traffic terminating on Lightship's UNE-P lines, . . .

---

[10]    The Merger Agreement's representations and warranties were expressly and only made by Lightship Holding, Inc., defined in the Merger Agreement as "Holding": "4. **Representations and Warranties of Holding.** Holding represents and warrants to the CTC Entities as follows: . . ." JSR Aff. Ex. 1 § 4 (p. 21).

[11]    "CABS" stands for carrier access billing system, an industry term used generally to describe the means by which carriers bill one another for exchanging telecommunications traffic. See Point II, below.

-10-

JSR Aff. Ex. 1 § 4(e)(v) (p. 25) (emphasis added).  The Complaint <u>drops</u> the crucial reference to "UNE-P lines" and <u>nowhere</u> alleges that any of the "Billing Practices" had anything whatsoever to do with "intra-LATA toll traffic terminating on Lightship's UNE-P lines."  The law requires Plaintiff to state with particularity, <u>i.e.</u>, to explain, how and why this representation was fraudulent.  This, the Complaint wholly fails to do.

       The genesis of the representation about CABS billing to Verizon makes it all the more astonishing that Plaintiff has taken such liberties with what the documents actually say.  This issue of CABS billing to Verizon over UNE-P lines arose at the very end of the months-long due diligence process and was thrashed out in meetings and an email chain -- including the March 10 email quoted below from Mr. Matlack (an outside director for the Megunticook entities) referred to in paragraphs 88 and 111 of the Complaint that Plaintiff contends was "false."  Here again, Plaintiff has selectively quoted something out of context, and has not included the <u>actual</u> email chain on which it relies.  That email chain presents a far different, and utterly innocent, picture from what is alleged in the Complaint.

       The email chain (JSR Aff. Ex. 10)[12] starts with communications between Mr. Matlack and Plaintiff's Chairman, Ken Peterson, about compromise on a final set of open issues.  On March 10 (10:46 p.m.), Matlack again wrote to Peterson, asking for Plaintiff's final proposal by Sunday, March 13, and following up on discussions that day where this issue about Lightship's CABS billing to Verizon over UNE-P lines had arisen:

> We are very confident in our CABs position and do not feel there is an exposure here.  If you want to take Friday to crystallize your views on these issues that is fine.

---

[12]   We quote below the relevant parts of the emails and, for ease of reference, identify them with the time they were sent.  The full emails are submitted as JSR Aff. Ex. 10.

Peterson, who was in Dublin at the time, replied on Friday, March 11 (4:50 a.m.), noting that the

Verizon billing issue had only just arisen and could be the product of a misunderstanding:

> As it has been relayed to me, subject to the proviso that I may have misunderstood or that
> others themselves, on one side or the other, may have misunderstood the issue is related to
> this:
>
> Lantern [Lightship] has a contractual agreement in place with Verizon that governs certain
> relations between the companies. One of the things governed relates to how Lantern will
> bill Verizon for services over UNE-P lines. The contract, as I am told, appears to prohibit a
> certain type of charge that in fact Lantern has been charging. Obviously, this only affects a
> fraction of Lantern's business, but it could result in a material affect [sic] on reported
> EBITDA should it turn out to be prohibited by contract. That's about all I can explain at this
> time. If you, or your trusted representatives, have examined the contract and have examined
> the actual billing practice and concluded that there is Explanation X which allows it
> nonetheless, or Explanation Y which says we have totally misunderstood the issue, then we
> would appreciate knowing it. It is also possible that we might simply disagree about how
> the contract or the billing practice should be interpreted and we just have a disagreement,
> but I would prefer not to assume this out of the box.[13]

Lightship's CEO, Kevin O'Hare, then wrote to Peterson (7:10 a.m.) to clarify the issue:

> I want to clear up an issue discussed between members of our teams yesterday. Lightship
> does bill intra-lata CABS for carriers on UNE-P lines but DOES NOT BILL VERIZON for
> intra-lata CABS on UNE-P lines. I believe this resolves the CABS misunderstanding.

Plaintiff's Ray Allierei responded to O'Hare (9:22 a.m.), referring to a response they had received

from Lightship's Executive Vice President in charge of Regulatory Affairs, Rainer Gawlick:

> This is in direct conflict with Rainer's response in writing, to Pam last night, so you can
> probably understand our concern on this. Can you help me understand why the 2 of you seem
> to have a different point of view? I am out of the office this morning, but will attempt to
> reach you via cell phone. Thanks

O'Hare immediately responded (9:30 a.m.):

> I think it was a misunderstanding between Pam and Rainer. Rainer was answering a
> broader question about whether or not we billed CABS on UNE-P lines. We do bill intra-
> lata CABS to all other carriers on UNE-P lines, all other than Verizon. My answer is

---

[13]   It is obvious from this email that Plaintiff had been given the interconnection agreements with
Verizon as well as what must have been detailed information about billing under those agreements.
See also Cplt. ¶¶ 64-65, 69, 72-73. It is also quite clear that Peterson himself recognized that billing
under these highly complex Verizon interconnection agreements could be a matter of disagreement
about how the contracts should be interpreted.

unambiguous and correct. We do not bill Verizon for intra-lata CABS on UNE-P lines. My understanding of this issue is absolute and complete. You need not concern yourself on this one any longer.

Lightship's investment banker, Michael Quinn, then spoke to Plaintiff's General Counsel, Jim Prenetta, and reported (9:42 a.m.) that "[t]hey will want a specific rep to this effect." That, of course, became the representation about CABS billing to Verizon over UNE-P lines that Lightship made in Section 4(e)(v) of the Merger Agreement which Plaintiff then completely distorted in the Complaint. In light of this documentary record, for Plaintiff to mislead about the Matlack email comment, misstate the Merger Agreement representation, and assert that <u>any</u> of this was false, borders on sanctionable conduct. It also illustrates the wisdom of the rule that requires a plaintiff charging fraud to do more than simply hurl conclusory allegations, but actually to explain the reason why any particular statement is fraudulent.

Yet another example, regarding the representation that Lightship made in the Merger Agreement about its contracts, also demonstrates how Plaintiff both misstates the documents on which it relies <u>and</u> fails to explain why the representations were fraudulent. In paragraph 93, the Complaint alleges that "Section 4(k)(iii) represented that all contracts set forth on schedules attached to the Merger Agreement were in full force and effect and that the applicable Lightship company was not in material default under any such contract, nor did any conditions exist that, with notice or lapse of time or both, would constitute a material default under any such contract." Again, Plaintiff does not quote the representation. The <u>actual</u> representation that Lightship made in Section 4(k)(iii) applies only to "All of the contracts set forth on **Schedule 4(k)(i) and (ii)**." JSR Aff. Ex. 1 § 4(k)(iii) (p. 30) (emphasis in original). Although Plaintiff's claims focus on the interconnection agreements with Verizon, the Complaint <u>does not make</u> the necessary allegation that this representation applied to the Verizon agreements because <u>none</u> of the Verizon agreements were included on Schedule 4(k)(i) and (ii) and, in fact, were <u>excluded</u> from this representation about

-13-

contracts being in full force and effect, etc. The Verizon interconnection agreements are not listed

in Schedule 4(k)(i) and are not "Customer Agreements" in Schedule 4(k)(ii). The Verizon

interconnection agreements -- which were <u>not</u> in "full force and effect" -- are treated separately

from Schedule 4(k)(i) and (ii) on the last page of Schedule 4(k), which states:

> Currently all of Lightship's interconnection agreements with Verizon have expired. Per
> industry practices, Lightship and Verizon continue to operate pursuant to the terms of the
> interconnection agreements on a month-to-month basis. In addition, per industry practice,
> Lightship and Verizon will continue to operate on a month-to-month basis pursuant to the
> terms of the interconnection agreements until the agreements are renegotiated. Lightship
> expects to renegotiate these agreements once the TRRO implementation has completed.
> Lightship has not received notice from Verizon of Verizon's intent to terminate the month-
> to-month operation of the interconnection agreements.

JSR Aff. Ex. 2 (Schedule 4(k)). This is the <u>only</u> statement about the Verizon interconnection

agreements anywhere in Schedule 4(k). In sum, because the Verizon interconnection agreements

were not included in Schedules 4(k)(i) and (ii) -- the only contracts to which the Section 4(k)(iii)

representation alleged in the Complaint applies -- they are specifically excluded from the terms of

the representation made by Lightship in Section 4(k)(iii) and were instead the subject of a separate,

limited disclosure in Schedule 4(k). There is no allegation anywhere in the Complaint that the

statement made in Schedule 4(k) about the Verizon interconnection agreements was false or

fraudulent in any respect.

   The foregoing constitute the only specific statements or representations made by

Lightship in the Merger Agreement with respect to Verizon. Under familiar principles of contract

interpretation, these specific representations as to the Verizon agreements and Lightship's billing to

Verizon control over general statements not specific to Verizon. Because these representations as to

Verizon are nowhere alleged with particularity to have been false, Plaintiff's entire "Billing

Practices" claim collapses of its own weight. Since the Complaint wholly fails to "explain why the

statements were fraudulent" -- much less that the JP Morgan Defendants themselves made these

representations -- the Rule 10b-5 claim must be dismissed as to the JP Morgan Defendants.

The only communications to Plaintiff that the Complaint does attribute to the JP

Morgan Defendants are generically described "telephone conference calls and discussions with

members of CTC's diligence team." Cplt. ¶ 111(d). Plaintiff substitutes verbiage for particularity.

For example, paragraphs 71 and 86 of the Complaint purport to describe these alleged

communications in greater detail but, tellingly, fail to attribute any particular statement, false or

otherwise, to the JP Morgan Defendants or Mr. Oppenheimer:

> 71.    Representatives of the JP Morgan and Megunticook entities (including
> Oppenheimer and Matlack, respectively) were directly involved in the negotiation and
> diligence process throughout. Conference calls addressing important aspects of both the
> deal terms and CTC's diligence requests frequently included O'Hare, Oppenheimer and
> Matlack, among other participants. Certain CTC diligence requests were addressed by
> Oppenheimer and Matlack on Lightship's behalf. Consequently, the JP Morgan and
> Megunticook Entities at all times had a direct, detailed working knowledge of and
> involvement in both the negotiations and the diligence process, and were aware of
> particularly important issues raised in due diligence which impacted the pricing of the deal,
> including information regarding Lightship's billing practices, Lightship's intercarrier
> compensation revenues in Maine and the impact of this information on Lightship's historical
> and projected EBITDA.

> 86.    Throughout the due diligence process, repeated questions regarding Lightship
> billing practices were responded to with false and misleading information. These requests
> for information and the responses thereto were discussed by O'Hare, Wilson, Koester,
> Oppenheimer and Matlack and other members of Lightship's senior management. Each of
> those individuals participated in numerous interstate conference telephone calls and
> exchanged emails with CTC personnel throughout the process, each providing false,
> materially misleading information including assurances regarding Lightship's billing
> practice.

These allegations fall woefully short of the particularity required under Rule 9(b) and PSLRA. As

the Second Circuit recently stated:

> A securities fraud complaint based on misstatements must (1) specify the statements that the
> plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the
> statements were made, and (4) explain why the statements were fraudulent. Novak v.
> Kasaks, 216 F.3d 300, 306 (2d Cir. 2000). Allegations that are conclusory or unsupported
> by factual assertions are insufficient. See Luce v. Edelstein, 802 F.2d 49, 54 (2d Cir. 1986).

ATSI Communications, Inc., 493 F.3d at 99.

There is no allegation of any particular statement to Plaintiff made by Mr. Oppenheimer or the JP Morgan Defendants. The Complaint does not allege where, when or to whom Mr. Oppenheimer or any other representative of the JP Morgan Defendants is supposed to have made or even participated in a false or misleading statement. Nor is the content of any purported representation by Mr. Oppenheimer or the JP Morgan Defendants alleged or how any such representation is meant to have been false or misleading. Merely alleging that these parties, along with others, were involved in numerous, unspecified discussions does not provide the defendants or the Court with the required notice of what the defendant is alleged to have said, when it took place and in what way is it alleged to have been false or misleading. Vague, undifferentiated allegations that lump together multiple parties and multiple communications are not sufficiently particular to survive a motion to dismiss. Kalin, 2007 WL 273546 at *7 ("When multiple defendants are named in an action for fraud or mistake '[Rule 9(b)] requires that plaintiffs specifically state what each particular defendant did or said, by what means, when, to whom and with what intent.' . . . '[P]laintiff may not rely on sweeping references to acts by all or some of the defendants.'") (citations omitted). For these reasons, the securities fraud claims against the JP Morgan Defendants must be dismissed.

**B.** **The Complaint Fails to Allege Reasonable Reliance on Any Alleged Representation of the JP Morgan Defendants**

Even if the Complaint had particularized one or more statements made by the JP Morgan Defendants during the course of due diligence or negotiation -- which it most assuredly does not -- the securities fraud claims against the JP Morgan Defendants must nonetheless be dismissed for failure adequately to allege Plaintiff's reliance on such statements. This was a

-16-

business transaction between sophisticated parties represented by experienced investment bankers

and counsel (Kelley Drye & Warren LLP for Plaintiff). JSR Aff. Ex. 1 § 2(b) (p. 12), § 3(e) (p. 21),

§ 10(g) (p. 56). The terms of the transaction were fully memorialized in a 59 page Merger

Agreement, containing a merger clause (Section 10(c)), 13 pages of representations by Lightship

(Section 4), and another 8 pages of pre-closing covenants by Lightship (Section 5). JSR Aff. Ex. 1.

Most importantly, the Merger Agreement contains an express provision whereby Plaintiff

specifically acknowledged that there were no representations or warranties outside the Agreement:

> **Representations and Warranties.** . . . Each of the CTC Entities acknowledges that the Lightship Companies do not make, and have not made, any representations or warranties relating to the Lightship Companies or the Business, including in the Offering Memorandum or any presentation relating to the Lightship Companies or the Business given in connection with the Transactions, other than those expressly set forth in this Agreement. No Person has been authorized by the Lightship Companies to make any representation or warranty regarding the Lightship Companies or the Business in connection with the Transactions that is inconsistent with or in addition to the representations and warranties expressly set forth in this Agreement or in any of the other Transaction Documents.

JSR Aff. Ex. 1 § 6(d) (p. 44). The Confidential Information Memorandum (JSR Aff. Ex. 8)

referenced in paragraph 111 of the Complaint -- on its very first page -- also specifically disclaimed

the existence of any representations or warranties other than those to be made by Lightship in a final

transaction agreement, and Plaintiff specifically acknowledged in Section 6(d), quoted above, that

there were no representations in that document or any other presentation.

Courts in this Circuit have consistently held that when a sophisticated party to a

business transaction expressly disclaims the existence of representations or warranties outside the

scope of an agreement, that party cannot, as a matter of law, claim justifiable reliance on those same

disclaimed representations in attempting to state a securities fraud claim. In Harsco Corp. v. Segui,

91 F.3d 337 (2d Cir. 1996), the Second Circuit held that an agreement which contains a "no other

representations" clause precludes justifiable reliance where the disclaimer is adequately specific and

the agreement is a "detailed writing developed via negotiations among sophisticated business

-17-

entities and their advisors." Id. at 343. See also ATSI Communications, 493 F.3d at 105 ("Where

the plaintiff is a sophisticated investor and an integrated agreement between the parties does not

include the misrepresentation at issue, the plaintiff cannot establish reasonable reliance on that

misrepresentation."); Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.,

343 F.3d 189, 195-96 (2d Cir. 2003) (finding lack of reliance as matter of law on representation not

included in stock purchase agreement between sophisticated business parties).

        Here, as in Harsco, both parties to the transaction were sophisticated business entities

well represented by counsel, and the detailed Merger Agreement was the product of arm's length

negotiation between parties with equal bargaining power. See JSR Aff. Ex. 1 § 1(b) (p. 12) (Merger

Agreement jointly negotiated and drafted); § 3(e) (p. 21) (Plaintiff's representation and warranty).

As was also the case in Harsco, here the operative representations by Lightship are set forth in detail

in the Merger Agreement (Section 4), and the provisions acknowledging the Merger Agreement

representations and warranties as the only representations and warranties (Sections 6(d) and 10(c))

are clear and unequivocal.  In these circumstances, once Plaintiff entered into the Merger

Agreement, it was precluded as a matter of law from asserting that it justifiably relied on any

representations or communications not set forth in the Merger Agreement.  As a result, the

Complaint's securities fraud claims against the JP Morgan Defendants based on alleged (though

unspecified) communications during the negotiation and due diligence process must be dismissed

for the additional reason that Plaintiff cannot as a matter of law have reasonably relied on such

communications.

**C.**    **The Complaint Fails to Allege that the**
        **JP Morgan Defendants Acted with Scienter**

        The Complaint also falls woefully short of the Supreme Court's Tellabs standards for

pleading particularized facts giving rise to a strong inference that the JP Morgan Defendants acted

with scienter. In the words of the Supreme Court, the inference of scienter must be more than merely "plausible," "reasonable" or "permissible." It must be "cogent and compelling, thus strong in light of other explanations" and "any opposing inference of nonfraudulent intent," which "the court must take into account." Tellabs, 127 S. Ct. at 2504-05, 2510.

In order to plead the scienter element, the Complaint must, at a minimum, state particularized facts giving rise to a strong inference that the JP Morgan Defendants (through Mr. Oppenheimer[14]) knew or were reckless in not knowing that (i) Lightship's "Billing Practices" breached the Verizon interconnection agreements (a claim that had never been made by Verizon and one that has not been established to this day); (ii) that "fact" (or legal conclusion) was falsely represented to Plaintiff; and (iii) the impact of the improper "Billing Practices" on the transaction was material. No such particularized facts are pleaded with respect to the JP Morgan Defendants or Mr. Oppenheimer. Instead, the Complaint merely makes the following conclusory assertions:

> Oppenheimer and Matlack knew or should have known that this financial information contained in the [January 17, 2005] PowerPoint presentation was false, materially misleading and based in material part upon various of the Undisclosed Lightship Billing Practices and that the [unspecified] representations regarding billing practices were materially false and directly inconsistent with various of the Undisclosed Lightship Billing Practices in which Lightship was actually engaged. Cplt. ¶ 79.

> Oppenheimer and Matlack knew or should have known that this information [provided by others to Plaintiff from March 21, 2005 through the closing] was false, materially misleading and based upon the Undisclosed Lightship Billing Practices. Cplt. ¶ 98.[15]

Nowhere does the Complaint allege any facts indicating that the JP Morgan Defendants or Mr. Oppenheimer knew, learned of, were informed about or otherwise were exposed to information that led them to conclude that Lightship's "Billing Practices" under the complex Verizon

---

[14]   Mr. Oppenheimer was an outside director, not a member of Lightship's management. Cplt. ¶¶ 28, 34.

[15]   The allegations that Mr. Oppenheimer "should have known" something alone defeat a strong inference of scienter under Tellabs because they raise no cogent or compelling inference of intention (or recklessness tantamount to intention), as opposed to mere negligence.

interconnection agreements were improper, still less that any alleged impropriety had a material impact. Lightship had experienced management, including a seasoned CFO and an Executive Vice President in charge of Regulatory Affairs, see JSR Aff. Ex. 8 (p. 24), and, like all telecom companies, outside regulatory counsel. See JSR Aff. Ex. 6 (Feb. 28, 2002 letter from Harry N. Malone III of Swidler Berlin Shereff Friedman, LLP). There is no allegation that Mr. Oppenheimer, an outside director for a financial investor, had expertise about the complex state-specific telecommunications regulatory regimes in which Lightship operated (see Point II, below), the ins and outs of Lightship's CABS billing, the interconnection agreements, or any regulatory requirements regarding intercarrier compensation. There is no allegation that Darren Kreitler -- the billing "manager" who figures prominently in the Complaint -- had expertise in any of these matters or, more importantly, brought any of his alleged concerns about Lightship's "Billing Practices" to the attention of Mr. Oppenheimer or the Board. There is also no allegation that Mr. Oppenheimer profited personally from the alleged fraud.[16] All of these factors create a strong inference that Mr. Oppenheimer utterly lacked any intent to defraud -- whereas Plaintiff's conclusory allegations raise no other inference at all.

The closest the Complaint comes to linking the JP Morgan Defendants to any billing issue (tellingly, not the "Billing Practices" related to Verizon that are alleged) is an assertion that Mr. Oppenheimer discussed with Lightship management Lightship's responses to Plaintiff's inquiries about billing, and a reference to two e-mail messages in which billing was mentioned. Neither of these, either separately or together, comes close to raising the requisite strong inference

---

[16]   Nor does the fact that the JP Morgan Defendants received the same benefits as all the other selling stockholders (Cplt. ¶ 114) advance the ball for Plaintiff. See, e.g., Kalnit v. Eichler, 264 F.3d 131, 141-42 (2d Cir. 2001) (desire to achieve the most lucrative acquisition proposal does not establish scienter; benefit similar to other shareholders does not supply motive); Novak, 216 F.2d at 307-08 (same).

of scienter, much less a cogent and compelling inference when contrasted with the strong opposing inferences of nonfraudulent intent.

Paragraph 86 of the Complaint alleges in pertinent part: "These requests for information [regarding unspecified billing practices] and the responses thereto were discussed by O'Hare, Wilson, Koester, Oppenheimer and Matlack and other members of Lightship's senior management." Nothing is alleged about the substance of these discussions or how they might have imparted knowledge to Mr. Oppenheimer about any issues with the "Billing Practices" alleged in the Complaint. Paragraphs 88 and 89 of the Complaint allege:

> 88.    On March 10, 2005, Matlack sent an e-mail to Peterson, Prenetta, other CTC employees, and Oppenheimer. In this e-mail Matlack stated, *inter alia*, "[W]e are very confident in our CABS position and do not feel there is an exposure here."

> 89.    On March 12, 2005, in an e-mail chain between, *inter alia*, Oppenheimer, Matlack and O'Hare, these individuals discussed requests for Lightship billing information from Prenetta. In this e-mail chain, Oppenheimer suggested that additional information on Lightship's CABS should not be provided, recognized that disclosure of the information sought might raise additional questions and raised the issue of whether the information sought would impact the valuation.

The first of these emails is discussed in Point I.A above. The comment refers to the particular aspect of CABS billing to Verizon over UNE-P lines that was under discussion at the time, which is nowhere alleged to be false. Nothing about having been copied on that email chain -- including the unequivocal statement from Lightship's CEO that Verizon was <u>not</u> billed for this -- can give rise to an inference of scienter on Mr. Oppenheimer's part. We submit it is impossible to infer that Mr. Matlack's[17] expression of <u>confidence</u> in Lightship's CABS position is tantamount to Mr. Oppenheimer's knowledge that the opposite was true. Indeed, the inference of nonfraudulent intent is the only possible one.

---

[17]    Mr. Matlack was an outside director affiliated with the Meganticook entities unrelated to the JP Morgan Defendants. Cplt. ¶¶ 31, 34.

-21-

The same is true with respect to the March 12, 2005 e-mail chain that the Complaint yet again mischaracterizes and pointedly fails to quote.[18]  By March 12, Plaintiff's team had already spent months on due diligence.  The fire drill over UNE-P lines had just ended.  The deadline for a deal was the next day.  The email chain (JSR Aff. Ex. 11) starts with a message to Plaintiff's team from Lightship's CEO Kevin O'Hare on Friday evening, March 11 (6:48 p.m.), saying that O'Hare believed he had "answered all of your questions."  Plaintiff's Jim Prenetta responded to O'Hare (8:10 p.m.) saying:  "I am still looking to talk about the specific issues that I left you a message on concerning CTC's [Plaintiff's] Nov 1, 2004 bills" and asking O'Hare to call him on Saturday. Having been copied on these messages, Oppenheimer asked O'Hare (9:10 p.m.):

> What questions are these and are you ok with this?  Are they determinants of value?  Is it worth the time and can they be answered quickly or will they create more questions?

O'Hare responded the next morning (10:43 a.m.):

> I have asked Jim [Prenetta] to specify the question and provide a copy of the bill he is looking at.  <u>If I can help I will but at this stage can not possibly imagine that it is value affecting.</u>  There has been no previous indication of concern on an issue with our carrier bill to CTC [Plaintiff].

> I wrote Jim an email a while ago and have not yet heard back from him on this.

(Emphasis added).  Oppenheimer replied (11:13 a.m.), "Sounds good" and "Obviously they should not need any more info at this point."

These internal emails between O'Hare and Oppenheimer completely negate any inference of scienter on Oppenheimer's part (and O'Hare's for that matter).  First, Prenetta was asking about <u>Plaintiff's</u> bill, not about Lightship's billing to Verizon (which was the subject of the UNE-P lines debate that had just been resolved).  Second, Oppenheimer was expressly assured by Lightship's CEO that the questions would not have an impact on value:  O'Hare could "not possibly

---

[18]   This email chain contains the <u>only</u> statements (albeit not even ones to Plaintiff) that Mr. Oppenheimer is alleged to have made.

imagine" that there could be an impact on value. How any reasonable person could possibly draw any inference that Oppenheimer (and O'Hare) <u>knew</u> that these questions <u>would</u> have any impact -- much less a material impact -- on value is mind-boggling. This would stand PSLRA and <u>Tellabs</u> on their heads. It cannot possibly be the case that a strong and compelling inference of scienter can be drawn by inferring the <u>exact opposite</u> of what defendants have said to each other internally. If that were the law, every innocent statement would <u>ipso facto</u> become a sufficient basis for an allegation of fraud. The only reasonable inference that can be drawn from this internal email communication is that Oppenheimer (and O'Hare) did <u>not</u> think that Plaintiff's questions were material to value or that there were any billing problems that needed to be hidden.

The subsequent and more detailed message from O'Hare in the chain bears this out. O'Hare wrote to the Lightship team (11:47 a.m.):

> I spoke to Prenetta. He has detailed questions on our CABS bill to CTC [Plaintiff]. I have asked him to send me the bill and told him I will need to review with Nick Zeitvogel who is flying to Texas right now. They have concerns because our CABS bills look different than theirs and wants to make sure we are not overbilling our carrier customers. I don't know any more at this point. <u>My biggest complaint on this issue is that they have had this information for some time and they could have asked for a review of this sooner.</u>

> I won't know if there is any sort of problem until I review this bill with Nick and Koester which I probably won't be able to get done until this afternoon. Obviously I will push to get an answer for ourselves ASAP.

(Emphasis added.) Oppenheimer responded (11:54 a.m.) that, given the deadline the next day for Plaintiff's final proposal, they should be upfront with the other side. Contrary to Plaintiff's mischaracterization, Oppenheimer did not suggest that information "should not be provided," only that the Lightship team should understand the information first:

> I think that is right to <u>get an answer for us internally first, to understand it, but not communicate it to the other side until then.</u> Unless others disagree, <u>because of the time it will take to get an answer</u> and then to discuss if/how a response is warranted, <u>I recommend telling Prenetta in an email, cc'g everyone, that they have had this information for a while and they should be prepared to meet our deadline tomorrow without an answer to that question.</u>

-23-

(Emphasis added.) The only reasonable inferences about Oppenheimer's state of mind that can be drawn from this email chain (JSR Aff. Ex. 11) are completely consistent with innocence: Oppenheimer was assured the issue had nothing to do with value; he was told Plaintiff had had the bill it was questioning for many months; the issue did not involve Verizon; and he believed Plaintiff should be told straight up that it would have to meet Lightship's deadline without an answer to its last minute questions.[19]  Nothing about this email chain gives rise to a strong and compelling inference of scienter. Indeed, the exact opposite is true. Therefore, Plaintiff's failure to plead facts giving rise to a strong and compelling inference of scienter alone warrants dismissal of the securities law claims against the JP Morgan Defendants.

**D.     The Allegations Regarding
        GWI Fail to State a Claim**

Apart from the "Billing Practices" issue, the only other allegations involve a purported failure during due diligence to disclose concentration information about a particular customer, Great Works Internet ("GWI"). These allegations also fail to state a claim. As demonstrated above, no statements made during the due diligence process are attributed to the JP Morgan Defendants with the requisite particularity, and Plaintiff could not have reasonably relied on such statements as a matter of law. Also as demonstrated above, the JP Morgan Defendants were not parties to the Merger Agreement and made none of the representations therein. Indeed, no statements about GWI are alleged to have been made by the JP Morgan Defendants at any time.

---

[19]   As to this last point, even if it had been suggested that the request be denied altogether, such a denial would not be fraudulent. Harsco, 91 F.3d at 347 (denial of request for information not fraudulent unless it falsely suggests information does not exist). Moreover, in the Merger Agreement Plaintiff specifically disclaimed having been denied information it requested, by representing and warranting that it had "the opportunity to ask questions of the [Lightship] Executive Officers and to acquire such additional information about the Business and financial condition and results of operations of Lightship as [it] has requested." JSR Aff. Ex. 1 § 3(e) (p. 21).

-24-

But beyond that, the allegations regarding the due diligence process do not make out an actionable misstatement or omission regarding GWI. On the contrary, Plaintiff alleges that it requested certain information regarding customers, and that Lightship refused to disclose that information. In the context of an arm's length negotiation for the sale of a company, that a potential buyer wanted certain information is legally irrelevant. Plaintiff knowingly chose to go forward with the transaction without the requested information. Plaintiff's allegations demonstrate the absence of reliance as a matter of law. Moreover, the representations regarding customers that were actually made by Lightship in the Merger Agreement are not alleged to have been false any way.

Plaintiff alleges:

> In or about October 2004, the largest ISP in Maine, Great White [sic] Internet ("GWI"), entered into a contract with Lightship for Lightship to provide all of GWI's telecommunication services, by and through which GWI's thousands of customers would access the internet. By January 2005, intercarrier compensation stemming from calls bound for GWI constituted Lightship's single largest source of revenue in Maine, which was Lightship's largest revenue producing State. Cplt. ¶ 35.

Plaintiff then alleges that Lightship's investment banker (not Mr. Oppenheimer) stated during due diligence that certain of Lightship's revenues "were largely shielded from this rate drop because of an increase in minutes as a result of overall growth. As indicated in the Information Memorandum, Lightship's business has doubled in size in the past 24 months. This increase in traffic volume compensated for any drop in the FCC rates." Cplt. ¶ 65. Plaintiff alleges that these statements by the investment banker were "misleading because they claimed to offset FCC mandated rate drops with 'overall growth' without noting that this 'overall growth' resulted almost exclusively from Lightship's contract with a single customer in Maine, GWI." Cplt. ¶ 67. Finally, Plaintiff alleges that "[i]n February 2005, CTC specifically requested information [customer lists with monthly billings] seeking to determine whether various types of Lightships [sic] revenues depended upon a

-25-

stable, broad mix of customers, or upon a less stable smaller number of customers" -- and that Lightship "failed" to provide this information. Cplt. ¶ 83.

     Nowhere is it alleged that Lightship actually provided false or misleading information about its customers -- only that Lightship did not provide specific, detailed information about customers and their billings to one of its chief competitors that may or may not have ended up as the successful bidder or gone forward with a transaction. Stating accurately that a company has experienced "overall growth" is not a fraud (nor is this statement by the investment banker alleged to be linked to the JP Morgan Defendants). Declining to provide a competitor, with whom one is negotiating, confidential competitive information is not a fraud. The bidder has a choice -- proceed without the information or withdraw.

     Having asked for detailed information identifying customers and billings and not gotten it, Plaintiff could not reasonably have relied on the absence of the very information it knew it did not have. In lieu of reliance, Plaintiff alleges nothing more than that it would have reduced its offer had Lightship disclosed its revenue from GWI. Cplt. ¶ 83. This is simply not the stuff of fraud. See Harsco, 91 F.3d at 347 ("[I]t cannot be said that denial of a request to see documents could constitute fraud, unless that denial suggested falsely and deceitfully that those documents did not exist.")

     The GWI allegations fail to meet the pleading requirements for transaction causation. As this Court has stated, "transaction causation is generally understood as reliance." Greenwald v. Orb Communications & Marketing, Inc., 192 F. Supp.2d 212, 226 (S.D.N.Y. 2002) (Swain, J.). As noted in the Greenwald case, the settled law under Rule 10b-5 is that, to satisfy the pleading requirements with respect to causation, plaintiff must allege, among other things, "transaction causation, i.e., that but for the fraudulent statement or omission, the plaintiff would not have entered into the transaction; . . ." Id., quoting Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 186 (2d

-26-

Cir. 2001) (quoting Suez Equity Investors v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir.

2001)). Plaintiff has wholly failed to allege that but for the omission of information about GWI it

would not have entered into the transaction here. Indeed, Plaintiff's allegations demonstrate just the

opposite and completely negate transaction causation. Plaintiff affirmatively alleges that it asked

for but did not receive the information, knew it did not have the information, and went ahead with

the transaction anyway. This alone is grounds for dismissal as to any fraud claim arising from the

GWI issue.

Finally, the Complaint is completely devoid of any allegation that the representations

made by Lightship (not the JP Morgan Defendants) in the Merger Agreement about GWI were

false. The only contractual representations mentioned in the Complaint are those set forth in

Sections 4(e), (h), (i) and (k) of the Merger Agreement. Cplt. ¶¶ 92-94. Section 4(k) deals

specifically with Lightship's contracts. None of the other representations is alleged to have any

relevance to the GWI issue.

With respect to Section 4(k), the entirety of what Lightship represented may be

summarized as follows:

> (i) It was providing a schedule of all its contracts regarding leases of real property,
> leases for personal property involving annual payments in excess of $10,000, contracts with
> a term of more than one year or that involved annual payments by Lightship in excess of
> $30,000, all maintenance contracts or similar agreements relating to the business or
> intellectual property, all contracts involving minimum purchase requirements, and all other
> material contracts;

> (ii) It was providing two CD ROMS listing all customers which it was currently
> billing for services either on a monthly basis or pursuant to a fixed term arrangement; and

> (iii) The contracts set forth on the above schedules (i) and (ii) were valid and
> binding, that Lightship was not in material default, and statements of similar import.

JSR Aff. Ex. 1 § 4(k) (pp. 29-30). None of these representations is alleged to have been false, and

Plaintiff had this information regarding Lightship's contracts for the two months between the

-27-

signing of the Merger Agreement and the closing of the transaction.  Moreover, the GWI claim flies

in the face of the specific representation and warranty that Plaintiff made in the Merger Agreement

that it had had the opportunity "to acquire such additional information about the Business and

financial condition and results of operations of Lightship as [it] has requested." JSR Aff. Ex. 1

§ 3(e) (p. 21).  In short, Plaintiff knew exactly what type of information Lightship was and was not

prepared to disclose regarding its customers, negotiated and signed a Merger Agreement accepting

only that information, so represented, and closed the transaction on that basis.  For all the foregoing

reasons, Plaintiff's allegations regarding the GWI issue fail to state a claim.

**E.     The Complaint Fails to
        Allege Control Person Liability**

The JP Morgan Defendants adopt by reference the arguments made by the

Megunticook Defendants regarding control person liability under Section 20(a) of the Securities

Exchange Act of 1934, 15 U.S.C. § 78t(a).  We discuss the law and address separately the absence

of sufficient factual allegations that the JP Morgan Defendants controlled Lightship or were

culpable participants in the alleged fraud.

**1.     The Complaint Fails to Allege that the
        JP Morgan Defendants "Controlled" Lightship**

To successfully plead control over a primary violator, a complaint must allege facts

that show that "the defendant possessed 'the power to direct or cause the direction of the

management and policies of [the primary violator], whether through the ownership of voting

securities, by contract, or otherwise.'" S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1472-73 (2d

Cir. 1996), quoting 17 C.F.R. § 240.12b-2.  In addition, a plaintiff must allege facts demonstrating

that the Section 20 defendant not only had the power to control the general affairs of the primary

violator, but also the "power to control or influence the specific corporate policy underlying the

alleged primary violation of the securities laws." In re Friedman's Inc. Sec. Litig., 385 F. Supp.2d

-28-

1345, 1373 (2d Cir. 1996) (dismissing Section 20 claims against defendant said to have exerted

general control over the defendant company's operations, but not over the company's financial

reporting which formed the basis of the plaintiffs' claims). See Kalin, 2007 WL 273546 at *10

("Actual control over the alleged wrongdoer and the purported transactions at issue is essential for

control person liability."); In re Alstom SA, 406 F. Supp.2d 433, 494-96 (S.D.N.Y. 2005) (§20

claims require pleading of actual control over the company and the transaction in question).

      Mere allegations of a majority shareholding and board representation are insufficient

to support a control person claim under Section 20. In Food and Allied Service Trades Dept. v.

Millfield Trading Co., 841 F. Supp. 1386, 1391 (S.D.N.Y. 1994) (court's further ruling that

allegations of culpable participation not required at pleading stage abrogated by later cases), a

Section 20 defendant was a director of the primary violator and a "major stockholder," but not an

officer or employee of the company.  Plaintiff alleged that the defendant's "timely divestment of his

[stock], along with the fact of his positions as [the company's] director and major stockholder . . .

support the inference that [he] exercised control over [the company] . . . and initiated, participated

in, knew about, and permitted the wrongs alleged herein." Id. at 1389.  The court disagreed and

dismissed the Section 20 claim, holding that the plaintiff had not alleged that the defendant

possessed a controlling block of the primary violator's stock, and had not alleged that the defendant

"was involved in the [company's] day-to-day operations or that he had anything to do with the

preparation or review" of the alleged fraudulent public statements. Id. at 1391.[20]

---

[20]  Compare In re BYSIS, 397 F. Supp.2d 430, 451-52 (S.D.N.Y. 2005) (control adequately
pleaded where complaint alleged: (i) defendants had served as either President, CEO, COO or CFO
of company, (ii) each defendant personally signed financial statements that contained alleged
misrepresentations, (iii) each defendant "had direct and supervisory involvement in the day-to-day
operations of the Company," and (iv) each defendant was involved in "drafting, producing,
reviewing and/or disseminating the [alleged] false and misleading statements"); In re Leslie Fay
Companies, Inc. Sec. Litig., 918 F. Supp. 749, 763-64 (S.D.N.Y. 1996) (control adequately pleaded
where complaint specifically alleged that directors reviewed and signed SEC filings containing

> [W]hen a defendant does not clearly occupy control status, the plaintiff must plead facts from which control status can be inferred, *e.g.,* that defendant had power, pursuant to an agreement to control the primary violator or aided the primary violator in performing some culpable conduct linking the defendant to the primary violation for which relief is sought.

Sloane Overseas Fund, LTD v. Sapiens International Corp., 941 F. Supp. 1369, 1378 (S.D.N.Y. 1996), citing Food and Allied Service Trades Dept., 841 F. Supp. at 1391. Pleading legal conclusions does not suffice. Rich v. Maidstone Financial, Inc., 2002 WL 31867724 at *11 (S.D.N.Y. 2002) ("A complaint must allege facts from which it can be inferred that the defendant had actual power or influence over the controlled person.")

Here, the Complaint alleges only that the two JP Morgan Defendants together had a "majority equity stake" in Lightship (Cplt. ¶ 30) and that Mr. Oppenheimer was the JP Morgan Defendants' designee on the Board (Cplt. ¶ 34). Neither Mr. Oppenheimer nor any other JP Morgan representative is alleged to have been an officer or employee of Lightship. The Complaint does not allege: that the JP Morgan Defendants directly managed Lightship or participated in, or had supervisory or managerial control over, the daily affairs of Lightship; or that the JP Morgan Defendants' equity interest in Holding was a controlling interest, or gave them the power to control or direct the affairs of Lightship, or that they in fact did so. Mere allegations of a directorship or a majority stockholding are insufficient to support an inference of actual control on the part of the JP Morgan Defendants. See In re Philip Services Corp., 383 F. Supp.2d 463, 485 (S.D.N.Y. 2004) (bare allegation of director status without more is insufficient pleading of control); In re Livent, Inc. Sec. Litig., 78 F. Supp.2d 194, 221 (S.D.N.Y. 1999) (pleading officer or director status alone is not enough); Rubinstein v. Skyteller, Inc., 48 F. Supp.2d 315, 318, 323 (S.D.N.Y. 1999) (allegations

---

fraudulent financial information and specifically alleged that they were in position to control and influence company's business and operations, particularly as to accounting and financial reporting policies).

that defendant was co-owner of majority of stock and <u>de facto</u> and <u>de jure</u> treasurer and chief

financial officer deemed insufficient to plead control).

       As for the "Billing Practices" at issue, the Complaint is devoid of factual allegations

that the JP Morgan Defendants or Mr. Oppenheimer had control over any of Lightship's billing

practices or any statements made about them to Plaintiff.  The Complaint's vague and conclusory

allegations fail to support a reasonable inference that the JP Morgan Defendants controlled

Lightship for purposes of stating a claim of Section 20(a) control person liability.  Accordingly, this

claim should be dismissed.

### 2.    The Complaint Fails to Allege "Culpable Participation" by the JP Morgan Defendants

       The Second Circuit has held that "[i]n order to establish a <u>prima facie</u> case of

controlling person liability, a plaintiff must . . . show that the controlling person was in some

meaningful sense [a] culpable participant [ ] in the fraud perpetrated by [the] controlled person."

<u>First Jersey Sec., Inc.</u>, 101 F.3d at 1472 (internal quotations omitted); <u>Boguslavsky v. Kaplan</u>, 159

F.3d 715, 720 (2d Cir. 1998); <u>In re Emex Corp. Sec. Litig.</u>, 2002 WL 31093612 at *9 (S.D.N.Y.

2002) (Second Circuit "clearly states that a <u>prima facie</u> case requires a showing of culpable

participation"); <u>Maidstone Financial</u>, 2002 WL 31867724 at *12 (50-75% stock ownership not

sufficient to show culpable participation).

       Moreover, numerous courts have held that in light of PSLRA, a Section 20(a) claim

must be pled with sufficient particularity to raise a strong inference that the alleged controlling

person knew or was reckless in not knowing that the controlled person was engaging in fraudulent

conduct.  <u>See</u> <u>Kalin</u>, 2007 WL 273546 at *12 ("[T]o withstand a motion to dismiss, a section 20(a)

claim must allege, at a minimum, particularized facts of the controlling person's conscious

misbehavior or recklessness."); <u>Deutsche Telekom AG Sec. Litig.</u>, 2002 WL 244597 at *7

(S.D.N.Y. 2002) (applying "culpable participation" requirement at pleading stage); Cromer Finance

Ltd. v. Berger, 137 F. Supp.2d 452, 484 (S.D.N.Y. 2001) (culpable participation element is subject

to PSLRA's heightened pleading standard); Gabriel Capital, L.P. v. Natwest Fin., Inc., 122 F.

Supp.2d 407, 426-28 (S.D.N.Y. 2000) (same); Mishkin v. Ageloff, 1998 WL 651065 at *23, *25

(S.D.N.Y. 1998) (because plaintiff must ultimately show that controlling person was "in some

meaningful sense a culpable participant," PSLRA requires that complaint allege particular facts that

give rise to "strong inference" "of the controlling person's conscious misbehavior as a culpable

participant in the fraud"). Here the Complaint fails to allege particularized facts to show either

culpable participation by the JP Morgan Defendants in the wrongs alleged or knowledge on their

part of fraud or wrongdoing on the part of Lightship.[21]  Indeed, Plaintiff has not alleged that the JP

Morgan Defendants or Mr. Oppenheimer were involved in the day-to-day operations of Lightship,

or that they had any involvement, influence, or responsibility regarding decision-making with

respect to the allegedly improper "Billing Practices" of Lightship or statements made to Plaintiff

about those "Billing Practices." The only allegations in the Complaint about the JP Morgan

Defendants are that: they exercised oversight (Cplt. ¶ 28); Mr. Oppenheimer received unspecified

financial and operating reports (Cplt. ¶ 34); and he was involved in the negotiations and due

diligence and had unspecified information about billing practices, revenues and the "impact of this

information on Lightship's historical and projected EBITDA" (Cplt. ¶ 71). None of these

allegations state or support an inference that the JP Morgan Defendants or Mr. Oppenheimer

participated in or controlled Lightship's "Billing Practices" or any statements made about them.

Finally, for the reasons stated in Point I.C, above, the Complaint fails to allege

particularized facts to support a strong inference that any alleged participation by the JP Morgan

---

[21] As noted in the Megunticook brief, the alleged primary violator for the Section 20 claim (Count
II) is Lightship (which is not a defendant), and the only parties charged under Section 20 are the two
outside financial investors -- who each had only one representative on the Board. See Cplt. ¶ 34.

Defendants was done with the requisite culpable intent. Indeed, the only allegations that purport to allege scienter on the JP Morgan Defendants' part are either too vague and conclusory to be meaningful (Cplt. ¶¶ 79, 86, 98), or tend strongly to negate any inference of culpable knowledge (Cplt. ¶¶ 88-89). Because Plaintiff's conclusory allegations fall far short of showing that the JP Morgan Defendants or Mr. Oppenheimer were in any meaningful sense culpable participants in the alleged fraud, the Section 20 claim against the JP Morgan Defendants must be dismissed.

II.

**THE "BILLING PRACTICES" CLAIMS
MAY NOT BE ADJUDICATED
BY THIS COURT IN THE FIRST INSTANCE**

Apart from the throwaway GWI issue, the essential underpinning of all Plaintiff's claims is the allegation that the purported "Billing Practices" in the period before the acquisition breached Lightship's interconnection agreement with Verizon in the State of Maine, and similar interconnection agreements in Vermont and New Hampshire. As demonstrated below, before any claim based on breach of an interconnection agreement can be adjudicated in federal court, the issue of whether there was a breach must first be brought before the state public utility commissions that approved the agreements. Thus, even if the Complaint stated a viable fraud or other claim -- which it surely does not -- the merits could not be adjudicated in this Court in the first instance.

**The Legal Standards**

Interconnection agreements arose in the wake of the new competitive regime ushered in by the Federal Telecommunications Act of 1996, Pub. L. No. 104-404, 110 Stat. 56 (1996) (the "Act"). Among other things, the Act established a duty upon incumbent local exchange carriers (telephone companies known as "ILECs", such as defendant Verizon) to "interconnect" (i.e., physically connect networks) with competitive local exchange carriers (telephone companies known

-33-

as "CLECs", such as Lightship) according to rates, terms and conditions that are just, reasonable and nondiscriminatory. See 47 U.S.C. § 251(c)(2).

      Generally speaking, telecom carriers that are "interconnected" pay each other for "terminating" calls on one another's networks. That is, the "originating" carrier, whose customer makes the call, pays the "terminating" carrier, whose customer receives the call, for completing the call, at different rates per minute for local or toll calls. The terminating carrier provides switching functionality and "last mile" connectivity to the originating carrier, and is compensated for that service (i.e., termination). These compensation obligations are bilateral, that is, when a CLEC customer originates a call, the CLEC pays the ILEC for terminating the call and vice versa. Because of the complexity of the federal and state-by-state regulatory schemes involved and the vast sums that change hands between carriers ($8-$10 billion annually), intercarrier compensation issues stemming from interconnection agreements between ILECs and CLECs are among the most complex, uncertain and hotly disputed issues under the Act -- itself a morass as to which the Supreme Court has said: "It would be gross understatement to say that the Act is not a model of clarity. It is in many important respects a model of ambiguity or indeed even self-contradiction." AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 397 (1999).[22]

---

[22]   Adding to the complexity, two separate provisions of the Act set forth the framework for compensation payments between carriers. First, Section 251(g) addresses traffic classified as "Exchange Access," "Information Access," and "exchange services for such Exchange Access." 47 U.S.C. § 251(g). Under this regime, the FCC has classified dial-up calls to Internet Service Providers (at least those that originate and terminate in the same local calling area, although state-by-state controversy exists here as well) as "information access." Implementation of the Local Competition Provisions in the Telecommunications Act of 1996; Intercarrier Compensation for ISP-Bound Traffic, Order on Remand and Report and Order, 16 F.C.C.R. 9151, 9168 (2001) ("ISP Remand Order"), remanded without vacatur, WorldCom v. FCC, 288 F.3d 429 (D.C. Cir. 2002), cert. denied, 538 U.S. 1012 (2003). A separate provision of the Act, Section 251(b)(5), addresses intercarrier compensation for all "telecommunications" not otherwise subject to Section 251(g), which the FCC has described as a "carve out" from Section 251(b)(5). Id. at 9166-67. Although the FCC has repeatedly found that the cost of providing traffic termination does not vary by traffic type (or statutory classification), id. at 9194-95, the rates for traffic termination vary wildly

Plaintiff's allegations that Lightship's alleged "Billing Practices" breached the interconnection agreement with Verizon approved by the Maine Public Utilities Commission (the "Maine PUC"), JSR Aff. Ex. 6, (and similar agreements between Lightship and Verizon approved by the state commissions in Vermont and New Hampshire) state nothing more than a potential contractual dispute with Verizon (which to the date Plaintiff filed this suit Verizon had never even asserted) over the interpretation and application of these highly complex interconnection agreements, the enforcement of which is charged to the state public utility commissions that approved them in the first instance. 47 U.S.C. § 252(e). Accordingly, the underlying contractual issue whether Lightship's alleged "Billing Practices" breached its interconnection agreements is not ripe for adjudication by this Court. To the extent that any of Plaintiff's claims otherwise survive this motion to dismiss, all claims based on "Billing Practices" must be dismissed for this wholly separate jurisdictional reason. Before such claims can be litigated in federal court, they must first be presented by Verizon to the state commissions that approved the interconnection agreements with Lightship and litigated before those state commissions. In the most recent decision directly on point handed down on July 18, 2007, in a case between Verizon and another CLEC, the Third Circuit ruled: "Pursuant to the FCC's guidance, we hold that interpretation and enforcement actions that arise after a state commission has approved an interconnection agreement must be litigated in the first instance before the relevant state commission." Core Communications, Inc. v. Verizon Pennsylvania, Inc., 493 F.3d 333, 344 (3d Cir. 2007) (emphasis added).

---

depending on the ultimate regulatory classification of a call. Because no economic or cost basis exists for having different regulated rates for providing identical functionality, the FCC has been working with state commissions and others since 2001 to "unify" intercarrier compensation rates. The ever-evolving technical and regulatory issues associated with intercarrier compensation has resulted in myriad disputes before a number of state public utilities commissions, which have implemented a wide range of decisions tailored to meet their individual state's needs.

Circuit courts have uniformly held that state pubic utility commissions have the authority to adjudicate interconnection agreement disputes in the first instance.[23] Myriad district courts similarly have found that they lack jurisdiction to hear interconnection agreement claims absent a prior state commission determination.[24] Indeed, the most recent and comprehensive decision to date -- that in Core -- adopted wholesale the position advocated by Verizon on this very point. Namely, Verizon argued -- and the district court and Third Circuit agreed -- that a dispute arising under an interconnection agreement must be presented to the state public utility commission that approved the agreement before it could be heard in federal court. Any reading of Plaintiff's Complaint demonstrates that a finding by the state commission that Lightship breached its

---

[23] See P.R. Tel. Co. v. Telecomms. Regulatory Bd., 189 F.3d 1, 10-13 (1st Cir. 1999); Bell Atl. Md., Inc. v. MCI WorldCom, 240 F.3d 279, 304 (4th Cir. 2001), vacated on other grounds, Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635 (2002); Southwestern Bell Tel. Co. v. Pub. Util. Comm'n of Tx., 208 F.3d 475, 479-80 (5th Cir. 2000); Ill. Bell Tel. Co. v. Worldcom Techs., Inc., 179 F.3d 566, 573 (7th Cir. 1999); Iowa Utils. Bd. v. FCC, 120 F.3d 753, 804 (8th Cir. 1997), rev'd in part on other grounds, AT&T Corp. v. Iowa Utils. Bd., 525 U.S. at 385; Southwestern Bell Tel. Co. v. Brooks Fiber Commc'ns of Okla., Inc., 235 F.3d 493, 497 (10th Cir. 2000); BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., Inc., 317 F.3d 1270, 1278 (11th Cir. 2003) (en banc).

[24] Contact Commc'ns v. Qwest Corp., 246 F. Supp. 2d 1184, 1189 (D. Wyo. 2003) (holding that "absent a prior determination of the issue by the state PSC, no federal court jurisdiction exists" over claim for breach of interconnection agreement); Intermedia Commc'ns v. BellSouth Telecomms., Inc., 173 F. Supp. 2d. 1282, 1287 (M.D. Fla. 2000) (holding that parties "must first bring their claims of violations of § 251 to the state PSC before a federal court has jurisdiction over the matter"); Atlantic Alliance Telecomms. v. Bell Atlantic, 2000 U.S. Dist. LEXIS 19649 (E.D.N.Y. 2000) (finding that the federal statutory scheme under section 252(e) limited the role of federal courts to appellate review of state commission decisions interpreting interconnection agreements); Bell Atlantic-Virginia v. WorldCom Techs. of Virginia, Inc., 70 F. Supp. 2d 620, 625-26 (E.D. Va. 1999) (dismissing breach of contract claim based on interconnection agreement because Virginia State Corporation Commission had not made a determination interpreting agreement); AT&T Commc'ns of Ohio, Inc. v. Ohio Bell Tel. Co., 29 F. Supp. 2d 855, 856 (S.D. Ohio 1998) (holding that the court lacked jurisdiction over claims because "the statutory scheme [of the Act] does not permit [a federal district court] to review disputes arising out of interconnection agreements not previously subject to action by a state commission"); AT&T Commc'ns of Illinois v. Illinois Bell Tel. Co., 1998 U.S. Dist. LEXIS 12925, *14 (N.D. Ill. 1998) (refusing to review issues not first submitted to state commission for determination); Indiana Bell Tel. Co. v. McCarty, 30 F. Supp. 2d 1100, 1104 (S.D. Ind. 1998) (holding that Act "was designed to allow the state commission to make the first determination on issues prior to judicial review").

interconnection agreement with Verizon is a necessary, but not sufficient, predicate to the purported fraud and other claims.

The Core case involved a dispute brought in federal court by a CLEC, Core Communications, against an affiliate of defendant Verizon here. In Count III of its complaint, Core alleged that Verizon had breached their interconnection agreement. Verizon moved to dismiss Count III under Rule 12(b)(1) for lack of jurisdiction. Core, 493 F.3d at 337.

Verizon argued below "that the statutory scheme under the Telecommunications Act requires that Core first present this claim to the state commission before proceeding in a federal district court." Id. at 338. The district court held that the Act prevented a party to an interconnection agreement from litigating claims under that agreement in federal court until they had first been litigated before the state commission that approved the agreement. Id. Accordingly, the district court dismissed Core's complaint. Core then appealed. As the Third Circuit framed the issue: "This appeal involves the question of whether a federal district court, in the first instance, may hear disputes concerning the breach of an interconnection agreement formed and approved pursuant to the Federal Telecommunications Act of 1996 [citation omitted]." Id. at 335. Affirming the district court on this point, the Third Circuit dismissed so much of Core's complaint as arose under its interconnection agreement with Verizon.

Highlighting the important state interest in resolving interconnection disputes, the Third Circuit wrote that the Act sought "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunication technologies." Id. (quoting Act's Preamble). To do so, the Act created a regime of "cooperative federalism" where "various responsibilities are to be divided between the state and federal governments" so that "local competition was implemented fairly and with due regard to the local conditions and the particular

-37-

historical circumstances of local regulations under the prior regime" in order to "leave state

commissions free, where warranted, to reflect the policy choices made by their states." Id. (internal

quotations and citations omitted).

      The Third Circuit's analysis proceeded by addressing the question whether, under the

Supreme Court's decision in Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S.

837 (1984), a federal court must defer to the FCC's decision in In re Starpower Communications

LLC, 15 F.C.C.R. 11277 (2000), interpreting the Act.  In Starpower, the FCC determined that "a

dispute arising from interconnection agreements and seeking interpretation and enforcement of

those agreements is within the state's 'responsibility' under section 252 [of the Act]." Core, 493

F.3d at 341, quoting Starpower, 15 F.C.C.R. at 11279.

      The Third Circuit also quoted with approval the en banc decision of the Eleventh

Circuit in BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., Inc., 317 F.3d

1270 (11th Cir. 2003), as to the important federal policy that required adjudication before state

commissions in the first instance:

> "A state commission's authority to approve or reject an interconnection agreement would
> itself be undermined if it lacked authority to determine in the first instance the meaning of
> an agreement that it has approved.  A court might ascribe to the agreement a meaning that
> differs from what the state commission believed it was approving -- indeed, the agreement
> as interpreted by the court may be one the state commission would never have approved in
> the first place.  To deprive the state commission of authority to interpret the agreement that
> it has approved would thus subvert the role that Congress prescribed for state commissions."

Core, 493 F.3d at 343 (emphasis added), quoting BellSouth, 317 F.3d at 1278 n.9.  As the FCC

noted in Starpower, "due to its role in the approval process, a state commission is well-suited to

address disputes arising from interconnection agreements." Core, 493 F.3d at 344, quoting

Starpower, 15 F.C.C.R. at 11280.

Applying the <u>Chevron</u> standards for deferring to an agency's interpretation of a statute where the statute is silent or ambiguous on the specific issue and the agency's construction is a permissible one, the Third Circuit concluded that

> the FCC has offered a reasonable solution to fill a gap that currently exists in the Telecommunications Act. Pursuant to the FCC's guidance, we hold that interpretation and enforcement actions that arise after a state commission has approved an interconnection agreement must be litigated in the first instance before the relevant state commission.

493 F.3d at 344.

The necessity of having the state commissions that approved the Lightship-Verizon interconnection agreements construe those agreements in the first instance is especially true here, where the fundamental issues involve <u>local</u> calling areas and intercarrier compensation for calls that originate and terminate within each individual state. These are quintessentially local issues. Indeed, the FCC expressly delegated the issue of establishing calling areas for intercarrier compensation purposes to the state commissions, and only the state commissions can authoritatively interpret interconnection agreements designed to implement their state-specific policies. <u>See</u> <u>In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996</u>, Memorandum Opinion and Order, 11 F.C.C.R. 15,499, 16,013-14 (1996) (subsequent history omitted) ("<u>Local Competition Order</u>").

Establishing the boundaries of local calling areas for consumers, and by extension carriers, is a fundamental responsibility of state public utilities commissions. <u>Id.</u> Respecting this fundamental state function, the FCC in the <u>Local Competition Order</u> expressly declined to address the issue of defining calling areas as between carriers for intercarrier compensation purposes. As the FCC stated, "state commissions have the authority to determine what geographic areas should be considered 'local areas' for the purpose of applying reciprocal compensation . . . consistent with the state commissions' historical practice of defining local services for wireline [telephone

-39-

companies]." Id. Thus, there can be no doubt that calling area issues are inherently within the province of the state commissions.

The FCC reiterated its view on the very matter at issue here -- intercarrier compensation where the carriers' local calling areas are not identical -- in a 2006 amicus curiae brief to the First Circuit. Citing its Local Competition Order, the FCC brief stated:

> The Commission decided that the states should "determine whether intrastate transport and termination of traffic between competing LECs, where a portion of their local service areas are not the same, should be governed by section 251(b)(5)'s reciprocal compensation obligations or whether intrastate access charges should apply to the portions of their local service areas that are different."

Global Naps, Inc. v. Verizon New England, Inc., No. 05-2657 (1st Cir.), Brief for Amicus Curiae Federal Communication Commissions at 3 (March 13, 2006) (citation omitted; emphasis added). Moreover, even in cases where (unlike here) a state commission has made a determination under an interconnection agreement, a subsequent action on that determination may be brought in federal court only if there is a federal interest. Verizon New York v. Choice One Commc'ns of New York, 2007 WL 927530 **4, 8 (S.D.N.Y. 2007) (Scheindlin, J.). The defendant in that action, Choice One Communications of New York, is Plaintiff's own subsidiary. It is disingenuous in the extreme that Plaintiff has tried here to circumvent the predicate requirement of a prior state commission proceeding -- when it expressly invoked the very same rule against Verizon in Judge Scheindlin's case.[25]

---

[25]    Judge Scheindlin quoted Choice One's brief in support of its motion to dismiss, as follows:

"Verizon impermissibly brought this action in state court even though it knew that under the provisions of the Federal Act, Verizon must first exhaust its remedies before the N.Y. PSC [Public Service Commission] before any court can properly hear the dispute. Indeed, federal courts have made clear that claims concerning the terms of an interconnection agreement . . . such as the one in dispute in this matter, must first be ruled on by the appropriate administrative agency before being heard by a federal court.   Verizon has asserted this very argument before other federal courts, but has failed to satisfy this requirement in the instant matter."

For all of these reasons, there is absolutely no doubt that this Court must dismiss the "Billing Practices" claims -- even if otherwise viable -- pending adjudication by the Maine PUC (and the state commissions in Vermont and New Hampshire) which approved the interconnection agreements in the first instance. Any different finding by this Court would create a baseless and direct conflict with the Third Circuit and numerous other federal court precedents.

**The Maine Interconnection Agreement**

That the state commissions must determine the underlying issues on which Plaintiff's "Billing Practices" claims are based is particularly true under an agreement as complex as the Maine interconnection agreement, which is (to borrow the Supreme Court's phrase) a model of ambiguity, as we demonstrate below.

The Maine interconnection agreement (the "Maine ICA") comprises a January 2002 letter of adoption whereby Lightship adopted, for services it would provide in the service territory of Verizon in Maine, the terms of an earlier interconnection agreement entered into between Verizon and another party in New York, and a series of amendments entered into between Lightship and Verizon over time. The letter transmitting Lightship's adoption, the adoption letter, the New York agreement, and Amendment No. 1 were all submitted to the Maine PUC for approval. JSR Aff. Ex. 6.

The anomalies begin with the adoption letter itself, which consists of four and half pages of single spaced type. However, as both Lightship's signature on the adoption letter, and Lightship's transmittal letter make clear, Lightship agreed <u>only</u> to the terms of paragraph 1(A), (B) and (C). The balance of the adoption letter, that is, paragraphs 2 through 6, constitute a statement of Verizon's position on various issues with which Lightship expressly did not agree and as to which

2007 WL 927530 at n.11 (emphasis in original).

Lightship was not bound. Lightship also expressly reserved its rights under the Act and other law. JSR Aff. Ex. 6 (Feb. 28, 2002 and Jan. 16, 2002 letters).

With those caveats and carve outs, Lightship adopted the underlying New York terms "as they are in effect on the date hereof after giving effect to operation of law." JSR Aff. Ex. 6 (Jan. 16, 2002 Adoption Letter at ¶ 1(A)). Thus, the Adoption Letter established a temporal framework whereby Lightship agreed to be bound by Verizon's terms in Maine as they existed in or about January 2002.

Later that month, on January 25, 2002, Verizon and Lightship entered into Amendment No. 1 to the Maine ICA. By its express terms, Amendment No. 1 applied only to their compensation arrangements regarding local calls, so-called "reciprocal compensation." JSR Aff. Ex. 7 (Amendment No. 1 §§1, 5). In addition to Attachment 1, which set forth the terms and conditions related to reciprocal compensation, and Appendix A, which set forth the reciprocal compensation rate each party would pay the other for terminating local calls, Amendment No. 1 also contained a glossary (Appendix B) for use only in connection with Amendment No. 1: "The terms listed in the Amendment Glossary shall have no application to non-reciprocal compensation provisions contained in the Terms." Id. (Amendment No. 1 § 2).

Attachment 1 set forth the actual terms relating to reciprocal compensation, and specified a list of "Traffic Not Subject to Reciprocal Compensation," including: "interstate or intrastate Exchange Access, Information Access, or exchange services for Exchange Access or Information Access"; "Internet Traffic"; "Toll Traffic"; and "Optional Extended Local Calling Area Traffic", among other types. Id. (Amendment No. 1, Attachment 1 §1.2).

Attachment 1 also gave Verizon and Lightship "the right to audit all Traffic" between them twice a year (or more if necessary), and the obligation "to provide the necessary Traffic data in conjunction with any such audit in a timely manner," so as to "ensure that rates are

being applied appropriately." Id. (Amendment No. 1, Attachment 1 §4.3).  Thus, Verizon had the

right to audit Lightship's billings at least twice each year -- and make any of the alleged "Billing

Practices" claims -- at all times relevant here.  No such claims were made.  Finally, with respect to

"local calling areas," Attachment 1 provided:   "Nothing in this Agreement shall be construed to

limit either Party's ability to designate the areas within which that Party's Customers may make calls

which that Party rates as 'local' in its Customer Tariffs." Id. (Amendment No. 1, Attachment 1

§4.4).

A.    **The Local Calling Area Issue**

A purported change in Verizon's local calling areas in Maine in late 2003 or early

2004 -- which (according to billing "manager" Darren Kreitler) Lightship allegedly was obligated to

follow under the Maine ICA -- is the source of Plaintiff's principal allegations of fraud.  See Cplt. ¶

40 et seq.  This entire issue appears to arise from a Maine PUC Order that took effect in December

2003 (Cplt. ¶ 40) and its relation to the Maine ICA.  Obviously, the Maine PUC is the appropriate

body to resolve this issue in the first instance.

Appendix B, the Amendment No. 1 glossary, is the sole basis for Plaintiff's

allegation that "determining the applicable form of intercarrier compensation (reciprocal

compensation, access charges or ISP-bound compensation) depends on the geographic scope of

LCAs [local calling areas] as defined by Verizon." Cplt. ¶33.  The Maine ICA says no such thing,

and by the express terms of Amendment No. 1, the glossary has "no application" to Exchange

Access, Toll Traffic, Internet Traffic, etc., all of which are expressly excluded from reciprocal

compensation.  JSR Aff. Ex. 7 (Amendment No. 1, Attachment 1 §§ 1.2, 2).  Mr. Kreitler's views

notwithstanding, neither the glossary -- nor any other provision of the Maine ICA -- provides that

Lightship was required to change its local calling areas whenever Verizon changed its local calling

areas, for purposes of determining intercarrier compensation for a call.

-43-

The only reference to using local calling areas "as defined by Verizon" is contained in a single sentence within the complicated definition of "Reciprocal Compensation Traffic" in the glossary. That sentence in the glossary differs in this material respect from the actual terms of reciprocal compensation that are set forth in Attachment 1 -- which does not refer to Verizon's local calling areas at all. Moreover, the sentence in the glossary purports to deal with a matter that is by definition not Reciprocal Compensation Traffic, in an Amendment which, by its express terms has no application to non-reciprocal compensation provisions: "The terms listed in the Amendment Glossary shall have no application to non-reciprocal compensation provisions contained in the Terms." JSR Aff. Ex. 7 (Amendment No. 1 § 2).

The glossary definition provides:

Reciprocal Compensation Traffic. Telecommunications traffic originated by a Customer of one Party on that Party's network and terminated to a Customer of the other Party on that other Party's network, except for Telecommunications traffic that is interstate or intrastate Exchange Access, Information Access, or exchange services for Exchange Access or Information Access. The determination of whether Telecommunications traffic is Exchange Access or Information Access shall be based upon Verizon's local calling areas as defined by Verizon. Reciprocal Compensation Traffic does not include: (1) any Internet Traffic; (2) traffic that does not originate and terminate within the same Verizon local calling area as defined by Verizon; (3) Toll Traffic, including, but not limited to, calls originated on a 1+ pre-subscription basis, or on a casual dialed (10XXX/101XXXX) basis; (4) Optional Extended Local Calling Scope Arrangement Traffic; (5) special access, private line, Frame Relay, ATM, or any other traffic that is not switched by the terminating Party; (6) Tandem Transit Traffic; or, (7) Information Service Traffic. For the purpose of this definition, a Verizon local calling area includes a Verizon non-optional Extended Local Calling Scope Arrangement, but does not include a Verizon optional Extended Local Calling Scope Arrangement.

Id. (Amendment No. 1, Appendix B) (former emphasis added). The parallel provision in Attachment 1 (the actual reciprocal compensation terms), which has no reference to Verizon local calling areas, provides in full:

1.2    Traffic Not Subject to Reciprocal Compensation.

-44-

1.2.1   Reciprocal Compensation shall not apply to interstate or intrastate Exchange Access, Information Access, or exchange services for Exchange Access or Information Access.

Id. (Amendment No. 1, Attachment 1 § 1.2).  The glossary also defines "Toll Traffic," without reference to Verizon's local calling areas, as:

Traffic that is originated by a Customer of one Party on that Party's network and terminates to a Customer of the other Party on that other Party's network and is not Reciprocal Compensation Traffic, Measured Internet Traffic, or Ancillary Traffic.  Toll Traffic may be either "IntraLATA Toll Traffic" or "InterLATA Toll Traffic", depending on whether the originating and terminating points are within the same LATA.

Id. (Amendment No. 1, Appendix B).[26]  Finally, the glossary defines "Extended Local Calling Scope Arrangement," referred to in the Reciprocal Compensation Traffic definition, as follows:

An arrangement that provides a Customer a local calling scope (Extended Area Service, "EAS"), outside of the Customer's basic exchange serving area.  Extended Local Calling Scope Arrangements may be either optional or non-optional.  "Optional Extended Local Calling Scope Arrangement Traffic" is traffic that under an optional Extended Local Calling Scope Arrangement chosen by the Customer terminates outside of the Customer's basic exchange serving area.

Id. (Amendment No. 1, Appendix B).

We assume for the sake of argument that, as the Complaint alleges, at some point in 2004 Verizon expanded its local calling areas in Maine but Lightship retained the smaller local calling areas that were in effect at the time the Maine ICA was entered into.  A number of questions that must be resolved by the Maine PUC as to the meaning of the Maine ICA and Amendment No. 1 arise in this connection.

First, because Amendment No. 1 by its terms does not apply to anything that is not "Reciprocal Compensation Traffic," and "Exchange Access, Information Access, or exchange services for Exchange Access or Information Access" are expressly identified as not "Reciprocal Compensation Traffic," does the sentence in the glossary stating that such traffic will be determined

_____

[26]   LATA, or local access and transport area, is not to be confused with LCA, local calling area.

based on Verizon's local calling areas have any applicability? As noted above, the only reference to use of Verizon's local calling areas is to distinguish between "Exchange Access" and "Information Access," both of which fall within Section 251(g)'s carve out from Section 251(b)(5)'s reciprocal compensation regime. See note 22, above. Furthermore, since the glossary sentence does not appear in the actual terms applicable to reciprocal compensation set forth in Attachment 1, does Attachment 1 control or does the glossary control?

Second, because there is no reference, in the glossary or elsewhere, to using Verizon's local calling areas for determining what is "Toll Traffic," including "IntraLATA Toll Traffic" or "InterLATA Toll Traffic," what relevance can Verizon's local calling areas have to the billing of traffic as Toll Traffic? (Plaintiff's case turns in substantial part on Lightship allegedly billing calls as Toll Traffic rather than as local calls.) In both Attachment 1 and the glossary, "Toll Traffic" is defined separately, and treated as a distinct item, from "Exchange Access." Compare Attachment 1 § 1.2.1 ("Reciprocal Compensation shall not apply to interstate or intrastate Exchange Access, Information Access, or exchange services for Exchange Access or Information Access") with § 1.2.3 ("Reciprocal Compensation shall not apply to Toll Traffic, including, but not limited to, . . . .").

Third, even if Verizon's local calling areas were deemed applicable, the glossary excludes from the concept of a Verizon local calling area a "Verizon optional Extended Local Calling Scope Arrangement." See JSR Aff. Ex. 7 (Amendment No. 1, Appendix B ("For the purpose of this definition [of Reciprocal Compensation Traffic] a Verizon local calling area includes a Verizon non-optional Extended Local Calling Scope Arrangement, but does not include a Verizon optional Extended Local Calling Scope Arrangement.")) The Complaint fails to allege that the expansion of Verizon's local calling areas in Maine was "non-optional". Indeed, the Complaint

-46-

suggests that these extended local calling areas <u>were</u> optional for Verizon's customers. In a footnote

to paragraph 40 of the Complaint, Plaintiff states:

> When the Maine PUC directed Verizon, among others, to adopt these new LCAs, they also
> required that the carriers offer two rate plans for calling within that LCA. One, called the
> "premium" plan, offered unlimited calling within the entire LCA for a fixed charge per
> month. The other, called the "economy" plan, offered unlimited calling within a portion of
> the LCA, with metered per minute charges for calls to the remainder of the LCA.

Cplt. ¶40, n.3.[27] If, as this footnote describes it, the selection of an expanded local calling area for a

fixed charge per month was optional for customers, then the entire issue of the Verizon local calling

areas becomes moot. How the Maine PUC would apply its requirements for these calling plans to

the terms of the Maine ICA that it approved is an open question subject to legitimate debate.

Neither the Maine PUC in the Order, nor Verizon in its Maine tariffs, uses the

terminology of the Maine ICA of "local calling areas," "optional Extended Local Calling Scope

Arrangement," or "non-optional Extended Local Calling Scope Arrangement." Maine has "Basic

Service Calling Areas," and options for subscribing to a "Premium Local Service Calling Area" or

an "Economy Local Service Calling Area," none of which requirements apply to Lightship. CLECs

such as Lightship were explicitly exempted from the Order, the Maine PUC reasoning that

"excluding [CLECs] from these requirements is consistent with moving to competitive markets,

because calling areas can be a feature on which carriers compete." Order at 8. Nothing in the Order

suggests that the Maine PUC contemplated any effect on intercarrier compensation arrangements

between co-carriers such as Verizon and Lightship. Notably, the Complaint wholly fails to allege

that the Maine PUC Order applied to Lightship, or that Verizon ever notified Lightship that it was

---

[27]    The Maine PUC order (the "Order") referenced in paragraph 40 of the Complaint was adopted
on December 10, 2002 and implemented on December 15, 2003, <u>Order Adopting Amended Rule;
Statement of Factual and Policy Basis, Docket No. 2001-865 (Me. PUC Dec. 12, 2002)</u> (available
at www.Maine.gov/mpuc/orders/2001/2001-865po.pdf), and revised Chapter 204 of the Maine
PUC rules. M.P.U.C. Reg. 65-407, Ch. 204 (available at
www.Maine.gov/sos/cec/rules/65/407/407c204.doc).

required to change its local calling areas or its billing to Verizon as a result of the Maine PUC Order or the change in Verizon's local calling areas, or, for that matter, how these economy and premium calling plan options related to the terms of the Maine ICA in Verizon's view.

Indeed, there is nothing in the Maine PUC Order, the Maine ICA or Amendment No. 1 that states, in words or substance, that Lightship was required to change its local calling areas whenever Verizon was required to change its local calling areas in Maine. Verizon, with its legion of lawyers and detailed contract documents, could have said so in just so many words. Yet Verizon did not include any such express provision in the Maine ICA, or in Amendment No. 1 specifically dealing with reciprocal compensation. Indeed, two provisions of the Maine ICA support the view that this was not required. First, as noted above, in the adoption letter Lightship agreed to be bound in Maine by Verizon's terms in effect at the time of the adoption, that is, January 2002. Lightship did not agree to be bound by future changes implemented by Verizon in Maine. JSR Aff. Ex. 6. Second, Amendment No. 1 specifically reserves the right to each party to designate local calling areas for its own customers. JSR Aff. Ex. 7 (Amendment No. 1, Attachment 1 § 4.4) ("Nothing in this Agreement shall be construed to limit either Party's ability to designate the areas within which that Party's Customers may make calls which that Party rates as 'local' in its Customer Tariffs.")

How the Maine PUC would reconcile, interpret and apply (prospectively or retroactively) the provisions of its own Order and the Maine ICA in this local calling area dispute -- if Verizon ever chose to bring such a claim before the Maine PUC -- is something as to which reasonable minds might differ. What is clear, however, is that the Maine PUC is the proper body to determine these quintessentially local regulatory issues in the first place. What is also crystal clear -- as Plaintiff's Chairman understood[28] -- is that a difference of opinion between contract parties as to

---

[28] See note 13, above.

-48-

the interpretation or application of a contract as complex and ambiguous as the Maine ICA cannot

as a matter of law form the basis of a claim for fraud.[29]

**B.    The VNXX Issue**

       The second aspect of Lightship's purported "Billing Practices" claims under the

various state interconnection agreements involves so-called VNXX, or virtual NXX, service. This

is a service typically provided to internet service providers ("ISPs"), which allows their subscribers

to dial up an internet connection using a number local to them, thereby incurring the charge for a

local call (if any) rather than a toll call. <u>See</u> Cplt. ¶ 24. On this score, the Complaint is a hash of

conclusory and contradictory allegations -- but ones that <u>clearly</u> implicate <u>state</u> regulatory policy in

Maine, Vermont and New Hampshire.

       For example, in paragraph 24 Plaintiff alleges: "In the time period at issue in this

suit, the communications regulators in Maine, New Hampshire and Vermont had either

implemented prohibitions on the use of such VNXX services or had begun implementing such

prohibitions." By paragraph 53, this allegation has morphed into an outright prohibition:

"Lightship provided VNXX service in Maine, Vermont and New Hampshire for ISP-bound traffic

despite regulations in each state that prohibited VNXX service in this context; . . ." These

conclusory legal assertions are entitled to no weight. Plaintiff has not cited any specific regulations

prohibiting VNXX service in Maine, Vermont or New Hampshire. Indeed, if the various state

regulators had only just "begun implementing" a prohibition on VNXX service, then obviously the

use of such service previously was not prohibited. The Maine PUC itself had terminated without

---

[29]    The words of the Court in <u>Drexel Burnham Lambert Inc. v. Saxony Heights Realty Associates</u>, 777 F. Supp. 228 (S.D.N.Y. 1991), are apt: This "is a classic case of the contract dispute dressed up in the language of fraud." "It is well-settled that a simple breach of contract does not constitute fraud." <u>Id.</u> at 235 (dismissing federal securities fraud claims brought by various banks without leave to replead since attempting to convert contract claim into a claim for fraud "would be futile").

resolution an earlier investigation into carrier use of NXX codes due to a "lack of interest" of telecommunications carriers in Maine. [30]  Once again, if there is an issue about VNXX service under the Maine ICA, the Maine PUC has the right and obligation to make such a determination in the first instance.

Similar conclusory and contradictory allegations are present with respect to inter-carrier billing for VNXX calls -- and similar <u>state</u> regulatory issues are implicated.  For example, in paragraph 25, Plaintiff alleges:

> For local ISP-bound traffic (*i.e.*, ISP-bound traffic that originates and terminates within a single LCA [local calling area]), the originating LEC pays the terminating LEC a charge capped at $0.0007 per minute.  Non-local, intrastate ISP-bound traffic (*i.e.*, ISP-bound traffic that originates and terminates in different LCAs within a single State) is subject to intercarrier compensation rules established by state regulators.

Plaintiff alleges in paragraph 24 that the purpose of VNXX service is to allow the ISP's customers to dial up to the internet through local rather than toll calls.  Plaintiff then alleges in paragraph 25 that the terminating carrier (here Lightship) is entitled to charge either the $.0007 rate if the call comes in as a local call, or the higher intrastate rate if the call comes in as a toll call.  These allegations contradict the conclusory allegations in paragraphs 23 and 53(c) that Lightship's charges for calls via VNXX service contravened unspecified federal and state precedent.

Contradictory allegations in a fraud complaint, such as Plaintiff's VNXX allegations, are entitled to no weight.  See, e.g., <u>Dresner v. Utility.com, Inc.</u>, 371 F. Supp.2d 476, 500 (S.D.N.Y. 2005) (dismissing securities fraud claim where allegations were internally contradictory, and

---

[30]   <u>Order Closing Investigation, Investigation of Compensation by Global NAPs to Verizon and Other LECs for Interexchange Internet Traffic and Use of NXX Codes by Global NAPs</u>, Docket No. 2002-578, available at http://mpuc.informe.org/easyfile/cache/easyfile_doc172536.DOC (Me. PUC Rel. Nov. 2, 2005) (noting that "[t]he investigation in this case is terminated because it appears the parties are no longer sufficiently interested in the issues to justify the expenditure of further resources.").  No party -- including Verizon -- opposed the Maine PUC's decision to terminate its investigation without resolution.

"therefore not properly particular"); In re Livent, 151 F. Supp.2d at 407 (where allegations of fraud

are internally self-contradictory, the inconsistencies defeat a reasonable inference that the requisite

scienter standard in pleading a Section 10(b) claim has been satisfied); Askanase v. Fatjo, 130 F.3d

657, 668 (5th Cir. 1997) (rejecting "contradictory" arguments; "[e]ither the directors knew or they

did not know of the allegedly bad audit . . ."); Wilson v. Mobil Oil Corp., 940 F. Supp. 944 (E.D.

La. 1996) (dismissing fraud claims under Rule 9(b) because of internally contradictory allegations

as to what information defendants did or did not disclose).

      Indeed, the one still point in the turning world of the Maine ICA is that it expressly

permits VNXX service for ISPs:

> "Compensable Internet Traffic" means dial-up switched Internet Traffic that is originated by
> an end-user subscriber of one Party, is transmitted to the switched network of the other
> Party, and then is handed off by that Party to an Internet Service Provider which has been
> assigned a telephone number or telephone numbers within an NXX or NXXs which are local
> to the originating end-user subscriber.

JSR Aff. Ex. 6 (Maine ICA § 1.16) (emphasis added).[31]  At most, the Complaint reflects nothing

more than an evolving regulatory scheme over an unspecified time frame, differing from state to

state, about a service that is expressly permitted under the Maine ICA.  These allegations do not

even approach the particularized pleading requirements necessary to state a claim for fraud -- and if

---

[31]   This is not surprising.  The FCC has construed interconnection agreement terms to require
Verizon to pay intercarrier compensation for VNXX traffic.  Starpower Communications, LLC v.
Verizon South Inc., Memorandum Opinion and Order, 18 F.C.C.R. 23625 (2003) (awarding
Starpower over $12 million for intercarrier compensation charges associated with VNXX traffic);
see also id. at 23634 (recognizing that state commissions have come to different results in
interpreting interconnection agreement language related to compensation for VNXX traffic);
Starpower Communications, LLC v. Verizon South Inc., Order, 19 F.C.C.R. 7592, 7595 (2004)
(declining to vacate $12 million damages order at request of parties as part of settlement, in part on
grounds that it represented FCC's first adjudication of dispute concerning intercarrier compensation
obligations "associated with the delivery of VNXX traffic").  We have no doubt that the Maine
PUC would similarly find that Lightship fully abided by its ICA obligations should Verizon ever
claim a breach.

they did so, the underlying issues would have to be adjudicated in the state commissions in the first instance.

## C.    **"Double Billing"**

The Complaint contains a single, three and a half line conclusory allegation regarding so-called "double billing" that fails to meet the strict pleading requirements for federal securities or common law fraud, and that also must be adjudicated before the relevant state commissions. In paragraph 53(a), Plaintiff alleges:

> Double Billing. With respect to local traffic that originated on the network of a third party carrier, transited Verizon's network, and then terminated on Lightship's network, Lightship improperly billed both Verizon and also the third party carrier for the same reciprocal compensation charges;

Plaintiff's failure to particularize its allegation regarding so-called double billing prevents the Court from drawing the strong and compelling inference of fraud required to sustain a Rule 10b-5 complaint. For example, were these just sporadic instances of billing errors occurring in the tens of thousands of calls exchanged between Lightship and Verizon? Were they inadvertent? Did they occur because of the way Verizon routed the calls to Lightship or provided call record data? [32] Were they isolated in a particular time period? Did they have a relatively insignificant impact on Lightship's revenues such that no reasonable purchaser would consider them material and no defendant would be likely to have acted with scienter with respect to them? Simply alleging that something was "improperly billed" does not raise any inference of fraud.

It is clear that, where a fraud claim is based on an assertion that a defendant's allegedly improper billing or sales practices made its financials materially misleading, the complaint

---

[32]  Lightship would argue that certain errors were caused by Verizon -- unbeknownst to Lightship -- having routed third party carrier calls to Lightship on Verizon trunk group lines that were supposed to be for Verizon originated traffic only, and having also listed the same calls on a daily usage file that Verizon provided to Lightship for third party carrier billing. Whether a state commission would consider these circumstances to constitute a breach by a CLEC of its interconnection agreement with an ILEC is an issue for the state commission in the first place.

must assert facts tending to show the materiality of the alleged overstatement. In <u>Gavish v. Revlon</u>, 2004 WL 2210269 (S.D.N.Y. 2004), the Court dismissed claims based on allegations that the defendant's financials had been enhanced due to allegedly improper revenue recognition and sales channel "stuffing" for failure to allege the magnitude or degree of alleged misstatements attributable to these billing practices in light of the defendant's total financial picture. The Court stated:

> [G]iven the particularity requirements of securities fraud pleading, the materiality of allegedly false financials may not be pled in a conclusory or general fashion; a complaint must contain allegations tending to demonstrate the materiality of the alleged overstatements in light of the defendant's total financial picture. . . . In other words, although there is no "numerical benchmark" for assessing the materiality of misstatements in financial reports, defendants (and the court) are still "entitled to be appraised of the approximate amount of overstatement involved."

<u>Id</u>. at *16 (citations omitted). Similarly, in <u>In re Nokia Oyj (Nokia Corp.) Sec. Litig.</u>, 423 F. Supp.2d 364 (S.D.N.Y. 2006), the court dismissed fraud claims based on allegations that the defendant's improper sales, shipment and billing practices had made its financials misleading, because the complaint failed to "approximate the magnitude or degree of the alleged misstatements in relation to [defendant's] total financial picture." <u>Id</u>. at 408. Further, allegations of improper billing or accounting, "absent sufficient allegations of fraudulent intent, are not sufficient to properly allege scienter." <u>Id</u>., <u>quoting</u>, <u>In re LaBranche Sec. Litig.</u>, 405 F. Supp.2d 333, 362 (S.D.N.Y. 2005). <u>See</u> <u>Gavish v. Revlon</u>, <u>supra</u>, 2004 WL 2210269 at *19 ("[A] complaint's totally conclusory allegations regarding defendants' omniscient awareness of traffic into and out of the [sales] channel . . . are insufficiently particularized to support a strong inference of defendants' scienter.")

## III.

### PLAINTIFF HAS FAILED TO STATE
### A COMMON LAW FRAUD CLAIM
### AGAINST THE JP MORGAN DEFENDANTS

To state a claim for common law fraud under New York law, a plaintiff must plead:

(1) a misrepresentation of material fact; (2) which the defendant knew to be false; (3) which the

defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably

relied; and (5) which caused injury to the plaintiff. See Wynn v. AC Rochester, 273 F.3d 153, 156

(2d Cir. 2001). "The claim also requires a showing of proximate causation, such that the injury 'is

the natural and probable consequence of the defrauder's misrepresentation or . . . the defrauder

ought reasonably to have foreseen that the injury was a probable consequence of his fraud.'" Suez

Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 104-05 (2d Cir. 2001), quoting

Cumberland Oil Corp. v. Thropp, 791 F.2d 1037, 1044 (2d Cir. 1986).

Rule 9(b)'s requirement that "all averments of fraud" be "stated with particularity"

must be met even where state law governs the claim. See, e.g., Malmsteen v. Berdon, LLP, F.

Supp.2d 655, 664 (S.D.N.Y. 2007), citing 5A Charles Alan Wright et al., Federal Practice and

Procedure § 1297 (3d ed. 2004). For claims of common law fraud, the Second Circuit has held that

Rule 9(b) requires allegations that: "(1) specify the statements that the plaintiff contends were

fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4)

explain why the statements were fraudulent." Novak, 216 F.3d at 306 (internal quotations omitted).

In addition, courts in this Circuit require a plaintiff alleging common law fraud to plead facts that

give rise to a strong inference of fraudulent intent. Id. at 295, citing Moore v. Paineweber, Inc., 189

F.3d 165, 172-73 (2d Cir. 1999), and Chill v. General Electric Co., 101 F.3d 263, 267 (2d Cir.

1999); see Glidepath Holding B.V. v. Spherion Corp., 2007 WL 2176072 (S.D.N.Y. 2007) (noting

-54-

Second Circuit's requirement that common law fraud pleading allege facts that give rise to strong inference of scienter and taking guidance from Supreme Court's decision in <u>Tellabs</u>).

Plaintiff's common law fraud claim fails to satisfy these pleading requirements. The Complaint: fails to allege with particularity any misrepresentation by the JP Morgan Defendants (Point I.A, above); fails to allege reasonable reliance on any purported representation outside of the Merger Agreement (Point I.B, above); fails to plead facts giving rise to a strong inference that the JP Morgan Defendants acted with the requisite scienter (Point I.C, above) and, as set forth in the brief on behalf of the Individual defendants, fails to allege that Plaintiff has suffered a loss caused by any alleged misrepresentation (<u>see also</u> Point I.D, above). For all of these reasons, Plaintiff's common law fraud claim against the JP Morgan Defendants fails to state a claim for relief and must be dismissed.

**IV.**

**PLAINTIFF HAS FAILED TO STATE A
NEGLIGENT MISREPRESENTATION CLAIM
<u>AGAINST THE JP MORGAN DEFENDANTS</u>**

Under New York law, a claim of negligent misrepresentation must satisfy the following five elements: "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that [it] should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." <u>Hydro Investors, Inc. v. Trafalgar Power, Inc.</u>, 227 F.3d 8, 20 (2d Cir. 2000). For the reasons discussed above, this claim must be dismissed because the Complaint fails to allege either a false representation by the JP Morgan Defendants (Point I.A, above) or reasonable reliance by Plaintiff (Point I.B, above).

-55-

In addition, there are no allegations to support the existence of a "special relationship of trust or confidence" between the JP Morgan Defendants and Plaintiff. Suez Equity Investors, 250 F.3d at 103. This was an arm's-length transaction between sophisticated commercial parties with able counsel. This type of commercial relationship does not constitute the kind of special relationship necessary for a negligent misrepresentation claim. "[I]t is accepted that the parties must enjoy a relationship of trust and reliance 'closer . . . than that of the ordinary buyer and seller.'" Polycast Technology Corp. v. Uniroyal, Inc., 1988 WL 96586 at *10 (S.D.N.Y. 1988), quoting Coolite Corp. v. American Cyanamid Co., 52 A.D. 2d 486, 384 N.Y.S.2d 808 (1st Dept. 1976). See also Lewis v. Rosenfeld, 138 F. Supp. 466, 481 (S.D.N.Y. 2001) ("well established" that commercial relationship of buyer and seller not enough). Here, the utter absence of any special relationship of trust or confidence between the JP Morgan Defendants and Plaintiff requires dismissal of the negligent misrepresentation claim.

Finally, New York courts do not recognize a common law cause of action for negligent misrepresentation arising from a sale of securities because such claims are preempted by the New York Martin Act, N.Y. General Business Law § 352-c (2003). Nanopierce Technologies, Inc. v. Southridge Capital Management LLC, 2003 WL 22052894 at *1-4 (S.D.N.Y. 2003), citing CPC Int'l Inc. v. McKesson Corp., 70 N.Y.2d 268, 519 N.Y.S.2d 804 (1987) and Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 190-91 (2d Cir. 2001). The Martin Act, New York's Blue Sky Law, creates a statutory mechanism giving the Attorney General broad powers to prevent fraudulent and deceitful practices in connection with securities transactions within or from New York State. Id. at *1. There is no private right of action under the Martin Act. CPC Int'l Inc., 70 N.Y.2d at 276-77, 519 N.Y.S.2d at 807. The overwhelming majority of New York state and federal courts have held that the Martin Act preempts common law claims based on securities transactions

-56-

within or from New York that, like the Martin Act, do not require scienter as an element of the

claim. Nanopierce, 2003 WL 22052894 at *1-4 (collecting cases):

> The Martin Act prohibits various fraudulent and deceitful practices in the distribution,
> exchange, sale and purchase of securities but does not require proof of intent to defraud or
> scienter. As a result, claims for breach of fiduciary duty and negligent and innocent
> misrepresentation, for example, which do not require a plaintiff to plead and prove
> intentional deceit, are covered by the Martin Act and cannot be asserted by private litigants.

Id. at *4, quoting Granite Partners, L.P. v. Bear Stearns & Co., 17 F. Supp.2d 275, 291 (S.D.N.Y.

1998). Here, pursuant to the Merger Agreement, the closing of the securities transaction at issue

took place in New York, and the Merger Agreement and Closing Agreement themselves are

governed by New York law. JSR Aff. Ex. 1 § 2(b) (p. 12), § 10(h) (p. 57); Ex. 5 § 8 (p. 2). The

transaction is thus within the ambit of the Martin Act. Since Plaintiff's negligent misrepresentation

claim arising out of a New York securities transaction does not have scienter as a required element,

the claim is preempted by the Martin Act and must be dismissed.

## V.

### THE INDEMNIFICATION CLAIM
### SHOULD BE DISMISSED IN FAVOR
### OF THE PRIOR PENDING SRC ACTION

Insofar as we understand the inartful pleading of Count V of the Complaint, Plaintiff

appears either to allege that the JP Morgan Defendants themselves breached representations and

warranties contained in the Merger Agreement,[33] or to seek indemnification with respect to the

alleged "Billing Practices" as well as for several other matters wholly unrelated to the issues in this

action. Cplt. ¶¶ 104, 141. See JSR Aff. Ex. 12 (Plaintiff's purported indemnification notices).

---

[33]    As we have demonstrated above, the JP Morgan Defendants were not parties to the Merger
Agreement, made no representations and warranties to Plaintiff in the Merger Agreement (or
otherwise), and therefore could not have breached any such representations or warranties. This
claim is nothing more than an attempted end run around the pleading deficiencies in the rest of the
Complaint.

As a condition to the acquisition, Lightship was required to secure the agreement of its stockholders to indemnify Plaintiff under the indemnification terms and conditions set forth in the Merger Agreement and the Indemnification Escrow Agreement. JSR Aff. Ex. 1 § 8(b) (p. 48). In the Merger Agreement, Plaintiff agreed that a Stockholder Representative Committee (the "SRC") "shall be named as the agent and representative of" the Lightship stockholders with "full power and authority to act for and on behalf" the stockholders in all matters regarding the indemnity, including, without limitation, authority to resolve all claims for indemnification. JSR Aff. Ex. 1 § 8(c)(i), (ii) (p. 48). The SRC was established with such powers, and an Indemnification Escrow Agreement was entered into among Plaintiff, the SRC and Mellon, whereby Mellon holds $7 million of the purchase price in an Indemnification Escrow. See JSR Aff. Exs. 3, 4.

After Plaintiff submitted its largely meritless eleventh hour claims against the Indemnification Escrow, thereby effectively tying up the entirety of the Indemnification Escrow fund, the SRC commenced an action in New York State Supreme Court seeking damages, a declaratory judgment and release of the escrowed funds. That action, Stockholder Representative Committee v. One Communications Corp., 07 Civ. 3905 (LTS) (the "SRC Action"), was commenced on April 30, 2007, well in advance of Plaintiff's commencement of this action on May 18, 2007. The SRC Action was removed by One Communications Corp. on June 8, 2007 and is before this Court as a related case.

Count V of the Complaint, which seeks to recover under the Merger Agreement's indemnification provisions, is entirely duplicative of the claims asserted by the SRC in the earlier commenced SRC Action and should be dismissed or stayed in deference to that prior pending action. Curtis v. Citibank, N.A., 226 F.3d 133, 138-39 (2d Cir. 2000) ("[A] court faced with a duplicative suit will commonly stay the second suit, dismiss it without prejudice, enjoin the parties from proceeding with it,...consolidate the two actions [or] . . . simpl[y] dismiss[]...the second

-58-

suit"); Rapture Shipping Ltd. v. Allround Fuel Trading B.V., 2006 WL 2474869 at *3 (S.D.N.Y. 2006) (dismissing duplicative second filed suit). Dismissal of Count V in favor of the prior SRC Action is particularly warranted here. The SRC Action already covers all of Plaintiff's purported indemnification claims,[34] most of which have nothing to do with the "Billing Practices" issue. The SRC Action, unlike this action, also includes all necessary parties. Although acknowledging, as it must, that the SRC is the only entity authorized to deal with indemnification claims (Cplt. ¶ 103), Plaintiff has failed to join the SRC, a party necessary for adjudication of those claims under Rule 19. Indeed, Plaintiff addressed each of its purported indemnification "notice" letters (Cplt. ¶ 141) solely to the members of the SRC and Mellon, the escrow agent. Cplt. ¶ 104; JSR Aff. Ex. 12. Accordingly, Count V should be dismissed in favor of the prior pending SRC Action.[35]

VI.

**THE COURT SHOULD DECLINE TO
EXERCISE SUPPLEMENTAL JURISDICTION
OVER PLAINTIFF'S STATE LAW CLAIMS**

The Complaint alleges jurisdiction under 28 U.S.C. § 1331 (federal question) and §1367 (supplemental jurisdiction). Cplt. ¶ 14. Pursuant to 28 U.S.C. § 1367(c), the district court "may decline to exercise supplemental jurisdiction" over state law claims where "the claim raises a novel or complex issue of State law," or "the district court has dismissed all claims over which it has original jurisdiction." To the extent any of Plaintiff's state law claims (Counts III-VI) otherwise survive this motion to dismiss, with the dismissal of the federal securities law claims the Court

---

[34]  The numerous deficiencies in Plaintiff's indemnifications claims, relating to such matters, among others, as the scope of and limitations on the indemnity, compliance with the procedures specified in the Merger Agreement and the Escrow Agreement, and the underlying merits -- or lack thereof -- of the claims, are properly the subject of the SRC suit and will be addressed therein.

[35]  For the reasons stated in Point II, above, the indemnification claim based on "Billing Practices" under the Verizon interconnection agreements must be dismissed until the underlying issues are adjudicated before the appropriate state commissions.

-59-

should dismiss any remaining state law claims. This is particularly required here because each of the state law claims depend on complex issues of state law under the various interconnection agreements. See, e.g., Greenwald, 192 F. Supp. at 228 (dismissing state law claims following dismissal of federal securities law claims).

## CONCLUSION

For the reasons set forth herein and in the briefs of the Megunticook defendants and the individual defendants, all claims against the JP Morgan Defendants should be dismissed.

Dated: New York, New York
       September 17, 2007

                                        Respectfully submitted,

                                        Jayne S. Robinson (JSR-5981)
                                        K. Ann McDonald (KAM-2876)

William M. Murphy
    Of Counsel
                                        ROBINSON & McDONALD LLP
                                        61 Broadway, Suite 1415
                                        New York, New York  10006
                                        Tel.:  212 953-3400
                                        Fax.:  212 953-3690

                                        Attorneys for Defendants
                                        JP Morgan SBIC LLC and
                                        Sixty Wall Street SBIC Fund, L.P.

-60-

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on September 17, 2007, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to the following by operation of the Court's electronic filing system, who may access this filing through the Court's system:

      John Michael Teitler, Esq.
      Nicholas W. Lobenthal, Esq.
      Teitler & Teitler
      1114 Avenue of the Americas
      New York, New York  10036
            Attorneys for One Communications Corp.

      Mark S. Resnick, Esq.
      The Resnick Law Group, P.C.
      Old City Hall
      45 School Street
      Boston, Massachusetts  02108
            Attorneys for One Communications Corp.

      Joseph M. Pastore, III, Esq.
      Dreier LLP
      One Landmark Square, 20th floor
      Stamford, Connecticut  06901
            Attorneys for Kevin O'Hare and Jeffrey Koester

      Scott H. Angstreich, Esq.
      Joseph Solomon Hall, Esq.
      William David Sarratt, Esq.
      Kellogg, Huber, Hansen, Todd & Evans PLLC (DC)
      1615 M Street, N.W., Suite 400
      Washington, D.C.  20036
            Attorneys for Verizon New England Inc.

      Nicholas J. Panarella, Esq.
      Kelley Drye & Warren LLP
      101 Park Avenue
      New York, New York  10178
            Attorneys for Mellon Investor Services LLC

      I also certify that on September 17, 2007, a copy of the foregoing was served by

Federal Express on the following:

Paul E. Summit, Esq.
Ira Gross, Esq.
Sullivan & Worcester
One Post Office Square
Boston, Massachusetts  02109
Email:  Psummit@sandw.com
    Attorneys for The Megunticoook Fund II, L.P. and
    The Megunticook Side Fund II, L.P.

David B. Mack, Esq.
O'Connor, Carnathan and Mack LLC
8 New England Executive Park
Suite 310
Burlington, Massachusetts  01803
Email:  dmack@ocmlaw.net
    Attorneys for Kevin O'Hare and Jeffrey Koester

Jayne S. Robinson (JSR-5981)

-2-