## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

One Communications Corp., as successor in
interest to CTC Communications Group, Inc.
and CTC Communications Acquisition Corp.,

        Plaintiff,

        -v.-

JP Morgan SBIC LLC, Sixty Wall Street
SBIC Fund, L.P., The Megunticook Fund II, L.P.,
The Megunticook Side Fund II, L.P.,
Kevin O'Hare, Jeffrey Koester,
Mellon Investor Services LLC as nominal defendant
as escrow agent and Verizon New England Inc.,
as defendant on a declaratory judgment claim,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action:  07 Civ 3905 (LTS)
(AJP)
(ECF Case)

## MEMORANDUM OF LAW IN SUPPORT OF
## THE MEGUNTICOOK DEFENDANTS'
## MOTION TO DISMISS

## Table of Contents

Page

TABLE OF AUTHORITIES ................................................................................................. iii

Introduction ......................................................................................................................... 1

Summary Of The Claims And Defenses ............................................................................. 2

The Allegations Of The Complaint As To Megunticook Dissolve Upon Examination ..... 3

ARGUMENT ..................................................................................................................... 11

I.      PLAINTIFF'S SECTION 10(B) CLAIM IS FATALLY FLAWED. ................. 11

        A.      The Requisite Pleading Standard Is Not Met. ........................................ 11

        B.      Plaintiff Has Failed Adequately To Allege Misrepresentations Or Omissions
                Against Megunticook. .............................................................................. 13

                1.      The November 2004 "Confidential Information Memorandum." ............. 15

                2.      The January 2005 "PowerPoint" Presentation. ........................................ 16

                3.      March 10, 2005 E-Mail Chain. ................................................................ 17

                4.      The March 12, 2005 E-Mail Chain. ......................................................... 20

                5.      March 9, May 11 and May 13, 2005 E-Mails Transmitting
                        Financial & Income Statements. .............................................................. 21

                6.      Remaining "Misrepresentations." ............................................................ 21

        C.      Plaintiff Has Failed Adequately To Allege Scienter. .............................. 23

                1.      Motive & Opportunity. ............................................................................. 23

                        a.   Receiving consideration from the sale of a company is
                             not sufficient motive. ...................................................................... 23

                2.      Conscious Misbehavior Or Recklessness. ............................................... 24

        D.      Plaintiff Has Failed To Allege "Justifiable Reliance." ............................ 26

                1.      Pre-Merger Agreement. ............................................................................ 27

Table of Contents
(continued)

Page

       2.      Representations And Warranties Of The Merger Agreement.....................27

E.     Plaintiff Has Failed Adequately To Plead Loss Causation. ....................29

II.     COUNT II – SECTION 20 CONTROLLING PERSON LIABILITY.............................29

     A.     Plaintiff Has Failed To Allege A Primary Violation By The Controlled Person. .......................................................................30

     B.     Even If Lightship Had Been Named And Sued As a Party, The Allegations Against Lightship Would Be Insufficient To Establish It As A Primary Violator.......................................................................31

     C.     Second Test:  Plaintiff Has Failed To Allege That Megunticook "Controlled" LHI Or Lightship.............................................................31

     D.     Third Test:  Plaintiff Has Failed To Allege Megunticook Culpability..................34

III.    COUNT III – COMMON LAW FRAUD........................................................35

IV.    COUNT IV – NEGLIGENT MISREPRESENTATION. ..................................36

V.     COUNT V – BREACH OF REPRESENTATIONS AND WARRANTIES.....................37

VI.    THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER MEGUNTICOOK...........................................................................38

VII.   THIS COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE STATE LAW CLAIMS ...................................39

VIII.  CONCLUSION................................................................................40

# TABLE OF AUTHORITIES

## FEDERAL CASES

ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) ...........11, 30

AT & T Corp. v. Iowa Utilities Board, 525 U.S. 366 (1999) ............................................10

Accusystems, Inc. v. Honeywell Information System, Inc.,
    580 F. Supp. 474 (S.D.N.Y. 1984) .........................................................................37

Allied Irish Banks, P.L.C. v. Bank of America, N.A., No. 03 Civ. 3748,
    2006 WL 278138 (S.D.N.Y. Feb. 2, 2006)................................................................26

America High-Income Trust v. Allied Signal,
    329 F. Supp. 2d 534 (S.D.N.Y. 2004).......................................................................31

In re Bayou Hedge Fund Litigation, Nos. 06-MDL-1755, 06-CV-2943,
    2007 WL 2319127 (S.D.N.Y. July 31, 2007)......................................................11, 23

Boguslavsky v. Kaplan, 159 F.3d 715 (2d Cir. 1998) ......................................................29

Brown v. Hutton Group, 795 F. Supp. 1317 (S.D.N.Y. 1992) ..........................................30

Busch v. Buchman, Buchman & O'Brien, Law Firm,
    11 F.3d 1255 (5th Cir. 1994) ..............................................................................38, 39

CMNY Capital L.P. v. Deloitte & Touche, 821 F. Supp. 152 (S.D.N.Y. 1993) ...............27

In re Capstead Mortgage Securities Litigation,
    258 F. Supp. 2d 533 (N.D. Tex. 2003) .....................................................................26

In re Carter-Wallace Securities Litigation, 220 F.3d 36 (2d Cir. 2000) ...........................24

Chill v. General Electric Co., 101 F.3d 263 (2d Cir. 1996)...............................................12

Cohen v. Koenig, 25 F.3d 1168 (2d Cir. 1994) .................................................................36

Cortec Industrial v. Sum Holding L.P., 949 F.2d 42 (2d Cir. 1991) ...................................5

DIMON Inc. v. Folium Inc., 48 F. Supp. 2d 359 (S.D.N.Y. 1999) ...................................37

De Jesus v. Sears, Roebuck & Co., 87 F.3d 65 (2d Cir. 1996)....................................12, 35

Deutsche Telecom AG Sec. Litig., No. 00  CIV 9475,
    2002 WL 244597 (S.D.N.Y. Feb. 20, 2002)...........................................32, 34

In re Digital Island Securities Litigation, , 357 F.3d 322 (3d Cir. 2004).....................24, 25

Dresner v. Utility.com, Inc., 371 F. Supp. 2d 476 (S.D.N.Y. 2005) ............................15, 24

Dujardin v. Liberty Media Corp., 359 F. Supp. 2d 337 (S.D.N.Y. 2005) .........................12

Duncan v. Pencer, No. 94 Civ. 0321, 1996 WL 19043 (S.D.N.Y. Jan. 18, 1996) .............36

Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.,
    343 F.3d 189 (2d Cir. 2003)..................................................................26, 29

In re Flag Telecom Holdings, Ltd., 308 F. Supp. 2d 249 (S.D.N.Y. 2004)........................32

Food & Allied Services Trades Department, 841 F. Supp. 1386 (S.D.N.Y. 1994).....32, 33

In re Friedman's Inc. Securities Litigation, 385 F. Supp. 2d 1345 (N.D. Ga. 2005) .........33

Ganino v. Citizens Utilities Co., 228 F.3d 154 (2d Cir. 2000) ...........................................23

Glickman v. Alexander & Alexander Services, Inc., No. 93 Civ. 7594,
    1996 U.S. Dist. LEXIS 2325 (S.D.N.Y. Feb. 27, 1996)..........................................12, 25

Glidepath Holding B.V. v. Spherion Corp., No. 04 Civ. 9758,
    2007 WL 2176072 (S.D.N.Y. July 26, 2007)..........................................................23, 36

In re Globalstar Sec. Litigation, No. 01 Civ. 1748,
    2003 WL 22953163 (S.D.N.Y. Dec. 15, 2003) ............................................................35

Greenwald v. Orb Communications & Marketing, Inc., 192 F. Supp. 2d 212
    (S.D.N.Y. 2002)............................................................................................................39

Griffin v. PaineWebber Inc., 84 F. Supp. 2d 508 (S.D.N.Y. 2000)....................................30

Grumman Allied Industrial, Inc. v. Rohr Industrial, Inc.,
    748 F.2d 729 (2d Cir. 1984)..................................................................................15, 27

Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.,
    104 F. Supp. 2d 279 (S.D.N.Y. 2000).........................................................................38

Harsco Corp. v. Segui, , 91 F.3d 337 (2d Cir. 1996) .................................................20, 21,
26, 28,
37

In re  Health Management System Inc., No. 97 Civ. 1865,
1998 WL 283286 (S.D.N.Y. Jun. 1, 1998) ..............................................................23, 24

In re Initial Public Offering Securities Litigation,
241 F. Supp. 2d 281 (S.D.N.Y. 2003)...........................................................................30

Internet Law Library, Inc. v. Southridge Capital Management, LLC,
223 F. Supp. 2d 474 (S.D.N.Y. 2002 .......................................................................29, 35

JHW Greentree Capital, L.P. v. Whittier Trust Co., No. 05 Civ. 2985,
2005 WL 3008452 (S.D.N.Y. Nov. 10, 2005)...............................................................29

Jackson v. Oppenheim, 411 F. Supp. 659 (S.D.N.Y. 1974) ................................................27

Johnson v. NYFIX, Inc., 399 F. Supp. 105 (D. Conn.  2005) ................................25, 26

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001) .............................................................3, 12,
23

Kramer v. Time Warner, Inc., 937 F.2d 767 (2d Cir. 1991)...............................................17

Leventhal v. Tow, 48 F. Supp. 2d 104 (D. Conn. 1999)....................................................23

Lewis v. Rosenfeld, 138 F. Supp. 2d 466 (S.D.N.Y. 2001) ...............................................37

In re Livent, Inc. Noteholders Securities Litigation,
151 F. Supp. 2d 371 (S.D.N.Y. 2001)...........................................................................24

In re Livent, Inc. Securities Litigation, 78 F. Supp. 2d 194 (S.D.N.Y. 1999) ...................25

Malin v. XL Capital Ltd., No. 3:03cv2001, __ F. Supp. 2d __,
2007 WL 2175422 (D. Conn. July 26, 2007) ...............................................................17

In re National Century Finance Enterprises, Inc., No. 2:03-1565, Slip Op.,
2007 WL 1362695 (S.D. Ohio May 7, 2007) ..........................................................13, 32

Omnipoint Communications Enterprises, L.P. v. Zoning Hearing Board of
Easttown Township, 331 F.3d 386 (3d Cir. 2003)........................................................10

Peay v. BellSouth Medical Assistance Plan, 205 F.3d 1206 (10th Cir. 2000) ..................38

In re Philip Services Corp. Securities Litigation,
    383 F. Supp. 2d 463 (S.D.N.Y. 2004)....................................................... 30, 32

Polycast Technology Corp v. Uniroyal Inc., No. 87 Civ. 3297,
    1988 WL 96586 (S.D.N.Y. Aug. 31, 1988).................................................37

In re Pronetlink Securities Litigation, 403 F. Supp. 2d 330 (S.D.N.Y. 2005)...................30

Rapoport v. Asia Electrics Holding, 88 F. Supp. 2d 179 (S.D.N.Y. 2000) .........................5

Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000)..........................................................24, 25

S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450 (2d Cir. 1996)....................................29, 31,
                                                               34

S.E.C. v. Stringer, Number Civ. 02-1341,
    2003 WL 23538011 (D. Or. Sept. 3, 2003) ..................................................30

Estate of Sabarese v. First National Investment Corp., No. 92 Civ. 8139,
    1994 WL 573320 (S.D.N.Y. Oct. 18, 1994)................................................36

Sedona Corp. v. Ladenburg Thalmann & Co., No. 03 Civ. 3120,
    2005 WL 1902780 (S.D.N.Y. Aug. 9, 2005)..................................................5

Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124 (2d Cir. 1994) .......................................36

Sloane Overseas Fund, Ltd. v. Sapiens International Corp.,
    941 F. Supp. 1369 (S.D.N.Y. 1996)..............................................................33

Small v. Arch Capital Group, Ltd., No. 03 Civ 5604,
    2005 WL 696903 (S.D.N.Y. Mar. 24, 2005) ...............................................39

Solar Travel Corp. v. Nachtomi, No. 00 Civ. 3564,
    2001 WL 641151 (S.D.N.Y. June 8, 2001) ...........................................36, 37

Stevelman v. Alias Research Inc., 174 F.3d 79 (2d Cir. 1999) .........................................12

Tellabs v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007)..................................11, 12

In re Twinlab Corp. Securities Litigation, 103 F. Supp. 193 (E.D.N.Y. 2000).................35

Verizon Cal., Inc. v. Peevey, 462 F.3d 1142 (9th Cir. 2006) .............................................10

In re Vivendi Universal, S.A., Nos. 02 Civ 5571, 03 Civ. 2175,
    2004 WL 876050 (S.D.N.Y. Apr. 22, 2004)................................................28

Willingway Hospital, Inc. v. Blue Cross & Blue Shield,
    870 F. Supp. 1102 (S.D. Ga. 1994)................................................................39

Western Intermodal Services, Ltd. v. Singamas Container Industrial Co.,
    No. 98 Civ. 8275, 2000 WL 343780 (S.D.N.Y. Mar. 31, 2000) ................................15

In re WorldCom, Inc. Securities Litigation, No. 02 Civ. 3288,
2005 WL 638268
    (S.D.N.Y. Mar. 21, 2005) .......................................................................13

## STATE CASES

Albert Apartment Corp. v. Corbo Co., 182 A.D.2d 500, 582 N.Y.S.2d 409 (1992) .........35

## FEDERAL STATUTES AND REGULATIONS

15 U.S.C. § 78t(a) ....................................................................................29

15 U.S.C. §78u-4(b)(2) ...............................................................................34

15 U.S.C. §§ 78u-4(b)(1)(B) and (b)(2)..............................................................11

28 U.S.C. §§ 1331 ....................................................................................39

28 U.S.C. § 1367(c) ..................................................................................39

17 C.F.R. § 240.12B-2 ................................................................................31

## OTHER

Robert K. Merton, Social Theory and Social Structure (Free Press 1968)..........................9

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| One Communications Corp., as successor in interest to CTC Communications Group, Inc. and CTC Communications Acquisition Corp., <br><br> Plaintiff, <br><br> -v.- <br><br> JP Morgan SBIC LLC, Sixty Wall Street SBIC Fund, L.P., The Megunticook Fund II, L.P., The Megunticook Side Fund II, L.P., Kevin O'Hare, Jeffrey Koester, Mellon Investor Services LLC as nominal defendant as escrow agent and Verizon New England Inc., as defendant on a declaratory judgment claim, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action: 07 Civ 3905 (LTS) (AJP)· (ECF Case) <br><br> **MEMORANDUM OF LAW IN SUPPORT OF THE MEGUNTICOOK DEFENDANTS' MOTION TO DISMISS** |

Defendants Megunticook Fund II, L.P. and Megunticook Side Fund II, L.P. (collectively, "Megunticook," or the "Megunticook Entities") submit this Memorandum in support of their motion to dismiss all claims against them.

## Introduction

In May 2005, Plaintiff's predecessors CTC Communications Group, Inc. and CTC Communications Acquisition Corp. (collectively, "CTC") purchased Lightship Holding Inc. ("LHI") and its subsidiary Lightship Telecom LLC (collectively, "Lightship"), a telecommunications company servicing New England. CTC was a leading telecommunications company in the Northeast and Mid-Atlantic. Now, two years after the acquisition, Plaintiff One Communications Corp. ("One Communications"), CTC's successor – apparently disappointed with its business deal – conjures up supposed "misrepresentations" in connection with the deal to try to undo it. Every one of its claims against Megunticook should be dismissed with prejudice.

Megunticook was a minority investor in Lightship, and provided an outside director, Thomas Matlack, to the Lightship Board. CTC stipulated in the acquisition's Merger Agreement that any prior Lightship representations were superseded by the representations and warranties of the Merger Agreement. The allegations of the Complaint fail utterly in any event to demonstrate that Matlack misrepresented anything to CTC; or knew of any misrepresentations to CTC; or, for that matter, that any one else misrepresented anything to CTC.[1]

In the acquisition, Megunticook's minority interest was fully purchased by CTC. Thus, Megunticook is not even a party to an Escrow Fund created to indemnify CTC against certain post-closing losses (though the Complaint erroneously states that it is).

Plaintiff asserts Federal claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") (Count One) and for "controlling person" liability in violation of Section 20(a) of the Exchange Act ("Section 20") (Count Two); for common law fraud (Count Three); for negligent misrepresentation (Count Four); for breach of contract in connection with supposed representations and warranties in the Merger Agreement (Count Five); and for Declaratory Judgment as to whether Verizon, a contract partner of Lightship, is owed money as a result of the alleged fraud of defendants (Count Six).

### Summary Of The Claims And Defenses

Every claim of this lawsuit must be dismissed for a host of independently sufficient reasons. First, Megunticook is not a party to the Merger Agreement, the Stockholder Representative Agreement or the Escrow Agreement – the very merger documents on which

---

[1] The other defendants in this lawsuit are J.P. Morgan SBIC LLC and a related entity (the "Morgan Entities"), another investor with an outside director on the Lightship Board; and two individual executives of Lightship, defendants Kevin O'Hare and Jeffrey Koester. Verizon New England, Inc. ("Verizon") is sued as a "defendant on a declaratory judgment claim" for tactical reasons of CTC's that we explain *infra*. Mellon Investor Services LLP is sued as a nominal defendant based on its role as escrow agent for a certain escrow fund (also described and explained *infra*).

Plaintiff relies for its lawsuit – though Plaintiff, remarkably, says the contrary.  Second, Plaintiff fails woefully to meet any of the pleading standards of Section 10(b) of the Exchange Act; Plaintiff fails to show with particularity any misrepresentations by Megunticook; reliance; scienter; or loss causation.  Third, Plaintiff fails to meet the fundamental requirements of pleading culpability and control to show "control person" liability under Section 20.  Fourth, Plaintiff fails to plead each element of the common law claims of fraud and negligent misrepresentation.  Fifth, even if Plaintiff had a cause of action against Megunticook, which it does not, this Court would have to stay its hand pending a decision by the Maine Public Utility Commission.  Sixth, this Court lacks personal jurisdiction over Megunticook.

### The Allegations Of The Complaint As To Megunticook Dissolve Upon Examination

Lightship was a regional telecommunications service provider created in June 1998 (as was LHI, its 100% owner).  Complaint ("Cmpl.") ¶ 26.[2]  Defendant O'Hare was at all relevant times the Chairman of the Board of Directors of LHI and Chief Executive Officer of Lightship. Defendant Koester was the Chief Operating Officer.  Cmpl. ¶ 9, 10.

In September 1999, Lightship secured $15 million of investment capital from the Morgan Entities.  Cmpl. ¶ 28.  In February 2002, the Morgan Entities invested additional money and converted their stake to equity in LHI.  Cmpl. ¶ 30.  At about that time, Megunticook, a company that invests in businesses in a variety of fields, also "made substantial investments and received

---

[2] The facts are drawn from the allegations of the Complaint; and from documents directly referenced in the Complaint. The specific factual allegations (as opposed to conclusory assertions and unwarranted inferences) of the Complaint must, of course, be assumed to be true for purposes of this motion, Kalnit v. Eichler, 264 F.3d 131, 135 (2d Cir. 2001).

stock in LHI." Cmpl. ¶ 31.[3]  As of January 2004, Thomas Matlack was a Megunticook designee

on LHI's Board, along with a Morgan designee Stephan Oppenheimer. Cmpl. ¶ 34.[4]

The Complaint tells a melodramatic tale of supposed billing fraud (called the

"Undisclosed Lightship Billing Practices") and misrepresentation, layered in arcane technical

terms, and driven forward by conclusory rhetoric. The "Undisclosed Lightship Billing Practices"

are said to have affected the purchase price paid by CTC:

> Unkown [sic] to CTC, the EBITDA figure upon which the purchase price was
> determined…was based upon revenue unlawfully produced by the Undisclosed
> Lightship Billing Practices.… Cmpl. ¶ 101

The technical issues are analyzed in detail in the Memorandum of Law in Support of the

Morgan Defendants' Motion to Dismiss the Complaint (the "Morgan Brief"). We join in

Sections I.A, I.D and II of the Morgan Brief.[5]

The Complaint also purports to relate the story of "the marketing of Lightship". Cmpl. ¶¶

55-69. In November 2004 Lightship retained Q Advisors LLC ("Q Advisors"), an investment

banking firm, to assist it with a possible sale of Lightship. Cmpl. ¶ 55. Q Advisors, in

consultation with O'Hare and other "senior Lightship executives," prepared the Confidential

Information Memorandum ("CIM"), which is said to have incorporated revenue and other

financial data reflecting results of "various of" the "Undisclosed Lightship Billing Practices." Id.

The CIM was given to CTC's parent corporation, Columbia Ventures Corporation ("Columbia

Ventures"). Cmpl. ¶ 56.

---

[3] At the time of the sale of Lightship, Morgan owned 54.6% of LHI; and Megunticook owned 22.5%. Cmpl. ¶ 102.

[4] The Complaint says that two Megunticook and Morgan designees served on the Board, but only identifies Matlack and Oppenheimer.

[5] Apart from the "Billing Practices" issue, the only other allegations regard a purported failure to disclose concentration information about a particular Lightship customer, Great White Internet ("GWI"). We join and rely upon Section I.D of the Morgan Brief for the arguments with respect to the GWI issue.

Over the next months, by Plaintiff's own description, Plaintiff did extensive due

diligence, heavily advised by specialized professionals:

> During the initial diligence review in January 2005, CTC personnel from human
> resources, finance, regulatory, information systems and technology, network
> operations, sales, legal taxation, and customer care all reviewed Lightship's data
> room materials, interacted with various Lightship counterparts, and formulated
> requests for additional information. Included in the initial diligence were
> extensive requests for information regarding Lightship's CABS and intercarrier
> compensation billing practices and the regulatory support therefore, multiple
> specific requests for explanations for specific types of Lightship billing revenue
> and data supporting that revenue, and requests for information disclosing the
> structure, mechanics, and systems associated with Lightship's carrier-to-carrier
> billing practices, including the specifics of those practices in Maine. Lightship
> collected a set of materials responsive to CTC's preliminary diligence requests in
> a data room at its headquarters in Fort Washington, Pennsylvania.

Cmpl. ¶ 73.  In May, 2005, CTC acquired all LHI stock for a price of about $67 million.  Cmpl.

¶ 100.

There were three key documents connected with the sale of Lightship.[6]  The first was the

Merger Agreement, signed by CTC and Lightship and dated as of March 21, 2005.  In the

Merger Agreement, CTC acknowledged

> (i) that it has had an opportunity to consult with counsel and other advisers about
> the Transactions; (ii) that material documents, records and books pertaining to the
> Transactions have, on request, been made available to CTC and CTC's advisors,
> and (iii) that Lightship has made available to CTC and its representatives and
> agents the opportunity to ask questions of the Executive Officers and to acquire
> such additional information about the Business and financial condition and results
> of operations of Lightship as CTC has requested.

JSR Aff. Ex. 1, ¶ 3(e).  And, Plaintiff explicitly

---

[6] On a motion to dismiss, the Court may examine documents that are referred to or quoted from in the Complaint, Sedona Corp. v. Ladenburg Thalmann & Co., No. 03 Civ. 3120, 2005 WL 1902780, at *5 (S.D.N.Y. Aug. 9, 2005) (Swain, J.), and documents that are "integral" to Plaintiff's claims, even if not explicitly incorporated by reference.  Cortec Indus. v. Sum Holding L.P., 949 F.2d 42, 46-48 (2d Cir. 1991).  Plaintiff has failed to attach to the Complaint any of the documents or e-mails referenced therein.  There is good reason for this – many of Plaintiff's allegations are directly contradicted by the very documents on which it relies.  The relevant documents are attached to the accompanying affidavit of Jayne S. Robinson, Esquire, sworn to on September 17, 2007 (cited herein as "JSR Aff. Ex.").  When a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.  Rapoport v. Asia Elecs. Holding, 88 F. Supp. 2d 179 (S.D.N.Y. 2000).

acknowledges that *the Lightship Companies do not make, and have not made, any representations or warranties* relating to the Lightship Companies or the business, including in the Offering memorandum or any presentation relating to the Lightship Companies or the business given in connection with the Transactions, *other than those expressly set forth* in this Agreement.[7]

Id., ¶ 6(d).  Moreover, the Merger Agreement

constitutes *the entire agreement* among the Parties and *supersedes any prior understandings, agreements, or representations* by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

Id., ¶ 10(c).[8]

Megunticook was fully "paid out" through the merger for its equity interest in LHI.  Id., ¶ 2(e).  The Merger Agreement, however, created an "Indemnification Escrow" in the amount of $7,000,000, carved out from the amounts to be paid by CTC to certain of the other shareholders.  Under the Merger Agreement and the Stockholder Representative Agreement, those shareholders (but not Megunticook) agreed to "indemnify, defend and hold harmless" CTC against certain "Losses"[9] by means of the Indemnification Escrow.  The Merger Agreement also directed that a Stockholder Representative Committee be formed to act for these shareholders regarding their rights to the "Indemnification Escrow."  Id., ¶ 8(c).

The Stockholder Representative Agreement was signed by LHI and the members of the Stockholder Representative Committee.  The Complaint suggests that Megunticook was a

---

[7] Unless otherwise stated, all emphasis throughout this Memorandum is supplied.

[8] This clause is obviously central to the Court's analysis of the issue of Megunticook's supposed "misrepresentations" prior to the Merger Agreement, explored further *infra* in Sections I.A. and I.C.

[9] "Losses" were defined as: "all Actions, injunctions, judgments, determinations, orders, decrees, writs, rulings, charges, damages, dues, penalties, sanctions, fines, costs, expenses, amounts paid in settlement, Liabilities, obligations, Taxes, Liens, and losses, including court costs and attorneys' fees and expenses; *provided, however,* that the term "Losses" shall not include, or shall otherwise be reduced by the following: (i) any amount that a Person seeking recovery for Losses receives under any insurance policy on account of such Losses, (ii) the amount of any net Tax benefit to the Claimant from the deduction of such Losses, (iii) Losses that are indirect, unforeseeable, consequential, special, collateral, or incidental; and (iv) lost profits, lost savings, punitive damages, impairment of goodwill or any other diminution in value of any intangible asset." JSR Aff. Ex. 1, p. 6.

member of the Stockholder Representative Committee, and, on this basis Plaintiff sues

Megunticook for breach of its supposed indemnification obligations under the Merger

Agreement.  In the words of the Complaint:

> The Holding Stockholders continued to be liable under the Merger Agreement for
> certain categories of claims. In accordance with the Merger Agreement, an
> indemnification basket in the amount of $7 million was placed in escrow pursuant
> to the terms of the Escrow Agreement, and *the Stockholders' Committee was
> formed to represent the interests of the Holding Stockholders in the escrowed
> funds.*

Cmpl. ¶ 103.

As to Megunticook, Plaintiff is demonstrably wrong.  Megunticook was *not* a member of

the Stockholder Representative Committee or a party to the Stockholder Representative

Agreement.  As the Complaint itself reveals, the Megunticook Entities held only "Series CC"

shares.  Cmpl. ¶¶ 6, 7.  The Merger Agreement Section 8(b) states that

> [Lightship] shall deliver to CTC the Stockholder Representative Agreement,
> executed and delivered by all of the Holding Stockholders (*other than Holding
> Stockholders who hold only Series CC* Preferred and no other Capital Stock of
> [Lightship]) which, among other things confirms their agreement to be bound by
> the terms of this Agreement.

JSR Aff. Ex. 2.  A separate Escrow Agreement was entered into by CTC and the members of the

Stockholder Representative Committee.  And the Escrow Agreement states:

> The former stockholders of the Company (*except for those holders of the
> Company's Series CC* Convertible Preferred Stock who are not also holders of the
> Company's Series AA Convertible Preferred Stock) … have agreed … to be
> bound by the terms of this Escrow Agreement.

JSR Aff. Ex. 3.

Thus, when the Complaint goes on to say flatly that the Megunticook entities were parties

to the Escrow Agreement, *and even premises this Court's jurisdiction over Megunticook on that

"fact,"* it is wrong again.  The Complaint says:

> In the Escrow Agreement, the Megunticook Entities, O'Hare and Koester
> submitted to personal jurisdiction in this Court with respect to any action, suit or
> proceeding relating to or arising from the Escrow Agreement. The Escrow
> Agreement was entered into as a part of the sale of LHI to CTC.

Cmpl. ¶ 13. But it is plain on the face of the Escrow Agreement (see JSR Aff. Ex. 3, ¶ 6) that the

Megunticook entities are *not* parties to the Escrow Agreement;[10] have had *no role* in the

controversies surrounding the Escrow Agreement (see below); and never submitted (through the

Escrow Agreement, or any other document) to the personal jurisdiction of this Court.

These extraordinary fact errors are hardly collateral. The Megunticook Entities were

specifically and consciously *exempted* from liability by the Merger Agreement, the Stockholder

Representative Agreement and the Escrow Agreement. Plaintiff's predecessor chose to do that

when it entered into these binding agreements; but now, in a desperate bid to add defendants,

Plaintiff flagrantly misrepresents those very agreements.[11]

In the Merger Agreement, LHI made certain Representations and Warranties; these are

explored in greater detail in Section II.C. of the Memorandum of Law in Support of the

Individual Defendants' Motion to Dismiss (the "Individuals' Brief"). These Representations and

Warranties had a life of 18 months once the deal closed (JSR Aff. Ex. 1, ¶ 8(a)); in other words,

they would have expired on or about November 20, 2006.

Just three days before that date, CTC apparently gave notice to the Stockholder

Representative Committee of various grievances by means of a November 17, 2006 letter.

Cmpl. ¶ 106. But that letter, of course, was not directed to the Megunticook entities, because

---

[10] The Escrow Agreement was signed by CTC, Stephan Oppenheimer, a Lightship shareholder (James Houghton) in his individual capacity, and Kevin O'Hare, as well as Mellon Investor Services LLC, as escrow agent. Id.

[11] Just so that there can be absolutely no misunderstanding: the Megunticook Entities believe the Complaint must be dismissed as to *all* defendants; and, as will be demonstrated below, the Megunticook Entities share numerous defenses in common with the other defendants. Most fundamentally to all defendants, there was no fraud or misrepresentation in connection with the sale of Lightship. The fact that the Megunticook Entities were not parties to the Stockholder Representative Agreement and the Escrow Agreement simply provides the Megunticook Entities with yet an additional set of defenses.

they are neither members of the Stockholder Representative Committee nor parties to the Stockholder Representative Agreement or the Escrow Agreement.[12]  The first "accusation" by CTC against the Megunticook entities was the filing of this error-filled Complaint on May 18, 2007.  Including Megunticook was, quite literally, an afterthought by Plaintiff, two years after CTC had deliberately excluded them from the Merger Agreement, the Escrow Agreement, and the Stockholder Representative Agreement.

It is evident from this brief discussion that Plaintiff's claims are confused and internally contradictory.  Even if they had been well stated, each falls under a blizzard of defenses, as introduced above and set forth in greater detail below.  For now, we note two points:

1.  Verizon is the "victim" of the supposed over-billing.  At the time of the acquisition, Verizon had not raised any grievance about supposed over charges.  Nor had Verizon done so by November 17, 2006, when CTC complained of the billing practices to the Stockholder Representative Committee; nor, for that matter, had Verizon even done so at the time that One Communications filed its Complaint, suing Verizon as a nominal defendant.

But now Verizon, a public company, has been served with a complaint by Lightship saying, "We cheated you out of millions of dollars."  Verizon might very well *now* bring claims against Lightship.[13]  That is utterly predictable *now*, in light of Lightship's "invitation" to sue it;[14] and essentially irrelevant to this motion to dismiss.

---

[12] Thus the Megunticook entities are not parties to the case brought by the Stockholder Representative Committee against One Communications Corp. (and Mellon as a nominal defendant) filed in N.Y. State court on April 27, 2007, and subsequently removed to this Court. Docket No. 07-cv-05440 (LTS).

[13] Verizon's deadline to move or answer is identical to the deadline for Megunticook and the other defendants' motion or answer, that is, September 17, 2007.

[14] The concept of a "self-fulfilling prophecy" was explored by the sociologist Robert Merton, who said, "The self-fulfilling prophecy is, in the beginning, a false definition of the situation evoking a new behavior which makes the original false conception come 'true'. This specious validity of the self-fulfilling prophecy perpetuates a reign of error. For the prophet will cite the actual course of events as proof that he was right from the very beginning." Robert K. Merton, Social Theory and Social Structure, p. 477 (Free Press 1968).

2.  The Complaint is an alphabet soup of unfamiliar and technical telecommunications acronyms:  LECs, CLECs, IXC, LCAs, CABS, ISP, NPA, NXX, VNXX, ICAs, LATAs, etc. See Section II of the Morgan Brief, which shows beyond cavil that – to the extent that any dispute really exists over Lightship's billing practices – that dispute is simply a legitimate disagreement over technical contract terms and complex regulations, not a basis for fraud.  But what is *Megunticook's* relationship to this specialized and arcane world?  Megunticook invested in Lightship.  Megunticook provided Matlack and another (unidentified) outside director to the Board.  The Complaint never suggests, nor could it, that Matlack had ever been a telecommunications specialist, or entrepreneur or analyst; indeed, the Complaint says *nothing* about Matlack's knowledge of this complex world,[15] because he is, in reality, an outsider.

The world of telecommunications since the passage of the Telecommunications Act of 1996 is one of notorious confusion, arcane regulation and conflicting interpretation.  See, e.g., AT & T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 397 (1999) ("It would be a gross understatement to say that the [Telecommunications] Act is not a model of clarity.  It is … a model of ambiguity or even self-contradiction"); Verizon Cal., Inc. v. Peevey, 462 F.3d 1142 (9th Cir. 2006) ("confusion from day one" about reciprocal compensation); Omnipoint Commc'ns Enters., L.P. v. Zoning Hearing Bd. of Easttown Twp., 331 F.3d 386, 401 (3d Cir. 2003) (Rosenn, J., dissenting) ("notoriously opaque" wording of the Act).  Plaintiff does not even *attempt* to allege that Matlack has any expertise whatever in that world.

---

[15] And precious little about *any* role played by Matlack.

## ARGUMENT

**I.    PLAINTIFF'S SECTION 10(b) CLAIM IS FATALLY FLAWED.**

    A.    The Requisite Pleading Standard Is Not Met.

With the passage of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Congress made it clear that plaintiffs would have to plead particularized facts, not conclusory rhetoric, to survive a motion to dismiss. The PSLRA imposed stringent requirements on securities plaintiffs to

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

> [And] with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. §§ 78u-4(b)(1)(B) and (b)(2).

The Supreme Court has recently clarified the heightened standard that must be satisfied by securities plaintiffs. In *Tellabs v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007), the Court held that, when a court examines "whether the pleaded facts give rise to a 'strong' inference of scienter," under the PSLRA, "the court *must* take into account *plausible opposing inferences*." *Tellabs*, 127 S. Ct. at 2509. For an inference of scienter to be "strong," the inference "must be *more than* merely 'reasonable' or 'permissible' – *it must be cogent and compelling*, thus strong in light of other plausible explanations". *Id.* at 2510. Omissions and ambiguities count against inferring scienter. *Id.* at 2511.

Thus, a complaint will survive *only* if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged. *Id.* at 2510. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) (quoting *Tellabs*); *In re Bayou Hedge Fund Litig.*, Nos. 06-MDL-1755, 06-CV-2943, 2007 WL

2319127, at *8 (S.D.N.Y. July 31, 2007) (plaintiff failed to meet the "stiff challenge[]" it faced under Tellabs).

Conclusory allegations, for scienter or any other element of the claim, will not suffice to withstand a motion to dismiss. Glickman v. Alexander & Alexander Servs., Inc., No. 93 Civ. 7594, 1996 U.S. Dist. LEXIS 2325 (S.D.N.Y. Feb. 27, 1996); De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 70 (2d Cir. 1996). Where motive is not apparent, plaintiffs bear an especially heavy burden of providing "correspondingly greater" specific allegations constituting *strong evidence* that defendants acted with knowledge or recklessness under the alternative method of pleading scienter. Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001).

To plead a valid securities fraud claim in the Second Circuit under Section 10(b) and Rule 10b-5, a Plaintiff must plead "that [the defendants] (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." Chill v. Gen. Elec. Co., 101 F.3d 263 (2d Cir. 1996); Dujardin v. Liberty Media Corp., 359 F. Supp. 2d 337, 347 (S.D.N.Y. 2005) (Swain, J.).

In addition, Rule 9(b) of the Federal Rules of Civil Procedure mandates that the "circumstances constituting fraud . . . shall be stated with particularity." This means that plaintiffs must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999).

Plaintiff has not even approached the requirements of a claim for securities fraud.

B.    <u>Plaintiff Has Failed Adequately To Allege Misrepresentations Or Omissions Against Megunticook.</u>

Plaintiff's allegations about "misrepresentations" and "omissions" are a potpourri of contradictions, sleight of hand and misstatement.

### <u>What Was Megunticook's Role In Lightship?</u>

Matlack was a Megunticook principal who served on the Lightship Board as an outside director: that is, a director who "is not an officer, an employee, or 'so deeply involved'" to really be an insider. <u>In re Nat'l Century Fin. Enters., Inc.</u>, No. 2:03-1565, Slip Op. 2007 WL 1362695, at *1 n.1 (S.D. Ohio May 7, 2007), <u>citing</u> <u>In re WorldCom, Inc. Sec. Litig.</u>, No. 02 Civ. 3288, 2005 WL 638268, at *10 (S.D.N.Y. Mar. 21, 2005). To state a claim as to an outside director for misrepresentations contained in published corporate documents, a complaint must make specific allegations that the outside director took part in *preparing* the documents, or was involved in the company's day-to-day management. <u>Id.</u>

With that as background, we examine the several times in which Matlack (or Megunticook more generally) is said to have played some role in this conjured up "fraud." The Complaint first attempts to characterize Megunticook's role in Lightship this way:

> At all times [after February 2002], the Megunticook Entities' Board representatives were actively involved in overseeing the financial condition and operations of LHI and Lightship.

Cmpl. ¶ 31. This generic allegation adds nothing beyond the fact that two Megunticook representatives (one never identified) served as outside Directors of Lightship. Plaintiff's next stab at showing Megunticook's involvement is equally feckless:

> By January 2004, Stephan Oppenheimer ("Oppenheimer") was serving as the JP Morgan Entities' designee on LHI's Board. Thomas Matlack ("Matlack") served as the Megunticook Entities' designee on LHI's Board. Throughout their respective terms as Directors, Oppenheimer and Matlack received reports tracking Lightship's financial condition and operations.

Cmpl. ¶ 34. This is nothing but a repetition of: "They served as Outside Directors."

**The Supposed Misrepresentations And Omissions**

Plaintiff has enumerated the supposed omissions and misrepresentations of the

Defendants this way:

> Lightship and the Fraud and Securities Claims Defendants failed to disclose the existence of the Undisclosed Lightship Billing Practices and the fact that a disproportionate amount of Lightship's revenue in the State of Maine stemmed from traffic bound for a single customer, GWI. Lightship and the Fraud and Securities Claims Defendants also made numerous false material statements of fact specifically designed to conceal these facts, including but not limited to in the following communications referred to above:
>
> (a)  The November 2004 CIM;
>
> (b)  Lightship's December 10, 2004 responses to questions;
>
> (c)  The January 17, 2005 PowerPoint presentation;
>
> (d)  Numerous interstate telephone conference calls and discussions with members of CTC's diligence team;
>
> (e)  The March 9, May 11 and May 13, 2005, e-mails transmitting financial and income statements;
>
> (f)  The March 10, 2005, e-mail;
>
> (g)  The Merger Agreement's representations and warranties.

Cmpl. ¶ 111. We will examine each of these. But first, we note that Plaintiff is *precluded* from

relying on any but the final one: the Merger Agreement's representations and warranties.

After an arms' length negotiation mediated by counsel[16] between two sophisticated

parties, CTC entered into the Merger Agreement. CTC "acknowledge[d] that the Lightship

Companies...have not made, any representations or warranties...other than those expressly set

forth in this Agreement." JSR Aff. Ex. 1, ¶ 10(d). CTC agreed that the Merger Agreement

---

[16] CTC was represented by Kelley Drye & Warren LLP. See JSR Aff. Ex. 1, ¶ 10(g).

"constitutes the entire agreement among the Parties and supersedes any prior…representations

by…the Parties…to the extent they relate in any way to the subject matter hereof." Id., ¶ 10(c).[17]

Where a merger agreement contains an integration clause, reliance on statements made

before signing of the agreement (here March 21, 2005) is quite simply precluded. Dresner v.

Utility.com, Inc., 371 F. Supp. 2d 476, 491-92 (S.D.N.Y. 2005) (dismissing all claims predicated

on statements made before entering into a merger agreement); W. Intermodal Servs., Ltd. v.

Singamas Container Indus. Co., No. 98 Civ. 8275, 2000 WL 343780, at *3 (S.D.N.Y. Mar. 31,

2000); Grumman Allied Indus., Inc. v. Rohr Indus., Inc., 748 F.2d 729, 734 (2d Cir. 1984).

Although the prior representations are, in effect, "extinguished," we nevertheless turn to

them individually; they amount to nothing.

> 1.    *The November 2004 "Confidential Information Memorandum."*

According to the Complaint,

> Throughout October 2004, O'Hare, in consultation with Oppenheimer and
> Matlack met with Q Advisors and reviewed materials, including a confidential
> information memorandum (the "CIM"), created by Q Advisors to be provided to
> potential purchasers and thus used in the marketing of Lightship.

Cmpl. ¶ 36. The Complaint next describes who prepared the CIM:

> In or about November 2004, Q Advisors, in close consultation with O'Hare and
> other senior Lightship executives, prepared the CIM, which favorably described
> Lightship and highlighted its exceptionally strong revenue, EBITDA and growth
> potential. This information incorporated revenue and other financial data resulting
> from various of the Undisclosed Lightship Billing Practices.

Cmpl. ¶ 55. Megunticook is not alleged to have prepared the CIM.  But the CIM was supposedly

tarnished by the Undisclosed Lightship Billing Practices; see Cmpl. ¶59.  Yet the CIM was

prepared for the "sole purpose" of "assis[ting]" CTC in deciding "whether to proceed with a

---

[17] Although CTC finds room in the Complaint for a lengthy recitation and discussion of provisions of the Merger Agreement, see Cmpl. ¶¶ 90-107, it somehow omits any mention of the clauses cited above.

further investigation" of Lightship. JSR Aff. Ex. 8. The CIM itself expressly *disclaims* any "express or implied representation or warranty as to the accuracy or completeness of the information contained herein." Id.

CTC also disclaims all prior representations in the Merger Agreement. Thus, even if Plaintiff had shown misrepresentations in the CIM (which it surely has not), those misrepresentations were: a) not by Megunticook, and b) not actionable.

   2.  *The January 2005 "PowerPoint" Presentation.*

Plaintiff fares no better with the "PowerPoint" Presentation. The Complaint says:

On January 17, 2005, Lightship's management made a presentation to the CTC diligence team at Lightship's headquarters…which included a narrated PowerPoint presentation. Lightship also prepared an agenda for this first day of due diligence, which included formal presentations by O'Hare, Koester, Wilson, Richard Kendall, Executive Vice President of Sales and Rainer Gawlick, Executive Vice President of Marketing. Cmpl. ¶ 75.

The Lightship PowerPoint presentation to the CTC diligence team on January 17, 2005, included, *inter alia,* historical financial results…. Cmpl ¶ 76.

These historical 2004 EBITDA and projected financial results, and many others contained in the PowerPoint presentation were false, materially misleading and based in material part upon various of the Undisclosed Lightship Billing Practices. Cmpl. ¶ 77.

O'Hare, Wilson and Koester and other members of Lightship senior management knew that this financial information contained in the PowerPoint presentation was false, materially misleading and based in material part upon various of the Undisclosed Lightship Billing Practices…. Cmpl. ¶ 78.

Oppenheimer and *Matlack knew or should have known* that this financial information contained in the PowerPoint presentation was false, materially misleading and based in material part upon various of the Undisclosed Lightship Billing Practices…. Cmpl. ¶ 79.

The PowerPoint Presentation represented that Lightship's procedures were "appropriate" and had been validated by industry experts, when O'Hare, Wilson and Koester knew that its billing practices were not appropriate, and multiple procedures and billing practices in which it was actually engaged were not legally permissible. Cmpl. ¶ 80.

There is nothing remotely actionable alleged in the PowerPoint. But as to Megunticook

specifically, the allegations are simply empty. There is no allegation that Matlack authored the

PowerPoint, or that he was present for its delivery. Plaintiff's ritualistic suggestion that

"Matlack knew or should have known" is just window dressing.

        3.     *March 10, 2005 E-Mail Chain.*

      Plaintiff's entire description of the March 10 e-mail and its "significance" is the

following:

> [o]n March 10, 2005, Matlack sent an e-mail to Peterson, Prenetta, other CTC
> employees, and Oppenheimer. In this e-mail Matlack stated, *inter alia*, '[W]e are
> very confident in our CABS[18] position and do not feel there is any exposure here.

Cmpl. ¶ 88. Plaintiff wishes to suggest, of course, that the March 10 e-mail places Matlack in

the midst of a dispute with Verizon over CABS charges (a dispute that, as of this writing, does

not even exist). This allegation is indicative of Plaintiff's readiness to play games with the

Court. The March 10/11 e-mail exchange does not support Plaintiff's allegations *at all*. Even at

the pleading stage, the rules permit a defendant to proffer a *complete* document to the Court that

has been selectively, and misleadingly, quoted by Plaintiff, and we shall do so (see the March

10/11 e-mail exchange, attached as JRS Aff. Ex. 10).[19]

---

[18] CABS ("carrier access billing systems") are complex billing systems that enable telecom service providers to bill each other for carrier access charges (long distance calls), reciprocal compensation charges (local calls), and for UNE-P access. The idea implicit in the Complaint, that all references to CABS must be related to the allegedly disputed reciprocal compensation charges, ignores both the breadth of the term and the complex realities of the industry.

[19] See Malin v. XL Capital Ltd., No. 3:03cv2001, __ F. Supp. 2d __, 2007 WL 2175422, at *6 (D. Conn. July 26, 2007) (courts have routinely held that when a complaint quotes documents only in part and omits critical portions of the documents, it is permissible for the court ruling on a motion to dismiss to consider the full texts of the quoted documents); see also Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991) ("Were courts to refrain from considering such documents, complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure" and such complaints might be filed "solely to extract nuisance settlements.").

First, however, we present the critical background: the Merger Agreement's representation relevant to the Matlack e-mail. Here is Plaintiff's *paraphrase* of the relevant representation:

> Section 4(e)(v) [of the Merger Agreement] provides that as of the closing date, none of the Lightship Companies had any liability to any affiliate of Verizon Communications, Inc. for CABS-related billing of intercarrier compensation.

Cmpl. ¶ 94.

But here is the *actual* Section 4(e)(v) representation, in relevant part:

> As of the Closing Date, none of the Lightship Companies has any Liability: (A) to any Affiliate of Verizon Communications, Inc. related to billing for CABS *with respect to any intra-LATA toll traffic terminating on Lightship's UNE-P lines....*[20]

JSR Aff. Ex. 1, ¶ 4(e)(v).

This is just more of Plaintiff's three card monte. As to the *actual* representation (not Plaintiff's misleading "paraphrase"), Plaintiff would have to show liability *to Verizon* "related to billing for CABS with respect to any intra-LATA toll traffic terminating on Lightship's UNE-P lines."

With that background, we return to the e-mail. The quoted Matlack text is a small part of an exchange between CTC principals and Lightship executives and outside directors in the midst of final due diligence issues. <u>See</u> JSR Aff. Ex. 10. Matlack sent the e-mail (addressing multiple issues, including CABS) following a conference call among the parties. Here is what Matlack's e-mail <u>actually</u> said on March 10, 2005:

> I have discussed our situation with other members of the board and propose the following in response to your request.

---

[20] UNE-P (Unbundled Network Element – Platform) lines are a restricted set of resale lines with mandated pricing that is significantly below that of other resale lines. The FCC requires Incumbent Local Exchange Carriers (ILECs) to make their network facilities available to Competitive Local Exchange Carriers (CLECs) at rates determined by state public utility commissions. The general theory behind the UNE-P system is that it maintains fair competition among local carriers.

> We feel that the call today has fully fleshed out areas of agreement and disagreement on the tax issues and do not feel further discussion will advance the ball.
>
> We are very confident in our CABs position and do not feel there is an exposure here. If you want to take Friday to crystallize your views on these issues that is fine.
>
> But if you want to talk to anyone on our team we would ask you to call Kevin O'Hare and no one else....

Id. On March 11, 2005, Ken Peterson, the Chairman of the Board of Columbia Ventures, responded to Matlack:

> As it has been relayed to me, subject to the proviso that I may have misunderstood or that others themselves, on one side or the other, may have misunderstood the issue is related to this:
>
> [Lightship] has a contractual agreement in place with Verizon that governs certain relations between the companies. One of the things governed relates to *how [Lightship] will bill Verizon for certain services over UNE-P lines*. The contract, as I am told, appears to prohibit a certain type of charge that in fact [Lightship] has been charging. Obviously, this only affects a fraction of [Lightship's] business, but it could result in a material affect [sic] on reported EBITDA should it turn out to be prohibited by contract. That's about all I can explain at this time....

Id. Defendant O'Hare replied to Peterson:

> I want to clear up an issue discussed between members of our teams yesterday. Lightship does bill intra-lata CABS for carriers on UNE-P lines but DOES NOT BILL VERIZON for intra-lata CABS on UNE-P lines. I believe this resolves the CABS misunderstanding.[21]

Id. Minutes later, O'Hare responded this way to Ray Allieri, a CTC principal, on the same issue:

> I think it was a misunderstanding between Pam [of CTC]and Rainer [of Lightship]. Rainer was answering a broader question about whether or not we bill CABS on UNE-P lines. We do bill intra-lata CABS to all other carriers on UNE-P lines, all other than Verizon. My answer is unambiguous and correct. *We do not bill Verizon for intra-lata CABS on UNE-P lines*. My understanding of this

---

[21] Intra-lata is just another name for local toll calls or regional calls (*i.e.*, within the boundaries of a local access area). These calls are made to numbers outside the local calling area but that are not considered long distance.

issue is absolute and complete. You need not concern yourself on this one any longer.

Id. And finally, to close the loop, Michael Quinn, of Q Advisors, wrote back to O'Hare:

I talked to Prenetta. He said if we believe this great. They will want a specific rep to this effect. If we are clear on this which it appears we are then we can probably give this rep.

Id. Matlack's allegedly false statement is true; consistent with the *actual* representation and warranty; and wholly unrelated to any of the "improper billing" allegations set forth in the Complaint. Plaintiff's use of the March 10 Email is misleading and disingenuous.

### 4.    The March 12, 2005 E-Mail Chain.

Plaintiff supposedly "summarizes" a chain of e-mails that took place on March 12, 2005. Plaintiff says that Oppenheimer, Matlack and O'Hare allegedly

discussed requests for Lightship billing information from Prenetta [of CTC]. In this e-mail chain, Oppenheimer suggested that additional information on Lightship's CABS should not be provided, recognized that disclosure of the information sought might raise additional questions and raised the issue of whether the information sought would impact the valuation.

Cmpl. ¶ 89. Characteristically, Plaintiff misstates the actual contents of the e-mail exchange, and quotes out of context.

The discussion in the March 12 e-mails regarded "questions on our CABS bill *to CTC*" that Prenetta had raised in a telephone conversation with O'Hare. JSR Aff. Ex. 10. According to O'Hare, CTC was "concern[ed] because [Lightship] CABS bills look different than theirs and wants to make sure we are not over billing our carrier customers." Id. The March 12 e-mails do not contain a single reference to any billing issues involving Verizon (or, for that matter, any other issues relating to valuation of Lightship).

Moreover, even if we assume for the sake of argument that CTC *sought* information, *but failed to receive it,* this cannot form the basis of a securities claim. See Harsco Corp. v. Segui,

91 F.3d 337, 347-48 (2d Cir. 1996) (denial of a request to see documents does not constitute

fraud unless that denial suggested falsely and deceitfully that those documents did not exist).

> 5.  *March 9, May 11 and May 13, 2005 E-Mails Transmitting Financial &*
> *Income Statements.*

Building on its flawed allegations regarding Lightship's billing practices, Plaintiff

concludes that the financial information that it received in due diligence must be false. Cmpl. ¶

98. And, of course, there is the incantation that Matlack "knew or should have known" this. Id.

Because Plaintiff has failed even to come close to pleading that Lightship's billing practices were

improper, its allegations regarding Lightship financial statements fail as well.

> 6.  *Remaining "Misrepresentations."*

Plaintiff's two remaining fraud allegations are equally inadequate. First, in the sole

statement in the Complaint addressing the "[n]umerous interstate telephone conference calls and

discussions with members of CTC's diligence team," Plaintiff alleges that:

> Specific requests for information regarding Lightship's compliance with its ICA's
> were made by various CTC employees...in telephone conference calls and e-
> mails throughout February and March 2005. Assurances were given by Lightship
> that it was in full compliance with its ICAs. These assurances included comments
> made by Koester and Gawlick [of Lightship] in telephone conference calls in
> February and March 2005, which were false because Lightship was not in
> compliance with, *inter alia*, the Maine ICA based upon various of the
> Undisclosed Lightship Billing Practices.

Cmpl. ¶ 87. Plaintiff's allegation is so vague and conclusory as to be meaningless. Plaintiff (i)

fails to identify any specific "conference calls" or "e-mails," (ii) fails to identify the specific

statements made in these communications, and (iii) fails to allege that Matlack (or Megunticook)

actually made any of the alleged "assurances."

Second, regarding "Lightship's December 10, 2004 responses to questions," Plaintiff

alleges that:

Q Advisors responded on Lightship's behalf to various of these requests, in writing, on December 10, 2004. In that correspondence, Q Advisors stated with respect to CTC's inquiries regarding CABS revenue:

Lightship receives CABS revenue for terminating calls on its network originated by non-customers. Interstate makes up 14% of total revenue, intrastate makes up 6% of total revenue and Recip Comp makes up 2% of total revenue.

Lightship's current average intrastate access charge is approximately $0.0536 per minute and its current average IXC/LD rate is approximately $0.0172. The blended rate on a weighted per minute basis is currently $0.0329. These rates incorporate the FCC-mandated rate decrease that took place earlier this year. Lightship's CABS revenues were largely shielded from this rate drop because of an increase in minutes as a result of overall growth. As indicated in the Information Memorandum, Lightship's business has doubled in size in the past 24 months. This increase in traffic volume compensated for any drop in the FCC rates.

The Maine interstate rate will drop in June 2005 from $0.053 to $0.018 which is reflected in the projections. Lightship does not anticipate any changes in other rates, and, as a result, the Company's financial projections do not contemplate any changes in access rates over the forecast period. Cmpl. ¶ 65.

According to the Complaint, these "representations were false because Lightship's access revenues in Maine were inflated from the Lightship billing practices that improperly levied access charges on Verizon…" First, the allegation is based on the false underlying premise that Lightship breached the ICA. Second, even if these statements were fraudulent (which they are not), Plaintiff could not rely on them; they were made prior to the Merger Agreement. Finally, as the Complaint admits, the statements were made by Q Advisors, *not* by Matlack.

In sum, nothing is left of the supposed misrepresentations and omissions by Megunticook.[22]

---

[22] CTC also alleges a dramatic "whistle-blower" story involving one "Lightship billing manager named Darren Kreitler." Cmpl. ¶ 40, *et seq.* Whatever did (or did not) happen with Kreitler is irrelevant to the allegations as to Megunticook; CTC does not allege anything (nor could it) about Matlack/Megunticook knowledge of, or participation in, anything having to do with Kreitler.

C.     Plaintiff Has Failed Adequately To Allege Scienter.

Prior to Tellabs, to plead scienter adequately in this Circuit, a plaintiff only had to allege

facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2)

constituting strong circumstantial evidence of conscious misbehavior or recklessness.  Ganino v.

Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000).  Now, "plaintiffs must also satisfy the

heightened standard recently announced [in Tellabs]."  See In re Bayou Hedge Fund Litig., Nos.

06-MDL-1755, 06-CV-2943, 2007 WL 2319127, at *8 (S.D.N.Y. Jul. 31, 2007); Glidepath

Holding B.V. v. Spherion Corp., No. 04 Civ. 9758, 2007 WL 2176072, at *13 (S.D.N.Y. July 26,

2007) (enhancing the traditional "motive and opportunity" and "recklessness" analysis with the

test announced in Tellabs).  Plaintiff's would-be inferences of scienter are far weaker than the

opposing inferences, and Plaintiff has not adequately pled motive and opportunity or

recklessness.

       *1.     Motive & Opportunity.*

Plaintiff's attempt to plead "motive" as to Megunticook amounts to the solitary allegation

that Defendants "received a concrete personal benefit from the acts complained of here in that

each received consideration for the sale of the respective interest of each in LHI to CTC."  Cmpl.

¶ 114.  That allegation says nothing cognizable about motive.

       a.     Receiving consideration from the sale of a company is not
            sufficient motive.

The law is clear that the "desire to achieve the most lucrative acquisition proposal can be

attributed to virtually every company seeking to be acquired" and is insufficient to plead

scienter.  Kalnit v. Eichler, 264 F.3d 131, 141 (2d Cir. 2001); see also Leventhal v. Tow, 48 F.

Supp. 2d 104, 115 (D. Conn. 1999) (defendants' "motive" to inflate stock price artificially for

more favorable terms in stock-for-stock transactions too generalized to establish scienter); In re

Health Mgmt. Sys. Inc., No. 97 Civ. 1865, 1998 WL 283286, at *6 (S.D.N.Y. Jun. 1, 1998)

(alleged desire to use artificially inflated company stock for a corporate transaction not a motive

for securities fraud).  What is required is not a bare invocation of magic words such as motive

and opportunity, but an "allegation of *facts* showing the type of particular circumstances that our

case law has recognized will render motive and opportunity probative of a strong inference of

scienter." Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000).

> 2.    *Conscious Misbehavior Or Recklessness.*

Having failed adequately to plead motive and opportunity, Plaintiff, in lieu of any

straightforward allegation of actual knowledge, feebly attempts to plead scienter by asserting that

Matlack and Megunticook "knew or should have known" about the supposed illegal practices,

Cmpl. ¶ 79; or, in an alternative and contradictory formulation, "recklessly failed to know about"

the alleged fraudulent practices (whatever that means).[23] Cmpl. ¶ 110.

To plead conscious misbehavior or recklessness satisfactorily plaintiffs must allege facts

showing that the alleged conduct is "at the least, conduct which is highly unreasonable and

which represents an extreme departure from the standards of ordinary care to the extent that the

danger was either known to the defendant or *so obvious that the defendant must have been aware

of it.*" In re Carter-Wallace Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000).  Scienter, therefore,

requires a misrepresentation so recklessly made that the culpability attaching to such conduct

closely approaches that which attaches to conscious deception.  In re Digital Island Sec. Litig.,

357 F.3d 322, 332 (3d Cir. 2004).  Plaintiff's conclusory statements in the Complaint are not

supported by any factual allegations regarding Megunticook's or Matlack's role in the alleged

---

[23] When a court is confronted with internal contradictions in a complaint, the proper resolution is to treat the contradictory allegations as a nullity.  See, e.g., Dresner v. Utility.com, Inc., 371 F. Supp. 2d 476, 500 (S.D.N.Y. 2005) (dismissing securities fraud claim where allegations were internally contradictory, and "therefore not properly particular"); In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 407 (S.D.N.Y. 2001).

fraud.  Instead, Plaintiff appears to rely entirely on Matlack's membership on the Lightship

Board of Directors.  Without more, such allegations fall far short of the mark.

To plead adequately that an outside director was "reckless" with respect to alleged

misrepresentations contained in published corporate documents, a complaint must make specific

allegations that the outside director took part in preparing the documents or was involved in the

company's day-to-day management.  Id.  Even a corporate *officer's* "unfettered access" to

corporate records is an inadequate basis for scienter because it would expose virtually any CEO

by virtue of his or her position alone to liability.  Glickman v. Alexander & Alexander Servs.,

Inc., No. 93 Civ. 7594, 1996 U.S. Dist. LEXIS 2325, at *43-44 (S.D.N.Y. Feb. 27, 1996).  In

Glickman, this Court held that the defendant's position *as CEO* was not enough to give rise to an

inference of scienter particularly where, as here, he did not oversee the company's daily

operations.[24]

It is simply insufficient to say, as Plaintiff does, that Matlack was "actively involved"

Cmpl. ¶ 31, or "had a direct, detailed knowledge."  Cmpl. ¶ 71.  Where a plaintiff alleges that

defendant corporate officers or directors are liable for a company's misleading financial

statements, the Plaintiff "must supply *some factual basis* for the allegation that the defendants

had reached this conclusion [that the statements were misleading] at some point during the time

period alleged."  Johnson v. NYFIX, Inc., 399 F. Supp. 2d 105, 115 (D. Conn. 2005), quoting

Rothman, 220 F.3d at 91.  The Johnson court explained that, in order to meet the "recklessness"

standard, plaintiffs had to plead specific facts from which one could strongly infer that

---

[24] See also In re Livent, Inc. Sec. Litig., 78 F. Supp. 2d 194, 219 (S.D.N.Y. 1999) (plaintiffs failed to adequately plead scienter where they alleged: (1) that the outside directors were responsible for reviewing Livent's financial reporting procedures, internal controls, and management information systems, and the performance of Livent's external auditors; (2) that the outside directors were primarily responsible for reviewing the quarterly unaudited financials; and (3) that there were several "red flags" which the outside directors failed to investigate or ignored).

defendants (even as high ranking company officials) knew or should have known not only the

actual nature of the individual transactions in question, but also the false or misleading nature of

the financial statements.  Id.

Plaintiff's allegations are far more vague and unsubstantiated than those in Livent or

Glickman.  Plaintiff does not point to any facts that would support a finding that Matlack knew

about, or should have known about, or even recklessly did not know about, the alleged improper

practices.  The Complaint says nothing about Matlack's responsibilities or role in managing

Lightship's affairs.  It says nothing about Matlack's involvement with Lightship's billing

practices.  It says nothing about Matlack's involvement with preparing Lightship's financial

statements.  Instead, the Complaint rests on empty formulations of unspecified "involvement."

Cmpl. ¶¶ 28, 31.  Plaintiff's attempt to "overwhelm the Court with conclusory, speculative and

esoteric allegations" fails.[25]

D.    Plaintiff Has Failed To Allege "Justifiable Reliance."

As an essential element of a cause of action for fraud, justifiable reliance must also be

pled with particularity.[26]  Here is Plaintiff's attempt to plead reliance:

> After the false representations were made, the Plaintiff continued to rely on those
> representations to its detriment.  The Fraud and Securities Claims Defendants
> knew of such reliance but failed to correct the false representations knowing they
> were false.  In reliance on the Fraud and Securities Claims Defendants' false and
> misleading statements and omissions, CTC priced the transaction far in excess of
> its true value, and ultimately paid far more for LHI than it would have agreed to
> pay had the Defendants disclosed the true facts, and far more than LHI was in fact
> worth as a result of the Undisclosed Lightship Billing Practices.

Cmpl. ¶ 105.

---

[25] See In re Capstead Mortg. Sec. Lit., 258 F. Supp. 2d 533, 565 (N.D. Tex. 2003).

[26] Allied Irish Banks, P.L.C. v. Bank of Am., N.A., No. 03 Civ. 3748, 2006 WL 278138, at *8 (S.D.N.Y. Feb. 2, 2006);
Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189 (2d Cir. 2003); Harsco Corp. v. Segui, 91 F.3d 337
(2d Cir. 1996).

The alleged fraudulent statements and omissions here include those that occurred prior to the Merger Agreement (*e.g.,* the CIM, the PowerPoint); and those embodied in the Merger Agreement itself. Plaintiff has failed to plead that it reasonably relied on any of them.

> *1.    Pre-Merger Agreement.*

Plaintiff alleges various pre-Merger Agreement omissions and misrepresentations supposedly relied upon by CTC. These evaporate upon investigation, and in any event Plaintiff's reliance on them is barred by the integration clause of the Merger Agreement.

> *2.    Representations And Warranties Of The Merger Agreement.*

Plaintiff further alleges that the Merger Agreement's representations and warranties also contain "numerous false material statements of fact." Cmpl. ¶ 111. We join in and rely upon Section I.A. of the Morgan Brief and Section II.C. of the Individuals' Brief, demonstrating that the Merger Agreement's representations and warranties are not false or misleading in any way.

In any event, New York law imposes an affirmative duty on sophisticated investors to investigate; and to know the business they are acquiring. Grumman Allied Indus. Inc. v. Rohr Indus. Inc., 748 F.2d 729, 734 (2d Cir. 1984). The law generally does not recognize fraud where a party had every opportunity to ascertain the facts for itself. CMNY Capital L.P. v. Deloitte & Touche, 821 F. Supp. 152, 159 (S.D.N.Y. 1993). The degree to which access precludes reliance is a matter of reasonableness that depends on the identity of the persons having access and the nature of the information at issue. Id., citing Jackson v. Oppenheim, 411 F. Supp. 659, 668 (S.D.N.Y. 1974) (insider's duty depends on the basis of what a party knows or reasonably should know considering the information to which he had access).

As noted, the Merger Agreement acknowledged that CTC had had the opportunity "to consult with counsel and other advisers about the Transactions;" that Lightship documents and records had been made available on request; and that Lightship had made available to CTC the

opportunity to acquire information about the business and financial condition and results of

operations of Lightship. Nowhere does Plaintiff allege that the ICA, the amendments thereto, or

information regarding Lightship's billing practices was withheld, altered or otherwise

misrepresented. Even if any of Lightship's billing practices had been, in fact, improper and, as

Plaintiff alleges, contrary to the Maine ICA (and they were not), Plaintiff had ample opportunity

and access to discover such alleged improprieties in the course of due diligence.

Plaintiff alleges that during due diligence, Lightship failed to respond to certain requests

for information:

> CTC requested that Lightship supply: (1) a list of significant customers including
> long-term or future contracts; (2) a list of Lightship's top 100 customers on a
> revenue basis with identification of total monthly billings; and (3) a list of the
> company's top ten internet customers. Despite these requests Lightship failed to
> identify access revenues related to calls to GWI as the source of 90 percent of its
> Maine access revenues.

Cmpl. ¶ 83. Even if this allegation were true, "it cannot be said that denial of a request to see

documents could constitute fraud, unless that denial suggested falsely and deceitfully that those

documents did not exist." Harsco Corp., 91 F.3d at 347-48; In re Vivendi Universal, S.A., Nos.

02 Civ. 5571, 03 Civ. 2175, 2004 WL 876050, at *3 (S.D.N.Y. Apr. 22, 2004) (in the Second

Circuit, when a contract is between two sophisticated parties, reliance is unreasonable not merely

on expressly disclaimed representations, but also on representations that a knowledgeable party

should have insisted on including in the agreement but that were not included).

As we have demonstrated, none of the representations and warranties were false. CTC's

alleged reliance on any statements made in the course of the marketing of Lightship, during due

diligence, and during the negotiations of the Merger Agreement is unreasonable as a matter of

law. Moreover, as Plaintiff itself acknowledged, throughout the due diligence, Lightship gave

CTC complete access to its documents, employees, and information. Any fault for not having

discovered the allegedly improper billing practices rests with CTC, not the Defendants.  For this reason alone the Complaint must be dismissed.

      E.      <u>Plaintiff Has Failed Adequately To Plead Loss Causation.</u>

To prevail on its federal securities fraud claims, Plaintiff must demonstrate that it has been injured; and that its injuries were proximately caused by defendants' omission of material information.  <u>Emergent Capital Inv. Mgmt.</u>, 343 F.3d at 196.

We join in and rely upon Section V of the Individuals' Brief regarding loss causation.

## II.      COUNT II – SECTION 20 CONTROLLING PERSON LIABILITY.

Section 20 provides that

> every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  To establish a *prima facie* case of control person liability, a Plaintiff must allege: 1) a primary violation by the controlled person; 2) control of the primary violator by the targeted defendant; and 3) that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person.  <u>S.E.C. v. First Jersey Sec., Inc.</u>, 101 F.3d 1450 (2d Cir. 1996); <u>Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC</u>, 223 F. Supp. 2d 474, 487 (S.D.N.Y. 2002), <u>citing</u> <u>Boguslavsky v. Kaplan</u>, 159 F.3d 715, 720 (2d Cir. 1998); <u>JHW Greentree Capital, L.P. v. Whittier Trust Co.</u>, No. 05 Civ. 2985, 2005 WL 3008452 (S.D.N.Y. Nov. 10, 2005).

As to Megunticook, Plaintiff's Section 20 claim fails each of the three tests.

A.    Plaintiff Has Failed To Allege A Primary Violation By The Controlled Person.

Plaintiff's first burden is to allege a primary violation by the controlled person. ATSI Commc'ns, Inc. v. Shaar Fund, LTD, 493 F.3d 87, 107 (2d Cir. 2007) (where plaintiff fails to allege any primary violation, it cannot establish control person liability); Brown v. Hutton Group, 795 F. Supp. 1317, 1324 (S.D.N.Y. 1992), aff'd, 991 F.2d 1020 (2d Cir. 1993).

In its brief Section 20 allegations, Plaintiff identifies the "controlled person" as LHI and, through LHI, Lightship. Cmpl. ¶20.[27] So Lightship was not directly "controlled" by the Fraud and Securities Claims Defendants; rather, Lightship was said to be "controlled" *through* non-party LHI. But neither LHI nor Lightship is a defendant. Plaintiff's Section 20 claims must be dismissed for this reason alone.

In In re Pronetlink Securities Litigation, 403 F. Supp. 2d 330 (S.D.N.Y. 2005), a class of Plaintiff shareholders brought a Section 10(b) action against one Jean Pierre Collardeau, the Chief Executive Officer of ProNetLink Company ("PNL"). They also sued Collardeau under Section 20, alleging his control over PNL as a primary violator. But plaintiffs had not sued PNL, which was inactive and in bankruptcy. That was enough for dismissal of the Section 20 claim, however. See also Griffin v. PaineWebber Inc., 84 F. Supp. 2d 508 (S.D.N.Y. 2000) (control person claim could not be brought against director of company until company alleged to be "primary violator" was added to suit as a defendant and wrongdoing was attributed to company).

---

[27] For a Section 20 defendant, the threshold issue is not his *own* alleged misconduct, but rather the alleged misconduct of the person or company he controls. See In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 392 (S.D.N.Y. 2003) (Section 20 is typically used to sue defendants who do not have primary liability, therefore Section 20 serves as a "statutory form of *respondeat superior*"). Whether or not Plaintiff has also brought a Section 10(b) claim against the Morgan defendants, the Megunticook defendants, or the individual defendants is "irrelevant to the [Section 20] analysis." In re Philip Services Corp. Sec. Litig., 383 F. Supp. 2d 463, 484 n.12 (S.D.N.Y. 2004); S.E.C. v. Stringer, No. Civ. 02-1341, 2003 WL 23538011, at *9 (D. Or. Sept. 3, 2003) ("The gravamen of a Section 20 action is not that the controlling person committed the violation, but that the controlling person controlled the person who committed a violation…").

Because Plaintiff has failed to name both LHI and Lightship as defendants, Count II of the Complaint must be dismissed.

B.     Even If Lightship Had Been Named And Sued As A Party, The Allegations Against Lightship Would Be Insufficient To Establish It As A Primary Violator.

Even if Lightship, the "controlled person," had been sued, as required, the Section 20 claims would still have to be dismissed. Although the allegations against Lightship are never specified, we will presume that every Section 10(b) allegation as to every one of the Fraud and Securities Claims Defendants is to be treated as an allegation against Lightship. Even then, as discussed, Plaintiff has failed on a host of dimensions to set forth a Section 10(b) claim against any of the Fraud and Securities Claims Defendants; and thus, *a fortiori*, against Lightship. Therefore, because Plaintiff has failed to establish a primary violation, the Section 20 claims must fail as well. Am. High-Income Trust v. Allied Signal, 329 F. Supp. 2d 534, 549 (S.D.N.Y. 2004) (plaintiffs failed to adequately plead a primary Section 10(b) violation; Section 20 count must be dismissed).

C.     Second Test:  Plaintiff Has Failed To Allege That Megunticook "Controlled" LHI Or Lightship.

Plaintiff has also failed to demonstrate that Megunticook "controlled" LHI (or, through LHI, Lightship).[28] To establish control over the primary violator, Lightship, Plaintiff must adequately allege that "the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." S.E.C. v. First Jersey Sec., Inc., 101 F.3d at 1472-73, quoting 17 C.F.R. § 240.12b-2. Here, Megunticook is alleged to have had a total of 22.5 percent of the shares of

---

[28] Plaintiff has an extra burden here:  to show that Megunticook controlled LHI, and then to show that LHI controlled Lightship. Cmpl. ¶ 120: ("persons who controlled LHI and, through LHI, Lightship"). Purely for purposes of this motion to dismiss, we shall assume that control over LHI, if Plaintiff had sufficiently pled it, would constitute control over Lightship.

LHI; and Matlack was a member of LHI's Board.  Cmpl. ¶¶ 102, 34.  Neither Matlack, nor any

other Megunticook representative, served as an officer or employee of LHI or Lightship.

The 22.5 percent shareholding is clearly insufficient for control.  Deutsche Telecom AG

Sec. Litig., No. 00 CIV 9475, 2002 WL 244597, at *7 (S.D.N.Y. Feb. 20, 2002) (allegation that

defendant owned 22 percent of the company is insufficient to infer control under Section 20); see

also In re Flag Telecom Holdings, Ltd., 308 F. Supp. 2d 249, 273-74 (S.D.N.Y. 2004) (Section

20 defendant co-founded Flag, owned almost 30 percent of voting stock and selected three of

nine members of board of directors; pleadings only established that defendant had considerable

*influence over* direction of management and policies of Flag, but did not create inference that

defendant *controlled* Flag).

Nor does a directorship lead to a finding of control:  "Courts agree that merely being a

director is typically insufficient to support a claim for control person liability."  In re Nat'l

Century Fin. Enters., Inc., No. 2:03-md-1565, Slip Op., 2007 WL 1362695, at *9 (S.D. Ohio

May 7, 2007); In re Philip Services Corp., 383 F. Supp. 2d at 485.

So Plaintiff must demonstrate that somehow a directorship of LHI, combined with less

than a one-fourth ownership of LHI, amounts to "control."  The authorities are otherwise.  For

example, in Food & Allied Servs. Trades Dep't, 841 F. Supp. 1386, 1391 (S.D.N.Y. 1994), a

defendant sued under Section 20, Peizer, was a director of the primary violator *and* a "major

stockholder" of that company's stock, but not an officer or employee.  Plaintiff alleged that

> Peizer's timely divestment of his [] stock, along with the fact of his positions as
> [the company's] director and major stockholder…support the inference that [he]
> exercised control over [the company]…and initiated, participated in, knew about,
> and permitted the wrongs alleged herein.  Id. at 1389.

But this Court dismissed the Section 20 claims against Peizer; Plaintiff had not alleged that

Peizer possessed a *controlling* block of the primary violator's stock, and had not alleged that

"Peizer was involved in [the company's] day-to-day operations or that he had anything to do with the preparation or review" of the alleged fraudulent public statements. Id. at 1391.

Here, Plaintiff is required to allege facts demonstrating that Megunticook not only had the power to control the general affairs of the company, but also the "power to control or influence the *specific* corporate policy underlying the alleged primary violation of the securities laws." In re Friedman's Inc. Sec. Litig., 385 F. Supp. 2d 1345, 1373 (N.D. Ga. 2005) (dismissing Section 20 claims against defendant said to have exerted general control over company's operations, but not over company's financial reporting at heart of plaintiffs' claims).

The Complaint tries to remedy its deficiencies on control with conclusory allegations about Matlack's supposed involvement. Even if the statements were specific enough to have some effect (and they are not), Plaintiff fails to allege that Megunticook's 22.5 percent ownership interest in LHI gave it the power to control or direct the affairs of LHI or Lightship, nor does Plaintiff allege that Megunticook in fact did so. Nowhere does Plaintiff allege that Megunticook directly managed LHI or Lightship, or had supervisory or managerial control over, the daily affairs of LHI or Lightship. Finally, nowhere in the Complaint does Plaintiff allege that Megunticook participated in, or had any supervisory input into, the alleged improper billing practices. The only relevant non-conclusory factual allegations about control in the Complaint – that Megunticook owned 22.5 percent of LHI shares, and Matlack was a director – are not enough to establish that Megunticook "controlled" Lightship.

> [W]hen a defendant does not clearly occupy control status, the plaintiff must plead facts from which control status can be inferred, *e.g.* that defendant had power, pursuant to an agreement to control the primary violator or aided the primary violator in performing some culpable conduct linking the defendant to the primary violation for which relief is sought.

Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., 941 F. Supp. 1369, 1378 (S.D.N.Y. 1996).

Although the Complaint is riddled with vague allegations regarding Matlack's supposed

"involvement" with the operations of LHI, Plaintiff has failed to allege *facts* that would support a reasonable inference of control.

> D.    Third Test:  Plaintiff Has Failed To Allege Megunticook Culpability.

Megunticook has been sued as a primary violator; the Section 20 claim is a sort of fallback or "safety net" for the Plaintiff.  Perhaps anticipating such tactics, the Second Circuit has held that

> [i]n order to establish a *prima facie* case of controlling-person liability, a plaintiff must … show that the controlling person was in some *meaningful sense a culpable participant in the fraud* perpetrated by the controlled person.

S.E.C. v. First Jersey Sec., Inc., 101 F.3d at 1472 (internal quotations omitted); Deutsche Telecom AG Sec. Litig., 2002 WL 244597, at *7 (applying "culpable participation" requirement at pleading stage).[29]

Moreover, because the culpable participation element requires plaintiffs to prove the controlling person's state of mind, it is subject to the PSLRA's heightened pleading standard. See 15 U.S.C. §78u-4(b)(2).[30]  A Section 20 claim must therefore be pled with sufficient particularity that a strong inference is raised that the Section 20 control person knew or should have known that the controlled person was engaging in fraudulent conduct.  See Deutsche Telecom AG Sec. Litig., 2002 WL 244597, at *7.

---

[29] This is a peculiar Section 20 case.  Every defendant is sued and accused of violating Section 10 (b); but none is named as the "primary" violator for purposes of Section 20 "control" liability.  Instead, for purposes of Section 20, a non-party, Lightship, is named as the "primary" violator; and the actual defendants, who were tagged earlier in the Complaint as "primary" violators, are all reduced to "control" violators, whose Section 20 liability depends on control of the primary violator, non-party Lightship.  It is difficult to imagine that Congress intended this bizarre outcome when it legislated Section 20 control liability.

[30] "In any private action arising under this chapter in which the Plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

-34-

Conclusory allegations will not suffice. <u>Internet Law Library</u>, 223 F. Supp. 2d at 488. Plaintiff must plead with particularity sufficient facts to show that the controlling person was "in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." <u>See</u> <u>In re Globalstar Sec. Litig.</u>, No. 01 Civ. 1748, 2003 WL 22953163, at *12 (S.D.N.Y. Dec. 15, 2003) (plaintiffs sufficiently pled defendant was a controlling person where they alleged that: (i) he was CEO and shareholder of the company; (ii) he "had direct involvement in or intimate knowledge of the day-to-day operations of [the company];" (iii) he "had intimate knowledge of [primary violator's] financial condition; (iv) he "influenced and controlled the decision-making of [the company] including the content and dissemination of false and misleading statements;" and (v) he allegedly signed the primary violator's 10-K's containing false information); <u>see also</u> <u>In re Twinlab Corp. Sec. Litig.</u>, 103 F. Supp. 2d 193, 208 (E.D.N.Y. 2000) (dismissing Section 20 claim because "[p]laintiffs do not specifically allege facts demonstrating that the officers of Twinlab culpably participated in the scheme, rather than, for example, unknowingly approving credible but fraudulent financial reports prepared by subordinates").

Plaintiff fails all three tests of control person liability.

## III.    COUNT III – COMMON LAW FRAUD.

The deficiencies in Plaintiff's pleading of federal securities fraud claims also infect its common law fraud claim.

To state a claim of common law fraud under New York law, a plaintiff must allege that: (1) the defendant made a false representation, (2) with intent to defraud the plaintiff, (3) plaintiff reasonably relied upon the representation, and (4) plaintiff suffered damage as a result of such reliance. <u>Albert Apartment Corp. v. Corbo Co.</u>, 182 A.D.2d 500, 582 N.Y.S.2d 409, 410 (1992). The strictures of Rule 9(b) again apply; a plaintiff must allege *facts*, not conclusions. <u>De Jesus v. Sears, Roebuck & Co.</u>, 87 F.3d 65, 70 (2d Cir. 1996).

In order to plead fraud adequately, Plaintiff must allege "facts that give rise to a strong

inference of fraudulent intent." Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124, 1128 (2d Cir.

1994). Similar to Rule 10b-5 analysis, to plead an adequate factual basis giving rise to a strong

inference of fraudulent intent under Rule 9(b), plaintiff may allege a motive to deceive and

access to accurate information. Cohen v. Koenig, 25 F.3d 1168, 1173-74 (2d Cir. 1994). Stock

ownership, by itself, does not provide sufficient motive to sustain the pleading burden. Duncan

v. Pencer, No. 94 Civ. 0321, 1996 WL 19043, at *11 (S.D.N.Y. Jan. 18, 1996).

Plaintiff here has pled that (i) Megunticook was a shareholder of Lightship, (ii) that

Matlack was a director of Lightship and (iii) that Matlack participated in negotiating the sale of

Lightship to CTC. Plaintiff has not pled and cannot plead that Matlack was active in the day to

day business of Lightship or that he was intimately familiar with its business. Rather, Plaintiff

repeats the mantra that Matlack knew or should have known that the allegedly false statements

were, in fact, false. The speculative and fact shy pleadings of the present Complaint "simply

demand too strenuous an exertion of the imagination." Estate of Sabarese v. First Nat'l Inv.

Corp., No. 92 Civ. 8139, 1994 WL 573320, at *3 (S.D.N.Y. Oct. 18, 1994) (discussing Koenig).

## IV.    COUNT IV – NEGLIGENT MISREPRESENTATION.

In a familiar pleading strategy, Plaintiff attempts a fallback claim of negligent

misrepresentation. But this is unavailing, because Plaintiff has failed to allege that Matlack had

a duty to disclose information about the alleged billing practices.

A claim of negligent misrepresentation requires that the Plaintiff establish

that the defendant had a *duty* to use reasonable care to impart correct information
because of some *special relationship* between the parties....

Glidepath Holding B.V. v. Spherion Corp., No. 04 Civ. 9758, 2007 WL 2176072, at *15

(S.D.N.Y. July 26, 2007), quoting Solar Travel Corp. v. Nachtomi, No. 00 Civ. 3564, 2001 WL

641151, at *4 (S.D.N.Y. Jun. 8, 2001). It is "well established that a simple commercial

relationship, such as that between a buyer and seller, does not constitute a 'special relationship'

supporting a negligent misrepresentation claim." Lewis v. Rosenfeld, 138 F. Supp. 2d 466, 481

(S.D.N.Y. 2001). An arms' length business relationship is not enough. DIMON Inc. v. Folium

Inc., 48 F. Supp. 2d 359, 373 (S.D.N.Y. 1999), even in the context of lengthy negotiations.

Accusystems, Inc. v. Honeywell Info. Sys., Inc., 580 F. Supp. 474, 481 (S.D.N.Y. 1984) (no

special relationship after months of negotiations).[31]

Plaintiff has not alleged anything other than buyer and seller in an arms' length

transaction. Thus, because Plaintiff has failed to allege that Megunticook owed it a special duty

of care in negotiating the deal, the Complaint must be dismissed.[32]

## V.    COUNT V – BREACH OF REPRESENTATIONS AND WARRANTIES.

Plaintiff alleges that, pursuant to the Escrow Agreement, the $7 million escrow fund was

"to be used to offset any claim under Section 8 [the "Post-Closing Indemnification" section] of

the Merger Agreement," Cmpl. ¶ 140, and sues *Megunticook* in Count V for alleged breach of

the Merger Agreement's representations and warranties. But Megunticook was not a party to the

Merger Agreement (entered into by CTC and LHI, JSR Aff. Ex. 1), the Stockholder

Representative Agreement or the Escrow Agreement.

In Paragraph 103 of the Complaint, Plaintiff alleges that the

---

[31] Compare Polycast Tech. Corp v. Uniroyal Inc., No. 87 Civ. 3297, 1988 WL 96586, at *12 (S.D.N.Y. Aug. 31, 1988) (plaintiff buyer of a corporation's subsidiary adequately alleged facts from which court inferred a "special relationship" between it and the seller, where it alleged that: (i) during an extended negotiation period, defendants repeatedly vouched for their projections of earning, knowing that such earnings were critical to plaintiff's willingness to consummate the transaction; (ii) plaintiff only gained complete access to defendant's books after the deal was consummated; and (iii) plaintiff was required to form a new corporation capitalized with $35 million of stock and $95 million in debt in order to effect the transaction).

[32] Loss causation is also an essential element of a claim for negligent misrepresentation, Solar Travel Corp., 2001 WL 641151, at *6 and the claim fails that test as well for all the reasons previously set forth. Moreover, reliance must also be proved under New York law to recover for negligent misrepresentation. Harsco Corp., 91 F.3d at 342. For the reasons described in Section II.D., supra, Plaintiff has failed to plead reasonable reliance as well.

Holding Stockholders continued to be liable under the Merger Agreement for certain categories of claims. In accordance with the Merger Agreement, an indemnification basket in the amount of $7 million was placed in escrow pursuant to the terms of the Escrow Agreement, and the Stockholders' Committee was formed to represent the interests of the Holding Stockholders in the escrowed funds. The Escrow Agreement established procedures for the submission of claims against the escrowed funds by CTC to the Stockholders' Committee.

Cmpl. ¶ 103.

As to Megunticook, this is all wrong. As previously discussed, the parties exempted Megunticook from any liability under the transaction's indemnification scheme. See discussion, *supra*; Megunticook held only Series CC Preferred shares in Lightship and was specifically exempted from the Stockholder Representative Committee, the Escrow Fund, and the indemnification procedures. The explicit terms of the transaction documents thus clearly demonstrate that Megunticook can bear no liability for breach of contract under Count V.

## VI.    THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER MEGUNTICOOK.

The allegation that "[i]n the Escrow Agreement, the Megunticook Entities…submitted to personal jurisdiction in this Court" is false. No other basis is pled. The Megunticook defendants recognize that this Circuit has held that minimum contacts with the United States satisfy the personal jurisdiction requirement in cases arising under the securities laws. See, e.g., Hallwood Realty Partners, L.P. v. Gotham Partners, L.P., 104 F. Supp. 2d 279, 283-84 (S.D.N.Y. 2000). We respectfully disagree and submit that the Court must also analyze whether requiring a defendant to litigate in the particular forum comports with the notions of fair play and substantial justice under the Fifth Amendment. See, e.g., Peay v. BellSouth Med. Assistance Plan, 205 F.3d 1206, 1212 (10th Cir. 2000) (the Fifth Amendment "protects individual litigants against the burdens of litigation in an unduly inconvenient forum."); Busch v. Buchman, Buchman & O'Brien, Law Firm, 11 F.3d 1255, 1259 (5th Cir. 1994) (Garza, J., dissenting) ("Requiring that

the individual defendant in a national service of process case only reside somewhere in the United States does not protect this interest."); Willingway Hosp., Inc. v. Blue Cross & Blue Shield, 870 F. Supp. 1102, 1106 (S.D. Ga. 1994) ("To allow Congress to dictate personal jurisdiction through the enactment of nationwide service of process provisions, unquestioned by the judiciary[,] is nonsensical."). Under a Fifth Amendment due process analysis, this Court would not have personal jurisdiction over the Megunticook Entities. We respectfully reserve this issue for appeal.

## VII.    THIS COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE STATE LAW CLAIMS.

Plaintiff alleges that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental jurisdiction). The district court may "decline to exercise supplemental jurisdiction" over state law claims if the court "has dismissed all claims over which it has original jurisdiction" or where the claim raises a "complex issue of State law." 28 U.S.C. §1367(c). Accordingly, should Plaintiff's federal claims be dismissed, this Court should dismiss the state claims for lack of subject matter jurisdiction. Greenwald v. Orb Commc'ns & Mktg., Inc., 192 F. Supp. 2d 212, 228 (S.D.N.Y. 2002) (Swain, J.) (dismissing state law claims because there is "no appropriate basis for the Court's jurisdiction … in light of the dismissal of the federal [claims]"); see also Small v. Arch Capital Group, Ltd., No. 03 Civ 5604, 2005 WL 696903 (S.D.N.Y. Mar. 24, 2005) (same).

## VIII.   CONCLUSION.

For the reasons stated above, the motion to dismiss should be granted in its entirety and

the Complaint should be dismissed with prejudice.

Respectfully Submitted,

THE MEGUNTICOOK FUND II, L.P., and
THE MEGUNTICOOK SIDE FUND II, L.P.

By their attorneys,

/s/ Ira K. Gross
Ira K. Gross (IG-6834)
Paul E. Summit (PS-6263)
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA  02109
(617) 338-2800
psummit@sandw.com

Of Counsel:
Philip Rakhunov
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA  02109
(617) 338-2800
prakhunov@sandw.com