Exhibit 1

EXECUTION COPY

AGREEMENT AND PLAN OF MERGER

by and among

CTC COMMUNICATIONS GROUP, INC.,

CTC COMMUNICATIONS ACQUISITION CORP.

and

LIGHTSHIP HOLDING, INC.

March 21, 2005

NY01/FROHJ/992841.12

# TABLE OF CONTENTS

**Page**

1.   Definitions ................................................................................................. 1
- (a)   Certain Definitions ................................................................................. 1
- (b)   Rules of Construction ........................................................................ 12
2.   Merger; Closing ...................................................................................... 12
- (a)   Merger ................................................................................................ 12
- (b)   Closing ............................................................................................... 12
- (c)   Actions at the Closing ...................................................................... 13
- (d)   Effect of Merger ............................................................................... 13
- (e)   Procedure for Payment ..................................................................... 16
- (f)   Working Capital Adjustment ........................................................... 18
3.   Representations and Warranties of CTC ............................................... 20
- (a)   Organization, Power and Authority ................................................ 20
- (b)   Authority; Noncontravention; Consents .......................................... 20
- (c)   Financial Ability to Close ................................................................ 21
- (d)   Brokers' Fees .................................................................................... 21
- (e)   Investment Matters ........................................................................... 21
4.   Representations and Warranties of Holding .......................................... 21
- (a)   Organization, Power and Authority ................................................ 21
- (b)   Authority; Noncontravention; Consents .......................................... 22
- (c)   Capital Structure .............................................................................. 23
- (d)   Assets; Title to Assets ...................................................................... 24
- (e)   Permits; Governmental Licenses; Consents .................................... 24
- (f)   Intellectual Property Rights ............................................................. 25
- (g)   Insurance ........................................................................................... 26
- (h)   Financial Statements; Undisclosed Liabilities: No Material Adverse Change ........................................................................................... 26
- (i)   Legal Compliance ............................................................................. 27
- (j)   Tax Matters ....................................................................................... 27
- (k)   Contracts ........................................................................................... 29
- (l)   Litigation .......................................................................................... 30

## TABLE OF CONTENTS
(continued)

Page

|  |  |  |  |
|---|---|---|---|
| | (m) | Employees | 31 |
| | (n) | Employee Benefits | 31 |
| | (o) | Environmental | 33 |
| | (p) | Brokers' Fees | 33 |
| | (q) | Accounts; Safe Deposit Boxes | 34 |
| | (r) | Transactions with Related Parties | 34 |
| | (s) | Accounts Receivable | 34 |
| | (t) | Consents; Resolutions; Minutes | 34 |
| 5. | | Pre-Closing Covenants | 34 |
| | (a) | General | 34 |
| | (b) | Regulatory and Other Consents | 35 |
| | (c) | Operation of Business | 35 |
| | (d) | Access | 38 |
| | (e) | Notice of Discovered Breach | 38 |
| | (f) | Exclusivity | 39 |
| | (g) | Supplemental Disclosure | 39 |
| | (h) | Tax Matters | 39 |
| | (i) | Certain Taxes | 40 |
| | (j) | Interim Lightship Estimates; Most Recent Financial Statements | 40 |
| | (k) | Employee Matters | 41 |
| | (l) | Confidentiality; Non-Solicitation | 41 |
| | (m) | USF/FET Tax Matters | 42 |
| | (n) | Delivery of Consents, Resolutions and Minutes | 42 |
| | (o) | Prior to the Closing Date, Lightship agrees to use its commercially reasonable efforts to determine, with its independent accountants, whether certain of its existing accounts receivable should be written off and whether any accounts receivable should be recorded as assets on Lightship's balance sheet | 42 |
| 6. | | Other Covenants | 43 |
| | (a) | General | 43 |
| | (b) | Employees | 43 |

## TABLE OF CONTENTS
(continued)

Page

|  |  |  |  |
|---|---|---|---|
| | (c) | Indemnification Matters | 43 |
| | (d) | Representations and Warranties | 44 |
| | (e) | Taxes | 44 |
| 7. | | Conditions to Obligations to Close | 45 |
| | (a) | Conditions of Parties | 45 |
| | (b) | CTC Entities' Conditions | 45 |
| | (c) | Holding's Conditions | 47 |
| 8. | | Survival; Post-Closing Indemnification | 47 |
| | (a) | Survival of Representations and Warranties | 47 |
| | (b) | Indemnification by the Holding Stockholders | 48 |
| | (c) | Stockholder Representative Committee | 48 |
| | (d) | Procedures for Indemnification Claims | 49 |
| | (e) | Procedures for Indemnification Claims Involving Third-Parties | 49 |
| | (f) | Limitations and Other Post-Closing Indemnification Matters | 51 |
| 9. | | Termination and Other Rights | 53 |
| | (a) | Notice and Opportunity to Cure | 53 |
| | (b) | Termination of Agreement | 53 |
| | (c) | Effect of Termination | 54 |
| | (d) | Injunctive Relief | 54 |
| | (e) | Exclusive Remedy; Non-Recourse | 55 |
| 10. | | Miscellaneous | 55 |
| | (a) | Press Releases and Public Announcements | 55 |
| | (b) | No Third-Party Beneficiaries | 55 |
| | (c) | Entire Agreement | 55 |
| | (d) | Succession and Assignment | 55 |
| | (e) | Counterparts | 56 |
| | (f) | Headings | 56 |
| | (g) | Notices | 56 |
| | (h) | Governing Law | 57 |
| | (i) | Amendments and Waivers | 57 |

## TABLE OF CONTENTS
(continued)

**Page**

(j)  Severability ................................................................................................ 57

(k)  Expenses ..................................................................................................... 57

(l)  Computation of Days .................................................................................. 58

(m)  Submission to Jurisdiction ......................................................................... 58

## EXHIBITS

| Exhibit Reference | Description |
| --- | --- |
| Exhibit A | Indemnification Escrow Agreement |
| Exhibit B | Megunticook Agreement |
| Exhibit C | Paying Agent Agreement |
| Exhibit D | Separation and Release Agreement |
| Exhibit E | Stockholder Representative Agreement |
| Exhibit F | Voting Agreement |
| Exhibit G | Certificate of Merger |

EXECUTION COPY

# AGREEMENT AND PLAN OF MERGER

**THIS AGREEMENT AND PLAN OF MERGER** (this "**Agreement**") is entered into as of March 21, 2005, by and among **CTC COMMUNICATIONS GROUP, INC.**, a Delaware corporation ("**CTC**"), **CTC COMMUNICATIONS ACQUISITION CORP.**, a Delaware corporation and a wholly-owned Subsidiary of CTC ("**Merger Sub**"), and **LIGHTSHIP HOLDING, INC.**, a Delaware corporation ("**Holding**"). Holding and its wholly-owned Subsidiary, **LIGHTSHIP TELECOM LLC**, a Delaware limited liability company (the "**Company**") are sometimes referred to collectively herein as the "**Lightship Companies**" or "**Lightship.**" CTC, Merger Sub, and Holding are sometimes referred to individually herein as a "**Party**" and collectively as the "**Parties.**"

## WITNESSETH

**WHEREAS**, the respective Board of Directors of each of CTC, Merger Sub and Holding have determined it to be advisable and in the best interests of their respective corporations and stockholders that CTC acquire all of Holding's outstanding Capital Stock (as defined herein) for cash through a reverse subsidiary merger of Merger Sub with and into Holding on the terms and subject to the conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and intending to be legally bound hereby, the Parties agree as follows:

1. **Definitions.**

    (a)    **Certain Definitions.**  As used in this Agreement, the following terms have the following meanings unless the context otherwise requires:

    "**Action**" means any action, suit, proceeding, hearing, litigation, investigation, charge, complaint, claim, demand or notice.

    "**Actual Current Closing Assets**" has the meaning set forth in **Section 2(f)(iv)(A)**.

    "**Actual Current Closing Liabilities**" has the meaning set forth in **Section 2(f)(iv)(B)**.

    "**Actual Working Capital Amount**" has the meaning set forth in **Section 2(f)(iv)(C)**.

    "**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For purposes of this definition, the term "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of capital stock or other equity ownerships, by contract or otherwise.

    "**Agreement**" has the meaning set forth in the preamble.

"**ATEL**" means ATEL Ventures, Inc., an Existing Lender.

"**Breaching Party**" has the meaning set forth in **Section 9(a)**.

"**Business**" means the businesses conducted by the Lightship Companies as of the date of this Agreement, which includes the provision of voice and data services (including integrated voice and data) to carriers and other business customers in selected markets in the Commonwealth of Massachusetts and the States of Maine, New Hampshire, Vermont, Rhode Island, Connecticut, New York, New Jersey, Delaware and Pennsylvania.

"**Business Day**" means any day other than a Saturday, a Sunday, a day on which commercial banks are authorized by Law to be closed in the Commonwealth of Massachusetts or the State of New York or a day on which the New York Stock Exchange is not open for trading.

"**Capitalization Table**" has the meaning set forth in **Section 4(c)(iv)**.

"**Capital Stock**" means (i) any and all shares, interests, participations or other equivalents (however designated) of capital stock or equity interests of a corporation, (ii) any and all equivalent membership or equity ownership interests in a Person (other than a corporation), (iii) any security or instrument that is exchangeable for or convertible into any of the foregoing, and (iv) and any and all warrants, rights or options to purchase, acquire or subscribe for any of the foregoing, or any warrants, rights or options to purchase, acquire or subscribe for any such warrants, rights or options.

"**Cash and Cash Equivalents**" means all cash on hand and in financial institutions and cash equivalents (including marketable securities) held by either of the Lightship Companies.

"**Certificates**" has the meaning set forth in **Section 2(d)(viii)**.

"**Certificate of Incorporation**" means the Amended and Restated Certificate of Incorporation of Holding filed with the Secretary of State of the State of Delaware on February 8, 2002, a true, correct and complete copy of which has heretofore been delivered to CTC by Holding.

"**Certificate of Merger**" has the meaning set forth in **Section 2(c)**.

"**Claim**" has the meaning set forth in **Section 8(d)**.

"**Claimant**" has the meaning set forth in **Section 8(d)**.

"**Claim Notice**" has the meaning set forth in **Section 8(d)**.

"**Closing**" has the meaning set forth in **Section 2(b)**.

"**Closing Date**" has the meaning set forth in **Section 2(b)**.

"**Code**" means the Internal Revenue Code of 1986.

"**Common Stock**" has the meaning set forth in **Section 4(c)(iii)**.

"**Communications Laws**" has the meaning set forth in **Section 4(e)(iii)**.

"**Company**" has the meaning set forth in the preamble.

"**Company Regulatory Licenses**" has the meaning set forth in **Section 4(e)(ii)**.

"**Company State Regulators**" has the meaning set forth in **Section 4(e)(ii)**.

"**Confidential Information**" has the meaning set forth in the Nondisclosure Agreement.

"**Consent**" means any permit, license, certificate, approval, consent, ratification, waiver, acquiescence, order or other authorization required from or notice to any Person, including any Governmental Authority, which may be necessary or advisable to consummate the Transactions.

"**Contract**" means any agreement, understanding, undertaking, obligation, contract, license, option or lease (or series or groups of related agreements, understandings, undertakings, obligations, contracts, licenses, options or leases), whether written or oral, that is legally binding.

"**CTC**" has the meaning set forth in the preamble.

"**CTC Entities**" means, collectively, CTC and Merger Sub.

"**CTC Indemnified Parties**" has the meaning set forth in **Section 8(b)**.

"**Customer Agreements**" has the meaning set forth in **Section 4(k)(ii)**.

"**DGCL**" means the General Corporation Law of the State of Delaware.

"**DSLAM**" means Digital Subscriber Line Access Multiplexer.

"**Disagreement Notice**" has the meaning set forth in **Section 2(f)(ii)**.

"**Dissenting Shares**" has the meaning set forth in **Section 2(d)(ix)(A)**.

"**Dissenting Stockholder Excess Consideration**" has the meaning set forth in **Section 2(d)(ix)(B)**.

"**Dissenting Stockholder Original Consideration**" has the meaning set forth in **Section 2(d)(ix)(A)**.

"**Effective Time**" has the meaning set forth in **Section 2(d)(i)**.

"**Employee Benefit Plan**" has the meaning set forth in **Section 4(n)(i)**.

"**Environmental Claims**" means any and all administrative, regulatory or judicial Actions, Liabilities, Liens, Losses, notices of non-compliance or violation, notice of Liability or potential Liability, investigations, costs of consultants and experts, proceedings, consent orders or consent agreements relating in any way to any Environmental Law, any environmental Permit or Regulated Substance or arising from alleged injury or threat of injury to health, safety or the

indoor or outdoor environment, including (i) by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages and (ii) by any Governmental Authority or any Person for sanctions, fines, penalties, damages (including punitive, consequential or treble damages), contribution, indemnification, cost recovery, compensation or injunctive relief.

"**Environmental Law**" means all Laws relating to pollution, the indoor or outdoor environment (including ambient air, surface water, groundwater, land surface or subsurface strata), or protection of human health as it relates to the indoor or outdoor environment, or occupational health and safety, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, et seq.) ("**CERCLA**"), the Hazardous Materials Transportation Act (49 U.S.C. § 1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, et seq.), the Federal Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401, et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.) and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), and any other present or future Laws relating to release or threatened release of Regulated Substances, damage to the indoor or outdoor environment, resource extraction or other activities that could have an impact on the environment, or the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Regulated Substances.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means each Person that is treated as a single employer with the Company for purposes of Code §414.

"**Escrow Agent**" means Mellon Investor Services LLC, a New Jersey limited liability company.

"**Executive Employment Agreement**" means that certain Executive Employment Agreement, dated as of February 7, 2002, between Holding and O'Hare, as amended by the First Amendment to Executive Employment Agreement, dated as of December 21, 2004.

"**Executive Officers**" means O'Hare, Jeff Koester, William Wilson, Richard Kendall, Elizabeth Downey, Nicholas Zeitvogel and Rainer Gawlick and any individual who succeeds to a position with a Lightship Company held by any such individual between the date of this Agreement and the Closing.

"**Existing Lenders**" means GECC and ATEL.

"**Existing Indebtedness**" means the existing indebtedness of the Lightship Companies pursuant to and in accordance with (i) the GECC Loan Agreement and the GECC Pledge, and (ii) the Master Lease Agreement.

"**FCC**" means the Federal Communications Commission.

"**FET**" has the meaning set forth in **Section 5(m)**.

"**Fiduciary**" has the meaning set forth in ERISA §3(21).

"**Financial Statements**" has the meaning set forth in **Section 4(h)(i)**.

"**GAAP**" means accounting principles generally accepted in the United States of America as in effect from time to time, consistently applied.

"**GECC**" means General Electric Capital Corporation, an Existing Lender.

"**GECC Loan Agreement**" means the First Amended and Restated Loan and Security Agreement, among GECC and the Lightship Companies, dated as of September 26, 2000 and restated as of February 8, 2002, as amended pursuant to that Amended and Restated Loan and Security Agreement, dated as of March 25, 2004.

"**GECC Pledge**" has the meaning set forth in **Section 4(c)(v)**.

"**Governmental Authority**" means any governmental or quasi-governmental agency or authority, whether administrative, executive, judicial, legislative or other or any combination thereof, including any federal, state, territorial, county, municipal or other government or governmental or quasi-governmental agency, arbitrator, authority, board, body, branch, bureau, central bank or comparable agency or entity, commission, corporation, court, tribunal, department, instrumentality, master, mediator, panel, referee, system or other political unit or subdivision or other entity of any of the foregoing, whether domestic or foreign.

"**Holding**" has the meaning set forth in the preamble.

"**Holding Shares**" means all issued and outstanding shares of Capital Stock of Holding on a fully-diluted basis.

"**Holding Stockholders**" means the holders, as of the date hereof and as of the Closing Date, of all of the Holding Shares.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"**Indemnification Basket**" has the meaning set forth in **Section 8(f)(i)**.

"**Indemnification Cap**" has the meaning set forth in **Section 8(f)(ii)**.

"**Indemnification Escrow**" means the sum of $7,000,000 which amount shall be held, administered and released by the Escrow Agent on the terms and subject to the conditions contained in the Indemnification Escrow Agreement.

"**Indemnification Escrow Agreement**" means that certain escrow agreement among CTC, the Stockholder Representative Committee and the Escrow Agent, substantially in the form attached hereto as **Exhibit A**.

"**Institutional Stockholders**" means collectively, J.P. Morgan SBIC LLC, Sixty Wall Street SBIC Fund, L.P., The Megunticook Fund II, L.P. and The Megunticook Side Fund II, L.P.

"**Intellectual Property**" has the meaning set forth in **Section 4(f)**.

"**Interim Lightship Estimates**" has the meaning set forth in **Section 5(j)**.

"**IRS**" means the Internal Revenue Service.

"**Known Pre-Closing Breach**" has the meaning set forth in **Section 5(e)**.

"**Law**" means any applicable common law, constitution, statute, ordinance or code enacted, adopted, promulgated, applied or followed by any Governmental Authority and, unless the context otherwise requires, all rules and regulations promulgated thereunder, and any injunction, judgment, determination, order, decree, writ, ruling, charge, or other restriction of any Governmental Authority.

"**Liability**" means any liability, indebtedness or obligation of whatever kind or nature (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"**Lien**" means any mortgage, pledge, security interest, lien, claim, charge or other restriction or encumbrance of every nature and description whatsoever, including those arising under or otherwise relating to the (i) GECC Loan Agreement and the GECC Pledge and (ii) the Master Lease Agreement.

"**Lightship**" or "**Lightship Companies**" has the meaning set forth in the preamble.

"**Lightship Estimate**" has the meaning set forth in **Section 2(f)(i)**.

"**Losses**" means all Actions, injunctions, judgments, determinations, orders, decrees, writs, rulings, charges, damages, dues, penalties, sanctions, fines, costs, expenses, amounts paid in settlement, Liabilities, obligations, Taxes, Liens, and losses, including court costs and attorneys' fees and expenses; *provided, however*, that the term "Losses" shall not include, or shall otherwise be reduced by the following: (i) any amount that a Person seeking recovery for Losses receives under any insurance policy on account of such Losses, (ii) the amount of any net Tax benefit to the Claimant from the deduction of such Losses, (iii) Losses that are indirect, unforeseeable, consequential, special, collateral, or incidental; and (iv) lost profits, lost savings, punitive damages, impairment of goodwill or any other diminution in value of any intangible asset.

"**Master Lease Agreement**" means that certain Master Lease Agreement, dated as of May 5, 2004, between ATEL and Holding.

"**Material Adverse Effect**" or "**Material Adverse Change**" means any effect, change or development or combination of developments relating to the Lightship Companies that could reasonably be expected to be materially adverse to the Business, assets, financial condition, prospects or operating results of any Lightship Company, individually, or the Lightship Companies, taken as a whole, or on the ability of the Lightship Companies to consummate timely the Transactions; *provided, however*, that any adverse effect or change arising from or relating to any of the following shall be disregarded in the determination of "Material Adverse Effect" or a "Material Adverse Change": (i) general business or economic conditions, including

such conditions related to the Business, (ii) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (iii) financial, banking, or securities markets, (iv) the entering into or announcement of this Agreement, and (v) the taking of any action contemplated by this Agreement and the other agreements contemplated hereby; and, *provided further,* that with respect to items (ii) and (iii) above, such items shall only be disregarded if and to the extent their impact is not disproportionate to the industry in which the Business operates.

"**Megunticook**" means, collectively, The Megunticook Fund II, L.P., The Megunticook Side Fund II, L.P., Megunticook Partners II, LLC and Megunticook Side Fund Partners II, LLC.

"**Megunticook Agreement**" means that certain Confidentiality, Non-Competition and Non-Solicitation Agreement between Megunticook and CTC, to be entered into as of the Closing Date, substantially in the form attached hereto as **Exhibit B**.

"**Merger**" has the meaning set forth in **Section 2(a)**.

"**Merger Sub**" has the meaning set forth in the preamble.

"**Most Recent Financial Statements**" has the meaning set forth in **Section 4(h)(i)**.

"**Multiemployer Plan**" has the meaning set forth in ERISA §3(37).

"**Non-Breaching Party**" has the meaning set forth in **Section 9(a)**.

"**Nondisclosure Agreement**" means that certain Mutual Nondisclosure Agreement, dated as of November 16, 2004, between the Company and CTC Communications Corp.

"**Nonvoting Common**" has the meaning set forth in **Section 4(c)(iii)**.

"**Nonvoting Series BB Preferred**" has the meaning set forth in **Section 4(c)(ii)**.

"**Nonvoting Series CC Preferred**" has the meaning set forth in **Section 4(c)(ii)**.

"**Offering Memorandum**" means the Confidential Offering Memorandum, dated November 2004, and any supplements or addenda thereto.

"**O'Hare**" means Kevin O'Hare, the Chief Executive Officer of Holding and a party to the Separation and Release Agreement and the Executive Employment Agreement.

"**O'Hare Payment**" means the payment to be paid to O'Hare at or immediately prior to Closing pursuant to **Schedule I** of the Separation and Release Agreement in connection with the termination of, and in full satisfaction of all obligations to O'Hare under or in connection with, the Executive Employment Agreement, but excluding the amounts, if any, to be paid by the

Surviving Corporation to or for the benefit of O'Hare as set forth in **Section 2(f)(iv)(B)(5)** hereof.

"**Ordinary Course of Business**" means the ordinary course of business in the industries in which the Business is conducted and in the manner in which the Business has been conducted, consistent with past custom and practice (including with respect to quantity and frequency). Without limiting the foregoing, (i) "Ordinary Course of Business" shall include the requirement that all expenditures made or incurred by the Lightship Companies in operating the Business consistent with past custom and practice will continue to be made, incurred and paid in the normal course, except to the extent expressly prohibited by the Agreement and (ii) the failure to make, incur or pay any such expenditures in the normal course shall be deemed to be not in the "Ordinary Course of Business."

"**Organizational Documents**" means (i) with respect to any corporation, its certificate or articles of incorporation or organization and its bylaws, (ii) with respect to any limited partnership, its certificate of limited partnership and its limited partnership agreement, (iii) with respect to any general partnership, its partnership agreement, and (iv) with respect to any limited liability company, its articles or certificate of organization or formation and its operating or limited liability company agreement.

"**Outside Date**" has the meaning set forth in **Section 9(b)(ii)**.

"**Party**" or "**Parties**" has the meaning set forth in the preamble.

"**Paying Agent**" means Mellon Investor Services LLC, a New Jersey limited liability company.

"**Paying Agent Agreement**" means that certain Paying Agent Agreement, by and among CTC, the Paying Agent and the Stockholder Representative Committee, substantially in the form attached hereto as **Exhibit C**, to be executed and delivered prior to the Effective Date.

"**Payment Fund**" means an aggregate amount equal to $66,000,000 *minus* the sum of: (1) the Payoff Amounts, (2) the Indemnification Escrow, and (3) the aggregate amount of all Dissenting Stockholder Original Consideration; *provided, however,* that the Payment Fund shall be adjusted, in accordance with **Section 2(f)**.

"**Payoff Amount**" has the meaning set forth on **Section 7(b)(i)**.

"**Payoff Statement**" has the meaning set forth in **Section 7(b)(i)**.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Permits**" has the meaning set forth in **Section 4(e)(i)**.

"**Permitted Liens**" means (i) any Lien for Taxes and assessments, not yet past due or otherwise being contested in good faith, (ii) any leases and any Lien arising out of deposits made to secure Contracts of a like nature arising in the Ordinary Course of Business, and (iii) Liens of carriers, warehousemen, mechanics, vendors, carriers, workmen, repairmen, laborers and

materialmen or other similar encumbrances incurred in the Ordinary Course of Business for sums not yet due or being contested in good faith, *provided that*, in the case of any of clauses (i), (ii) and (iii), adequate reserves have been established therefor to the extent required by GAAP.

"**Person**" means any individual, partnership, corporation, limited liability company, limited liability partnership, association, joint stock company, trust, joint venture, unincorporated organization or other entity, including any Governmental Authority.

"**Preferred Stock**" has the meaning set forth in **Section 4(c)(ii)**.

"**Prohibited Transaction**" has the meaning set forth in ERISA §406 and Code §4975.

"**Registration Rights Agreement**" means the Registration Rights Agreement, dated as of February 8, 2002, by and among Holding and certain of its stockholders.

"**Regulated Substances**" means any substances, chemicals, materials or elements that are prohibited, limited or regulated by any Environmental Laws, any petroleum and petroleum products, radioactive materials, asbestos-containing materials, urea formaldehyde foam insulation, transformers or other equipment that contain polychlorinated biphenyls, and radon gas or any other substances, chemicals, materials or elements that are defined as "hazardous" or "toxic" or words of similar import or otherwise regulated, under the Environmental Laws, or that are known or considered to be harmful to the health or safety of occupants or users of the Premises. The term "Regulated Substances" shall also include any substance, chemical, material or element (i) defined as a "hazardous substance" under CERCLA, as amended by the Superfund Amendments and Reauthorization Act of 1986; (ii) defined as a "regulated substance" within the meaning of Subtitle I of the Resource Conservation and Recovery Act (42 U.S.C. §§ 6991-6991i); (iii) designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act (33 U.S.C. § 1321), or listed pursuant to Section 307 of the Clean Water Act (33 U.S.C. § 1317); or (iv) defined as "hazardous", "toxic", or otherwise regulated, under any Environmental Laws adopted by the Governmental Authorities of any of the jurisdictions where Lightship owns, operates or leases real property.

"**Release**" means disposing, discharging, injecting, spilling, leaking, leaching, dumping, emitting, escaping, emptying, seeping, placing and the like into or upon any land or water or air or otherwise entering into the environment.

"**Reportable Event**" has the meaning set forth in ERISA § 4043.

"**Required Consent**" means any Consent of any Governmental Authority or other Person of any kind that is necessary or otherwise appropriate in order for the Lightship Companies to consummate the Transactions and to perform their respective obligations under the Transaction Documents, including (i) the filing of a pre-merger notification and report form under the HSR Act, and the expiration or termination of the applicable waiting period thereunder, (ii) the filing of notifications with or receipt of approval from the FCC and applicable Company State Regulators in the Commonwealth of Massachusetts and the States of New Hampshire, Vermont, Maine, Rhode Island, Connecticut, New York, New Jersey, Delaware and Pennsylvania, (iii) the filing of the Certificate of Merger with the Secretary of State of the State of Delaware and appropriate documents with the relevant authorities of other states in which the Lightship

Companies conduct business, (iv) any Consents required to be obtained from the Existing Lenders, lessors of real or personal property occupied or used by the Lightship Companies in the Business or vendors of the Lightship Companies, and (v) any Consents required to be obtained from a customer of Lightship in connection with the consummation of the Transactions, where the failure to obtain any Consent set forth in any of clauses (i), (ii), (iii), (iv) or (v) above could reasonably be expected to have a Material Adverse Effect.

"**Required Working Capital Amount**" has the meaning set forth in **Section 2(f)(iv)(D)**.

"**Requisite Stockholder Approval**" means the approval of the Merger and the Transactions by the Holding Stockholders, as required by and in accordance with the DGCL and Holding's Certificate of Incorporation.

"**Separation and Release Agreement**" means that certain Separation and Release Agreement, to be effective as of the Effective Time, between O'Hare and Holding, substantially in the form attached hereto as **Exhibit D**.

"**Series AA Preferred**" has the meaning set forth in **Section 4(c)(ii)**.

"**Series BB Preferred**" has the meaning set forth in **Section 4(c)(ii)**.

"**Series CC Preferred**" has the meaning set forth in **Section 4(c)(ii)**.

"**Shareholders' Agreement**" means the Amended and Restated Shareholders' Agreement, dated as of February 8, 2002, by and among Holding and certain of its stockholders.

"**Stockholder Representative Committee**" has the meaning set forth in **Section 8(c)(i)**.

"**Stockholder Representative Agreement**" means that certain Stockholder Representative Agreement, to be dated as of the Closing Date, by and between Holding and the Stockholder Representative Committee on behalf of certain Holding Stockholders, as set forth therein, substantially in the form attached hereto as **Exhibit E**.

"**Subsidiary**" means any Person of which (i) if a corporation, a majority of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (ii) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of partnership or other similar equity or ownership interests thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons own(s) a majority equity or ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"**Surviving Corporation**" has the meaning set forth in **Section 2(a)**.

"**Tax**" or "**Taxes**" means any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including Taxes under Code §59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to the Tax liability of any other Person. "Tax" or "Taxes" shall also be deemed to include all fees and assessments imposed by any Governmental Authority, including amounts payable to USAC.

"**Taxing Authority**" means, with respect to any Tax, the Governmental Authority that imposes such Tax, and the Governmental Authority (if any) charged with the collection of such Taxes, including any Governmental Authority that imposes, or is charged with collecting, social security or similar charges or premiums.

"**Tax Return**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and any amendment thereof.

"**Third-Party Action**" has the meaning set forth in **Section 8(e)**.

"**Third-Party Action Notice**" has the meaning set forth in **Section 8(e)**.

"**to Holding's Knowledge**", "**known to**" or similar phrase, means the knowledge of an Executive Officer after reasonable inquiry given the nature of such individual's position and responsibilities; *provided, however,* that no such individual (i) is making any representations or warranties of Holding in his or her individual capacity or (ii) shall have any personal liability for any representations or warranties of Holding set forth herein.

"**Transaction Documents**" means this Agreement, the Indemnification Escrow Agreement, the Certificate of Merger, the Paying Agent Agreement, the Stockholder Representative Agreement, the Megunticook Agreement, the Separation and Release Agreement, the Voting Agreement and the other documents and agreements contemplated hereby or necessary to effectuate the Transactions.

"**Transaction Expenses**" means the sum of (i) fifty percent (50%) of the fees and expenses of the Escrow Agent and the Paying Agent, and (ii) all other fees and expenses incurred in connection with the Merger and the Transactions (whether or not invoiced) on or before the Closing Date and payable by the Lightship Companies to third parties related to or arising out of the Transactions, including any fees payable by Lightship to Q Advisors LLC or an Affiliate thereof, fees and disbursements of attorneys, accountants and other advisors, and any and all stay bonuses which Lightship has agreed to pay its employees in connection with or as a result of the proposed Merger, all of which shall be paid in full by Lightship on or before the Closing.

"**Transactions**" means the Merger and the performance by each of the Parties of its respective obligations under this Agreement and the other Transaction Documents to which it is a party.

"**Transmittal Letter**" has the meaning set forth in **Section 2(e)(ii)**.

"**USF**" means Universal Service Fund.

"**Voting Agreement**" means that certain Voting Agreement, dated as the date hereof, by and among Holding, the CTC Entities, the Institutional Stockholders and certain other Holding Stockholders, in the form attached hereto as **Exhibit F**.

"**Voting Common**" has the meaning set forth in **Section 4(c)(iii)**.

"**Voting Series BB Preferred**" has the meaning set forth in **Section 4(c)(ii)**.

"**Voting Series CC Preferred**" has the meaning set forth in **Section 4(c)(ii)**.

"**Working Capital Closing Estimate**" has the meaning set forth in **Section 2(f)(iii)**.

(b)    **Rules of Construction**.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise (i) any definition of or reference to any Contract, instrument or other document herein shall be construed as referring to such Contract, instrument or other document as from time to time amended, supplemented or otherwise modified, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) any definition or reference to any Law shall be construed as referring to such Law as from time to time amended, supplemented or otherwise modified, and (v) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement.  The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

2.    **Merger; Closing**.

(a)    **Merger**.  On and subject to the terms and conditions of this Agreement, the other Transaction Documents and Section 251 of the DGCL, Merger Sub will be merged with and into Holding at and as of the Effective Time (the "**Merger**").  Holding shall be the surviving corporation in the Merger (the "**Surviving Corporation**"), and shall be a wholly-owned Subsidiary of CTC.  The separate existence of Merger Sub shall terminate at and as of the Effective Time.

(b)    **Closing**.  The closing of the Transactions (the "**Closing**") shall take place at the offices of Kelley Drye & Warren LLP, 101 Park Avenue, New York, New York, at a time and date to be specified by the Parties hereto, which shall be no later than the second Business

Day after the satisfaction or waiver in writing of all conditions to the obligations of the Parties to consummate the Transactions (other than conditions with respect to actions the respective Parties shall take at the Closing itself pursuant to the terms of the Transaction Documents), or at such other place and/or date as the Parties may mutually agree. The actual date of Closing shall be referred to herein as the "**Closing Date**."

(c)      **Actions at the Closing**. At the Closing, (i) Holding will deliver to CTC the documents required under **Section 7(b)**, (ii) CTC will deliver to Holding the documents required under **Section 7(c)**, (iii) Merger Sub and Holding will file with the Secretary of State of the State of Delaware a Certificate of Merger in the form attached hereto as **Exhibit G** (the "**Certificate of Merger**"), and (iv) CTC will make the payment required under **Section 2(e)**.

(d)      **Effect of Merger**.

(i)      **General**. The Merger shall become effective at the time (the "**Effective Time**") that Merger Sub and Holding file the Certificate of Merger with the Secretary of State of the State of Delaware. The Merger shall have the effect set forth in the DGCL. The Surviving Corporation may, at any time after the Effective Time, take any action (including executing and delivering any document or instrument) in the name and on behalf of any of the Parties in order to carry out and effectuate the Transactions.

(ii)      **Certificate of Incorporation**. The Certificate of Incorporation of Holding shall be amended and restated at and as of the Effective Time to read as did the certificate of incorporation of Merger Sub immediately prior to the Effective Time, except that the name of the Surviving Corporation shall be Lightship Holding, Inc.

(iii)      **Bylaws**. The bylaws of Holding shall be amended and restated at and as of the Effective Time to read as did the bylaws of Merger Sub immediately prior to the Effective Time, except that the name of the Surviving Corporation shall be Lightship Holding, Inc.

(iv)      **Directors and Officers**. The directors and officers of Merger Sub in office at and as of the Effective Time shall remain the directors and officers of the Surviving Corporation (and retain their respective positions and terms of office), until the earlier of their respective resignations, removals or otherwise ceasing to be a director of officer, or until their respective successors are duly elected and qualified, as the case may be.

(v)      **Conversion of Holding Shares in the Merger**. At and as of the Effective Time, each Holding Share, other than Dissenting Shares, issued and outstanding immediately prior to the Effective Time shall be converted into and represent the right to receive that portion of the Payment Fund and of amounts released by the Escrow Agent to the Stockholder Representative Committee in accordance with **Section 8** to which such Holding Share is entitled as set forth on **Schedule 2(d)(v)**. Each Holding Share that is held by Holding (as treasury stock or otherwise) immediately prior to the Effective Time shall automatically be canceled and retired and no consideration or payment shall be delivered therefor or in respect thereof.

(vi)    **No Other Rights After Effective Time**. From and after the Effective Time, no Holding Share shall be deemed to be outstanding or to have any rights whatsoever, other than those expressly set forth in **Sections 2(d)** and **2(e)** hereof.

(vii)    **Conversion of Merger Sub Shares in the Merger**. At and as of the Effective Time, each share of common stock of Merger Sub issued and outstanding immediately prior to the Effective Time shall be converted into one validly issued, fully paid and non-assessable share of common stock, par value $0.01 per share, of the Surviving Corporation. Each stock certificate of Merger Sub evidencing ownership of any such shares shall continue to evidence ownership of such shares of common stock of the Surviving Corporation until exchanged in accordance with the terms hereof.

(viii)    **No Further Ownership Rights in Holding Shares**. The payments made by CTC pursuant to **Section 2(e)** and **Section 2(f)** shall be deemed to have been issued in full satisfaction of all rights pertaining to all of the Holding Shares, other than Dissenting Shares, and, after the Effective Time, there shall be no further registration of transfers on the books of the Surviving Corporation of Holding Shares that were outstanding immediately prior to the Effective Time. If, after the Effective Time, certificates representing Holding Shares outstanding immediately prior to the Effective Time ("**Certificates**") are presented to the Surviving Corporation for any reason, they shall be cancelled and exchanged as provided in this Agreement and the Paying Agent Agreement.

(ix)    **Appraisal Rights**.

(A)    Notwithstanding any provision of this Agreement to the contrary, in the event a Holding Stockholder demands appraisal rights with respect to any Holding Shares in accordance with the DGCL and such Holding Stockholder has not, as of the Effective Time, withdrawn or otherwise lost its appraisal rights with respect to such shares ("**Dissenting Shares**"),, then such Dissenting Shares shall not be converted into or represent a right to receive that portion of the Payment Fund that would have been attributable to such shares as set forth on **Schedule 2(d)(v)** hereto if such shares were not Dissenting Shares (the "**Dissenting Stockholder Original Consideration**"), but shall instead be entitled to such rights, if any, as may be granted by the DGCL. The Parties acknowledge and agree that CTC shall have no obligation whatsoever to deliver or deposit into the Payment Fund the Dissenting Stockholder Original Consideration with respect to any Dissenting Shares and, if CTC has already delivered or deposited into the Payment Fund the Dissenting Stockholder Original Consideration with respect to any Dissenting Shares, such Dissenting Stockholder Original Consideration shall be promptly refunded to CTC or the Surviving Corporation pursuant to the terms of the Paying Agent Agreement, and the Holders of such Dissenting Shares shall be required to look solely to the Surviving Corporation (subject to abandoned property, escheat and similar Laws) as general creditors thereof with respect to any Dissenting Stockholder Original Consideration payable upon surrender of their Certificates and compliance with any other applicable requirements set forth herein and receipt thereof by the Surviving Corporation.

(B)    In the event it is finally and conclusively determined by a court of competent jurisdiction or in a settlement mutually approved in writing by CTC and the Stockholder Representative Committee (1) that the holders of Dissenting Shares are entitled to

the Dissenting Stockholder Original Consideration with respect to such Dissenting Shares, then CTC or the Surviving Corporation shall deliver to the holders of such Dissenting Shares the Dissenting Stockholder Original Consideration, or (2) that the holders of Dissenting Shares are entitled to an amount in excess of the Dissenting Stockholder Original Consideration with respect to such Dissenting Shares (such amount, the **"Dissenting Stockholder Excess Consideration"**), then CTC or the Surviving Corporation shall deliver to the holders of such Dissenting Shares, the Dissenting Stockholder Excess Consideration; *provided, however*, that in the event CTC or the Surviving Corporation is required to pay any Dissenting Stockholder Excess Consideration with respect to any Dissenting Shares, then CTC or Surviving Corporation, as the case may be, shall be entitled to be indemnified on a dollar-for-dollar basis under **Section 8** hereof, without regard to the Indemnification Basket, for the aggregate amount of the excess of such Dissenting Stockholder Excess Consideration over the Dissenting Stockholder Original Consideration, together with any Losses incurred by CTC or the Surviving Corporation relating thereto, including all reasonable legal and other expenses incurred by CTC or the Surviving Corporation in connection with or otherwise relating to such appraisal rights process under the DGCL; and *provided, further,* that in the event any appraisal proceedings with respect to any Dissenting Shares under the DGCL shall not have been resolved on or prior to the third anniversary of the Closing Date, then an amount equal to the sum of (x) 50% of the aggregate Dissenting Stockholder Original Consideration with respect to any Dissenting Shares subject to appraisal proceedings that have not been resolved by such date and with respect to which CTC did not deposit any Dissenting Stockholder Original Consideration into the Payment Fund pursuant to **Section 2(d)(ix)(A)**, (y) to the extent not duplicative of the amounts set forth in clause (x) above, 150% of the aggregate Dissenting Stockholder Original Consideration with respect to any Dissenting Shares subject to appraisal proceedings that have not been resolved by such date and with respect to which CTC deposited funds into the Payment Fund on or prior to the Effective Time, provided such funds have not been (and will not be during the pendency of such appraisal proceedings) released by the Paying Agent to CTC pursuant to the terms of the Paying Agent Agreement (or 50% of the aggregate Dissenting Stockholder Original Consideration in the event any funds deposited into the Payment Fund with respect to such shares are released by the Paying Agent to CTC pursuant to the terms of the Paying Agent Agreement during the pendency of any such appraisal proceedings); and (z) $100,000 (to cover reasonable legal expenses incurred by CTC and the Surviving Corporation), shall be withheld from the final distribution of the Indemnification Escrow and held by the Escrow Agent until such time as all appraisal proceedings have been finally and conclusively determined, at which time the Parties shall instruct the Escrow Agent to release such remaining funds to CTC to the extent necessary or required to pay any Dissenting Share Excess Consideration and all reasonable legal expenses incurred by CTC or the Surviving Corporation in connection with such appraisal proceedings. To the extent any funds remain in the Indemnification Escrow following such distribution to CTC, the Parties shall instruct the Escrow Agent to release such funds to the Stockholder Representative Committee to be distributed pro rata to the Holding Stockholders.

(C)    Notwithstanding the provisions of subsection (A) above, if a holder of Holding Shares who has demanded appraisal rights under the DGCL with respect to such shares shall have effectively withdrawn with prejudice its request for appraisal, then, as of the later of the Effective Time or the occurrence of such withdrawal, such Holding Shares shall automatically be converted into and represent only the right to receive the Dissenting

Stockholder Original Consideration with respect to such shares upon surrender of the Certificate(s) representing such shares and complying with any other applicable requirements under this Agreement and the Paying Agent Agreement in accordance with the Stockholder Representative Agreement.

(D)     Lightship shall give CTC (1) prompt notice of any written demands for appraisal of any Dissenting Shares, withdrawals of such demands, and any other documents or instruments received by Lightship prior to the Effective Time which relate to any such demand, and (2) the opportunity to participate in all negotiations and proceedings which take place prior to the Effective Time with respect to demands for appraisal under the DGCL. Lightship shall not, except as required by a final and conclusive order of a court of competent jurisdiction or with the prior written consent of CTC, such consent not to be unreasonably withheld, make any payment with respect to any demands for appraisal of any Dissenting Shares or offer to settle or settle any such demands.

(e)     **Procedure for Payment**.

(i)     **Payments**. At or before the Closing, CTC shall deliver the Payment Fund to the Paying Agent for distribution to the Holding Stockholders, other than the holders of Dissenting Shares who have theretofor exercised appraisal rights, in accordance with the Paying Agent Agreement. Each Holding Share, other than Dissenting Shares, shall be entitled to receive that portion of the Payment Fund as set forth on **Schedule 2(d)(v)**. The Paying Agent Agreement shall provide that the Paying Agent shall pay over to the Surviving Corporation any portion of the Payment Fund (including any interest or earnings thereon) held by the Paying Agent on the first anniversary of the Closing Date. Thereafter, all Holding Stockholders shall be required to look solely to the Surviving Corporation (subject to abandoned property, escheat and similar Laws) as general creditors thereof with respect to any portion of the Payment Fund payable upon surrender of their Certificates and compliance with any other applicable requirements set forth herein and in the Paying Agent Agreement and receipt thereof by the Surviving Corporation.

(ii)    **Exchange Procedure**. In accordance with the terms of the Paying Agent Agreement, CTC shall instruct the Paying Agent to deliver to each holder of record of Holding Shares: (A) a letter of transmittal (the **"Transmittal Letter"**), which shall specify that delivery of the Certificates shall be effected, and risk of loss and title to the Certificates held by such Person shall pass, only upon the proper delivery of the Certificates to the Paying Agent and shall be in such form and shall comply with such other requirements as are set forth in the Paying Agent Agreement, and (B) instructions as reasonably specified by the Paying Agent or CTC for use in effecting the surrender of the Certificates in exchange for such Holding Stockholder's interest in the Payment Fund. Subject to the provisions of this **Section 2(e)**, upon surrender of a Certificate for cancellation to the Paying Agent, together with such Transmittal Letter, duly completed and executed, and compliance with all other requirements set forth in the instructions thereto, the holder of such Certificate shall be entitled to receive in exchange therefor, and the Paying Agent shall distribute to such holder in accordance with the terms of the Paying Agent Agreement, that portion of the Payment Fund to which the Holding Shares theretofore represented by such Certificate shall be entitled as set forth on **Schedule 2(d)(v)**, and the Certificate so surrendered shall forthwith be cancelled. In the event that a transfer of ownership

of Holding Shares is not registered in the transfer records of Holding, payment may be made to a Person other than the Person in whose name the Certificate so surrendered is registered if such Certificate shall be properly endorsed or otherwise be in proper form for transfer and the Person requesting such payment shall pay any transfer or other Taxes required by reason of the payment to a Person other than the registered holder of such Certificate or establish to the satisfaction of CTC and the Paying Agent that such tax has been paid or is not applicable. Until surrendered as contemplated by this **Section 2(e)**, each Certificate shall be deemed at any time after the Effective Time to represent only the right to receive upon such surrender the portion of the Payment Fund, without interest, into which the Holding Shares theretofore represented by such Certificate shall have been converted pursuant to the terms hereof. No interest will be paid or will accrue on the cash payable upon the surrender of any Certificate.

    **(iii)** **Timing of Payment**. It is the Parties' intention that the Paying Agent will receive Certificates for Holding Shares at least three (3) Business Days prior to the Effective Time. Provided that Letters of Transmittal and all other documents required thereby (including Certificates) are provided to the Paying Agent at least three (3) Business Days prior to the Effective Time, the Paying Agent shall draw upon the Payment Fund as required to make payments via check or wire transfer at the Effective Time, in accordance with the terms of the Paying Agent Agreement and Letters of Transmittal.

    **(iv)** **No Liability**. None of CTC, Merger Sub, the Surviving Corporation or the Paying Agent shall be liable to any Person in respect of any cash delivered to any Governmental Authority pursuant to any applicable abandoned property, escheat or similar Law. If any Certificate shall not have been surrendered prior to seven years after the Effective Time (or immediately prior to such earlier date on which any Payment Fund would otherwise escheat to or become the property of any Governmental Authority), the Payment Fund shall, to the extent permitted by applicable Law, become the property of the Surviving Corporation, free and clear of all claims or interest of any Person previously entitled thereto.

    **(v)** **Lost Certificates**. If any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such Certificate to be lost, stolen or destroyed and, if required by CTC or the Paying Agent, the posting by such Person of a bond satisfactory to and in such amount as CTC or the Paying Agent may direct as indemnity against any claim that may be made with respect to such Certificate, the Paying Agent will pay to the holder of such lost, stolen or destroyed Certificate, such holder's portion of the Payment Fund.

    **(vi)** **Withholding**. The Paying Agent shall deduct and withhold from the Payment Fund otherwise payable pursuant to this Agreement to any holder of Holding Shares such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code and the rules and regulations promulgated thereunder, or any provisions of any other Law relating to Taxes. To the extent that amounts are so deducted and withheld by the Paying Agent, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the holder of Holding Shares in respect to which such deduction and withholding were made by the Paying Agent.

(vii)    **Indemnification Escrow**.  On the Closing Date, CTC shall deliver the Indemnification Escrow into an escrow account to be maintained by the Escrow Agent in accordance with the Indemnification Escrow Agreement.

(viii)    **Payoff of Existing Indebtedness**.  On the Closing Date, CTC shall pay to each Existing Lender its respective Payoff Amount, as specified in its respective Payoff Statement.

(ix)    **Voting Agreement**.  Simultaneously with the execution and delivery of this Agreement, Lightship shall deliver to CTC the Voting Agreement, duly executed and delivered by all parties thereto.

(f)    **Working Capital Adjustment**.  The Payment Fund shall be adjusted in accordance with this **Section 2(f)**.

(i)    No later than two (2) days prior to the Closing Date, Holding and/or its designated accountants and representatives shall prepare and deliver (or cause to be prepared and delivered) to CTC, a written good faith estimate of the Actual Working Capital Amount as of the Closing Date (the "**Lightship Estimate**").  The Lightship Estimate shall be accompanied by (A) supporting documents, work papers, and other data setting forth in reasonable detail Holding's calculation of the Lightship Estimate and (B) a certificate signed by the Chief Financial Officer of Holding certifying that the Lightship Estimate was calculated in accordance with this **Section 2(f)**.  The Lightship Estimate shall be calculated using the same methods and assumptions as were used in preparing the Most Recent Financial Statements.  Lightship shall cause CTC and/or its accountants and representatives to have prompt and full access to all of Lightship's books, records, personnel, accountants, and advisors in order to review and verify the calculation of the Lightship Estimate.

(ii)    If CTC objects to the Lightship Estimate, it shall deliver a written notice to Lightship to such effect no later than one (1) day prior to the Closing Date (such notice, a "**Disagreement Notice**") accompanied by (A) supporting documents, work papers, and other data setting forth in reasonable detail the basis for CTC's disagreement with the Lightship Estimate and (B) a certificate signed by the Chief Financial Officer of CTC certifying that the Disagreement Notice was delivered in accordance with this **Section 2(f)**.  Failure of CTC to deliver a Disagreement Notice by such date shall be deemed to constitute final and conclusive acceptance of the Lightship Estimate as the Actual Working Capital Amount as of the Closing Date.

(iii)    If CTC timely provides a Disagreement Notice and the Parties are unable to resolve all disagreements set forth therein, then (A) if the aggregate amount still in dispute between the Parties is less than $100,000, the Closing shall proceed based upon the Lightship Estimate of the Actual Working Capital Amount and (B) if the aggregate amount still in dispute between the Parties equals or exceeds $100,000, then the arithmetic average of the Parties' respective estimates of the Actual Working Capital Amount shall be used as the Actual Working Capital Amount for purposes of Closing (with the amount used as the Actual Working Capital Amount for purposes of Closing under this **Section 2 (f)(iii)** being referred to herein as the "**Working Capital Closing Estimate**").  In either such event (A) at Closing, the Payment

Fund shall be increased to the extent that the Working Capital Closing Estimate exceeds the Required Working Capital Amount, (B) at Closing, the Payment Fund shall be decreased to the extent that the Working Capital Closing Estimate is less than the Required Working Capital Amount and (C) promptly following the Closing, the Parties shall engage a mutually satisfactory independent accounting firm to resolve all remaining disagreements between them within thirty (30) days after the Closing, with the decision of such accounting firm as to the amount of the Actual Working Capital Amount being final and conclusive for all purposes. The Stockholder Representative Committee shall represent the Holding Stockholders after the Effective Time for purposes of this **Section 2(f)(iii)**. If, as a result of such final determination, (A) the Actual Working Capital Amount exceeds the Working Capital Closing Estimate, then, within five (5) Business Days after such final determination, CTC shall pay to the Stockholder Representative Committee, for distribution to the Holding Stockholders, such excess in immediately available funds or (B) the Actual Working Capital Amount is less than the Working Capital Closing Estimate, then, within five (5) Business Days after such final determination, CTC and the Stockholder Representative Committee shall instruct the Escrow Agent to release to CTC such difference in immediately available funds from the Indemnification Escrow. The fees and expenses of the independent accounting firm shall be paid by the Party whose estimate of the Actual Working Capital Amount differed to a greater extent from the Actual Working Capital Amount, as determined by such accounting firm.

(iv)     For purposes of this **Section 2(f)**:

(A)     "**Actual Current Closing Assets**" means the sum, as determined in accordance with GAAP on a consolidated basis, as of the Closing Date, of Lightship's: (1) Cash and Cash Equivalents, (2) accounts receivable (net of allowances for doubtful accounts), (3) unbilled revenues, (4) inventory (net of any related reserves), (5) current portion of installation charges, (6) prepaid expenses and other current assets (excluding deposits as set forth in the line item appearing in the balance sheet which is part of the Most Recent Financial Statements, and any inter-company or related party balances), (7) receivables from insurance claims, and (8) Taxes receivable for overpayment credits. For purposes of clarification, the term "Actual Current Closing Assets" shall not include any net operating loss carry forwards.

(B)     "**Actual Current Closing Liabilities**" means the sum, as determined in accordance with GAAP on a consolidated basis, as of the Closing Date, of: (1) Lightship's accounts payable, (2) Lightship's accrued expenses, (3) Lightship's other current Liabilities, including those Liabilities determined to be recorded pursuant to **Section 5(m),** (4) all amounts payable by Lightship in connection with the termination of Lightship's 401(k) plan, (5) the amounts to be paid after Closing by the Surviving Corporation to or for the benefit of O'Hare pursuant to **Schedule II** of the O'Hare Separation and Release Agreement, and (6) premiums payable with respect to the directors and officers' insurance policy covering individuals who served as officers and directors of Holding prior to the Closing Date as described in **Section 6(c)** Without limiting the foregoing, (x) to the extent any Transaction Expense has been paid prior to the Closing, it shall not be considered or treated as an Actual Current Closing Liability for purposes of this **Section 2(f)**, (y) to the extent any Transaction Expense has not been paid prior to the Closing, it shall be considered and treated as an Actual Current Closing Liability for purposes of this **Section 2(f)**, and (z) the current portion of Existing Indebtedness (including all

accrued and unpaid interest thereon) shall not be considered or treated as an Actual Current Closing Liability for purposes of this **Section 2(f)**.

        **(C)**    "**Actual Working Capital Amount**" means the difference between the Actual Current Closing Assets and the Actual Current Closing Liabilities.

        **(D)**    "**Required Working Capital Amount**" means $750,000, *plus* (x) an amount equal to the product of (i) the aggregate cost of the DSLAM configurations installed as of February 1, 2005 in the Company's network, divided by the number of such completed installations, *times* (ii) 64, *minus* (y) an amount equal to the sum of (a) the amount actually paid for all DSLAM configurations installed or ordered and held in inventory up to the Closing Date, *plus* (b) any amount accrued in short-term Liabilities as of the Closing Date for all DSLAM configurations installed or ordered and held in inventory.

    **3.**    **Representations and Warranties of CTC**. CTC hereby represents and warrants to Holding as follows:

        **(a)**    **Organization, Power and Authority**. CTC is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware and has full power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder. The execution, delivery and performance of this Agreement and the other Transaction Documents to which it is a party have been duly authorized by CTC. Merger Sub is a corporation duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is a wholly-owned Subsidiary of CTC.

        **(b)**    **Authority; Noncontravention; Consents**.

        **(i)**    CTC has the requisite power and authority to enter into this Agreement and the other Transaction Documents to which it is a Party and to consummate the Transactions. The execution and delivery of this Agreement and the other Transaction Documents to which it is a party by CTC and the consummation by CTC of the Transactions have been duly authorized by all necessary action on the part of CTC. This Agreement has been duly executed and delivered by CTC and, assuming this Agreement constitutes the legal, valid and binding agreement of Holding, constitutes a legal, valid and binding obligation of CTC, enforceable against it in accordance with its terms, except to the extent enforcement thereof may be limited by: (A) bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditor's rights generally, and (B) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity). Each of the other Transaction Documents to which CTC is a party, when executed and delivered by CTC, will have been duly executed and delivered by CTC and, assuming such Transaction Documents constitute legal, valid and binding agreements of each of the other parties thereto, will constitute legal, valid and binding obligations of CTC, except to the extent enforcement thereof may be limited by (A) bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally, and (B) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity).

(ii)       Except as set forth in **Schedule 3(b)(ii)**, none of the execution and delivery of this Agreement or the other Transaction Documents to which it is a party by CTC, the performance by CTC of its obligations hereunder and thereunder, or the consummation by the CTC Entities of the Transactions will: (A) violate, conflict with or result in any breach of any provision of any CTC Entities' respective Organizational Documents, (B) violate, conflict with or result in a violation or material breach of, constitute a default (with or without due notice or lapse of time or both) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture or deed of trust, or any material Contract to which either of the CTC Entities is a party or by which either of the CTC Entities or any of their respective properties or assets may be bound or affected, or (C) violate any Law applicable to either of the CTC Entities or any of their respective properties or assets.

(iii)       No Consent is required by or with respect to either of the CTC Entities in connection with the execution and delivery of this Agreement or the other Transaction Documents to which it is a party by CTC, or the consummation by CTC of the Transactions, except for the Required Consents.

(c)       **Financial Ability to Close**.  The CTC Entities, through their Affiliate, Columbia Ventures Corporation, presently have, and at Closing will have, the financial ability to perform their respective obligations under this Agreement and the other Transaction Documents to which either is a party, including CTC's obligation to deliver the Payment Fund.

(d)       **Brokers' Fees**.  Except with respect to The Bank Street Group LLC, CTC has no Liability to pay any fees or commissions to any broker, finder, or agent with respect to the Transactions.

(e)       **Investment Matters**.  CTC acknowledges (i) that it has had an opportunity to consult with counsel and other advisers about the Transactions; (ii) that material documents, records and books pertaining to the Transactions have, on request, been made available to CTC and CTC's advisors, and (iii) that Lightship has made available to CTC and its representatives and agents the opportunity to ask questions of the Executive Officers and to acquire such additional information about the Business and financial condition and results of operations of Lightship as CTC has requested.

4.       **Representations and Warranties of Holding**.  Holding represents and warrants to the CTC Entities as follows:

(a)       **Organization, Power and Authority**.  Holding is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has full corporate power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder.  The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and is a wholly-owned Subsidiary of Holding.  The execution, delivery and performance of this Agreement and the other Transaction Documents to which Holding or the Company is or will be a party have been duly authorized by each of Holding and the Company, as the case may be.  Each of Holding and the Company: (i) is duly qualified and in good standing under the Laws of each jurisdiction where such qualification

is required, except where the failure to be so qualified, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, and (ii) has the requisite power and authority to carry on the Business in which it is currently engaged and to own, lease and use the properties as currently owned and used by it, and has complied and, as of the date hereof, is in compliance with, their respective Organizational Documents.

(b)    **Authority; Noncontravention; Consents**.

(i)    Each of Holding and the Company has the requisite power and authority to enter into this Agreement and the other Transaction Documents to which it is a party and to consummate the Transactions contemplated hereby and thereby, as the case may be.  The execution and delivery of this Agreement and the other Transaction Documents to which it is a party by each Lightship Company and the consummation by each Lightship Company of the Transactions have been duly authorized by all necessary action on the part of the Lightship Companies, subject to obtaining the Requisite Stockholder Approval.  The Voting Agreement contains the agreement of Holding Stockholders holding an aggregate of 98.88% of the outstanding voting power with respect to the Holding Shares to vote in favor of the Merger, which is sufficient to constitute the Requisite Stockholder Approval.  This Agreement has been duly executed and delivered by Holding and, assuming this Agreement constitutes the legal, valid and binding obligation of the CTC Entities, constitutes a legal, valid and binding obligation of Holding, enforceable against it in accordance with its terms, except to the extent such enforceability may be limited by (A) bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditor's rights generally, and (B) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity).  Each of the other Transaction Documents, when executed and delivered by Holding or the Company, as the case may be, and assuming such Transaction Documents constitute the legal, valid and binding obligation of each of the other parties thereto, will constitute legal, valid and binding obligations of Holding or the Company, as the case may be, except to the extent such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally, and (ii) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity).

(ii)    Set forth on **Schedule 4(b)(ii)** is a list of all Required Consents. Except as set forth on such schedule, none of the execution and delivery of this Agreement and the other Transaction Documents by the Lightship Companies, the performance by Lightship Companies of their respective obligations hereunder and thereunder, or the consummation by the Lightship Companies of the Transactions will: (A) violate, conflict with or result in any breach of any provision of the respective Organizational Documents of the Lightship Companies, (B) violate, conflict with or result in a violation or breach of, constitute a default (with or without due notice or lapse of time or both) under, or permit the termination of, or require the Consent of any other Person to, or result in the acceleration of, or entitle any Person to accelerate (whether as a result of a change in control of any of the Lightship Companies or otherwise) any obligation, Contract, agreement, instrument, order, judgment or decree to which any of the Lightship Companies is a party or result in the loss of any benefit, or give rise to the creation of any Lien upon any of the properties or assets of any of the Lightship Companies under any of the terms, conditions or provisions of any note, bond, mortgage, indenture or deed of trust, or any Contract

to which either of the Lightship Companies is a party or by which they or any of their respective properties or assets may be bound or affected, or (C) violate any Law applicable to either of the Lightship Companies or any of their respective properties or assets.

      **(c)**    **Capital Structure**.

         **(i)**    **Authorized Capital Stock**. The authorized Capital Stock of Holding consists of two classes of stock that are designated, respectively, "Common Stock" and "Preferred Stock." The total number of shares of Capital Stock that Holding is authorized to issue is 125,000,000 shares, of which 60,000,000 shares are Common Stock and 65,000,000 shares are Preferred Stock. All shares of Common Stock and Preferred Stock have a par value of $0.0001 per share.

         **(ii)**    **Preferred Stock**. The Preferred Stock consists of three series, the Series AA Convertible Preferred Stock (the "**Series AA Preferred**"), the Series BB Convertible Preferred Stock, which consists of two sub-series, the Voting Series BB Convertible Preferred Stock (the "**Voting Series BB Preferred**") and the Nonvoting Series BB Convertible Preferred Stock (the "**Nonvoting Series BB Preferred**", and, together with the Voting Series BB Preferred, the "**Series BB Preferred**"), and the Series CC Convertible Preferred, which consists of two sub-series, the Voting Series CC Convertible Preferred Stock (the "**Voting Series CC Preferred**") and the Nonvoting Series CC Preferred Stock (the "**Nonvoting Series CC Preferred**", and, together with the Voting Series CC Preferred, the "**Series CC Preferred**," and, the Series CC Preferred, the Series BB Preferred, and the Series AA Preferred, collectively, the "**Preferred Stock**").

         **(iii)**    **Common Stock**. The Common Stock consists of two series, the Series X Voting Common Stock ( the "**Voting Common**") and the Series Y Nonvoting Common Stock (the "**Nonvoting Common**," and, together with the Voting Common, the "**Common Stock**").

         **(iv)**    **Outstanding Shares**. Set forth on **Schedule 4(c)(iv)** is a complete and accurate list, as of the date hereof, of all of the Holding Stockholders and their respective individual holdings, by series and sub-series, on a fully diluted basis (the "**Capitalization Table**"). Except as set forth on **Schedule 4(c)(iv)**, there are no, and as of the Closing Date there will be no, outstanding options, warrants, rights (including conversion and preemptive rights and rights of first refusal and similar rights) or agreements for the purchase or acquisition from or by Holding of any of its Capital Stock. Except as set forth on **Schedule 4(c)(iv)** and in the Voting Agreement, no outstanding Capital Stock of Holding provides for acceleration or vesting, or requires anti-dilution adjustments, by reason of the consummation of the Transactions. Lightship is not a party to or subject to any Contract and, except as set forth on **Schedule 4(c)(iv)**, there is no Contract between or among any Persons that affects or relates to the voting or giving of written consent with respect to any security or voting by a stockholder or director of Holding. All of the outstanding Capital Stock of Holding is duly and validly authorized and issued, fully paid and nonassessable, and was issued in compliance with all applicable federal and state securities Laws. Except as set forth on **Schedule 4(c)(iv)**, Holding has not granted or agreed to grant any registration rights, including piggyback and/or demand registration rights, to any Person other than pursuant to the Registration Rights Agreement.

          

(v)    **Subsidiaries**. Except for the Company, which is a wholly-owned Subsidiary of Holding, none of the Lightship Companies presently owns or controls, directly or indirectly, any interest in any other Person. All of the membership interests of the Company are wholly-owned by Holding free and clear of any Lien, except for the pledge by Holding to GECC of all of the membership interests of the Company (the "**GECC Pledge**") pursuant to the GECC Loan Agreement. Except as set forth on **Schedule 4(c)(iv)**, There are no outstanding options, warrants, rights (including conversion and preemptive rights and rights of first refusal and similar rights) or agreements for the purchase or acquisition from or by either Holding or the Company of any of the Capital Stock of either thereof.

(d)    **Assets; Title to Assets**. Set forth on **Schedule 4(d)** is a list, as of the date hereof, of all assets of Lightship with an original purchase price of at least $10,000, which list is set forth in sufficient detail to enable CTC to identify such assets to its reasonable satisfaction. Except for (i) the GECC Pledge and GECC's Lien on all of the assets of the Company pursuant to the GECC Loan Agreement, (ii) any Liens on equipment financed by ATEL or (iii) as set forth on **Schedule 4(d)**, each of the Lightship Companies owns all of its property and assets free and clear of all Liens (other than Permitted Liens). With respect to the property and assets it leases, Lightship is in substantial compliance with all terms of such leases and, to Holding's Knowledge, holds a valid leasehold interest free of any Liens other than Permitted Liens. Neither Lightship Company owns any real property.

(e)    **Permits; Governmental Licenses; Consents**.

(i)    Each Lightship Company has all permits, licenses, orders, certificates, authorizations and approvals of any Governmental Authority (collectively, "**Permits**") that are required in order to conduct or are material to the Business or any other business in which it engages, as presently conducted and as proposed to be conducted. All such Permits are in full force and effect and, as of the date hereof, no notices of failure to comply have been received by Lightship or, to Holding's Knowledge, recorded in respect of any such Permits. Holding has no Knowledge of any reason why such Permits may be revoked, suspended or not renewed at expiration. All applications, reports, notices and other documents required to be filed by Lightship with all Governmental Authorities have been timely filed, except where failure to timely file would not have a Material Adverse Effect, and all such filings are complete and correct in all material respects as filed or as amended prior to the date hereof. With respect to any required Permits, applications for which are either pending or contemplated as of the date hereof, Holding knows of no reason why such Permits would not be approved and granted by the appropriate Governmental Authority.

(ii)    Set forth on **Schedule 4(e)(ii)** is a complete list of all Permits issued by the FCC or any state public service commission (collectively, the "**Company State Regulators**") to the Lightship Companies and all other material regulatory authorizations, including but not limited to franchises, ordinances and other agreements issued or granted to Lightship by a Governmental Authority with jurisdiction over the Lightship Companies (the "**Company Regulatory Licenses**"). True and complete copies of all Company Regulatory Licenses that exist in a tangible form have been provided to CTC by the Lightship Companies. Except as indicated on **Schedule 4(e)(ii)**, each of the Lightship Companies is in substantial compliance with the terms and conditions of each Company Regulatory License and has not

received notice that it is currently in violation of any of the terms or conditions of such Company Regulatory License. Each Company Regulatory License is valid and in full force and effect. Lightship owns or possesses all right, title and interest in and to each Company Regulatory License except as indicated on **Schedule 4(e)(ii)**, and has taken all necessary action to maintain such Company Regulatory Licenses, except to the extent as could not reasonably be expected to result in the revocation, termination or other loss thereof. No loss or expiration of any such Company Regulatory License is pending or reasonably foreseeable other than expiration in accordance with the terms thereof. To Holding's Knowledge, no event has occurred, other than matters of general applicability to the competitive local exchange industry, and no agreement has been entered into by Lightship with respect to the Company Regulatory Licenses that permits, or after notice or lapse of time would result in, any impairment of the rights of Lightship with respect to such Company Regulatory Licenses. Except as indicated on **Schedule 4(e)(ii)**, other than the Company Regulatory Licenses, there are no other Permits necessary for the Lightship Companies to conduct their business operations or hold any of their respective assets. No notices have been received by and no claims have been filed against Lightship alleging their failure to hold any requisite and material Permits.

      **(iii)**    Except as indicated on **Schedule 4(e)(iii)**, the operations of Lightship are in substantial compliance with the terms and conditions of the Company Regulatory Licenses and with the Communications Act of 1934, as amended, applicable state Laws and the published rules, regulations and policies promulgated by the FCC and the Company State Regulators thereunder (the "**Communications Laws**"), including the obligations of Lightship to make USF payments and comply with the provisions of the Communications Assistance to Law Enforcement Act. Lightship has not done anything or failed to do anything that could reasonably be expected to cause the loss of any Company Regulatory License.

      **(iv)**    Except as set forth in **Schedule 4(e)(iv)**, (A) no petition, action, investigation, notice of violation or apparent liability, notice of forfeiture, order to show cause, complaint, or proceeding seeking to revoke, reconsider the grant of, cancel, suspend, or modify any of the Company Regulatory Licenses is pending or, to Holding's Knowledge, threatened before the FCC, the Company State Regulations or any Governmental Authority and (B) other than conditions referred to in **Schedule 4(e)(iv)** and/or of general applicability to the competitive local exchange carrier industry, none of the Company Regulatory Licenses is subject to any restriction or condition, including any Lien. Except as indicated on **Schedule 4(e)(iv)**, the Transactions will not adversely change, alter or impair any of the Company Regulatory Licenses and are permissible under the Company Regulatory Licenses.

      **(v)**    As of the Closing Date, none of the Lightship Companies has any Liability: (A) to any Affiliate of Verizon Communications, Inc. related to billing for CABS with respect to any intra-LATA toll traffic terminating on Lightship's UNE-P lines, or (B) to any CLEC related to switched access charges in its non-UNE-P access bills to other CLECs for UNE-P feature group D access charges associated with its local interconnection arrangements.

      **(f)**    **Intellectual Property Rights.** Lightship owns or licenses or otherwise has the right to use all licenses, permits, patents, patent applications, trademarks, trademark applications, service marks, tradenames, copyrights, copyright applications, franchises, authorizations, non-governmental licenses and permits and other intellectual property rights

("**Intellectual Property**") necessary for its Business as now conducted and as presently proposed to be conducted, without any conflict with or infringement of the rights of any other Person and, to Holding's Knowledge, no Person is infringing, violating or misappropriating any Intellectual Property owned by Lightship or in which Lightship has an interest. There are no outstanding Liens (other than Permitted Liens) relating to any of the foregoing. Lightship is not bound by or a party to any Contracts of any kind with respect to the Intellectual Property of any other Person other than such Contracts arising from the purchase or use of "off the shelf" products. A list of all Intellectual Property as of the date hereof is set forth on **Schedule 4(f)**. Lightship has not received any written notice alleging that Lightship has violated or, by conducting its Business as proposed, would violate any of the Intellectual Property rights of any other Person, nor does Holding have Knowledge of any such violations. Lightship has (i) purchased and licensed any and all of the "Rights to Use" the software required to provide the following number of ports for trunking for the four Nortel DMS-100 switches, and (ii) as of February 28, 2005, the following ports were in service: Massachusetts switch: 1,632 ports purchased, 753 ports in service; New Hampshire switch: 812 ports purchased, 493 ports in service; Maine switch: 1,740 ports purchased, 814 ports in service; and Vermont switch: 368 ports purchased, 202 ports in service.

(g)    **Insurance**. Lightship has in full force and effect (i) insurance to such extent and against such risks, including fire and other casualties, as is customary and reasonable with companies in the same or similar businesses, (ii) workmen's compensation insurance in the amount required by applicable Law, (iii) public liability insurance in the amount customary with companies in the same or similar business against claims for personal injury or death on properties owned, occupied or controlled by it, and (iv) such other insurance as may be required by applicable Law (including, without limitation, against larceny, embezzlement or other criminal misappropriation, flood, vandalism, malicious mischief, and environmental damage). **Schedule 4(g)** sets forth a complete and accurate list of all insurance policies maintained by Lightship as of the date hereof.

(h)    **Financial Statements; Undisclosed Liabilities: No Material Adverse Change**.

(i)    Attached as **Schedule 4(h)** are the following financial statements (collectively, the "**Financial Statements**"): (A) the audited consolidated balance sheets and statements of operations, changes in stockholders' equity (deficit) and cash flows for Lightship as of and for the fiscal years ended December 31, 2003 and 2002; and (B) the unaudited consolidated balance sheets and statements of operations, changes in stockholders' equity (deficit) and cash flows for Lightship as of and for the fiscal year ended December 31, 2004 (the "**Most Recent Financial Statements**"). Except as set forth on **Schedule 4(h)(i)**, the Financial Statements fairly present the financial condition of Lightship as of such dates and the results of its operations and changes in its cash flows for the periods covered thereby in accordance with GAAP (subject to, with respect to the Most Recent Financial Statements, the omission of certain footnotes and other presentation items required by GAAP with respect to audited financial statements).

(ii)    Except as set forth on **Schedule 4(h)(ii),** Lightship has no Liabilities of a type required by GAAP to be reflected on a consolidated balance sheet, except for

(A) Liabilities set forth in the Most Recent Financial Statements and (B) Liabilities that have arisen after the date of the Most Recent Financial Statements in the Ordinary Course of Business which, individually and in the aggregate, are not material.

      **(iii)**    The books of account, stock record books, and other material financial records of the Lightship Companies, all of which have been made available to CTC, are complete and correct in all material respects and have been maintained in accordance with sound business practices. The Lightship Companies have established and maintain a system of internal controls and procedures to provide assurances that all material information regarding the Lightship Companies' operations and financial condition is communicated to the Lightship Companies' management, including their Executive Officers.

      **(iv)**    Since the Most Recent Financial Statements, the Business has been conducted in the Ordinary Course of Business and there has been no Material Adverse Change.

      **(i)**    **Legal Compliance**. Except as set forth on **Schedule 4(i)**, the Company has complied in all material respects and is currently in compliance in all material respects with all applicable Laws. As of the date hereof Lightship has not received any written notice of alleged noncompliance of any applicable Laws that could reasonably be expected to have a Material Adverse Effect.

      **(j)**    **Tax Matters**.

      **(i)**    Except as set forth on **Schedule 4(j)(i)**, each of the Lightship Companies has timely filed all Tax Returns required to be filed by it, and all such Tax Returns are true, correct and complete in all respects. Except as set forth on **Schedule 4(j)(i)**, no extension to file any Tax Return has been granted to or requested by any of the Lightship Companies, other than for Tax Returns that have already been filed. Except as set forth on **Schedule 4(j)(i)**, each of the Lightship Companies has timely paid or caused to be paid all Taxes required to be paid.

      **(ii)**    Except as set forth on **Schedule 4(j)(ii)**, each of the Lightship Companies has withheld and paid over all Taxes required to have been withheld and paid over, and complied with all information reporting and backup withholding requirements in connection with amounts paid or owing to any employee, creditor, independent contractor, shareholder or other third-party.

      **(iii)**    Except as set forth on **Schedule 4(j)(iii)**, Lightship has collected and remitted to the applicable Taxing Authorities on a timely basis the proper amount of Federal communications excise Taxes and state and local Taxes payable with respect to the services provided by the Lightship Companies.

      **(iv)**    There are no Liens on any of the assets of the Lightship Companies with respect to Taxes, other than for Taxes not yet due and payable.

      **(v)**    No Tax Return filed by any of the Lightship Companies has been audited by a Taxing Authority, and, except as set forth on **Schedule 4(j)(v)**, no such audit is pending. No Taxing Authority has threatened (orally or in writing, formally or informally) such

an audit, or asserted a deficiency with respect to any Tax. None of the Lightship Companies is a party to any proceeding for the assessment or collection of any Tax, nor has any such proceeding been asserted or threatened (orally or in writing, formally or informally) by any Taxing Authority. No Taxing Authority has requested (orally or in writing, formally or informally) information related to Tax matters.

(vi)    Except as set forth on **Schedule 4(j)(vi)**, the unpaid Taxes of the Lightship Companies (A) did not, as of the date of the Most Recent Financial Statement, exceed the reserve for Tax Liability set forth on the face of the Most Recent Financial Statements and (B) do not exceed the reserve for the Tax Liability set forth on the face of the Most Recent Financial Statements as adjusted through the Closing Date in a manner consistent with previous years and past practice. Since the date of the Most Recent Financial Statements, none of the Lightship Companies has incurred any Liability for Taxes arising from extraordinary gains or losses, as that term is used in GAAP, outside of the Ordinary Course of Business, consistent with previous years and past practice.

(vii)    None of the Lightship Companies has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(viii)    Except as set forth on **Schedule 4(j)(viii)**, none of the Lightship Companies has ever made a request for a ruling by any Taxing Authority.

(ix)    None of the Lightship Companies (A) has been a member of a group filing a consolidated income Tax Return other than a group the common parent of which was at all times Holding or (B) has any Liability for the Taxes of any Person (other than the Lightship Companies) under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign Law), as a transferee or successor, by contract or otherwise.

(x)    None of the Lightship Companies is or ever has been, a party to any tax sharing, Tax indemnity or Tax allocation agreement or arrangement.

(xi)    None of the Lightship Companies has been a "distributing corporation" or "controlled corporation" in a distribution described in Section 355 of the Code.

(xii)    None of the Lightship Companies is a party to any agreement, contract, arrangement or plan that has resulted or could result in its making of a payment that:

(A)    is not deductible under, or would otherwise constitute a "parachute payment" within the meaning of, Section 280G of the Code (or any similar provision of state, local or foreign Law); or

(B)    is or may be subject to the imposition of an excise tax under Section 4999 of the Code.

(xiii)    None of the Lightship Companies has filed a consent under Section 341(f) of the Code concerning collapsible corporations.

(xiv)    None of the Lightship Companies is a party to any Contract, arrangement or plan that has resulted or would result, separately or in the aggregate, in the payment of any amount that will not be fully deductible pursuant to Section 162(m) of the Code.

(xv)    None of the Lightship Companies has agreed to make any adjustments or changes to its methods of accounting pursuant to Section 481 of the Code (or any similar provision of state, local or foreign Law), and no Taxing Authority has proposed (orally or in writing, formally or informally) any such adjustment. None of the Lightship Companies will be required to include in post-Closing income any amount resulting from a change in accounting method, installment sale, inter-company transaction, or excess loss account or similar type of adjustment.

(xvi)    No claim has ever been made (orally or in writing, formally or informally) by any Taxing Authority in a jurisdiction in which any of the Lightship Companies does not file or has not filed Tax Returns that any of the Lightship Companies is or may be subject to Taxation by that jurisdiction; or is or may be required to file Tax Returns with that Taxing Authority, nor does any basis exist for such a claim.

(xvii)    None of the Lightship Companies is or has been a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code within the period specified in Section 897(c)(1)(A)(ii) of the Code.

(xviii)    None of the Lightship Companies is a party to any joint venture, partnership or other arrangement or contract that could be treated as a partnership for federal income tax purposes.

(xix)    [Intentionally Omitted].

(xx)    Schedule 4(i)(xx) lists all the jurisdictions in which the Lightship Companies are or have been required to file Tax Returns or pay Taxes.

(xxi)    Schedule 4(i)(xxi) sets forth all material elections with respect to Taxes affecting the Lightship Companies as of the date hereof.

(xxii)    Holding has at all times been the sole owner of all interests in the Company, and the Company has, at all times, been treated as a disregarded entity for federal income Tax purposes.

(xxiii)    Notwithstanding anything to the contrary contained herein, in any of the other Transaction Documents, in any of the Lightship Companies' Tax Returns, the Financial Statements or otherwise, Holding makes no representations or warranties with respect to net operating losses of the Lightship Companies as of any date.

(k)    **Contracts**.

(i)    **Schedule 4(k)(i)** lists all of the following Contracts, as of the date hereof, to which either of the Lightship Companies is a party:

(A)    all leases of real property;

(B)    all leases for personal property that involve annual payments by Lightship in excess of $10,000;

(C)    all Contracts that have a term of more than one year or that involve annual payments by Lightship in excess of $30,000;

(D)    all maintenance Contracts or similar agreements of any kind relating to the Business or Intellectual Property;

(E)    all Contracts involving minimum purchase requirements; and

(F)    all other Contracts that are material to Lightship or the Business.

(ii)    **Schedule 4(k)(ii)** consists of two (2) CD ROMS provided by Lightship to CTC, which list all customers which Lightship is currently billing for services, whether on a month-to-month basis or pursuant to a fixed-term contractual arrangement (collectively, the "**Customer Agreements**");

(iii)    All of the Contracts set forth on **Schedule 4(k)(i) and (ii)** are valid, in full force and effect and binding upon the applicable Lightship Company party thereto and, to Holding's Knowledge, the other parties thereto, enforceable against the applicable Lightship Company in accordance with their respective terms; and the applicable Lightship Company is not in material default under any such Contract, nor, to Holding's Knowledge, does any condition exist that, with notice or lapse of time or both, would constitute a material default under any such Contract. Except with respect to Customer Agreements involving annual payments to Lightship of not more than $6,000, to Holding's Knowledge, no party to any such Contract intends to terminate or refuse to renew or otherwise modify its respective Contract or take any adverse action against CTC, the Surviving Corporation or the Company or any action that would otherwise adversely affect CTC, the Surviving Corporation or the Company as a result of the consummation of the Transactions.

(l)    **Litigation**. Except as set forth on **Schedule 4(l)**, there are no Actions or subpoenas: (i) pending against Lightship, or (ii) to Holding's Knowledge, pending against any current or former supervisory employee of Lightship with respect to any acts or omissions in connection with his or her employment with Lightship, or any properties or assets of Lightship, or (iii) to Holding's Knowledge, threatened against Lightship or any current or former supervisory employee of Lightship with respect to any acts or omissions in connection with his or her employment with Lightship, any properties or assets of Lightship, relating to or arising from the Transactions, or (iv) whether filed or threatened, that have been settled or compromised by Lightship within three years prior to the date of this Agreement and at the time of such settlement or compromise were material to the Business. Lightship is not subject to any outstanding order, judgment, writ, injunction or decree that could reasonably be expected to have a Material Adverse Effect or could reasonably be expected to prevent or delay the consummation of the Transactions. There has not been since January 1, 2002, nor are there currently any

internal investigations or inquiries being conducted by or with respect to Lightship, its employees, officers, directors, managers or members, as the case may be, or any third-party or Governmental Authority at the request of any of the foregoing concerning any financial, accounting, Tax, conflict of interest, self-dealing, fraudulent or deceptive conduct or other misfeasance or malfeasance issues.

(m)    **Employees**. Lightship is not bound by or subject to (and none of its assets or properties is bound by or subject to) any Contract with any labor union, and no labor union has requested in writing or, to Holding's Knowledge, has sought to represent any of the employees, representatives or agents of Lightship. There has not been and there is not currently any strike or other material labor dispute involving Lightship pending, or to Holding's Knowledge, threatened, nor is Lightship aware of any labor organization activity involving Lightship's employees. Holding is not aware that any officer (other than O'Hare) or employee at the level of Vice President or above, or that any group of such employees, intends to terminate their employment with Lightship. Holding has made no inquiry as to the intentions of any officer, key employee or group of employees other than O'Hare with respect to any such individual's desire to continue or terminate employment with Lightship following the Effective Time. Set forth on **Schedule 4(m)** is the name, past twelve months' salary and most recent target bonus of each salaried employee of Lightship as of the date hereof. Except for O'Hare, whose employment is governed by the terms of the Executive Employment Agreement, the employment of each officer and employee of Lightship is terminable at the will of Lightship. Lightship has complied in all material respects with all applicable state and federal equal employment opportunity Laws and with all other Laws related to employment. To Holding's Knowledge, no employee of Lightship, nor any consultant with whom Lightship has contracted, is in violation of any term of any Contract relating to the right of any such individual to be employed by, or to contract with, Lightship because of the nature of the business to be conducted by Lightship or otherwise; and to Holding's Knowledge the continued employment by Lightship of its present employees, and the performance of Lightship's contracts with its independent contractors, will not result in any such violation. As of the date hereof Lightship has not received any written notice alleging that any such violation has occurred. Except as set forth on **Schedule 4(m)** , no employee of Lightship has been granted the right to continued employment by Lightship or to any compensation following a change of control of Lightship or following termination of employment with Lightship.

(n)    **Employee Benefits**.

(i)    **Schedule 4(n)** sets forth a complete and accurate list as of the date hereof of all "employee benefit plans," within the meaning of Section 3(3) of ERISA, and all other bonus, profit sharing, pension, severance, deferred compensation, individual employment, consulting, health, life, stock option, disability plans, Contracts or policies (whether written or unwritten, insured or self insured) established, maintained, sponsored, or contributed to (or with respect to which any obligation to contribute has been undertaken) by Lightship on behalf of any employee, director, manager, or shareholder of Lightship (whether current, former, or retired) or their beneficiaries (each an "**Employee Benefit Plan**"). There are not currently, nor have there ever been, any Persons that would be deemed to be a "single employer" with Lightship under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.