(ii)    With respect to each Employee Benefit Plan set forth on **Schedule 4(n)**: (A) such Employee Benefit Plan has been maintained and operated in all material respects in accordance with their terms and applicable Law, including ERISA and the Code; (B) such Employee Benefit Plans intended to qualify under Section 401(a) of the Code have all received a determination letter from the Internal Revenue Service to the effect that the Employee Benefit Plan is qualified under Section 401 and 501 of the Code (or has submitted or is within the remedial amendment period for submitting an application for a determination letter from the IRS); (C) no Action has been asserted or instituted or, to Holding's knowledge, has been threatened or is anticipated, against any Employee Benefit Plan (other than immaterial routine claims for benefits, and appeals of such claims), any trustee or Fiduciaries thereof, Lightship, any director, officer, manager, or employee thereof, or any of the assets of any trust of any Employee Benefit Plan; (D) to Holding's Knowledge, no Employee Benefit Plan is or is expected to be under audit or investigation by the Internal Revenue Service, U.S. Department of Labor, or any other Governmental Authority; and (E) no event, condition, or circumstance exists that would prevent the amendment or termination of any Employee Benefit Plan.

(iii)    Neither Lightship nor any of its respective predecessors has ever contributed to, currently contributes to, has ever been required to contribute to, or otherwise participated in or currently participates in or in any way, directly or indirectly, has any Liability with respect to any plan subject to Section 412 of the Code, Section 302 of ERISA or Title IV of ERISA, including any "multiemployer plan" (within the meaning of Sections (3)(37) or 4001(a)(3) of ERISA or Section 414(f) of the Code), or any single employer pension plan (within the meaning of Section 4001(a)(15) of ERISA) that is subject to Sections 4063 or 4064 of ERISA. None of Lightship, any Employee Benefit Plan, any trust created thereunder, or any trustee, administrator, or fiduciary (as defined in Section 3(21) of Title I or ERISA) thereof, has engaged in a Prohibited Transaction. Lightship has made all contributions, paid all premiums and satisfied all liability with respect to the Employee Benefit Plans which are payable as of the date hereof

(iv)    True, correct and complete copies of all documents embodying the current Employee Benefit Plans, including all plan and trust instruments and insurance, group annuity and other contracts pertaining thereto, have heretofore been delivered to CTC. With respect to each of the Employee Benefit Plans, the reporting and disclosure requirements of ERISA and the Code, as applicable, have been fulfilled and CTC has been furnished with copies of all filings with the IRS, the Department of Labor and the PBGC of each Employee Benefit Plan's most recent plan year, including Schedule B of Department of Treasury Form 5500.

(v)    Except as set forth on **Schedule 4(n)(v)**, the consummation of the Transactions will not give rise to any Liability, including Liability for severance pay, unemployment compensation, termination pay, or withdrawal liability, or accelerate the time of payment or vesting or increase the amount of compensation or benefits due to any employee, director, manager, shareholder, or beneficiary of Lightship (whether current, former, or retired) or their beneficiaries solely by reason of such Transactions or by reason of a termination following such Transactions. Except for Lightship's 401(k) plan, which shall be terminated at or prior to Closing, Lightship does not maintain, contribute to, or in any way provide for any welfare benefits of any kind whatsoever (other than under Section 4980B of the Code, the Federal Social Security Act, or a plan qualified under Section 401(a) of the Code) to any current

or future retiree or terminee. Lightship does not have any unfunded Liabilities pursuant to any Employee Benefit Plan that is not intended to be qualified under Section 401(a) of the Code and that is an employee pension benefit plan within the meaning of Section 3(2) of ERISA, a nonqualified deferred compensation plan or an excess benefit plan.

      (o)   **Environmental**.

      (i)   Except as set forth on **Schedule 4(o)**: (A) Lightship and the Business are in substantial compliance with all Environmental Laws; (B) there has been no Release at any of the properties owned or operated by Lightship or a predecessor in interest, or at any disposal or treatment facility that received Regulated Substances generated by Lightship or any predecessor in interest that could reasonably be expected to have a Material Adverse Effect; (C) no Environmental Claim has been asserted against or addressed to Lightship or any predecessor in interest nor does Lightship have knowledge or notice of any threatened or pending Environmental Claim against Lightship or any predecessor in interest that could reasonably be expected to have a Material Adverse Effect; (D) no Environmental Claims have been asserted against any facilities that may have received Regulated Substances generated by Lightship or any predecessor in interest that could reasonably be expected to have a Material Adverse Effect; (E) no property now or formerly owned or operated by Lightship has been used as a treatment or disposal site for any Regulated Substances; (F) Lightship has not failed to report to the proper Governmental Authority any Release that is required to be so reported by any Environmental Laws that could reasonably be expected to have a Material Adverse Effect; (G) Lightship holds all Permits required under any Environmental Laws in connection with the operation of its Business, except for such Permits as to which Lightship's failure to maintain or comply with could not reasonably be expected to have a Material Adverse Effect; (H) Lightship has not received any notification pursuant to any Environmental Laws that (1) any work, repairs, construction or capital expenditures are required to be made in respect as a condition of continued compliance with any Environmental Laws, or any Permit issued pursuant thereto or (2) any Permit referred to above is about to be reviewed, made, subject to limitations or conditions, revoked, withdrawn or terminated, in each case, except as could not reasonably be expected to have a Material Adverse Effect; and (I) Lightship has heretofore provided to CTC all studies, reports, laboratory data, analyses, and the like pertaining in any way to the environmental condition of the facilities, and has heretofore disclosed to CTC in writing any material information regarding the environmental condition of Lightship's facilities.

      (ii)   As of the date hereof there are no Actions pending or, to Holding's Knowledge, threatened (A) against any of the Lightship Companies regarding any obligation to undertake or bear the cost of any Environmental Claim, including any environmental cleanup, or with respect to any real or personal property at which Regulated Substances generated by any Lightship Company were transported for disposal or (B) against any real or personal property or operations that any Lightship Company owns, leases or manages, or owned, leased or managed in the past, in whole or in part.

      (p)   **Brokers' Fees**. Except for Q Advisors LLC, the fees and expenses of which shall be borne solely by Holding and paid in full as Transaction Expenses on or before the Closing, neither Lightship nor any Holding Stockholder has any Liability to pay any fees or commissions to any broker, finder, or agent with respect to the Transactions.

(q)    **Accounts; Safe Deposit Boxes**.  Set forth in **Schedule 4(q)** is a complete and accurate list of all bank and savings accounts, certificates of deposit and safe deposit boxes of Lightship and those individuals authorized to draw on these accounts or deposits or to have access to these boxes.

(r)    **Transactions with Related Parties**.  Except as set forth on **Schedule 4(r)**, none of Lightship's officers, directors, managers or shareholders or any of their respective spouses, children or other relatives has (i) borrowed money from or lent money to Lightship that remains outstanding, (ii) to Holding's Knowledge, any Claims of any kind whatsoever against Lightship; (iii) any interest in any property or assets used by or useful to Lightship, or (iv) to Holding's Knowledge, been a director, officer, manager, or employee of, or had any direct or indirect interest in, any Person that has done business with Lightship (except for the ownership of not more than five percent of the outstanding securities of any class of any publicly-traded securities).

(s)    **Accounts Receivable**.  The accounts receivable of Lightship relating to Customer Agreements, as of the date hereof and as of the Closing, (i) represent valid and bona fide claims of Lightship against the customers under the Customer Agreements or other Contracts to which Lightship is a party, (ii) have arisen in the Ordinary Course of Business, and (iii) to Holding's Knowledge, subject to Lightship's allowance for doubtful accounts as reflected in its books and records, have not been and are not subject to set-off, counterclaim or any future performance obligation on the part of Lightship.

(t)    **Consents; Resolutions; Minutes.**  Prior to the date hereof, Holding has made available or provided directly to CTC, true, complete and correct copies of all consents, resolutions and minutes of (i) Holding's Board of Directors and any committee thereof and of the annual or special meetings of the Holding Stockholders, and (ii) the Managers/Board of Directors of the Company and any committee thereof or meetings of the members of the Company, in each case during the period from January 1, 2005 through March 11, 2005 and for calendar years 2004, 2003 and 2002.  Such consents, resolutions and minutes accurately reflect, as the case may be, all actions taken or approved by (x) Holding's Board of Directors and any committee thereof and/or the Holding Stockholders, and (y) the Managers/Board of Directors of the Company and any committee thereof or meetings of the members during such time periods, and no such consents, resolutions or minutes have been altered, modified, amended or rescinded and all such consents, resolutions and minutes remain in full force and effect.

5.    **Pre-Closing Covenants**.  The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (or the earlier termination of this Agreement):

(a)    **General**.  Each of the Parties will use their commercially reasonable efforts to take all action and to do all things necessary, proper or advisable in order to consummate and make effective the Transactions at the earliest practicable time (including satisfaction of the Closing conditions set forth in **Section 7**).

**(b)**    **Regulatory and Other Consents**.

**(i)**    **HSR Act**.  Within five (5) Business Days after the date of this Agreement, each of the Parties will file any Notification and Report Forms and related material that may be required to file with the Federal Trade Commission and the Antitrust Division of the United States Department of Justice under the HSR Act, and will use its reasonable best efforts to obtain early termination of the applicable waiting period and will make any further filings pursuant thereto that may be necessary, proper or advisable in connection therewith.  CTC shall pay any filing fees required under the HSR Act.

**(ii)**    **FCC and State Consents**.  Within five (5) Business Days after the date of this Agreement, each of the Parties will file with the FCC and any Company State Regulators applications seeking Consent to the consummation of the Transactions.  The Parties shall cooperate and use their respective reasonable best efforts to prosecute such applications to a favorable conclusion at the earliest practicable time.  Each Party shall respond with reasonable diligence and dispatch to any request for additional information made in response to such filings.  CTC shall pay any filing fees required in connection with such applications.

**(iii)**    **Required Consents**.  Holding will use its reasonable best efforts to obtain the Required Consents.

**(c)**    **Operation of Business**.  Holding will, and will cause the Company to, operate the Business in the Ordinary Course of Business, including keeping the Business and their respective properties substantially intact, including their present operations, physical facilities, working conditions, insurance policies, and relationships with lessors, licensors, suppliers, customers, and employees.  Further, Holding will not, and will not cause or permit the Company to, engage in any practice, take any action, or enter into any transaction outside the Ordinary Course of Business.  Without limiting the generality of the foregoing, Holding will not take, or cause or permit the Company to take, any of the following actions outside the Ordinary Course of Business without the prior written consent of CTC:

**(i)**    authorize or effect any change in Lightship's Organizational Documents;

**(ii)**    make or change any election, change an annual accounting period, adopt or change any accounting method, file any amended Tax Return, enter into any closing agreement, settle any Tax claim or assessment relating to Lightship, surrender any right to claim a refund of Taxes, consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment, or take any other similar action relating to the filing of any Tax Return or the payment of any Tax;

**(iii)**    grant or pay, or enter into any Contract or amendment to an existing Contract providing for the granting of, any change of control, severance or termination payments (whether in cash, stock, equity securities, or property) or the acceleration of vesting or other benefits to any employee except pursuant to written agreements, policies or plans outstanding on the date hereof and identified on **Schedule 5(c)(iii)**, or adopt any new severance or termination plan, program or arrangement, or amend or modify or alter in any manner any

severance or termination plan, agreement or arrangement existing on the date hereof (including any retention, change of control or similar agreement), or grant any equity-based compensation, whether payable in cash or stock;

(iv)    transfer or license to any Person or otherwise extend, amend or modify any rights to Lightship's Intellectual Property, or enter into grants to transfer or license to any Person future rights to Lightship's Intellectual Property, in each case other than non-exclusive licenses granted to end-users and non-exclusive distribution, reseller and similar commercial agreements entered into in the Ordinary Course of Business and consistent with past practice;

(v)    enter into any Contract (A) with a vendor with whom Lightship did not previously have a Contract, (B) with a vendor with whom Lightship previously had a Contract requiring Lightship to pay in excess of, or requiring Lightship to purchase a minimum amount of products or services with aggregate commitments over the life of all such Contracts in excess of $50,000, or (C) with customers requiring Lightship to (1) provide a minimum amount of products or services with commitments in excess of $100,000 during any one year period, or (2) provide products or services at a later date at a fixed price for a period of more than 36 months;

(vi)    declare, set aside or pay any dividends on or make any other distributions (whether in cash, stock, equity securities or property) in respect of any Capital Stock or split, combine or reclassify any Capital Stock of Lightship or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for any Capital Stock; *provided, however,* that the forgoing restrictions shall not be deemed to prohibit the accrual of dividends with respect to Series CC Preferred in accordance with the terms of Holding's Certificate of Incorporation;

(vii)    issue, deliver, sell, purchase, redeem, acquire, authorize or designate (including by certificate of designation) or pledge or otherwise encumber, or propose any of the foregoing with respect to any shares of Capital Stock or any securities convertible into or exchangeable for shares of Capital Stock, or subscriptions, rights, warrants or options to acquire any shares of Capital Stock or any securities convertible into or exchangeable for shares of Capital Stock, or enter into other Contracts of any character obligating it to issue any such shares or securities;

(viii)    acquire or agree to acquire by merging or consolidating with, or by purchasing or acquiring any equity interest in or a portion of the assets of, or by any other manner, any business or any Person or division thereof, or otherwise acquire or agree to enter into any joint ventures, strategic partnerships or similar alliances;

(ix)    sell, lease, license, encumber or otherwise dispose of any tangible properties or tangible assets or enter into any agreement for the purchase or sale of any interest in real property, grant any Lien on any real property, enter into any lease, sublease, license or other occupancy agreement with respect to any real property or alter, amend, modify, knowingly violate or terminate any of the terms of any real property leases;

(x)    make any loan, advance (other than business expense advances to employees in the Ordinary Course of Business consistent with past practice) or capital contribution to, or investment in, any Person or guarantee any such indebtedness or the indebtedness of another Person, or issue or sell any debt securities or options, warrants, calls or other rights to acquire any debt securities of Lightship, enter into any "keep well" or other agreement to maintain any financial statement condition, forgive or discharge in whole or in part any outstanding loans for borrowed money, modify any loan for borrowed money previously granted, enter into any hedging agreement or similar financial agreement or arrangement or enter into any arrangement having the economic effect of any of the foregoing;

(xi)    except for the payments to be made by the Lightship Companies pursuant to **Section 7(b)(x)** and **Section 7(b)(xi)**, adopt, terminate or amend any Employee Benefit Plan or enter into any new Employee Benefit Plan, or amend any compensation, bonus, commission, insurance coverage (except as expressly permitted by this Agreement), benefit, entitlement, grant or award provided or made under any Employee Benefit Plan; or enter into any collective bargaining agreement; pay any special bonus, commission or special remuneration to any employee (cash, equity or otherwise); increase the salaries, bonuses, commissions or wage rates or fringe benefits (including rights to severance or indemnification) of its employees; or pay any benefit not provided for as of the date of this Agreement under any Employee Benefit Plan;

(xii)    pay, discharge, settle or satisfy any Liabilities in excess of $15,000, individually, other than the payment, discharge, settlement or satisfaction of Liabilities in the Ordinary Course of Business consistent with past practice or pursuant to Contracts previously furnished to CTC, or waive the benefits of, release any Person from or knowingly fail to enforce the confidentiality or nondisclosure provisions of any Contract to which Lightship is a party or of which Lightship is a beneficiary;

(xiii)    except as required by GAAP, revalue any of its assets (including writing down the value of inventory or writing off notes or accounts receivable other than in the Ordinary Course of Business consistent with past practice) or make any change in accounting methods, principles or practices (and if any of the foregoing is required, Holding shall promptly notify CTC thereof);

(xiv)    enter into, renew or materially modify any Contract relating to the distribution, sale, license or marketing by third parties of the Business, other than (A) renewals of existing Contracts on a nonexclusive basis or modifications in connection with renewals of existing Contracts on a nonexclusive basis, or (B) new nonexclusive Contracts, either of which can be terminated without penalty upon notice of 90 days or less;

(xv)    engage in any action with the intent to, or which could, directly or indirectly, adversely impact or materially delay the consummation of the Transactions;

(xvi)    hire any Executive Officer or any senior officers, consultants, independent contractors or employees (other than sales representatives) having annual compensation in excess of $50,000 (except that in the event an employee is terminated for cause pursuant to the last clause of this paragraph (xvi) or voluntarily terminates, including by death or disability, his or her employment, a replacement may be engaged to fill such terminated

employee's position, *provided however*, that (A) any consideration payable for services rendered by such replacement is substantially similar in kind and amount to the consideration paid for such terminated employee, and (B) any arrangement with any such replacement shall be terminable, at the sole option of CTC, without payment or penalty at or after the Closing), or enter into, or amend or extend the term of, any employment or consulting agreement with any such employee, or terminate any employee (except for termination for cause), or take any action that would allow any employee to claim a constructive termination or termination for "good reason";

(xvii)   except for the Transaction Expenses and payments to be made by the Lightship Companies pursuant to **Section 7(b)(x)** and **(xi)**, make any individual or series of related payments outside of the Ordinary Course of Business (including payments to legal, accounting or other professional service advisors) in excess of $20,000 individually or $250,000 in the aggregate, other than pursuant to Contracts existing on the date hereof and made available to CTC prior to the date hereof;

(xviii)   commence or settle any threatened or pending Action involving more than $15,000 individually (other than any Action to enforce any of its rights under this Agreement);

(xix)   adopt, implement or amend any stockholder rights plan, "poison pill" anti-takeover plan or other similar plan, device or arrangement that, in each case, is applicable to Lightship or the Transactions;

(xx)   take any action that is intended or could reasonably be expected to result in any of the conditions to the Merger not being satisfied; or

(xxi)   make any capital expenditures, capital additions, capital improvements or other expenditures in excess of $30,000 individually or $250,000 in the aggregate per calendar month; *provided, however*, that the Lightship Companies may take such actions as may be reasonably required in connection with the installation of DSLAMs;

(xxii)   except with the prior written consent of CTC, which consent shall not be unreasonably withheld, make any payment with respect to any demands for appraisal of any Dissenting Shares or offer to settle or settle any such demands.

(d)   **Access**.   At reasonable times and upon reasonable advance notice to an Executive Officer, Holding shall cause CTC, through its employees and representatives, to have access to and to make such investigation of, the personnel, attorneys, accountants, advisers, facilities, properties, assets, books, records and operations of the Business as CTC reasonably requests; *provided, however*, that any such inspection shall be done in such a manner so as not to unreasonably disrupt Lightship's conduct of the Business.

(e)   **Notice of Discovered Breach**.   If, prior to the Closing, Lightship acquires knowledge of a fact or circumstance that constitutes a breach of a representation, warranty, covenant or agreement made herein or in any of the other Transaction Documents (a "**Known Pre-Closing Breach**"), then Lightship shall promptly notify CTC of the existence of such fact or circumstance.

**(f)**    **Exclusivity**.

   **(i)**    From and after the date hereof Lightship will, and will cause its officers, directors, managers, employees, financial advisors, agents and representatives, other than CTC and its representatives, to immediately cease and terminate any existing solicitation, initiation, encouragement, activity, discussion or negotiation with any Persons with respect to any proposed, potential or contemplated acquisition proposal.

   **(ii)**    From and after the date hereof Lightship will use its reasonable best efforts to cause its Affiliates, and their respective officers, directors, managers, employees, financial advisors, agents and representatives, other than CTC and its representatives, to immediately cease and terminate any existing solicitation, initiation, encouragement, activity, discussion or negotiation with any Persons with respect to any proposed, potential or contemplated acquisition proposal.

   **(iii)**    Without limiting the foregoing, from and after the date hereof, Holding will not and will not permit the Company to, directly or indirectly (A) solicit, initiate or encourage any inquiries or proposals that constitute, or could reasonably be expected to lead to, the submission of any proposal or offer from any Person relating to the acquisition of any Capital Stock, or any substantial portion of the assets, of Lightship (including any acquisition structured as a merger, consolidation or share exchange), (B) participate in any discussions or negotiations regarding, furnish any information with respect to, assist or participate in, or facilitate in any other manner any effort or attempt by any Person to do or seek any of the foregoing, or (C) enter into any letter of intent, agreement in principle or any acquisition agreement or other similar agreement with respect to any of the foregoing. Lightship shall forthwith notify CTC of the receipt by either Holding or the Company or any of their respective employees, officers, Affiliates, advisors or representatives of any of the foregoing proposals or any request for information regarding Lightship. Such notice shall be made orally and confirmed in writing and shall disclose the identity of the offeror and the terms and conditions of such proposal, inquiry or contact.

   **(g)**    **Supplemental Disclosure**. From time to time, Holding shall, by written notice to CTC, supplement or amend any of the disclosure schedules attached hereto (or create one or more additional disclosure schedules, if appropriate) with respect to any matter that, if existing or known at the date of this Agreement, would have been required to be set forth or listed in any such schedule. No such supplement or amendment and no notice under **Section 5**, however, shall operate to cure or waive any failure of a condition precedent to be satisfied pursuant to **Section 7**. Any such supplements or amendments shall be clearly marked to show the changes made with respect to such disclosure schedules.

   **(h)**    **Tax Matters**.

   **(i)**    The Lightship Companies shall give CTC and its authorized representatives full access to all properties, books, records and Tax Returns of or relating to the Lightship Companies, whether in the possession of the Lightship Companies or third-party advisors or representatives so that CTC may make such investigations as it shall desire of the affairs of the Lightship Companies. The Lightship Companies shall ensure that all third-party

advisors and representatives (including lawyers and accountants) of the Lightship Companies are reasonably available to, and will reasonably cooperate with, CTC with respect to such investigations.

      (ii)    If, between the date hereof and the Closing Date, the Lightship Companies have knowledge of the commencement or scheduling or threat or proposal (made orally or in writing, formally or informally) of any Audit, assessment of any Tax, issuance of any notice of Tax due or any bill for the collection of any Tax due or the commencement or scheduling or threat or proposal (made orally or in writing, formally or informally) of any other administrative or judicial proceeding with respect to the determination, assessment or collection of any Tax of any of the Lightship Companies, the Lightship Companies shall provide prompt notice to CTC of such matter, setting forth information describing any asserted or proposed Tax liability in reasonable detail and including copies of any notices or other documentation received from the applicable Taxing Authority with respect to such matter.

      (iii)    The Lightship Companies shall not take any of the following actions without the prior written consent of CTC:

      (A)    make, revoke or amend any Tax election;

      (B)    request an extension of the due date with respect to any Tax Return, other than the Tax Return due on March 15, 2005, for the 2004 Tax year;

      (C)    execute any waiver of restrictions on assessment or collection of any Tax; or

      (D)    enter into or amend any agreement or settlement with any Taxing Authority.

      (i)    **Certain Taxes**.  All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement or any of the other Transaction Documents shall be paid by the Holding Stockholders when due, and the Holding Stockholders will, at their own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use stamp, registration and other Taxes and fees, and, if required by applicable Law, CTC will, and will cause its Affiliates to, join in the execution of any such Tax Returns or other documentation.

      (j)    **Interim Lightship Estimates; Most Recent Financial Statements.**

      (i)    Simultaneously with the execution of this Agreement, Holding and/or its designated accountants and representatives shall prepare and deliver (or cause to be prepared and delivered) to CTC, a written good faith estimate of the Actual Working Capital Amount as of December 31, 2004, calculated using the same components set forth in the definitions of Actual Current Closing Assets and Actual Current Closing Liabilities in **Section 2(f)** and using the same methods and assumptions as were used in preparing the Financial Statements.

(ii)     Within ten (10) Business Days after the end of each month following the execution of this Agreement and continuing until the earlier of the termination of this Agreement or the Closing Date, Holding and/or its designated accountants and representatives shall prepare and deliver (or cause to be prepared and delivered) to CTC, a written good faith estimate of the Actual Working Capital Amount as of the last day of the month preceding the delivery of such notice, calculated using the same components set forth in the definitions of Actual Current Closing Assets and Actual Current Closing Liabilities in **Section 2(f)** and using the same methods and assumptions as were used in preparing the Financial Statements (each such estimate and the estimates required pursuant to **Section 5(j)(i)**, an "**Interim Lightship Estimate**" and, collectively the "**Interim Lightship Estimates**"). Each Interim Lightship Estimate shall be accompanied by supporting documents, work papers and other data setting forth in reasonable detail Holding's calculation of such Interim Lightship Estimate.

(iii)     Prior to the Closing, Holding shall deliver to CTC a copy of the audited Most Recent Financial Statements, accompanied by an unqualified opinion of Lightship's independent public accountants.

(k)     **Employee Matters**. On or prior to the Closing Date, Holding shall have resolved and paid and discharged to CTC's satisfaction (X) except to the extent included within the definition of Actual Current Closing Liabilities, all Liabilities to O'Hare under the Executive Employment Agreement that arise from, are triggered by or otherwise relate to the occurrence of a change of control of Holding or the Company and/or termination of his employment, pursuant to the Separation and Release Agreement, and (Y) all bonuses payable to Lightship employees for the 2004 calendar year, whether pursuant to any Employee Benefit Plan or otherwise, in the amounts set forth on **Schedule 5(k)**.

(l)     **Confidentiality; Non-Solicitation**. From and after the date of this Agreement and continuing until the earlier to occur of the Closing Date or the date that is one (1) year after the date hereof, each of the CTC Entities agrees, except in accordance with this Agreement and the other Transaction Documents and the facilitation of the Merger and the Transactions:

(i)     to keep secret and retain in strictest confidence, and not, without the express prior written consent of one of the Executive Officers, directly or indirectly, disclose, disseminate, publish, reproduce, retain, use (for its benefit or for the benefit of others) or otherwise make available in any manner whatsoever, any Confidential Information regarding the Lightship Companies or the Business to anyone except (1) to CTC's representatives who need to know such Confidential Information to perform duties not inconsistent with this Agreement (who shall be informed of the confidential nature of such information and who shall agree to keep such information confidential), (2) as otherwise required by Law, or (3) as may be required by CTC to enforce its rights under this Agreement;

(ii)     not to, directly or indirectly, solicit, divert, take away or induce any employee of the Lightship Companies to leave the employ of the Lightship Companies, or solicit, induce or influence any other Person to do so; and

**(iii)**     not to make any remarks or take any action which would demean, disparage or criticize (1) Lightship or any of its current or former Affiliates, partners, officers, directors, employees, agents, suppliers or customers, or (2) any product or service sold, marketed or distributed by Lightship; and

**(iv)**     that if (1) it breaches, or threatens to commit a breach of, any of the provisions of this **Section 5(l)**, Holding shall have the right (in addition to any other rights and remedies available to Holding at law or in equity) to equitable relief (including injunctions) against such breach or threatened breach, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable harm to the Lightship Companies and that money damages would not be an adequate remedy to the Lightship Company and (2) it will not seek, and it hereby waives any requirement for, the securing or posting of a bond or proving actual damages in connection with the Holding seeking or obtaining such relief.

**(m)**     **USF/FET Tax Matters**.  The Lightship Companies are currently analyzing whether USF contributions and state and federal excise Taxes ("**FET**") are owed by the Lightship Companies with respect to the following matters for each calendar year in which Lightship has been engaged in the Business:  (i) USF contributions on PICC charges on voice lines, (ii) USF contributions on EUCL charges, (iii) FET on USF charges, (iv) FET on voice PICC charges, and (v) FET on EUCL charges on voice lines.  Prior to the Closing Date, Lightship agrees to use commercially reasonable efforts to finalize such analysis and to record as a Liability on the Most Recent Financial Statements and the Interim Lightship Estimates any amounts that the Lightship Companies' independent accountants determine are required to be recorded as a current Liability in accordance with GAAP.  To the extent that Lightship and its independent accountants determine in good faith that a current Liability is to be recorded on Lightship's balance sheet with respect to the matters identified in this **Section 5(m)**, such Liabilities, and only such Liabilities, shall be deemed to have been disclosed to CTC for purposes of the various Schedules to the Lightship Companies' representations and warranties contained herein.  The Lightship Companies are also currently analyzing whether they have overpaid any amounts with respect to their USF and/or FET obligations, in which case the amounts actually overpaid and therefore due to the Lightship Companies would be recorded as an asset on Lightship's balance sheet.

**(n)**     **Delivery of Consents, Resolutions and Minutes**.  Lightship agrees to promptly deliver to CTC true, complete and correct copies of all consents, resolutions and minutes of Holding's Board of Directors and any committee thereof and of the annual or special meetings of the Holding Stockholders, and the Managers/Board of Directors of the Company and any committee thereof or meetings of the members of the Company, taken, approved or executed between the date hereof and the Closing Date.

**(o)**     Prior to the Closing Date, Lightship agrees to use its commercially reasonable efforts to determine, with its independent accountants, whether certain of its existing accounts receivable should be written off and whether any accounts receivable should be recorded as assets on Lightship's balance sheet.

6.  **Other Covenants**. The Parties agree as follows:

(a)  **General**. In case at any time after Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties shall promptly agree take such further action (including the execution and delivery of such further instruments and documents) as the other Party may reasonably request, all at the sole cost and expense of the requesting Party.

(b)  **Employees**.

(i)  **Post-Closing Employment**. To the extent CTC chooses, in its sole and absolute discretion, to retain employees of Lightship subsequent to the Closing Date, CTC shall cause the Surviving Corporation to: (A) provide such employees with benefits comparable to those offered to such employees prior to the Effective Time, and (B) give such employees credit for years of service with the Lightship Companies and any predecessors as to which the Lightship Companies have given credit for prior service, for purposes of eligibility, participation, vesting, entitlement, vacation, sick pay and similar items accrued as of Closing, other than with respect to any rights to receive Capital Stock of any Person.

(ii)  **Severance**. Except with respect to the Executive Employment Agreement, which shall be terminated pursuant to the Separation and Release Agreement, CTC will honor, and will not take, or permit to be taken, any action that would alter or impair on a retroactive basis, any severance arrangements existing as of the date hereof and set forth on **Schedule 6(b)(ii)** for the benefit of any individual who served as an employee or officer of Lightship at any time prior to the Effective Time. The Parties acknowledge that CTC and the Surviving Corporation will have no duty, liability or responsibility with respect to O'Hare, all of which should be satisfied pursuant to the Separation and Release Agreement, except the amounts to be paid by the Surviving Corporation to or for the benefit of O'Hare as set forth in **Section 2(f)(iv)(B)(5)** hereof and **Schedule II** of the Separation and Release Agreement.

(iii)  **No Third-Party Benefit**. Nothing contained in this Agreement shall confer upon any employee of Lightship any right with respect to continued employment by Lightship, the Surviving Corporation or CTC or shall create any third-party rights in any such employee, or any beneficiary or dependent thereof, with respect to the compensation, terms and conditions of employment and benefits that may be provided to such employee by CTC, Lightship or the Surviving Corporation or under any benefit plan that CTC, Lightship or the Surviving Corporation may maintain.

(c)  **Indemnification Matters**. CTC will not take or permit any action to be taken that would alter or impair on a retroactive basis any exculpatory or indemnification provisions now existing in the Organization Documents of either Lightship Company for the benefit of any individual who served as a director or employee or officer of either Lightship Company at any time prior to the Effective Time, *provided*, that nothing in this Agreement shall require CTC or the Surviving Corporation to amend its respective Certificate of Incorporation or By-Laws other than as provided in **Section 2**. For a period of three years after the Closing Date, the Surviving Corporation shall maintain in full force and effect a tail on the Company's liability

insurance policy (Federal Insurance Company Policy Number 81799797), covering all individuals who served as directors and officers of Holding prior to the Closing Date.

      (d)    **Representations and Warranties**. The rights and remedies of the CTC Indemnified Parties will not be impaired by any investigation conducted by or on behalf of the CTC Entities with respect to Lightship, the Business or the Transactions or any knowledge acquired or capable of being acquired by the CTC Entities at any time, whether before or after the execution and delivery of the Transaction Documents or the Closing Date, relating to the accuracy or inaccuracy of, or compliance or noncompliance with, any representation, warranty, covenant, agreement or obligation of the Lightship Companies relating to or arising out of the Transaction Documents. Each of the CTC Entities acknowledges that the Lightship Companies do not make, and have not made, any representations or warranties relating to the Lightship Companies or the Business, including in the Offering Memorandum or any presentation relating to the Lightship Companies or the Business given in connection with the Transactions, other than those expressly set forth in this Agreement. No Person has been authorized by the Lightship Companies to make any representation or warranty regarding the Lightship Companies or the Business in connection with the Transactions that is inconsistent with or in addition to the representations and warranties expressly set forth in this Agreement or in any of the other Transaction Documents.

      (e)    **Taxes**.

      (i)    In the event that either of the Lightship Companies receives written notice of any pending or threatened examinations, claims, settlements, compromises, proposed adjustments, assessments or reassessments or related matter with respect to Taxes that could affect the Lightship Companies (with respect to Tax periods or portions thereof ending on or before the Closing Date) or the CTC Entities, or CTC or the Surviving Corporation receives notice of any Tax matter that could affect the Lightship Companies, the Person receiving the notice shall notify in writing the potentially affected Person within ten days thereof. The failure of any Person to give the notice required hereunder shall not impair that Person's rights under this Agreement, except to the extent that the other Person demonstrates that it has been materially damaged thereby.

      (ii)    CTC and the Stockholder Representative Committee shall cooperate fully, as and to the extent reasonably requested by the other, in connection with any audit or Action with respect to Taxes. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

      (iii)    CTC and the Stockholder Representative Committee shall, upon request, use their commercially reasonable efforts to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, but not limited to, with respect to the Transactions).

(iv)    CTC and the Stockholder Representative Committee agree, upon request, to provide the other party with all information that either party may be required to report pursuant to Code § 6043 and the Treasury Regulations promulgated thereunder.

7.    **Conditions to Obligations to Close.**

(a)    **Conditions of Parties**. The obligation of each of the Parties to consummate the Merger is subject to satisfaction (or waiver in writing by any such Party) at or prior to the Closing of the following conditions:

(i)    all applicable waiting periods (and any extensions thereof) under the HSR Act shall have expired or otherwise been terminated

(ii)    all other Required Consents shall have been obtained and shall not contain any conditions or limitations with respect thereto that are not reasonably acceptable to the Parties; and

(iii)    no preliminary or permanent injunction or other order, decree or ruling issued by a Governmental Authority, nor any Law promulgated or enacted by any Governmental Authority, shall be in effect that would impose material limitations on the ability of any Party to consummate the Transactions or prohibit such consummation.

(b)    **CTC Entities' Conditions**. The obligations of the CTC Entities to consummate the Merger is subject to satisfaction (or waiver in writing by CTC) at or prior to Closing of the following conditions:

(i)    Holding shall have delivered or cause to have been delivered to CTC a pay-off statement (each a "**Payoff Statement**") from each of the Existing Lenders stating that immediately upon receipt in full of payment of the amount (the "**Payoff Amount**") set forth in such Existing Lender's Payoff Statement, (A) all of the amounts relating to the Existing Indebtedness owing to such Existing Lender shall have been paid in full, (B) all obligations with respect to such Existing Indebtedness shall have been discharged and (C) all Liens securing such Existing Indebtedness shall be released automatically. CTC shall have received Uniform Commercial Code termination statements and all other documents and instruments necessary to record or evidence such release;

(ii)    Holding shall have delivered to CTC evidence reasonably satisfactory to CTC of termination of the Shareholders' Agreement and the Registration Rights Agreement;

(iii)    all representations and warranties of Holding made in this Agreement shall be true and correct in all material respects (except for representations and warranties that are qualified as to materiality, which shall be true and correct in all respects, and except to the extent there have been changes that are expressly permitted by this Agreement, subject to the second sentence of **Section 5(g)**), on and as of the Closing Date with the same force and effect as though such representations and warranties were made on and as of the Closing Date, except for representations and warranties that were made as of a specific date, which shall be true and correct as of such date.

(iv)     all of the terms, covenants, obligations and agreements and conditions of this Agreement to be complied with and performed by Holding on or prior to the Closing Date shall have been complied with and performed in all material respects;

(v)     there shall have been no Material Adverse Change in the Business since the date of this Agreement;

(vi)     the Indemnification Escrow Agreement and the Paying Agent Agreement shall have been executed and delivered by all parties thereto;

(vii)     Holding shall have delivered to CTC a copy of the audited Most Recent Financial Statements, accompanied by an unqualified opinion of Lightship's independent public accountants satisfactory to CTC. The Most Recent Financial Statements shall fairly present the financial condition of Lightship as of such dates and the results of its operations and changes in its cash flows for the periods covered thereby in accordance with GAAP consistently applied and shall not differ in any material respect from the Most Recent Financial Statements set forth in **Schedule 4(h)** hereto; *provided, however,* that CTC shall notify Holding within five (5) Business Days after its receipt of such audited Most Recent Financial Statements whether it believes there are any such material differences;

(viii)     the Megunticook Agreement shall have been executed and delivered by Megunticook,

(ix)     the Separation and Release Agreement shall have been executed and delivered by Holding and O'Hare; *provided, however,* that Holding and O'Hare agree to execute the Separation and Release Agreement sufficiently in advance of the Closing Date in order to ensure that any applicable revocation periods under applicable Law shall have expired as of the Closing Date;

(x)     the O'Hare Payment shall have been paid to O'Hare;

(xi)     all amounts payable by Lightship with respect to bonuses for periods prior to December 31, 2004 whether pursuant to any Employee Benefit Plan or otherwise, and all amounts payable by Lightship in connection with the termination of Lightship's 401(k), plan shall have been paid by Holding;

(xii)     CTC shall have received a certificate of the secretary of Holding attesting to (A) the Organizational Documents of the Lightship Companies, (B) the resolutions adopted by the governing bodies of Holding and the Holding Stockholders, duly authorizing the execution, delivery and performance of this Agreement by Holding and the execution and delivery by the Lightship Companies of all other Transaction Documents, and (C) the signatures of the officers or authorized representatives of Holding who have been authorized to execute and deliver this Agreement and any other Transaction Documents;

(xiii)     None of the Required Consents from any Governmental Authority shall contain any conditions or limitations which are not reasonably acceptable to CTC;

(xiv)    Holding shall have delivered to CTC a certificate to the effect that each of the conditions specified above in **Section 7(a)** and this **Section 7(b)** have been satisfied (or waived in writing by CTC); and

(xv)    CTC shall have received such other documents and instruments as it shall reasonably request.

(c)    **Holding's Conditions**. Holding's obligation to consummate the Merger is subject to satisfaction (or waiver in writing by Holding) at or prior to Closing of the following conditions:

(i)    CTC shall have delivered to the Paying Agent the Payment Fund;

(ii)    the Indemnification Escrow Agreement and Paying Agent Agreement shall have been executed and delivered by all parties thereto, and CTC shall have delivered to the Escrow Agent the Indemnification Escrow;

(iii)    CTC shall have paid to each Existing Lender the applicable Payoff Amount;

(iv)    all representations and warranties of CTC made in this Agreement shall be true and correct in all material respects (except for representations and warranties that are qualified as to materiality, which shall be true and correct in all respects, and except to the extent there have been changes that are expressly permitted by this Agreement), on and as of the Closing Date with the same force and effect as though such representations and warranties were made on and as of the Closing Date, except for representations and warranties that were made as of a specific date, which shall be true and correct as of such date;

(v)    all of the terms, covenants, obligations, agreements and conditions of this Agreement to be complied with and performed by the CTC Entities on or prior to the Closing Date shall have been complied with and performed in all material respects;

(vi)    Holding shall have received a certificate of the secretary of CTC attesting to (A) the Organizational Documents of the CTC Entities, (B) the resolutions adopted by the governing body of CTC duly authorizing the execution, delivery and performance of this Agreement by the CTC Entities and the execution and delivery by the CTC Entities of all other Transaction Documents, and (C) the signatures of the officers or authorized representatives of the CTC Entities who have been authorized to execute and deliver this Agreement and any other Transaction Documents; and

(vii)    CTC shall have delivered to Holding a certificate to the effect that each of the conditions specified above in **Section 7(a)** and this **Section 7(c)** have been satisfied.

8.    **Survival; Post-Closing Indemnification**.

(a)    **Survival of Representations and Warranties**. The representations and warranties of the Parties contained in this Agreement shall survive the Closing and continue in full force and effect for a period of 18 months thereafter, except that (i) the representations and

warranties of Holding contained in **Sections 4(j), 4(n)** and **4(o)**, each of which shall survive the Closing and shall continue in full force and effect until six months after the expiration of their respective statutes of limitation under applicable Law, (ii) the representations and warranties of Holding contained in **Sections 4(a), 4(b), 4(c)** and **4(d)** shall survive the Closing and shall continue in full force and effect indefinitely and (iii) the representations and warranties of CTC in **Sections 3(a)** and **3(b)** shall survive the Closing and shall continue in full force and effect indefinitely.

(b)    **Indemnification by the Holding Stockholders**.  Subject to the limitations set forth in **Section 8(f)**, from and after the Closing Date the Holding Stockholders agree to indemnify, defend and hold harmless CTC, the Surviving Corporation, the Company and their respective directors, managers, officers, stockholders, representatives, agents and employees (collectively, the "**CTC Indemnified Parties**"), from and against all Losses based upon, incurred in connection with, arising out of or otherwise in respect of (i) subject to the terms of **Section 8(a)**, any inaccuracy in or any breach of any representation or warranty of Holding contained in this Agreement or in any other Transaction Document, and (ii) any breach of any covenant, obligation or agreement of Holding contained in this Agreement, any other Transaction Document or other document or instrument contemplated by this Agreement.  For all purposes of this **Section 8**, the representations, warranties, covenants, agreements and obligations of the Lightship Companies and other provisions of this Agreement, the other Transaction Documents and each agreement, instrument and document related thereto, shall be interpreted and construed without consideration of any standard or qualification relating to materiality, Material Adverse Change, Material Adverse Effect, knowledge or words of similar import (whether express or implied).  On or before the Closing, and as a condition precedent to the obligations of the CTC Entities to consummate the Merger, Holding shall deliver to CTC the Stockholder Representative Agreement, executed and delivered by all of the Holding Stockholders (other than Holding Stockholders who hold only Series CC Preferred and no other Capital Stock of Holding) which, among other things, confirms their agreement to be bound by the terms of this Agreement.

(c)    **Stockholder Representative Committee**.

(i)    Pursuant to the Stockholder Representative Agreement, a committee shall be named as the agent and representative of all of the Holding Stockholders (the "**Stockholder Representative Committee**") for purposes of receiving on their behalf all notices under this Agreement, the Indemnification Escrow Agreement and the Paying Agent Agreement, issuing on their behalf such notices under this Agreement, the Indemnification Escrow Agreement and the Paying Agent Agreement as the Stockholder Representative Committee shall determine in its sole discretion to issue, and performing such other administrative and other functions under this Agreement, the Indemnification Escrow Agreement and the Paying Agent Agreement as may become necessary or desirable.

(ii)    The Stockholder Representative Committee shall have full power and authority to act for and on behalf of the Holding Stockholders in regard to their rights under this Agreement, the Indemnification Escrow Agreement and the Paying Agent Agreement. Without limiting the foregoing, the Stockholder Representative Committee is authorized to (A) resolve all Claims or Actions for indemnification under this Agreement, the Indemnification

Escrow Agreement and the Paying Agent Agreement (B) retain counsel of its choosing, experts and other professionals as may be necessary or desirable to assist in the resolution of any Claims or Actions for indemnification under this Agreement, the Indemnification Escrow Agreement and the Paying Agent Agreement and (C) give notices to the Escrow Agent under the Indemnification Escrow Agreement and the Paying Agent under the Paying Agent Agreement that the Stockholder Representative Committee, in its sole discretion, may determine. The Stockholder Representative Committee shall have no right to act as agent for service of process for any one of the Holding Stockholders, except that any notice delivered to the Stockholder Representative Committee from CTC or the Escrow Agent with respect to the Indemnification Escrow Agreement or from the Paying Agent with respect to Paying Agent Agreement shall be deemed notice to all Holding Stockholders with respect thereto and any notice delivered to the Stockholder Representative Committee with respect to any Claim or Action arising pursuant to this **Section 8** and any other matter under this Agreement after the Effective Time shall be deemed notice to all Holding Stockholders with respect thereto.

(iii)    The Stockholder Representative Committee shall be entitled to reasonable compensation from the Holding Stockholders for its services and reimbursement of all expenses (including reasonable attorneys' fees and the cost of errors and omissions insurance) incurred in its capacity as Stockholder Representative Committee in the manner set forth in the Stockholder Representative Agreement.

(d)    **Procedures for Indemnification Claims**.  Except as provided in **Section 8(e)**, if a claim for indemnification (a "**Claim**") is to be made by a CTC Indemnified Party (the "**Claimant**"), the Claimant shall give written notice (a "**Claim Notice**") to the Stockholder Representative Committee as soon as practicable after the Claimant becomes aware of the facts, condition or event that may give rise to Losses for which indemnification may be sought under this **Section 8**.  Following receipt of the Claim Notice from the Claimant, the Stockholder Representative Committee shall have a reasonable period of time under the circumstances, not to exceed thirty (30) days in any event, to make a reasonable investigation of the Claim; *provided, however,* that if the Claimant reasonably determines that it will be prejudiced by affording the Stockholder Representative Committee such period of time for investigation, the Stockholder Representative Committee and the Claimant shall agree promptly on the appropriate period of time for such investigation.  For the purposes of such investigation, the Claimant agrees to make reasonably available to the Stockholder Representative Committee and/or its authorized representative(s) the information relied upon by the Claimant to substantiate the Claim.  If the Claimant and the Stockholder Representative Committee agree at or prior to the expiration of said investigation period to the validity and amount of such Claim, the Stockholder Representative Committee shall cause to be paid promptly to the Claimant the full amount of such Claim.  If the Claimant and the Stockholder Representative Committee do not agree within said period, the Claimant may seek appropriate legal remedy.

(e)    **Procedures for Indemnification Claims Involving Third-Parties**.  If any Action is commenced (or a Claim is made) by a Person other than a Party ("**Third-Party Action**") against a Claimant, written notice thereof (the "**Third-Party Action Notice**") shall be given by Claimant to the Stockholder Representative Committee as promptly as practicable (and in any event within ten (10) Business Days after the service of the citation or summons or other manner of process).  The failure of any Claimant to give notice timely hereunder shall not affect

rights to indemnification hereunder, except to the extent that the Stockholder Representative Committee demonstrates actual damage caused by such failure. After such notice, if the Stockholder Representative Committee shall acknowledge in writing to the Claimant that the Stockholder Representative Committee shall be obligated under the terms of its indemnity hereunder in connection with such Third-Party Action, then the Stockholder Representative Committee shall be entitled, if it so elects, (i) to take control of the defense and investigation of such Third-Party Action, (ii) to employ and engage attorneys reasonably satisfactory to the Claimant to handle and defend the same, at the Stockholder Representative Committee's cost, risk and expense, and (iii) to compromise or settle such Third-Party Action, which compromise or settlement shall be made only with the prior written consent of the Claimant, such consent not to be unreasonably withheld. Notwithstanding the foregoing, the Claimant shall not be obligated to consent to any compromise or settlement which (x) exposes any CTC Indemnified Party to any monetary risk or obligation not completely paid for by the Holding Stockholders (including from the Indemnification Escrow), (y) involves any injunctive or equitable relief against any CTC Indemnified Party or (z) involves any finding, determination or admission of a violation of Law or any wrongdoing on the part of any CTC Indemnified Party. If the Stockholder Representative Committee fails to assume the defense of such Third-Party Action promptly after receipt of the Third-Party Action Notice, the Claimant will (upon delivering notice to such effect to the Stockholder Representative Committee) have the right to undertake, at the Holding Stockholders' cost and expense, the defense, compromise or settlement of such Third-Party Action on behalf of and for the account and risk of the Holding Stockholders; *provided, however,* that such Third-Party Action shall not be compromised or settled without the written consent of the Stockholder Representative Committee, which consent shall not be unreasonably withheld, conditioned or delayed. In the event the Claimant assumes the defense of the Third-Party Action, the Claimant will keep the Stockholder Representative Committee reasonably informed of the progress of any such defense, compromise or settlement. The Holding Stockholders shall be liable for any settlement of any Third-Party Action effected pursuant to and in accordance with this **Section 8** and for any final judgment (subject to any right of appeal), and the Holding Stockholders agree to indemnify and hold harmless Claimant from and against any Losses by reason of such settlement or judgment. Notwithstanding the foregoing, the Claimant shall be entitled at any time, at its own cost and expense (except that such cost and expense shall be paid by the Holding Stockholders if: (x) the Claimant reasonably determines that the Stockholder Representative Committee is not adequately representing or, because of a conflict of interest, may not adequately represent the interests of the Claimant, (y) the Claimant has separate or additional defenses or counterclaims or (z) any relief other than the payment of money damages is sought against the Claimant), to participate in such contest and defense and to be represented by attorneys of its own choosing. Additionally, notwithstanding the foregoing, if a Claimant determines in good faith that there is a reasonable probability that a Third-Party Action will create a material adverse legal precedent or materially affect the ongoing business operations or ongoing business relationships of the Claimant or its Affiliates, then the Claimant will have the right to conduct the defense of the claim with counsel of its choice; *provided, however,* that the Stockholder Representative Committee shall have the right to monitor the defense of such claim and participate in the defense thereof at its own expense. The Claimant shall not consent to the entry of any judgment or enter into any settlement with respect to such Claim without the prior written consent of the Stockholder Representative Committee, which shall not be unreasonably withheld.

**(f)    Limitations and Other Post-Closing Indemnification Matters**.
Notwithstanding anything to the contrary contained in this Agreement, in any other Transaction Document or otherwise:

(i)    Except as provided in **Section 2(d)(ix)** and **Section 8(f)(viii)**, no indemnification for the matters set forth in this **Section 8**, as the case may be, shall be required to be made by Holding Stockholders until the aggregate amount of the CTC Indemnified Parties' Losses exceeds $500,000 (the "**Indemnification Basket**"), at which point the Holding Stockholders shall be obligated to indemnify the CTC Indemnified Parties from and against all such Losses incurred by the CTC Indemnified Parties in excess of $250,000 in the aggregate without regard to the Indemnification Basket; *provided, however,* that once the aggregate amount of Losses incurred by the CTC Indemnified Parties equals the Indemnification Basket, the Holding Stockholders shall be obligated to indemnify the CTC Indemnified Parties from and against all Losses based upon, incurred in connection with, arising out of or otherwise in respect of Taxes without regard to the Indemnification Basket.

(ii)    In the case of any Claim or Claims attributable to USF obligations, FET or state and local Taxes, in each case, payable with respect to Internet service revenue, no indemnification shall be required to be made for 20% of the amount of the first $1,000,000 of such Claim or Claims; *provided, however,* that under no circumstances shall there be a reduction of more than $200,000 (in the aggregate) in the amount of such Claim or Claims pursuant to this **Section 8(f)(ii)**.

(iii)    Except as provided in **Section 8(f)(viii)**, no indemnification shall be required to be made by the Holding Stockholders for the amount of the CTC Indemnified Parties' Losses that exceed the Indemnification Escrow (the "**Indemnification Cap**").

(iv)    Except as provided in **Section 8(f)(viii)**, the CTC Indemnified Parties' sole source for recovery under this **Section 8** shall be the Indemnification Escrow.

(v)    No indemnification shall be available to any CTC Indemnified Party with respect to any Claim resulting from or otherwise relating to any fraudulent or illegal action on behalf of such CTC Indemnified Party.

(vi)    Any payments to any CTC Indemnified Party from the Indemnification Escrow for indemnification under this **Section 8** shall be treated as an adjustment to the consideration paid to the Holding Stockholders in connection with the Merger for all federal, state, local and foreign Tax purposes.

(vii)    Except with respect to any equitable remedies or injunctive relief that may be available to any Party, the indemnification rights contained in this **Section 8** shall constitute the sole and exclusive remedies of the CTC Indemnified Parties and shall supersede and displace all other rights that any CTC Indemnified Party may have under applicable Law.

(viii)    Notwithstanding anything herein to the contrary, there shall be no limitation based on the time, the Indemnification Basket, the Indemnification Cap or source of recovery with respect to any Losses relating to or arising from the fraudulent or illegal actions of Lightship or the Holding Stockholders prior to the Closing; *provided, however,* that the amount

for which any Holding Stockholder shall be liable for such fraudulent or illegal actions shall be limited to the aggregate amount actually received by such Holding Stockholder from the Payment Fund and the Indemnification Escrow.

(ix)    For purposes of **Section 8(d)** and **Section 8(e)**, any Claim based on a breach of a representation or warranty shall be timely made if the Claimant gives the Stockholder Representative Committee a Claim Notice or Third-Party Action Notice on or before the date on which such representation or warranty ceases to survive the Closing, even if such Claim is not resolved until after such representation or warranty ceases to survive.

(x)    CTC and the Stockholder Representative Committee shall instruct the Escrow Agent to release the funds remaining in the Indemnification Escrow as follows:

(A)    On the date which is six (6) months after the Closing Date, CTC and the Stockholder Representative Committee shall instruct the Escrow Agent to release to the Stockholder Representative Committee an amount equal to (I) $2,000,000, *minus* (II) the sum of all Losses theretofore paid to CTC Indemnified Parties pursuant to this **Section 8** plus the aggregate amount of claimed Losses relating to all Claims which have been asserted but have not yet been definitively resolved at that time;

(B)    On the date which is eighteen (18) months after the Closing Date, CTC and the Stockholder Representative Committee shall instruct the Escrow Agent to release to (or as directed by) the Stockholder Representative Committee an amount equal to (I) $3,000,000 *minus* (II) the sum of all Losses theretofore paid to the CTC Indemnified Parties during the period since the date which was six (6) months after the Closing Date, *plus* the aggregate amount of claimed Losses relating to all Claims that have been timely asserted but have not yet been definitively resolved at that time, *plus* (III) any amount which was subtracted from the payment made pursuant to **Section 8(f)(x)(A)** because of clause (II) thereof with respect to any Claim which was subsequently definitively resolved in favor of the Holding Stockholders;

(C)    On the third anniversary of the Closing Date, CTC and the Stockholder Representative Committee shall instruct the Escrow Agent to release to (or as directed by) the Stockholder Representative Committee an amount equal to (I) all remaining funds then held by the Escrow Agent (including interest and earnings) *minus* (II) the aggregate amount of claimed Losses relating to all Claims that have been timely asserted but have not been definitively resolved at that time; *provided, however*, that in the event any appraisal proceedings with respect to any Dissenting Shares under the DGCL shall not have been resolved on or prior to the third anniversary of the Closing Date, then an amount equal to the sum of (x) 50% of the aggregate Dissenting Stockholder Original Consideration with respect to any Dissenting Shares subject to appraisal proceedings that have not been resolved by such date and with respect to which CTC did not deposit any Dissenting Stockholder Original Consideration into the Payment Fund pursuant to **Section 2(d)(ix)(A)**, (y) to the extent not duplicative of the amounts set forth in clause (x) above, 150% of the aggregate Dissenting Stockholder Original Consideration with respect to any Dissenting Shares subject to appraisal proceedings that have not been resolved by such date and with respect to which CTC deposited funds into the Payment Fund on or prior to the Effective Time, provided such funds have not been (and will not be during the pendency of such appraisal proceedings) released by the Paying Agent to CTC

pursuant to the terms of the Paying Agent Agreement (or 50% of the aggregate Dissenting Stockholder Original Consideration in the event any funds deposited into the Payment Fund with respect to such shares are released by the Paying Agent to CTC pursuant to the terms of the Paying Agent Agreement during the pendency of any such appraisal proceedings); and (z) $100,000 (to cover reasonable legal expenses incurred by CTC and the Surviving Corporation), shall be withheld from the final distribution of the Indemnification Escrow and held by the Escrow Agent until such time as all appraisal proceedings have been finally and conclusively determined, at which time the Parties shall instruct the Escrow Agent to release such remaining funds to CTC to the extent necessary or required to pay any Dissenting Share Excess Consideration and all reasonable legal expenses incurred by CTC or the Surviving Corporation in connection with such appraisal proceedings. To the extent any funds remain in the Indemnification Escrow following such distribution to CTC, the Parties shall instruct the Escrow Agent to release such funds to the Stockholder Representative Committee to be distributed pro rata to the Holding Stockholders.

**(D)**    To the extent that funds are held by the Escrow Agent after the release to CTC referred to in **Section 8(f)(x)(C)**, CTC and the Stockholder Representative Committee shall instruct the Escrow Agent to release all remaining funds held by the Escrow Agent (including interest and earnings) to the Stockholder Representative Committee after all Claims that were timely asserted have been definitively resolved.

9.    **Termination and Other Rights**.

(a)    **Notice and Opportunity to Cure**. Prior to the exercise by a Party of any termination rights afforded under this Agreement, if any Party that is not in breach of any of the Transaction Documents (the "**Non Breaching Party**") believes another Party (the "**Breaching Party**") is in breach hereunder or under any Transaction Document, the Non-Breaching Party shall provide the Breaching Party with written notice specifying in reasonable detail the nature of such breach, whereupon the Breaching Party shall have thirty (30) days from the receipt of such notice to cure such breach; *provided, however*, that if such breach is not capable of being cured within such period and if the Breaching Party shall have commenced action to cure such breach within such period and is diligently attempting to cure such breach, and it is reasonable to expect that such breach could be cured within a reasonable amount of time thereafter, then the Breaching Party shall be afforded an additional reasonable amount of time to cure such breach, such additional time not to exceed fifteen (15) days or to extend beyond the Outside Date (as defined below) in any event; *provided, further, however*, that CTC shall have no opportunity to cure the breach of its obligation to deliver any required portion of the Payment Fund. If the breach is not cured within such time period, then the Breaching Party shall be in default hereunder and the Non-Breaching Party shall be entitled to terminate this Agreement (as provided in **Section 9(b)**). This right of termination shall be in addition to, and not in lieu of, any legal or equitable remedies available to the Non-Breaching Party.

(b)    **Termination of Agreement**. In addition to any other rights of termination expressly set forth in this Agreement, this Agreement may be terminated, and the Transactions may be abandoned, at any time prior to the Closing as provided below:

(i)      CTC, Merger Sub and Holding may terminate this Agreement by mutual written consent;

(ii)      provided CTC is not in material breach of this Agreement, CTC may terminate this Agreement, pursuant to a written notice to Holding: (A) if any one or more of the conditions to CTC's obligation to close set forth in **Sections 7(a)** and **(b)** has not been fulfilled in any material respect as of the Closing Date, (B) subject to **Section 9(a)**, if the Lightship Companies have breached in any material respect any representation, warranty, covenant, obligation or agreement contained in this Agreement or any of the Transaction Documents, or (C) if the Closing shall not have taken place by the date that is six (6) months after the date of execution of this Agreement (the "**Outside Date**"); and

(iii)      provided Holding is not then in material breach of this Agreement, Holding may terminate this Agreement pursuant to a written notice to CTC: (A) if any one or more of the conditions to Holding's obligation to close set forth in **Sections 7(a)** and **(c)** has not been fulfilled in any material respect as of the Closing Date, (B) subject to **Section 9(a)**, if CTC has breached in any material respect any representation, warranty, covenant, obligation or agreement contained in this Agreement or any of the Transaction Documents, or (C) if the Closing shall not have taken place by the Outside Date.

(c)      **Effect of Termination**.  Upon any termination of this Agreement, the Transactions shall be terminated and abandoned, this Agreement shall become void without further action or liability by either Party, and no Party shall have any further obligation or liability to the other Party, except as set forth below:

(i)      the provisions of this **Section 9(c)** and **Section 10** shall survive the termination of this Agreement in accordance with their respective terms;

(ii)      subject to the provisions of **Section 9(c)(iii)**, any Party who has breached any of its representations, warranties, covenants, obligations or agreements under this Agreement prior to termination of this Agreement shall remain liable to the Non-Breaching Party for any Losses sustained by the Non-Breaching Party;

(iii)      in the event this Agreement is terminated pursuant to the terms of **Section 9(b)(ii)(B)**, Holding shall pay to CTC, and if this Agreement is terminated pursuant to the terms of **Section 9(b)(iii)(B)**, CTC shall pay to Holding, a termination fee in the amount of $2,000,000 as liquidated damages, and not as a penalty, which shall constitute the sole and exclusive remedy of CTC or Holding, as the case may be, with respect to any Losses incurred by CTC or Holding, as the case may be, in connection with any breach of (and subsequent termination of) this Agreement, it being agreed that it would be difficult, if not impossible, to quantify the actual Losses that would be incurred as a result of any such breach; and

(iv)      each Party shall return to the other Party all documents and other material received from such other Party relating to the Transactions, whether received from the other Party before or after execution of this Agreement.

(d)      **Injunctive Relief**.  Holding agrees that the Holding Shares are unique assets that cannot be readily obtained on the open market and that CTC shall have the right to

enforce specifically Holding's performance of its obligations under this Agreement and the Transaction Documents, and Holding agrees to waive the defense in any such suit that CTC has an adequate remedy at law and to interpose no opposition, legal or otherwise, as to the propriety of specific performance as a remedy.

      (e)    **Exclusive Remedy; Non-Recourse**.

      (i)    Notwithstanding anything that may be expressed or implied in this Agreement, but subject to **Section 8(f)(vii)**, CTC and Merger Sub agree and acknowledge that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any current Holding Stockholder or any current or future officer, agent or employee of any Holding Stockholder or any current or future member of any Holding Stockholder or any current or future director, officer, employee, partner or member of any Holding Stockholder or of any Affiliate or assignee thereof, as such, for any obligation of any Holding Stockholder under this Agreement, the other Transaction Documents or any other documents or instruments delivered in connection with this Agreement or the other Transaction Documents for any claim based on, in respect of or by reason of such obligations or their creation.

      (ii)    The provisions of **Section 9(e)** were specifically bargained for and reflected in the amounts payable to the Holding Stockholders in connection with the Merger pursuant to **Section 2**.

    10.    **Miscellaneous**.

      (a)    **Press Releases and Public Announcements**. Prior to the Closing, no Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement or the Transactions, including its financial terms, without the prior written approval of the other Party; *provided, however*, that any Party may make any public disclosure it believes in good faith is required by applicable Law (in which case the disclosing Party will use its reasonable best efforts to advise the other Party a reasonable time prior to making the disclosure).

      (b)    **No Third-Party Beneficiaries**. This Agreement shall not confer any rights or remedies upon any Person, other than the Parties, the Stockholder Representative Committee, the CTC Indemnified Parties and their respective successors and permitted assigns.

      (c)    **Entire Agreement**. This Agreement (including the Exhibits, Schedules and documents referred to herein) along with the Nondisclosure Agreement and the other Transaction Documents, constitute the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

      (d)    **Succession and Assignment**. This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign or delegate either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other Party; *provided, however*, that either Party may (i) assign any or all of its rights and interests hereunder to one or more of its respective Affiliates and (ii) designate one or more of its respective Affiliates to perform its

obligations hereunder (provided that in all such cases in clauses (i) and (ii), the assigning or designating Party nonetheless shall remain responsible for the performance of all of its obligations hereunder).  Any purported assignment or delegation in violation of this **Section 10(d)** shall be null and void.

      **(e)**     **Counterparts**.  This Agreement may be executed in counterparts (including by means of facsimile), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

      **(f)**     **Headings**.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

      **(g)**     **Notices**.  All demands, notices, requests, consents and other communications required or permitted under this Agreement shall be in writing and shall be personally delivered against receipt or sent by facsimile machine, nationally recognized commercial (including FedEx and UPS) or U.S. Postal Service overnight delivery service, or, deposited with the U.S. Postal Service mailed first class, registered or certified mail, postage prepaid, return receipt requested, as set forth below:

     If to CTC, Merger Sub, or the Surviving Corporation, to:

     CTC Communications Corp
     220 Bear Hill Road
     Waltham, MA 02451
     Telephone:  781-522-8773
     Facsimile:  781-522-8711
     Attention:  James P. Prenetta, Jr.
                Senior Vice President and General Counsel

     With a required copy (that shall not itself constitute notice) to:
     Kelley Drye & Warren LLP
     101 Park Avenue
     New York, New York 10178
     Telephone:  (212) 808-7800
     Facsimile:  (212) 808-7897
     Attention:  Jacob J. Miles, Esq.

     If to Holding (prior to Closing) to:

     Lightship Holding, Inc.
     1301 Virginia Drive / Suite 440
     Fort Washington, PA  19034
     Telephone:  (215) 641-0110
     Facsimile:  (215) 641-9790
     Attention:  Kevin M. O'Hare

With a required copy (that shall not itself constitute notice) to:
Kleinbard Bell & Brecker LLP
1900 Market Street, Suite 700
Philadelphia, PA 19103
Telephone: (215) 496-7231
Facsimile: (215) 568-0140
Attention: Ralph J. Mauro, Esq.

If to Stockholder Representative Committee, to the address set
forth in the Stockholder Representative Agreement.

Notices shall be deemed given upon the earlier to occur of (i) receipt by the Person to whom
such notice is directed; (ii) if sent by facsimile machine, on the Business Day such notice is sent
if sent (as evidenced by the facsimile confirmed receipt) prior to 5:00 p.m. Eastern Time and, if
sent after 5:00 p.m. Eastern Time, on the Business Day after which such notice is sent; (iii) on
the first Business Day following the day the same is deposited with the commercial carrier or
U.S. Postal Service if sent by commercial overnight delivery service; or (iv) the fifth Business
Day following deposit thereof with the U.S. Postal Service as aforesaid. Each Party by notice
duly given in accordance therewith may specify a different address for the giving of any notice
hereunder.

      **(h)**    <u>**Governing Law**</u>. This Agreement shall be governed by and construed in
accordance with the substantive Laws of the State of New York without giving effect to any
choice or conflict of Law provision (whether of the State of New York or any other jurisdiction)
that would cause the application of the Laws of any jurisdiction other than the State of New
York.

      **(i)**    <u>**Amendments and Waivers**</u>. No amendment of any provision of this
Agreement shall be valid unless the same shall be in writing and signed by the Parties to be
charged therewith. No waiver by any Party of any provision of this Agreement or any default,
misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall
be valid unless the same shall be in writing and signed by the Party making such waiver, nor
shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or
breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any
prior or subsequent such default, misrepresentation, or breach of warranty or covenant.

      **(j)**    <u>**Severability**</u>. Any term or provision of this Agreement that is invalid or
unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of
the remaining terms and provisions hereof or the validity or enforceability of the offending term
or provision in any other situation or in any other jurisdiction.

      **(k)**    <u>**Expenses**</u>. Each of the Parties will bear its own costs and expenses
(including legal fees and expenses) incurred in connection with this Agreement and the
Transactions; *provided, however*, that Lightship (prior to the Closing) and CTC shall each pay
fifty percent (50%) of the fees and expenses of the Paying Agent and the Escrow Agent.

(l)    **Computation of Days**.  Whenever this Agreement provides for a date, day or period of time on or prior to which actions or events are to occur or not occur, and if such date, day or last day of such period of time falls on a day other than a Business Day, then the same shall be deemed to fall on the immediately following Business Day.

(m)    **Submission to Jurisdiction**.  Each of the Parties irrevocably submits to the jurisdiction of any state or federal court sitting in New York, New York, in any Action arising out of or relating to this Agreement or any other Transaction Document and agrees that all claims in respect of the Action may be heard and determined in any such court.  Each Party also agrees not to bring any Action arising out of or relating to this Agreement in any other court. Each of the Parties waives any defense or objection of improper venue or inconvenient forum to the maintenance of any Action so brought and waives any bond, surety, or other security that might be required of any other Party with respect thereto.

*[signature page follows]*

03/21/05  16:25 FAX 781 622 6711        CTC COMMUNICATION                    @002
                                                                          P.03/03
MAR-21-2005  13:54

[signature page]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as

of the date first above written.

CTC COMMUNICATIONS GROUP, INC.

By: _____
    Name: Kenneth D. Peterson, Jr.
    Title: President

CTC COMMUNICATIONS ACQUISITION
CORP.

By: _____
    Name:
    Title:

LIGHTSHIP HOLDING, INC.

By: _____
    Name:
    Title:

TOTAL P.03

03/21/05  10:25 FAX 781 522 8711      CTC COMMUNICATION                    Ø003

*[signature page]*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as

of the date first above written.

CTC COMMUNICATIONS GROUP, INC.

By_____
   Name:
   Title:

CTC COMMUNICATIONS ACQUISITION
CORP.

By_____
   Name:
   Title:

LIGHTSHIP HOLDING, INC.

By_____
   Name:
   Title:

*[signature page]*

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as

of the date first above written.

**CTC COMMUNICATIONS GROUP, INC.**

By_____
    Name:
    Title:

**CTC COMMUNICATIONS ACQUISITION
CORP.**

By:_____
    Name:
    Title:

**LIGHTSHIP HOLDING, INC.**

By: *Kevin McCabe as President CEO*
    Name: *Kevin M. O'Hare*
    Title: *President + CEO*