Exhibit 3

## STOCKHOLDER REPRESENTATIVE AGREEMENT

**THIS STOCKHOLDER REPRESENTATIVE AGREEMENT** (this "**Agreement**") is made and entered into as of May 16, 2005, by and among **LIGHTSHIP HOLDING, INC.**, a Delaware corporation ("**Holding**"), and the members of the Stockholder Representative Committee set forth on the signature page hereto (the "**Committee**") on behalf of certain holders of the Capital Stock of Holding (except for those holders of Holding's Series CC Convertible Preferred Stock who are not also holders of Series AA Convertible Preferred Stock or Series BB Convertible Preferred Stock) (collectively, the "**Holding Stockholders**"). Holding and the Committee are sometimes referred to individually herein as a "**Party**" and collectively as the "**Parties**."

### WITNESSETH

**WHEREAS**, Holding has entered into an Agreement and Plan of Merger, dated as of March 21, 2005 (the "**Merger Agreement**"), by and among Holding, CTC Communications Group, Inc., a Delaware corporation ("**CTC**") and CTC Communications Acquisition Corp., a Delaware corporation and a wholly-owned Subsidiary of CTC ("**Merger Sub**"), providing for the merger (the "**Merger**") of Merger Sub with and into Holding, with the result that Holding, as the Surviving Corporation in the Merger, will become a wholly-owned subsidiary of CTC (all capitalized terms used but not defined herein shall have the meanings assigned to them in the Merger Agreement); and

**WHEREAS**, the Merger Agreement requires that the Committee be constituted and appointed as agent, representative and attorney-in-fact for and on behalf of the Holding Stockholders in connection with the transactions contemplated by the Merger Agreement and the Indemnification Escrow Agreement.

**NOW, THEREFORE**, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.    **Establishment of Committee**.

(a)    **Members/Term**. The Committee shall consist of three members, selected as follows: (i) one individual designated by J.P. Morgan SBIC LLC in its sole discretion (the "**JPM Designee**"), (ii) one individual designated by Osprey Partners LLC in its sole discretion (the "**Osprey Designee**"), and (iii) Kevin O'Hare. The initial members of the Committee shall be Stephan Oppenheimer as the JPM Designee, James D. Houghton as the Osprey Designee and Kevin O'Hare. Each member shall serve until the earlier of his or her resignation or removal or the appointment of a successor. J.P. Morgan SBIC LLC and Osprey Partners LLC shall have the sole right of designation, removal, and replacement with respect to the JPM Designee and the Osprey Designee, respectively

(b)    **Manner of Acting**. The act of a majority of the members of the Committee (which majority must include the affirmative vote of the JPM Designee) shall constitute the act of the entire Committee, and shall be binding upon all Committee members and the Holding Stockholders.

(c)     **Vacancies**.  Any vacancy in the Committee may be filled by the unanimous vote of the remaining members of the Committee.

(d)     **Chairman**.  The Committee members may elect a Chairman from its members who shall serve at the pleasure of the Committee.  The Chairman shall be responsible for communicating the actions of the Committee to such Persons as may be necessary, and all such Persons shall be entitled to rely upon the actions of the Chairman, unless such Person has actual knowledge of, or has received notice from the Committee of, a change in the Chairman of the Committee.

2.     **Appointment; Responsibilities of Committee; Binding Effect**.

(a)     Each Holding Stockholder hereby appoints the Committee as his, her or its agent, representative and attorney-in-fact with full power and authority to represent each such Holding Stockholder and his, her or its successors with respect to all matters arising under this Agreement, the Merger Agreement, the Paying Agent Agreement and the Indemnification Escrow Agreement and to perform all duties required of each such Holding Stockholder, including, without limitation, those set forth in **Section 2**, **Section 5**, **Section 6** and **Section 8** of the Merger Agreement, and all actions taken by the Stockholder Committee hereunder and thereunder shall be binding upon all such Holding Stockholders and their successors as if expressly confirmed and ratified in writing by each of them. The Committee shall take any and all actions which it believes are necessary or appropriate under this Agreement, the Merger Agreement, the Paying Agent Agreement and the Indemnification Escrow Agreement for and on behalf of such Holding Stockholders, as fully as if such Holding Stockholders were acting on their own behalf, including, without limitation, defending all indemnity claims, consenting to, compromising or settling all such indemnity claims, distributing to the Holding Stockholders funds received from time to time from the Escrow Agent, conducting negotiations with CTC and the Escrow Agent under the Indemnification Escrow Agreement, taking any and all other actions specified in or contemplated by this Agreement, the Merger Agreement, the Paying Agent Agreement and the Indemnification Escrow Agreement and engaging counsel and accountants in connection with the foregoing matters.  Without limiting the generality of the foregoing, the Committee shall have full power and authority to interpret all the terms and provisions of this Agreement, the Merger Agreement, the Paying Agent Agreement and the Indemnification Escrow Agreement and to consent to any amendment hereof or thereof on behalf of all such Holding Stockholders and successors.

(b)     The Committee shall treat confidentially and not disclose any non-public information from or about CTC, Holding or any Subsidiary of Holding (except on a need to know basis to individuals who agree to treat such information confidentially).

(c)     A decision, act, consent or instruction of the Committee shall constitute the decision, act, consent and instruction of all Holding Stockholders and shall be final, binding and conclusive upon each such Holding Stockholder, and the Escrow Agent and CTC may rely upon any decision, act, consent or instruction of the Committee as being the decision, act, consent or instruction of each and every Holding Stockholder. The Escrow Agent and CTC are

hereby relieved from any liability to any Person for any acts done by them in accordance with such decision, act, consent or instruction of the Committee.

      **(d)**      Set forth on <u>Schedule A</u> hereto is a complete and accurate list of each Holding Stockholder's name, tax identification number, address and the percentage of funds such Holding Stockholder shall be entitled to receive upon distributions made by the Escrow Agent to the Committee for or on behalf of the Holding Stockholders. The Committee may assume without independent inquiry that the facts set forth in <u>Schedule A</u> are true and correct in all material respects and that <u>Schedule A</u> has not been and is not required to be amended. The Committee shall promptly release all funds received from the Escrow Agent to the Holding Stockholders in accordance with the percentages set forth in <u>Schedule A</u>, subject to the adjustments set forth herein.

      **3.**      **<u>Third Party Beneficiaries.</u>** The Holding Stockholders and the Committee acknowledge and agree that each of CTC, Merger Sub, and the Surviving Corporation has an interest in assuring that actions required under this Agreement are taken in accordance with the terms and conditions set forth herein, and each of CTC, Merger Sub and the Surviving Corporation shall therefore be deemed to be third party beneficiaries of and under this Agreement for all purposes.

      **4.**      **<u>Compensation/Expenses/Indemnification.</u>** Committee members shall be entitled to compensation for services rendered and reimbursement of all reasonable expenses (including the cost of errors and omissions insurance and attorneys' fees and expenses) incurred in their capacity as Committee members either (a) out of any portion of Indemnification Escrow that has been validly released by the Escrow Agent to the Committee in accordance with the terms of <u>Section 8(f)(ix)</u> of the Merger Agreement and the terms of the Indemnification Escrow Agreement, or (b) from each Holding Stockholder in that percentage set forth opposite such Holding Stockholder's name on <u>Schedule A</u>. The Holding Stockholders shall severally indemnify and hold harmless the Committee members from any and all Losses arising out of or in connection with the performance of their obligations as Committee members while acting in good faith, and in the exercise of reasonable judgment and any act done or omitted to be done pursuant to the written advice of counsel shall be conclusive evidence of such good faith. Notwithstanding any other provision contained herein, no Holding Stockholder shall be responsible for Losses in excess of the portion of the Payment Fund that such Holding Stockholder receives under the Merger Agreement.

      **5.**      **<u>Governing Law.</u>** This Agreement shall be governed by and construed in accordance with the substantive Laws of the State of New York without giving effect to any choice or conflict of Law provision (whether of the State of New York or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New York.

      **6.**      **<u>Succession and Assignment.</u>** This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors, heirs and legal representatives and permitted assigns. Nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement. No Party may assign or delegate either this

Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other Party. Any purported assignment or delegation in violation of the foregoing shall be null and void.

**7.**    **Counterparts.** This Agreement may be executed in counterparts (including by means of facsimile), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

**8.**    **Headings.** The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**9.**    **Notices.** All demands, notices, requests, consents and other communications required or permitted under this Agreement shall be given in the manner set forth in the Merger Agreement.

**10.**    **Amendments and Waivers.** No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Parties to be charged therewith. No waiver by any Party of any provision hereof or default hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default hereunder or affect in any way any rights arising by virtue of any prior or subsequent such default.

**11.**    **Severability.** Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

**12.**    **Entire Agreement.** This Agreement together with the Merger Agreement and the other Transaction Documents constitute the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

**13.**    **Termination.** This Agreement shall terminate upon the earlier to occur of the termination of the Merger Agreement in accordance with Section 10 thereof or the release of all amounts being held by the Escrow Agent pursuant to the terms of the Indemnification Escrow Agreement.

*[signature page follows]*

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement effective as of the day and year first above written.

LIGHTSHIP  HOLDING, INC.

By: _Kee MCH_____ President + CEO
Name: Kevin M O'Hare
Title: President + CEO


STOCKHOLDER REPRESENTATIVE
COMMITTEE MEMBERS:


J.P. MORGAN SBIC LLC


By:_____
Name:
Title:


OSPREY PARTNERS LLC


By:_____
Name:
Title:


KEVIN M. O'HARE

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement effective as of the day and year first above written.

LIGHTSHIP HOLDING, INC.

**By:** _____
**Name:**
**Title:**

STOCKHOLDER REPRESENTATIVE
COMMITTEE MEMBERS:

J.P. MORGAN SBIC LLC

**By:** _____
**Name:** STEPHAN OPPENHEIMER
**Title:** PRINCIPAL

OSPREY PARTNERS LLC

**By:** _____
**Name:**
**Title:**

KEVIN M. O'HARE

_____

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement effective as of the day and year first above written.

LIGHTSHIP  HOLDING, INC.

By:_____
Name:
Title:

STOCKHOLDER REPRESENTATIVE
COMMITTEE MEMBERS:

J.P. MORGAN SBIC LLC

By:_____
Name:
Title:

OSPREY PARTNERS LLC

By:_____
Name: JAMES Hoffritter
Title: Managing Merder

KEVIN M. O'HARE

_____

## SCHEDULE A

[Holding Stockholder Information]

Exhibit 4

## ESCROW AGREEMENT

ESCROW AGREEMENT (the "Escrow Agreement"), dated as of May __, 2005, among CTC COMMUNICATIONS GROUP, INC., a Delaware corporation ("Acquirer"), the members of the Stockholder Representative Committee signatories hereto (collectively "Representative"), as representatives of the former stockholders of LIGHTSHIP HOLDING, INC., a Delaware corporation ("Company"), and MELLON INVESTOR SERVICES LLC, a New Jersey limited liability company (the "Escrow Agent").

WHEREAS, CTC Communications Acquisition Corp., a Delaware corporation and wholly-owned subsidiary of Acquirer ("Merger Sub"), the Acquirer and Company have entered into an Agreement and Plan of Merger, dated as of March 21, 2005 (the "Merger Agreement"), whereby the Merger Sub will merge with and into the Company and each share of the currently outstanding capital stock of the Company will be converted into the right to receive cash in accordance with the Merger Agreement; and

WHEREAS, pursuant to the Merger Agreement, Acquirer, Merger Sub and the Company have agreed that at the Closing (as defined in the Merger Agreement) immediately available funds in the aggregate amount of $7,000,000 (the "Funds") will be transferred to the Escrow Agent for deposit into an escrow account (the "Escrow Account") to be established in accordance with this Escrow Agreement; and

WHEREAS, except for the holders of Dissenting Shares (as defined in the Merger Agreement), the former stockholders of the Company (except for those holders of the Company's Series CC Convertible Preferred Stock who are not also holders of the Company's Series AA Convertible Preferred Stock or Series BB Convertible Preferred Stock) (the "Shareholders") have executed or will execute a Letter of Transmittal and a Stockholder Representative Agreement in connection with the Merger Agreement and their surrender of shares in the Company in exchange for cash, have agreed in the Letter of Transmittal and the Stockholder Representative Agreement to be bound by the terms of this Escrow Agreement, and have granted authority to the Representative to act on their behalf for all purposes relevant to this Agreement; and

WHEREAS, Acquirer and Representative desire to appoint Mellon Investor Services LLC to act as Escrow Agent for the Funds and any other funds deposited or held in the Escrow Account from time to time in accordance with this Escrow Agreement, including without limitation income or earnings thereon (collectively the "Escrowed Property").

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

Section 1.    Appointment of the Escrow Agent.

The Escrow Agent is hereby appointed, and hereby agrees to act, as the Escrow Agent hereunder upon the terms set forth herein, and to accept the Funds, deposit the Funds in the Escrow Account and otherwise perform the duties of the Escrow Agent expressly set forth in this Escrow Agreement. The Escrow Agent shall hold and safeguard the Funds and any other

Escrowed Property deposited or held from time to time in the Escrow Account during the term of this Escrow Agreement.

Section 2.    Escrow; Investment; Definitions.

(a)    Escrow.  The Escrow Agent hereby acknowledges receipt from Acquirer of immediately available funds in the aggregate amount of $7,000,000.

(b)    Investment of Funds.  So long as the Escrow Agent is holding the Funds or any other Escrowed Property in accordance with this Agreement, it shall invest such Funds, other funds or cash in Class B Shares of the Dreyfus General Money Market Fund.  All income and earnings from the investment of the Escrowed Property shall be credited to, and become a part of, the Escrowed Property, and any losses on any such investments shall be debited to the Escrow Account.  The Escrow Agent shall have no duty, responsibility or obligation to invest any funds or cash held in the Escrow Account other than in accordance with this Section 2(b).  The Escrow Agent shall have no liability or responsibility for any investment losses, including without limitation, any market loss on any investment liquidated (whether at or prior to maturity) in order to make a payment required under this Escrow Agreement.  The Escrow Agent may, in making or disposing of any investment permitted by this Escrow Agreement, deal with itself, in its individual capacity, or any of its affiliates, whether or not it or such affiliate is acting as a subagent of the Escrow Agent or for any third person or dealing as principal for its own account.

(c)    Definitions of Claim and Notice of Claim.  For purposes of this Escrow Agreement, the term "Claim" means a claim for indemnification of any CTC Indemnified Party (as defined in the Merger Agreement) under Section 8 of the Merger Agreement.  Acquirer may give notice of a Claim, whether on behalf of itself or any other CTC Indemnified Party pursuant to written notice of a Claim executed by Acquirer (a "Notice of Claim") and delivered to the Representative and the Escrow Agent promptly after Acquirer or any other CTC Indemnified Party becomes aware of the facts, condition or event that may give rise to a Claim, but in any event before the Escrow Termination Date (as hereinafter defined).

(d)    Definitions of Appropriate Officer and Escrow Termination Date.  For purposes of this Escrow Agreement, (i) the term "Appropriate Officers" means those officers of Acquirer set forth on the incumbency certificate of Acquirer delivered to the Escrow Agent simultaneously with the execution and delivery of this Escrow Agreement, as the same may be amended in a notice to Escrow Agent and Representative from time to time, and (ii) the term "Escrow Termination Date" shall mean the third anniversary of the date of this Agreement, provided, however, that if on or before such third anniversary, the Escrow Agent shall have received a notice executed by an Appropriate Officer of Acquirer stating that one or more Claims have been timely asserted and have not yet been definitively resolved at that time, then the Escrow Termination Date shall be deemed to be extended until the date on which the Escrow Agent receives joint written instructions executed by an Appropriate Officer of Acquirer and Representative informing the Escrow Agent that the Escrow Termination Date has occurred and instructing the Escrow Agent to disburse to Representative any Escrowed Property, including the income and earnings credited thereon, not previously disbursed in accordance with this Escrow Agreement.

Section 3.    Release from Escrow.

NY01/STONM/994228.9

(a)    <u>Release of Escrowed Property</u>.  The Escrowed Property shall be held by the Escrow Agent until such Escrowed Property is required to be released pursuant to either: (i) Section 7 or (ii) when required under applicable provisions of Section 5 hereof or (iii) upon receipt of joint written instructions from the Acquirer and the Representative.  Such delivery of Escrowed Property shall be as specified in written instructions from Representative or at Representative's election, by wire transfer of immediately available funds as specified in the wire instructions (attached hereto as <u>Exhibit A</u>) in the case of the Representative, or in written instructions from Acquirer in the case of the CTC Indemnified Party.

(b)    <u>Power to Transfer Escrowed Property</u>.  The Escrow Agent shall effect any transfer of Escrowed Property in accordance with this Agreement.

(c)    <u>Protection of Escrowed Property</u>.  The Escrow Agent shall hold and safeguard the Escrowed Property, shall treat the Escrowed Property in accordance with the terms of this Agreement and not as property of Acquirer, and shall hold and dispose of the Escrowed Property only in accordance with the terms of this Agreement.

Section 4.    <u>Contents of Notice of Claim</u>.  Each Notice of Claim shall contain the following information:

(a)    a statement that a CTC Indemnified Party has incurred or paid or, in good faith, reasonably believes it shall have to incur or pay, Losses (as defined in the Merger Agreement) in an aggregate stated amount (where practicable) arising from such Claim (which statement shall include, if known by the CTC Indemnified Party on whose behalf the Claim is being made, the amount of damages claimed by such third party in an action brought against any CTC Indemnified Party based on alleged facts, which if true, would give rise to liability for Losses to such CTC Indemnified Party); and

(b)    a written notice setting forth in reasonable detail the basis for the alleged Losses (which written notice shall be accompanied by relevant supporting documents and other information and shall certify that such allegation of Losses is bona fide and in good faith).  Following delivery of the Notice of Claim (or at the same time if the Acquirer so elects) the Acquirer shall deliver copies of any demand or complaint, the amount of Losses, the date each such item was incurred or paid, or the basis for such anticipated liability and the specific nature of the breach to which such item is related.

Section 5.    <u>Resolution of Notice of Claim</u>.  Each timely Notice of Claim given by Acquirer shall be resolved as follows:

(a)    <u>Admitted Claims</u>.  If, within ten Business Days after a Notice of Claim is delivered to the Representative and the Escrow Agent, the Representative has not delivered an objection in accordance with Section 5(b), Representative (on behalf of the Shareholders) conclusively shall be deemed to have consented to the recovery by Acquirer from the Escrowed Property of the full amount of Losses specified in the Notice of Claim (any Claim to which Representative has not so timely delivered such an Objection is hereinafter called an "Admitted Claim").  With respect to any Admitted Claim, on the first Business Day following receipt of the Representative's agreement that such Claim is an Admitted Claim, or, if such agreement is not earlier received from Representative, or on the sixth Business Day after delivery of such Notice

of Claim, the Escrow Agent shall: (i) release from escrow and transfer to Acquirer that amount of the Escrowed Property relating to such Admitted Claims; and (ii) notify the Representative in writing of such transfer of Escrowed Property.

(b)    Contested Claims.  If the Escrow Agent and the Acquirer receive from the Representative within the ten Business Day period referred to in the first sentence of Section 5(a) a written notice contesting all or any portion of a Notice of Claim and setting forth in reasonable detail the basis for Representative's disagreement with the Notice of Claim (which written notice shall be accompanied by relevant supporting documents and other information and shall certify that such disagreement is bona fide and being made in good faith) (an "Objection"), then the Claim that is the subject of the Objection ("Contested Claim") shall be resolved by either (i) a written settlement agreement executed by Acquirer and the Representative or (ii) in the absence of such a written settlement agreement, by a final order rendered by a court of competent jurisdiction (a "Final Order").  To the extent Acquirer is entitled to the recovery of Losses as determined by a Final Order, the Escrow Agent shall disburse the Escrowed Property to Acquirer in accordance with the provisions of paragraph (d) below.

(c)    Settled Claims.  If a Claim (including a Contested Claim) is settled by a written settlement agreement executed by the Representative and Acquirer (a "Settled Claim"), then the Representative and Acquirer shall promptly deliver such settlement agreement to the Escrow Agent together with written instructions to the Escrow Agent executed by both Acquirer and the Representative ("Settlement Instructions").  The Settlement Instructions shall, in accordance with and subject to the terms of the written settlement agreement, instruct the Escrow Agent either:  (i) to release a stated amount of the Escrowed Property to Acquirer pursuant to such settlement agreement; and/or (ii) that no action need be taken by the Escrow Agent with respect to such Claim.  If and only to the extent required by the Settlement Instructions, upon its receipt of such written settlement agreement and Settlement Instructions, the Escrow Agent shall: (x), immediately release from Escrowed Property and transfer to Acquirer that amount of Escrowed Property that Acquirer and the Representative have agreed shall be transferred by the Shareholders, as stated in such Settlement Instructions; and (y) notify the Representative in writing of such transfer of Escrowed Property on the same date.

(d)    Payment of Losses.  Any Losses that (i) are the subject of an Admitted Claim, (ii) are to be paid to Acquirer as a Settled Claim or (iii) have been awarded to Acquirer pursuant to a Final Order (all such Losses are hereinafter referred to as "Awarded Damages") shall be paid from the Escrowed Property.

(e)    Multiple Claims Permitted.  The assertion of any single Claim for indemnification hereunder shall not bar the CTC Indemnified Parties from asserting any other Claims hereunder.

Section 6.    The Escrow Agent.  The Escrow Agent:

(a)    shall act hereunder as an escrow agent only and shall not be responsible or liable in any manner whatever for the sufficiency, collection, correctness, genuineness or validity of any revenues, cash, payments, securities, property, funds, investments, income, earnings or other amounts deposited with or held by it or for the identity, authority or rights of any person or

entity executing and delivering or purporting to execute or deliver any thereof to the Escrow Agent;

(b)    shall be fully protected in acting upon any written notice, instruction, direction, request or other communication, paper or document which the Escrow Agent believes to be genuine, and shall have no duty to inquire into or investigate the validity, accuracy or content of any thereof;

(c)    shall not be liable for any error of judgment or for any action taken, suffered or omitted to be taken except in the case of its own gross negligence or bad faith, as determined by a final non-appealable order, judgment, decree or ruling of a court of competent jurisdiction.  In no event shall the Escrow Agent be (A) liable for acting in accordance with a notice, instruction, direction, request or other communication, paper or document that purports to be signed by an Appropriate Officer of Acquirer or Representative or (B) liable or responsible for special, punitive, indirect, consequential or incidental loss or damages of any kind whatsoever to any person or entity (including without limitation lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage. Any liability of the Escrow Agent under this Escrow Agreement will be limited to the amount of fees paid to the Escrow Agent;

(d)    may consult with and obtain advice from counsel (who may be counsel to a party hereto or an employee of the Escrow Agent) and shall be fully protected in taking, suffering or omitting to take any action in reliance on said advice;

(e)    shall have no duties, responsibilities or obligations as the Escrow Agent except those which are expressly set forth herein, and in any modification or amendment hereof to which the Escrow Agent has consented in writing, and no duties, responsibilities or obligations shall be implied or inferred. Without limiting the foregoing, the Escrow Agent shall not be subject to, nor be required to comply with, or determine if any person or entity has complied with, the Merger Agreement or any other agreement between or among the parties hereto, even though reference thereto may be made in this Escrow Agreement, or to comply with any notice, instruction, direction, request or other communication, paper or document other than as expressly set forth in this Escrow Agreement;

(f)    may execute or perform any duty, responsibility or obligation hereunder either directly or through agents, attorneys, accountants or other experts;

(g)    may engage or be interested in any financial or other transaction with the Company or any party hereto or affiliate thereof, and may act on, or as depositary, trustee or agent for, any committee or body of holders of obligations of such party or affiliate, as freely as if it were not the Escrow Agent hereunder;

(h)    shall not be obligated to expend or risk its own funds or to take any action which it believes would expose it to expense or liability or to a risk of incurring expense or liability, unless it has been furnished with assurances of repayment or indemnity satisfactory to it;

- 5 -

(i)     shall not take instructions or directions except those given in accordance with this Escrow Agreement;

(j)     shall not incur any liability for not performing any act, duty, obligation or responsibility by reason of any occurrence beyond the control of the Escrow Agent (including without limitation any act or provision of any present or future law or regulation or governmental authority, any act of God, war, civil disorder or failure of any means of communication); and

(k)     shall not be called upon to advise any person or entity as to any investments with respect to any security, property or funds held in escrow hereunder or the dividends, distributions, income, interest or earnings thereon.

Section 7.     Miscellaneous.

(a)     Fees and Expenses.  The Escrow Agent shall be entitled to reasonable compensation for its services as Escrow Agent hereunder from time to time and to reimbursement for all its reasonable out-of-pocket costs and expenses (including without limitation reasonable fees and disbursements of counsel) in connection with the preparation, negotiation, amendment, modification, waiver, execution, delivery, performance or enforcement of this Escrow Agreement.  The fees and expenses of the Escrow Agent shall be paid one-half each by the Company and Acquirer at Closing.  The Escrow Agent is expressly authorized and directed, but shall not be obligated, to charge against and withdraw from the Escrow Account for its own account or for the account of an Indemnitee (as hereinafter defined) any amounts due to the Escrow Agent under this Section 7(a) or to an Indemnitee under Section 7(b).  To the extent that (i) the Escrow Agent in its sole discretion decides to charge against and withhold from the Escrow Account any such amounts and the Escrowed Property is insufficient to pay the amounts due to the Escrow Agent under this Section 7(a) or to an Indemnitee under Section 7(b) or (ii) the Escrow Agent decides not to charge and withhold any such amounts from the Escrow Account, Acquirer and each Shareholder (to the extent of its interest in the Escrowed Property) jointly and severally agree to pay such amounts to the Escrow Agent or such Indemnitee on demand.  To the extent that the Escrow Agent decides to charge against and withhold from the Escrow Account an amount that exceeds the Company's agreed share of the amounts due to the Escrow Agent under this Section 7(a), Acquirer will, upon notice from the Representative, promptly deposit into the Escrow Account cash in the amount of such excess.  The obligations contained in this Section 7(a) shall survive the termination of this Escrow Agreement and the resignation or removal of the Escrow Agent.

(b)     Indemnification.  The parties hereto (to the extent of their interest in the Escrowed Property), jointly and severally, agree to indemnify, defend, protect, save and keep harmless the Escrow Agent and its affiliates and their respective successors, assigns, directors, officers, managers, employees, agents, attorneys, accountants and experts (collectively the "Indemnitees"), from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses, including without limitation reasonable fees and disbursements of counsel (collectively "Agent Losses"), that may be imposed on, incurred by, or asserted against any Indemnitee, at any time, and in any way relating to or arising out of the execution, delivery or performance of this Escrow Agreement, the enforcement of any rights or remedies under or in connection with this Escrow Agreement, the establishment of the Escrow Account, the acceptance or administration of the

Escrowed Property and any payment, transfer or other application of funds pursuant to this Escrow Agreement, or as may arise by reason of any act, omission or error of the Indemnitee; provided, however, that no Indemnitee shall be entitled to be so indemnified, defended, protected, saved and kept harmless to the extent such Agent Loss was proximately caused by its own gross negligence or bad faith, as determined by a final, non-appealable order, judgment, decree or ruling of a court of competent jurisdiction. The obligations contained in this Section 7(b) shall survive the termination of this Escrow Agreement and the resignation or removal of the Escrow Agent.

(c)     Termination.  Except as specifically set forth in Sections 7(a), 7(b) and 7(n) hereof, this Escrow Agreement shall terminate upon final distribution and disbursement of all of the Escrowed Property, including income and earnings thereon, in accordance with Section 2 hereof; provided, however, that in the event an Appropriate Officer of Acquirer and the Representative jointly notify the Escrow Agent on or prior to the third anniversary of the date of this Agreement that not all appraisal proceedings with respect to Dissenting Shares (as defined in the Merger Agreement) shall have been resolved by that time, which notice shall state the amount to continue to be held in escrow subsequent to such third anniversary, then the term of this Escrow Agreement shall be extended, and such amount shall continue to be held as Escrowed Property in accordance with this Agreement, until such time as an Appropriate Officer of Acquirer and the Representative jointly notify the Escrow Agent that all such appraisal proceedings have been definitively resolved , which notice shall instruct the Escrow Agent regarding the distribution and disbursement of all of the Escrowed Property. The Acquirer and the Representative agree promptly to give the joint notices referred to in the proviso of the immediately preceding sentence.

(d)     Notices.  All notices, instructions, directions, requests or other communications hereunder shall be in writing and shall be delivered personally, sent by facsimile transmission (with immediate confirmation of receipt thereafter by telephone or otherwise), or sent by U.S. registered, certified or express mail, first class postage prepaid, return receipt requested, or sent by a nationally recognized overnight courier service, marked for overnight delivery, to the addresses set forth below:

(i)     If to the Escrow Agent:


Mellon Investor Services LLC
Overpeck Centre
85 Challenger Road
Ridgefield Park, New Jersey 07660
Attention: Michael Battista
Telephone: (201) 329-8285
Facsimile: (201) 296-4774


With an additional copy to:

Mellon Investor Services LLC
Overpeck Centre
85 Challenger Road
Ridgefield Park, New Jersey  07660
Attention:  Legal Department
Telephone:  (201) 373-7155
Facsimile:  (201) 373-7166

(ii)    If to Representative:

Stephan Oppenheimer
JP Morgan Partners
1221 Avenue of the Americas
39th Floor
New York, NY  10020

James D. Houghton
c/o Megunticook Management
137 Newbury Street
Boston, MA 02116

Kevin O'Hare
48 Steeplechase Drive
Doylestown, PA 18901

with a copy to:

Kleinbard, Bell & Brecker LLP
1900 Market Street, Suite 700
Philadelphia, Pennsylvania  19103
Attention: Ralph J. Mauro, Esq.
Telephone:  (215) 496-7231
Facsimile:  (215) 568-0140

(iii)   If to the Acquirer:

CTC Communications Group, Inc..
220 Bear Hill Road
Waltham, Massachusetts  02451
Attention:  James P. Prenetta, Jr.
Telephone:  (781) 522-8773
Facsimile:   (781) 522-8711

with a copy to:

Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178
Attention:  Jacob J. Miles, Esq.
Telephone:  (212) 808-7800
Facsimile:   (212) 808-7897

or to such other address as Acquirer, the Representative, or the Escrow Agent, as the case may be, designates in a writing delivered to each of the other parties hereto in accordance with this Section 7(d).  Notwithstanding the foregoing, notices and the like addressed to the Escrow Agent shall be effective only upon receipt.  "Business Day" means any day other than a Saturday, a Sunday, a day on which commercial banks are authorized by Law to be closed in the Commonwealth of Massachusetts or the States of New York or New Jersey or a day on which the New York Stock Exchange is not open for trading.

(e)   Benefit of Agreement.  This Escrow Agreement and all rights and obligations hereunder in and to the Escrowed Property and the Escrow Account and any and all written instruments evidencing investments made from the funds held in the Escrow Account shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

(f)   Amendment, Modification, Waiver and Consent.  No amendment, modification or waiver of any provision of this Escrow Agreement, nor any consent to any departure therefrom, by any party hereto shall be valid or effective for any purpose unless the same shall be in writing and signed by the party to be charged therewith, and then such amendment, modification, waiver or consent shall be effective only in the specific instance and for the specific purpose given.  Any notice to, or demand on, any party for any purpose not specifically required of another hereunder shall not entitle the first party to any other or further notice or demand in the same, similar or other circumstances unless specifically required hereunder.

(g)   Conflicts and Severability.  In the event of any conflict between the terms and provisions of this Escrow Agreement and those of the Merger Agreement, the terms and conditions of this Escrow Agreement shall control.  If any provision of this Escrow Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such

- 9 -

prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the parties hereto to the fullest extent permitted by law, to the end that this Escrow Agreement shall be enforced as written.

(h)    No Interest of Third Parties. Except as expressly provided in Section 7(b), nothing in this Escrow Agreement, whether express or implied, shall be construed to give to any person or entity other than the parties hereto any legal or equitable right, remedy, interest or claim under or in respect of this Escrow Agreement or any funds escrowed hereunder.

(i)    Titles and Headings. Titles and headings to sections herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Escrow Agreement.

(j)    Applicable Law and Forum. This Escrow Agreement and all amendments, modifications and waivers thereof shall, in all respects, be governed by and construed and enforced in accordance with the internal laws (without regard to principles of conflicts of law) of the State of New York. Each party hereto hereby irrevocably submits to the personal jurisdiction of the state and federal courts located within the City and State of New York with respect to any action, suit or proceeding relating to or arising from this Escrow Agreement. Each party hereto irrevocably waives (i) any claim or defense based upon improper venue or inconvenient forum with respect to any action, suit or proceeding brought in any such court and (ii) the right to trial by jury in any action, suit or proceeding relating to or arising under this Escrow Agreement. Each party waives personal service of process and consents to the service of process by the manner set forth in Section 7(d), in addition to any other method of service of process permitted by applicable law.

(k)    Execution in Counterparts. This Escrow Agreement may be executed in one or more counterparts, each of which shall be an original and all of which, taken together, shall be considered one and the same agreement, and shall become a binding agreement when one or more counterparts have been signed by each party hereto and delivered to each other party or such party's representative.

(l)    Resignation or Replacement of Escrow Agent.

(i)    The Escrow Agent may at any time resign by giving not less than 30 days' notice to Acquirer and Representative, or may be removed jointly by Acquirer and Representative by giving not less than 30 days' notice to the Escrow Agent. Acquirer and Representative jointly shall designate a successor Escrow Agent prior to the expiration of any such thirty-day period by giving written notice to the Escrow Agent. The Escrow Agent shall promptly transfer the Escrowed Property to such designated successor, provided such successor agrees in writing to be bound by the terms hereof.

(ii)    Any person or entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any person or entity resulting from any merger, conversion or consolidation to which the Escrow Agent shall be a party, or any person or entity to which substantially all the stock transfer business of the Escrow Agent may be

- 10 -

transferred, shall automatically be the Escrow Agent under this Escrow Agreement without further act.

      (m)   <u>Ambiguity and Disputes.</u>

      (i)   In the event the Escrow Agent believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the Escrow Agent hereunder, Escrow Agent, may, in its sole discretion, refrain from taking any action, and shall be fully protected and shall not be liable in any way to Acquirer, Representative or any Shareholder or other person or entity for refraining from taking such action, unless the Escrow Agent receives written instructions signed by Acquirer and Representative eliminating such ambiguity or uncertainty to the satisfaction of Escrow Agent.

      (ii)   If any dispute between or conflicting claims by or among the Acquirer, Representative and/or other person or entity with respect to this Escrow Agreement, the Escrowed Property or the Escrow Account arises, the Escrow Agent may, in its sole discretion, at its option (A) initiate an action in interpleader or another appropriate action, suit or proceeding in a court of competent jurisdiction seeking to resolve such dispute or claims and/or (B) refrain from complying with any claim, notice, instruction, direction, request or other communication, paper or document, so long as such dispute or conflict shall continue, and (in either case) shall be fully protected and shall not be liable in any way to Acquirer, Representative or any other person or entity for failure or refusal to comply with such conflicting claims, notices, instructions, directions, requests, communications, papers or documents until the Escrow Agent is satisfied, in its sole discretion, that such conflicting claims, notices, instructions, directions, requests, communications, papers or documents have been definitively determined by a final, non-appealable order, judgment, decree or ruling of a court of competent jurisdiction or settled by agreement between the conflicting parties as evidenced in a writing satisfactory to the Escrow Agent.

      (n)   <u>Tax Issues.</u>  The parties acknowledge that the Escrow Agent does not have any interest in the Escrowed Property or the Escrow Account, but is serving only as escrow holder hereunder. Without limiting the foregoing, the Acquirer and each Shareholder shall be responsible for any taxes relating to the Escrowed Property, the Escrow Account and funds on deposit therein and the income and earnings thereon. Any disbursements of the Escrowed Property or payments from the Escrow Account shall be subject to withholding taxes and regulations then in force under the United States Federal Income Tax Code. For tax purposes, the Escrow Agent shall report all income and earnings from the investment of the Escrowed Property (i) to the extent such income or earnings are distributed by the Escrow Agent to any person or entity pursuant to this Escrow Agreement, as being allocated to such person or entity and (ii) otherwise, as set forth in joint written instructions provided by the Acquirer and Representative simultaneously with the execution and delivery of this Escrow Agreement. The Acquirer and each Shareholder will provide the Escrow Agent with appropriate forms for tax certifications, as requested by the Escrow Agent. This Section 7(n) shall survive the termination of this Escrow Agreement and the resignation or removal of the Escrow Agent.

      (o)   <u>Compliance With Process.</u>  Notwithstanding anything in this Escrow Agreement to the contrary, if at any time the Escrow Agent is served with any judicial or

administrative order, judgment, decree, writ or other form of judicial or administrative process which in any way affects the Escrow Agent, the Escrow Account or the Escrowed Property (including, without limitation, orders of attachment or garnishment or levies or injunctions), the Escrow Agent is authorized to comply therewith in any manner it deems appropriate, and shall be fully protected from doing so even if such order, judgment, decree, writ or process may be subsequently amended, modified, vacated or otherwise determined to be invalid or without legal force or effect.

(p)    Representations.

(i)    The Acquirer represents and warrants that it is a corporation duly organized, validly existing in good standing under its jurisdiction of organization. The Acquirer and Representative each represents and warrants, as to itself, that (A) it has all requisite power and authority to execute, deliver and perform its obligations under the Merger Agreement (in the case of Acquirer) and this Escrow Agreement, (B) each of the Merger Agreement (in the case of the Acquirer) and this Escrow Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid, binding and enforceable obligations and (iii) the execution, delivery and performance by it of the Merger Agreement (in the case of the Acquirer) and this Escrow Agreement do not and will not violate or require consent under any of its organizational documents, any law, statute, rule, regulation or ordinance or contract, agreement, instrument, indenture or other undertaking to which it is a party or by which it or its property may be bound. Representative further represents and warrants that it has the irrevocable right, power and authority to act on behalf of and bind all of the Shareholders, to give and receive notices, instructions, directions, requests or other communications hereunder and to make determinations that may be necessary or appropriate under this Escrow Agreement.

(ii)    The Escrow Agent represents and warrants that (A) it is a limited liability company, duly organized, validly existing in good standing under its jurisdiction of organization, (B) it has all requisite power and authority to execute, deliver and perform its obligations under this Agreement, (C) this Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid, binding and enforceable obligation, and (D) the execution, delivery and performance by it of this Agreement do not and will not violate or require consent under any of its organizational documents, any law, statute, rule, regulation or ordinance or contract, agreement, instrument, indenture or other undertaking to which it is a party or by which it or its property may be bound.

(q)    Merger Clause. This Escrow Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof, and supersedes any prior oral or written agreements in regard thereto.

(r)    Cumulative Remedies. The rights and remedies of the Escrow Agent set forth in this Escrow Agreement shall be cumulative, and not exclusive, of any rights and remedies available to it at law or equity or otherwise.

NY01/STONM/994228.9

EXECUTION COPY

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement by their duly authorized officers as of the day and year above written.

CTC COMMUNICATIONS GROUP, INC.

By: _____
Name: James Prenetta, Jr.
Title: Secretary + General Counsel

Address for Notices:

     220 Bear Hill Road
     Waltham, Massachusetts 02451
     Telephone: (781) 522-8773
     Facsimile: (781) 522-8711
     Attention: James P. Prenetta, Jr., Senior Vice
     President and General Counsel

STOCKHOLDER REPRESENTATIVE COMMITTEE

_____
STEPHAN OPPENHEIMER

_____
JAMES HOUGHTON

_____
KEVIN O'HARE

Address for Notices:

     Stephan Oppenheimer
     JP Morgan Partners
     1221 Avenue of the Americas
     39th Floor
     New York, NY 10020

     James D. Houghton
     c/o Megunticook Management
     137 Newbury Street
     Boston, MA 02116

     Kevin O'Hare
     48 Steeplechase Drive
     Doylestown, PA 18901

With a copy to:

     Kleinbard Bell & Brecker LLP
     1900 Market Street, Suite 700
     Philadelphia, PA 19103
     Attention: Ralph J. Mauro, Esq.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement by their duly authorized officers as of the day and year above written.

CTC COMMUNICATIONS GROUP, INC.

By:_____

Name:

Title:

Address for Notices:

220 Bear Hill Road
Waltham, Massachusetts 02451
Telephone: (781) 522-8773
Facsimile: (781) 522-8711
Attention: James P. Prenetta, Jr., Senior Vice
President and General Counsel

STOCKHOLDER REPRESENTATIVE COMMITTEE

_____

STEPHAN OPPENHEIMER

_____

JAMES HOUGHTON

_____

KEVIN O'HARE

Address for Notices:

Stephan Oppenheimer
JP Morgan Partners
1221 Avenue of the Americas
39th Floor
New York, NY 10020

James D. Houghton
c/o Megunticook Management
137 Newbury Street
Boston, MA 02116

Kevin O'Hare
48 Steeplechase Drive
Doylestown, PA 18901

With a copy to:

Kleinbard Bell & Brecker LLP
1900 Market Street, Suite 700
Philadelphia, PA 19103
Attention: Ralph J. Mauro, Esq.

EXECUTION COPY

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement by their duly authorized officers

as of the day and year above written.

CTC COMMUNICATIONS GROUP, INC.

By:_____
     Name:
     Title:

     Address for Notices:

         220 Bear Hill Road
         Waltham, Massachusetts 02451
         Telephone: (781) 522-8773
         Facsimile: (781) 522-8711
         Attention: James P. Prenetta, Jr., Senior Vice
         President and General Counsel

STOCKHOLDER REPRESENTATIVE COMMITTEE

STEPHAN OPPENHEIMER

JAMES HOUGHTON

KEVIN O'HARE

     Address for Notices:

         Stephan Oppenheimer
         JP Morgan Partners
         1221 Avenue of the Americas
         39th Floor
         New York, NY 10020

         James D. Houghton
         c/o Megunticook Management
         ~~137 Newbury Street~~
         Boston, MA 02116
         *After June 1, 2005:*
         *143 Newbury Street, Floor 6*

         Kevin O'Hare
         48 Steeplechase Drive
         Doylestown, PA 18901

     With a copy to:

         Kleinbard Bell & Brecker LLP
         1900 Market Street, Suite 700
         Philadelphia, PA 19103
         Attention: Ralph J. Mauro, Esq.

EXECUTION COPY

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement by their duly authorized officers as of the day and year above written.

CTC COMMUNICATIONS GROUP, INC.

By:_____
      Name:
    Title:

Address for Notices:

    220 Bear Hill Road
    Waltham, Massachusetts 02451
    Telephone: (781) 522-8773
    Facsimile: (781) 522-8711
    Attention: James P. Prenetta, Jr., Senior Vice
    President and General Counsel

STOCKHOLDER REPRESENTATIVE COMMITTEE

_____
STEPHAN OPPENHEIMER

_____
JAMES HOUGHTON

_____
KEVIN O'HARE

Address for Notices:

    Stephan Oppenheimer
    JP Morgan Partners
    1221 Avenue of the Americas
    39th Floor
    New York, NY 10020

    James D. Houghton
    c/o Megunticook Management
    137 Newbury Street
    Boston, MA 02116

    Kevin O'Hare
    48 Steeplechase Drive
    Doylestown, PA 18901

With a copy to:

    Kleinbard Bell & Brecker LLP
    1900 Market Street, Suite 700
    Philadelphia, PA 19103
    Attention: Ralph J. Mauro, Esq.

MELLON INVESTOR SERVICES LLC,
as Escrow Agent

By: *Michael J Battista*

Name: Michael J Battista

Title: Events Manager

TEL: 201-329-8285

Address for Notices:

85 Challenger Road
Ridgefield Park, New Jersey 07660
Attention:
Facsimile:

## **EXHIBIT A**- Wire Instructions

Mellon Bank
ABA 043000261
A/C Reorg Cash
A/C # 1002331
RE:  Lightship Holdings, Inc.
Attn:  Evelyn O'Connor
Tel:  201-296-4515

Exhibit 5

## CLOSING AGREEMENT

THIS CLOSING AGREEMENT (this "**Agreement**"), is entered into as of the 20th day of May, 2005, by and among CTC COMMUNICATIONS GROUP, INC., a Delaware corporation ("**CTC**"), CTC COMMUNICATIONS ACQUISITION CORP., a Delaware corporation and a wholly-owned Subsidiary of CTC ("**Merger Sub**"), and LIGHTSHIP HOLDING, INC., a Delaware corporation ("**Holding**").

## W I T N E S S E T H :

WHEREAS, CTC, Merger Sub and Holding entered into that certain Agreement and Plan of Merger, dated as of March 21, 2005 (the "**Merger Agreement**", with capitalized terms used but not otherwise defined herein having the respective meanings given to them in the Merger Agreement), pursuant to which Merger Sub is to merge with and into Holding on the terms and subject to the conditions set forth in the Merger Agreement; and

WHEREAS, closing of the transactions contemplated by the Merger Agreement is occurring on the date hereof, and in connection therewith, the Parties desire to set forth their understandings regarding certain matters set forth herein;

NOW THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and intending to be legally bound, the Parties agree as follows:

1.    Closing Date.  Pursuant to Section 2(b) of the Merger Agreement, Closing of the Transactions is occurring as of the date hereof, which date shall constitute the "Closing Date" under the Merger Agreement.

2.    Termination of Plan.  CTC hereby waives the condition to the obligations of the CTC Entities to consummate the Merger set forth in Section 7(b)(xi) of the Merger Agreement to the extent, and only to the extent, such provision requires Holding, prior to the Closing, to terminate, or cause to be terminated, the 401(k) plan.

3.    Working Capital.

   a.    Attached hereto as Exhibit 1 is the Parties' agreed-upon determination of the "Required Working Capital Amount" as referred to in Section 2(f)(iv)(D) of the Merger Agreement.

   b.    Attached hereto as Exhibit 2 is the Lightship Estimate delivered by Lightship on May 17th, 2005.  Attached hereto as Exhibit 3 is the revised Disagreement Notice of CTC, which replaces the original Disagreement Notice provided by CTC on May 18th, 2005, and which shall be deemed delivered by CTC as of May 18th, 2005, in accordance with Section 2(f)(ii) of the Merger Agreement.

4.    Appraisal Rights.  Holding represents and warrants to CTC that Holding is not aware of any stockholder of Holding that has demanded or intends to demand an appraisal for

any of such stockholder's Holding Shares as contemplated by the provisions of Section 2(d)(ix) of the Merger Agreement.

5.    Supplemental Disclosure.  CTC hereby waives the condition to the obligations of the CTC Entities to consummate the Merger set forth in Section 7(b)(iii) of and Section 7(b)(xiv) of the Merger Agreement to the extent, and only to the extent, the Officer's Certificate delivered by Holding pursuant to Section 7(b)(xiv) of the Merger Agreement does not conform to the requirements of said Section 7(b)(iii) and Section 7(b)(xiv); *provided, however*, that none of the CTC Indemnified Parties waives any right to indemnification under Section 8 of the Merger Agreement based upon, incurred in connection with, arising out of or otherwise in respect of any of the matters referred to in said Officer's Certificate.

6.    Representations of the Parties.  Each Party represents that (a) it has the requisite power and authority to enter into this Agreement, (b) the execution and delivery by it of this Agreement have been authorized by all necessary action on its part, and (c) this Agreement has been duly executed and delivered by it and, assuming this Agreement constitutes the legal, valid and binding obligation of the other Parties, constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except to the extent such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditor's rights generally, and (ii) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity).

7.    Construction of Agreement.  The Parties acknowledge and agree that this Agreement constitutes a Transaction Document for all purposes of the Merger Agreement and the other Transaction Documents.  In the event of any conflict or inconsistency between any provision of this Agreement and any provision of the Merger Agreement, the provisions of this Agreement shall govern and control.  Except as expressly stated herein, the Merger Agreement is hereby ratified and confirmed and shall continue unmodified and in full force and effect. Without limiting the foregoing, no provisions of the Merger Agreement or any other Transaction Document, and no rights or remedies of any Party relating to any thereof, are amended, modified, waived, diminished or impaired, other than to the extent expressly set forth in this Agreement.

8.    Governing Law; Counterparts.  This Agreement shall be governed by and construed in accordance with the substantive Laws of the State of New York without giving effect to any choice or conflict of Law provision (whether of the State of New York or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New York.  This Agreement may be executed in counterparts (including by means of facsimile), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

*[signature page follows]*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**CTC COMMUNICATIONS GROUP, INC.**

By: _____
Name: Kenneth D. Peterson, Jr.
Title: CEO

**CTC COMMUNICATIONS ACQUISITION CORP.**

By: _____
Name: James Preston
Title: President

**LIGHTSHIP HOLDING, INC.**

By: _____
Name:
Title:

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**CTC COMMUNICATIONS GROUP, INC.**

By: _____
    Name:
    Title:

**CTC COMMUNICATIONS ACQUISITION CORP.**

By: _____
    Name:
    Title:

**LIGHTSHIP HOLDING, INC.**

By: _K____ MC____ CB Paident CEC___
    Name: Kevin M Chan
    Title: President y CEO

<u>Exhibit 1</u>

$726,228.00

Exhibit 2



1 Executive Park Drive
Bedford, NH 03110

603.314.2000   phone
603.314.6420   fax

www.lightship.com

CTC Communications Corp.
220 Bear Hill Road
Waltham, MA 02451
*Attention: James P. Prenetta, Jr., Senior Vice President and General Counsel*

  Re: Lightship Estimate

Ladies and Gentlemen:

  Reference is hereby made to that certain Agreement and Plan of Merger dated as of March 21, 2005, by and among CTC Communications Corp., CTC Communications Acquisition Corp., and Lightship Holding, Inc. ("Merger Agreement"). Pursuant to Section 2(f)(i) of the Merger Agreement, Holding hereby delivers to CTC the Lightship Estimate, together with supporting documents, work papers, and other data setting forth in reasonable detail Holding's calculation of the Lightship Estimate, and the undersigned Chief Financial Officer of Holding hereby certifies that the Lightship Estimate was calculated in accordance with the provisions of Section 2(f) of the Merger Agreement.

  IN WITNESS WHEREOF, the undersigned has executed this Certificate as of the 17th day of May, 2005.

      LIGHTSHIP HOLDING, INC.,
      a Delaware corporation

      By: _____
      Name: William A. Wilson
      Title: Chief Financial Officer

**Required Working Capital - Projection**
**Lightship Teleoom**
**Projected as of May 20, 2005**

| | Aggregate Cost of DSLAMs | Number of DSLAMS Acquired | Total DSLAMs Required | Required Working Capital |
|---|---|---|---|---|
| | | | | $ 750,000 |
| **Plus:** | | | | |
| An amount equal to the sum of (a) the amount actually paid for DSLAM configurations installed as of February 1, 2005 in the Company's network, divided by the number of installations, times (ii) 64 | $ 128,046 | 17 | 64 | 482,056 |
| **Minus:** | | | | |
| An amount equal to the sum of (a) the amount actually paid for all DSLAM configurations installed or ordered and held in inventory up to the Closing Date, plus (b) any amount accrued in short term Liabilities as of the Closing Date for all DSLAM: | | | | |
| Configurations installed or ordered and held in inventory: | | | | |
| Paid through February 1, 2005 | 128,046 | 17 | | |
| Paid from February 1 - May 20, 2005 | 113,833 | 15 | | |
| Amount accrued for DSLAMs in short term liabilities as of Closing Date | 263,950 | 32 | | |
| | $ 505,829 | 64 | | (505,829) |
| **Projected Required Working Capital** | | | | $ 726,228 |

**Lightship Telecom**
**DSLAM Buildout Plan**
**2005**

|  | DSLAMs Acquired |  | Cost |
|---|---|---|---|
| Through February 1, 2005 | 17 | $ | 128,046 |
| February 2 - May 20, 2005 | 15 |  | 113,833 |
| Amount accrued for DSLAMs in short term liabilities as of Closing Date | 32 |  | 263,950 |
| Project total | 64 | $ | 505,828 |

Configurations

| LOCATION | CHASSIS | SCU | CSM | OCTAL IMA | DS3PSM | PCU | BNC I/O | |
|---|---|---|---|---|---|---|---|---|
| Unit Cost | $857.89 | $787.37 | $2,421.05 | $1,000.00 | $3,229.47 | $829.47 | $102.13 | |
| *Config 1* | 1 | 1 | 2 | 1 | | | | $7,487.36 |
| *Config 2* | 1 | | | | 2 | 1 | 1 | $8,248.43 |

| | | |
|---|---|---|
| Prior to Feb 1 | 17 | $128,046.19 |
| Feb 1 - May 20 | 15 | $113,832.54 |
| Accrued at May 20 | 32 | $263,949.76 |
| Total Spend Plan | | $505,828.49 |

**Lightship Telecom**
**Projection of Actual Working Capital**
As of May 17, Projected through May 20, 2006

| | Actual April | Operational Adjustments | Prior to Transaction Costs 20-May | Transactional Adjustments | Balance at Closing 20-May |
|---|---|---|---|---|---|
| **Current Assets:** | | | | | |
| Cash | $ 4,620,078 | (1,338,740) | $ 3,281,338 | (2,206,951) | $ 1,074,387 |
| Accounts receivable, net of allowances for doubtful accounts | 4,667,270 | 1,599,367 | 6,166,637 | - | 6,166,637 |
| Unbilled revenues | 1,800,848 | - | 1,800,848 | - | 1,800,848 |
| Current portion of installation charges, net | 512,726 | - | 512,726 | - | 512,726 |
| Prepaid expenses and other assets | 2,741,887 | (214,193) | 2,527,364 | (558,680) | 1,968,714 |
| Total current assets | 14,242,810 | 46,434 | 14,288,944 | (2,765,631) | 11,523,313 |
| | | | | | |
| **Current Liabilities:** | | | | | |
| Accounts payable | $ 4,005,277 | (205,656) | $ 3,799,621 | - | $ 3,799,621 |
| Accrued payroll | 1,088,301 | (803,536) | 264,765 | - | 264,765 |
| Accrued expenses | 3,905,639 | - | 3,905,639 | (346,587) | 3,558,852 |
| Deferred revenues | 691,684 | 768,400 | 1,460,083 | - | 1,460,083 |
| Total current liabilities | 9,680,901 | (240,793) | 9,420,008 | (346,587) | 9,073,422 |
| | | | | | |
| **Actual Working Capital** | $ 4,561,709 | 287,227 | $ 4,868,936 | (2,419,044) | $ 2,449,892 Projected |
| | | | | | 728,228 Required WC |
| | | | | | $ 1,723,664 Excess |

**NOTES:**

**Operational Adjustments**

Cash        (1,338,740) Net of cash collected and disbursed through 5/13.  Source Daily Cash Balance.  All Updates have $0.00 impact to working cap
AR           1,599,367  AR from feeds minus amounts collected through May 13th.  Source for AR is AR Build tab.  Source for collections is Daily Cash Balance.  Every dollar in reduces AR dollar for dollar.
Prepaid      (214,193)  Two events. 1.) An increase in prepaids related to Jamison D&O.  Source invoice. 2.) Reversal of Short Term Loan origination fees which will disappear upon closing.  Source internal balance sheet.

AP           (205,658)  Projected 15 business days of expenses minus those amounts disbursed.  Source Forecast Model and Daily Cash Balance
Accrued Payro (603,536) Represents the reversal of the 2004 Bonus accrual and amount to adjust over accrual for a May 20th closing.  Source Internal balance sheet, and Payroll.
Deferred Rev.  758,400  Amount increased to reflect the unearned revenues related to the 15th billing cycle.  Offset in AR.  Source May 15th Billing for May 20

Total         287,227

**Transactional Adjustments**

Cash        (2,206,651) Represent cash items related specifically to the closing.  I.E. Legal bills, Ernst & Young, Q Advisors etc.  See detail below.  Source Invoices and estimates
Prepaids      (558,690) This is simply the reversal of prepaid assets related to the transaction that Lightahly had already paid for.  Source Invoice

Accrued Exp.  (346,587) Accrued expenses related to the close, mostly legal.  See below for detail.  Source Invoices

Detail

**Operational Adjustments**

**Cash**
Posted to Trade         1,605,407  Cash Balance
Customer EFTS              43,947  Cash Balance
Mail/Misc                 28,834  Cash Balance
Verizon CABS/RC        1,013,543  Cash Balance
MTD all disbursements (actual time $ (2,798,630) Cash Balance
Other carriers:          (251,306) Cash Balance
Bonus                    (669,530) Cash Balance / Payroll
Employee expenses         (30,000) Estimated cash disbursement - Dollar for dollar reduction to AP
Taxes                     (10,000) Estimated cash disbursement - Dollar for dollar reduction to AP
Billing                   (20,000) Estimated cash disbursement - Dollar for dollar reduction to AP
Marketing                 (50,000) Estimated cash disbursement - Dollar for dollar reduction to AP
Other                      (5,000) Estimated cash disbursement - Dollar for dollar reduction to AP
Maintenance Contracts    (124,000) Estimated cash disbursement - E-Mail for D&O
Insurance (Jamison)       (16,000) Estimated cash disbursement - E-mail
EAY Bill                  (25,000) Estimated cash disbursement
CAPEX
Total          $ (1,338,740)

**AR**
Projections             4,289,098  Projections based off of billing cycles.  See AR Build
Posted to Trade        (1,605,407) Cash Balance Sheet
Customer EFTS             (43,947) Cash Balance Sheet
Mail/Misc                (28,834) Cash Balance Sheet
Verizon CABS/RC        (1,013,543) Cash Balance Sheet
              $ 1,599,367

**Prepaid Assets**
Insurance (Jamison)       124,000  Invoice
Reversal of Loan Origination Fees (338,193) Internal Balance sheet
              $ (214,193)

**Accounts Payable**

| | | |
|---|---|---|
| Projections | 2,959,279 | Projections, 15 business days |
| MTD all disbursements (actual thru t | (2,798,630) | Cash Balance Sheet |
| Other carriers | (251,308) | Cash Balance Sheet |
| Employee expenses | (30,000) | Estimated - Offset by Cash from Above |
| Taxes | | Estimated - Offset by Cash from Above |
| Billing | (10,000) | Estimated - Offset by Cash from Above |
| Marketing | (20,000) | Estimated - Offset by Cash from Above |
| Other | (50,000) | Estimated - Offset by Cash from Above |
| Maintenance Contracts | (5,000) | Estimated - Offset by Cash from Above |
| | $ (205,665) | |

**Accrued payroll**

| | | |
|---|---|---|
| Payroll Accrual | (104,000) | Balance sheet and Payroll - Over estimate of Accrual |
| 2004 Bonus | (699,535) | From Payroll |
| | $ (803,535) | |

**Deferred revenues**

| | | |
|---|---|---|
| Deferral Estimate | $ 768,400 | Based on May 15th Invoice (5 day period) |

***Transactional Adjustment***

**Cash**

| | | |
|---|---|---|
| Kleinberg - Legal Bills, still to be paid | | |
| Invoice 4/15 Unpaid | (113,882) | Invoice on my desk |
| Estimate for Remainder | (92,262) | Estimate via email |
| Swidler - Legal Bills, still to be paid | | |
| Invoice 4/22 Unpaid | (27,879) | Invoice on my desk |
| Estimate for Remainder | (20,000) | Estimate via email |
| Edwerds & Angela - To be paid to Magulicook & E&A | | |
| Invoice 2/11 Unpaid | (1,877) | Invoice |
| Invoice 3/21 Unpaid | (14,016) | Invoice |
| Invoice 4/12 Unpaid | (33,804) | Invoice |
| Estimate for Remainder | (7,000) | Estimate via email |
| Taxes related to Options | (6,757) | Estimate based on 6.66% |
| E&Y | (70,000) | From E&Y |
| Q | (782,849) | From Michelle |
| Paying Agent | (14,237) | From Michelle |
| Escrow Agent | (19,750) | Estimate, Liz |
| 401K Term | (1,510) | From Michelle |
| O'Hare | (466,200) | From Michelle |
| Bonus True Up | (535,030) | From Michelle + Taxes |
| | $ (2,206,961) | |

## Prepaid Assets

| | | |
|---|---:|---|
| **Kleinbard - Legal Bills, still to be paid** | | |
| TRX Date 1/13 | (2,234) | Invoice |
| TRX Date 1/17 | (6,454) | Invoice |
| TRX Date 2/22 | (2,429) | Invoice |
| TRX Date 1/13 | (61,597) | Invoice |
| Invoice 3/21 In Accrued | (61,981) | Invoice |
| Invoice 4/15 Unpaid | (113,882) | Invoice |
| Estimate for Remainder | (75,000) | Over accrual - Difference between Cash and Prepaid |
| **Swidler - Legal Bills, still to be paid** | | |
| Invoice 2/24 Paid | (5,834) | Invoice |
| Invoice 3/21 In Accrued | (6,988) | Invoice |
| Invoice 4/22 Unpaid | (27,878) | Invoice |
| Estimate for Remainder | (60,000) | Over accrual - Difference between Cash and Prepaid |
| **Edwards & Angels - To be paid to Meguitcook & E&A** | | |
| Invoice 2/11 Unpaid | (1,877) | Invoice |
| Invoice 3/21 Unpaid | (14,016) | Invoice |
| Invoice 4/12 Unpaid | (33,934) | Invoice |
| Estimate for Remainder | (40,000) | Over accrual - Difference between Cash and Prepaid |
| O- | (64,965) | Invoice |
| | $ (588,880) | |

## Accrued expenses

| | | |
|---|---:|---|
| **Kleinbard - Legal Bills, still to be paid** | | |
| Invoice 4/15 Unpaid | (113,882) | Invoice |
| Estimate for Remainder | (75,000) | Over accrual - Difference between Cash and Prepaid |
| **Swidler - Legal Bills, still to be paid** | | |
| Invoice 4/22 Unpaid | (27,878) | Invoice |
| Estimate for Remainder | (60,000) | Over accrual - Difference between Cash and Prepaid |
| **Edwards & Angels - To be paid to Meguitcook & E&A** | | |
| Invoice 2/11 Unpaid | (1,877) | Invoice |
| Invoice 3/21 Unpaid | (14,016) | Invoice |
| Invoice 4/12 Unpaid | (33,934) | Invoice |
| Estimate for Remainder | (40,000) | Over accrual - Difference between Cash and Prepaid |
| O'Hare | 20,000 | Michelle |
| | $ (346,587) | |

Exhibit 3



## SECTION 2(f)(ii) DISAGREEMENT NOTICE

May 18, 2005

Lightship Holding, Inc.
1301 Virginia Drive, Suite 440
Fort Washington, PA 19034
Attention: Kevin M. O'Hare, President and Chief Executive Officer

**Re:  CTC Communications Group Objections to Lightship's Estimate**

Dear Sirs:

In accordance with the requirements of Section 2(f)(ii) of the Merger Agreement, dated March 21, 2005 (the "**Merger Agreement**"), by and among CTC Communications Group, Inc. ("**CTC**"), CTC Communications Acquisition Corp. and Lightship Holding, Inc., CTC hereby (i) submits the attached Disagreement Notice, together with supporting documents, work papers and other data setting forth, in reasonable detail, CTC's objections to the Lightship Estimate, and (ii) the undersigned Chief Financial Officer/Treasurer of CTC hereby certifies that the attached Disagreement Notice has been delivered in accordance with the requirements of Section 2(f) of the Merger Agreement.

All Capitalized terms used in this letter and/or the attached Disagreement Notice and not otherwise defined have the meaning given such terms in the Merger Agreement.

**IN WITNESS WHEREOF**, the undersigned has executed this certificate as of the 18th day of May 2005.

**CTC COMMUNICATIONS GROUP, INC.**

By: _____
Name:  John D. Pittenger
Title:  Chief Financial Officer and Treasurer

**BASIS FOR POSITION THAT USF IS REQUIRED TO BE IMPOSED ON THE TRANSPORT PORTION OF INTERNET SERVICES**

As part of the diligence process, CTC became aware that Lightship was not charging USF on the transport portion (DSL circuit or T-1 circuit) of its internet service product offerings. CTC believes that this position is incorrect and inconsistent with the FCC's stated position on the matter.   As backup for CTC's position, we provide the following support: (1) the FCC has determined that all revenues from the provision of interstate telecommunications services are subject to USF (*See* Federal-State Joint Board on Universal Service, CC Docket No. 96-45, Report to Congress, 13 FCC Rcd 11501, 11520, para 39 (rel Apr. 10, 1998), (2) consistent with the FCC's position on T-1 access, in 1998 the FCC declared that DSL services are interstate telecommunications services (*See* In the Matter of GTE Telephone Operating Cos., Memorandum Opinion and Order, 13 FCC Rcd. 22,466 (1998) and in 1999 the FCC confirmed that revenues generated by carriers who provision DSL services are subject to USF assessments (*See* In the Matters of Deployment of Wireline Services Offering Advanced Telecommunications Capability, CC Docket No. 98-147, FCC 99-330, Second Report and Order, 14 FCC Rcd 19237, 19247, Section 21 (released November 9, 1999), (3) the instructions for the completion of Line Item 418 of Section 4 (Explanation of Block 3 and Block 4-A Filer Revenue Categories, Other Revenue Categories) of FCC Form 499-A and the instructions for the completion of Line 404 of FCC Form 499-A relating to bundled offerings (page 21 of the instructions), (4) in 2002, the FCC issued a Notice of Proposed Rulemaking questioning whether to change its stated position that DSL service revenues are interstate telecommunications service revenues eligible for inclusion in a carrier's USF revenue base – no change was implemented by the FCC (*See* Comments Sought on Appropriate Framework for Broadband Access to Internet Over Wireline Facilities; Universal Service Obligations of Broadband Providers; Computer III Further Remand Proceedings, Notice of Proposed Rulemaking, DA 02-485, CC 98-10, CC 02-33, CC 95-20, 17 FCC Rcd. 3706, rel Feb 28, 2002), and (5) in September 2004 (and in 2003) the FCC demonstrated that it will go after companies that fail to pay applicable USF on DSL and providers of broadband internet access services (*See,* the FCC's website and enforcement actions against NALs and Globcom and see In the Matter of New Edge Networks, Inc., Order and Consent Decree, File No. EB-04-IH-0157, 19 FCC Rcd 17,689 (2004)).

|  | Balance at closing May 20 per Lightship estimate | Adjustments per attached | Adjusted working capital |
|---|---|---|---|
| **Current Assets:** | | | |
| Cash | 1,074,387 | | 1,074,387 |
| Accounts Receivable | 6,166,637 | (129,919) | 6,036,718 |
| Unbilled revenues | 1,800,848 | | 1,800,848 |
| Current portion of installation charges | 512,726 | | 512,726 |
| Prepaid expenses | 1,968,714 | (892,926) | 1,075,788 |
| Total Current assets | 11,523,313 | (1,022,845) | 10,500,468 |
| | | | |
| **Current Liabilities** | | | |
| Accounts payable | 3,799,621 | 35,700 | 3,835,321 |
| Accrued payroll | 254,765 | | 254,765 |
| Accrued expenses | 3,558,952 | 367,233 | 3,926,185 |
| Deferred revenues | 1,460,083 | | 1,460,083 |
| Total current Liabilities | 9,073,421 | 402,933 | 9,476,354 |
| | | | |
| **Actual Working Capital** | 2,449,892 | (1,425,778) | 1,024,114 |
| | | | |
| **Required Working Capital** | 726,228 | | 726,228 |
| | | | |
| **Excess/(Under)** | 1,723,664 | | 297,886 |