# Exhibit 6

**STATE OF MAINE**
**PUBLIC UTILITIES COMMISSION**
**CASE SUMMARY FORM**

Docket No: 2002-177 _____ Reporting Category: COMMUNICATIONS _____

Filer: **VERIZON - MAINE** _____

Case Type: REQUEST FOR APPROVAL OF INTERCONNECTION AGREEMENT _____

Addendeum: WITH LIGHTSHIP TELECOM, LLC _____

_____

_____

Statute: _____ Reference/Rule: TEL.. ACT. '96 ___ Cross Docket No: _____

Filed: 04-01-2002 _____ Notice of Intent to File: _____ % increase: _____

Due Dates: 1st Suspension: _____ 60/120 Day Suspension _____

ARP/AMP Suspension: _____ Rule Comments: _____ AG Approval: _____

Mail Log: Notice of Rulemaking/Complaint/investigation Issued: _____

Newspaper Notice Required: _____ Code: ICA _____ Priority Level: 3 _____

NOTE/COMMENTS: 90 DAY DEADLINE JUNE 30, 2002 _____

CONFIDENTIAL MATERIAL ENCLOSED: ___YES X NO

DELEGATED AUTHORITY TO: _____ TA _____ FIN _X___ NONE _____ CAD

## ASSIGNMENTS*

| | NON-ADJUDICATORY | | | ADJUDICATORY | | |
|---|---|---|---|---|---|---|
| | CP | STAFF | CP | ADVISORS | CP | ADVOCATES |
| LEGAL | | | | | | |
| FINANCE | | SHIFMAN - CL | | | | |
| TA | X | SUKASKAS - SET W/DSK | | | | |
| CAD | | | | | | |
| REVIEWER | | KANIA | | | | |
| EXTERNAL MAILINGS | | | | | | |

*General Counsel will indicate whether the case is initially expected to be adjudicatory or non-adjudicatory. Non-adjudicatory cases are cases in which there is not a right to a hearing or cases where a hearing is not expected to be necessary. (Examples include: routine financing cases, single tariff filings, rulemakings, advisory rulings).

185 Franklin Street, Room 1403, Boston, MA 02110
Tel (617) 743-5769
Fax (617) 737-0648
donald.w.boecke@verizon.com

**Donald W. Boecke**
General Counsel – Maine



March 29, 2002

**BY OVERNIGHT MESSENGER**
Dennis L. Keschl, Administrative Director
State of Maine, Public Utilities Commission
242 State Street, State House Station 18
Augusta, Maine 04333-0018

      RE:   Interconnection Agreement between Verizon Maine and
              Lightship Telecom, LLC

Dear Mr. Keschl:

     Enclosed for filing under Section 252(i) of the Telecommunications Act of 1996 is the
adoption by Lightship Telecom, LLC of an interconnection agreement between Verizon New
York Inc., and Level 3 Communications LLC which was approved by the New York Public
Service Commission on April 27, 2001, in Docket No. 01-C-0148. As a courtesy, enclosed is an
electronic copy of the adoption letter and the Level 3 Communications Agreement on disk.

     Also enclosed for Commission approval pursuant to Section 252(e) is an Amendment
No. 1 supplying certain interconnection terms and provisions that are not covered by Lightship's
adoption of the Level 3 agreement. An electronic copy of Amendment No. 1 is also provided on
disk.

     Section 252 (e)(4) of the Act specifies that if a state agency does not act to approve
or reject an agreement reached by negotiation within 90 days following the filing, the
agreement shall be deemed approved. In view of the short time period provided for
Commission review, Verizon Maine requests that the Commission promptly give public
notice of the filing and provide interested persons an opportunity to file comments and
permit Verizon Maine and Lightship Telecom, LLC to submit reply comments, if
necessary.

     Questions the Commission or other interested persons may have regarding this filing
may be directed to the undersigned. Kindly include the representative for Lightship Telecom,

-2-

LLC on the distribution of any notices, orders or other materials issued by the Commission at the following address:

John Lozzi
Vice President – Marketing & Regulatory Affairs
Lightship Telecom, LLC
1301 Virginia Drive, Suite 120
Ft. Washington, PA  19034
Tel:  215-641-1874
Fax:  215-641-0531

Thank you for your assistance in this matter.

Very truly yours,

Donald W. Boecke

cc:    William Black, Esq.
       John Lozzi

# SWIDLER BERLIN SHEREFF FRIEDMAN, LLP

3000 K STREET, NW, SUITE 300
WASHINGTON, DC 20007-5116
TELEPHONE (202) 424-7500
FACSIMILE (202) 424-7645
WWW.SWIDLAW.COM

HARRY N. MALONE III
DIRECT DIAL (202) 424-7705
HNMALONE@SWIDLAW.COM

NEW YORK OFFICE
405 LEXINGTON AVENUE
NEW YORK, NY 10174
(212) 758-9500 FAX (212) 758-9526

February 28, 2002

**VIA OVERNIGHT DELIVERY**

Steven J. Pitterle
Director - Negotiations
Verizon Communications
600 Hidden Ridge HQE03B67
Irving, Texas 75038

Re:     Lightship Telecom LLC Adoption of the Interconnection Agreement between
Verizon – New York, Inc. and Level 3 Communications LLC Pursuant to
Section 252(i)

Dear Mr. Pitterle:

We are enclosing herewith two partially executed signatures pages of the Adoption Letter ("Letter") that was sent to Lightship, via electronic mail, on January 16, 2002 for counter-signature by Verizon.

Lightship has signed the enclosed Letter prepared by Verizon to signify that it agrees *only* with points 1(A), 1(B), and 1(C) on pages 1 and 2 of the Letter. Lightship understands the balance of the Letter to be simply a statement of Verizon's position on various issues. Lightship does not agree with, and is not bound by, Verizon's statement of position, although Lightship does agree that neither party shall be deemed to have waived any rights by signing the Letter.

Lightship's execution of the adoption letter shall not be construed as, nor is it intended to be, a concession, waiver, stipulation, admission, or other evidence that any provision of the Letter complies with the rights and duties imposed by the Act, decisions and orders of the FCC, decisions and orders of the Department, the decisions of federal or state courts, or other applicable law. Lightship expressly reserves its full right to assert and pursue any claims, in any forum of competent jurisdiction, including but not limited to those arising from or related to the Agreement, the Act, and FCC or [STATE] Public Service Commission ("Commission") orders.

Please arrange to have Verizon sign these pages, return one original to us, and file a copy of the other with the Commission as soon as possible. Since it is Verizon's intention to file the

Mr. Pitorie
January 24, 2002
Page 2

Adoption Letter along with the Agreement itself, Lightship requests that Verizon attach this letter to the filing as well. In addition, please instruct the Verizon attorneys who are responsible for filing the Adoption Letter and Agreement with the Commission to identify the undersigned as counsel of record in the filing. Of course, we will appreciate a courtesy copy of all filings associated with the Adoption Letter and the Agreement.

Thank you in advance for your assistance in this matter.

Sincerely,

John Lozzi
Lightship Telecom LLC

Enclosures

cc:    Renee Ragsdale – Verizon (via overnight delivery)
       Annette Semler – Verizon (with originals of signature pages)

Jeffrey A. Masoner
Vice President — Interconnection Services Policy & Planning



Network Services
2107 Wilson Blvd., 11th Floor
Arlington, VA 22201

Telephone: 703/974-4610
Facsimile: 703/974-0314
jeffrey.a.masoner@verizon.com

January 16, 2002

John Lozzi
Lightship Telecom, LLC
Vice President — Marketing & Regulatory Affairs
1301 Virginia Drive, Suite 120
Ft. Washington, PA 19034

Re:  Requested Adoption Under the FCC Merger Conditions

Dear Mr. Lozzi:

Verizon New England Inc., d/b/a Verizon Maine, f/k/a New England Telephone and
Telegraph Company, d/b/a Bell Atlantic - Maine ("Verizon"), has received your letter
stating that, pursuant to paragraph 32 of the BA/GTE Merger Conditions ("Merger
Conditions"), released by the FCC on June 16, 2000 in CC Docket No. 98-184, Lightship
Telecom, LLC ("Lightship") wishes to provide services to customers in Verizon's service
territory in the State of Maine by adopting the voluntarily negotiated terms of the
Interconnection Agreement between Level 3 Communications, LLC ("Level 3")and
Verizon New York Inc., f/k/a New York Telephone Company ("Verizon New York")
that was approved by the New York Public Service Commission as an effective
agreement in the State of New York, as such agreement exists on the date hereof after
giving effect to operation of law (the "Verizon New York Terms").

I understand that Lightship has a copy of the Verizon New York Terms which, in any
case, are attached hereto as Appendix 1. Please note the following with respect to
Lightship's adoption of the Verizon New York Terms.

1.    By Lightship's countersignature on this letter, Lightship hereby represents and
      agrees to the following three points:

      (A)   Lightship agrees to be bound by and adopts in the service territory of
            Verizon, the Verizon New York Terms, as they are in effect on the date
            hereof after giving effect to operation of law, and in applying the Verizon
            New York Terms, agrees that Lightship shall be substituted in place of
            Level 3 Communications, LLC and Level 3 in the Verizon New York
            Terms wherever appropriate.

LIGHTSHIP-ME.DOC                              1

(B)   Notice to Lightship and Verizon as may be required or permitted under the Verizon New York Terms shall be provided as follows:

To Lightship:

> Attention: Kevin J. Ohare
> President and CEO
> 1301 Virginia Drive, Suite 120
> Ft. Washington, Pennsylvania 19034
> Telephone Number: 215-641-1875
> Facsimile Number: 215-641-0531
> Internet Address: kohare@lightshiptel.com

To Verizon:

> Director-Contract Performance & Administration
> Verizon Wholesale Markets
> 600 Hidden Ridge
> HQEWMNOTICES
> Irving, TX  75038
> Telephone Number: 972-718-5988
> Facsimile Number: 972-719-1519
> Internet Address: wmnotices@verizon.com

with a copy to:

> Vice President and Associate General Counsel
> Verizon Wholesale Markets
> 1320 N. Court House Road
> 8th Floor
> Arlington, VA  22201
> Facsimile:  703/974-0744

(C)   Lightship represents and warrants that it is a certified provider of local telecommunications service in the State of Maine, and that its adoption of the Verizon New York Terms will only cover services in the service territory of Verizon in the State of Maine.

2.   Lightship's adoption of the Verizon New York Terms shall become effective on January 23, 2002.  Verizon shall file this adoption letter with the Maine Public Utilities Commission ("Commission")  promptly upon receipt of an original of this letter, countersigned by an authorized officer of Lightship.  The Level 3/Verizon New York agreement is currently scheduled to terminate on September 30, 2002.

LIGHTSHIP-ME.DOC                                    2

3.  As the Verizon New York Terms are being adopted by Lightship pursuant to the Merger Conditions, Verizon does not provide the Verizon New York Terms to Lightship as either a voluntary or negotiated agreement. The filing and performance by Verizon of the Verizon New York Terms does not in any way constitute a waiver by Verizon of any position as to the Verizon New York Terms or a portion thereof. Nor does it constitute a waiver by Verizon of any rights and remedies it may have to seek review of the Verizon New York Terms, or to seek review of any provisions included in these Verizon New York Terms as a result of Lightship's election pursuant to the Merger Conditions.

4.  Lightship's adoption of the Verizon New York Terms pursuant to the Merger Conditions is subject to all of the provisions of such Merger Conditions. Please note that the Merger Conditions exclude the following provisions from the interstate adoption requirements: state-specific pricing, state-specific performance measures, provisions that incorporate a determination reached in an arbitration conducted in the relevant state under 47 U.S.C. Section 252, provisions that incorporate the results of negotiations with a state commission or telecommunications carrier outside of the negotiation procedures of 47 U.S.C. Section 252(a)(1), and provisions from the Level 3/Verizon New York agreement that are not required pursuant to Section 251(c) of the Telecommunications Act of 1996 (the "Act"). Verizon, however, does not oppose Lightship's adoption of the Verizon New York Terms at this time, subject to the following reservations and exclusions:

    (A)  Verizon's standard pricing schedule for interconnection agreements in Maine (as such schedule may be amended from time to time) (attached as Appendix 2 hereto) shall apply to Lightship's adoption of the Verizon New York Terms. Lightship should note that the aforementioned pricing schedule may contain rates for certain services the terms for which are not included in the Verizon New York Terms or that are otherwise not part of this adoption. In an effort to expedite the adoption process, Verizon has not deleted such rates from the pricing schedule. However, the inclusion of such rates in no way obligates Verizon to provide the subject services and in no way waives Verizon's rights under the Merger Conditions.

    (B)  Lightship's adoption of the Verizon New York Terms shall not obligate Verizon to provide any interconnection arrangement or unbundled network element unless it is feasible to provide given the technical, network and Operations Support Systems attributes and limitations in, and is consistent with the laws and regulatory requirements of the State of Maine and with applicable collective bargaining agreements.

    (C)  On January 25, 1999, the Supreme Court of the United States issued its decision on the appeals of the Eighth Circuit's decision in Iowa Utilities Board. The Supreme Court modified several of the FCC's and the Eighth Circuit's rulings regarding unbundled network elements and pricing

requirements under the Act. *AT&T Corp. v. Iowa Utilities Board*, 119 S. Ct. 721 (1999). Certain provisions of the Verizon New York Terms may be void or unenforceable as a result of the Supreme Court's decision of January 25, 1999, the United States Eighth Circuit Court of Appeals' decision in Docket No. 96-3321 regarding the FCC's pricing rules, and the current appeal before the Supreme Court of the United States regarding the FCC's UNE rules. Moreover, nothing herein shall be construed as or is intended to be a concession or admission by Verizon that any provision in the Verizon New York Terms complies with the rights and duties imposed by the Act, the decisions of the FCC and the Commissions, the decisions of the courts, or other law, and Verizon expressly reserves its full right to assert and pursue claims arising from or related to the Verizon New York Terms.

(D)    Lightship's adoption of the Verizon New York Terms does not include any provisions related to reciprocal compensation, which provisions are not subject to the interstate adoption requirements under the Merger Conditions. For example, reciprocal compensation provisions constitute state-specific pricing, which as described above, is exempt from the interstate adoption requirements in the Merger Conditions. Also, because the obligation to pay reciprocal compensation is found in Section 251(b)(5), reciprocal compensation provisions are outside the scope of Merger Conditions' requirement permitting adoptions of provisions required to be provided under Section 251(c). Moreover, even if the Merger Conditions were misconstrued as encompassing not only items subject to Section 251(c), but also items subject to Section 251(b), it would still not obligate Verizon to permit the interstate adoption of compensation terms pertaining to Internet Traffic. The FCC found that Internet Traffic constitutes "information access" outside the scope of the reciprocal compensation obligations set forth in Section 251(b)(5).[1] Thus, even if the Level 3/Verizon New York agreement has, or is mistakenly construed as containing, a voluntary commitment to pay compensation on Internet traffic, that commitment would be entirely outside the scope of the interstate adoption provisions of the Merger Conditions.[2] Please contact Verizon at your earliest convenience to supplement Lightship's adoption with an agreement regarding reciprocal compensation.[3]

---

[1] Order on Remand and Report and Order, In the Matters of: Implementation of the Local Competition Provisions in the Telecommunications Act of 1996 and Intercarrier Compensation for ISP-Bound Traffic, CC Docket No. 99-68 (rel. April 27, 2001) ("*FCC Remand Order*") ¶44.

[2] In addition, any reasonable amount of time permitted for adopting interconnection agreement provisions that invoke a compensation mechanism for internet traffic under the FCC's rules implementing section 252(i) of the Act (47 C.F.R. § 51.809(c)) has expired. These rules implementing section 252(i) of the Act apply to interstate adoptions under the Merger Conditions as well. *See, e.g.*, Merger Conditions ¶32 (such adoptions shall be made available "under the same rules that would apply to a request under 47 U.S.C. § 252(i)").

[3] For your convenience, an industry letter distributed by Verizon explaining its plans to implement the *FCC Remand Order* can be viewed at Verizon's Customer Support Website at URL www.verizon.com/wise (select Verizon East Customer Support, Resources, Industry Letters, CLEC).

(E)     Lightship's adoption does not include any terms that were arbitrated in the Verizon New York Terms.

5.     Verizon reserves the right to deny Lightship's adoption and/or application of the Verizon New York Terms, in whole or in part, at any time:

(A)     when the costs of providing the Verizon New York Terms to Lightship are greater than the costs of providing them to Level 3;

(B)     if the provision of the Verizon New York Terms to Lightship is not technically feasible;

(C)     if Verizon otherwise is not obligated to permit such adoption and/or application under the Merger Conditions or under applicable law.

6.     Should Lightship attempt to apply the Verizon New York Terms in a manner that conflicts with paragraphs 3-5 above, Verizon reserves its rights to seek appropriate legal and/or equitable relief.

In the event that a voluntary or involuntary petition has been or is in the future filed against Lightship under bankruptcy or insolvency laws, or any law relating to the relief of debtors, readjustment of indebtedness, debtor reorganization or composition or extension of debt (any such proceeding, an "Insolvency Proceeding"), then: (i) all rights of Verizon under such laws, including, without limitation, all rights of Verizon under 11 U.S.C. § 366, shall be preserved, and Lightship's adoption of the Verizon New York Terms shall in no way impair such rights of Verizon; and (ii) all rights of Lightship resulting from Lightship's adoption of the Verizon New York Terms shall be subject to and modified by any Stipulations and Orders entered in the Insolvency Proceeding, including, without limitation, any Stipulation or Order providing adequate assurance of payment to Verizon pursuant to 11 U.S.C. § 366.

Please arrange for a duly authorized representative of Lightship to sign this letter in the space provided below and return it to the undersigned.

Sincerely,

VERIZON NEW ENGLAND INC. D/B/A VERIZON MAINE

Jeffrey A. Masoner
Vice President – Interconnection Services Policy & Planning

Reviewed and countersigned as to points A, B, and C of paragraph 1:

LIGHTSHIP TELECOM, LLC

By _____

Title _____

Attachment

c:     Stephen Hughes - Verizon (w/out attachments)

LIGHTSHIP-ME                              6

INTERCONNECTION AGREEMENT

Dated as of November 1, 2000

by and between

VERIZON NEW YORK

F/k/a BELL ATLANTIC - NEW YORK

and

Level 3 Communications, LLC

Level 3/BELL ATLANTIC Interconnection Agreement for New York

## TABLE OF CONTENTS

Page

1.0   DEFINITIONS ................................................................................................................. 2

2.0   INTERPRETATION AND CONSTRUCTION ............................................................. 10

3.0   SCOPE ........................................................................................................................... 11

4.0   INTERCONNECTION AND PHYSICAL ARCHITECTURE ..................................... 11
      4.1   INTERCONNECTION ACTIVATION.............................................................................11
      4.2   TRUNK TYPES AND INTERCONNECTION POINTS ....................................................11
      4.3   PHYSICAL ARCHITECTURES.....................................................................................14
      4.4   ALTERNATIVE INTERCONNECTION ARRANGEMENTS...........................................15
      4.5   INTERCONNECTION IN ADDITIONAL LATAs ..........................................................16

5.0   TRANSMISSION AND ROUTING OF TELEPHONE EXCHANGE SERVICE TRAFFIC
(PURSUANT TO SECTION 251(C)(2)) AND COMPENSABLE INTERNET TRAFFIC ................................ 17
      5.1   SCOPE OF TRAFFIC ...................................................................................................17
      5.2   TRUNK GROUP CONNECTIONS AND ORDERING .....................................................17
      5.3   SWITCHING SYSTEM HIERARCHY AND TRUNKING REQUIREMENTS.......................18
      5.4   SIGNALING ...............................................................................................................18
      5.5   GRADES OF SERVICE .................................................................................................18
      5.6   MEASUREMENT AND BILLING ..................................................................................18
      5.7   INTERCARRIER COMPENSATION ARRANGEMENTS – SECTION 51(B)(5).................19
      5.8   CALL DETAIL ............................................................................................................21

6.0   TRANSMISSION AND ROUTING OF EXCHANGE ACCESS TRAFFIC PURSUANT TO 251(C)(2)
      22
      6.1   SCOPE OF TRAFFIC ...................................................................................................22
      6.2   ACCESS TOLL CONNECTING TRUNK GROUP ARCHITECTURE ...............................22
      6.3   MEET-POINT BILLING ARRANGEMENTS..................................................................22
      6.4   TOLL FREE SERVICE ACCESS CODE (E.G., 800/888/877) TRAFFIC .........................26

7.0   TRANSPORT AND TERMINATION OF OTHER TYPES OF TRAFFIC ................. 27
      7.1   INFORMATION SERVICES TRAFFIC............................................................................27
      7.2   BLV/BLVI TRAFFIC ................................................................................................28
      7.3   TANDEM TRANSIT TRAFFIC SERVICE ("TRANSIT SERVICE")................................29
      7.4   911/E911 ARRANGEMENTS.......................................................................................30

8.0   NUMBER RESOURCES, RATE CENTERS AND RATING POINTS ......................... 32

9.0   NETWORK MAINTENANCE AND MANAGEMENT; OUTAGES ............................ 33
      9.1   COOPERATION...........................................................................................................33
      9.2   RESPONSIBILITY FOR FOLLOWING STANDARDS.......................................................33
      9.3   REPEATED OR WILLFUL INTERFERENCE OR IMPAIRMENT .....................................33
      9.4   OUTAGE REPAIR STANDARD ....................................................................................34
      9.5   NOTICE OF CHANGES -- SECTION 251(C)(5) .............................................................34

10.0  JOINT NETWORK IMPLEMENTATION AND GROOMING PROCESS; INSTALLATION,
MAINTENANCE, TESTING AND REPAIR ........................................................................... 34
      10.1  JOINT NETWORK IMPLEMENTATION AND GROOMING PROCESS.............................34

SV033099

| | | |
|---|---|---|
| 10.2 | INSTALLATION, MAINTENANCE, TESTING AND REPAIR | 35 |
| 10.3 | INITIAL REQUIREMENTS AND FORECASTING FOR TRUNK PROVISIONING | 35 |
| 10.4 | DEMAND MANAGEMENT FORECASTS | 36 |
| **11.0** | **UNBUNDLED ACCESS** | **37** |
| 11.1 | BA'S PROVISION OF NETWORK ELEMENTS | 37 |
| 11.2 | LOOP TRANSMISSION TYPES | 37 |
| 11.3 | NETWORK INTERFACE DEVICE | 42 |
| 11.4 | UNBUNDLED SWITCHING ELEMENTS | 43 |
| 11.5 | INTEROFFICE TRANSMISSION FACILITIES | 43 |
| 11.6 | OPERATIONS SUPPORT SYSTEMS | 43 |
| 11.7 | LIMITATIONS ON UNBUNDLED ACCESS | 44 |
| 11.8 | AVAILABILITY OF OTHER NETWORK ELEMENTS ON AN UNBUNDLED BASIS | 45 |
| 11.9 | PROVISIONING OF LOOPS | 46 |
| 11.10 | MAINTENANCE OF LOOPS | 47 |
| 11.11 | COMBINATIONS OF NETWORK ELEMENTS | 48 |
| **12.0** | **RESALE – SECTIONS 251(C)(4) AND 251(B)(1)** | **48** |
| 12.1 | AVAILABILITY OF RETAIL RATES FOR RESALE | 48 |
| 12.2 | AVAILABILITY OF WHOLESALE RATES FOR RESALE | 48 |
| 12.3 | AVAILABILITY OF SUPPORT SERVICES AND BRANDING FOR RESALE | 48 |
| 12.4 | ADDITIONAL TERMS GOVERNING RESALE AND USE OF BA SERVICES | 49 |
| **13.0** | **COLLOCATION -- SECTION 251(C)(6)** | **49** |
| **14.0** | **NUMBER PORTABILITY -- SECTION 251(B)(2)** | **52** |
| 14.1 | SCOPE | 52 |
| 14.2 | PROCEDURES FOR PROVIDING LNP ("LONG-TERM NUMBER PORTABILITY") | 52 |
| 14.3 | PROCEDURES FOR PROVIDING NP THROUGH FULL NXX CODE MIGRATION | 53 |
| **15.0** | **DIALING PARITY – SECTION 251(B)(3)** | **54** |
| **16.0** | **ACCESS TO RIGHTS-OF-WAY -- SECTION 251(B)(4)** | **54** |
| **17.0** | **DATABASES AND SIGNALING** | **54** |
| **18.0** | **COORDINATED SERVICE ARRANGEMENTS** | **56** |
| 18.1 | INTERCEPT AND REFERRAL ANNOUNCEMENTS | 56 |
| 18.2 | COORDINATED REPAIR CALLS | 56 |
| 18.3 | CUSTOMER AUTHORIZATION | 56 |
| **19.0** | **DIRECTORY SERVICES ARRANGEMENTS** | **57** |
| **20.0** | **RATES AND CHARGES; ASSURANCE OF PAYMENT** | **60** |
| **21.0** | **INSURANCE** | **61** |
| **22.0** | **TERM AND TERMINATION.** | **62** |
| **23.0** | **DISCLAIMER OF REPRESENTATIONS AND WARRANTIES** | **64** |
| **24.0** | **INDEMNIFICATION** | **64** |
| **25.0** | **LIMITATION OF LIABILITY** | **65** |

SV033099

Level 3/BELL ATLANTIC Interconnection Agreement for New York

26.0    PERFORMANCE STANDARDS FOR SPECIFIED ACTIVITIES ............................................ 66

27.0    COMPLIANCE WITH LAWS; REGULATORY APPROVAL ........................................... 67

28.0    MISCELLANEOUS ................................................................................................................ 67

SV033099

Level 3/BELL ATLANTIC Interconnection Agreement for New York

## LIST OF SCHEDULES AND EXHIBITS

Schedules

Schedule 4.0        Network Interconnection Schedule
Schedule 4.2        Interconnection Points for Different Types of Traffic
Schedule 5.6        Applicable Factors
Schedule 6.3        Rate Elements Under Meet Point Billing
Schedule 11.3       Access to Network Interface Device
Schedule 11.4       Unbundled Switching Elements
Schedule 12.3       Support Services for Resale

Exhibits

Exhibit A           Detailed Schedule of Itemized Charges
Exhibit B           Network Element Bona Fide Request

SV033099

## INTERCONNECTION AGREEMENT

This Interconnection Agreement ("Agreement") is effective as of the 1st day of November, 2000 (the "Effective Date"), by and between Verizon New York , f/k/a Bell Atlantic – New York, ("BA"), a New York corporation , and Level 3 Communications, LLC ("Level 3"), a Delaware limited liability company with offices at 1025 Eldorado Boulevard, Broomfield, Colorado 80021 (each of BA and Level 3 being, individually, a "Party" and, collectively, the "Parties").

WHEREAS the Parties want to interconnect their networks at mutually agreed upon Points of Interconnection to provide Telephone Exchange Services, Switched Exchange Access Services and other Telecommunications Services (all as defined below) to their respective Customers;

WHEREAS Sections 251 and 252 of the Communications Act of 1934 as amended by the Telecommunications Act of 1996 (the "Act") have specific requirements for Interconnection, unbundled Network Elements and resale service, and the Parties intend that this Agreement meet these requirements;

WHEREAS the Parties are entering into this Agreement to set forth the respective obligations of the Parties and the terms and conditions under which the Parties will interconnect their networks and provide other services as required by the Act; and

WHEREAS the Parties substantially completed negotiation of this Agreement (including, without limitation, the network architecture and Intercarrier Compensation provisions herein) prior to June 30, 2000.

NOW, THEREFORE, in consideration of the mutual provisions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Level 3 and BA hereby agree as follows:

SV033099

Level 3/BELL ATLANTIC Interconnection Agreement for New York

1.0    DEFINITIONS

As used in this Agreement, the following terms shall have the meanings specified below in this Section 1. All capitalized terms used but not defined herein shall have the meanings set forth in the Act.

1.1    "Act" means the Communications Act of 1934 (47 U.S.C. § 151 et. seq.), as from time to time amended (including, without limitation by the Telecommunications Act of 1996) and interpreted in the duly authorized rules and regulations of the FCC or the Commission.

1.2    "ADSL" or "Asymmetrical Digital Subscriber Line" means a transmission technology which transmits an asymmetrical digital signal of up to 6 Mbps to the Customer and up to 640 kbps from the Customer.

1.3    "Agreement" means this Interconnection Agreement, including all Exhibits, Schedules, addenda and attachments referenced herein and/or appended hereto.

1.4    "Ancillary Traffic" means all traffic that is destined for ancillary services, or that may have special billing requirements, including but not limited to the following: BLV/BLVI, Directory Assistance, 911/E911, Operator Services (IntraLATA call completion), IntraLATA third party, collect and calling card, 800/888 database query, LIDB and information services requiring special billing as described in Section 7.1.

1.5    "ANI" or "Automatic Number Identification" means a signaling parameter which refers to the number transmitted through a network identifying the billing number of the calling party.

1.6    "Applicable Law" means all laws, regulations and orders applicable to each Party's performance of its obligations hereunder.

1.7    "BFR" or "Bona Fide Request" means the process described in Exhibit B that prescribes the terms and conditions relating to Level 3's request that BA provide an unbundled Network Element that it does not currently provide under the terms of this Agreement.

1.8    "Busy Line Verification" or "BLV" means an operator request for a status check on the line of a called party. The request is made by one Party's operator to an operator of the other Party. The verification of the status check is provided to the requesting operator.

1.9    "Busy Line Verification and Interrupt" or "BLVI" means a service that may be requested and provided when BLV has determined that a line is busy due to an ongoing call. BLVI is an operator interruption of that ongoing call to inform the called party that a calling party is seeking to complete his or her call to the called party.

1.10    "CCS" or "Common Channel Signaling" means a method of transmitting call set-up and network control data over a digital signaling network separate from the public switched

SV033099

2

Level 3/BELL ATLANTIC Interconnection Agreement for New York

telephone network facilities that carry the actual voice or data content of the call. "SS7" means the common channel out of band signaling protocol developed by the Consultative Committee for International Telephone and Telegraph ("CCITT") and the American National Standards Institute ("ANSI"). BA and Level 3 currently utilize this out-of-band signaling protocol. "CCSAC" or "CCSAS" means the Common Channel Signaling access connection or access service, respectively, which connects one Party's signaling point of Interconnection ("SPOI") to the other Party's Signaling Transfer Point for the exchange of SS7 messages.

1.11    "Central Office" means a local switching system for connecting lines to lines, lines to trunks, or trunks to trunks for the purpose of originating/terminating calls over the public switched telephone network. A single Central Office may handle several Central Office codes ("NXXs"). Sometimes this term is used to refer to a telephone company building in which switching systems and telephone equipment are installed.

1.12    "Central Office Switch" means a switch used to provide Telecommunications Services, including, but not limited to an End Office Switch or a Tandem Switch. A Central Office Switch may also be employed as a combination End Office/Tandem Office Switch.

1.13    "CLASS Features" means certain CCS-based features available to Customers including, but not limited to: Automatic Call Back; Call Trace; Caller Identification; and future CCS-based offerings.

1.14    "Collocation" means an arrangement in which the equipment of one Party (the "Collocating Party") is installed and maintained at the premises of the second Party (the "Housing Party") for the purpose of Interconnection with or access to the unbundled Network Elements of the Housing Party; provided, however, that Level 3 shall not be required to provide Collocation to BA for the purpose of access to unbundled Network Elements, unless so required under Applicable Law.

1.15    "Commission" means the New York Public Service Commission.

1.16    "Compensable Internet Traffic" means dial-up switched Internet Traffic that is originated by an end-user subscriber of one Party, is transmitted to the switched network of the other Party, and then is handed off by that Party to an Internet Service Provider which has been assigned a telephone number or telephone numbers within an NXX or NXXs which are local to the originating end-user subscriber.

1.17    "CLEC" or "Competitive Local Exchange Carrier" means any Local Exchange Carrier other than BA that is operating as such in BA's certificated territory in New York

1.18    "CPN" or "Calling Party Number" is a Common Channel Signaling ("CCS") parameter which identifies the calling party's telephone number.

1.19    "Cross Connection" means a jumper cable or similar connection provided in connection with a Collocation arrangement at the digital signal cross connect, Main Distribution

SV033099

3

Frame or other suitable frame or panel between (i) the Collocating Party's equipment and (ii) the equipment or facilities of the Housing Party (see definition of "Collocation").

1.20    "Customer" means a third party residence or business end-user subscriber to Telephone Exchange Services provided by either of the Parties.

1.21    "Digital Signal Level" means one of several transmission rates in the time-division multiplex hierarchy.

1.22    "Digital Signal Level 0" or "DS0" means the 64 Kbps zero-level signal in the time-division multiplex hierarchy.

1.23    "Digital Signal Level 1" or "DS1" means the 1.544 Mbps first-level signal in the time-division multiplex hierarchy.

1.24    "Digital Signal Level 3" or "DS3" means the 44.736 Mbps third-level signal in the time-division multiplex hierarchy.

1.25    "End Office Switch" or "End Office" is a switching entity that is used to terminate Customer station Loops for the purpose of interconnection to each other and to trunks.

1.26    "Entrance Facility" means the facility between a Party's designated premises and the Central Office serving that designated premises.

1.27    "Exchange Message Interface" or "EMI" means the standard used for exchange of Telecommunications message information among Telecommunications Carriers for billable, non-billable, sample, settlement and study data.  EMI format is contained in document SR-320 published by the Alliance for Telecom Industry Solutions.

1.28    "FCC" means the Federal Communications Commission.

1.29    "FCC Regulations" means the regulations duly and lawfully promulgated by the FCC, as in effect from time to time.

1.30    "HDSL" or "High-Bit Rate Digital Subscriber Line" means a transmission technology which transmits up to a DS 1 – level signal, using any one of the following line codes: 2 Binary/1 Quartenary ("2B1Q"), Carrierless AM/PM, Discrete Multitone ("DMT"), or 3 Binary/1 Octet ("3BO").

1.31    "Independent Telephone Company" or "ITC" means any entity other than BA which, with respect to its operations within New York , is an Incumbent Local Exchange Carrier.

1.32    "Information Services Traffic" means Local Traffic or IntraLATA Toll Traffic which originates on a Telephone Exchange Service line and which is addressed to an information service provided over a Party's information services platform (e.g., 976).

SV033099

Level 3/BELL ATLANTIC Interconnection Agreement for New York

1.33   "Inside Wire" or "Inside Wiring" means all wire, cable, terminals, hardware and other equipment or materials on the Customer's side of the Rate Demarcation Point.

1.34   "Integrated Digital Loop Carrier" or "IDLC" means a subscriber loop carrier system which integrates within the switch at a DS1 level that is twenty-four (24) loop transmission paths combined into a 1.544 Mbps digital signal.

1.35   "Integrated Services Digital Network" or "ISDN" means a switched network service providing end-to-end digital connectivity for the simultaneous transmission of voice and data. Basic Rate Interface-ISDN ("BRI-ISDN") provides for digital transmission of two 64 kbps bearer channels and one 16 kbps data and signaling channel (2B+D).  Primary Rate Interface-ISDN ("PRI-ISDN") provides for digital transmission of twenty three (23) 64 kbps bearer channels and one (1) 64 kbps data and signaling channel (23 B+D).

1.36   "Intercarrier Compensation" refers to the remuneration received by one Party (the "Receiving Party") to recover its costs for receiving and terminating Local Traffic or receiving and handing off Compensable Internet Traffic that originates on the network of the other Party (the "Originating Party").

1.37   "Interexchange Carrier" or "IXC" means a carrier that provides, directly or indirectly, InterLATA or intraLATA Telephone Toll Services.

1.38   "Interim Number Portability" or "INP" means the use of existing and available call routing, forwarding, and addressing capabilities (e.g. remote call forwarding) to enable a Customer to receive Telephone Exchange Service provided by any Local Exchange Carrier operating within the exchange area with which the Customer's telephone number(s) is associated, without having to change the telephone number presently assigned to the Customer and regardless of whether the Customer's chosen Local Exchange Carrier is the carrier that originally assigned the number to the Customer.

1.39   "Internet Traffic" means any traffic that is transmitted to or returned from the Internet at any point during the duration of the transmission.

1.40   "IP" or "Interconnection Point" means the point at which a Party who receives traffic originating on the network of the other Party assesses Intercarrier Compensation charges for the further transport and termination of that traffic.

1.41   "Line Side" means an End Office Switch connection that provides transmission, switching and optional features suitable for Customer connection to the public switched network, including loop start supervision, ground start supervision, and signaling for BRI-ISDN service.

1.42   "Local Traffic" means traffic that is originated by a Customer of one Party on that Party's network and terminates to a Customer of the other Party on that other Party's network

SV033099

5

within a given local calling area or expanded area service ("EAS") area, as defined in BA's effective Customer Tariffs. Local Traffic does not include any Internet Traffic.

1.43    "Loop" (and any like term) means a transmission path that extends from a Main Distribution Frame, DSX-panel, or functionally comparable piece of equipment in a Customer's serving End Office to the Rate Demarcation Point (or Network Interface Device ("NID") if installed) in or at the Customer's premises. The actual transmission facilities used to provide a Loop may utilize any of several technologies.

1.44    "Main Distribution Frame" or "MDF" means the primary point at which outside plant facilities terminate within a Wire Center, for Interconnection to other Telecommunications facilities within the Wire Center.

1.45    "MECAB" means the Multiple Exchange Carrier Access Billing ("MECAB") document prepared by the Billing Committee of the Ordering and Billing Forum ("OBF"), which functions under the auspices of the Carrier Liaison Committee ("CLC") of the Alliance for Telecommunications Industry Solutions ("ATIS"). The MECAB document, published by Bellcore as Special Report SR-BDS-000983, contains the recommended guidelines for the billing of an Exchange Access service provided by two or more LECs, or by one LEC in two or more states, within a single LATA.

1.46    "MECOD" means the Multiple Exchange Carriers Ordering and Design ("MECOD") Guidelines for Access Services - Industry Support Interface, a document developed by the Ordering/Provisioning Committee under the auspices of OBF. The MECOD document, published by Bellcore as Special Report SR-STS-002643, establishes methods for processing orders for Exchange Access service which is to be provided by two or more LECs.

1.47    "Meet-Point Billing" or "MPB" means an arrangement whereby two or more LECs jointly provide to a third party (e.g., an Interexchange Carrier) the transport element of a Switched Exchange Access Service to one of the LECs' End Office Switches. Each LEC receives an appropriate share of the transport element revenues as defined by their effective Exchange Access tariffs.

1.48    "Meet Point Billing Traffic" means traffic that is subject to an effective Meet-Point Billing arrangement.

1.49    "Mid-Span Fiber Meet" means an Interconnection architecture whereby two carriers' transmission facilities meet at a mutually agreed-upon Point of Interconnection ("POI"), limited by technical feasibility and the availability of facilities, utilizing a fiber hand-off and, at the delivering carrier's option, may interface with such carrier's collocated equipment to gain access to unbundled Network Elements.

1.50    "Network Interface Device" or "NID" means an interface provided by a telecommunications carrier, including all features, functions and capabilities of such interface, and terminating such carrier's telecommunications network on the property where a Customer's

SV033099

6

service is located at a point determined by such carrier. The NID contains an FCC Part 68 registered jack from which Inside Wire may be connected to BA's network.

1.51  "North American Numbering Plan" or "NANP" means the numbering plan used in the United States that also serves Canada, Bermuda, Puerto Rico and certain Caribbean Islands. The NANP format is a 10-digit number that consists of a 3-digit NPA code (commonly referred to as the area code), followed by a 3-digit NXX code and 4-digit line number.

1.52  "Numbering Plan Area" or "NPA" is also sometimes referred to as an area code. There are two general categories of NPAs, "Geographic NPAs" and "Non-Geographic NPAs." A Geographic NPA is associated with a defined geographic area, and all telephone numbers bearing such NPA are associated with services provided within that geographic area. A Non-Geographic NPA, also known as a "Service Access Code" or "SAC Code," is typically associated with a specialized Telecommunications Service which may be provided across multiple geographic NPA areas; 800, 900, 700, 500 and 888 are examples of Non-Geographic NPAs.

1.53  "NXX," "NXX Code," or "End Office Code" means the three digit switch entity indicator (i.e., the first three digits of a seven digit telephone number).

1.54  "Percent Interstate Usage" or "PIU" is a factor that distinguishes the interstate portion of minutes from the intrastate portion of minutes of traffic exchanged via Traffic Exchange Trunks. PIU is a whole number developed through consideration of every call in which the calling and called party are not located within the LATA. PIU is the first such factor applied to traffic for jurisdictional separation of traffic.

1.55  "Percent Local Usage" or "PLU" is a factor that distinguishes the intraLATA, intrastate portion of minutes from the interLATA, intrastate portion of minutes of traffic exchanged via Traffic Exchange Trunks. PLU is a whole number developed through consideration of every call in which the calling and called party are located within the same Rate Center Area. The PLU factor is applied to traffic only after the PIU factor has been applied for jurisdictional separation of traffic.

1.56  "Physical Collocation" has the meaning set forth therefor under Applicable Law.

1.57  "Port Element" or "Port" means a line card (or equivalent) and associated peripheral equipment on an End Office Switch which interconnects individual Loops or individual Customer trunks with the switching components of an End Office Switch and the associated switching functionality in that End Office Switch. Each Port is typically associated with one (or more) telephone number(s) which serves as the Customer's network address. The Port Element is part of the provision of unbundled local Switching Element.

1.58  "Point of Interconnection" or "POI" means the physical location where the originating Party's facilities physically interconnect with the terminating Party's facilities for the purpose of exchanging traffic.

SV033099

7

Level 3/BELL ATLANTIC Interconnection Agreement for New York

1.59    "Rate Center Area" or "Exchange Area" means the geographic area that has been identified by a given LEC as being associated with a particular NPA-NXX code assigned to the LEC for its provision of Telephone Exchange Services. The Rate Center Area is the exclusive geographic area which the LEC has identified as the area within which it will provide Telephone Exchange Services bearing the particular NPA-NXX designation associated with the specific Rate Center Area.

1.60    "Rate Center Point" means a specific geographic point, defined by a V&H coordinate, located within the Rate Center Area and used to measure distance for the purpose of billing Customers for distance-sensitive Telephone Exchange Services and Toll Traffic.

1.61    "Rate Demarcation Point" means the Minimum Point of Entry ("MPOE") of the property or premises where the Customer's service is located as determined by BA. This point is where network access recurring charges and BA responsibility stop and beyond which Customer responsibility begins.

1.62    "Rating Point" or "Routing Point" means a specific geographic point identified by a specific V&H coordinate. The Rating Point is used to route inbound traffic to specified NPA-NXXs and to calculate mileage measurements for distance-sensitive transport charges of switched access services. Pursuant to Bellcore Practice BR-795-100-100, the Rating Point may be an End Office location or a "LEC Consortium Point of Interconnection." Pursuant to that same Bellcore Practice, examples of the latter shall be designated by a common language location identifier ("CLLI") code with (x)KD in positions 9, 10, 11, where (x) may be any alphanumeric A-Z or 0-9. The Rating Point/Routing Point must be located within the LATA in which the corresponding NPA-NXX is located. However, the Rating Point/Routing Point associated with each NPA-NXX need not be the same as the corresponding Rate Center Point, nor must it be located within the corresponding Rate Center Area, nor must there be a unique and separate Rating Point corresponding to each unique and separate Rate Center Area.

1.63    "Service Control Point" or "SCP" means the node in the Common Channel Signaling network to which informational requests for service handling, such as routing, are directed and processed. The SCP is a real time database system that, based on a query from a service switching point ("SSP") and via a Signaling Transfer Point, performs subscriber or application-specific service logic, and then sends instructions back to the SSP on how to continue call processing.

1.64    "Signaling Transfer Point" or "STP" means a specialized switch that provides SS7 network access and performs SS7 message routing and screening.

1.65    "Switched Access Detail Usage Data" means a category 1101XX record as defined in the EMR Bellcore Practice BR-010-200-010.

1.66    "Switched Access Summary Usage Data" means a category 1150XX record as defined in the EMR Bellcore Practice BR-010-200-010.

SV033099

Level 3/BELL ATLANTIC Interconnection Agreement for New York

1.67   "Switched Exchange Access Service" means the offering of transmission and switching services for the purpose of the origination or termination of Telephone Toll Service Traffic. Switched Exchange Access Services include but may not be limited to: Feature Group A, Feature Group B, Feature Group D, 700 access, 800 access, 888 access and 900 access.

1.68   "Switching Element" is the unbundled Network Element that provides a CLEC the ability to use switching functionality in a BA End Office switch, including all vertical services that are available on that switch, to provide Telephone Exchange Service to its end user Customer(s). The Switching Element is provisioned with a Port Element, which provides Line Side access to the Switching Element.

1.69   "Tandem Switch" or "Tandem Office" or "Tandem" is a switching entity that has billing and recording capabilities and is used to connect and switch trunk circuits between and among End Office Switches and between and among End Office Switches and carriers' aggregation points, points of termination, or points of presence, and to provide Switched Exchange Access Services.

1.70   "Tandem Transit Traffic" or "Transit Traffic" means Telephone Exchange Service traffic that originates on Level 3's network, and is transported through a BA Tandem to the Central Office of a CLEC, ITC, Commercial Mobile Radio Service ("CMRS") carrier, or other LEC, that subtends the relevant BA Tandem to which Level 3 delivers such traffic. Subtending Central Offices shall be determined in accordance with and as identified in the Local Exchange Routing Guide ("LERG"). Switched Exchange Access Service traffic is not Tandem Transit Traffic.

1.71   "Tariff" means any applicable federal or state Tariff of a Party, or standard agreement or other document that sets forth the generally available terms and conditions, each as may be amended by the Party from time to time, under which a Party offers a particular service, facility or arrangement.

1.72   "Toll Traffic" means traffic that is originated by a Customer of one Party on that Party's network and terminates to a Customer of the other Party on that Party's network and is not Local Traffic or Ancillary Traffic. Toll Traffic may be either "IntraLATA Toll Traffic" or "InterLATA Toll Traffic," depending on whether the originating and terminating points are within the same LATA.

1.73   "Trunk Side" means a Central Office Switch connection that is capable of, and has been programmed to treat the circuit as, connecting to another switching entity (e.g., another carrier's network). Trunk Side connections offer those transmission and signaling features appropriate for the connection of switching entities.

1.74   "Voice Grade" means either an analog signal of 300 to 3000 Hz or a digital signal of 56/64 kilobits per second. When referring to digital Voice Grade service (a 56/64 kbps channel), the terms "DS-0" or "sub-DS-1" may also be used.

SV033099

9

1.75   "Wire Center" means a building or portion thereof which serves as a Routing Point for Switched Exchange Access Service. The Wire Center serves as the premises for one or more Central Offices.

## 2.0   INTERPRETATION AND CONSTRUCTION

2.1   All references to Sections, Exhibits and Schedules shall be deemed to be references to Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. The headings used in this Agreement are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning of this Agreement. Unless the context shall otherwise require, any reference to any agreement, other instrument (including BA or other third party offerings, guides or practices), statute, regulation, governmental rule or Tariff is to such agreement, instrument, statute, regulation, or governmental rule or Tariff as amended and supplemented from time to time (and, in the case of a statute, regulation, governmental rule or Tariff, to any successor provision).

2.2   Each Party hereby incorporates by reference those provisions of its Tariffs that govern the provision of any of the services or facilities provided hereunder. Subject to the terms set forth in Section 20 regarding rates and charges, if any provision of this Agreement and an applicable Tariff cannot be reasonably construed or interpreted to avoid conflict, the provision contained in this Agreement shall prevail. If any provision contained in this main body of the Agreement and any Schedule or Exhibit hereto cannot be reasonably construed or interpreted to avoid conflict, the provision contained in this main body of the Agreement shall prevail. The fact that a condition, right, obligation, or other term appears in this Agreement but not in any such Tariff or in such Tariff but not in this Agreement, shall not be interpreted as, or be deemed grounds for finding, a conflict for purposes of this Section 2.

2.3   This Agreement is intended as a successor to the Interconnection Agreement between the same Parties for New York. Any provision of this Agreement that requires or permits a Party to take certain actions (such as submitting service orders, installing facilities, or providing information) shall not be interpreted as requiring either Party to repeat actions that were already taken under the previous agreement, unless the requirements of this Agreement are inconsistent with the arrangements previously in place between the Parties; provided, however, that for the avoidance of any doubt, the foregoing shall not apply to (a) any new services, facilities, or Network Elements for which Level 3 submits an order, request, or application after the Effective Date, (b) nor to any pending (but not yet provisioned) services, facilities, or Network Elements for which Level 3 submits an order, request, or application after the Effective Date of this Agreement to modify or add to the pending (i.e., submitted by Level 3 prior to the Effective Date of this Agreement, but not yet fulfilled) order, request, or application, (c) nor to any existing services, facilities, or Network Elements for which Level 3 submits an order, request, or application after the Effective Date of this Agreement to modify the same. Rather, in the case of subsections (a), (b), and (c) directly above, any orders, requests, applications submitted by Level 3 after the Effective Date of this Agreement shall be governed by the rates, terms, and conditions of this Agreement. Whenever possible, services provided under the previous agreement shall be continued without interruption under the rates, terms, and conditions

SV033099

Level 3/BELL ATLANTIC Interconnection Agreement for New York

of this Agreement. Nothing in this Agreement is intended to extinguish any obligation of either Party to pay for services provided under the previous agreement but not yet billed or paid for, or any other obligation arising under the previous agreement that, by the terms of that agreement or by the nature of the obligation, survives the termination of that agreement.

3.0    SCOPE

3.1    This Agreement sets forth the terms, conditions and pricing under which BA will offer and provide to Level 3 within each LATA in which BA operates within New York : (a) Interconnection and access to unbundled Network Elements and ancillary services for their respective use in providing Telephone Exchange Service; (b) resale of local Telecommunications Services; (c) services related to (a) and (b); and (d) the terms, conditions and pricing under which Level 3 will offer and provide Interconnection and related services to BA. As such, this Agreement is an integrated package that reflects a balancing of interests critical to the Parties. It will be submitted to the Commission, and the Parties will refrain from requesting any action to change, suspend or otherwise delay implementation of the Agreement.

4.0    INTERCONNECTION AND PHYSICAL ARCHITECTURE

4.1    Interconnection Activation

Subject to the terms and conditions of this Agreement, each Party shall exercise commercially reasonable efforts to enable Level 3 to provide fully operational service to Customers in accordance with Level 3's intended implementation schedule in New York , attached hereto as Schedule 4.0. To that end, the Parties will establish and perform to milestones such as Trunking arrangements for Traffic Exchange, timely submission of Access Service Requests, 911 Interconnection establishments, SS7 Certification and arrangements for alternate-billed calls.

4.2    Trunk Types and Interconnection Points

4.2.1    Trunk Types.    Section 4 describes the architecture for Interconnection of the Parties' facilities and equipment over which the Parties shall configure the following separate and distinct trunk groups:

Traffic Exchange Trunks for the transmission and routing of (a) terminating Local Traffic, Tandem Transit Traffic, translated LEC IntraLATA toll free service access code (e.g. 800/888/877) traffic, IntraLATA Toll Traffic, and, where agreed to between the Parties and as set forth in subsection 4.3.7, InterLATA Toll Traffic between their respective Telephone Exchange Service customers pursuant to Section 251 (c)(2) of the Act, and (b) Compensable Internet Traffic, all in accordance with Section 5;

Access Toll Connecting Trunks for the transmission and routing of Exchange Access traffic, including translated InterLATA toll free service access code (e.g., 800/888/877) traffic, between Level 3 Telephone Exchange Service customers

SV033099

11

Level 3/BELL ATLANTIC Interconnection Agreement for New York

and purchasers of Switched Exchange Access Service via a BA Tandem, pursuant to Section 251(c)(2) of the Act, in accordance with Section 6;

Information Services Trunks for the transmission and routing of terminating Information Services Traffic in accordance with Section 7;

BLV/BLVI Trunks for the transmission and routing of terminating BLV/BLVI traffic, in accordance with Section 7;

911/E911 Trunks for the transmission and routing of terminating E911/911 traffic, in accordance with Section 7;

Directory Assistance Trunks for the transmission and routing of terminating directory assistance traffic, in accordance with Section 19;

Operator services (IntraLATA call completion) Trunks for the transmission and routing of terminating IntraLATA call completion traffic, in accordance with Section 19; and

Other Trunks as may be requested and agreed to by the Parties.

4.2.2   Any traffic that is not covered in Schedule 4.2 shall be subject to separate negotiations between the Parties, except that either Party may deliver traffic of any type or character to the other Party for termination as long as the delivering Party pays the receiving Party's then current tariffed Switched Exchange Access rates applicable to such traffic; provided, however, that the foregoing is subject to Section 5.7.9 with respect to how the Parties have determined to address their disagreement in terms of compensation for the exchange of Internet Telephony.

4.2.3 Points of Interconnection.   As and to the extent required by Section 251 of the Act, the Parties shall provide Interconnection of their networks at any technically feasible point, as described in Section 4.3

4.2.4 Geographic Relevance.   Notwithstanding any contrary provision in this Agreement, this Section 4.2.4 shall set forth the Parties' mutual rights and obligations with respect to Interconnection architecture from the Effective Date hereof through the termination of this Agreement. In the event of a conflict between any of the terms of this Section 4.2.4 and any other provision of this Agreement, the terms of this Section 4.2.4 shall control.

4.2.4.1 Interconnection Points.   The Parties shall establish physical Interconnection Points ("IPs") at the locations designated on Schedule 4.0, which shall be revised from time to time in accordance with the requirements of this Section. The points on the Level 3 network at which BA shall hand off Local Traffic and Compensable Internet Traffic to Level 3 are designated as the Level 3 Interconnection Points ("Level 3-IPs"). The points on the BA network at which Level 3 shall hand off Local Traffic and Compensable Internet Traffic to BA

SV033099

12

Level 3/BELL ATLANTIC Interconnection Agreement for New York

are designated as the BA Interconnection Points ("BA-IPs"). Each Party, as an Originating Party, may request that the other Party, as a Receiving Party, establish IPs on the Receiving Party's network that are geographically-relevant to the NXXs (and associated rate centers) that are assigned by the Receiving Party. In the case of BA as a Receiving Party, to the extent Level 3 requests BA to establish a geographically-relevant IP in addition to the BA-IPs at the BA Tandems, the geographically-relevant IP shall be the BA End Office serving the Customer for whom the traffic is intended. In the case of Level 3 as a Receiving Party, BA may request, and Level 3 will then establish, geographically-relevant IPs by establishing a Level 3-IP at a Collocation site at each BA Tandem in a LATA (or, in the case of a single Tandem LATA, at each BA End Office Host), for those NXXs serving equivalent BA rate centers which subtend the BA Tandem (or BA End Office Host). For purposes of this Section 4.2.4.1, the Parties agree that Level 3-IPs at Collocation sites at the BA Tandems shown in Schedule 4.0 represent geographically relevant IPs for the LATAs listed in Schedule 4.0. In any LATA in which BA agrees that Level 3 may meet its obligation to establish geographically relevant IPs through a Collocation site at fewer than all of the BA Tandems (or BA End Office Host) in a LATA, including the LATAs identified in Schedule 4.0, then BA shall determine and advise Level 3 as to which Level 3 IP established at a Collocation site (or other available Level 3 IP) BA will deliver traffic from each relevant originating rate center or other originating location.

If Level 3 fails to establish a geographically-relevant IP as provided herein within a commercially reasonable time, then Level 3 shall bill and BA shall pay only the applicable Intercarrier Compensation Rate for the relevant NXX, as set forth in Section 5.7 below, less BA's monthly recurring rate for unbundled dedicated interoffice transport from BA's originating End Office to Level 3's IP.

Should either Party offer additional IPs to any Telecommunications Carrier that is not a Party to this Agreement, the other Party may elect to deliver traffic to such IPs for the NXXs or functionalities served by those IPs. To the extent that any such Level 3-IP is not located at a Collocation site at a BA Tandem (or BA End Office Host), then Level 3 shall permit BA to establish physical interconnection at the Level 3-IP, to the extent such physical interconnection is technically feasible.

At any time that Level 3 establishes a Collocation site at a BA End Office, then either Party may request that such Level 3 Collocation site be established as the Level 3-IP for traffic originated by BA Customers served by that End Office. Such request shall be negotiated pursuant to the Joint Grooming Plan process, and approval shall not be unreasonably withheld or delayed. To the extent that the Parties have already implemented network interconnection in a LATA, then upon BA's request for a geographically-relevant Level 3-IP, the Parties shall negotiate a mutually-acceptable transition process and schedule to implement the geographically-relevant IPs. If Level 3 should fail to establish an IP at an End Office Collocation site pursuant to BA's request, or if the Parties have been unable to agree upon a schedule for completing a transition from existing arrangements to geographically relevant Level 3 IPs or to an end office Collocation site Level 3 IP within thirty (30) days following BA's request, Level 3 shall bill and BA shall pay the applicable Intercarrier Compensation rate for the relevant NXX, as set forth in Section 5.7 below, less BA's monthly recurring rate for unbundled dedicated interoffice transport

SV033099

13

Level 3/BELL ATLANTIC Interconnection Agreement for New York

from BA's originating End Office to the Level 3-IP.

Should Level 3 choose to obtain transport from BA for Local and Compensable Internet Traffic from a Level 3-IP at a Collocation site to another Level 3 location, BA shall bill and Level 3 shall pay, the applicable unbundled dedicated interoffice transport and channel termination rates set forth herein. Channel termination charges shall not apply where the transport is between Level 3 Collocation sites.

4.2.4.2 Trunking Architecture. The Originating Party must establish direct trunking to a Receiving Party's End Office (which may have a Tandem-routed overflow) by self-provisioning, purchasing transport rated as unbundled dedicated interoffice transport from the Receiving Party, or purchasing from a third party if the Local and Compensable Internet Traffic destined for that End Office exceeds the CCS busy hour equivalent of two (2) DS1s for any three (3) months during any six (6) month period. For purposes of this paragraph, BA shall satisfy its end office trunking obligations by handing off traffic to a Level 3 IP. Should Level 3 fail to comply with this end office trunking requirement, then the Intercarrier Compensation rate to be paid by Level 3 shall be determined as follows: (a) for direct (non-switched) end office trunks delivered to BA at the BA Tandem wire center that is subtended by the BA End Office serving the Customer location receiving the call, Level 3 shall pay the applicable Intercarrier Compensation rate then in effect pursuant to Section 5.7.3, plus $.0007 per minute of use; and (b) for Tandem-switched trunks delivered to BA at the BA Tandem Wire Center that is subtended by the relevant BA end office, Level 3 shall pay the Tandem Office Reciprocal Call Termination Rate as set forth in Exhibit A hereto; provided, however, that in the event Level 3 has properly forecasted and ordered the required trunking from BA and BA has been unable to provision the ordered trunking, Level 3 shall not be obligated to pay the higher Tandem Office rate until BA is able to provide the requested trunking.

4.3     Physical Architectures

4.3.1 Level 3 shall have the sole right and discretion to specify any of the following three methods for interconnection at any of the BA-IPs:

(a)     a physical or virtual Collocation node Level 3 established at the BA-IP; and/or

(b)     a physical or virtual Collocation node established separately at the BA-IP by a third party with whom Level 3 has contracted for such purposes; and/or

(c)     an Entrance Facility and transport (where applicable) leased from BA (and any necessary multiplexing), to the BA-IP.

4.3.2 Level 3 shall provide its own facilities or purchase necessary transport for the delivery of traffic to any Collocation arrangement it establishes at a BA-IP pursuant to Section 13.

SV033099

14

Level 3/BELL ATLANTIC Interconnection Agreement for New York

4.3.3  Level 3 may order from BA any of the Interconnection methods specified above in accordance with the rates, order intervals, and other terms and conditions in the Agreement, in any applicable Tariff(s), or as may be subsequently agreed to between the Parties. Under each of the options specified above, Level 3 shall interconnect with BA at a DS1 or DS3 level; provided, however, that upon mutual agreement of the Parties higher speed connections (e.g., optical connections) may be made, when and where available.

4.3.4  BA shall have the sole right and discretion to specify any of the following methods for Interconnection at any of the Level 3-IPs:

(a)  a physical or virtual Collocation node BA establishes at the Level 3-IP; and/or

(b)  a physical or virtual Collocation node established separately at the Level 3-IP by a third party with whom BA has contracted for such purposes; and/or

(c)  an Entrance Facility leased from Level 3 (and any necessary multiplexing), to the Level 3-IP.

4.3.5  BA shall provide its own facilities or purchase necessary transport for the delivery of traffic to any Collocation node it establishes at a Level 3-IP pursuant to Section 13.

4.3.6  BA may order from Level 3 any of the Interconnection methods specified above in accordance with the order intervals and other terms and conditions, including, without limitation, rates and charges, set forth in this Agreement, in any applicable Tariff(s), or as may be subsequently agreed to between the Parties. Under each of the options specified above, BA shall interconnect with Level 3 at a DS1 or DS3 level; provided, however, that upon mutual agreement of the Parties higher speed connections (e.g., optical connections) may be made, when and where available.

4.3.7  Under any of the architectures described in this subsection 4.2, and subject to mutual agreement between the Parties, either Party may utilize the Traffic Exchange Trunks for the termination of InterLATA Toll Traffic in accordance with the terms contained in Section 5 and pursuant to the other Party's Switched Exchange Access Service Tariffs. The other Party's Switched Exchange Access Service rates shall apply to such facilities.

4.3.8  The publication "Bellcore Technical Publication GR-342-CORE; High Capacity Digital Special Access Service, Transmission Parameter Limits and Interface Combination" describes the specification and interfaces generally utilized by BA and is referenced herein to assist the Parties in meeting their respective Interconnection responsibilities.

4.4     Alternative Interconnection Arrangements

4.4.1  In addition to the foregoing methods of Interconnection, and subject to mutual agreement of the Parties, the Parties may agree to establish a Mid-Span Fiber Meet

SV033099

arrangement which may include a SONET backbone with an electrical interface at the DS-3 level in accordance with the terms of this subsection 4.4. The fiber meet point shall be designated as the POI for both Parties. In the event the Parties agree to adopt a Mid-Span Fiber Meet arrangement, each Party agrees to (a) bear all expenses associated with the purchase of equipment, materials, or services necessary to facilitate and maintain such arrangement on its side of the fiber hand-off to the other Party and (b) compensate the terminating Party for transport of traffic from the POI to the terminating Party's IP at rates set forth in Exhibit A.

4.4.2  The establishment of any Mid-Span Fiber Meet arrangement is expressly conditioned upon the Parties' reaching prior written agreement on routing, appropriate sizing and forecasting, equipment, ordering, provisioning, maintenance, repair, testing, augment, and compensation procedures and arrangements, reasonable distance limitations, and on any other arrangements necessary to implement the Mid-Span Fiber Meet arrangement. Any Mid-Span Fiber Meet arrangement requested at a third-party premises is expressly conditioned on the Parties having sufficient capacity at the requested location to meet such request, on unrestricted 24-hour access for both Parties to the requested location, on other appropriate protections as reasonably deemed necessary by either Party, and on an appropriate commitment that such access and other arrangements will not be changed or altered.

4.4.3  Mid-Span Fiber Meet arrangements shall be used only for the termination of Local Traffic, Compensable Internet Traffic and IntraLATA Toll Traffic unless and until such time as the Parties have agreed to permit its utilization for other traffic types and unless and until the Parties have agreed in writing on appropriate compensation arrangements relating to the exchange of other types of traffic over such Mid-Span Fiber Meet, and only where facilities are available.

4.4.4  Level 3 and BA shall work cooperatively to install and maintain a reliable network as agreed pursuant to Section 4.4.2.  Level 3 and BA shall exchange appropriate information (e.g., maintenance contact numbers, information related to the jointly constructed network configuration, information required to comply with law enforcement and other security agencies of the Government and such other information as the Parties shall mutually agree) to achieve this desired reliability.

4.4.5  Level 3 and BA shall work cooperatively to apply sound network management principles and network management controls to alleviate or to prevent congestion.

4.5     Interconnection in Additional LATAs

4.5.1  If Level 3 determines to offer Telephone Exchange Services in any LATA in New York  not listed in Schedule 4.0 in which BA also offers Telephone Exchange Services, Level 3 shall provide written notice to BA of the need to establish Interconnection in such LATA pursuant to this Agreement.

SV033099

16

4.5.2  The notice provided in subsection 4.5.1 shall include (a) the CLEC-IP; (b) the requested BA-IP; (c) the initial Rating Point Level 3 has designated in the new LATA; (d) Level 3's intended Interconnection activation date; and (e) a forecast of Level 3's trunking requirements conforming to subsection 10.3.

4.5.3  The Parties shall agree upon an addendum to Schedule 4.0 to reflect the schedule applicable to each new LATA requested by Level 3; provided, however, that unless agreed by the Parties, the Interconnection activation date to which the Parties agree in a new LATA shall not be earlier than sixty (60) days after receipt by BA of all complete and accurate trunk orders and routing information (and shall generally be within ninety (90) days of such receipt, absent extenuating circumstances). Within ten (10) business days of BA's receipt of the Level 3's notice provided for in subsection 4.5.1, BA and Level 3 shall confirm the BA-IP, the Level 3-IP and the Interconnection activation date for the new LATA by attaching an addendum to Schedule 4.0. Unless otherwise ordered by the Commission, such addendums will automatically become a part of the Agreement.

5.0  TRANSMISSION AND ROUTING OF TELEPHONE EXCHANGE SERVICE TRAFFIC (PURSUANT TO SECTION 251(c)(2)) AND COMPENSABLE INTERNET TRAFFIC

5.1  Scope of Traffic

Section 5 prescribes parameters for Traffic Exchange Trunks used for Interconnection pursuant to Section 4.0.

5.2  Trunk Group Connections and Ordering

5.2.1  Traffic Exchange Trunk group connections will be made at a DS-3 or DS-1 level. Subject to agreement of the Parties, higher speed connections may be made, when and where available, in accordance with the Joint Process prescribed in Section 10.

5.2.2  Each Party will identify its Carrier Identification Code, a three or four digit numeric obtained from Bellcore, to the other Party when ordering a trunk group.

5.2.3  Unless mutually agreed to by both Parties, each Party will send a Carrier Identification Code and outpulse ten (10) digits to the other Party.

5.2.4  Each Party will use commercially reasonable efforts to monitor its trunk groups and to augment those groups using generally accepted trunk engineering standards so as to not exceed blocking objectives. Each Party agrees to use modular trunk engineering techniques where practical.

SV033099

Level 3/BELL ATLANTIC Interconnection Agreement for New York

5.3    Switching System Hierarchy and Trunking Requirements

For purposes of routing Level 3 traffic to BA, the subtending arrangements between BA Tandem Switches and BA End Office Switches shall be the same as the Tandem/End Office subtending arrangements BA maintains for the routing of its own or other carriers' traffic. For purposes of routing BA traffic to Level 3, the subtending arrangements between Level 3 Tandem Switches (or functional equivalent) and Level 3 End Office Switches (or functional equivalent) shall be the same as the Tandem/End Office subtending arrangements (or functional equivalent) which Level 3 maintains for the routing of its own or other carriers' traffic.

5.4    Signaling

Each Party will provide the other Party with access to its databases and associated signaling necessary for the routing and completion of the other Party's traffic in accordance with the provisions contained in Section 17.

5.5    Grades of Service

The Parties shall initially engineer and shall jointly monitor and enhance all trunk groups consistent with the Joint Process as set forth in Section 10.

5.6    Measurement and Billing

5.6.1  For billing purposes, each Party shall pass Calling Party Number ("CPN") information on at least ninety percent (90%) of calls carried over the Traffic Exchange Trunks.

5.6.1.1  If the Originating Party passes CPN on ninety percent (90%) or more of its calls, the Receiving Party shall bill the Originating Party the applicable Intercarrier Compensation rate, Intrastate Exchange Access rates, intrastate/interstate Tandem Transit Traffic rates, or interstate Exchange Access rates applicable to each minute of traffic, as provided in Section 5.7 hereof, Exhibit A and applicable Tariffs, for which CPN is passed. For any remaining (up to ten percent (10%) of) calls without CPN information, the Receiving Party shall bill the Originating Party for such traffic at the applicable Intercarrier Compensation rate, intrastate Exchange Access rates, intrastate/interstate Tandem Transit Traffic rates, or interstate Exchange Access rates applicable to each minute of traffic, as provided in Section 5.7 hereof, Exhibit A and applicable Tariffs, in direct proportion to the minutes of use of calls passed with CPN information.

5.6.1.2  If the Originating Party passes CPN on less than ninety percent (90%) of its calls and the Originating Party chooses to combine Local Traffic, Compensable Internet Traffic and Toll Traffic on the same trunk group, the terminating Party shall bill its interstate Switched Exchange Access Service rates for all traffic passed without CPN unless the Parties agree that other rates should apply to such traffic.

SV033099

18

5.6.2  At such time as either Party has the capability, on an automated basis, to use such CPN information to classify traffic delivered by the other Party as either Local Traffic, Compensable Internet Traffic or Toll Traffic, such Receiving Party shall bill the Originating Party the applicable Intercarrier Compensation rate, intrastate Exchange Access rates, or interstate Exchange Access rates applicable to each minute of Traffic for which CPN is passed, as provided in Section 5.7 hereof, Exhibit A and applicable Tariffs . If the Receiving Party lacks the capability, on an automated basis, to use CPN information to classify on an automated basis traffic delivered by the other Party as either Local Traffic, Compensable Internet Traffic or Toll Traffic, the Originating Party will supply a PIU and PLU factor. The PIU and PLU factors applicable upon the Effective Date are specified in Schedule 5.6. Such factors may be updated by the Originating Party quarterly by written notification.

5.6.3  Measurement of billing minutes for purposes of determining terminating compensation shall be in conversation seconds. Measurement of billing minutes for originating toll free service access code (e.g., 800/888/877) calls shall be in accordance with applicable Tariffs.

5.6.4  If Level 3 demonstrates to BA's reasonable satisfaction that there are technical restrictions that make it technically infeasible for Level 3 to transmit individual CPNs for the station numbers within a PBX, BA shall accept, in lieu of such individual CPNs for the station numbers of the subject PBX, a single charge number with respect to such PBX, provided that the physical location of each of the station numbers is within the same BA local calling area as the BA local calling area for the charge number of the subject PBX.

5.7    Intercarrier Compensation Arrangements – Section 251(b)(5)

Subject to Section 4.2.4 of this Agreement, but notwithstanding any other provisions of this Agreement, the provisions of this Section 5.7 shall govern the payment of Intercarrier Compensation between the Parties from and including the Effective Date hereof through and including September 30, 2002. Subject to Sections 4.2.4 and 22 of this Agreement, the provisions of this Section 5.7 shall govern the payment of Intercarrier Compensation between the Parties from and including October 1, 2002 through and including the date of termination of this Agreement. The Parties intend and agree that the Originating Party's payment of Intercarrier Compensation to the Receiving Party in accordance with the terms of this Agreement shall fulfill the Originating Party's obligation under Section 251(b)(5) of the Act to pay reciprocal compensation to the Receiving Party for termination of Local Traffic, and shall further fulfill any obligation the Originating Party may have under Applicable Law to compensate the Receiving Party for receiving and handing off Compensable Internet Traffic. BA's delivery of traffic to Level 3 that originates with a third carrier is addressed in Section 7.3. Where Level 3 delivers traffic to BA that originates with a third carrier, except as may be set forth herein or subsequently agreed to by the Parties, Level 3 shall pay BA the same amount that such carrier would have paid BA for termination of that traffic at the location the traffic is delivered to BA by Level 3. Compensation for the transport and termination of traffic not specifically addressed in this subsection shall be as provided elsewhere in this Agreement, or if

SV033099

19

Level 3/BELL ATLANTIC Interconnection Agreement for New York

not so provided, as required by the Tariffs of the Party transporting and/or terminating the traffic.

5.7.1    Nothing in this Agreement shall be construed to limit either Party's ability to designate the areas within which that Party's Customers may make calls which that Party rates as "local" in its Customer Tariffs.

5.7.2    Each Party shall pay Intercarrier Compensation to the other Party at equal and symmetrical rates, as provided in Section 5.7.3 below, on condition that the other Party continues to fulfill its obligations under Section 4.2.4. These rates are to be applied at the Level 3-IP for traffic delivered by BA, and at the BA-IP for traffic delivered by Level 3. No additional charges, including port or transport charges, shall apply for receiving and terminating Local Traffic or receiving and handing off Compensable Internet Traffic delivered to the BA-IP or the Level 3-IP, except as set forth in Exhibit A. When Local Traffic or Compensable Internet Traffic is exchanged over the same trunks as Toll Traffic, any port or transport or other applicable access charges related to the delivery of Toll Traffic from the IP to an end user shall be prorated to be applied only to the Toll Traffic.

5.7.3    In consideration of the Parties' having agreed to the appropriate application of Section 252(i) and Applicable Law to the Intercarrier Compensation and physical architecture provisions herein, the Originating Party shall compensate the Receiving Party as follows: (as used herein, the term "Chatline Rate" means the Intercarrier Compensation rate for convergent traffic established by order of the New York Public Service Commission in *Opinion and Order Concerning Reciprocal Compensation*, Opinion No. 99-10, Case 99-C-0529 (*rel.* August 26, 1999), as such rate may be modified from time to time by order of the New York Public Service Commission; provided, however, that in no event shall the Chatline Rate as applied hereunder be less than $.0015 per minute of use for Local and Compensable Internet Traffic that is below a 10:1 ratio of originating to received traffic, or less than $.0012 per minute of use for Local and Compensable Internet Traffic above a 10:1 ratio of originating to received traffic).

For Local Traffic and Compensable Internet Traffic delivered by the Originating Party to the Receiving Party during the period from and including November 1, 2000 to and including September 30, 2002, the Originating Party shall compensate the Receiving Party at a rate equal to $.002 per minute of use or, for traffic delivered by BA to Level 3 only, the Chatline Rate then in effect if less than $.002 per minute of use; provided, however, that during any month after January 1, 2001 in which the balance of traffic (including both Local Traffic and Internet Traffic) between the Originating Party and the Receiving Party exceeds a ratio of 10:1, then the rate to be paid by the Originating Party to the Receiving Party in that month for all traffic in excess of said 10:1 ratio shall be $.0015 per minute of use or, for traffic delivered by BA to Level 3 only, the Chatline Rate then in effect if less than $.0015 per minute of use.

SV033099

20

Level 3/BELL ATLANTIC Interconnection Agreement for New York

5.7.4   Intentionally left blank.

5.7.5   The Intercarrier Compensation arrangements set forth in this Agreement are not applicable to Switched Exchange Access Service, InterLATA or IntraLATA Toll Traffic, or Internet Traffic other than Compensable Internet Traffic. All Switched Exchange Access Service and all Toll Traffic shall continue to be governed by the terms and conditions of the applicable federal and state Tariffs. In addition, the Intercarrier Compensation arrangements set forth in this Agreement are not applicable to special access, private line or any other traffic that is not switched by the Originating and Receiving Parties.

5.7.6   The designation of Traffic as Local or Toll for purposes of compensation shall be based on the actual originating and terminating points of the complete end-to-end call, regardless of the carrier(s) involved in carrying any segment of the call; provided, however, that the foregoing shall not affect the Parties' agreement herein to compensate each other for Compensable Internet Traffic.

5.7.7   Each Party reserves the right to measure and audit all Traffic to ensure that proper rates are being applied appropriately. Each Party agrees to provide the necessary Traffic data or permit the other Party's recording equipment to be installed for sampling purposes in conjunction with any such audit.

5.7.8   The Parties will engage in settlements of alternate-billed calls (*e.g.,* collect, calling card, and third-party billed calls) originated or authorized by their respective Customers in New York   in accordance with the terms of an appropriate billing services agreement for intraLATA intrastate alternate-billed calls or such other arrangement as may be agreed to by the Parties.

5.7.9   In entering into this Agreement, the Parties acknowledge that they have not reached agreement as to the compensation structure that should apply to Internet Traffic over which telephony is conducted ("Internet Telephony"). The entry into, filing and performance by the Parties of this Agreement does not in any way constitute a waiver by either Party of any of the rights and remedies it may have to seek review of the compensation structure that should apply to Internet Telephony.

5.8    Call Detail

5.8.1   BA will record usage originating from Level 3 Customers using certain BA Network Elements or BA Telecommunications Services with no rounding of billable time on unrated usage to full minutes. Recorded usage detail generally includes, but is not limited to, the following categories of information where BA currently records such data in the ordinary course of its business:  (a) completed calls, including 800 calls and alternately billed calls; (b) calls to directory assistance; and (c) calls to and completed by Operator Services where BA provides such service to a Level 3 Customer.

SV033099

21

Level 3/BELL ATLANTIC Interconnection Agreement for New York

5.8.2   BA shall provide call detail information to Level 3 daily, excluding holidays, unless otherwise negotiated.  BA and Level 3 will exchange schedules of designated data center holidays.  BA shall provide Level 3 with call detail information for at least ninety percent (90%) of recorded call events within five (5) business days of when the Level 3 Customer incurred such usage.  BA and Level 3 will work cooperatively to promptly analyze and resolve any problems or anomalies in the data, as reported by either Party.

6.0    TRANSMISSION AND ROUTING OF EXCHANGE ACCESS TRAFFIC PURSUANT TO 251(c)(2)

6.1    Scope of Traffic

Section 6 prescribes parameters for certain trunks to be established over the Interconnections specified in Section 4 for the transmission and routing of traffic between Level 3 Telephone Exchange Service Customers and Interexchange Carriers ("Access Toll Connecting Trunks"), in any case where Level 3 elects to have its End Office Switch subtend a BA Tandem. This includes casually-dialed (1010XXX and 101XXXX) traffic.

6.2    Access Toll Connecting Trunk Group Architecture

6.2.1   If Level 3 chooses to subtend a BA access tandem then Level 3's NPA/NXX must be assigned by Level 3 to subtend the same BA access tandem that a BA NPA/NXX serving the same Rate Center subtends as identified in the LERG.

6.2.2   Level 3 shall establish Access Toll Connecting Trunks pursuant to applicable access Tariffs by which it will provide tandem-transported Switched Exchange Access Services to Interexchange Carriers to enable such Interexchange Carriers to originate and terminate traffic to and from Level 3's Customers.

6.2.3   Access Toll Connecting Trunks shall be used solely for the transmission and routing of Exchange Access to allow Level 3's Customers to connect to or be connected to the interexchange trunks of any Interexchange Carrier which is connected to a BA Tandem. If Level 3 collocates at a BA access tandem, applicable Tariff rates and charges shall apply for transport and switching.

6.2.4   The Access Toll Connecting Trunks shall be two-way trunks.  Such trunks shall connect the End Office or Tandem Switch Level 3 utilizes to provide Telephone Exchange Service and Switched Exchange Access to its customers in a given LATA to the Tandem(s) BA utilizes to provide Exchange Access in such LATA.

6.3    Meet-Point Billing Arrangements

6.3.1  Level 3 and BA will establish Meet-Point Billing ("MPB") arrangements in order to provide a common transport option to Switched Access Services Customers via a Tandem

SV033099

Level 3/BELL ATLANTIC Interconnection Agreement for New York

Switch in accordance with the Meet-Point Billing guidelines contained in the OBF's MECAB and MECOD documents, except as modified herein, and in BA's applicable Switched Access Service Tariffs. The arrangements described in this Section 6 are intended to be used to provide Switched Exchange Access Service that originates and/or terminates with a Telephone Exchange Service Customer of either Party that is provided by either Party, where the transport component of the Switched Exchange Access Service is routed through a Tandem Switch that is provided by BA.

6.3.2  In each LATA, the Parties shall establish MPB arrangements between the applicable Rating Point/BA Serving Wire Center combinations.

6.3.3  Interconnection for the MPB arrangement shall occur at the BA access tandems in the LATA, unless otherwise agreed to by the Parties.

6.3.4  Level 3 and BA will use reasonable efforts, individually and collectively, to maintain provisions in their respective state access Tariffs, and/or provisions within the National Exchange Carrier Association ("NECA") tariff No. 4, or any successor Tariff sufficient to reflect the MPB arrangements established pursuant to this Agreement.

6.3.5  In general, there are four alternative Meet-Point Billing arrangements possible, which are:

(a) "Single Bill/Single Tariff" in which a single bill is presented to the Interexchange Carrier and each Local Exchange Carrier involved applies rates for its portion of the services from the same Tariff.

(b) "Multiple Bill/Single Tariff" in which each involved Local Exchange Carrier presents separate bills to the Interexchange Carrier and each carrier involved applies rates for its portion of the service from the same Tariff.

(c) "Multiple Bill/Multiple Tariff" in which each involved Local Exchange Carrier presents separate bills to the Interexchange Carrier, and each carrier involved applies rates for its portion of the service from its own unique Tariff.

(d) "Single Bill/Multiple Tariff" in which one bill is rendered to an Interexchange Carrier from all LECs who are jointly providing Switched Exchange Access Service. A single bill consists of all rate elements applicable to access services billed on one statement of charges under one bill account number using each LEC's appropriate access Tariffs. The bill could be rendered by, or on behalf of, any of the Local Exchange Carriers involved in the provision of service.

Each Party shall implement the "Multiple Bill/Single Tariff" or "Multiple Bill/Multiple Tariff" option, as appropriate, in order to bill an IXC for the portion of the jointly provided Telecommunications Service provided by that Party. Alternatively, each Party may use the New York State Access Pool on its behalf to implement Single Bill/Multiple Tariff or Single Bill/Single

SV033099

23

Level 3/BELL ATLANTIC Interconnection Agreement for New York

Tariff option, as appropriate, in order to bill an IXC for the portion of the jointly provided telecommunications service provided by each Party.

6.3.6  The rate elements to be billed by each Party are as set forth in BA's and Level 3's applicable Tariffs.  The actual rate values for each Party's affected access service rate element shall be the rates contained in that Party's own effective federal and state access Tariffs, or other document that contains the terms under which that Party's access services are offered.  The MPB billing percentages for each Rating Point/BA Serving Wire Center combination shall be calculated in accordance with the formula set forth in subsection 6.3.15.

6.3.7  Each Party shall provide the other Party with the billing name, billing address, Carrier Identification Code ("CIC") of the IXC, and identification of the IXC's Serving Wire Center in order to comply with the MPB notification process as outlined in the MECAB document via facsimile or such other media as the Parties may agree to.

6.3.8  BA shall provide Level 3 with the Switched Access Detail Usage Data (category 1101XX records) on magnetic tape or via such other media as the Parties may agree to, no later than ten (10) business days after the date the usage occurred.

6.3.9  Level 3 shall provide BA with the Switched Access Summary Usage Data (category 1150XX records) on magnetic tape or via such other media as the Parties may agree, no later than ten (10) business days after the date of its rendering of the bill to the relevant IXC, which bill shall be rendered no less frequently than monthly.

6.3.10  All usage data to be provided pursuant to subsections 6.3.8 and 6.3.9 shall be sent to the following addresses:

To Level 3:       UDP, Inc.
                  2426 Cee Gee, Suite 100
                  San Antonio, TX  72817-6222
                  ATTN:  Director of Message Processing

To BA:            New York State Access Pool
                  C/O ACM
                  1309 Main Street
                  Rotterden Junction, NY 12150
                  Attn: Mark Ferri

Either Party may change its address for receiving usage data by notifying the other Party in writing pursuant to subsection 28.10.

6.3.11  Each Party shall coordinate and exchange the billing account reference ("BAR") and billing account cross reference ("BACR") numbers or Operating Company Number ("OCN"), as appropriate, for the MPB Service.  Each Party shall notify the other if the level of

SV033099

24

billing or other BAR/BACR elements change, resulting in a new BAR/BACR number, or if the OCN changes.

6.3.12   Each Party agrees to provide the other Party with notification of any errors it discovers within 30 calendar days of the receipt of the original data.  In the event of a loss of data, both Parties shall cooperate to reconstruct the lost data and, if such reconstruction is not possible, shall accept a reasonable estimate of the lost data based upon prior usage data.

6.3.13   Either Party may request a review or audit of the various components of access recording up to a maximum of two (2) audits per calendar year.  All costs associated with each review and audit shall be borne by the requesting Party.  Such review or audit shall be conducted subject to confidentiality protection and during regular business hours.  A Party may conduct additional audits, at its expense, upon the other Party's consent, which consent shall not be unreasonably withheld.

6.3.14   Nothing contained in this subsection 6.3 shall create any liability for damages, losses, claims, costs, injuries, expenses or other liabilities whatsoever on the part of either Party (other than as may be set forth in MECAB or in any applicable Tariff, subject to the limitations on liability set forth in this Agreement).

6.3.15   MPB will apply for all traffic bearing the 500, 900, toll free service access code (e.g. 800/888/877) (to the extent provided by an IXC) or any other non-geographic NPA which may be likewise designated for such traffic in the future.  In the event Level 3 determines to offer Telephone Exchange Services in another LATA in New York  in which BA operates a Tandem Switch, BA shall permit and enable Level 3 to subtend the BA Tandem Switch(es) designated for the BA End Offices in the area where the Level 3 Rating Point(s) associated with the NPA-NXX(s) to/from which the Switched Exchange Access Services are homed.  The MPB billing percentages for each new Routing Point/BA Serving Wire Center combination shall be calculated according to the following formula:

$$a / (a + b) = \text{Level 3 Billing Percentage}$$
$$\text{and}$$
$$b / (a + b) = \text{BA Billing Percentage}$$

where:

a = the airline mileage between the Routing Point and the actual point of interconnection for the MPB arrangement; and

b = the airline mileage between the BA serving Wire Center and the actual point of interconnection for the MPB arrangement.  6.3.16   Level 3 shall inform BA of the LATA in which it intends to offer Telephone Exchange Services and its calculation of the billing percentages which should apply for such arrangement, as part of the notice required by subsection 4.5.1.  Within ten (10) business days of Level 3's delivery of notice to BA, BA and Level 3 shall confirm the new Routing Point/BA Serving Wire Center combination and billing percentages.

SV033099

Level 3/BELL ATLANTIC Interconnection Agreement for New York

6.3.17    Within thirty (30) days of a written request from Level 3, BA shall provide Level 3 with a list of all switched access users with a Carrier Identification Code in a LATA in which the Parties have newly established Interconnection arrangements pursuant to this Agreement.

6.4    Toll Free Service Access Code (e.g., 800/888/877) Traffic

The following terms shall apply when either Party delivers toll free service access code (e.g., 800/888/877) calls to the other Party for completion.

6.4.1    When Level 3 delivers translated toll free service access code (e.g., 800/888/877) calls to BA for completion

(a)    to an IXC, Level 3 shall:

(i)    Provide an MPB record in an industry standard format to BA; and

(ii)    Bill the IXC the appropriate Level 3 query charge associated with the call.

(b)    as an IntraLATA call to BA or another LEC in the LATA, Level 3 shall:

(i)    Provide a copy record in an industry standard format to BA or the terminating LEC; and

(ii)    Submit the call records to ITORP for payment by BA or the LEC that is the toll free service access code (e.g., 800/888/877) service provider of Level 3's and any intermediate LECs applicable Tariffed Exchange Access or local call termination charges and query charges.

6.4.2    When BA delivers translated toll free service access code (e.g., 800/888/877) calls originated by BA's or another LEC's Customers to Level 3 for completion

(a)    to Level 3 in its capacity as an IXC, BA shall:

(i)    Bill Level 3 the appropriate BA query charge associated with the call; and

(ii)    Bill Level 3 the appropriate Feature Group D ("FGD") Exchange Access charges associated with the call.

(b)    as an IntraLATA call to Level 3 in its capacity as a LEC,

SV033099

26

Level 3/BELL ATLANTIC Interconnection Agreement for New York

     (i)    the originating LEC shall submit the appropriate call records to BA for processing under the IntraLATA Toll Originating Responsibility Plan ("ITORP") for payment by Level 3 of BA's (and another LEC's, if appropriate) applicable Tariffed Exchange Access or local call termination charges; and

     (ii)    Level 3 shall pay the originating LEC's appropriate query charge associated with the call.

     6.4.3   The settlement of all IntraLATA toll free service access code (e.g., 800/888/877) calls exchanged pursuant to this Section 6.4 shall be in accordance with the terms of an appropriate IntraLATA Telecommunications Services Settlement Agreement between the Parties. Upon a Party's receipt of a written request from the other Party, the Parties shall undertake good faith negotiations to conclude such an agreement.

## 7.0    TRANSPORT AND TERMINATION OF OTHER TYPES OF TRAFFIC

### 7.1   Information Services Traffic

     The following provisions shall apply only to Level 3-originated Information Services Traffic directed to an information services platform connected to BA's network. At such time as Level 3 connects Information Services platforms to its network, the Parties shall agree upon a comparable arrangement for BA-originated Information Services Traffic.

     7.1.1  Level 3 shall have the option to route Information Services Traffic that originates on its own network to the appropriate information services platform(s) connected to BA's network. In the event Level 3 exercises such option, Level 3 will establish a dedicated trunk group to the BA information services serving switch. This trunk group will be utilized to allow Level 3 to route Information Service Traffic originated on its network to BA.

     7.1.2  Level 3 shall provide an electronic file transfer or monthly magnetic tape containing recorded call detail information to BA.

     7.1.3  BA shall provide to Level 3 via electronic file transfer or magnetic tape or other means as available all necessary information to rate the Information Services Traffic to Level 3's Customers pursuant to the BA's agreements with each information services provider. Information shall be provided in as timely a fashion as practical in order to facilitate record review and reflect actual prices set by the individual information services providers.

     7.1.4  Level 3 shall bill and collect such information services provider charges and remit the amounts collected to BA less:

     (a)    The Information Services Billing and Collection fee set forth in Exhibit A; and

SV033099

27

Level 3/BELL ATLANTIC Interconnection Agreement for New York

(b)    An uncollectibles reserve calculated based on the uncollectibles reserve in BA's billing and collection agreement with the applicable information services provider; and

(c)    Customer adjustments provided by Level 3.

Level 3 shall provide to BA sufficient information regarding uncollectibles and Customer adjustments to allow BA to pass through the adjustments to the information services provider, and BA shall pass through such adjustments. However, if the information services provider disputes such adjustments and refuses to accept such adjustments, Level 3 shall reimburse BA for all such disputed adjustments. Final resolution regarding all disputed adjustments shall be solely between Level 3 and the information services provider.

7.1.5    Nothing in this Agreement shall restrict either Party from offering, or obviate either Party's obligations, if any, under Applicable Law to offer, to its Telephone Exchange Service Customers the ability to block the completion of Information Service Traffic or from establishing such blocking as the default and requiring that such Customers make an affirmative request to remove the blocking.

7.1.6    To the extent either Party offers variable rated (e.g., 976, 554, and/or 915, as applicable) information services, the Parties may agree to separate arrangements for the billing and compensation of such services.

7.1.7    The Information Services Traffic addressed herein does not include 555 traffic or similar traffic with AIN service interfaces, which traffic shall be subject to separate arrangements between the Parties.

7.2    BLV/BLVI Traffic

7.2.1    If Party A decides or is required by a regulatory body of competent jurisdiction to offer BLV and BLVI services to enable its Customers to verify and/or interrupt calls of Party B's Customers, Party B shall accept and respond to BLV and BLVI requests from the operator bureau of Party A. Each Party shall compensate the other Party for BLV and BLVI inquiries in accordance with the other Party's Tariffed rates, the terms of the Directory Assistance and Call Completion Agreement appended hereto as Exhibit C, or as may be agreed to by the Parties.

7.2.2    The Party B operator shall only verify the status of the line (BLV) or interrupt the line to inform the called party that there is a call waiting (BLVI). The Party B operator will not complete the telephone call of the Customer initiating the BLV/BLVI request. The Party B operator will only make one BLV/BLVI attempt per Customer operator bureau telephone call, and the applicable charges apply whether or not the called party releases the line.

SV033099

Level 3/BELL ATLANTIC Interconnection Agreement for New York

7.2.3 Each Party's operator bureau shall accept BLV and BLVI inquiries from the operator bureau of the other Party in order to allow transparent provision of BLV/BLVI traffic between the Parties' networks.

7.2.4 Each Party shall route BLV/BLVI Traffic inquiries over separate direct trunks (and not the Local/IntraLATA/InterLATA Trunks) established between the Parties' respective operator bureaus. Each Party shall offer Interconnection for BLV/BLVI traffic at its operator services Tandem Office or other mutually agreed point in the LATA. Unless otherwise mutually agreed, the Parties shall configure BLV/BLVI trunks over the Interconnection architectures in accordance with the terms of Section 4, consistent with the Joint Implementation and Grooming Process. Party A shall outpulse the appropriate NPA, ATC Code, and Routing Code (operator code) to Party B.

7.3    Tandem Transit Traffic Service ("Transit Service")

7.3.1    BA shall provide Level 3 with the transport of Tandem Transit Traffic as provided below ("Transit Service"). Tandem Transit Traffic consists of a call where neither the originating nor terminating Customer is a Customer of BA.

7.3.2    Tandem Transit Traffic may be routed over the Traffic Exchange Trunks described in Sections 4 and 5. Level 3 shall deliver each Tandem Transit Traffic call to BA with CCS and the appropriate Transactional Capabilities Application Part ("TCAP") message to facilitate full interoperability of those CLASS Features supported by BA and billing functions. In all cases, each Party shall follow the Exchange Message Interface ("EMI") standard and exchange records between the Parties.

7.3.3    Level 3 shall exercise commercially reasonable best efforts to enter into a reciprocal Telephone Exchange Service traffic arrangement (either via written agreement or mutual tariffs) with every CLEC, ITC, CMRS carrier or other LEC to which BA terminates Telephone Exchange Service traffic (as originated by Level 3) that transits a BA Tandem Office.

7.3.4    Except as set forth in this Section 7.3.4, BA may, at its option, not provide Tandem Transit Traffic Service for Tandem Transit Traffic that exceeds one (1) DS1 level volume of calls to a particular CLEC, ITC, CMRS carrier or other LEC for any three (3) months in any consecutive six (6) month period or for any consecutive three (3) months (the "Threshold Level"). At such time that Level 3's Tandem Transit Traffic exceeds the Threshold Level, upon receipt of a written request from Level 3, BA shall continue to provide Tandem Transit Service to Level 3 (for the carrier in respect of which the Threshold Level has been reached) for a period equal to sixty (60) days after the date upon which the Threshold Level was reached for the subject carrier (the "Transition Period"). During the Transition Period, in addition to any and all Tandem Transit Traffic rates and charges as provided in Section 7.3.6 hereof, Level 3 shall pay BA (a) a monthly "Transit Service Trunking Charge" for each subject carrier, as set forth in Exhibit A hereto, and (b) a monthly "Transit Service Billing Fee". At the end of the Transition Period, BA may, in its sole discretion, terminate Tandem Transit Traffic Service to Level 3 with respect to the subject carrier. Without derogating in any way the foregoing termination right, if

SV033099

29