BA exercises such right, BA agrees to cooperate with Level 3's reasonable requests with respect to Level 3's transition to the subject carrier.

7.3.5    Except as otherwise provided in Section 7.3.4 hereof, if Level 3 does not implement and provide notice to BA of the implementation of the reciprocal Telephone Exchange Service arrangement as specified in Section 7.3.3 above within one hundred eighty (180) days of the initial traffic exchange with the relevant third party carrier(s), then, in addition to any and all Tandem Transit Service rates and charges provided for in this Agreement, Level 3 shall pay BA (a) the monthly Transit Service Trunking Charge and (b) the monthly Transit Service Billing Fee, for each such carrier in respect of which Level 3 has not entered into such an arrangement.

7.3.6    Level 3 shall pay BA for Transit Service that Level 3 originates at the rate specified in Exhibit A, plus any additional charges or costs the terminating CLEC, ITC, CMRS carrier or other LEC imposes or levies on BA for the delivery or termination of such traffic, including any Switched Exchange Access Service charges.

7.3.7    If and, when, a third party carrier's Central Office subtends a Level 3 Central Office, then Level 3 shall provide to BA a service arrangement equal to or equivalent of Transit Service as provided by BA to Level 3 pursuant to this Section 7.3 so that BA may terminate calls to the Central Office of such third-party CLEC, ITC, CMRS carrier or other LEC that subtends a Level 3 Central Office ("Reciprocal Transit Service"). Level 3 shall offer such Reciprocal Transit Service arrangements under terms and conditions no less favorable than those provided in this Section 7.3.

7.3.8    Neither Party shall take any actions to prevent the other Party from entering into a direct and reciprocal Local Traffic exchange arrangement (either via written agreement or tariff) with any CLEC, ITC, CMRS carrier or other LEC to which it originates, or from which it terminates, Telephone Exchange Service traffic.

7.4    911/E911 Arrangements

7.4.1    Level 3 may, at its option, interconnect to the BA 911/E911 selective routers or 911 Tandem Offices, as appropriate, that serve the areas in which Level 3 provides Telephone Exchange Services, for the provision of 911/E911 services and for access to all subtending Public Safety Answering Points ("PSAP"). In such situations, BA will provide Level 3 with the appropriate CLLI codes and specifications of the Tandem Office serving area. In areas where E911 is not available, Level 3 and BA will negotiate arrangements to connect Level 3 to the 911 service.

7.4.2    Path and route diverse Interconnections for 911/E911 shall be made at the Level 3-IP, the BA-IP, or other points as necessary and mutually agreed, and as required by Applicable Law.

SV033099

Level 3/BELL ATLANTIC Interconnection Agreement for New York

7.4.3   Within thirty (30) days of its receipt of a request from Level 3 and to the extent authorized by the relevant federal, state, and local authorities, BA will provide Level 3 with the following at no charge:

(a)   a file on diskette or other mutually agreed upon medium containing the Master Street Address Guide ("MSAG") for each county within the LATA(s) specified in this Agreement, which MSAG shall be updated no more frequently than monthly and a complete copy of which shall be made available on an annual basis;

(b)   a list of the address, CLLI code, and an associated NXX of each 911/E911 selective router or 911 Tandem Office(s) in the area in which Level 3 plans to offer Telephone Exchange Service;

(c)   a list of the address, CLLI code, associated NXX, contact name and phone number of each Public Safety Answering Point ("PSAP") in each county in the area in which Level 3 plans to offer Telephone Exchange Service;

(d)   a list of BA personnel who currently have responsibility for each county's 911 requirements;

(e)   the ten-digit subscriber number for each PSAP or the "main" PSAP that subtends each BA 911/E911 selective router or 911 Tandem Office to which Level 3 is interconnected for the transfer of "0-" calls to the PSAP;

(f)   any information regarding any special 911 trunking requirements for each 911/E911 selective router or 911 Tandem Office; and

(g)   a Design Layout Record ("DLR") of a 911 (CAMA) trunk, if applicable.

7.4.4   The Parties acknowledge the objective of including the five (5) character Telephone Company Identification ("TCI") of the company that provides service to the calling line as part of the Automatic Location Identification display.

7.4.5   BA and Level 3 will use commercially reasonable efforts to facilitate the prompt, robust, reliable and efficient Interconnection of Level 3 systems to the 911/E911 platforms.

7.4.6   BA and Level 3 will work cooperatively to arrange meetings with PSAPs to answer any technical questions the PSAPs, or county or municipal coordinators may have regarding the 911/E911 arrangements.

7.4.7   Level 3 will compensate BA for connections to its 911/E911 pursuant to Exhibit A.

SV033099

31

7.4.8    Level 3 will comply with all applicable rules and regulations pertaining to the provision of 911/E911 services in New York .

7.4.9    BA shall return any Level 3 E911 data entry files containing errors no later than two (2) business days after completion of the order, so that Level 3 may ensure the accuracy of the Customer records.

7.4.10    When available, BA shall provide to Level 3, at no charge, an electronic interface through which Level 3 shall input and provide a daily update of 911/E911 database information related to appropriate Level 3 Customers. Until such time as an electronic interface is available, Level 3 shall provide BA with all appropriate 911 information such as name, address, and telephone number in writing for BA's entry into the 911 database system. Any 911-related data exchanged between the Parties prior to the availability of an electronic interface shall conform to BA standards, whereas 911-related data exchanged electronically shall conform to the National Emergency Number Association standards.

8.0    NUMBER RESOURCES, RATE CENTERS AND RATING POINTS

8.1    Nothing in this Agreement shall be construed to limit or otherwise adversely affect in any manner either Party's right to employ or to request and be assigned any Central Office Codes ("NXX") pursuant to the Central Office Code Assignment Guidelines and any relevant FCC or Commission orders, as may be amended from time to time, or to establish, by Tariff or otherwise, Rate Centers and Rating Points corresponding to such NXX codes.

8.2    It shall be the responsibility of each Party to program and update its own switches and network systems in accordance with the Local Exchange Routing Guide ("LERG") in order to recognize and route traffic to the other Party's assigned NXX codes at all times. Neither Party shall impose any fees or charges whatsoever on the other Party for such activities, except as expressly set forth in this Agreement.

8.3    Unless otherwise required by Commission order, the Rate Center Areas will be the same for each Party. During the term of this Agreement, Level 3 shall adopt the Rate Center Area and Rate Center Points that the Commission has approved for BA, in all areas where BA and Level 3 service areas overlap, and Level 3 shall assign whole NPA-NXX codes to each Rate Center Area unless the LEC industry adopts alternative methods of utilizing NXXs in the manner adopted by the NANP.

8.4    Level 3 will also designate a Routing Point for each assigned NXX code. Level 3 shall designate one location for each Rate Center Area as the Routing Point for the NPA-NXXs associated with that Area, and such Routing Point shall be within the same LATA as the Rate Center Area but not necessarily within the Rate Center Area itself.

8.5    Notwithstanding anything to the contrary contained herein, nothing in this Agreement is intended to, and nothing in this Agreement shall be construed to, in any way constrain Level 3's choices regarding the size of the local calling area(s) that Level 3 may

SV033099

32

establish for its Customers, which local calling areas may be larger than, smaller than, or identical to, BA's local calling areas.

## 9.0    NETWORK MAINTENANCE AND MANAGEMENT; OUTAGES

### 9.1    Cooperation

The Parties will work cooperatively to install and maintain a reliable network. Level 3 and BA will exchange appropriate information (e.g., maintenance contact numbers, escalation procedures, network information, information required to comply with law enforcement and other security agencies of the Government) to achieve this desired reliability. In addition, the Parties will work cooperatively to apply sound network management principles to alleviate or to prevent congestion and to minimize fraud associated with third-number billed calls, calling card calls, and any other services related to this Agreement.

### 9.2    Responsibility for Following Standards

Each Party recognizes a responsibility to follow the standards that may be agreed to between the Parties and to employ characteristics and methods of operation that will not interfere with or impair the service or any facilities of the other Party or any third parties connected with or involved directly in the network of the other.

### 9.3    Repeated or Willful Interference or Impairment

If Party A reasonably determines that the characteristics, facility or service or methods of operation used by Party B will or are likely to interfere with or impair Party A's provision of services, Party A may interrupt or temporarily suspend any service or facilities provided to Party B that gives rise to or is likely to give rise to the interference or impairment, subject to the following:

9.3.1    Except in emergency situations (defined as those situations in which a Customer of Party A suffers significant service degradation or situations that pose injury or death to any person or damage to tangible property), Party A shall have given Party B at least thirty (30) days' prior written notice of the interference or impairment or potential interference or impairment and the need to correct the condition within said time period; and,

9.3.2    Upon correction of the interference or impairment, Party A will promptly restore the temporarily suspended service or facility. During such period of suspension or interruption, there will be no compensation or credit allowance by Party A to Party B, unless it is shown that the suspension or interruption in service by Party A was unreasonable or unwarranted.

9.3.3    Either Party may, at any time, bring to the Commission a dispute arising out of any such interference or impairment, or potential interference or impairment.

SV033099

Level 3/BELL ATLANTIC Interconnection Agreement for New York

9.4    Outage Repair Standard

In the event of an outage or trouble in any arrangement, facility, or service being provided by a Party hereunder, the providing Party will respond to the outage or trouble in a nondiscriminatory manner that treats the other Party in parity with the providing Party's own end user Customers.

9.5    Notice of Changes -- Section 251(c)(5)

If a Party makes a change in the information necessary for the transmission and routing of services using that Party's network, or any other change in its network which it believes will materially affect the interoperability of its network with the other Party's network, the Party making the change shall publish at least ninety (90) days in advance of such change, and shall use reasonable efforts to publish at least one hundred eighty (180) days notice where practicable; provided, however, that if an earlier publication is required by the FCC's or Commission's rules, including, e.g., the Network Disclosure rules set forth in the FCC Regulations, the Party will comply with such rules.

10.0    JOINT NETWORK IMPLEMENTATION AND GROOMING PROCESS; INSTALLATION, MAINTENANCE, TESTING AND REPAIR

10.1    Joint Network Implementation and Grooming Process

Upon the request of either Party, the Parties shall jointly develop an implementation and grooming process (the "Joint Grooming Process" or "Joint Process") which may define and detail, inter alia,

(a)    standards to ensure that Traffic Exchange Trunks experience a grade of service, availability and quality which is comparable to that achieved on interoffice trunks within BA's network and in accord with all appropriate relevant industry-accepted quality, reliability and availability standards. Trunks provided by either Party for Interconnection services will be engineered using a design blocking objective of B.01. (Blocking Level B.01 - high-day-network-busy-hour blocking standard as defined in Bellcore's special report - (Bellcore - ST TAP000191));

(b)    the respective duties and responsibilities of the Parties with respect to the administration and maintenance of the trunk groups, including, but not limited to, standards and procedures for notification and discoveries of trunk disconnects;

(c)    disaster recovery provision escalations;

(d)    additional technically feasible and geographically relevant IP(s) in a LATA as provided in section 4 above; and

SV033099

(e)    such other matters as the Parties may agree, including, e.g., End Office to End Office high usage trunks as good engineering practices may dictate.

Nothing in this subsection 10.1 shall affect either Party's obligations to meet the milestone dates set forth in Schedule 4.0 hereof.

10.2    Installation, Maintenance, Testing and Repair

Unless otherwise agreed to by the Parties, Interconnection shall be equal in quality to that provided by each of the Parties to itself, any subsidiary, affiliate or third party, to the extent required by Applicable Law.  If either Party is unable to fulfill its obligations under this subsection 10.2, it shall notify the other Party of its inability to do so and will negotiate alternative intervals in good faith.  The Parties agree that the standards to be used by each Party for isolating and clearing any disconnections and/or other outages or troubles shall be at parity with standards used by each Party with respect to itself, any subsidiary, affiliate or third party, to the extent required by Applicable Law.

10.3    Initial  Requirements and Forecasting for Trunk Provisioning

Within ten (10) days after execution of this Agreement, Level 3 shall provide BA a two (2) year traffic forecast (unless the Parties are already operating under forecasts submitted under a prior interconnection agreement).  This initial forecast will provide the amount of traffic to be exchanged between the Parties over each of the Traffic Exchange Trunk groups over the next eight (8) calendar quarters.  Level 3 forecasts shall be updated and provided to BA on an as-needed basis, but no less frequently than quarterly and no more frequently than monthly.  All forecasts shall comply with the BA CLEC Interconnection Trunking Forecast Guide and shall include, at a minimum, Access Carrier Terminal Location ("ACTL"), trunk group type (Local Traffic/intraLATA Toll/Compensable Internet Traffic, Toll Traffic, Operator Services, 911, etc.), code (identifies trunk group), A location/Z location (CLLI codes for Level 3-IPs and BA-IPs), interface type (e.g., DS1), and trunks in service each year (cumulative).

10.3.1    Initial Trunking Requirements and Forecasts.  In consideration of Level 3's agreement to the provisions set forth in Sections 4 and 5.7, as an initial matter BA shall provision the number of voice grade equivalent Traffic Exchange Trunks from BA to Level 3 IPs in each of three successive calendar quarters, beginning in the Fourth Quarter of 1999 and ending in the Second Quarter of 2000, as shall be set forth in a separate schedule and related payment terms to be agreed upon by Level 3 and BA (the "Initial Trunk Requirements").

After the Initial Trunk Requirements have been provisioned, Level 3 shall provide trunk forecasts for both inbound (from BA) and outbound (from Level 3) traffic.  Level 3 shall use its best efforts to make the forecasts as accurate as possible based on reasonable engineering criteria.  BA will exercise commercially reasonable efforts to provide the number of Traffic Exchange Trunks Level 3 forecasts, as adjusted pursuant to Section 10.3.2 below;

SV033099

35

provided, however, that in all cases BA's provision of the forecasted number of Traffic Exchange Trunks to Level 3 is subject to capacity constraints.

10.3.2  Monitoring and Adjusting Trunking Requirements and Forecasts. BA and Level 3 shall monitor both inbound and outbound traffic on each trunk group that is installed pursuant to the schedule of Initial Trunk Requirements provided for in Section 10.3.1 and Level 3's subsequent quarterly forecasts. At any time after the end of each calendar quarter, based on a review of the capacity utilization during such quarter for installed trunks carrying Local Traffic and Compensable Internet Traffic from BA to Level 3, and notwithstanding any contrary provision in Section 4:  (a) subject to the provisions of clause (b) following, after giving fifteen (15) days advance written notice to Level 3, BA may disconnect any trunk that it has determined is not being utilized for Local Traffic or Compensable Internet Traffic at a sixty-five percent (65%) busy hour utilization level ("Underutilized Trunks"), provided that the Parties have not otherwise agreed;  and (b) within ten (10) days following the notice prescribed in clause (a) above, Level 3 may request that BA not disconnect some or all of the Underutilized Trunks, in which event BA shall keep the trunks in service and may invoice Level 3 for, and Level 3 shall pay, all applicable recurring and nonrecurring charges for the Underutilized Trunks, such charges to be retroactive to the date on which such trunks were installed and to continue until such trunks are disconnected, or to the extent Level 3 requests that such trunks remain in service, until they are reach a sixty-five percent (65%) busy hour utilization level for Local Traffic and Compensable Internet Traffic. In addition, beginning after October 1, 2000, the Level 3 forecasts for each subsequent forecast period shall be automatically reduced by the number of trunks that have been determined to be subject to disconnection pursuant to the foregoing procedures.  To the extent Level 3 requests BA to install additional trunks in any forecast period following the end of Second Quarter 2000 that are not included in the forecast for that period (as such forecast may be revised from time to time pursuant to the preceding sentence), such trunks may be provisioned by BA subject to the conditions set forth in Section 10.3.1 above, and all applicable recurring and nonrecurring charges for such trunks shall be billed to and paid by Level 3 until such trunks reach a sixty-five percent (65%) busy hour utilization level for Local Traffic and Compensable Internet Traffic.  To the extent that any Tandem trunk group is utilized at a busy hour level of ninety percent (90%) or greater, the Parties shall negotiate in good faith for the installation of augmented facilities, including the possibility of expediting such installations.

10.4    Demand Management Forecasts

10.4.1  Level 3 will furnish BA with good faith demand management forecasts including but not limited to:  unbundled Network Elements and resale products. Such forecasts will describe Level 3's expected needs for service volumes, and timeframes for service deployment, by Wire Center. Level 3 agrees to provide such forecasts to BA thirty (30) days following the Effective Date, with updates to follow every six (6) months thereafter. BA agrees that such forecasts shall be subject to the confidentiality provisions defined in Section 28.4, and that such information will only be used by BA to perform its obligations pursuant to this Agreement.

SV033099

Level 3/BELL ATLANTIC Interconnection Agreement for New York

## 11.0  UNBUNDLED ACCESS

To the extent required by Applicable Law, and subject to the provisions of this Section 11.0 (including, without limitation, Section 11.7 hereof), BA shall offer to Level 3 nondiscriminatory access to Network Elements on an unbundled basis at any technically feasible point pursuant to, and in accordance with the terms and provisions of, this Agreement; provided, however, that BA shall not have any obligation to continue to provide such access with respect to any Network Element listed in Section 11.1 (or otherwise) that ceases to be subject to an unbundling obligation under Applicable Law; provided further that, if BA intends to cease provisioning a Network Element that it is no longer required by Applicable Law to provision, the Parties agree to work cooperatively to develop an orderly and efficient transition process for discontinuation of provisioning of such Network Element. Unless otherwise agreed to by the Parties (or required by Applicable Law), the transition period shall be at most three (3) months from the date that the FCC (or other applicable governmental entity of competent jurisdiction) issues (or issued) public notice that BA is not required to provision a particular Network Element. Level 3 may request renegotiation pursuant to Section 27.3 hereof to obtain from BA access to any Network Element not listed in Section 11.1 that is subject to a legally effective FCC or Commission order, and which BA makes available to requesting carriers under the Act; in such cases Level 3 shall not be required to use the Bona Fide Request Process to obtain nondiscriminatory access to such additional Network Element on an unbundled basis.

### 11.1  BA's Provision of Network Elements

Subject to Section 11.0, BA shall provide Level 3 access to the following:

11.1.1 Loops, as set forth in subsection 11.2;

11.1.2 Network Interface Device, as set forth in subsection 11.3;

11.1.3 Switching Elements, as set forth in subsection 11.4;

11.1.4 Interoffice Transmission Facilities, as set forth in subsection 11.5;

11.1.5 Signaling Links and Call-Related Databases, as set forth in Section 17;

11.1.6 Operations Support Systems, as set forth in subsection 11.6; and

11.1.7 such other Network Elements in accordance with subsection 11.8 below.

### 11.2  Loop Transmission Types

Subject to Section 11.0, BA shall allow Level 3 to access the following Loop types (in addition to those Loops available under applicable Tariffs) unbundled from local switching and local transport in accordance with the terms and conditions set forth in this Section 11.2.

SV033099

11.2.1 "2-Wire Analog Voice Grade Loop" or "Analog 2W" provides an effective 2-wire channel with 2-wire interfaces at each end that is suitable for the transport of analog Voice Grade (nominal 300 to 3000 Hz) signals and loop-start signaling. The service is more fully described in Bell Atlantic TR-72565. If "Customer-Specified Signaling" is requested, the service will operate with one of the following signaling types that may be specified when the service is ordered: loop-start, ground-start, loop-reverse-battery, and no signaling. The service is more fully described in Bell Atlantic TR-72570.

11.2.2 "4-Wire Analog Voice Grade Loop" or "Analog 4W" provides an effective 4-wire channel with 4-wire interfaces at each end that is suitable for the transport of analog Voice Grade (nominal 300 to 3000 Hz) signals. The service will operate with one of the following signaling types that may be specified when the service is ordered: loop-start, ground-start, loop-reverse-battery, duplex, and no signaling. The service is more fully described in Bell Atlantic TR-72570.

11.2.3 "2-Wire ISDN Digital Grade Loop" or "BRI ISDN" provides a channel with 2-wire interfaces at each end that is suitable for the transport of 160 kbps digital services using the ISDN 2B1Q line code.

11.2.4 "2-Wire ADSL-Compatible Loop" or "ADSL 2W" provides a channel with 2-wire interfaces at each end that is suitable for the transport of digital signals up to 6 Mbps toward the Customer and up to 640 kbps from the Customer. BA will offer ADSL-Compatible Loops to Level 3 subject to BA's rights and Level 3's obligations nder Applicable Law (including, without limitation, with respect to spectrum interference). In addition, ADSL-Compatible Loops will be available only where existing copper facilities can meet applicable industry standards.

11.2.5 "2-Wire HDSL-Compatible Loop" or "HDSL 2W" provides a channel with 2-wire interfaces at each end that is suitable for the transport of 784 kbps digital signals simultaneously in both directions using the 2B1Q line code. HDSL compatible Loops will be available only where existing copper facilities can meet the specifications.

11.2.6 "4-Wire HDSL-Compatible Loop" or "HDSL 4W" provides a channel with 4-wire interfaces at each end. Each 2-wire channel is suitable for the transport of 784 kbps digital signals simultaneously in both directions using the 2B1Q line code. HDSL compatible Loops will be available only where existing copper facilities can meet the specifications.

11.2.7 "4-Wire DS1-compatible Loop" provides a channel with 4-wire interfaces at each end. Each 4-wire channel is suitable for the transport of 1.544 Mbps digital signals simultaneously in both directions using PCM line code. DS-1-compatible Loops will be available where existing copper facilities can meet the specifications.

11.2.8 "4-Wire 56 kbps Loop" means a 4-wire Loop that provides a transmission path that is suitable for the transport of digital data at a synchronous rate of 56 kbps in opposite directions on such Loop simultaneously. A 4-Wire 56 kbps Loop consists of two pairs of non-

SV033099

loaded copper wires with no intermediate electronics or it consists of universal digital loop carrier with 56 kbps DDS dataport transport capability. BA shall provide 4-Wire 56 kbps Loops to Level 3 in accordance with, and subject to, the technical specifications set forth in BA Technical Reference TR72575, as revised from time to time.

11.2.8.A    "DS-3 Loops" means Loops that will support the transmission of isochronous bipolar serial data at a rate of 44.736 Mbps or the equivalent of 28 DS-1 channels. The DS-3 Loop includes the electronics necessary to provide the DS-3 transmission rate.  A DS-3 Loop will only be provided where the electronics are at the requested installation date currently available for the requested Loop.  BA will not install new electronics.  DS-3 specifications are referenced in BA's TR72575 as revised from time to time.

11.2.9  Loops will be offered on the terms and conditions specified herein and on such other terms in applicable Tariffs that are not inconsistent with the terms and conditions set forth herein and, in any case, in a manner that complies with the requirements of Applicable Law.  BA shall make Loops available to Level 3 at the rates specified in Exhibit A (subject to Section 20.0 hereof), subject to the provisions of Section 11.2.11 below.

11.2.10     Subject to availability, BA will make Analog 2-Wire Loops, BRI ISDN Loops, Analog 4W Loops, 4-Wire 56kbps Loops, 4-Wire DS-1-compatible Loops, DS-3 Loops, HDSL 4-Wire, HDSL 2-Wire, and ADSL 2-Wire Loops available to Level 3 at any time after the Effective Date.

11.2.11  "Digital Designed Loops" are comprised of designed Loops that meet specific Level 3 requirements for metallic Loops over 18,000 feet or for conditioning of ADSL, HDSL, or BRI ISDN (Premium) Loops.  "Digital Designed Loops" may include requests for:

(a) a 2W Digital Designed Metallic Loop with a total Loop length of 18,000 to 30,000 feet, unloaded, with the option to remove bridged tap;

(b) an ADSL 2W Loop of 12,000 to 18,000 feet with an option to remove bridged tap;

(c) an ADSL 2W Loop of less than 12,000 feet with an option to remove bridged tap;

(d) an HDSL 2W Loop of less than 12,000 feet with an option to remove bridged tap:

(e) an HDSL 4W Loop of less than 12,000 feet with an option to remove bridged tap; and

(f) a 2W Digital Designed Metallic Loop with BA-placed ISDN loop extension electronics.

11.2.11.1    BA shall make Digital Designed Loops available to Level 3 at the rates as set forth in Exhibit A.  These rates and/or rate structures shall be considered interim in nature until they have been approved by the Commission or otherwise allowed to go into effect. If the Commission should approve or make effective rates and/or rate structures different than

SV033099

39

Level 3/BELL ATLANTIC Interconnection Agreement for New York

those shown in Exhibit A, the rates and/or rate structures approved or made effective by the Commission shall supersede those shown in Exhibit A upon the effective date of such rates and/or rate structures.

11.2.11.2    The following ordering procedures shall apply to Digital Designed Loops:

(a) Level 3 shall place orders for Digital Designed Loops by delivering to BA a valid electronic transmittal service order or other mutually agreed upon type of service order. Such service order shall be provided in accordance with industry format and specifications or such format and specifications as may be agreed to by the Parties.

(b) BA is in the process of conducting a mechanized survey of existing Loop facilities, on a Central Office by Central Office basis, to identify those Loops that meet the applicable technical characteristics established by BA for compatibility with ADSL and HDSL signals. The results of this survey will be stored in a mechanized database and made available to Level 3 as the process is completed in each Central Office. Level 3 must utilize this mechanized Loop qualification database, where available, in advance of submitting a valid electronic transmittal service order for an ADSL or HDSL Loop. Charges for mechanized Loop qualification information are set forth in Exhibit A. Level 3 may use prequalified Loops to offer SDSL or IDSL services, but neither BA's prequalification process nor its current Loop offerings are designed to ensure compatibility with such services or any services other than those set forth in the Loop descriptions set forth above. To the extent required by Applicable Law, Level 3's access to information regarding the availability of Digital Designed Loops pursuant to the foregoing mechanized database shall be at parity with the level of access available to BA's own retail operations and other telecommunications carriers with respect to such database.

(c) If the Loop is served out of a Central Office that has not been prequalified on a mechanized basis, Level 3 must request a manual Loop qualification prior to submitting a valid electronic service order for an ADSL, HDSL, or BRI ISDN ULL. The rates for manual Loop qualification are set forth in Exhibit A. In general, BA will complete a manual Loop qualification request within three (3) business days, although BA may require additional time due to poor record conditions, spikes in demand, or other unforeseen events; provided, however, that BA shall conduct such qualifications requested by Level 3 in parity with manual Loop qualifications it conducts on behalf of other telecommunications carriers and BA's own retail operations (to the extent that BA conducts such qualifications for its own retail operations).

(d) If the mechanized Loop qualification database indicates that a Loop does not qualify (e.g., because it does not meet the applicable technical parameters set forth in the Loop descriptions above), Level 3 may request a manual Loop qualification, as described above, to determine whether the result is due to the presence of load coils, presence of digital loop carrier, or Loop length (including bridged tap).

SV033099

40

(e)    If Level 3 submits a service order for an ADSL, HDSL, or BRI ISDN Loop that has not been prequalified on either a mechanized or manual basis, BA will query the service order back to Level 3 for qualification and will not accept such service order until the Loop has been prequalified on a mechanized or manual basis. If Level 3 submits a service order for an ADSL, HDSL, or BRI ISDN Loop that is, in fact, not compatible with such services in its existing condition, BA will respond back to Level 3 with a "Nonqualified" indicator.

(f)    Where Level 3 has followed the prequalification procedure described above and has determined that a Loop is not compatible with ADSL, HDSL, or BRI ISDN service in its existing condition, it may either request an Engineering Query to determine whether conditioning may make the Loop compatible with the applicable service; or if Level 3 is already aware of the conditioning required (e.g., where Level 3 has previously requested a manual Loop qualification), Level 3 may submit a service order for a Digital Designed Loop. BA will undertake to condition or extend the Loop in accordance with this Section upon receipt of Level 3 's valid, accurate and pre-qualified service order for a Digital Designed Loop.

11.2.11.3  Level 3 acknowledges that Digital Designed Loops are currently being rolled out throughout BA's service territory, including areas where BA may not have a retail service that utilizes comparable Loop facilities. As a result, it is possible that provisioning intervals for Digital Designed Loops may not be at optimal levels during the early stages of this roll out. The Parties will make reasonable efforts to coordinate their respective roles in the early phases of the roll out in order to minimize provisioning problems.  In general, where conditioning or Loop extensions are requested by Level 3, an interval of eighteen (18) business days will be required by BA to complete the Loop analysis and the necessary construction work involved in conditioning and/or extending the loop as follows (provided, however, that BA shall provide such Loop conditioning to Level 3 at parity with the manner in which BA provides such Loop conditioning to other requesting carriers):

(a) Three (3) business days will be required following receipt of Level 3's valid, accurate and pre-qualified service order for a Digital Designed Loop to analyze the Loop and related plant records and to create an Engineering Work Order.

(b) Upon completion of an Engineering Query, BA will initiate the construction order to perform the changes/modifications to the Loop requested by Level 3. Conditioning activities are, in most cases, able to be accomplished within fifteen (15) business days. Unforeseen conditions may add to this interval.

After the engineering and conditioning tasks have been completed, the standard Loop provisioning and installation process will be initiated, subject to BA's standard provisioning intervals.

SV033099

41

11.2.11.4    If Level 3 requires a change in scheduling, it must contact BA to issue a supplement to the original service order. If Level 3 cancels the request for conditioning after a Loop analysis has been completed but prior to the commencement of construction work, Level 3 shall compensate BA for an Engineering Work Order charge as set forth in Exhibit A. If Level 3 cancels the request for conditioning after the Loop analysis has been completed and after construction work has started or is complete, Level 3 shall compensate BA for an Engineering Work Order charge as well as the charges associated with the conditioning tasks performed as set forth in Exhibit A.

11.3    Network Interface Device

(a)  Subject to Section 11.0 and at the request of Level 3, BA shall permit Level 3 to connect a Level 3 Loop to the Inside Wiring of a Customer through the use of a BA NID in the manner set forth in this Section 11.3. Level 3 may access a BA NID either by means of a cross connect (but only if the use of such cross connect is technically feasible) from an adjoining Level 3 NID deployed by Level 3 or, if an entrance module is available in the BA NID, by connecting a Level 3 Loop to the BA NID. When necessary, BA will rearrange its facilities to provide access to an existing Customer's Inside Wire. An entrance module is available only if facilities are not connected to it. The Customer shall be responsible for resolving any conflicts between service providers for access to the Customer's premises and Inside Wire.

(b)  In no case shall Level 3 access, remove, disconnect or in any other way rearrange BA's Loop facilities from BA's NIDs, enclosures, or protectors.

(c)  In no case shall Level 3 access, remove, disconnect or in any other way rearrange a Customer's Inside Wire from BA's NIDs, enclosures, or protectors where such Customer Inside Wire is used in the provision of ongoing telecommunication service to that Customer.

(d)  In no case shall Level 3 remove or disconnect ground wires from BA's NIDs, enclosures, or protectors.

(e)  In no case shall Level 3 remove or disconnect NID modules, protectors, or terminals from BA's NID enclosures.

(f)  Maintenance and control of premises Inside Wiring is the responsibility of the Customer. Any conflicts between service providers for access to the Customer's Inside Wire must be resolved by the Customer.

(g)  When Level 3 is not connecting a Level 3-provided Loop to the Inside Wiring of a Customer's premises through the Customer's side of the BA NID, Level 3 does not need to submit a request to BA and BA shall not charge Level 3 for access to the BA NID. In such instances, Level 3 shall comply with the provisions of Subsections (b) - (f) above and shall access the Customer's Inside Wire in the manner set forth in Subsection (i) directly below.

SV033099

(i)    Due to the wide variety of NIDs utilized by BA (based on Customer size and environmental considerations), Level 3 may access the Customer's Inside Wire, acting as the agent of the Customer, by any of the following means:

(A)    Where an adequate length of Inside Wire is present and environmental conditions permit, requesting carrier (i.e., Level 3 or Level 3's agent, the building owner, or the Customer) may remove the Inside Wire from the Customer's side of the BA NID and connect that wire to Level 3's NID;

(B)    Where an adequate length of Inside Wire is not present or environmental conditions do not permit, Level 3 may enter the Customer side of the BA NID enclosure for the purpose of removing the Inside Wire from the terminals of BA's NID and connecting a connectorized or spliced jumper wire from a suitable "punch out" hole of such NID enclosure to the Inside Wire within the space of the Customer side of the BA NID. Such connection shall be electrically insulated and shall not make any contact with the connection points or terminals within the Customer side of the BA NID.

(C)    Request BA to make other rearrangements to the Inside Wire terminations or terminal enclosure on a time and materials cost basis to be charged to the requesting party (i.e. Level 3, its agent, the building owner or the Customer). If Level 3 accesses the Customer's Inside Wire as described in this Subsection (C), time and materials charges will be billed to the requesting party (i.e., Level 3, its agent, the building owner or the Customer).

11.4    Unbundled Switching Elements

Subject to Section 11.0, BA shall make available to Level 3 the local Switching Element and tandem Switching Element unbundled from transport, local Loop transmission, or other services in accordance with Applicable Law and as more fully described in Schedule 11.4.

11.5    Interoffice Transmission Facilities

11.5.1    Subject to Section 11.0, where facilities are available, at Level 3's request, BA shall provide Level 3 with interoffice transmission facilities ("IOF") (at DS1, DS3, OC3, OC3c, OC12 and OC12c levels) unbundled from other Network Elements in accordance with, but only to the extent required by, Applicable Law, in accordance with Exhibit A and this Section 11.5. To the extent Level 3 purchases unbundled common transport, Level 3 shall also be required to purchase unbundled local switching in conjunction with such unbundled common transport.

11.6    Operations Support Systems

Subject to Section 11.0, BA shall provide Level 3 with access via electronic interfaces to databases required for pre-ordering, ordering, provisioning, maintenance and repair, and billing at any time after the Effective Date. All such transactions shall be submitted by Level 3 through such electronic interfaces; provided, however, that in the case of a new or materially modified

SV033099

electronic interface, the Parties shall work cooperatively to transition within a commercially reasonable period of time to the use of any such new or materially modified interface.

11.7    Limitations on Unbundled Access

11.7.1 Level 3 shall access BA's unbundled Network Elements via Collocation in accordance with Section 13 at the BA Wire Center where those elements exist or other mutually agreed upon means of Interconnection, and each Loop or Port shall, in the case of Collocation, be delivered to Level 3's Collocation by means of a Cross Connection.

11.7.2 BA shall provide Level 3 access to its Loops at each of BA's Wire Centers for Loops terminating in that Wire Center. In addition, if Level 3 requests one or more Loops provisioned via Integrated Digital Loop Carrier or Remote Switching technology deployed as a Loop concentrator, BA shall, where available, move the requested Loop(s) to a spare, existing physical Loop at no additional charge to Level 3. If, however, no spare physical Loop is available, BA shall within three (3) business days of Level 3's request notify Level 3 of the lack of available facilities. Level 3 may then at its discretion make a Network Element Bona Fide Request to BA to provide the Loop through the demultiplexing of the integrated digitized Loop(s). Level 3 may also make a Network Element Bona Fide Request for access to Loops at the Loop concentration site point. Alternatively, Level 3 may choose to avail itself of BA's Special Construction services, as set forth in Exhibit A, for the provisioning of such Loop(s). Notwithstanding anything to the contrary in this Agreement, the provisioning intervals set forth in subsection 11.9 and the Performance Criteria and Performance Interval Dates set forth in subsection 26.1 and Schedule 26, respectively, shall not apply to Loops provided under this subsection 11.7.2.

11.7.3 If Level 3 orders a Loop type and the distance requested on such Loop exceeds the transmission characteristics in applicable technical references, Level 3 may request BA to provide distance extensions on such Loops. BA will comply with such requests unless the requested extensions are incompatible with the services Level 3 wishes to provide, or are likely to cause degradation of service in BA's network. The rates and charges for such loop extensions shall be as set forth in Exhibit A, in BA's applicable Tariffs if there is no rate in Exhibit A, or in the absence of either, at a rate to be agreed upon between the Parties.

11.7.4 BA will exercise commercially reasonable efforts to ensure that the service intervals that apply to Loops and unbundled Ports are comparable to the (a) repair intervals that apply to the bundled dial tone line service, and (b) installation intervals that apply to other BA-coordinated services, except as provided in Section 26. Although BA will make commercially reasonable efforts to ensure that Loops and unbundled ports meet specified or agreed-upon technical standards, BA makes no warranty that the Loops or unbundled Ports supplied by BA hereunder will be compatible with the services Level 3 may offer to its Customers.

11.7.5 Nothing contained in this Agreement shall be deemed to constitute agreement by BA that any item identified in this Agreement as a Network Element is (a) a Network Element under Applicable Law, or (b) a Network Element BA is required by Applicable

SV033099

44

Level 3/BELL ATLANTIC Interconnection Agreement for New York

Law to provide to Level 3 on an unbundled basis; provided, however that BA shall continue to provide access to all Network Elements identified as such herein, subject, however, to Section 11.0. Nothing contained in this Agreement shall limit BA's right to appeal, seek reconsideration of, or otherwise seek to have stayed, modified, reversed or invalidated any order, rule, regulation, decision, ordinance or statute issued by the Commission, the FCC, any court or any other governmental authority relating to or pertaining to BA's obligations under this Agreement.

11.7.6 Notwithstanding anything set forth in this Agreement, BA shall not be required under this Agreement to construct new Network Elements, unless it is so required under Applicable Law.

11.7.7 (a)        BA shall provide access to 4-Wire 56 kbps Loops, NIDs and Combinations subject to charges based on rates and/or rate structures that are consistent with Applicable Law (such rates and/or rate structures, the "Rates"). Level 3 acknowledges that BA is developing the Rates but that BA has not finished developing the Rates as of the Effective Date. When BA finishes developing a Rate, BA shall notify Level 3 in writing of the Rate and thereafter shall bill Level 3, and Level 3 shall pay to BA, for services provided under this Agreement on the Effective Date and thereafter in accordance with such Rate, subject to subsection (b) directly below.

(b) The Rates for 4-Wire 56 kbps Loops, NIDs and Combinations provided under this Agreement shall be interim Rates and shall be replaced on a prospective basis by such Rates as may be approved by the Commission, or as otherwise allowed to go into effect, or if appealed as may be ordered at the conclusion of such appeal; provided, however, that a Rate provided by BA to Level 3 in accordance with subsection (a) directly above that has been approved or allowed to go into effect by the Commission prior to the date on which BA provides such Rate to Level 3 shall not be considered an "interim Rate" hereunder. If the Commission should alter, amend or modify and then approve or make effective an interim Rate, the Parties shall true up amounts billed and paid based on such interim Rate for 4-Wire 56 kbps Loops, NIDs and Combinations provided under this Agreement on the Effective Date and thereafter until the date on which the Commission approves or allows to go into effect such altered, amended or modified interim Rate.

11.8    Availability of Other Network Elements on an Unbundled Basis

11.8.1 BA shall, upon request of Level 3 and to the extent required by Applicable Law, provide to Level 3 nondiscriminatory access to its Network Elements on an unbundled basis for the provision of Level 3's Telecommunications Service. Any request by Level 3 for access to a BA Network Element that is not specifically required to be offered under regulations or orders of the FCC or the Commission shall be treated as a Network Element Bona Fide Request. Where the FCC or the Commission, in a legally effective order, has required or shall require BA to offer a UNE, service, or Interconnection not covered in this Agreement, BA shall offer to Level 3 said UNE, service, or Interconnection in the manner required by such legally effective order. The Parties agree to amend this Agreement to include any new UNE, service, or Interconnection that BA is so required to make available to Level 3 under Applicable Law.

SV033099

45

Level 3/BELL ATLANTIC Interconnection Agreement for New York

Level 3 shall provide BA access to its Network Elements as mutually agreed by the Parties or as required by the Commission or FCC. The Parties are currently negotiating terms for provisioning of line sharing, dark fiber and subloops, which terms, upon completion thereof, the Parties shall incorporate into this Agreement, by way of an amendment hereto.

11.8.2 A Network Element obtained by one Party from the other Party under this subsection 11.8 may be used in combination with the facilities of the requesting Party only to provide a Telecommunications Service, including obtaining billing and collection, transmission, and routing of the Telecommunications Service.

11.8.3 Notwithstanding anything to the contrary in this subsection 11.8, a Party shall not be required to provide a proprietary Network Element to the other Party under this subsection 11.8 except as required by Applicable Law.

11.8.4 BA will, on a semi-annual basis, notify Level 3 of the availability of new unbundled Network Elements.

11.9    Provisioning of Loops

The following coordination procedures shall apply for conversions of "live" Telephone Exchange Services to Loops. These and other mutually agreed-upon procedures shall apply reciprocally for the "live" cutover of Customers from BA to Level 3 and from Level 3 to BA.

11.9.1 Coordinated cutover charges will apply to any conversion of live Telephone Exchange Services to Loops. If Level 3 elects not to request a coordinated cutover, BA will process Level 3's request in the normal course and subject to the normal installation intervals.

11.9.2 Level 3 shall request Loops from BA by delivering to BA a valid electronic transmittal service order (when available) or another mutually agreed-upon type of service order such as a Loop/NID Time and Material form. Such service order shall be provided in accordance with industry format and specifications or such format and specifications as may be agreed to by the Parties. Within forty-eight (48) hours of BA's receipt of such valid service order, BA shall provide Level 3 the firm order commitment date according to the Performance Interval Dates set forth in Schedule 26.1 by which the Loops covered by such service order will be installed.

11.9.3 On each Loop order in a Wire Center, Level 3 and BA will agree on a cutover time at least forty eight (48) hours before that cutover time. The cutover time will be defined as a 15-30 minute window within which both the Level 3 and BA personnel will make telephone contact to complete the cutover.

11.9.4 Within the appointed 15-30 minute cutover time, the BA person will call the Level 3 person designated to coordinate cutover work.

SV033099

46

Level 3/BELL ATLANTIC Interconnection Agreement for New York

11.9.5  If Level 3 requires a change in scheduling, it must contact BA to issue a supplement to the original order. The negotiations process to determine the date and time of cutover will then be reinitiated as usual.

11.9.6  If the Level 3 person is not ready within the appointed interval and if Level 3 had not called to reschedule the work at least two (2) hours prior to the start of the interval, Level 3 shall be liable for the non-recurring charge for the unbundled Network Elements scheduled for the missed appointment. In addition, non-recurring charges for the rescheduled appointment will apply.

11.9.7  If BA is not available or not ready at any time during the appointed 15-30 minute interval, Level 3 and BA will reschedule and BA will waive the non-recurring charge for the unbundled Network Elements originally scheduled for that interval, whenever those unbundled elements are actually cut over pursuant to an agreed-upon rescheduling.

11.9.8  The standard time expected from disconnection of a live Telephone Exchange Service to the connection of the unbundled Network Element to the Level 3 Collocation arrangement is fifteen (15) minutes per Voice Grade circuit for all orders consisting of twenty (20) Loops or less. Orders involving more than twenty (20) Loops will require a negotiated interval.

11.9.9  If unusual or unexpected circumstances prolong or extend the time required to accomplish the coordinated cutover, the Party responsible for such circumstances is responsible for the reasonable labor charges of the other Party. Delays caused by the Customer are the responsibility of Level 3.

11.9.10    If Level 3 has ordered LNP as part of an Loop installation, BA will coordinate implementation of LNP with the Loop coordinated cutover installation. BA's provision of unbundled Network Elements shall in all cases be subject to the availability of suitable facilities, to the extent permitted by Section 251 of the Act.

11.9.11    If Level 3 requests or approves a BA technician to perform services on the network side of the Rate Demarcation Point beyond normal installation of the Loops covered by the service order, BA may charge Level 3 for any additional and reasonable labor charges to perform such services. BA may also charge Level 3 its normal overtime rates for services Level 3 requests to be performed outside of BA's normal business hours (M-F, 9 am to 5 pm, Eastern Time).

11.10   Maintenance of Loops

If (a) Level 3 reports to BA a Customer trouble, (b) Level 3 requests a dispatch, (c) BA dispatches a technician, and (d) such trouble was not caused by BA's facilities or equipment, then Level 3 shall pay BA the applicable Tariff rate for said dispatch. In addition, this charge also applies in situations when the Customer contact as designated by Level 3 is not available at the appointed time. Level 3 accepts responsibility for initial trouble isolation and providing BA

SV033099

Level 3/BELL ATLANTIC Interconnection Agreement for New York

with appropriate dispatch information based on its test results. If, as the result of Level 3 instructions, BA is erroneously requested to dispatch within the Central Office, BA may levy on Level 3 an appropriate charge. However, if BA imposes any charge on Level 3 under this Section 11.10 and the same trouble recurs and the cause in both instances is determined to be in BA's facilities, then BA shall refund to Level 3 all charges applicable to that trouble that were erroneously levied on and paid by Level 3 to BA plus interest at the rate applicable to refunds of overpayments pursuant to BA's Tariffs.

### 11.11   Combinations of Network Elements

Notwithstanding anything set forth in this Agreement and subject to the conditions set forth in Section 11.0 hereof, BA shall be obligated to provide a combination of network elements (a "Combination") only to the extent provision of such Combination is required by Applicable Law. To the extent BA is required by Applicable Law to provide a Combination to Level 3, BA shall provide such Combination in accordance with, and subject to, requirements established by BA that are consistent with Applicable Law (such requirements, the "Combo Requirements"). BA shall make the Combo Requirements publicly available in an electronic form.

## 12.0   RESALE -- SECTIONS 251(c)(4) and 251(b)(1)

### 12.1   Availability of Retail Rates for Resale

BA shall make available to Level 3 for resale all Telecommunications Services as described in (and to the extent required by) Section 251(c)(4) of the Act, pursuant to the rates, terms and conditions of BA's applicable Tariffs, as may be amended from time to time. Such services shall be provided by BA to Level 3 at parity with the manner in which BA provides Telecommunications Services to its end user Customers in terms of service quality and performance intervals.

### 12.2   Availability of Wholesale Rates for Resale

BA shall make available to Level 3 for resale all Telecommunications Services that BA provides at retail to Customers that are not Telecommunications Carriers at the retail prices set forth in BA's Tariffs less the wholesale discount set forth in Exhibit A in accordance with Section 251(c)(4) of the Act. Such services shall be provided in accordance with the terms of the applicable retail services Tariff(s).

### 12.3   Availability of Support Services and Branding for Resale

BA shall make available to Level 3 the various support services for resale described in Schedule 12.3 hereto in accordance with the terms set forth therein. In addition, to the extent required by Applicable Law, upon request by Level 3 and at prices, terms and conditions to be negotiated by Level 3 and BA, BA shall provide BA Retail Telecommunications Services (as defined in Schedule 12.3) that are identified by Level 3's trade name, or that are not identified by trade name, trademark or service mark.

SV033099

12.4    Additional Terms Governing Resale and Use of BA Services

12.4.1 Level 3 shall comply with the provisions of this Agreement (including, but not limited to, all applicable BA Tariffs) regarding resale or use of BA services. In addition, Level 3 shall undertake in good faith to ensure that its Customers comply with the provisions of BA's Tariffs applicable to their use of BA's Telecommunications Services.

12.4.2 Without in any way limiting subsection 12.4.1, Level 3 shall not resell (a) residential service to business or other nonresidential Customers of Level 3, (b) Lifeline or other means-tested service offerings, or grandfathered service offerings, to persons not eligible to subscribe to such service offerings from BA, or (c) any other BA service in violation of any user or user group restriction that may be contained in the BA Tariff applicable to such service to the extent such restriction is not prohibited by Applicable Laws. In addition, Level 3 shall be subject to the same limitations that BA's own retail Customers may be subject to with respect to any Telecommunications Service that BA discontinues offering.

12.4.3 BA shall not be obligated to offer to Level 3 at a wholesale discount Telecommunications Services that BA offers at a special promotional rate if such promotions are for a duration of ninety (90) days or less.

12.4.4 Level 3 shall not be eligible to participate in any BA plan or program under which BA Customers may obtain products or merchandise, or services which are not BA Telecommunications Services, in return for trying, agreeing to purchase, purchasing, or using BA Telecommunications Services.

12.4.5 BA may impose additional restrictions on Level 3's resale of BA's retail Telecommunications Services to the extent permitted by Applicable Laws.

13.0    COLLOCATION -- SECTION 251(c)(6)

13.1    To the extent required by and, in accordance with, Applicable Law, BA shall offer to Level 3 Physical Collocation of equipment necessary for Interconnection (pursuant to Section 4) or for access to unbundled Network Elements (pursuant to Section 11.0), except that BA may offer only virtual Collocation if so permitted under Applicable Law, including, without limitation, if BA demonstrates to the Commission that Physical Collocation is not practical for technical reasons or because of space limitations, as provided in Section 251(c)(6) of the Act. To the extent required under Applicable Law, BA shall permit Level 3 to utilize such Collocation without distinction for all Telecommunications Services, whether traditional voice or advanced services. BA shall provide such Collocation solely for the purpose of Interconnection with facilities or services of BA or access to unbundled Network Elements of BA, except as otherwise mutually agreed to in writing by the Parties or as required by the FCC or the Commission. BA shall provide Collocation under the terms of its applicable Tariffs and this Agreement. In the event of a conflict between this Agreement and the Tariffs, this Agreement controls. In all cases, where BA is required to provide Collocation under Applicable Law, it shall be provided to Level

SV033099

49

3 on rates, terms and conditions that are just, reasonable and nondiscriminatory as set forth in 47 U.S.C. 251(c)(6).

13.2    Level 3 shall offer to BA Collocation of equipment for purposes of Interconnection (pursuant to Section 4) on a non-discriminatory basis and at comparable rates, terms and conditions as Level 3 may provide to other third parties. Level 3 shall provide such Collocation subject to applicable Tariffs or a separate agreement between the Parties.

13.3    In the course of implementing a Collocation project, BA shall:

(a)    identify the Collocation project manager assigned to the project;

(b)    develop a written comprehensive "critical tasks" timeline detailing the work (and relative sequence thereof) that is to be performed by each Party or jointly by both Parties; and

(c)    provide Level 3 with the relevant engineering requirements, including the projected dimensions of the Physical Collocation space.

13.4    Where Level 3 is virtually collocated in a space which was initially prepared for virtual Collocation, Level 3 may elect to (a) retain its virtual Collocation in that space and expand that virtual Collocation according to current procedures and the terms set forth in applicable Tariffs or (b) unless it is not practical for technical reasons or because of space limitations, transition its virtual Collocation to Physical Collocation at such premises, in which case Level 3 shall coordinate the construction and rearrangement with BA of its transmission equipment and facilities for which Level 3 shall pay BA at the rates set forth in applicable Tariffs. In addition, all applicable Physical Collocation nonrecurring and recurring charges shall apply and any nonrecurring and recurring charges for the transition to Physical Collocation and removal of virtual Collocation equipment shall apply.

13.5    After notifying Level 3 that BA has no available Physical Collocation space in a particular Central Office, BA must timely file a petition, where required under Applicable Law, with the Commission pursuant to 47 U.S.C. § 251(c)(6). BA will maintain a waiting list of customers on a first come, first served basis. BA will notify the telecommunications carriers on the waiting list when space becomes available according to how much space becomes available and the position of telecommunications carrier on said waiting list. Upon written request, BA will advise Level 3 as to its position on the list. Notwithstanding the foregoing, should any state regulatory agency impose a different procedure regarding the assignment of space in a Central Office where space has been previously unavailable, this Agreement may be amended to incorporate such Commission-ordered procedure.

13.6 Joint Planning and Implementation Intervals

13.6.1 Upon BA's receipt of a written request from Level 3, BA shall provide to Level 3 point of termination bay assignments for a Collocation arrangement; BA shall provide such assignments to Level 3 at least ten (10) days prior to the date of completion of the

SV033099

Collocation arrangement, so long as BA has had a reasonable amount of time to respond to Level 3's request for such information. Upon Level 3's reasonable request for additional information relating to its Collocation arrangement, BA shall work cooperatively and in good faith with Level 3 to supply such information as it becomes available.

13.6.2  For each Collocation request submitted by Level 3, the Parties shall meet to develop a set of major milestones for such request. BA and Level 3 shall work cooperatively to meet such milestones. The Parties shall conduct additional joint planning meetings if, and, as reasonably required.

13.6.3  After completion of construction, Level 3 and BA will complete an acceptance walkthrough of all collocated space requested from BA. Exceptions that are noted during this acceptance walkthrough and mutually agreed to by the Parties shall be corrected by BA within thirty (30) calendar days after the walkthrough. The correction of these exceptions from Level 3's original request for Collocation shall be at BA's expense.

13.6.4  Level 3 shall have the right to install all reasonable security measures it reasonably deems necessary for the protection of facilities within its own Collocation cage. Such measures shall include, but are not limited to, the installation of locks or access card readers. Level 3 will ensure that BA has adequate access to the locked enclosure for the purposes of routine inspections or emergencies, subject to the applicable BA Tariff provisions governing such access by BA.

13.6.5  Subject to the applicable BA Tariff bona fide request process, and only to the extent required by Applicable Law, Level 3 is entitled to a rebuttable presumption that its requested Collocation arrangement is technically feasible if any local exchange carrier has deployed such an arrangement in any incumbent local exchange carrier premises.

13.6.6  Equipment deployed by Level 3 at the BA premises will meet the safety requirements defined in BA's NEBS Requirements Document RNSA-NEB-95-0003. BA shall not impose any equipment safety requirements upon Level 3 that are more stringent than the requirements it places upon its own equipment, nor shall BA require that collocated equipment meets NEBS performance requirements. If BA denies Collocation on safety grounds, it shall provide Level 3 a list that includes all equipment in the BA premises, together with an affidavit attesting that this equipment meets or exceeds the relevant safety standard, within five (5) business days of the denial; provided, however, that the scope of the equipment BA is required to provide on such a list will be determined in accordance with Applicable Law. BA may obtain an extension of this interval upon receipt of written consent from Level 3, which consent shall not unreasonably be withheld.

13.6.7  Upon written request by Level 3 to utilize a vendor not previously approved or authorized by BA, BA shall not unreasonably delay consideration of whether BA shall approve or authorize Level 3 or any entity designated by Level 3 as a vendor eligible to work in BA premises. Such requests for approval or authorization shall be considered in a

SV033099

51

nondiscriminatory manner pursuant to published certification or approval standards provided by BA to Level 3.

## 14.0    NUMBER PORTABILITY – SECTION 251(b)(2)

### 14.1    Scope

The Parties shall provide Number Portability ("NP") in accordance with the Act, rules and regulations as from time to time prescribed by the FCC and the Commission, as applicable, and applicable industry standards.

### 14.2    Procedures for Providing LNP ("Long-term Number Portability")

The Parties will follow the LNP provisioning process recommended by the North American Numbering Council (NANC) and adopted by the FCC. In addition, the Parties agree to follow the LNP ordering procedures established at the Ordering and Billing Forum ("OBF"). The Parties shall provide LNP on a reciprocal basis.

14.2.1 LNP applies when a Customer of one Party ("Party A") elects to become a Customer of the other Party ("Party B") and also elects to utilize the original telephone number(s) corresponding to the Telephone Exchange Service(s) it previously received from Party A, in conjunction with the Telephone Exchange Service(s) it will now receive from Party B. After Party B has received appropriate authorization in accordance with Applicable Law from an end user Customer and sends an LSR to Party A, Parties A and B will work together to port the Customer's telephone number(s) from Party A's network to Party B's network. It is Party B's responsibility to maintain a file of all such authorizations. Upon written request from Party A, Party B shall provide a copy of any such authorization.

14.2.2 When a telephone number is ported out of Party A's network, Party A will remove any non-proprietary line based calling card(s) associated with the ported number(s) from its Line Information Database ("LIDB"). Reactivation of the line-based calling card in another LIDB, if desired, is the responsibility of Party B or Party B's Customer.

14.2.3 When a Customer of Party A ports his or her telephone numbers to Party B and the Customer has previously secured a reservation of line numbers from Party A for possible activation at a future point, these reserved but inactive numbers may be ported along with the active numbers to be ported provided the numbers have been reserved for the Customer. Party B may request that Party A port all reserved numbers assigned to the Customer or that Party A port only those numbers listed by Party B. As long as Party B maintains reserved but inactive numbers ported for the Customer, Party A shall not reassign those numbers. Party B shall not reassign the reserved numbers to another end user Customer.

14.2.4 When a Customer of Party A ports his or her telephone numbers to Party B, in the process of porting the Customer's telephone numbers, Party A shall implement the ten-digit trigger feature where it is available. When Party A receives the porting request, the unconditional

SV033099

52

trigger shall be applied to the Customer's line before the due date of the porting activity. When the ten-digit unconditional trigger is not available, Party A and Party B must coordinate the disconnect activity.

14.2.5 The Parties shall furnish each other with the Jurisdiction Information Parameter (JIP) in the Initial Address Message (IAM), containing a Local Exchange Routing Guide (LERG)-assigned NPA-NXX (6 digits) identifying the originating switch on calls originating from LNP capable switches.

14.2.6 Where LNP is commercially available, the NXXs in the End Office shall be defined as portable, except as noted in Section 14.2.7, and translations will be changed in the Parties' switches to open those NXXs for database queries in all applicable LNP capable End Offices within the LATA of the given switch(es). On a prospective basis, all newly deployed switches will be equipped with LNP capability and so noted in the LERG, pursuant to schedules and requirements, if any, set forth under industry standards and/or Applicable Law.

14.2.7 All NXXs assigned to LNP capable switches are to be designated as portable unless an NXX(s) has otherwise been designated as non-portable. Non-portable NXXs include NXX codes assigned to paging, cellular and wireless services; codes assigned for internal testing and official use and any other NXX codes required to be designated as non-portable by the rules and regulations of the FCC. NXX codes assigned to mass calling on a choked network may not be ported using LNP technology but are portable using methods established by the NANC and adopted by the FCC. On a prospective basis, newly assigned codes in switches capable of porting shall become commercially available for porting with the effective date in the network, pursuant to schedules and requirements, if any, set forth under industry standards and/or Applicable Law.

14.2.8 Both Parties' use of LNP shall meet the performance criteria specified by the FCC. Both Parties will act as the default carrier to perform the query for location routing number for the other Party in the event that either Party is unable to perform the routing necessary for LNP.

14.3    Procedures for Providing NP Through Full NXX Code Migration

Where a Party has activated an entire NXX for a single Customer, or activated at least eighty percent (80%) of an NXX for a single Customer, with the remaining numbers in that NXX either reserved for future use by that Customer or otherwise unused, if such Customer chooses to receive Telephone Exchange Service from the other Party, the first Party shall cooperate with the second Party to have the entire NXX reassigned in the LERG (and associated industry databases, routing tables, etc.) to an End Office operated by the second Party. Such transfer will be accomplished with appropriate coordination between the Parties and subject to appropriate industry lead-times for movements of NXXs from one switch to another. Neither Party shall charge the other in connection with this coordinated transfer.

SV033099

## 15.0    DIALING PARITY -- SECTION 251(b)(3)

BA and Level 3 shall each provide the other with nondiscriminatory access to such services and information as are necessary to allow the other Party to implement Dialing Parity for Telephone Exchange Service, operator services, directory assistance, and directory listing information with no unreasonable dialing delays, as required under Section 251(b)(3) of the Act.

## 16.0    ACCESS TO RIGHTS-OF-WAY -- SECTION 251(b)(4)

16.1    To the extent required by Applicable Law and where facilities are available, each Party ("Licensor") shall provide the other Party ("Licensee") access for purposes of making attachments to the poles, ducts, rights-of-way and conduits it owns or controls pursuant to any existing or future license agreement between the Parties. Such access shall be in conformance with 47 U.S.C. § 224 and on terms, conditions and prices comparable to those offered to any other entity pursuant to each Party's applicable Tariffs (including generally-available license agreements).

16.2    Licensor shall process all completed license applications for new or additional attachments, including the performance of a pre-license survey, on a first-come, first-serve basis as set forth in its applicable Tariff. Licensor shall make all access determinations in accordance with the requirements of Applicable Law (including any applicable FCC Regulations), considering such factors as capacity, safety, reliability and general engineering considerations. Licensor shall inform Licensee in writing as to whether an application has been granted (subject to Licensee's payment for any "make-ready" work that may be required) or denied within forty-five (45) days of receipt of such application. Where an application involves an increase in capacity by Licensor, Licensor shall take reasonable steps to accommodate requests for access in accordance with Applicable Law. Before denying Licensee access based on lack of capacity, Licensor shall explore potential accommodations in good faith with Licensee. In order to facilitate Licensee's completion of an application, Licensor shall make commercially reasonable efforts to, within fifteen (15) business days of a legitimate request identifying the specific geographic area and types and quantities of required structures, provide Licensee such maps, plats or other relevant data reasonably necessary to complete the applications described above, subject to a non-disclosure agreement in form reasonably agreeable to Licensor. Such requests shall be processed by Licensor on a first-come, first-serve basis. This exchange of information and records does not preclude the need for a field survey to verify the location and availability of structures and rights of way to be used. Licensor shall make commercially reasonable efforts to meet with or respond to Licensee's inquiries regarding the information supplied to it as soon as practicable following receipt of such request for meeting or inquiry from Licensee. Completion of make-ready work and attachments shall be in accordance with any existing or future license agreement between the Parties.

## 17.0    DATABASES AND SIGNALING

17.1    Subject to Section 11.0, each Party shall provide the other Party with access to databases and associated signaling necessary for call routing and completion by providing SS7 Common Channel Signaling ("CCS") Interconnection in accordance with existing Tariffs, and

SV033099

Interconnection and access to toll free service access code (e.g., 800/888/877) databases, LIDB, and any other necessary databases in accordance with existing Tariffs and/or agreements with other unaffiliated carriers, at the rates set forth in Exhibit A. Alternatively, either Party may secure CCS Interconnection from a commercial SS7 hub provider, and in that case the other Party will permit the purchasing Party to access the same databases as would have been accessible if the purchasing party had connected directly to the other Party's CCS network. In either case, Level 3 shall comply with BA's SS7 certification process prior to establishing CCS Interconnection with BA.

17.2    The Parties will provide CCS Signaling to each other, where and as available, in conjunction with all Local Traffic, Compensable Internet Traffic, Toll Traffic, Meet Point Billing Traffic, and Transit Traffic. The Parties will cooperate on the exchange of TCAP messages to facilitate interoperability of CCS-based features between their respective networks, including all CLASS Features and functions, to the extent each Party offers such features and functions to its Customers. All CCS Signaling parameters will be provided upon request (where available), including called party number, Calling Party Number, originating line information, calling party category, and charge number. All privacy indicators will be honored. The Parties will follow all Ordering and Billing Forum-adopted standards pertaining to CIC/OZZ codes. Where CCS Signaling is not available, in-band multi-frequency ("MF") wink start signaling will be provided. Any such MF arrangement will require a separate local trunk circuit between the Parties' respective switches in those instances where the Parties have established End Office to End Office high usage trunk groups. In such an arrangement, each Party will outpulse the full ten-digit telephone number of the called party to the other Party.

17.3    Each Party shall provide trunk groups, where available and upon reasonable request, that are configured utilizing the B8ZS ESF protocol for 64 kbps clear channel transmission to allow for ISDN interoperability between the Parties' respective networks.

17.4    The following publications describe the practices, procedures and specifications generally utilized by BA for signaling purposes and is listed herein to assist the Parties in meeting their respective Interconnection responsibilities related to Signaling:

(a)    Bellcore Generic Requirements, GR-905-CORE, Issue 1, March, 1995, and subsequent issues and amendments; and

(b)    Bell Atlantic Supplement Common Channel Signaling Network Interface Specification (BA-905).

17.5    Each Party shall charge the other Party mutual and reciprocal rates for any usage-based charges for CCS Signaling, toll free service access code (e.g., 800/888/877) database access, LIDB access, and access to other necessary databases, as follows: BA shall charge Level 3 in accordance with Exhibit A hereto and applicable Tariffs; Level 3 shall charge BA rates equal to the rates BA charges Level 3, unless Level 3's Tariffs for CCS signaling provide for lower generally available rates, in which case Level 3 shall charge BA such lower rates; except to the

SV033099

extent a Party uses a third party vendor for the provision of CCS Signaling, in which case such charges shall apply only to the third party vendor.

## 18.0    COORDINATED SERVICE ARRANGEMENTS

### 18.1    Intercept and Referral Announcements

When a Customer changes its service provider from BA to Level 3, or from Level 3 to BA, and does not retain its original telephone number, the Party formerly providing service to such Customer shall provide a referral announcement ("Referral Announcement") on the abandoned telephone number which provides details on the Customer's new number or provide other appropriate information to the extent known. Referral Announcements shall be provided reciprocally, free of charge to either the other Party or the Customer to the extent the providing Party does not charge its own Customers for such service, for a period of not less than four (4) months after the date the Customer changes its telephone number in the case of business Customers and not less than sixty (60) days after the date the Customer changes its telephone number in the case of residential Customers.

### 18.2    Coordinated Repair Calls

Level 3 and BA will employ the following procedures for handling misdirected repair calls:

18.2.1    Level 3 and BA will educate their respective Customers as to the correct telephone numbers to call in order to access their respective repair bureaus.

18.2.2    To the extent Party A is identifiable as the correct provider of service to Customers that make misdirected repair calls to Party B, Party B will immediately refer the Customers to the telephone number provided by Party A, or to an information source that can provide the telephone number of Party A, in a courteous manner and at no charge. In responding to misdirected repair calls, neither Party shall make disparaging remarks about the other Party, its services, rates, or service quality.

18.2.3    Level 3 and BA will provide their respective repair contact numbers to one another on a reciprocal basis.

### 18.3    Customer Authorization

18.3.1    Without in any way limiting either Party's obligations under subsection 27.1, each Party shall comply with Applicable Law with regard to Customer selection of a primary Telephone Exchange Service provider.

18.3.2    In the event either Party requests that the other Party install, provide, change, or terminate a Customer's Telecommunications Service (including, but not limited to, a Customer's selection of a primary Telephone Exchange Service Provider) and (a) fails to provide documentary evidence of the Customer's primary Telephone Exchange Service Provider

SV033099

56

selection upon request, or (b) fails to obtain authorization from the Customer for such installation, provision, selection, change or termination in accordance with Applicable Law, then in addition to any other rights or remedies available to the other Party, the requesting Party shall be liable to the other Party for all charges that would be applicable to the Customer for the initial change in the Customer's Telecommunications Service and any charges for restoring the Customer's Telecommunications Service to its Customer-authorized condition, including to the appropriate primary Telephone Exchange Service provider.

18.3.3  Without in any way limiting Level 3's obligations under subsection 27.1, Level 3 shall comply with Applicable Law with regard to Customer Proprietary Network Information, including, but not limited to, 47 U.S.C. § 222. Level 3 shall not access (including, but not limited to, through BA OSS Services (as defined in Schedule 12.3) and BA Pre-OSS Services), use, or disclose Customer Proprietary Network Information made available to Level 3 by BA pursuant to this Agreement unless Level 3 has obtained any Customer authorization for such access, use and/or disclosure required by Applicable Law.  By accessing, using or disclosing Customer Proprietary Network Information, Level 3 represents and warrants that it has obtained authorization for such action from the applicable Customer in the manner required by Applicable Law and this Agreement.  Level 3 shall, upon request by BA, provide proof of such authorization (including a copy of any written authorization).

18.3.4  BA shall have the right to monitor and/or audit Level 3's access to and use and/or disclosure of Customer Proprietary Network Information that is made available by BA to Level 3 pursuant to this Agreement to ascertain whether Level 3 is complying with the requirements of Applicable Law and this Agreement with regard to such access, use, and/or disclosure.  To the extent permitted by Applicable Law, the foregoing right shall include, but not be limited to, the right to electronically monitor Level 3's access to and use of Customer Proprietary Network Information that is made available by BA to Level 3 pursuant to this Agreement.

## 19.0    DIRECTORY SERVICES ARRANGEMENTS

Subject to Section 11.0 and upon request, BA will provide directory services to Level 3 in accordance with the terms set forth herein.  In this Section 19, references to a Level 3 Customer's "primary listing" shall mean such Customer's primary name, address, and telephone number, which number falls within the NXX codes directly assigned to Level 3 or is retained by Level 3 on the Customer's behalf pursuant to Number Portability arrangements with BA or any other carrier within the geographic area covered in the relevant BA directory.

### 19.1    Directory Listings and Directory Distributions

19.1.1  BA will include the Level 3 Customer's primary listing in the appropriate "White Pages" directories (residence and business listings) and "Yellow Pages" directories (business listings), as well as in any electronic directories in which BA's own Customers are ordinarily included, and directory assistance databases, and will distribute such directories to such Customers in an identical manner in which it provides those functions for its own Customers.

SV033099

Level 3/BELL ATLANTIC Interconnection Agreement for New York

Listings of Level 3's Customers will be interfiled with listings of BA's Customers and the Customers of other LECs included in the BA directories. Where required, Level 3 will pay BA the charge(s) set forth in Exhibit A for providing such service for each Level 3 Customer's primary listing. Level 3 will also pay BA's Tariffed charges, as the case may be, for additional and foreign white page listings and other white pages services for Level 3's Customers. BA will not require a minimum number of listings per order.

19.1.2  Upon request by Level 3, BA will make available to Level 3 a directory list of relevant NXX codes, the close dates, publishing data, yellow page headings and call guide close dates on the same basis as such information is provided to BA's own business offices.

19.1.3  Level 3 shall provide BA with daily listing information on all new Level 3 Customers in the format required by BA or a mutually-agreed upon industry standard format, at no charge.  The information shall include the Customer's name, address, telephone number, the delivery address and number of directories to be delivered, and, in the case of a business listing, the primary business heading under which the business Customer desires to be placed, and any other information necessary for the publication and delivery of directories. Level 3 will also provide BA with daily listing information showing Customers that have disconnected or terminated their service with Level 3.  BA will promptly provide Level 3 with confirmation of listing order activity, either through a verification report or a query on any listing which was not acceptable.

19.1.4  BA will accord Level 3's directory listing information the same level of confidentiality which BA accords its own directory listing information, and BA shall ensure that access to Level 3's directory listing information will be used solely for the purpose of providing directory services; provided, however, that should it determine to do so, BA may use or license information contained in its directory listings for direct marketing purposes so long as the Level 3 Customers are not separately identified as such; and provided further that Level 3 may identify those of its Customers that request that their names not be sold for direct marketing purposes, and BA will honor such requests to the same extent as it does for its own Customers.

19.1.5  Both Parties shall use commercially reasonable efforts to ensure the accurate listing of Level 3 Customer listings. BA will provide Level 3 with a report of all Level 3 Customer listings ninety (90) days prior to the service order close date for that directory. BA will process any corrections made by Level 3 with respect to its listings, provided such corrections are received prior to the close date of the particular directory.  BA will provide appropriate advance notice of applicable close dates.

19.1.6  Level 3 will adhere to all practices, standards, and ethical requirements of BA with regard to listings, and, by providing BA with listing information, warrants to BA that Level 3 has the right to place such listings on behalf of its Customers. BA will provide Level 3, upon request, a copy of the BA listings standards and specifications manual.  Level 3 agrees that it will undertake commercially practicable and reasonable steps to attempt to ensure that any business or person to be listed is authorized and has the right (a) to provide the product or service offered, and (b) to use any personal or corporate name, trade name or language used in the listing. In addition, Level 3 agrees to release, defend, hold harmless and indemnify BA from and against

SV033099

58

any and all claims, losses, damages, suits, or other actions, or any liability whatsoever, suffered, made, instituted, or asserted by any person arising out of BA's listing of the listing information provided by Level 3 hereunder.

19.1.7 BA's liability to Level 3 in the event of a BA error in or omission of a listing shall not exceed the amount of charges actually paid by Level 3 for such listing. In addition, Level 3 agrees to take, with respect to its own Customers, all reasonable steps to ensure that its and BA's liability to Level 3's Customers in the event of a BA error in or omission of a listing shall be subject to the same limitations that BA's liability to its own Customers are subject to.

19.2    Service Information Pages

BA will include all Level 3 NXX codes associated with the areas to which each directory pertains, to the extent it does so for BA's own NXX codes, in any lists of such codes which are contained in the general reference portions of the directories. Level 3's NXX codes shall appear in such lists in the same manner as BA's NXX information. In addition, when Level 3 is authorized to, and is offering, local service to end-users located within the geographic region covered by a specific directory, at Level 3 request, BA will include in the "Customer Guide" or comparable section of the applicable white pages directories listings provided by Level 3 for Level 3's installation, repair and Customer service and other essential local service oriented information, as agreed by the Parties, including appropriate identifying logo. Such listings shall appear in the manner agreed to by the Parties. Level 3 will be responsible for providing the necessary information to BA by the applicable close date for the particular directory. BA will provide Level 3 with the close dates and reasonable notice of any changes in said dates. BA shall not charge Level 3 for inclusion of this essential local service-oriented information, but reserves the right to impose charges on other information Level 3 may elect to submit and BA may elect to accept for inclusion in BA's white pages directories.

19.3    Yellow Pages Maintenance

The Parties agree to work cooperatively to ensure that Yellow Page advertisements purchased by Customers that switch their service to Level 3 (including Customers utilizing Level 3-assigned telephone numbers and Level 3 Customers utilizing Number Portability) are maintained without interruption. BA will offer Yellow Pages services to Level 3 Customers on the same basis as they are offered to BA Customers.

19.4    Directory Assistance (DA) and Operator Services (OS)

19.4.1 Subject to Section 11.0 and upon request, BA will provide Level 3 with directory assistance and/or IntraLATA operator services in accordance with rates and terms to which the Parties may agree, as set forth in BA's standard Directory Assistance and Operator Services Agreement as available from time to time.

19.4.2 Level 3 shall arrange at its expense the trunking and other facilities required to transport to and from the designated DA and OS switch locations.

SV033099

59

19.5    Busy Line Verification and Busy Line Verification Interrupt (BLV/BLVI)

19.5.1    BLV permits the operator of one local carrier to request the status of access lines (conversation in progress, available to receive calls, or out of order) that are served by another local carrier. BLVI allows the operator of one local carrier to request interruption of conversation on access lines that have been determined to be in use.

19.5.2    If either Party ("Carrier A") decides or is required by Applicable Law to offer BLV/BLVI services to enable its Customers to verify and/or interrupt calls of other Customers, the operator bureau of the other Party ("Carrier B") shall accept and respond to BLV/BLVI requests from the operator bureau of Carrier A.

19.5.3    The Local Carrier B operator shall only verify the status of the line or interrupt the line to inform the called party that another caller is attempting to reach them. The Local Carrier B operator will not complete the telephone call of the Customer initiating the BLVI request. The Local Carrier B operator will make only one BLVI attempt per operator bureau telephone request, and the applicable charges shall apply whether or not the called Customer releases the line. BLVI cannot be performed on telephone numbers utilizing a "call forwarding" feature. The operator shall respond to only one telephone number per call on requests for BLVI.

19.5.4    Both Parties shall route BLV/BLVI traffic inquiries over separate direct trunk groups (and not the Local/IntraLATA/InterLATA Trunks) established between the Parties' respective operator bureaus. Each Party shall offer Interconnection for BLV/BLVI traffic at its operator services switch serving the LATA or other mutually agreed point within the LATA. Unless otherwise mutually agreed, the Parties shall configure BLV/BLVI trunks over the Interconnection architectures in accordance with the terms of Section 4 of this Agreement. Local Carrier A shall outpulse the appropriate NPA, ATC Code, and Routing Code (operator code) to Local Carrier B.

## 20.0    RATES AND CHARGES; ASSURANCE OF PAYMENT

20.1    Except as provided elsewhere in this Agreement, the rates and charges set forth in Exhibit A hereto shall apply to the services, facilities, and arrangements provided hereunder and used for the provision of Telephone Exchange Service and associated Exchange Access. To the extent that services, facilities or arrangements are not included in Exhibit A, or the rates and charges therefor are not set forth in Exhibit A or elsewhere in this Agreement, the providing Party may charge its applicable, effective and nondiscriminatory Tariff rate that has been approved or otherwise allowed to go into effect by the Commission or the FCC.

20.2    Notwithstanding Section 20.1 hereof, the rates and charges set forth in Exhibit A shall be superseded by any new rate or charge when such new rate or charge is required by any order of the Commission or the FCC, approved by the Commission or the FCC, or otherwise allowed to go into effect, provided such new rates or charges are not subject to a stay issued by any court or regulatory body of competent jurisdiction. Notwithstanding any other provision of this

SV033099