Agreement, each Party reserves its respective right to file a complaint with the Commission with respect to the Tariff rates and charges of the other Party.

20.3  Upon request by BA, Level 3 shall, at any time and from time to time, provide to BA adequate assurance of payment of amounts due (or to become due) to BA hereunder. Assurance of payment of charges may be requested by BA if Level 3 (a) in BA's reasonable judgment, at the Effective Date or at any time thereafter, is unable to demonstrate that it is creditworthy, (b) fails to timely pay (or fails to give notice of a bona fide dispute pursuant to Section 28.8 hereof with respect to) a bill rendered to Level 3 by BA, (c) in BA's reasonable judgment, at the Effective Date or at any time thereafter, does not have established credit with BA or (d) admits its inability to pay its debts as such debts become due, has commenced a voluntary case (or has had a case commenced against it) under the U.S. Bankruptcy Code or any other law relating to bankruptcy, insolvency, reorganization, winding-up, composition or adjustment of debts or the like, has made an assignment for the benefit of creditors or is subject to a receivership or similar proceeding. Unless otherwise agreed by the Parties, the assurance of payment shall, at BA's option, consist of (i) a cash security deposit in U.S. dollars held in an account by BA or (ii) an unconditional, irrevocable standby letter of credit naming BA as the beneficiary thereof and otherwise in form and substance satisfactory to BA from a financial institution acceptable to BA, in either case in an amount equal to two (2) months anticipated charges (including, without limitation, both recurring and non-recurring charges), as reasonably determined by BA, for the services, facilities or arrangements to be provided by BA to Level 3 in connection with this Agreement. To the extent that BA opts for a cash deposit, the Parties intend that the provision of such deposit shall constitute the grant of a security interest pursuant to Article 9 of the Uniform Commercial Code as in effect in any relevant jurisdiction. If required by an applicable BA Tariff or by Applicable Law, interest will be paid on any such deposit held by BA at the higher of the stated interest rate in such Tariff or in the provisions of Applicable Law. BA may (but is not obligated to) draw on the letter of credit or funds on deposit in the account, as applicable, upon notice to Level 3 in respect of any amounts billed hereunder that are not paid within thirty (30) days of the date of the applicable statement of charges prepared by BA. The fact that a security deposit or a letter of credit is requested by BA hereunder shall in no way relieve Level 3 from compliance with BA's regulations as to advance payments and payment for service, nor constitute a waiver or modification of the terms herein pertaining to the discontinuance of service for nonpayment of any sums due to BA for the services, facilities or arrangements rendered.

21.0  INSURANCE

21.1  Level 3 shall maintain during the term of this Agreement all insurance and/or bonds required to satisfy its obligations under this Agreement and all insurance and/or bonds required by Applicable Law, including, without limitation, its obligations set forth in Section 24 hereof. At a minimum and without limiting the foregoing covenant, Level 3 shall maintain the following insurance:

(a)  Commercial General Liability Insurance, on an occurrence basis, including but not limited to, premises-operations, broad form property damage, products/completed

SV033099

61

operations, contractual liability, independent contractors, and personal injury, with limits of at least $2,000,000 combined single limit for each occurrence.

(b)     Automobile Liability, Comprehensive Form, with limits of at least $500,000 combined single limit for each occurrence.

(c)     Excess Liability, in the umbrella form, with limits of at least $10,000,000 combined single limit for each occurrence.

(d)     Worker's Compensation Insurance as required by Applicable Law and Employer's Liability Insurance with limits of not less than $1,000,000 per occurrence.

21.2    Level 3 shall name BA as an additional insured on the foregoing insurance, except with respect to Worker's Compensation Insurance.

21.3    Level 3 shall, within two (2) weeks of the date hereof and on a semi-annual basis thereafter, furnish certificates or other proof of the foregoing insurance acceptable to BA.  The certificates or other proof of the foregoing insurance shall be sent to:  Director - Interconnection Services;  Bell Atlantic Telecom Industry Services; 1095 Avenue of the Americas; Room 1423; New York, NY 10036.  In addition, Level 3 shall require its agents, representatives, and contractors, if any, that may enter upon the premises of BA or BA's affiliated companies to maintain similar and appropriate insurance and, if requested, to furnish BA certificates or other adequate proof of such insurance.  Certificates furnished by Level 3 or Level 3's agents, representatives, or contractors shall contain a clause stating:  "Verizon New York shall be notified in writing at least thirty (30) days prior to cancellation of, or any material change in, the insurance."

22.0    TERM AND TERMINATION.

22.1    This Agreement shall be effective as of the Effective Date and, unless cancelled or terminated earlier in accordance with the terms hereof, shall continue in effect until September 30, 2002 (the "Initial Term").  Thereafter, this Agreement shall continue in force and effect unless and until cancelled or terminated as provided in this Agreement.

22.2    Either Level 3 or BA may terminate this Agreement effective upon the expiration of the Initial Term or effective upon any date after expiration of the Initial Term by providing written notice of termination at least ninety (90) days in advance of the date of termination.

22.3    Both Level 3 and BA shall have the right to request negotiation of a new interconnection agreement at any time beginning January 1, 2002.  Any such request must be provided to the other Party in writing and shall be deemed a request for negotiation under Section 251 of the Act.  If either Level 3 or BA provides notice of termination pursuant to Section 22.2 and on or before the proposed date of termination either Level 3 or BA has requested negotiation of a new interconnection agreement, unless this Agreement is cancelled or terminated earlier in accordance with the terms hereof, this Agreement shall remain in effect during the "interim period" beginning on the proposed date of termination (which date shall not be earlier than

SV033099

Level 3/BELL ATLANTIC Interconnection Agreement for New York

September 30, 2002) and ending on the earlier of: (a) the effective date of a new interconnection agreement between Level 3 and BA; or, (b) the date one (1) year after the proposed date of termination; provided, however, that notwithstanding any other provision in this Agreement, if the Commission, the FCC or a court of competent jurisdiction should at any time after the date hereof issue or release an order, or if a federal or state legislative authority should enact a statute, that by its terms (i) expressly supercedes or modifies existing interconnection agreements and (ii) specifies a rate or rate structure for reciprocal compensation, intercarrier compensation, or access charges that is to apply to Internet Traffic, then the Parties shall promptly amend this Agreement to reflect the terms of such order or statute for the foregoing interim period (but, for the avoidance of any doubt, not for any period prior to the start of such interim period); provided further that, if such order or statute does not expressly supercede or modify existing interconnection agreements, then either Party, in its sole discretion, may elect, on any date from and after the beginning of the foregoing interim period (but, for the avoidance of any doubt, not prior to the start of such interim period), to terminate the Intercarrier Compensation provisions set forth herein with thirty (30) days advance written notice to the other Party (it being understood, for the avoidance of any doubt, that such notice may be provided (but not yet be effective) prior to the start of such interim period). In the event either Party elects to exercise its right to terminate the Intercarrier Compensation provisions, then the Parties shall promptly amend this Agreement to reflect the terms of such order or statute, and any such amendment shall be retroactive to the effective date of the termination (but, for the avoidance of any doubt, shall not be retroactive with respect to any period prior to October 1, 2002).

22.4    If either Level 3 or BA provides notice of termination pursuant to Section 22.2 and by 11:59 PM Eastern Time on the proposed date of termination neither Level 3 nor BA has requested negotiation of a new interconnection agreement, (a) this Agreement will terminate at 11:59 PM Eastern Time on the proposed date of termination, and (b) the Services being provided under this Agreement at the time of termination will be terminated, except to the extent that the purchasing Party has requested that such Services continue to be provided pursuant to an applicable Tariff. In any event, should termination of the Agreement be contemplated pursuant to this Section 22.4, the Parties agree to take commercially reasonable steps to minimize end user Customer disruption and to ensure an orderly transition in the provision of services.

22.5    If either Party defaults in the payment of any amount due hereunder (that is not the subject of a bona fide, good faith dispute hereunder), or if either Party materially violates any other material provision of this Agreement, and such default or violation shall continue for sixty (60) days after written notice thereof, the other Party may terminate this Agreement or suspend the provision of any or all services hereunder by providing written notice to the defaulting Party. At least twenty-five (25) days prior to the effective date of such termination or suspension, the other Party must provide the defaulting Party and the appropriate federal and/or state regulatory bodies with written notice of its intention to terminate the Agreement or suspend service if the default is not cured. Notice shall be posted by overnight mail, return receipt requested. If the defaulting Party cures the default or violation within the sixty (60) day period, the other Party shall not terminate the Agreement or suspend service provided hereunder but shall be entitled to recover all reasonable costs, if any, incurred by it in connection with the default or violation, including,

SV033099

63

without limitation, costs incurred to prepare for the termination of the Agreement or the suspension of service provided hereunder.

23.0    DISCLAIMER OF REPRESENTATIONS AND WARRANTIES

EXCEPT AS EXPRESSLY PROVIDED UNDER THIS AGREEMENT, **NEITHER PARTY MAKES OR RECEIVES** ANY WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE SERVICES, FACILITIES OR ARRANGEMENTS PROVIDED HEREUNDER OR CONTEMPLATED BY THIS AGREEMENT AND THE PARTIES DISCLAIM ANY OTHER WARRANTIES, INCLUDING BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND OF FITNESS FOR A PARTICULAR PURPOSE.

24.0    INDEMNIFICATION

24.1    BA agrees to indemnify, defend and hold harmless Level 3 from and against any and all Losses resulting from any claims, demands, suits, governmental proceedings, or other actions:

(a)    relating to personal injury to or death of any person, or damage to, or destruction or loss of, real and/or personal property of any person, arising from transactions or activities relating to this Agreement, to the extent such injury, death, damage, destruction or loss, was proximately caused by the negligent or otherwise tortious acts or omissions of BA; or

(b)    made, instituted, or asserted by BA's own Customer(s) against Level 3 arising out of Level 3's provision of services to BA under this Agreement (except for a Loss as to which Level 3 is obligated to indemnify BA under Section 24.2(a)).

24.2    Level 3 agrees to indemnify, defend and hold harmless BA from and against any and all Losses resulting from any and all claims, demands, suits, governmental proceedings, or other actions:

(a)    relating to personal injury to or death of any person, or damage to, or destruction or loss of, real and/or personal property, owned by any person, arising from transactions or activities relating to this Agreement, to the extent such injury, death, damage, destruction or loss, was proximately caused by the negligent or otherwise tortious acts or omissions of Level 3; or

(b)    made, instituted, or asserted by Level 3's own Customer(s) against BA arising out of BA's provision of services to Level 3 under this Agreement (except for a Loss as to which BA is obligated to indemnify Level 3 under Section 24.1(a)).

24.3    Nothing in Sections 24.1 and 24.2 shall affect or limit any claims, remedies, or other actions the indemnifying Party may have against the indemnified Party under this Agreement, any

SV033099

64

other contract, any applicable Tariff(s), or Applicable Law, relating to the indemnified Party's provision of services, facilities or arrangements to the indemnifying Party under this Agreement.

24.4    A Party's obligation to indemnify the other Party as provided herein shall be conditioned upon the following:

(a)    The indemnified Party shall promptly notify the indemnifying Party of any action taken against the indemnified Party relating to the indemnification. However, the failure to give such notice shall release the Indemnifying Party from its obligations under this Section 24.0 only to the extent the failure to give such notice has prejudiced the indemnifying Party.

(b)    The indemnifying Party shall have sole authority to defend any such action, including the selection of legal counsel, and the indemnified Party may engage separate legal counsel only at the indemnified Party's sole cost and expense.

(c)    In no event shall the indemnifying Party settle or consent to any judgment in an action without the prior written consent of the indemnified Party, which consent shall not be unreasonably withheld. However, in the event the settlement or judgment requires a contribution from or affects the rights of the indemnified Party, the indemnified Party shall have the right to refuse such settlement or judgment and, at its own cost and expense, take over the defense against such Loss, provided that in such event the indemnifying Party shall not be responsible for, nor shall it be obligated to indemnify the indemnified Party against, the Loss for any amount in excess of such refused settlement or judgment.

(d)    The indemnified Party shall, in all cases, assert any and all provisions in its Tariffs that limit liability to third parties as a bar to any recovery by the third party claimant in excess of such limitation of liability.

(e)    The indemnified Party shall offer the indemnifying Party all reasonable cooperation and assistance in the defense of any such action.

24.5    Each Party agrees that it will not implead or bring any action against the other Party or its affiliates, or any of their respective directors, officers, agents or employees, based on any claim by any person for personal injury or death that occurs in the course or scope of employment of such person by the other Party and that arises out of performance of this Agreement.

## 25.0    LIMITATION OF LIABILITY

25.1    The liability of either Party to the other Party for damages, claims or other losses arising out of failure to comply with a direction to install, restore or terminate facilities, or out of failures, mistakes, omissions, interruptions, delays, errors, defects or the like (collectively, "Errors") occurring in the course of furnishing any services, arrangements, or facilities hereunder shall be determined in accordance with the terms of the applicable Tariff(s) of the providing Party. In the

SV033099

event no Tariff(s) apply, the providing Party's liability for such Errors shall not exceed an amount equal to the pro rata applicable monthly charge for the period in which such Errors occur. Recovery of said amount shall be the injured Party's sole and exclusive remedy against the providing Party for such Errors.

25.2    Neither Party shall be liable to the other Party in connection with the provision or use of services offered under this Agreement for indirect, incidental, consequential, reliance, punitive, or like damages, including ,without limitation, damages for lost profits (collectively, "Consequential Damages"), regardless of the form of action, whether in contract, warranty, strict liability, tort or otherwise, including, without limitation, negligence of a Party, even if the other Party has been advised of the possibility of such damages; provided that the foregoing shall not limit a Party's obligation under Section 24 hereof.

## 26.0    PERFORMANCE STANDARDS FOR SPECIFIED ACTIVITIES

### 26.1    Performance Standards

BA shall provide Interconnection and unbundled Network Elements, and make its Telecommunication Services available for resale, all as set forth herein in accordance with the performance standards set forth in Section 251(c) of the Act and the FCC Regulations.

### 26.2    Performance Reporting

26.2.1 To the extent required by the FCC Order in the Application of BELL ATLANTIC Corporation, Transferee, For Consent to Transfer Control of BELL ATLANTIC Corporation and its Subsidiaries, NSD-L-96-10, Memorandum Opinion and Order (August 14, 1997) ("the FCC Merger Order"), BA shall provide Level 3 with the Performance Monitoring Reports applicable to Level 3 in accordance with the requirements of said FCC Merger Order.

26.2.2 To the extent required by Appendix D, Section V, "Carrier-to-Carrier Performance Plan (Including Performance Measurements)," and Appendix D, Attachment A, "Carrier-to-Carrier Performance Assurance Plan," of the Memorandum Opinion and Order In re Application of GTE Corporation, Transferor, and BELL ATLANTIC CORPORATION, Transferee, For Consent to Transfer Control of Domestic and International Sections 214 and 310 Authorizations and Application to Transfer Control of a Submarine Cable Landing License, CC Docket No. 98-184 (June 16, 2000), BA shall provide performance measurement results to Level 3.

26.2.3    Level 3 agrees that the performance information included in the Performance Monitoring Reports and the performance measurement results described in Sections 26.2.1 and 26.2.2 hereof is confidential and proprietary to BA, and shall be used by Level 3 solely for internal performance assessment purposes, for purposes of joint Level 3 and BA assessments of service performance, and for reporting to the Commission, the FCC, or courts of competent jurisdiction, under cover of an agreed-upon protective order, for the sole purpose of

SV033099

enforcing BA's obligations hereunder. Level 3 shall not otherwise disclose this information to third parties.

## 27.0  COMPLIANCE WITH LAWS; REGULATORY APPROVAL

27.1  Each Party  shall remain in compliance with Applicable Law in the course of performing this Agreement. Each Party shall promptly notify the other Party in writing of any governmental action that suspends, cancels, withdraws, limits, or otherwise materially affects its ability to perform its obligations hereunder.

27.2  The Parties understand and agree that this Agreement will be filed with the Commission and may thereafter be filed with the FCC as an integral part of BA's application pursuant to Section 271(d) of the Act. In the event that any one or more of the provisions contained herein in BA's reasonable determination is likely to adversely affect BA's application pursuant to Section 271(d) of the Act, the Parties agree to make only the minimum revisions necessary to eliminate the inconsistency or amend the application-affecting provision(s).

27.3  Except as explicitly provided in Sections 4.2.4, 5.7 and 22 of this Agreement, in the event of a change in Applicable Law that materially affects any material term of this Agreement, the rights or obligations of either Party hereunder, or the ability of either Party to perform any material provision hereof, the Parties shall renegotiate in good faith such affected provisions with a view toward agreeing to acceptable new terms as may be required or permitted as a result of such legislative, regulatory, judicial or other legal action.

27.4  Except as explicitly provided in Sections 4.2.4, 5.7 and 22 of this Agreement, notwithstanding anything else herein to the contrary, if, as a result of any decision, order or determination of any judicial or regulatory authority with jurisdiction over the subject matter hereof, it is determined that BA is not required to furnish any service, facility or arrangement, or to provide any benefit required to be furnished or provided to Level 3 hereunder, then BA may discontinue the provision of any such service, facility, arrangement or benefit to the extent permitted by any such decision, order or determination by providing ninety (90) days prior written notice to Level 3, unless a different notice period or different conditions are specified in this Agreement (including, but not limited to, in an applicable Tariff or Applicable Law) for termination of such service, in which event such specified period and/or conditions shall apply.

## 28.0  MISCELLANEOUS

28.1  Authorization

28.1.1  BA is a corporation duly organized, validly existing and in good standing under the laws of the State of New York  and has full power and authority to execute and deliver this Agreement and to perform the obligations hereunder.

SV033099

28.1.2  Level 3 is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, and has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder.

28.1.3  Level 3 represents that it is a certified provider of local exchange services in the State of New York.

28.2    Independent Contractor; Disclaimer of Agency

Each Party shall perform services hereunder as an independent contractor and nothing herein shall be construed as creating any other relationship between the Parties. Each Party and each Party's contractor shall be solely responsible for the withholding or payment of all applicable federal, state and local income taxes, social security taxes and other payroll taxes with respect to their employees, as well as any taxes, contributions or other obligations imposed by applicable state unemployment or workers' compensation acts. Each Party has sole authority and responsibility to hire, fire and otherwise control its employees. Except for provisions herein expressly authorizing a Party to act for another, nothing in this Agreement shall constitute a Party as a legal representative or agent of the other Party, nor shall a Party have the right or authority to assume, create or incur any liability or any obligation of any kind, express or implied, against or in the name or on behalf of the other Party unless otherwise expressly permitted by such other Party. Except as otherwise expressly provided in this Agreement, no Party undertakes to perform any obligation of the other Party, whether regulatory or contractual, or to assume any responsibility for the management of the other Party's business.

28.3    Force Majeure

Neither Party shall be responsible for delays or failures in performance resulting from acts or occurrences beyond the reasonable control of such Party, including, without limitation: adverse weather conditions, fire, explosion, power failure, acts of God, war, revolution, civil commotion, or acts of public enemies; any law, order, regulation, ordinance or requirement of any governmental or legal body; labor unrest, including, without limitation, strikes, slowdowns, picketing or boycotts; or delays caused by the other Party or by other service or equipment vendors beyond the Party's reasonable control; or any other acts or occurrences beyond the Party's reasonable control (the fact that a particular delay or failure in performance was foreseen or foreseeable not necessarily being indicative or non-indicative of whether or not the act or occurrence was within a Party's reasonable control) (any of the foregoing, a "Force Majeure Event"). In such event, the nonperforming Party shall, upon giving prompt notice to the other Party, be excused from such performance on a day-to-day basis to the extent of such interference (and the other Party shall likewise be excused from performance of its obligations on a day-to-day basis to the extent such Party's obligations relate to the performance so interfered with). The non-performing Party shall use its commercially reasonable efforts to avoid or remove the cause(s) of non-performance and both Parties shall proceed to perform with dispatch once the cause(s) are removed or cease. Notwithstanding the above, in no case shall a Force Majeure Event excuse either Party from the obligation to pay money when due under this Agreement, nor require the non-performing Party to settle any labor dispute except as the non-performing Party, in its sole discretion, determines appropriate. Each Party

SV033099

68

agrees to treat the other in parity with the manner in which it treats itself and any other entities with regard to a Force Majeure Event.

28.4    Confidentiality

28.4.1    All information, including but not limited to specifications, microfilm, photocopies, magnetic disks, magnetic tapes, drawings, sketches, models, samples, tools, technical information, data, employee records, maps, financial reports, and market data, that is furnished by one Party to the other Party and that:

(a) contains customer specific, facility specific, or usage specific information, other than customer information communicated for the purpose of publication or directory database inclusion, or

(b) is in written, graphic, electromagnetic, or other tangible form and marked at the time of delivery as "Confidential" or "Proprietary," or

(c) is communicated orally and declared to the receiving Party at the time of delivery, and by written notice given to the receiving Party within ten (10) days after delivery, to be "Confidential" or "Proprietary" (collectively referred to as "Proprietary Information"), shall remain the property of the disclosing Party.

28.4.2    Each Party shall keep all of the other Party's Proprietary Information confidential in the same manner it holds its own Proprietary Information confidential (which in all cases shall be no less than in a commercially reasonable manner) and shall use the other Party's Proprietary Information only for performing the covenants contained in this Agreement. Neither Party shall use the other Party's Proprietary Information for any other purpose except upon such terms and conditions as may be agreed upon between the Parties in writing or to enforce its rights hereunder (provided that the Party wishing to disclose the other Party's Proprietary Information submits the same to the Commission, the FCC or courts of competent jurisdiction, as applicable, under a request for a protective order).

28.4.3    Unless otherwise agreed, the obligations of confidentiality and non-use set forth in this Agreement do not apply to such Proprietary Information that:

(a) was, at the time of receipt, already known to the receiving Party free of any obligation to keep it confidential as evidenced by written records prepared prior to delivery by the disclosing Party; or

(b) is or becomes publicly known through no wrongful act of the receiving Party; or

(c) is rightfully received from a third person having no direct or indirect secrecy or confidentiality obligation to the disclosing Party with respect to such information; or

SV033099

69

Level 3/BELL ATLANTIC Interconnection Agreement for New York

(d) is independently developed by an employee, agent, or contractor of the receiving Party that is not involved in any manner with the provision of services pursuant to this Agreement and does not have any direct or indirect access to the Proprietary Information; or

(e) is approved for release by written authorization of the disclosing Party; or

(f) is required to be made public by the receiving Party pursuant to Applicable Law, provided that the receiving Party shall have made commercially reasonable efforts to give adequate notice of the requirement to the disclosing Party in order to enable the disclosing Party to seek protective orders.

28.4.4  Following termination or expiration of this Agreement, and upon request by the disclosing Party, the receiving Party shall return all tangible copies of Proprietary Information, whether written, graphic, electromagnetic or otherwise, except that the receiving Party may retain one copy for archival purposes only.

28.4.5  Notwithstanding any other provision of this Agreement, the provisions of this Section 28.4 shall apply to all Proprietary Information furnished by either Party to the other in furtherance of the purpose of this Agreement, even if furnished before the Effective Date.

28.4.6  The Parties' obligations with respect to Proprietary Information under this Section 28 shall not last beyond any time limitations therefor mandated under State law.

28.5    Choice of Law

The construction, interpretation and performance of this Agreement shall be governed by and construed in accordance with the laws of the state in which this Agreement is to be performed, except for its conflicts of laws provisions.  In addition, insofar as and to the extent federal law may apply, federal law will control.

28.6    Taxes

28.6.1  In General.  With respect to any purchase hereunder of services, facilities or arrangements, if any federal, state or local tax, fee, surcharge or other tax-like charge (a "Tax") is required or permitted by Applicable Law to be collected from the purchasing Party by the providing Party, then (i) the providing Party shall properly bill the purchasing Party for such Tax, (ii) the purchasing Party shall timely remit such Tax to the providing Party and (iii) the providing Party shall timely remit such collected Tax to the applicable taxing authority.

28.6.2  Taxes Imposed on the Providing Party.  With respect to any purchase hereunder of services, facilities or arrangements, if any federal, state or local Tax is imposed by Applicable Law on the receipts of the providing Party, and such Applicable Law permits the providing Party to exclude certain receipts received from sales for resale to a public utility, distributor, telephone company, local exchange carrier, telecommunications company or other

SV033099

70

communications company ("Telecommunications Company"), such exclusion being based solely on the fact that the purchasing Party is also subject to a tax based upon receipts ("Receipts Tax"), then the purchasing Party (i) shall provide the providing Party with notice in writing in accordance with Section 28.6.6 of this Agreement of its intent to pay the Receipts Tax and (ii) shall timely pay the Receipts Tax to the applicable tax authority.

28.6.3 Taxes Imposed on Customers. With respect to any purchase hereunder of services, facilities or arrangements that are resold to a third party, if any federal, state or local Tax is imposed by Applicable Law on the subscriber, end-user, Customer or ultimate consumer ("Subscriber") in connection with any such purchase, which a Telecommunications Company is required to impose and/or collect from a Subscriber, then the purchasing Party (i) shall be required to impose and/or collect such Tax from the Subscriber and (ii) shall timely remit such Tax to the applicable taxing authority.

28.6.4 Liability for Uncollected Tax, Interest and Penalty. If the providing Party has not received an exemption certificate and fails to collect any Tax as required by Section 28.6.1, then, as between the providing Party and the purchasing Party, (i) the purchasing Party shall remain liable for such uncollected Tax and (ii) the providing Party shall be liable for any interest assessed thereon and any penalty assessed with respect to such uncollected Tax by such authority. If the providing Party properly bills the purchasing Party for any Tax but the purchasing Party fails to remit such Tax to the providing Party as required by Section 28.6.1, then, as between the providing Party and the purchasing Party, the purchasing Party shall be liable for such uncollected Tax and any interest assessed thereon, as well as any penalty assessed with respect to such uncollected Tax by the applicable taxing authority. If the providing Party does not collect any Tax as required by Section 28.6.1 because the purchasing Party has provided such providing Party with an exemption certificate that is later found to be inadequate by a taxing authority, then, as between the providing Party and the purchasing Party, the purchasing Party shall be liable for such uncollected Tax and any interest assessed thereon, as well as any penalty assessed with respect to such uncollected Tax by the applicable taxing authority. If the purchasing Party fails to pay the Receipts Tax as required by Section 28.6.2, then, as between the providing Party and the purchasing Party, (x) the providing Party shall be liable for any Tax imposed on its receipts and (y) the purchasing Party shall be liable for any interest assessed thereon and any penalty assessed upon the providing Party with respect to such Tax by such authority. If the purchasing Party fails to impose and/or collect any Tax from Subscribers as required by Section 28.6.3, then, as between the providing Party and the purchasing Party, the purchasing Party shall remain liable for such uncollected Tax and any interest assessed thereon, as well as any penalty assessed with respect to such uncollected Tax by the applicable taxing authority. With respect to any Tax that the purchasing Party has agreed to pay, or is required to impose on and/or collect from Subscribers, the purchasing Party agrees to indemnify and hold the providing Party harmless on an after-tax basis for any costs incurred by the providing Party as a result of actions taken by the applicable taxing authority to recover the Tax from the providing Party due to the failure of the purchasing Party to timely pay, or collect and timely remit, such Tax to such authority. In the event either Party is audited by a taxing authority, the other Party agrees to cooperate fully with the Party being audited in order to respond to any audit

SV033099

inquiries in a proper and timely manner so that the audit and/or any resulting controversy may be resolved expeditiously.

28.6.5  Tax Exemptions and Exemption Certificates.  If Applicable Law clearly exempts a purchase hereunder from a Tax, and if such Applicable Law also provides an exemption procedure, such as an exemption-certificate requirement, then, if the purchasing Party complies with such procedure, the providing Party shall not collect such Tax during the effective period of such exemption.  Such exemption shall be effective upon receipt of the exemption certificate or affidavit in accordance with the terms set forth in Section 28.6.6.  If Applicable Law clearly exempts a purchase hereunder from a Tax, but does not also provide an exemption procedure, then the providing Party shall not collect such Tax if the purchasing Party (i) furnishes the providing Party with a letter signed by an officer requesting such an exemption and citing the provision in the Applicable Law which clearly allows such exemption and (ii) supplies the providing Party with an indemnification agreement, reasonably acceptable to the providing Party (e.g., an agreement commonly used in the industry), which holds the providing Party harmless on an after-tax basis with respect to its forbearing to collect such Tax.

28.6.6  If any discount or portion of a discount in price provided to Level 3 under this Agreement (including, but not limited to, a wholesale discount provided for in Exhibit A) is based on anticipated Tax savings to BA because it was anticipated that receipts from sales of BA services that would otherwise be subject to a Tax on such receipts could be excluded from such Tax under Applicable Law because the BA services would be sold to Level 3 for resale, and BA is, in fact, required by Applicable Law to pay such Tax on receipts from sales of BA services to Level 3, then, as between BA and Level 3, Level 3 shall be liable for, and shall indemnify and hold harmless BA against (on an after-tax basis), any such Tax and any interest and/or penalty assessed by the applicable taxing authority on either Level 3 or BA with respect to the Tax on BA's receipts.

28.6.7  All notices, affidavits, exemption-certificates or other communications required or permitted to be given by either Party to the other, for purposes of this Section 28.6, shall be made in writing and shall be delivered in person or sent by certified mail, return receipt requested, or registered mail, or a courier service providing proof of service, and sent to the addressees set forth in Section 28.10 as well as to the following:

| | |
|---|---|
| To Bell Atlantic: | Tax Administration |
| | Bell Atlantic Corporation |
| | 1095 Avenue of the Americas |
| | Room 3109 |
| | New York, NY 10036 |
| | |
| To Level 3: | Director of Tax Administration |
| | Level 3 Communications, LLC |
| | 1025 Eldorado Blvd. |
| | Broomfield, CO 80021 |

SV033099

Level 3/BELL ATLANTIC Interconnection Agreement for New York

Either Party may from time to time designate another address or other addressees by giving notice is accordance with the terms of this Section 28.6. Any notice or other communication shall be deemed to be given when received.

28.7    Assignment

Neither Party may assign this Agreement or any of its rights or obligations hereunder to a third party without the written consent of the other Party; provided, however, that either Party may assign this Agreement to an affiliate, without the other Party's prior written consent (but with written notice thereof to the other Party), upon the provision of reasonable evidence by the proposed assignee that it has the resources, ability, and authority to provide satisfactory performance under this Agreement, and provided further that the proposed assignee is in good standing with the other Party. Any assignment or delegation in violation of this subsection 29.7 shall be void and ineffective and constitute a default of this Agreement. For the purposes of this Section, the term "affiliate" shall mean any entity that controls, is controlled by, or is under common control with the assigning Party. The forgoing shall not be construed to prevent a Party from granting a security interest in this Agreement.

28.8    Billing and Payment; Disputed Amounts

28.8.1    Except as may otherwise be provided in this Agreement, each Party shall submit on a monthly basis an itemized statement of charges incurred by the other Party during the preceding month(s) for services, facilities or arrangements provided hereunder. Payment of amounts billed under this Agreement, whether billed on a monthly basis or as otherwise provided herein, shall be due, in immediately available U.S. funds, on the later of (a) thirty (30) days following the date of such statement, or (b) twenty (20) days from the date of receipt of such statement.

28.8.2    Although it is the intent of both Parties to submit timely and accurate statements of charges, failure by either Party to present statements to the other Party in a timely manner shall not constitute a breach or default, or a waiver of the right to payment of the incurred charges, by the billing Party under this Agreement, and the billed Party shall not be entitled to dispute the billing Party's statement(s) based on such Party's failure to submit them in a timely fashion.

28.8.3    If any portion of an amount due to a Party (the "Billing Party") under this Agreement is subject to a bona fide dispute between the Parties, the Party billed (the "Non-Paying Party") shall within sixty (60) days of its receipt of the invoice containing such disputed amount give notice to the Billing Party of the amounts it disputes ("Disputed Amounts") and include in such notice the specific details and reasons for disputing each item. The Non-Paying Party shall pay when due (i) all undisputed amounts to the Billing Party and (ii) all Disputed Amounts into an interest bearing escrow account with a third party escrow agent mutually agreed upon by the Parties.

SV033099

73

28.8.4  If the Parties are unable to resolve the issues related to the Disputed Amounts in the normal course of business within thirty (30) days after delivery to the Billing Party of notice of the Disputed Amounts, each of the Parties shall appoint a designated representative who has authority to settle the dispute and who is at a higher level of management than the persons with direct responsibility for administration of this Agreement. The designated representatives shall meet as often as they reasonably deem necessary in order to discuss the dispute and negotiate in good faith in an effort to resolve such dispute. The specific format for such discussions will be left to the discretion of the designated representatives, however all reasonable requests for relevant information made by one Party to the other Party shall be honored.

28.8.5  If the Parties are unable to resolve issues related to the Disputed Amounts within thirty (30) days after the Parties' appointment of designated representatives pursuant to Section 28.8.4, or if either Party fails to appoint a designated representative within thirty (30) days of the end of the thirty (30) day period referred to Section 28.8.4, then either Party may file a complaint with the Commission or any other authority of competent jurisdiction to resolve such issues or proceed with any other remedy pursuant to law or equity.

28.8.6  The Parties agree that all negotiations pursuant to this Section 28.8 shall remain confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and state rules of evidence.

28.8.7  Charges which are not paid by the due date stated on BA's bill shall be subject to a late payment charge. The late payment charge shall be an amount specified by BA which shall not exceed a rate of one and one half percent (1 1/12%) of the overdue amount (including any unpaid previously billed late payment charges) per month.

28.9  Dispute Resolution

Except as otherwise provided in this Agreement, any dispute between the Parties regarding the interpretation or enforcement of this Agreement or any of its terms shall be addressed by good faith attempts at conducting good faith negotiation between the Parties, in the first instance. Should such negotiations fail to resolve any dispute under this Agreement in a reasonable time (given, among other things, the circumstances giving rise to the dispute, the scope of perceived harm to the Parties, and the perceived threat to the services provided to Customers), either Party may initiate an appropriate action in any regulatory or judicial forum of competent jurisdiction.

28.10  Notices

Except as otherwise provided in this Agreement, notices given by one Party to the other Party under this Agreement shall be in writing and shall be (a) delivered personally, (b) delivered by express delivery service, (c) mailed, certified mail or first class U.S. mail postage prepaid, return receipt requested, or (d) delivered by telecopy to the following addresses of the Parties:

SV033099

To Level 3:

Level 3 Communications, LLC
Tony Sachetti, Direcor-Interconnection Services
1025 Eldorado Blvd.
Broomfield, CO  80021
Tel.: (720) 888-1000

with a copy to:

Michael R. Romano, Esq.
Level 3 Communications, LLC
1025 Eldorado Blvd.
Broomfield, CO  80021
Facsimile:      (720) 888-5134

To BA:

Director - Interconnection Services
Bell Atlantic Telecom Industry Services
1095 Avenue of the Americas
Room 1423
New York, NY  10036
Facsimile:  212/704-4381

with copies to:

General Counsel
1095 Avenue of Americas
40th Floor
New York, NY  10036
Facsimile: (212) 597-2560
Associate General Counsel – Telecom
1320 N. Court House Road
8th Floor
Arlington, VA  22201
Facsimile:  703/974-0744

or to such other address as either Party shall designate by proper notice.  Notices will be deemed given as of the earlier of (i) the date of actual receipt, (ii) the next business day when notice is sent via express mail or personal delivery, (iii) three (3) days after mailing in the case of first class or certified U.S. mail, or (iv) on the date set forth on the confirmation in the case of telecopy.

SV033099

75

### 28.11  Joint Work Product

This Agreement is the joint work product of the Parties and has been negotiated by the Parties and their respective counsel and shall be fairly interpreted in accordance with its terms and, in the event of any ambiguities shall be drawn against either Party.

### 28.12  No Third Party Beneficiaries

This Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein express or implied shall create or be construed to create any third-party beneficiary rights hereunder.

### 28.13  No Licenses

28.13.1        Nothing in this Agreement shall be construed as the grant of a license with respect to any patent, copyright, trademark, trade name, trade secret or any other proprietary or intellectual property now or hereafter owned, controlled or licensable by either Party. Neither Party may use any patent, copyrightable materials, trademark, trade name, trade secret or other intellectual property right of the other Party except in accordance with the terms of a separate license agreement between the Parties granting such rights.

28.13.2        Except as may be required under Section 28.13.4 hereof, neither Party shall have any obligation to defend, indemnify or hold harmless, or acquire any license or right for the benefit of, or owe any other obligation or have any liability to, the other Party or its Customers based on or arising from any claim, demand, or proceeding by any third party alleging or asserting that the use of any circuit, apparatus, or system, or the use of any software, or the performance of any service or method, or the provision of any facilities by either Party under this Agreement, alone or in combination with that of the other Party, constitutes direct, vicarious or contributory infringement or inducement to infringe, misuse or misappropriation of any patent, copyright, trademark, trade secret, or any other proprietary or intellectual property right of any Party or third party.  Each Party, however, shall offer to the other reasonable cooperation and assistance in the defense of any such claim.

28.13.3        NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, THE PARTIES AGREE THAT NEITHER PARTY HAS MADE, AND THAT THERE DOES NOT EXIST, ANY WARRANTY, EXPRESS OR IMPLIED, THAT THE USE BY EACH PARTY OF THE OTHER'S FACILITIES, ARRANGEMENTS, OR SERVICES PROVIDED UNDER THIS AGREEMENT SHALL NOT GIVE RISE TO A CLAIM OF INFRINGEMENT, MISUSE, OR MISAPPROPRIATION OF ANY INTELLECTUAL PROPERTY RIGHT.

28.13.4        Level 3 agrees that the rights granted by BA hereunder shall, where applicable, be subject to the restrictions, if any, contained in any current software license agreements between BA and BA's software vendors. If BA asserts any such restrictions, BA shall provide written notice thereof to Level 3, and upon receipt of written request by Level 3, BA

SV033099

76

shall provide a copy of the applicable restrictive provisions in the subject license agreement(s), except to the extent that BA is prohibited from doing so by a confidentiality obligation; provided, however, that in the case of such a confidentiality obligation, BA shall exercise commercially reasonable best efforts to make a copy of the subject license agreement(s) available to Level 3, although in no event shall BA be required to expend funds or undertake any additional obligations to make such information available to Level 3. Level 3 acknowledges that functions and features made available to it hereunder through the use of third party proprietary products may involve additional terms and conditions and/or separate licensing to Level 3; provided, however, BA agrees that it shall comply with the requirements, if any, of Applicable Law with respect to making efforts to secure intellectual property rights from third parties necessary for Level 3 to make use of BA services and facilities.

### 28.14   Technology Upgrades

Notwithstanding any other provision of this Agreement, BA shall have the right to deploy, upgrade, migrate and maintain its network at its discretion. The Parties acknowledge that BA, at its election, may deploy fiber throughout its network and that such fiber deployment may inhibit or facilitate Level 3's ability to provide service using certain technologies. Nothing in this Agreement shall limit BA's ability to upgrade its network through the incorporation of new equipment, new software or otherwise. Level 3 shall be solely responsible for the cost and effort of accommodating such changes in its own network. BA shall, however, notify Level 3 in writing of any technology upgrades that would materially affect BA's provision of services or facilities hereunder, as soon as reasonably possible after the decision is made to implement such upgrades, so that Level 3 will have reasonable time to make alternative arrangements as necessary. In no event shall such notice be less than sixty (60) days in advance of the upgrade to be implemented by BA.

### 28.15   Survival

The Parties' obligations under this Agreement which by their nature are intended to continue beyond the termination or expiration of this Agreement (including, without limitation, the obligation to pay amounts owed hereunder (to include indemnification obligations) and the obligation to protect the other Party's Proprietary Information) shall survive the termination or expiration of this Agreement.

### 28.16   Entire Agreement

The terms contained in this Agreement and any Schedules, Exhibits, Tariffs and other documents or instruments referred to herein that are incorporated into this Agreement by this reference constitute the entire agreement between the Parties with respect to the subject matter hereof, and supersede any and all understandings, proposals and other communications, oral or written regarding such subject matter that have been made or entered into prior to the effective date hereof, November 1, 2000. Neither Party shall be bound by any preprinted terms additional to or different from those in this Agreement that may appear subsequently in the other Party's

SV033099

form documents, purchase orders, quotations, acknowledgments, invoices or other communications.

### 28.17  Counterparts

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

### 28.18  Modification, Amendment, Supplement, or Waiver

No modification, amendment, supplement to, or waiver of the Agreement or any of its provisions shall be effective and binding upon the Parties unless it is made in writing and duly signed by the Parties. A failure or delay of either Party to enforce any of the provisions hereof, to exercise any option which is herein provided, or to require performance of any of the provisions hereof shall in no way be construed to be a waiver of such provisions or options.

### 28.19  Successors and Assigns

This Agreement shall be binding on and inure to the benefit of the Parties and their respective legal successors and permitted assigns.

### 28.20  Publicity and Use of Trademarks or Service Marks

Neither Party nor its subcontractors or agents shall use the other Party's trademarks, service marks, logos or other proprietary trade dress in any advertising, press releases, publicity matters or other promotional materials without such Party's prior written consent.

### 28.21  Cooperation With Law Enforcement

BA may cooperate with law enforcement authorities to the full extent required or permitted by Applicable Law in matters related to services provided by BA hereunder, including, but not limited to, the production of records; the establishment of new lines or the installation of new services on an existing line in order to support law enforcement operations; and the installation of wiretaps, trap-or-trace devices and pen registers. BA shall not have the obligation to inform the Customers of Level 3 of such law enforcement requirements, except to the extent required by Applicable Law. BA will inform Level 3 of such law enforcement requirements, unless an appropriate governmental authority requests that notice to Level 3 be withheld, or such disclosure is otherwise inconsistent with Applicable Law. Where a law enforcement requirement relates to the establishment of new lines (including, but not limited to, lines established to support interception of communications on other lines), or the installation of services on existing lines, BA may take measures to prevent CLECs from obtaining access to information concerning such lines or services through operations support system interfaces, whenever an appropriate governmental authority so requests. A requirement that the existence of the lines or services not be disclosed shall be interpreted as including a requirement to block access to information concerning the lines or services through operations support system interfaces. BA will not be

SV033099

Level 3/BELL ATLANTIC Interconnection Agreement for New York

liable to any person for any economic harm, personal injury, invasion of any right of privacy, or any other harm, loss or injury, caused or claimed to be caused, directly or indirectly, by actions taken by BA to block, or by its failure to block, access to information concerning particular lines or services through operations support systems interfaces or otherwise.

28.22   CLEC Certification

Notwithstanding any other provision of this Agreement, BA shall have no obligation to perform under this Agreement until such time as Level 3 has obtained a Certificate of Public Convenience and Necessity (CPCN) or such other Commission authorization as may be required by law as a condition for conducting business in New York as a local exchange carrier.

28.23   Section 252(i)

Except as set forth in Section 5.7.3 hereof, nothing in this Agreement shall be construed to prevent either Party from exercising any rights it may hold under Section 252(i) of the Act. Except as set forth in Section 5.7.3 hereof, nothing in this Agreement shall be construed to excuse either Party from any obligations it may bear under Section 252(i) of the Act.

SV033099

Level 3/BELL ATLANTIC Interconnection Agreement for New York

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of this 1st day of November, 2000.

LEVEL 3 COMMUNICATIONS, LLC          VERIZON NEW YORK

By:_____          By:_____

Printed:_____          Printed:_____

Title:_____          Title:_____

SV033099

Level 3/BELL ATLANTIC Interconnection Agreement for New York

SV033099