# Exhibit 10

**From:**     Tom Matlack <TMatlack@megunticook.com>
**Sent:**     Friday, March 11, 2005 9:41 AM
**To:**        Deal Team <DealTeam@megunticook.com>
**Subject:**  FW:

-----Original Message-----
From: O'Hare, Kevin [mailto:kohare@lightship.com]
Sent: Friday, March 11, 2005 9:35 AM
To: Kenneth D. Peterson, Jr.; Richard A. Roman; roliver@ctcnet.com; james.prenetta@ctcnet.com;
stephan.oppenheimer@jpmorganpartners.com; Tom Matlack; quinn@qllc.com
Subject: FW:

-----Original Message-----
From: O'Hare, Kevin
Sent: Friday, March 11, 2005 9:30 AM
To: 'Ray.Allieri@CTCNet.com'
Subject: RE:

Ray,

I think it was a misunderstanding between Pam and Rainer. Rainer was
answering a broader question about whether or not we bill CABS on UNE-P
lines. We do bill intra-lata CABS to all other carriers on UNE-P lines,
all other than Verizon. My answer is unambiguous and correct. We do
not bill Verizon for intra-lata CABS on UNE-P lines. My understanding
of this issue is absolute and complete. You need not concern yourself
on this one any longer.

Kevin

-----Original Message-----
From: Ray.Allieri@CTCNet.com [mailto:Ray.Allieri@CTCNet.com]
Sent: Friday, March 11, 2005 9:22 AM
To: O'Hare, Kevin
Subject: RE:

Kevin,
This is in direct conflict with Rainer's response, in writing, to Pam
last
night, so you can probably understand our concern on this. Can you help
me
un derstand why the 2 of you seem to have a different point of view?
I am out of the office this morning, but I will attempt to reach you via
cell [phone.
thanks.
rca

To:  "Kenneth D.
Peterson, Jr." <ken@colventures.com>, "Tom Matlack"

<TMatlack@megunticook.com>, <Ray.Allieri@ctcnet.com>,

<stephan.oppenheimer@jpmorganpartners.com>

"O'Hare, Kevin"          cc:  "Richard A. Roman"
<rar@colventures.com>, <quinn@qllc.com>,
<kohare@lightship.com>
<roliver@ctcnet.com>, <james.prenetta@ctcnet.com>

Subject:     RE:

03/11/2005 09:10 AM

To All,

I want to clear up an issue discussed between members of our teams
yesterday.  Lightship does bill intra-lata CABS for carriers on UNE-P
lines but DOES NOT BILL VERIZON for intra-lata CABS on UNE-P lines.  I
believe this resolves the CABS misunderstanding.

Kevin

-----Original Message-----
From: Kenneth D. Peterson, Jr. [mailto:ken@colventures.com]
Sent: Friday, March 11, 2005 4:50 AM
To: Tom Matlack; Ray.Allieri@ctcnet.com;
stephan.oppenheimer@jpmorganpartners.com
Cc: Richard A. Roman; O'Hare, Kevin; quinn@qllc.com; roliver@ctcnet.com;
james.prenetta@ctcnet.com
Subject: RE:

Thank you very much for the opportunity to discuss this situation last
night with both you and Stephan. I am sorry, Stephan, that you were not
able to stay for the whole call, but I totally understand that timing of
things makes such conflicts inevitable. I am OK with the Sunday timing
that you have suggested although I will note it is 2 pm Pacific Time.
    I am happy to accept that the owners of Lantern feel they
completely understand their own internal tax issues that have been
raised recently in the Due Diligence process. I am also sure that you
similarly understand that we as complete outsiders have only been
exposed to the issues within the last few days so it may take a bit
longer to work through the issues that you have lived with for years. I
am also happy to accept that you have developed over time a position
that is comfortable to you regarding the legal consequences and
interpretations in this dynamic area. In this particular case, however,
we will be stepping into your shoes and you have insisted that there be
no recourse on our part for your position being wrong except for the
limited escrow we have agreed to put into place. This is compounded by
the fact that you are a private company and therefore not liable under
various laws to have certified subject to government penalty and
sanctions certain things. This just means that we must be careful, as
you would be if the shoe were on the other foot. (I have no interest in
shoe manufacturing although I seem stuck on that analogy I see.)

The recent CABS issue is a bit different in my view. First, it is the latest breaking news, so to speak, so we have had the least time to even think about it since it was disclosed to me only just before we spoke last evening. This means, as I mentioned, that there is a risk that we have not properly understood what was being disclosed. Or, alternatively, it is possible that the question we were asking was not understood so the answer was actually about something else. In other words, it would be unfortunate to find out that some difference between your and my view on the issue was simply a misunderstanding if we could just talk about it further.

As it has been relayed to me, subject to the proviso that I may have misunderstood or that others themselves, on one side or the other, may have misunderstood, the issue is related to this:

Lantern has a contractual agreement in place with Verizon that governs certain relations between the companies. One of the things governed relates to how Lantern will bill Verizon for certain services over UNE-P lines. The contract, as I am told, appears to prohibit a certain type of charge that in fact Lantern has been charging. Obviously, this only affects a fraction of Lantern's business, but it could result in a material affect on reported EBITDA should it turn out to be prohibited by contract. That's about all I can explain at this time. If you, or your trusted representatives, have examined the contract and examined the actual billing practice and concluded that there is Explanation X which allows it nonetheless, or Explanation Y which says we have totally misunderstood the issue, then we would appreciate knowing it. It is also possible that we might simply disagree about how the contract or the billing practice should be interpreted and we just have a disagreement, but I would prefer not to assume this out of the box.

Before we come to a conclusion on this issue, however, I would sincerely desire the opportunity to inquire what Lantern thinks of the situation and whether they can point out a misunderstanding or an alternate interpretation. In other words, it is just regular Due Diligence and good practice for understanding the company that we are seeking to acquire. It turns out to have come up at the last minute only because the disclosure came up at the last minute in response to earlier questions.

In summary, I absolutely agree with your observation that if all questions are to be resolved with absolute knowledge about everything, then probably nothing would ever be done. My history demonstrates that CVC does not act that way. We have a track record of doing many, many deals around the world and going where others have feared to tread. I am an entrepreneur, not a banker(!), and, by definition, not risk averse. I do, however, try to understand the risks I am absorbing and in this case I do not have that understanding yet about a couple of late-breaking issues, though not from lack of trying.

It is totally in your discretion to set the rules of engagement you wish to adhere to and we will happily work with Kevin to reach as clear an understanding of the situation as possible today. I am hopeful, however, that if something is not in his personal knowledge that he will be allowed to bring in the resource that can further clarify the situation. Again, that will be up to you. I am trying hard not to allow simple misunderstandings to color either of our views so that we can both have business decisions to make at the end of the day based on as much fact as possible.

Finally, your proposals seem constructive to me, although I will have to be updated to make sure I understand how they fit within the full context of things. I also take your point about lawyers and I hereby ask Jim to make sure our legal team is working as cooperatively as possible on the minor drafting issues remaining. Our positions should only be reasonable and I would be very disappointed to see another loggerheads develop again similar to the one outlined in the first of Tom's nine points down below in this chain.

Again, thank you for letting us have some time to tie down these late issues. I, too, look forward to bringing this to an end in a way

that allows us to mutually move forward.
    Best wishes,
KEN PETERSON

---

From: Tom Matlack [mailto:TMatlack@megunticook.com]
Sent: Thu 3/10/2005 10:46
To: Kenneth D. Peterson, Jr.; Ray.Allieri@ctcnet.com;
stephan.oppenheimer@jpmorganpartners.com
Cc: Richard A. Roman; kohare@lightship.com; quinn@qllc.com;
roliver@ctcnet.com; james.prenetta@ctcnet.com
Subject: RE:


Ken, Ray & Rich:

I have discussed our situation with other members of the board and
propose the following in response to your request.

We feel that the call today has fully fleshed out areas of agreement and
disagreement on the tax issues and do not feel further discussion will
advance the ball.

We are very confident in our CABs position and do not feel there is an
exposure here. If you want to take Friday to crystallize your views on
these issues that is fine.

But if you want to talk to anyone on our team we would ask you to call
Kevin O'Hare and no one else.

We would ask you to get us your final proposal by 5 pm EST Sunday March
13th for our board to vote up or down first thing Monday morning.

We would propose the following package to close the legal issues:
*       We indemnify you on the legal costs associated with dissenters
rights with a cap @ $100k
*       We move to $250k on escrow basket but with our materiality
language
*       We accept your MAC on financial markets but with language to the
effect that the adverse change has to be disproportionate to others in
the industry.
*       Megunticook is ok with 3 year confidentiality but no LPs and no
reimbursement of expenses
*       WC mechanism as agreed today with language we have already
circulated to your side using our most recent 12/31 balance sheet as the
baseline
*       We schedule any tax exposure you are concerned about, consult
with auditors as to proper accounting post signing of the merger
agreement, agree that if no reserve is required now we will look again
at the time of closing giving you the opportunity through our WC
mechanism to force an audit then if there is no reserve and you feel one
is appropriate, and even if that audit goes against you, stipulate that
in that case with regard to these tax matters you get protection from
the first dollar from the escrow, recalling you have $7 million of which
$3 million goes out 18 months and another $2 million goes out 3 years.
*       The lawyers resolve any last drafting issues on the ancillary
agreements Friday. We would appreciate if you could instruct your
lawyers to work cooperatively on whatever minor drafting issues remain
and not create new ones.

Please confirm whether we should expect to hear from you Sunday.

Tom

-----Original Message-----
From: Kenneth D. Peterson, Jr. [mailto:ken@colventures.com]
Sent: Thursday, March 10, 2005 2:04 AM
To: Tom Matlack; Ray.Allieri@ctcnet.com;
stephan.oppenheimer@jpmorganpartners.com
Cc: Richard A. Roman; kohare@lightship.com; quinn@qllc.com; Kenneth D.
Peterson, Jr.; roliver@ctcnet.com; james.prenetta@ctcnet.com
Subject: RE:

Dear Tom and Stephan,

   Just a quick personal response to say thank you for your e-mail and
the sentiment behind it of trying to drive all of us toward a prompt
signing of this deal. As a recovering lawyer I can especially appreciate
the frustration that can come from a zealous representative. Just for
your information, this is the first time that CVC has worked with Kelley
Drye in any M&A transaction. Thus, they do not have a background with
how reasonable their client wishes to be and they certainly want to do
their utmost to care for our interests. THis creates the potential for
"over the top" things. On top of this, in an effort to move this along
ourselves I have taken the position that we should keep the paperwork
pushing forward and not always requiring that every word and
punctutation be reviewed by a CVC employee before being delivered to the
Sellers' counsel. I am still in Dublin working on another, smaller
acquisition here and Rich is heavily involved with a venture funding on
the West Coast while Russ and Jim are also busy with various additional
matters. Finally, Ray does also have a day job of running CTC!  So there
is a lot going on and this is something that we absolutely agree should
move forward as quickly as possible for all concerned, which is why we
send things out without the fullest internal review if we had a few more
weeks.

    To the substance of the points you raise. Last night (Dublin time)
we had a major internal "all hands" meeting to review the paper
situation, as well as the Due Diligence status. We will be reporting on
your various comments at more length at a Thursday conference call, but
let me address your first issue that you raise below.

   In short, I totally agree with your comments and I am sorry that
such an issue even arose at this stage. You are right on the
practicalities of this situation and I empathize with your evident
frustration. We can certainly adopt your approach. A minor clarification
would be to also include any legal costs required to defend such a
hypothetical case. I emphasize that I do not actually think there will
be any such litigation. It just makes no sense it seems to me if I were
the dissident shareholder to expend the time to prosecute such a case.
It totally boggles my mind to try and imagine sort of gross miscarriage
of justice that would have to occur to have any judge rule that what we
have offered to pay is not fully and clearly the highest reasonable
value for this business. But, our legal representatives are paid to look
out for our myopia so we get these sort of things. You will find that we
have every desire to be reasonable on things that require a judgment
call, although some things fundamental to the economics of the deal
itself are, of course, bedrock issues. In short, this is not one of
them.

    We want to complete this deal being mindful that we are talking
about millions of dollars and that there is limited recourse for any
mistakes or oversights we make now. Thanks again. We are making
progress. We will again be addressing our DD status among ourselves
later today again as we are really coming to completion there as well.

    Best wishes and good luck with the never-ending snow.
KEN PETERSON

From: Tom Matlack [mailto:TMatlack@megunticook.com]
Sent: Tue 3/8/2005 8:57 PM

To: Kenneth D. Peterson, Jr.; Ray.Allieri@ctcnet.com;
stephan.oppenheimer@jpmorganpartners.com
Cc: Richard A. Roman; kohare@lightship.com; quinn@qllc.com
Subject:


Dear Ken and Ray:


I think we have made solid progress this week and we understand that
your due diligence should be finished by Wednesday. We still, however,
seem to be a few yards from the goal line and we think rather than have
our advisors and lawyers beat up on each other for another few days we
need to get the principals on the phone (with advisors in listen mode
only) and finalize the remaining business issues. We have again
postponed our Board Meeting (set for Wednesday) because we did not feel
comfortable that the deal was far enough along.


Set forth below is a package of compromises which we believe addresses
the outstanding issues between the parties. We have tried to be fair but
are getting frustrated with the inability to move past these issues (and
with new issues that keep popping up). We trust that this package of
compromises can get us over the finish line.


1. Appraisal and Dissenters Rights and interplay with Escrow


      Last week we agreed to take the risk of any dissenting
shareholders who seek appraisal rights. We think that this was a big hot
button issue for your side.  We believe that by signing of the merger
agreement, we will have around 98% of the votes for the deal. Your side
has written that if any shareholder seeks appraisal rights within the 3
year escrow period then any moneys that were to be distributed at the
end of the escrow period are to be held up pending this dispute. While
we all believe it is unlikely that any appraisal proceeding will occur,
we do not think the approach taken is commercially reasonable. There is
no way on earth that 2% (assuming for a crazy moment that all 2% sought
appraisal rights) of LS holders would be entitled to the $2 million that
would be remaining in escrow. Instead, we proposed that what is withheld
is 150% of the amount any dissenting shareholder would have received in
the Merger. For example, if a stockholder would be entitled to $10,000
under the merger agreement, CTC can withhold $15,000 from the final
escrow disbursement relating to that stockholder.


2. Working Capital


      a. Mechanics-After conferring with the accountants we do not
believe that the mechanism proposed in the merger agreement works since
nothing can be done by the accountants in a timely fashion. Instead what
we propose is that LS will deliver a proposed working capital projection

at signing, which will be updated monthly between signing and closing so
that CTC knows where LS is every step of the way.  5 days prior to
closing we will deliver our final estimate, we close off of our estimate
but we hold back $500,000 from the closing until you can audit the
number.

We did not want another holdback and negotiated hard against your team
on this point but are now reversing ourselves for the sake of getting
this deal done cleanly.  We think this gives everyone certainty of
closing and your side comfort that there is a holdback.

   b.   Confirmation of definitions of CA and CL with the Lantern
Accountants. We have done this and included refinements in our markup of
the agreement sent back to your side last night. Our accountants just
made the entries for assets and liabilities track the audited balance
sheets.

   c. Tax impact on CL. As we have stated we are not going to cut off
our tax year at the closing and accrue artificially for all taxes
without the benefit of NOLs. We already have been dinged on the PP for
the NOL issue and believe our position here to be fair and market.

3. Escrow Basket size- As a compromise, we propose decreasing the basket
from $500,000 to $350,000 and CTC would get compensated from dollar one
if the basket gets filled up.

4. Tied to the above concession, we would require that your position
which guts the materiality in the reps and warranties  in connection
with determining damages goes away.  The notion of flat reps is not
something we have seen or can accept.

5. As our markup indicated we need more flexibility on ability to sign
up customer contracts between signing and closing, which we believe will
benefit both buyer and seller.

6. MAC language- Language was proposed to your counsel but we do not
want CTC to walk away on account of changes in financial markets or
terrorist acts.

7. Payment of accrued employee vacation benefits.  There is $153,000 in
accrued 2004 vacation. Your side wanted us to pay this off. In fact it
is accrued as a liability on the balance sheet so it is taken into
account in the WC calculation.

8. Megunticook Non-Compete and Non-solicitation-Megunticook will have
one year term.

9. Voting Agreement.

The Voting Agreement that you want the investors to sign has provisions that are so beyond the norm that no institution would ever sign. These provisions include liquidated damages, agreement not to do another deal for one year if our deal somehow does not happen etc. We will give you a traditional agreement which ensures that all of us vote for this deal. We need to get all the parties to be a little more commercial in their approach. We sent back a markup with what we can live with.

We have now provided all of the disclosure schedules and believe all of the major DD points have been addressed.

Ken and Ray, we have scheduled our board meeting Friday @ 10 EST to either vote this deal or move on to our next alternative.

Looking forward to discussing by these final points by phone and being in a position to vote the deal and sign Friday.

Regards,

Stephan Oppenheimer

Tom Matlack

This e-mail message, including any attachment(s), is intended only for the
use of the individual or entity to which it is addressed and may contain
information that is privileged and/or confidential.

Lightship Telecom / www.lightship.com

-------------------------------------------------
NOTICE OF CONFIDENTIALITY
-------------------------------------------------

This e-mail and any attachments thereto is intended only for use by the
addressee(s) named herein and may be proprietary and/or legally
privileged.

If you are not the intended recipient of this e-mail, you are hereby
notified that any dissemination, distribution or copying of this email,
and
any attachments thereto, without the prior written permission of the
sender
is strictly prohibited.   If you receive this e-mail in error, please
immediately telephone or e-mail the sender and permanently delete the
original copy and any copy of this e-mail, and any printout thereof.

All documents, contracts or agreements referred or attached to this
e-mail
are SUBJECT TO CONTRACT.

The contents of an attachment to this e-mail may contain software
viruses
that could damage your own computer system.   While CTC Communications
has
taken every reasonable precaution to minimize this risk, we cannot
accept
liability for any damage that you sustain as a result of software
viruses.
You should carry out your own virus checks before opening any
attachment.


This e-mail message, including any attachment(s), is intended only for the use of the individual or entity to which it is addressed and
may contain information that is privileged and/or confidential.

Lightship Telecom / www.lightship.com

-----Original Message-----
From: Michael Quinn [mailto:quinn@qllc.com]
Sent: Friday, March 11, 2005 9:42 AM
To: 'O'Hare, Kevin'
Cc: rmauro@kleinbard.com; 'Oppenheimer, Stephan'; Tom Matlack
Subject: RE:

I talked to Prenetta. He said if we believe this great. They will want a
specific rep to this effect. If we are clear on this which it appears we are
then we can probably give this rep.

However, he is vehement that we are wrong on USF as it relates to internet
and pointed me to the instructions to some form 4400. I am out of my depth
here but we need to figure out what the deal is

-----Original Message-----
From: O'Hare, Kevin [mailto:kohare@lightship.com]
Sent: Friday, March 11, 2005 7:10 AM
To: Kenneth D. Peterson, Jr.; Tom Matlack; Ray.Allieri@ctcnet.com;
stephan.oppenheimer@jpmorganpartners.com
Cc: Richard A. Roman; quinn@qllc.com; roliver@ctcnet.com;
james.prenetta@ctcnet.com
Subject: RE:

To All,

I want to clear up an issue discussed between members of our teams
yesterday. Lightship does bill intra-lata CABS for carriers on UNE-P lines
but DOES NOT BILL VERIZON for intra-lata CABS on UNE-P lines. I believe
this resolves the CABS misunderstanding.

Kevin

-----Original Message-----
From: Kenneth D. Peterson, Jr. [mailto:ken@colventures.com]
Sent: Friday, March 11, 2005 4:50 AM
To: Tom Matlack; Ray.Allieri@ctcnet.com;
stephan.oppenheimer@jpmorganpartners.com
Cc: Richard A. Roman; O'Hare, Kevin; quinn@qllc.com; roliver@ctcnet.com;
james.prenetta@ctcnet.com
Subject: RE:

Thank you very much for the opportunity to discuss this situation last night with both you and Stephan. I am sorry, Stephan, that you were not able to stay for the whole call, but I totally understand that timing of things makes such conflicts inevitable. I am OK with the Sunday timing that you have suggested although I will note it is 2 pm Pacific Time.

I am happy to accept that the owners of Lantern feel they completely understand their own internal tax issues that have been raised recently in the Due Diligence process. I am also sure that you similarly understand that we as complete outsiders have only been exposed to the issues within the last few days so it may take a bit longer to work through the issues that you have lived with for years. I am also happy to accept that you have developed over time a position that is comfortable to you regarding the legal consequences and interpretations in this dynamic area. In this particular case, however, we will be stepping into your shoes and you have insisted that there be no recourse on our part for your position being wrong except for the limited escrow we have agreed to put into place. This is compounded by the fact that you are a private company and therefore not liable under various laws to have certified subject to government penalty and sanctions certain things. This just means that we must be careful, as you would be if the shoe were on the other foot. (I have no interest in shoe manufacturing although I seem stuck on that analogy I see.)

The recent CABS issue is a bit different in my view. First, it is the latest breaking news, so to speak, so we have had the least time to even think about it since it was disclosed to me only just before we spoke last evening. This means, as I mentioned, that there is a risk that we have not properly understood what was being disclosed. Or, alternatively, it is possible that the question we were asking was not understood so the answer was actually about something else. In other words, it would be unfortunate to find out that some difference between your and my view on the issue was simply a misunderstanding if we could just talk about it further.

As it has been relayed to me, subject to the proviso that I may have misunderstood or that others themselves, on one side or the other, may have misunderstood, the issue is related to this:

Lantern has a contractual agreement in place with Verizon that governs certain relations between the companies. One of the things governed relates to how Lantern will bill Verizon for certain services over UNE-P lines. The contract, as I am told, appears to prohibit a certain type of charge that in fact Lantern has been charging.

Obviously, this only affects a fraction of Lantern's business, but it could result in a material affect on reported EBITDA should it turn out to be prohibited by contract. That's about all I can explain at this time. If you, or your trusted representatives, have examined the contract and examined the actual billing practice and concluded that there is Explanation X which allows it nonetheless, or Explanation Y which says we have totally misunderstood the issue, then we would appreciate knowing it. It is also possible that we might simply disagree about how the contract or the billing practice should be interpreted and we just have a disagreement, but I would prefer not to assume this out of the box.

Before we come to a conclusion on this issue, however, I would sincerely desire the opportunity to inquire what Lantern thinks of the situation and whether they can point out a misunderstanding or an alternate interpretation. In other words, it is just regular Due Diligence and good practice for understanding the company that we are seeking to acquire. It turns out to have come up at the last minute only because the disclosure came up at the last minute in response to earlier questions.

In summary, I absolutely agree with your observation that if all questions are to be resolved with absolute knowledge about everything, then probably nothing would ever be done. My history demonstrates that CVC does not act that way. We have a track record of doing many, many deals around the world and going where others have feared to tread. I am an entrepreneur, not a banker(!), and, by definition, not risk averse. I do, however, try to understand the risks I am absorbing and in this case I do not have that understanding yet about a couple of late-breaking issues, though not from lack of trying.

It is totally in your discretion to set the rules of engagement you

wish to adhere to and we will happily work with Kevin to reach as clear an understanding of the situation as possible today. I am hopeful, however, that if something is not in his personal knowledge that he will be allowed to bring in the resource that can further clarify the situation. Again, that will be up to you. I am trying hard not to allow simple misunderstandings to color either of our views so that we can both have business decisions to make at the end of the day based on as much fact as possible.

Finally, your proposals seem constructive to me, although I will have to be updated to make sure I understand how they fit within the full context of things. I also take your point about lawyers and I hereby ask Jim to make sure our legal team is working as cooperatively as possible on the minor drafting issues remaining. Our positions should only be reasonable and I would be very disappointed to see another loggerheads develop again similar to the one outlined in the first of Tom's nine points down below in this chain.

Again, thank you for letting us have some time to tie down these late issues. I, too, look forward to bringing this to an end in a way that allows us to mutually move forward.

Best wishes,
KEN PETERSON

----------------------------------------

From: Tom Matlack [mailto:TMatlack@megunticook.com]
Sent: Thu 3/10/2005 10:46
To: Kenneth D. Peterson, Jr.; Ray.Allieri@ctcnet.com;
stephan.oppenheimer@jpmorganpartners.com
Cc: Richard A. Roman; kohare@lightship.com; quinn@qllc.com;
roliver@ctcnet.com; james.prenetta@ctcnet.com
Subject: RE:

Ken, Ray & Rich:

I have discussed our situation with other members of the board and propose the following in response to your request.

We feel that the call today has fully fleshed out areas of agreement and disagreement on the tax issues and do not feel further discussion will advance the ball.

We are very confident in our CABs position and do not feel there is an exposure here. If you want to take Friday to crystallize your views on these issues that is fine.

But if you want to talk to anyone on our team we would ask you to call Kevin O'Hare and no one else.

We would ask you to get us your final proposal by 5 pm EST Sunday March 13th for our board to vote up or down first thing Monday morning.

We would propose the following package to close the legal issues:
*    We indemnify you on the legal costs associated with dissenters rights with a cap @ $100k
*    We move to $250k on escrow basket but with our materiality language
*    We accept your MAC on financial markets but with language to the effect that the adverse change has to be disproportionate to others in the industry.
*    Megunticook is ok with 3 year confidentiality but no LPs and no reimbursement of expenses
*    WC mechanism as agreed today with language we have already circulated to your side using our most recent 12/31 balance sheet as the baseline

\*    We schedule any tax exposure you are concerned about, consult
with auditors as to proper accounting post signing of the merger agreement,
agree that if no reserve is required now we will look again at the time of
closing giving you the opportunity through our WC mechanism to force an
audit then if there is no reserve and you feel one is appropriate, and even
if that audit goes against you, stipulate that in that case with regard to
these tax matters you get protection from the first dollar from the escrow,
recalling you have $7 million of which
$3 million goes out 18 months and another $2 million goes out 3 years.
\*    The lawyers resolve any last drafting issues on the ancillary
agreements Friday. We would appreciate if you could instruct your lawyers
to work cooperatively on whatever minor drafting issues remain and not
create new ones.

Please confirm whether we should expect to hear from you Sunday.

Tom

-----Original Message-----
From: Kenneth D. Peterson, Jr. [mailto:ken@colventures.com]
Sent: Thursday, March 10, 2005 2:04 AM
To: Tom Matlack; Ray.Allieri@ctcnet.com;
stephan.oppenheimer@jpmorganpartners.com
Cc: Richard A. Roman; kohare@lightship.com; quinn@qllc.com; Kenneth D.
Peterson, Jr.; roliver@ctcnet.com; james.prenetta@ctcnet.com
Subject: RE:

Dear Tom and Stephan,
    Just a quick personal response to say thank you for your e-mail and the
sentiment behind it of trying to drive all of us toward a prompt signing of
this deal. As a recovering lawyer I can especially appreciate the
frustration that can come from a zealous representative. Just for your
information, this is the first time that CVC has worked with Kelley Drye in
any M&A transaction. Thus, they do not have a background with how reasonable
their client wishes to be and they certainly want to do their utmost to care
for our interests. THis creates the potential for "over the top" things. On
top of this, in an effort to move this along ourselves I have taken the
position that we should keep the paperwork pushing forward and not always
requiring that every word and punctutation be reviewed by a CVC employee
before being delivered to the Sellers' counsel. I am still in Dublin working
on another, smaller acquisition here and Rich is heavily involved with a
venture funding on the West Coast while Russ and Jim are also busy with
various additional matters. Finally, Ray does also have a day job of running
CTC! So there is a lot going on and this is something that we absolutely
agree should move forward as quickly as possible for all concerned, which is
why we send things out without the fullest internal review if we had a few
more weeks.
    To the substance of the points you raise. Last night (Dublin time) we
had a major internal "all hands" meeting to review the paper situation, as
well as the Due Diligence status. We will be reporting on your various
comments at more length at a Thursday conference call, but let me address
your first issue that you raise below.
    In short, I totally agree with your comments and I am sorry that such
an issue even arose at this stage. You are right on the practicalities of
this situation and I empathize with your evident frustration. We can
certainly adopt your approach. A minor clarification would be to also
include any legal costs required to defend such a hypothetical case. I
emphasize that I do not actually think there will be any such litigation. It
just makes no sense it seems to me if I were the dissident shareholder to
expend the time to prosecute such a case.
It totally boggles my mind to try and imagine sort of gross miscarriage of
justice that would have to occur to have any judge rule that what we have
offered to pay is not fully and clearly the highest reasonable value for
this business. But, our legal representatives are paid to look out for our
myopia so we get these sort of things. You will find that we have every

desire to be reasonable on things that require a judgment call, although
some things fundamental to the economics of the deal itself are, of course,
bedrock issues. In short, this is not one of them.

　　We want to complete this deal being mindful that we are talking about
millions of dollars and that there is limited recourse for any mistakes or
oversights we make now. Thanks again. We are making progress. We will again
be addressing our DD status among ourselves later today again as we are
really coming to completion there as well.

　　Best wishes and good luck with the never-ending snow.

KEN PETERSON

---

From: Tom Matlack [mailto:TMatlack@megunticook.com]
Sent: Tue 3/8/2005 8:57 PM
To: Kenneth D. Peterson, Jr.; Ray.Allieri@ctcnet.com;
stephan.oppenheimer@jpmorganpartners.com
Cc: Richard A. Roman; kohare@lightship.com; quinn@qllc.com
Subject:


Dear Ken and Ray:


I think we have made solid progress this week and we understand that your
due diligence should be finished by Wednesday. We still, however, seem to be
a few yards from the goal line and we think rather than have our advisors
and lawyers beat up on each other for another few days we need to get the
principals on the phone (with advisors in listen mode
only) and finalize the remaining business issues. We have again postponed
our Board Meeting (set for Wednesday) because we did not feel comfortable
that the deal was far enough along.


Set forth below is a package of compromises which we believe addresses the
outstanding issues between the parties. We have tried to be fair but are
getting frustrated with the inability to move past these issues (and with
new issues that keep popping up). We trust that this package of compromises
can get us over the finish line.


1. Appraisal and Dissenters Rights and interplay with Escrow


　　Last week we agreed to take the risk of any dissenting shareholders
who seek appraisal rights. We think that this was a big hot button issue for
your side.  We believe that by signing of the merger agreement, we will have
around 98% of the votes for the deal. Your side has written that if any
sharcholder seeks appraisal rights within the 3 year escrow period then any
moneys that were to be distributed at the end of the escrow period are to be
held up pending this dispute. While we all believe it is unlikely that any
appraisal proceeding will occur, we do not think the approach taken is
commercially reasonable. There is no way on earth that 2% (assuming for a
crazy moment that all 2% sought appraisal rights) of LS holders would be
entitled to the $2 million that would be remaining in escrow. Instead, we
proposed that what is withheld is 150% of the amount any dissenting
shareholder would have received in the Merger. For example, if a stockholder
would be entitled to $10,000 under the merger agreement, CTC can withhold

$15,000 from the final escrow disbursement relating to that stockholder.

2. Working Capital

    a. Mechanics-After conferring with the accountants we do not believe
that the mechanism proposed in the merger agreement works since nothing can
be done by the accountants in a timely fashion. Instead what we propose is
that LS will deliver a proposed working capital projection at signing, which
will be updated monthly between signing and closing so
that CTC knows where LS is every step of the way.    5 days prior to
closing we will deliver our final estimate, we close off of our estimate but
we hold back $500,000 from the closing until you can audit the number.

We did not want another holdback and negotiated hard against your team on
this point but are now reversing ourselves for the sake of getting this deal
done cleanly.  We think this gives everyone certainty of closing and your
side comfort that there is a holdback.

    b.  Confirmation of definitions of CA and CL with the Lantern
Accountants. We have done this and included refinements in our markup of the
agreement sent back to your side last night. Our accountants just made the
entries for assets and liabilities track the audited balance sheets.

    c. Tax impact on CL. As we have stated we are not going to cut off our
tax year at the closing and accrue artificially for all taxes without the
benefit of NOLs. We already have been dinged on the PP for the NOL issue and
believe our position here to be fair and market.

3. Escrow Basket size- As a compromise, we propose decreasing the basket
from $500,000 to $350,000 and CTC would get compensated from dollar one if
the basket gets filled up.

4. Tied to the above concession, we would require that your position which
guts the materiality in the reps and warranties  in connection with
determining damages goes away.  The notion of flat reps is not something we
have seen or can accept.

5. As our markup indicated we need more flexibility on ability to sign up
customer contracts between signing and closing, which we believe will
benefit both buyer and seller.

6. MAC language- Language was proposed to your counsel but we do not want
CTC to walk away on account of changes in financial markets or terrorist
acts.

7. Payment of accrued employee vacation benefits. There is $153,000 in accrued 2004 vacation. Your side wanted us to pay this off. In fact it is accrued as a liability on the balance sheet so it is taken into account in the WC calculation.

8. Megunticook Non-Compete and Non-solicitation-Megunticook will have one year term.

9. Voting Agreement.

The Voting Agreement that you want the investors to sign has provisions that are so beyond the norm that no institution would ever sign. These provisions include liquidated damages, agreement not to do another deal for one year if our deal somehow does not happen etc. We will give you a traditional agreement which ensures that all of us vote for this deal.
We need to get all the parties to be a little more commercial in their approach. We sent back a markup with what we can live with.

We have now provided all of the disclosure schedules and believe all of the major DD points have been addressed.

Ken and Ray, we have scheduled our board meeting Friday @ 10 EST to either vote this deal or move on to our next alternative.

Looking forward to discussing by these final points by phone and being in a position to vote the deal and sign Friday.

Regards,

Stephan Oppenheimer

Tom Matlack

This e-mail message, including any attachment(s), is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged and/or confidential.

Lightship Telecom / www.lightship.com

Exhibit 11

**From:** Oppenheimer, Stephan [mailto:Stephan.Oppenheimer@JPMorganPartners.com]
**Sent:** Saturday, March 12, 2005 4:01 PM
**To:** Tom Matlack; quinn@qllc.com; O'Hare, Kevin
**Subject:** RE: follow up

I can still do that - I have to run out briefly, let's see if there is any response and then maybe we huddle around 6 EST to discuss before I call?

-----Original Message-----
**From:** Tom Matlack [mailto:TMatlack@megunticook.com]
**Sent:** Saturday, March 12, 2005 3:51 PM
**To:** quinn@qllc.com; Oppenheimer, Stephan; kohare@lightship.com
**Subject:** Re: follow up

I think stephan was planning to make a call later today anyways...
---------------------------
From THOMAS MATLACK
www.megunticook.com

-----Original Message-----
From: Michael Quinn <quinn@qllc.com>
To: 'Oppenheimer, Stephan' <Stephan.Oppenheimer@JPMorganPartners.com>; 'O'Hare, Kevin'
<kohare@lightship.com>; Tom Matlack <TMatlack@megunticook.com>
Sent: Sat Mar 12 15:53:50 2005
Subject: RE: follow up

Just thinking out loud but wondering if Tom or Stephan should call Peterson
or Roman and say the  dive without purpose has to stop

-----Original Message-----
From: Oppenheimer, Stephan [mailto:Stephan.Oppenheimer@JPMorganPartners.com]

Sent: Saturday, March 12, 2005 1:23 PM
To: quinn@qllc com; O'Hare, Kevin; Tom Matlack
Subject: RE: follow up

Great.

-----Original Message-----
From: Michael Quinn [mailto:quinn@qllc.com]

Sent: Saturday, March 12, 2005 3:17 PM
To: 'O'Hare, Kevin'; 'Tom Matlack'; Oppenheimer, Stephan
Subject: RE: follow up


After talking with Kevin I agree with Stephen but think the response to
Prenetta copied to his whole group should be. I have sent you 2 emails
on
your Bill question. We will try to answer it but we need complete
information which you have not provided. You have had this bill since
Oct
2004 and you have done an exhaustive analysis on our CABS stuff.

If you give me the information I need to answer your question we will
try to
answer it. Quite frankly we do not see how this relates to the issues
that
are being debated. I think we need to make the wood chucks look
disorganized
and it best coming from Kevin.

I am this close to calling up ATN

-----Original Message-----
From: O'Hare, Kevin [mailto:kohare@lightship.com]
Sent: Saturday, March 12, 2005 11:31 AM
To: quinn@qllc.com; Tom Matlack; Oppenheimer, Stephan
Subject: FW: follow up

I wrote USP and meant USF sorry for the confusion.

-----Original Message-----
From: O'Hare, Kevin
Sent: Saturday, March 12, 2005 1:30 PM
To: 'Oppenheimer, Stephan'; Tom Matlack; quinn@qllc.com
Subject: RE: follow up

Ray takes our total data revenue then subtracts out our frame relay
service revenue to arrive at an estimate of our bundled internet service
revenue.  So far so good, that is roughly $1M - $186k (per month)
leaving
him with $814k of monthly bundled internet service revenue.  He made a
comment that he would apply a ration of between 25% and 30% as that
portion
of the bundled internet service revenue that should be exposed for
contribution to federal USP payment of about 9%.  He didn't make it as a
clear statement but a passing comment so please don't take it too
literally.
This implies a USF obligation of about $20k per month on the bundled
internet services from his perspective.

The real question is if that is how he is sizing it what will he do with
the
information?

Kevin

-----Original Message-----
From: Oppenheimer, Stephan
[mailto:Stephan.Oppenheimer@JPMorganPartners.com]
Sent: Saturday, March 12, 2005 1:22 PM

To: O'Hare, Kevin; Tom Matlack; quinn@qllc.com
Subject: RE: follow up

What was the exposure they were thinking of?

-----Original Message-----
From: O'Hare, Kevin [mailto:kohare@lightship.com]
Sent: Saturday, March 12, 2005 1:18 PM
To: Oppenheimer, Stephan; Tom Matlack; quinn@qllc.com
Subject: RE: follow up

I also got a call from Ray Allieri late this morning asking about a
sales tax issue and giving me some additional insight into how they are
thinking about their perspective on the exposure on our difference of
opinion re: USF funding on bundled internet services. Ray shared with
me his methodology from another company he was a part of, by the way a
company that went bankrupt. I love advice like that.

-----Original Message-----
From: Oppenheimer, Stephan
[mailto:Stephan.Oppenheimer@JPMorganPartners.com]
Sent: Saturday, March 12, 2005 11:54 AM
To: O'Hare, Kevin; Tom Matlack; quinn@qllc.com
Subject: RE: follow up

I think that is right to get an answer for us internally first, to
understand it, but not communicate it to the other side until then.
Unless others disagree, because of the time it will take to get an
answer and then to discuss if/how a response is warranted, I recommend
telling Prenetta in an email, cc'g everyone, that they have had this
information for a while and they should be prepared to meet our deadline
tomorrow without an answer to that question.

-----Original Message-----
From: O'Hare, Kevin [mailto:kohare@lightship.com]
Sent: Saturday, March 12, 2005 11:47 AM
To: Oppenheimer, Stephan; Tom Matlack; quinn@qllc.com
Subject: RE: follow up

I spoke to Prenetta. He has detailed questions on our CABS bill to CTC.
I have asked him to send me the bill and told him I will need to review
with Nick Zeitvogel who is flying to Texas right now. They have
concerns because our CABS bills look different than theirs and wants to
make sure we are not over billing our carrier customers. I don't know
any more than that at this point. My biggest complaint on this issue is
that they have had this information for some time and they could have
asked for a review of this sooner.

I won't know if there is any sort of problem until I review this bill
with Nick and Koester which I probably won't be able to get done until
this afternoon. Obviously I will push to get an answer for ourselves
ASAP.

-----Original Message-----
From: Oppenheimer, Stephan
[mailto:Stephan.Oppenheimer@JPMorganPartners.com]
Sent: Saturday, March 12, 2005 11:13 AM

To: O'Hare, Kevin
Subject: RE: follow up

Sounds good - if you get anything, please cc everyone on it - quinn, me,
james henry, peterson, ray, russ, jim etc. Obviously they should not
need any more info at this point.

-----Original Message-----
From: O'Hare, Kevin [mailto:kohare@lightship.com]
Sent: Saturday, March 12, 2005 10:43 AM
To: Oppenheimer, Stephan
Subject: RE: follow up

I have asked Jim to specify the question and provide a copy of the bill
he is looking at. If I can help I will but at this stage can not
possibly imagine that it is value affecting. There has been no previous
indication of concern on an issue with our carrier bill to CTC.

I wrote Jim an e-mail a while ago and have not yet heard back from him
on this.

-----Original Message-----
From: Oppenheimer, Stephan
[mailto:Stephan.Oppenheimer@JPMorganPartners.com]
Sent: Friday, March 11, 2005 9:10 PM
To: O'Hare, Kevin
Cc: quinn@qllc.com; Tom Matlack
Subject: RE: follow up

What questions are these and are you ok with this? Are they
determinants of value? Is it worth the time and can they be answered
quickly or will they create more questions?

-----Original Message-----
From: James.Prenetta@ctcnet.com [mailto:James.Prenetta@ctcnet.com]
Sent: Friday, March 11, 2005 8:10 PM
To: O'Hare, Kevin
Cc: Kenneth D. Peterson, Jr.; quinn@qllc.com; Richard A. Roman;
Ray.Allieri@ctcnet.com; Russell.Oliver@ctcnet.com; Oppenheimer, Stephan;
Tom Matlack
Subject: Re: follow up

Kevin,

I am still looking to talk about the specific issues that I left you a
message on concerning CTC's Nov 1, 2004 bills. Can you call me on that
on
Sat at 978-440-8104 (H) or 781-760-3582. Thanks.

To:
<Ray.Allieri@CTCNet.com>, <James.Prenetta@CTCNet.com>, "Kenneth D.

Peterson, Jr."
<ken@colventures.com>, "Richard A. Roman"

<rar@colventures.com>, <Russell.Oliver@CTCNet.com>

"O'Hare, Kevin"        cc:  "Tom Matlack"
<TMatlack@megunticook.com>, "Oppenheimer, Stephan"
<kohare@lightship.com>
<Stephan.Oppenheimer@JPMorganPartners.com>, <quinn@qllc.com>

Subject:     follow up

03/11/2005 06:48 PM

Team,

I believe I have answered all of your questions and feel like today was a
complete day. I will try to support any last questions you may have
tomorrow. I am committed to this opportunity and look forward to your
response on Sunday based on Tom's e-mail to your team last night.

Kevin M. O'Hare

This e-mail message, including any attachment(s), is intended only for the
use of the individual or entity to which it is addressed and may contain
information that is privileged and/or confidential.

Lightship Telecom / www.lightship.com

------------------------------------------------
NOTICE OF CONFIDENTIALITY
------------------------------------------------

This e-mail and any attachments thereto is intended only for use by the
addressee(s) named herein and may be proprietary and/or legally
privileged.

If you are not the intended recipient of this e-mail, you are hereby
notified that any dissemination, distribution or copying of this email,
and
any attachments thereto, without the prior written permission of the
sender
is strictly prohibited.  If you receive this e-mail in error, please
immediately telephone or e-mail the sender and permanently delete the
original copy and any copy of this e-mail, and any printout thereof.

All documents, contracts or agreements referred or attached to this
e-mail
are SUBJECT TO CONTRACT.

The contents of an attachment to this e-mail may contain software
viruses
that could damage your own computer system.   While CTC Communications
has
taken every reasonable precaution to minimize this risk, we cannot
accept
liability for any damage that you sustain as a result of software
viruses.
You should carry out your own virus checks before opening any
attachment.

The information contained in this transmission may contain confidential
and/or privileged material. If you are not the intended recipient, you
are hereby notified that any disclosure, copying, distribution or use of

the information contained herein or in any attachments is STRICTLY
PROHIBITED.
If you have received this transmission in error, please immediately
contact
the sender by return e-mail and delete this e-mail from your computer
system.
Thank you.

The information contained in this transmission may contain confidential
and/or privileged material. If you are not the intended recipient, you
are hereby notified that any disclosure, copying, distribution or use of

the information contained herein or in any attachments is STRICTLY
PROHIBITED.
If you have received this transmission in error, please immediately
contact
the sender by return e-mail and delete this e-mail from your computer
system.
Thank you.

The information contained in this transmission may contain confidential
and/or privileged material. If you are not the intended recipient, you
are hereby notified that any disclosure, copying, distribution or use of

the information contained herein or in any attachments is STRICTLY
PROHIBITED.
If you have received this transmission in error, please immediately
contact
the sender by return e-mail and delete this e-mail from your computer
system.
Thank you.

The information contained in this transmission may contain confidential
and/or privileged material. If you are not the intended recipient, you
are hereby notified that any disclosure, copying, distribution or use of

the information contained herein or in any attachments is STRICTLY
PROHIBITED.
If you have received this transmission in error, please immediately
contact
the sender by return e-mail and delete this e-mail from your computer
system.
Thank you.

The information contained in this transmission may contain confidential
and/or privileged material. If you are not the intended recipient, you
are hereby notified that any disclosure, copying, distribution or use of
the information contained herein or in any attachments is STRICTLY
PROHIBITED.
If you have received this transmission in error, please immediately contact
the sender by return e-mail and delete this e-mail from your computer
system.
Thank you.

The information contained in this transmission may contain confidential
and/or privileged material. If you are not the intended recipient, you
are hereby notified that any disclosure, copying, distribution or use of
the information contained herein or in any attachments is STRICTLY PROHIBITED.
If you have received this transmission in error, please immediately contact
the sender by return e-mail and delete this e-mail from your computer system.
Thank you.