DREIER LLP
Joseph M. Pastore III, Esq. (JP-1717)
499 Park Avenue
New York, New York 10022
(212) 328-6100

O'CONNOR, CARNATHAN AND MACK LLC
David B. Mack, Esq.  (*Pro Hac Vice forthcoming*)
Sean Carnathan, Esq.  (*Pro Hac Vice forthcoming*)
8 New England Executive Park, Suite 310
Burlington, Massachusetts  01803

*Attorney for Defendants Kevin O' Hare and Jeffrey Koester*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ——————————————— X | |
| One Communication Corp., as successor in interest to CTC Communications Group, Inc. and CTC Communications Acquisitions Corp.,<br><br>     Plaintiff,<br><br>     v.<br><br>JP Morgan SBIC LLC, Sixty Wall Street SBIC Fund, L.P., The Megunticook Fund II, L.P., Kevin O'Hare, Jeffrey Koester, Mellon Investor Services LLC as nominal defendant as escrow agent and Verizon New England Inc., as defendant on a declaratory judgment claim,<br><br>     Defendants. | **Case No. 1:07-civ-03905 (LTS)**<br>**ECF Case**<br><br><br><br><br><br>**September 17, 2007** |
| ——————————————— X | |

# MEMORANDUM OF LAW IN SUPPORT
# OF THE INDIVIDUAL DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page No.**

TABLE OF AUTHORITIES ............................................................................... iii

Introduction.................................................................................................2

Summary of the Arguments Supporting Dismissal of the 106-5
Claim Against the Individual Defendants...........................................................3

ARGUMENT.................................................................................................5

I.      For Each Individual Defendant, the Court Must Evaluate Each of
        the Alleged Misstatements Separately Under the Heightened
        Pleading Requirements of Rule 9 and the PSLRA, as Recently
        Interpreted in Tellabs ..........................................................................5

II.     Whittling Down the Purported Misrepresentations to their Hollow Core ...............7

        A.      As a Matter of Law, Plaintiff Cannot Rely on Statements
                Outside The Merger Agreement's Representations and
                Warranties. ...........................................................................8

        B.      The Great White Internet [sic] Issue is a Red Herring................................9

        C.      Plaintiff Fails to Allege with Particularity that any of the
                Alleged Statements in the Merger Agreement Was False
                or Misleading. ......................................................................9

III.    Even if Plaintiff were Entitled to Rely on Representations Beyond
        Those Set Forth in the Merger Agreement, Plaintiff Has Failed to
        Allege Facts Specifically Attributing Any Such Statements to
        Either Individual Defendant....................................................................12

        A.      Plaintiff Has Not Alleged that Koester or O'Hare Participated in
                Making the Statements in the November 2004 CIM or the
                December 10, 2004 Q Advisors Response. ................................13

        B.      The Complaint Fails to Allege that Either O'Hare or Koester
                Made the Representations Contained in the January 2005
                PowerPoint Presentation. .......................................................15

        C.      The Vague Allegations of Misrepresentations "Throughout
                the [Due Diligence] Process" are not Attributed to O'Hare or
                Koester with Any Specificity...................................................16

D.      The Remaining Alleged Misrepresentations are not Attributed
Directly to O'Hare or Koester and Cannot Form the Basis of
a 10(b) Claim Against Either Defendant. ...................................17

IV.     The Section 10(b) Claim Against O'Hare and Koester Must
Be Dismissed because Plaintiff Fails to Plead Scienter
Adequately With Regard to Any Purported Misrepresentation.............................18

A.      The Heightened Scienter Requirement Under the
PSLRA and Tellabs..................................................................................18

B.      The Court Should Disregard Conclusory, Generalized
Allegations of Scienter.............................................................................18

C.      Plaintiff Has Failed to Plead Facts Sufficient to Establish
that O'Hare and Koester Had the Motive and Opportunity
to Commit Fraud. ....................................................................................20

D.      Plaintiff has Failed to Allege Facts Sufficient to Establish
Conscious Misbehavior or Other Highly Unreasonable
Conduct by Either Individual Defendant. ...................................21

E.      The Facts Alleged Support Compelling Innocent Inferences. ..................28

V.      The Securities Fraud Claims Fail to Allege a Loss, Let Alone a
Loss Caused by Any of the Purported Misrepresentations. ...................................30

A.      A Complaint Must Allege an Economic Loss and Facts
Sufficient to Demonstrate that the Loss was Caused by the
Alleged Misrepresentation. ....................................................................30

B.      Plaintiff Has Failed to Allege any Economic Loss, Let
Alone that any Purported Loss was Caused by the
"Undisclosed Lightship Billing Practices." ...............................32

VI.     A Predicate to Plaintiff's Securities Fraud Claim Is Not Properly
Before this Court...................................................................................................36

VII.    The Other Claims Against the Individual Defendants Should
be Dismissed. .......................................................................................................37

CONCLUSION.............................................................................................................38

## TABLE OF AUTHORITIES

### FEDERAL CASES

*In re Advanta Corp. Sec. Litigation,*
    180 F.3d 525 (3d Cir. 1999)....................................................................................19

*In re AOL Time Warner, Inc. Securities Litigation,*
    2007 WL 1789013, *9 (S.D.N.Y. 2007)....................................................n.33, 35

*ATSI Communications V. The Shaar Fund, Ltd,,*
    2007 WL 1987336 *5 (2nd Cir. 2007)........................................................6, 12, 13

*In re Axis Capital Holdings, Ltd Sec. Litigation,*
    456 F.Supp.2d 576 (S.D.N.Y. 2006)...........................................................18, 20

*In re Bristol-Myers Squibb Sec. Litigation,*
    312 F.Supp.2d 549 (S.D.N.Y. 2004)............................................................27, 36

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
    511 U.S. 164 (1994)............................................................................................12

*Citibank N.A. v. K.H. Corp.,*
    968 F.2d 1489 (2d Cir. 1992)...................................................................31, n.36

*Core Communications, Inc. v. Verizon Pennsylvania, Inc.,*
    2007 WL 2059093, at *10 (3d Cir. 2007).......................................................5, 37

*Dura Pharm., Inc. v. Proudo,*
    544 U.S. 336 (2005).........................................................................30, 31, n.36

*Emergent Capital Investment Management v. Stonepath Group, Inc.,*
    343 F.3d 189 (2d Cir. 2003)....................................................................8, 31, 32

*Fezzani v. Bear, Stearns & Co., Inc.,*
    384 F.Supp.2d 618 (S.D.N.Y. 2004)..................................................................12

*Funke v. Life Finance Corp.,*
    237 F.Supp.2d 458 (S.D.N.Y. 2002).....................................................22, 26, 27

*Ganino v. Citizens Utilities Co.,*
    228 F.3d 154 (2d Cir. 2000).........................................................................16, 20

*In re Glaxo Smithkline, PLC Securities Litigation,*
    2006 WL 2871968 (S.D.N.Y. Oct. 6, 2006).......................................................35

*Globis Capital Partners, L.P. v. Stonepath Group, Inc.*,
  2007 WL 1977236, at *2 (3d Cir. 2007)................................................22

*Greenstone v. Cambex Corp.*,
  975 F.2d 22 (1st Cir. 1992)...............................................................19

*Greenwald v. Orb Communications & Marketing, Inc.*,
  192 F.Supp.2d 212 (S.D.N.Y. 2002)...............................................34, 35

*Harrison v. Rubenstein*,
  2007 WL 582955, at *2 (S.D.N.Y. 2006).............................................37

*Higgenbotham v. Baxte*,
  2007 WL 2142298 at *2 (7th Cir. 2007)............................................n.14

*Homburger v. Venture Minerals, Inc.*,
  1985 WL 549, at *2 (S.D.N.Y. 1985)....................................6, 16, n.23

*International Audiotext Network, Inc. v. AT & T*,
  62 F.3d 69 (2d Cir. 1995).................................................................n.2

*In re JP Morgan Chase Sec. Litigation*,
  363 F.Supp.2d 595 (S.D.N.Y. 2005)..............................................20, 21

*Kalnit v. Eichler*,
  264 F.3d 131 (2d. Cir. 2001).....................................18, 20, 21, 23, 26

*Kayduk v. Lanna*,
  775 F.2d 441 (1st Cir. 1985).............................................................19

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir 2005)...................................................... *passim*

*Leykin v. AT&T Corp.*,
  423 F.Supp.2d 229 (S.D.N.Y. 2006)............................................35, n.36

*In re Livent, Inc. Noteholders Sec. Litigation*,
  151 F.Supp.2d 371 (S.D..Y. 2001) ...............................................11, 24

*Luce v. Edelstein*,
  802 F.2d 49 (2D Cir. 1986).............................................................. 13

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)...............................12, 14, 18, 20, 21, 28

*Shields v. Citytrust Bancorp, Inc.,*
    25 F.3d 1124 (2d Cir. 1994)..................................................................6

*Small v. Arch Capital Group, Ltd.,*
    2006 WL 2708448, at *10 (S.D.N.Y. 2006)...............................................28, 37

*Steed Finance LDC v. Nomura Securities Intern., Inc.,*
    2004 WL 2072536, at *9 (S.D.N.Y. 2004)..........................................................29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    127 S.Ct. 2499 (2007)............................................................... *passim*

*The Pension Committee of the University of Montreal Pension Plan v. Banc
of America Securities, LLC,*
    446 F.Supp.2d 163 (S.D.N.Y. 2006)...................................................12

*Trustees of the Plumbers and Pipefitters National Pension Fund v. De-Con
Mechanical Contractors,*
    896 F.Supp. 342 (S.D.N.Y. 1995) ......................................................16

*Xerion Partners I LLC v. Resurgence Asset Management, LLC,*
    474 F.Supp.2d 505 (S.D.N.Y. 2007)...............................................6, 13

## FEDERAL STATUTES

15 U.S.C. § 78u-4(b)(1) ............................................................................5, 14

15 U.S.C. § 78u-4(b)(2) ............................................................................6, 18

15 U.S.C. §78u-4(b)(3) ...............................................................................7

15 U.S.C. §78u-4(b)(4) ..............................................................................31

Fed. R. Civ. P. 9...........................................................................................5

Defendants Kevin O'Hare ("O'Hare") and Jeffrey Koester ("Koester") (O'Hare and Koester, collectively, the "Individual Defendants")[1] submit this Memorandum of Law in Support of their Motion to Dismiss the Complaint of One Communications Corp. ("Plaintiff"). The Individual Defendants incorporate by reference the JP Morgan Defendants' Memorandum of Law in support of their motion to dismiss ("JPM Memo."), the Megunticook Defendants' Memorandum of Law in support of their motion to dismiss and the Affidavit of Jayne Robinson ("Robinson Aff.").[2]

## Introduction

More than two years after its purchase of Lightship, and only after having been sued for asserting bogus claims against an indemnification escrow fund, Plaintiff filed its 146-paragraph, 40-page complaint, in which it asserts that it would not have paid $67 million for Lightship had it been aware of certain "facts" concerning Lightship's supposed "billing practices". The Complaint, however, is devoid of <u>substance</u>. Instead, Plaintiff relies entirely on allegations that: (a) are vague or conclusory; (b) concern statements made during the due diligence period on which it is not entitled to rely; and/or (c) are not specifically attributed to O'Hare or Koester. Stripped of these insufficient allegations, the Complaint seeks to plead a securities fraud claim solely on the theory that the Interconnection Agreement ("ICA") between Lightship and Verizon clearly and unambiguously required that Lightship maintain the same local calling areas ("LCAs") in

---

[1] O'Hare and Koester are the former Chief Executive Officer and former Chief Operating Officer, respectively, of Lightship Telecom, LLC, a regional telecommunications company purchased in May 2005 by the Plaintiff. Plaintiff, through its predecessors in interest, acquired the shares of Lightship Holding, Inc. For purposes of this motion, it is sufficient to refer to Lightship Telecomm and Lightship Holding, collectively, as "Lightship".

[2] The Robinson Aff. attaches copies of documents referenced by Plaintiff in the Complaint. In the context of a 12(b)(6) motion, the Court may properly consider documents referenced or incorporated in the Complaint. <u>International Audiotext Network, Inc. v. AT & T</u>, 62 F.3d 69, 72 (2nd Cir. 1995).

the State of Maine as Verizon. Without any factual support, Plaintiff simply asserts that the ICA so required, that Koester and O'Hare knew it or it was so obvious that they should have known it, and that their failure to disclose to Plaintiff that Lightship's LCAs differed from Verizon's constitutes fraud.

In reality, the ICA is an extraordinarily ambiguous and complex document that has never been interpreted by any authority or in any formal or even informal proceeding. Moreover, Verizon, the incumbent local exchange carrier (ILEC) in New England with whom Lightship by necessity communicated on a daily basis, had never called Lightship's billing practices into question. Indeed, Lightship had billed Verizon for approximately seventeen months using different LCAs without Verizon saying a word regarding their discrepancy. As of the filing of the Complaint, Verizon had not disputed this practice (although presumably it will now accept Plaintiff's invitation to do so).

The prolonged absence of even a whiff of a dispute with Verizon and the lack of any regulatory guidance or interpretation notwithstanding, Plaintiff speculates that O'Hare and Koester each knew Lightship had breached the ICA to the tune of $200,000 to $300,000 per month or that such breach was so obvious that they had to have known. The Complaint reeks of buyer's remorse and is riddled with the vague, general, wholesale allegations squarely rejected by the Supreme Court and the Second Circuit.

### Summary of the Arguments Supporting Dismissal of the 10b-5 Claim Against the Individual Defendants

The claim against the Individual Defendants under Section 10(b) of the Securities Exchange Act of 1934 should be dismissed for several independent reasons. First, the Complaint fails to allege with the requisite particularity that either Koester or O'Hare made any misrepresentation at all. See infra pp. 5-12. Moreover, as a matter of law,

Plaintiff is not entitled to rely on any of the alleged misrepresentations during the due diligence period because reliance is barred by the specific terms of the fully integrated, arm's-length Merger Agreement negotiated between Lightship and Plaintiff, both sophisticated telecommunications companies. See infra pp. 8-9 and JPM Memo., §I.B.

Second, Plaintiff fails to allege facts sufficient to establish the required "cogent and compelling" inference that O'Hare or Koester, assuming arguendo they made any actionable misrepresentations at all, acted with scienter. See infra pp. 20-30. Even assuming, for purposes of this Motion, the truth of all well-plead facts in the Complaint, the most plausible – and entirely innocent – inference to be drawn from its allegations is merely that Koester and O'Hare at some point were informed by a low-level billing manager of facts that, in his inexpert opinion, theoretically could have led – but did not then lead – to a dispute with Verizon concerning the meaning of the very complex, ambiguous ICA. See infra pp. 28-30. The allegations of the Complaint do not remotely satisfy the vigorous standard under the Private Securities Litigation Reform Act ("PSLRA"), as recently interpreted by the Supreme Court and historically applied in this Circuit.

Third, the securities claims should be dismissed because Plaintiff has failed to allege that it has suffered a loss, let alone a loss caused by any of the alleged "misrepresentations." See infra pp. 30-36.

Finally, even if each of these fatal flaws does not mandate dismissal (which each does in its own right), the Section 10(b) claim against each Individual Defendant must be dismissed because the foundation of such claim – that Lightship breached the ICA – is a matter that must be brought in the first instance to the Maine Public Utilities Commission

("Maine PUC"). Because a necessary component to Plaintiff's securities claims is a determination that Lightship breached the ICA, which is a matter over which the Maine PUC has exclusive original jurisdiction, Plaintiff's securities claims are not ripe and should be dismissed. See infra pp. 37-38 and JPM Memo. § II.[3]

## ARGUMENT

**I.**     **For Each Individual Defendant, the Court Must Evaluate Each of the Alleged Misstatements Separately Under the Heightened Pleading Requirements of Rule 9 and the PSLRA, as Recently Interpreted in Tellabs**

Under Section 10(b) and Rule 10b-5, a plaintiff is required to allege well-plead facts showing (1) that defendants made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which plaintiff reasonably relied, and (5) that plaintiff's reliance was the proximate cause of its injury. Dura Pharm., Inc. v. Proudo, 544 U.S. 336, 341 (2005); Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2nd Cir. 2005).

The PSLRA sets forth two heightened pleading requirements for securities fraud cases. The first requires that any securities fraud complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-(b)(1); see also Fed. R. Civ. P. 9(b). Where, as here, a plaintiff is bringing securities fraud claims against multiple defendants, the complaint must

---

[3] Plaintiff does not bring a claim against the Individual Defendants under Section 20 of the 1934 Act (Count II). The remaining (non-securities) claims against the Individual Defendants (in Counts III-VI) must be dismissed for the reasons discussed in detail in the JPM Memo. In the interests of avoiding repetition, the Individual Defendants do not rehash those arguments here.

"specifically state what each particular defendant did or said, by what means, when, to whom, and with what intent." Homburger v. Venture Minerals, Inc., 1985 WL 549, at *2 (S.D.N.Y. 1985). See also Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2nd Cir. 1994)(same); Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC, 474 F. Supp. 2d 505, 516 (S.D.N.Y. 2007)(same).[4]

The second mandate of the PSLRA is the pleading of particular <u>facts</u> – not accusations, assumptions, surmise, or conclusions – "giving rise to a <u>strong inference</u> that," with respect to <u>each</u> alleged misstatement or omission, "the defendant acted with the required state of mind." 15 U.S.C. § 78u-(b)(2)(emphasis added). Scienter, in the context of a securities fraud claim, is "an intent to deceive, manipulate, or defraud." Ganino v. Citizens Utils. Co., 228 F.3d 154, 168 (2nd Cir. 2000). In order to survive a motion to dismiss, a plaintiff must allege facts giving rise to an inference of scienter that is "more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509-10 (2007). Omissions and ambiguities count against an inference of scienter. Id. at 2511. Moreover, in determining whether the pleaded facts give rise to a strong inference of scienter, the Court "<u>must</u>" consider other, non-fraudulent explanations. Id. at 2509-10 (emphasis added).

Following these principles, the Second Circuit has held that the heightened pleading standards of the PSLRA and Rule 9(b) require the plaintiff to "provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Communications v. The Shaar Fund, Ltd.,

---

[4] Copies of all unreported cases cited by the Defendants are included in an Appendix accompanying the Defendants' briefs.

2007 WL 1989336, at *5 (2nd Cir. 2007). Assuming the truth of all well pleaded facts –

not conclusions masquerading as facts – the Complaint falls far short of satisfying the

stringent requirements for pleading securities fraud claims against O'Hare or Koester.

Where, as here, the PSLRA's pleading requirements are not met, "the court shall . . .

dismiss the complaint." 15 U.S.C. § 78u-(b)(3)(emphasis added).

## II.     **Whittling Down the Purported Misrepresentations to their Hollow Core.**

Relying solely on a single identified source (Darren Krietler) – a low-level billing

manager who is not alleged to have any expertise in regulatory affairs – Plaintiff tries to

portray a complicated scheme of deception. In a classic attempt to muddy the waters,

Plaintiff seeks to add substance to its securities fraud claim by including as many

purported communications and statements as possible, with the hope that the sheer

weight of the Complaint will allow it to clear a 12(b)(6) motion.

Plaintiff's alleged "material misrepresentations of fact" appear in Paragraph 111

of the Complaint:

     (a)     The November 2004 [Confidential Information Memorandum ("CIM")];

     (b)     'Lightship's' [sic] December 10, 2004 responses to questions; [5]

     (c)     The January 17, 2005 PowerPoint presentation;

     (d)     Numerous interstate telephone conference calls and discussions with members of CTC's diligence team;

     (e)     The March 9, May 11, and May 13, 2005 e-mails transmitting financial and income statements;

     (f)     The March 10, 2005 e-mail;

---

[5] Although Plaintiff conveniently attributes the December 10, 2004 response to "Lightship" in Paragraph 111, Paragraph 65 of the Complaint makes plain that non-defendant Q Advisors authored the correspondence. Complaint, ¶ 65 ("Q Advisors responded on Lightship's behalf to various of these requests, in writing, on December 10, 2004. In that correspondence, Q Advisors stated with respect to CTC's inquiries regarding CABS revenue . . . ." (emphasis added)).

(g)     The Merger Agreement's representations and warranties.

Complaint, ¶111.

## A.     As a Matter of Law, Plaintiff Cannot Rely on Statements Outside The Merger Agreement's Representations and Warranties.

With the exception of the representations contained in the Merger Agreement (see

Complaint ¶111(g)), the Court need not delve into the particulars of any of the

communications on which Plaintiff's securities fraud claim is based.  Where, as here, the

Plaintiff is a sophisticated investor and an integrated agreement between the parties does

not include the misrepresentation at issue, the Plaintiff cannot establish reasonable

reliance on that alleged misrepresentation.  Emergent Capital Inv. Mgmt. v. Stonepath

Group, Inc., 343 F.3d 189, 196 (2nd Cir. 2003).  The Merger Agreement – which was the

product of an arduous, lengthy, arm's-length negotiation between two sophisticated

enterprises represented by competent counsel and investment bankers – explicitly states

that Plaintiff is not entitled to rely on any statements not specifically contained in the

Merger Agreement.  See Merger Agreement (Robinson Aff., Ex. 1), § 6(d), p. 44; see

also Merger Agreement, §10, p. 55 (integration clause).  The courts of this Circuit

preclude Plaintiff from claiming that it justifiably and reasonably relied on any statements

not specifically contained in the Merger Agreement itself.  The alleged

misrepresentations delineated in (a) through (f) above, therefore, are not actionable as a

matter of law.  See JPM Memo. § I.B.

Plaintiff is also not entitled, as a matter of law, to rely upon any of the statements

in the CIM because the CIM itself expressly states that "neither Lightship nor Q Advisors

makes any express or implied representation or warranty as to the accuracy or

completeness of the information contained herein or made available in connection with

any further investigation of the Company." CIM (Robinson Aff., Ex. 8) (emphasis added).

## B.    The Great White Internet [sic] [6] Issue is a Red Herring.

In Paragraph 83, Plaintiff alleges that CTC specifically requested certain information concerning the mix and identity of Lightship's customers and "[d]espite these requests Lightship failed to identify access revenues related to calls to GWI as the source of 90 percent of its Maine access revenues." Complaint, ¶83. In essence, Plaintiff seeks to base its 10(b) claim on the failure to provide information it specifically requested but which Lightship (reasonably) refused to provide. For the reasons explained in detail in the JPM Memo., the allegations concerning GWI cannot form the basis of a claim against any of the Defendants, including O'Hare or Koester. See JPM Memo. § I.D.

## C.    Plaintiff Fails to Allege with Particularity that any of the Alleged Statements in the Merger Agreement Was False or Misleading.

Thus, the only statements that even have the potential to form the basis of a Section 10(b) claim are representations contained in the Merger Agreement itself. Although the Complaint refers to several representations in the Merger Agreement, the Complaint fails to allege how any of them was false or misleading. In fact, Plaintiff has critically and materially mischaracterized at least two of the representations.[7]

Contrary to Plaintiff's loosely-pleaded allegations, Lightship did not make any representations at all concerning the Verizon ICA. The only specific representation

---

[6] The correct name of company is Great *Works* Internet.

[7] Plaintiff refers to the following specific representations in the Merger Agreement: Section 4(h) (concerning the accuracy of financial statements, see Complaint ¶ 92)); Section 4(i) (compliance with laws, see Complaint ¶ 93); Section 4(k)(iii) (validity of and compliance with specifically identified contracts, see Complaint ¶ 93); Section 4(e)(i)-(iii) (relating to permits and licenses, see Complaint ¶ 94); Section 4(e)(v) (relating to liability to Verizon for intra-LATA toll traffic terminating on Lightship's UNE-P lines, see Complaint ¶ 94).

concerning Verizon in the entire Merger Agreement is in Section 4(e)(v), which is a narrow representation concerning toll traffic terminating on Lightship's UNE-P lines. See Merger Agreement (Robinson Aff., Ex. 1) § 4(e)(v), p. 25; see also Robinson Aff., Ex. 11 (email chain concerning Verizon UNE-P representation). The discrepancy in the LCAs is an entirely different issue and Plaintiff fails to allege with particularity how the representation in Section 4(e)(v) of the Merger Agreement is false or misleading. See JPM Memo. § I.A.

Plaintiff similarly mischaracterizes the representation in Section 4(k) of the Merger Agreement, concerning the applicability of certain contracts. See Merger Agreement (Robinson Aff., Exs. 1 and 2) § 4(k), p. 29. As explained in the JPM Memo., that representation applies only to contracts specifically identified in Schedule 4(k)(i) and (ii) to the Merger Agreement. See JPM Memo. § I.A. Plaintiff conveniently omits that the Verizon ICA is not among the contracts included in these schedules. Indeed, to the contrary, Lightship expressly stated that the Verizon ICA had expired. See JPM Memo. § I.A. and Robinson Aff., Exs. 1 and 2.

Plaintiff also references the representation in Section 4(h) of the Merger Agreement, which provides, in pertinent part:

> (i) . . . the Financial Statements [audited financial statements for 2002 and 2003 and unaudited financial statements for 2004] fairly present the financial condition of Lightship as of such dates . . . in accordance with GAAP . . .
>
> (ii) Except as set forth on Schedule 4(h)(ii), Lightship has no Liabilities of a type required by GAAP to be reflected on a consolidated balance sheet . . .

Merger Agreement (Robinson Aff., Ex. 1) § 4(h), pp. 26-27.

Plaintiff has failed to allege with particularity how this representation is false or misleading. Plaintiff has simply alleged in conclusory fashion that the ICA required

Lightship to maintain the same LCAs in Maine as Verizon's. This allegation is not sufficient. Rule 9(b) requires Plaintiff to allege with particularity facts sufficient to support the assertion that the ICA in fact did require Lightship to match Verizon's LCAs. The Court need not, and should not, accept Plaintiff's bald allegation on its face. In re Livent, Inc. Noteholders Sec. Litigation, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth conflicting pleadings . . . that are contradicted either by statements in the Complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice."). It is not enough to allege that the ICA was breached. For the litany of reasons discussed in detail in the JPM Memo., the ICA in fact did not require Lightship to maintain LCAs identical to Verizon's. See JPM Memo. § II. Upon reviewing the ICA, which the Court should do as it is integral to Plaintiff's allegations and is specifically referenced in the Complaint, it is clear that Plaintiff has not sufficiently alleged that the representation in Section 4(h) of the Merger Agreement is false or misleading.

Plaintiff similarly has failed to allege with particularity how the Financial Statements did not "fairly present the financial condition of Lightship as of such dates . . . in accordance with GAAP." Merger Agreement § 4(h)(i). Plaintiff has simply alleged that the Individual Defendants at some point learned of a discrepancy in the LCAs and (conclusorily asserted) that the discrepancy violated the ICA. Even with dollar figures attached to the purported breach, for all the reasons set forth herein, Plaintiff has failed to allege with particularity any basis for that breach and thus has failed to allege any basis for its conclusion that there was any material inaccuracy in the Financial Statements.

Thus, the Complaint must be dismissed because it has failed to allege with particularity that either of the Individual Defendants made any false or misleading statement at all.

III.    **Even if Plaintiff were Entitled to Rely on Representations Beyond Those Set Forth in the Merger Agreement, Plaintiff Has Failed to Allege Facts Specifically Attributing Any Such Statements to Either Individual Defendant.**

Section 10(b) claims may only be brought against those to whom the underlying misrepresentations are attributable. The Pension Committee of the Univ. of Montreal Pension Plan v. Banc of America Securities, LLC, 446 F. Supp. 2d 163, 178-79 (S.D.N.Y. 2006) ("A secondary actor cannot incur primary liability under the Act for a statement not attributed to that actor at the time of its dissemination. . . ." (internal quotations omitted)); Fezzani v. Bear, Stearns & Co., Inc., 384 F. Supp. 2d 618, 644-45 (S.D.N.Y. 2004) (dismissing claims where there were no actionable allegations relating to particular defendants' participation in alleged misrepresentation scheme); see also Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 177-78 (1994) ("a private plaintiff may not maintain an aiding and abetting suit under § 10(b)"). It is well established that the PSLRA requires a plaintiff "(1) to specify the statements that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Communications, 2007 WL1987336, at *6, citing Novak v. Kasaks, 216 F.3d 300, 306 (2nd Cir. 2000). "It is not enough for a plaintiff to allege that a defendant merely 'knew of the purported fraud through transactions with the defrauders, but failed to expose the deception.'" The Pension Committee of the Univ. of Montreal Pension Plan, 446 F. Supp. 2d at 179.

Conclusory allegations or allegations unsupported by factual assertions are, of course, insufficient to state a claim for fraud. ATSI Communications, 2007 WL 1987336, at *6, citing Luce v. Edelstein, 802 F. 2nd 49, 54 (2nd Cir. 1986). The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading . . . [I]n short, a plaintiff must set forth the who, what, when, where and how of the alleged fraud." Xerion Partners, 474 F. Supp. 2d at 516.

### A.    Plaintiff Has Not Alleged that Koester or O'Hare Participated in Making the Statements in the November 2004 CIM or the December 10, 2004 Q Advisors Response.

Plaintiff's Section 10(b) claims rely in large part on financial statements contained in the November 2004 CIM, which was prepared not by Lightship, but by an investment banking firm, non-defendant Q Advisors. Complaint ¶¶36, 57, 58, 111(a). Plaintiff also rests its claims on representations made by Q Advisors in response to inquiries by CTC. Id. ¶65 (quoting December 10, 2004 response to CTC from Q Advisors); id. ¶111(b). The Complaint, however, is devoid of any allegation that Koester participated in any way in the drafting of the CIM (or even of the underlying financial statements). There is also no allegation that Koester participated in, or even knew of, the December 10, 2004 Q Advisors response. Nor, in the absence of any such allegations, would it be proper for the Court to draw any inference that Koester was nonetheless somehow responsible for third party Q Advisor's representations.[8] Absent these essential links, neither the CIM nor Q Advisors' December 10, 2004 email may form the basis of a Section 10(b) claim against Koester.

---

[8] Such an inference would be particularly illogical given Koester's role as COO and Executive Vice President of Engineering – positions not typically responsible for financial results or projections.

Similarly, Plaintiff's allegations of O'Hare's review of the CIM – the only allegations linking him to it in any way – are flawed and inadequate as a matter of law. The Complaint alleges, apparently on information and belief, and without identifying any source,[9] that "[t]hroughout October 2004, O'Hare, in consultation with Oppenheimer and Matlack met with Q Advisors and reviewed materials, including a confidential information memorandum . . . created by Q Advisors to be provided to potential purchasers and thus used in the marketing of Lightship." Complaint ¶36. The Complaint also alleges, again without any source or other details, that Q Advisors was in "close consultation with O'Hare and other senior Lightship executives" when it prepared the CIM in November 2004. Complaint ¶57.

These vague, un-sourced allegations cannot suffice, as a matter of law, to establish that O'Hare "made" the purported misstatements by Q Advisors in the CIM, nor are they sufficient to state a claim for liability under Section 10(b). See 15 U.S.C. § 78u-4(b)(1)("[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."). In the absence of an identified source, there is no means of assessing the reliability of the statement as required by the PSLRA. See Novak v. Kasaks, 216 F.3d 300, 314 (2nd Cir. 2000) (source must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged").[10] The allegations that O'Hare reviewed

---

[9] It appears from a review of the Complaint that CTC's only source is billing manager Darren Kreitler, who is now an employee of Plaintiff. See Compl. ¶¶ 40-52, 74. Plaintiff does not identify the source of the allegations that O'Hare reviewed the CIM, and the Court may reasonably infer that Kreitler is not the source for these allegations as he is not identified as such.

[10] In the wake of Tellabs, the Seventh Circuit has held that the requirement for source identification is even more stringent than the standard set forth in Novak. See Higgenbotham v. Baxter, 2007 WL 2142298, at

or worked with Q Advisors on the CIM are not sufficiently detailed to form the basis for any attribution of the statements in the CIM to O'Hare.

The Complaint thus fails at a most basic level to state a claim against O'Hare or Koester based on the contents of the CIM or Q Advisors' December 10, 2004 email.

### B.    The Complaint Fails to Allege that Either O'Hare or Koester Made the Representations Contained in the January 2005 PowerPoint Presentation.

The Complaint alleges that "[o]n January 17, 2005, Lightship's management made a presentation to the CTC diligence team . . . which included a narrated PowerPoint presentation . . . . Lightship also prepared an agenda for this first day of due diligence, which included formal presentations by O'Hare, Koester, Wilson, Richard Kendall, Executive Vice President of Sales, and Rainer Gawlick, Executive Vice President of Marketing." Complaint ¶ 75.[11]  The Complaint goes on to allege that the PowerPoint presentation included allegedly inaccurate historical financial results for 2003 and 2004, and allegedly inaccurate financial projections for 2005 through 2007. Id. ¶ 76.  The Complaint, however, critically omits any allegation attributing any of the PowerPoint presentation's alleged misrepresentations to either O'Hare or Koester, nor can one reasonably infer from the presentation itself (see Robinson Aff., Ex. 9) that either O'Hare or Koester actually made the purportedly misleading statements.

Plaintiff simply alleges that Koester and O'Hare attended a meeting where representations were made.  Such allegations fall woefully shy of the pleading

---

*2 (7th Cir. 2007) (after Tellabs, allegations from anonymous sources must be discounted entirely: "It is hard to see how information from anonymous sources could be deemed "compelling" or how we could take account of plausible opposing inferences.").

[11] It should be noted that this purported securities fraud case, the premise of which appears to be financial statements rendered misleading by an alleged violation of the ICA, has not been brought against either the CFO of Lightship (Wilson) or the person in charge of regulatory affairs (Gawlick).

requirements under Rule 9(b) and the PSLRA.   Plaintiff's failure to describe these

purported misrepresentations with any specificity is particularly fatal where, as here,

there are multiple securities fraud defendants.   <u>Trustees of the Plumbers and Pipefitters</u>

<u>Nat'l Pension Fund v. De-Con Mech. Contractors</u>, 896 F. Supp. 342, 347 (S.D.N.Y.

1995)(plaintiff "may not rely on sweeping references to acts by all or some of the

defendants"); <u>Homburger v. Venture Minerals, Inc</u>, 1985 WL 549, at *2 (Rule 9(b)

"requires that plaintiffs specifically state what each particular defendant did or said, by

what means, when, to whom and with what intent").

     **C.**    **The Vague Allegations of Misrepresentations "Throughout the [Due Diligence] Process" are not Attributed to O'Hare or Koester with Any Specificity.**

Interspersed throughout the Complaint are several allegations that during the due

diligence period O'Hare and Koester (among many others, including individuals not

named as defendants), participated in communications with CTC and/or its

representatives.  For example, in Paragraph 86, Plaintiff alleges, without any further

detail regarding specific statements by specific individuals, that "[CTC's] requests for

information and the responses thereto were discussed by O'Hare, Wilson, Koester,

Oppenheimer and Matlack and other members of Lightship's senior management . . . ."

and that "[e]ach of these individuals participated in numerous interstate conference

telephone calls and exchanged emails with CTC personnel throughout the process, each

providing false, materially misleading information including assurances regarding

Lightship's billing practice."  In Paragraph 87, Plaintiff in similarly vague fashion alleges

that "assurances were given by Lightship that it was in full compliance with its ICAs.

These assurances included [unspecified] comments made by Koester and Gawlick in telephone conference calls in February and March 2005."[12]

Allegations that unspecified speakers made unspecified statements at unspecified times cannot form the basis of a Section 10(b) claim. Thus, to the extent Plaintiff's Section 10(b) claims rest on "<u>numerous</u> interstate telephone conference calls and discussions with <u>members</u> of CTC's due diligence teams", (Complaint ¶ 111(d) (emphasis added)), such claims must be dismissed.

**D.    The Remaining Alleged Misrepresentations are not Attributed Directly to O'Hare or Koester and Cannot Form the Basis of a 10(b) Claim Against Either Defendant.**

Plaintiff also seeks to base its claims against Koester and O'Hare on four emails, dated March 9, 2005, March 10, 2005, May 11, 2005, and May 13, 2005. Under the Merger Agreement, Plaintiff is not entitled to rely on any of these emails as a matter of law. <u>See</u> <u>supra</u> § II.A. In any event, none of these emails is even remotely attributable to Koester. Similarly, as to O'Hare, the Complaint makes plain that O'Hare simply had nothing to do with these emails.[13]

This Court should disregard these statements in evaluating the viability of any claim against the Individual Defendants.

---

[12] Even if given, these "assurances" were specifically not included as a representation in the Merger Agreement (contrary to Plaintiff's characterization of same). <u>See</u> <u>supra</u> § II.C and JPM Memo. § I.A.

[13] <u>See</u> Complaint ¶ 85 ("On March 9, <u>Q Advisors</u> sent an email to James Henry at Bank Street, attaching Lightship's consolidated income statements for January 2005 . . . ." (emphasis added)); Complaint ¶ 88 ("On March 10, 2005, <u>Matlack</u> sent an e-mail to Peterson, Prenetta, other CTC employees, and Oppenheimer . . . [stating] . . . "We are very confident in our CABS position and do not feel there is an exposure here." (emphasis added)); Complaint ¶ 96 ("On May 11, 2005, Lightship's CFO [non-defendant] <u>Wilson</u> sent an e-mail to Prenetta and other CTC employees which attached audited financial statements for 2003 and 2004 as well as working capital calculation as of year-end 2004." (emphasis added)); Complaint ¶ 97 ("On or about May 13, 2005, <u>Wilson</u> sent an e-mail to Prenetta and other CTC employees which attached various Lightship financial information . . . ." (emphasis added)).

**IV.    The Section 10(b) Claim Against O'Hare and Koester Must Be Dismissed because Plaintiff Fails to Plead Scienter Adequately With Regard to Any Purported Misrepresentation.**

      **A.    The Heightened Scienter Requirement Under the PSLRA and Tellabs.**

A Section 10(b) claim fails unless a plaintiff alleges "with particularity facts giving rise to a strong inference" that the defendants acted with scienter. See 15 U.S.C. § 78u-4(b)(2). The inference must be both reasonable and strong. See Kalnit v. Eichler, 264 F.3d 131, 138 (2nd Cir. 2001); Novak, 216 F.3d at 311. Not only must the complaint allege with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind, the trial court in reviewing such allegations must take into account all plausible opposing inferences. Tellabs, 127 S. Ct. at 2509-10. As the Tellabs Court recently explained:

> To determine whether the plaintiff has alleged facts giving rise to the requisite "strong inference," a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference . . . must be more than merely "reasonable" or "permissible" – it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged.

Id. at 2510 (emphasis added).

The facts alleged here fall well shy of the intentionally high burden set by the PSLRA, as recently interpreted in Tellabs.

      **B.    The Court Should Disregard Conclusory, Generalized Allegations of Scienter.**

"A pleading technique . . . 'that couples a factual statement with a conclusory allegation of fraudulent intent is insufficient to support the inference that the defendants acted recklessly or with fraudulent intent.'" In re Axis Capital Holdings, Ltd Sec. Litig.,

456 F. Supp. 2d 576, 592 (S.D.N.Y. 2006) (citations omitted).  See also Kayduk v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985) ("[M]ere allegations of fraud . . . averments to conditions of mind, or referrals to plans and schemes are too conclusory to satisfy the particularity requirement, no matter how many times such accusations are repeated."); Greenstone v. Cambex Corp., 975 F.2d 22, 25 (1st Cir. 1992) (mere averment that defendant "knew" a fact insufficient); In re Advanta Corp. Sec. Litig., 180 F.3d 525, 535 (3d Cir. 1999) ("Generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company.").

In other words, a plaintiff cannot establish scienter simply by alleging that a defendant acted with scienter, yet the Complaint here is riddled with such conclusory allegations.  For example, in Paragraph 74, Plaintiff alleges that Koester "knew" in January 2005 that the access charge increase about which Verizon inquired was the result of that change to Lightship's LCAs.  Similarly, in Paragraph 78, Plaintiff conclusorily alleges that O'Hare and Koester "knew or should have known" that financial information contained in the January 2005 PowerPoint presentation was inaccurate.  See also Complaint ¶ 98 (O'Hare and Koester "knew or should have known" that financial information supplied to CTC from March 21, 2005 to closing was false and misleading due to Lightship's "undisclosed billing practices").[14]

The Court must disregard these patently vague allegations.

---

[14] Plaintiff's allegations that O'Hare "knew" of the falsity of the financial statements at the time of the PowerPoint presentation in January 2005 conflicts with its allegation that O'Hare did not learn of the changes to the LCAs or the purported effect of those changes until March 2005. Complaint ¶ 49 ("In or about March 2005, Kreitler and Koester met with O'Hare and Wilson. At this meeting, they discussed Lightship's use of the smaller Lightship-created LCAs which were at variance with the LCAs defined by Verizon and the Maine PUC and Koester's plan to utilize the new billing protocols and have Lightship define its own LCAs . . . .").

**C.    Plaintiff Has Failed to Plead Facts Sufficient to Establish that O'Hare and Koester Had the Motive and Opportunity to Commit Fraud.**

Stripped of empty, conclusory statements, the only (still insufficient) allegation as to motive and opportunity to defraud, in the entire forty-page Complaint, appears in Paragraph 114, where Plaintiff simply alleges the legal standard:

> The Fraud and Securities Claims Defendants had the opportunity to inflate the CTC purchase price by inflating EBITDA and concealing the fact that traffic bound for single customer (GWI) accounted for a disproportionate share of Maine EBITDA. Each of the Fraud and Securities Claims Defendants received a concrete personal benefit from the acts complained of here in that each received consideration for the sale of their respective interest of each in LHI to CTC.

Complaint ¶ 114.

The apparent inference Plaintiff seeks to draw from this allegation is that Koester and O'Hare were motivated, as corporate officers and shareholders, to inflate Lightship's revenue in order to maximize the sale price. Such generic allegations of motive and opportunity driven by corporate success, however, have long been rejected. Novak, 216 F.3d at 307 ("[P]laintiffs [cannot] proceed based on motives possessed by virtually all corporate insiders, including . . . the appearance of corporate profitability."); Ganino, 228 F.3d at 170 ("General allegations that the defendants acted in their economic self-interest are not enough."); In re Axis Capital Holdings, Ltd Sec. Litig., 456 F. Supp. 2d at 594 ("Motives which may be easily imputed to 'any publicly-owned, for-profit endeavor are not sufficiently concrete for purposes of inferring scienter.'"); Kalnit, 264 F.3d at 139-140 ("Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."); In re JP Morgan Chase Sec. Litig., 363

F. Supp. 2d 595, 619 (S.D.N.Y. 2005) ("[G]eneralized allegations of a desire to achieve favorable terms in a merger or acquisition are insufficient.").

Plaintiff has not alleged, nor could it, that Koester or O'Hare received a benefit different from that received by any other shareholder. To the contrary, Plaintiff's allegations show precisely the contrary: Koester's and O'Hare's profit from the sale of Lightship was, on a share-by-share basis, exactly the same as every other holder of shares.[15] Where there is no "uncommon benefit," Plaintiff's generalized allegations of personal benefit simply do not give rise to a strong inference of scienter. In re JP Morgan Chase Sec. Litig., 363 F.Supp. 2d at 619 (observing steadfast requirement of "uncommon benefit" to show motive); Kalnit, 264 F.3d at 142 (no scienter where "plaintiffs have not pointed to any specific benefit that would inure to the defendants that would not be either generalized to all corporate directors or beneficial to all shareholders, not just the defendant directors specifically"). Novak, 216 F.3d at 307-08 (same).[16]

### D. Plaintiff has Failed to Allege Facts Sufficient to Establish Conscious Misbehavior or Other Highly Unreasonable Conduct by Either Individual Defendant.

Because Plaintiff has failed to plead any meaningful allegations of motive and opportunity, any attempt to establish scienter through circumstantial evidence of conscious behavior or recklessness is held to an even higher standard. See Kalnit, 264

---

[15] For example, there is no allegation (nor could there be) that either O'Hare or Koester received a special bonus as a result of Lightship's sale price being over a particular amount. Nor has Plaintiff alleged that contemporaneously with the alleged misrepresentation O'Hare and Koester engaged in insider trading that could be indicative of scienter. See Kalnit, 264 F.3d at 139.

[16] The Complaint specifies that O'Hare held 900,000 series AA shares, 22,000 series BB shares, and 700,000 series CC shares in Lightship, Complaint ¶ 9, and that Koester owned 400,000 Series AA and CC shares, id. ¶10, and that the total percentage of shares held by all officers and employees was 18.8 percent, id. ¶ 102. There is no allegation that either Koester or O'Hare held an extraordinary number of shares, nor is there any allegation that their interest in Lightship was otherwise unique among shareholders.

F.3d at 142 (where, as here, there are no cognizable allegations of motive, the bar is even higher for pleading a theory of scienter resting on circumstantial allegations of conscious behavior: "To survive dismissal under the 'conscious misbehavior' theory, the appellants must show that they alleged reckless conduct . . . . which is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."); Funke v. Life Fin. Corp., 237 F.Supp. 2d 458, 468-69 (S.D.N.Y. 2002) (Second Circuit has held that where there is no motive, "the strength of the circumstantial allegations [of motive and opportunity] must be correspondingly greater" (emphasis added)). Under the PSLRA, "[r]ecklessness involves not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care . . . . [The courts] employ a demanding standard of recklessness to ensure that 'the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception.'" Globis Capital Partners, L.P. v. Stonepath Group, Inc., , 2007 WL 1977236, at *2 (3rd Cir. 2007)(emphasis added) (citations omitted).

With one exception, Plaintiff's securities fraud claim against the Individual Defendants rests entirely on allegations that they failed to disclose certain "Lightship Billing Practices," practices which purportedly violated the ICA and/or regulatory decisions in the States of Maine, New Hampshire and Vermont.[17]  For purposes of the scienter analysis, Plaintiff must allege facts sufficient to show that the Individual Defendants' failure to disclose these billing practices was "highly unreasonable and . . .

---

[17] The one exception is the entirely irrelevant GWI issue, which is addressed in detail above at §II.B and in the JPM Memo. at §I.D.

represent[ed] an extreme departure from the standards of ordinary care to the extent that the danger was either known . . . or so obvious that the [Defendants] must have been aware of it." Kalnit, 264 F.3d at 142.

Plaintiff lumps all of the "Undisclosed Lightship Billing Practices" into an amorphous whole (which itself is flawed, see infra note 28). The billing practices, however, fairly fall into three categories: the Local Calling Area issue, the VNXX issue and purported "Double Billing". The details of each of these highly technical inter-carrier compensation issues are addressed in the JPM Memo. at § II. In essence, Plaintiff attempts to create a strong inference of scienter through a series of allegations designed to suggest that Koester and O'Hare knowingly or recklessly participated in a scheme to furnish financial results and projections that were made false as a result of these purported "Undisclosed Billing Practices," the only one of which described in any detail is the local calling area discrepancy. See Complaint ¶¶ 37-53.[18]

Plaintiff conclusorily alleges that the ICA required Lightship to change its local calling areas in Maine any time Verizon changed its LCAs. Plaintiff alleges that Lightship maintained its (smaller) LCAs when Verizon expanded its LCAs, and by doing so collected more money from Verizon than it should have, which in turn inflated the EBITDA upon which the purchase price was based. Even assuming arguendo the truth of all of these allegations, to establish scienter against Koester or O'Hare (which must be

---

[18] The allegations relating to VNXX services and "Double Billing" are sketchy at best, and in no respect comply with the stringent pleading requirements of the PSLRA and Rule 9(b). See Complaint ¶ 53. The Plaintiff does not state precisely what was said, by whom, or when. See Homburger, 1985 WL 549, at *2. Plaintiff has also made no sufficiently specific allegation that Koester or O'Hare were in any way aware of these "additional improper billing practices." This Court should disregard these allegations as irrelevant window dressing.

established separately for each), Plaintiff must do more than allege facts sufficient to

show that the Individual Defendants at some point knew that Lightship's LCAs differed

from Verizon's. Plaintiff must also allege facts sufficient to demonstrate that each

Individual Defendant knew that maintaining different LCAs violated the ICA, or at least

allege facts sufficient to show that such violation was so obvious that Koester and/or

O'Hare individually must have known that maintaining different LCAs violated the ICA.

The Complaint does neither.[19]

The Complaint lacks any allegation even remotely suggesting that Verizon had

called Lightship's billing practices into question. Indeed, there is no allegation that to

this day Verizon has ever even inquired about the LCA discrepancy, much less made a

claim.[20] Nor does the Complaint identify any language in the ICA which purportedly

prohibited Lightship from maintaining different LCAs. Rather, the Complaint, in

familiar cursory fashion, alleges: "Under the Maine ICA, Lightship was required to use

LCA's identified by Verizon for purposes of determining the appropriate intercarrier

compensation for a call." Complaint ¶ 37. Such general allegations are insufficient as a

matter of law. The Court must test this allegation by looking at the specific language of

the ICA. See, e.g., In re Livent, Inc. Noteholders Sec. Litigation, 151 F. Supp. 2d 371,

405-06 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth

---

[19] The Complaint also must allege with particularity, of course, that the Individual Defendants represented that Lightship complied with the ICA. As discussed supra at § II.B, no such representation was made.

[20] The only reference to communications with Verizon appears in Paragraph 74, where Plaintiff alleges that in January 2005 "Kreitler received inquiries from Verizon questioning the large increase in access charges levied on Verizon the previous month resulting from the GWI traffic." The Complaint goes on to allege, without any foundation or factual support, that "Koester knew this increase resulted from Lightship's intentional decision to retain the old, smaller local calling areas" and Plaintiff does not allege at all that O'Hare was apprised of these inquiries. Id. Moreover, Plaintiff does not allege that Verizon discussed the LCA issue with anyone at Lightship, including Kreitler. Nor does Plaintiff allege (nor could it) that the "inquiries" in any respect continued thereafter. Plaintiff thus does not (and cannot) tie the GWI "inquiry" to the LCA issue.

conflicting pleadings . . . that are contradicted either by statements in the Complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice."); see also Lentell, 396 F.3d at 176 (legal conclusions insufficient to establish loss causation; allegations of fact to support the conclusion are required).

Plaintiff intimates by its conclusory allegation that the ICA plainly and unambiguously dictates that Lightship should have changed its LCAs when Verizon changed its LCAs. In reality, the ICA at best (from Plaintiff's perspective) is an extremely complex, extraordinarily ambiguous agreement that has never before been interpreted in any proceeding or even informal dispute. A review of the ICA and related agreements reveals that it is far from clear that Lightship was required by the ICA to change its LCAs when Verizon changed its LCAs in or about December 2003. Indeed, there are several compelling arguments that the ICA did not require Lightship's LCAs to mirror Verizon's LCAs. See JPM Memo. § II.[21]

Thus, all that Plaintiff has alleged is that Koester and O'Hare at some point in time knew that Lightship maintained LCAs in Maine that differed from Verizon's LCAs. Even as of the filing of the Complaint, however, Verizon had never questioned the discrepancy in the LCAs, let alone asserted a claim against Lightship. The ICA had never been the subject of any proceeding, informal or otherwise, in which Lightship's position (or Verizon's purported position) had been tested. And the ICA itself is an ambiguous, technical morass subject to many differing interpretations, several of which persuasively support the position that mirroring Verizon's LCAs was not required. These facts do not even remotely support an inference that Koester's or O'Hare's conduct was

---

[21] The fact that Verizon never raised this issue for the approximately seventeen months following (and for years thereafter) speaks volumes as to the ICA's ambiguity.

"highly unreasonable and … represent[ed] an extreme departure from the standards of ordinary care." Kalnit, 264 F. 3d at 142. See also Tellabs, 127 S. Ct. at 2511 (omissions and ambiguities count against an inference of scienter). The proposition that two non-lawyers – neither of whom is alleged to be responsible for the company's regulatory affairs – can be charged with "knowing" what this highly technical, complex agreement required is ludicrous.

To the contrary, several courts have held that scienter cannot be established where, as here, the agreement or principle in question was ambiguous and/or had not been interpreted by the relevant authority. Funke v. Life Fin. Corp. is strikingly similar to the case at bar. In Funke, plaintiffs based their 10(b) claim on general allegations that the individual defendants concealed that the company followed an accounting method they knew to be improper under GAAP pursuant to a Financial Accounting Standards Board (FASB) statement. Funke, 237 F. Supp. 2d at 468.[22] This flawed accounting principle, plaintiffs alleged, rendered the financial statements materially false and misleading. Subsequent to plaintiff's purchase of shares, the company re-stated its financial statements, allegedly causing a decline in the stock price.

The court held that plaintiff failed to plead facts sufficient to support an inference that defendants' conduct reflected an "extreme departure from the standards of ordinary care." In reaching this conclusion, the court noted:

> First, from the complaint and the documents integral to it, it is apparent that the accounting principle on which plaintiffs rely was not a long-standing, well-recognized rule. Indeed it was not promulgated and effective until January 1, 2007 [six months before the class period], when FASB Statement No. 125 took

---

[22] The accounting principle in question related to the timing of recognition of collateralization of assets. The company used the "cash-in" method, whereas plaintiff alleged that GAAP clearly required that the "cash-out" method be followed.

effect. Second, the cited FASB Statement did not itself explicitly impose a rule that collateralizing assets must be booked on a cash-out basis, nor did it refer to cash reserves or other forms of collateralization. . . Third, it is evident from the face of the FASB statement and from what transpired after its issuance, that this document did not unambiguously dictate a rule with respect to the cash-in/cash-out question. Indeed, . . . nearly two years after the effective date of [the] FASB Statement the SEC felt obliged to provide clarification.

Funke, 237 F. Supp. 2d at 468-69.

The court accordingly held: "This set of circumstances is entirely antithetical to the notion that defendants engaged in conscious misconduct or reckless behavior, at least judged by the standards applied by our circuit court." Id. at 469.

As in Funke, Plaintiff here bases its fraud claim on the failure to disclose a practice allegedly inconsistent with a contract that does not unambiguously or explicitly (or even implicitly) dictate that Lightship's LCAs had to mirror Verizon's. Indeed the inference of conscious misconduct or reckless behavior in the case at bar is even weaker than in Funke because in Funke there was at least some guidance (albeit unclear) from a relevant authority. The FASB Statement at issue in Funke had been promulgated approximately six months prior to the class period, and the court nevertheless concluded an inference of scienter was lacking because, inter alia, the "accounting principle . . . was not a long-standing, well-established rule." Id. at 468. Here, the ICA to this day has never been interpreted by any relevant regulatory or governmental body.

Thus, the ambiguity of the ICA and the utter absence of any authoritative guidance (indeed any guidance at all) preclude a reasonable inference, much less a "cogent and compelling" inference, that O'Hare or Koester acted in a manner reflecting an "extreme departure from the standards of ordinary care."  See also In re Bristol-Myers Squibb Sec. Litig, 312 F.Supp. 2d 549, 567-68 (S.D.N.Y. 2004) (no scienter alleged

where no guidance was available on accounting treatment in question and therefore "no strong inference [could] be drawn that Defendants knew or were reckless in not knowing that the accounting for the sales at issue was wrong and, therefore, that the financials recognizing revenue on those sales were wrong"); Small v. Arch Capital Group, Ltd., 2006 WL 2708448, at *10 (S.D.N.Y. 2006)("On the subject of conscious misbehavior and recklessness, [Defendants'] interpretation of their contractual obligation is not so unreasonable that the Court must consider it reckless and indicative of scienter.").[23]

### E.    The Facts Alleged Support Compelling Innocent Inferences.

The most compelling inference to be drawn from the Complaint is entirely innocent, namely that Lightship, like all telecommunications companies operating in a heavily regulated industry, did not rely on a low-level billing manager with respect to regulatory issues such as the ICA.[24]  Rather, Lightship charged one of its senior management members with the task of ensuring that the company complied with applicable regulations and contracts, including an extraordinarily complex agreement like the ICA.  Indeed, the CIM itself confirms this inference:  Rainer Gawlick (not named as a defendant) was in charge of regulatory affairs, not Darren Kreitler.  CIM (Robinson Aff.

---

[23] In any event, the statements in the November 2004 CIM or the January 2005 PowerPoint presentation (or any statements made prior to March 2005 for that matter) should be disregarded as Plaintiff has failed to allege that Koester or O'Hare knew that such statements were false or misleading at the time they were made. Novak, 326 F.3d at 309 ("We have refused to allow plaintiffs to proceed with allegations of "fraud by hindsight."). Plaintiff has not alleged any specific facts showing that O'Hare knew of the changes to Lightship's LCAs or any of the other (vaguely described) "undisclosed billing practices" prior to March 2005. Plaintiff has also not alleged any facts showing that Koester knew of any impact on revenue regarding the changes to Lightship's LCAs until March 2005. See Complaint ¶¶ 40-52 (changes to LCA not implemented by Kreitler until March 1, 2005; Koester did not learn of the purported loss of revenue (and thus any potential materiality of the underlying issue) until March 2005; O'Hare also did not learn of any of these issues until March 2005).

[24] Plaintiff alleges that Kreitler was one of "several" billing managers. Complaint, ¶40. The Complaint does not allege that Kreistler had any expertise regarding regulatory matters in Maine or the interpretation of ICAs. Krietler was not an officer of the company and had no responsibilities at Lightship for regulatory matters.

Ex. 8), p. 24. In addition, as a matter of common sense, the Court may reasonably infer Lightship not only had a person within the company charged with regulatory affairs, but that it also regularly conferred with outside counsel.

A compelling non-culpable inference also maybe drawn from the following facts, all of which are apparent on the face of the Complaint: (1) Verizon, the giant in the industry with extraordinary resources and the right under the ICA to audit Lightship, never once audited Lightship, with respect to the LCA issue or otherwise; (2) Verizon, for the approximately seventeen months between the time it expanded its LCAs in or about December 2003 and the closing of the Lightship-CTC merger, never raised the LCA issue; (3) Verizon, when it expanded its LCAs, never notified Lightship that Lightship had to follow suit under the ICA; and (4) CTC, upon acquiring Lightship, did not change its LCAs to match Verizon's LCAs.

Under the circumstances, the only logical inference is that the Individual Defendants, when finally told by low-level billing manager Kreitler of his (inexpert) belief that there was a discrepancy in the LCAs, looked into the matter and were advised by experts that Lightship had no obligation to match Verizon's LCAs (for one or more of the many reasons stated in the JPM Memo). See Steed Finance LDC v. Nomura Securities Intern., Inc., 2004 WL 2072536, at *9 (S.D.N.Y. 2004) (scienter not adequately pled; defendants were entitled to the defense of good faith reliance on counsel).

These entirely innocent inferences are far more powerful than Plaintiff's convoluted and conclusory allegations of scienter. Under Tellabs, the claims against Koester and O'Hare (and the other defendants) cannot stand.

V.    **The Securities Fraud Claims Fail to Allege a Loss, Let Alone a Loss Caused by Any of the Purported Misrepresentations.**

The Complaint should be dismissed because it fails to allege that Plaintiff has

suffered any economic loss at all, let alone any economic loss proximately caused by any

of the alleged misrepresentations of the Defendants.  Rather, Plaintiff summarily

speculates that it would have paid substantially less for Lightship had it known of the

"Undisclosed Lightship Billing Practices."  Plaintiff generally alleges that it purchased

Lightship at an artificially inflated price, but does not allege any facts concerning the

purported true value of Lightship or facts sufficient to demonstrate a causal connection

between any purported loss and Defendants' alleged misrepresentations.  The Supreme

Court and the courts of this Circuit have definitively and repeatedly held that vague,

conclusory allegations of this ilk are insufficient to state a securities fraud claim under the

PSLRA.

A.    **A Complaint Must Allege an Economic Loss and Facts Sufficient to Demonstrate that the Loss was Caused by the Alleged Misrepresentation.**

All private plaintiffs asserting securities fraud claims under Section 10(b) and

Rule 10b-5 "must prove that the defendant's fraud caused an economic loss."  Dura

Pharmaceuticals, 544 U.S. at 338.  A plaintiff must prove both transaction and loss

causation.  Lentell, 396 F.3d at 172.  Transaction causation requires allegations sufficient

to show that but for the claimed misrepresentation or omission, the plaintiff would not

have entered into the securities transaction.  Id.  Loss causation is "the causal link

between the alleged misconduct and the economic harm ultimately suffered by the

plaintiff."  Id.  "To establish loss causation, a plaintiff must allege that the subject of the

fraudulent statement or omission was the cause of the actual loss suffered."  Lentell, 396

F.3d at 175 (emphasis is original). "A plaintiff must show that the economic harm that is suffered occurred <u>as a result of</u> the alleged misrepresentation." <u>Id.</u> at 173, <u>citing</u> <u>Citibank N.A. v. K.H. Corp.</u>, 968 F.2d 1489, 1495 (2nd Cir. 1992) (emphasis in original). Underlying both of these pleading requirements is, of course, the fundamental requirement that the plaintiff plead an actual economic harm. <u>Dura Pharmaceuticals</u>, 544 U.S. at 343, citing 15 U.S.C. § 78u-4(b)(4).

In <u>Dura Pharmaceuticals</u>, the Supreme Court expressly rejected the Ninth Circuit's holding that "a plaintiff can satisfy . . . [loss causation] simply by alleging that 'the price' of the security 'on the date of purchase was inflated because of the misrepresentation.'" <u>Id.</u> The Court held that a plaintiff must plead facts sufficient "to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." <u>Id.</u> at 347. In <u>Dura Pharmaceuticals</u>, the plaintiffs alleged that they purchased shares at an artificially inflated purchase price, but failed to allege that the share price fell significantly after the truth became known. <u>Id.</u> In reversing the Ninth Circuit, the Supreme Court held that alleging that one purchased shares at an "artificially inflated purchase price" is not itself a relevant economic loss. <u>Id.</u> Moreover, the Court held that dismissal below was appropriate because the complaint "nowhere else provides the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation . . . ." <u>Id.</u>

<u>Dura Pharmaceuticals</u> reaffirmed Second Circuit law rejecting the "inflated purchase price approach to proving causation and loss." <u>Id.</u> at 344, <u>citing</u> <u>Emergent Capital</u>, 343 F.3d at 198. [25] Following <u>Emergent Capital</u>, the Second Circuit reiterated

---

[25]The Court in <u>Emergent Capital</u> did hold that plaintiff adequately pleaded loss causation with respect to certain allegations in the complaint. The allegations that survived, however, illustrate the gross deficiencies

that "[i]t is not enough to allege that a defendant's misrepresentations and omissions induced a purchase-time value disparity between the price paid for a security and its true investment quality." Lentell, 396 F.3d at 174. "Such an allegation - which is nothing more than a paraphrased allegation of transaction causation - explains why a particular investment was made, but does not speak to the relationship between the fraud and the loss of the investment." Id.

>    **B.**    **Plaintiff Has Failed to Allege any Economic Loss, Let Alone that any Purported Loss was Caused by the "Undisclosed Lightship Billing Practices."**

Plaintiff's allegations here are precisely the type of "inflated purchase price" allegations rejected by the Supreme Court and by the Second Circuit.   Plaintiff's broad-brush allegations of purported economic loss appear in Paragraph 105 of the Complaint:

> The foregoing false and misleading statements and omissions were intended to, and did cause, CTC directly and proximately to purchase Lightship at an inflated purchase price. . .  In reliance on the Fraud and Securities Claims Defendants' false and misleading statements and omissions, CTC priced the transaction far in excess of its true value, and ultimately paid far more for Lightship than it would have agreed to pay had the Defendant disclosed the true facts, and far more than Lightship was in fact worth as a result of the Undisclosed Lightship Billing Practices.

Complaint ¶ 105.

---

of the Complaint at bar.  In Emergent Capital, the plaintiff alleged that defendants had failed to disclose the company's connection with one Appel, a broker barred by the NASD. More specifically, the plaintiff alleged the failure to disclose that one of the defendants and Appel had engaged in "pump and dump" schemes whereby they artificially inflated the stock price before "dumping" their own shares on the market. Plaintiff alleged that had it known of the connection between the defendants and Appel, it would not have purchased the stock, the price of which plummeted a few months after the purchase.  The Court, in a "close" case, 343 F.3d at 197, held that it could infer that Plaintiff alleged that the stock it purchased similarly had been inflated through a pump and dump scheme.  Thus, the plaintiff had alleged both a loss and a nexus between the alleged omission and the loss.  In contrast, Plaintiff's Complaint here alleges neither a loss nor a causal connection between a loss and the alleged fraud.

Plaintiff repeats this speculative, conclusory allegation in Paragraph 116: "Had the correct and complete information been disclosed to the Plaintiff by Lightship and the Fraud and Securities Claims Defendants, the Plaintiff would not have purchased Lightship at the price paid." See also Complaint ¶ 117 ("As a direct and proximate result of the foregoing fraudulent conduct, Plaintiff has been proximately damaged by the Fraud and Securities Claims Defendants' fraudulent misstatements and omissions in an amount believed to be no less than $20 million in addition to all amounts that may be due to Verizon by reason of the aforementioned wrongful billing practices."). The only other allegations of loss are similarly vague. In Paragraph 83, Plaintiff speculates that it "would have significantly reduced its purchase price" had "Lightship disclosed the revenue in Maine attributable to traffic bound for GWI." In Paragraph 113, Plaintiff makes the insufficient and conclusory allegation that "Defendants' false and misleading statements were intended to and did cause CTC directly and proximately to purchase Lightship at the inflated purchase price." See Lentell, 396 F.3d at 176 (legal conclusions insufficient to establish loss causation; allegations of fact are required).

Nowhere in the 146-paragraph, 40-page Complaint does Plaintiff allege that it has been required to return any of the monies received by Lightship on account of any of the "Undisclosed Lightship Billing Practices" or GWI issue, much less that anyone, including Verizon, has even inquired about monies it may be owed. Nor does Plaintiff allege anywhere in the Complaint that revenues subsequent to the acquisition of Lightship departed from projected revenues, on account of a change in inter-carrier billing practices or otherwise.[26]

---

[26] Of course, "the mere failure to meet earnings forecasts is insufficient to establish loss causation." In re AOL Time Warner, Inc. Securities Litigation, 2007 WL 1789013, *9 (S.D.N.Y. 2007) (citations omitted).

Plaintiff also fails to allege that upon learning of the "Undisclosed Lightship Billing Practices" it corrected any of the practices. For example, Plaintiff does not allege that it expanded the Lightship local calling areas in Maine to match Verizon's. Plaintiff does not allege that it has ceased offering VNXX services, in Maine or elsewhere. Plaintiff does not allege that it has returned any monies it received from Verizon as a result of the so-called "Double Billing" practice. And Plaintiff does not allege that GWI is no longer a customer nor that GWI revenue in Maine has declined in any respect. In other words, nowhere in the Complaint has Plaintiff made a single allegation that the risk purportedly concealed by Defendants' purported omissions actually "materialized to cause [a] loss." Lentell, 396 F.3d at 176. This shortcoming is all the more noteworthy because here, unlike an open market case, Plaintiff – as the owner of the company – has all of the necessary information at its fingertips. That Plaintiff has made nothing more than insufficient, conclusory allegations of loss demonstrates that Plaintiff cannot allege anything more.

In Greenwald v. Orb Communications & Marketing, Inc., 192 F. Supp. 2d 212 (S.D.N.Y 2002) (Swain, J.), this Court dismissed plaintiff's complaint where it failed to plead either economic loss or loss causation. The plaintiff in Greenwald, unlike Plaintiff here, alleged facts demonstrating rather serious deceitful and misleading representations on the part of the defendants, including, inter alia, that defendants had purposefully inflated the company's revenue by 500%, had rigged the company's computer model to create the illusion of capital requirements, and that certain equipment had been purchased to support two of the company's key clients when in fact it had been purchased for a former officer's new employer (in which one of the defendant's officers had a financial

stake). Despite these allegations of nefarious conduct, this Court dismissed the

complaint:

> Nowhere in the Complaint does Greenwald allege any economic default or other
> economic loss in respect of the debt security he purchased, or any disparity
> between what he paid for that security and whatever he would claim to have been
> its true value. In other words, careful review of the Complaint reveals that there
> is no allegation that Greenwald has suffered a loss on the security, much less that
> the alleged misrepresentations and omissions were the proximate cause of such a
> loss. The Complaint does not draw a connection between the Defendants'
> misrepresentations and any foreseeable loss suffered by Greenwald on the
> Debenture as a result of the purchase of that security.

Greenwald, 192 F. Supp. 2d at 227.

A similar result was reached in In re AOL Time Warner, Inc. Securities

Litigation, 2007 WL 1789013 (S.D.N.Y. 2007). In that case, plaintiffs alleged that Ernst

& Young falsely certified that AOL's and Time Warner's financial statements fairly

presented their financial condition in conformity with GAAP. The Court dismissed the

complaint on the basis that it failed to allege loss causation:

> The plaintiffs do not allege that the [audit] opinion was ever the subject of a
> corrective disclosure. In fact, the plaintiffs do not allege that the financial results
> certified by that Opinion were ever restated, or that the truth of that Opinion was
> called into question at any time during the AOLTW stock decline that caused
> their losses.

Id. at *9. See also In re Glaxo Smithkline, PLC Securities Litigation, 2006 WL 2871968

(S.D.N.Y. Oct. 6, 2006)(plaintiff failed to allege a loss where the stock price at the time

of disclosure of drug's effect on children was higher than the date of purchase); Leykin v.

AT&T Corp., 423 F. Supp. 2d 229, 248-249 (S.D.N.Y. 2006) (purchasers of At Home

stock alleged that defendants, despite knowing that Cox and Comcast intended to stop

doing business with At Home, represented that Cox and Comcast would not revoke their

relationships with the company; court held no loss causation alleged because the

complaint did not allege that Cox or Comcast stopped doing business with At Home during the class period). [27] As a matter of logic and law, in the absence of any allegation of actual loss, there can be no loss causation. These critical omissions are fatal to Plaintiff's Section 10(b) claims.[28]

## VI.    A Predicate to Plaintiff's Securities Fraud Claim Is Not Properly Before this Court.

For the reasons explained above, this Court should dismiss the 10b-5 claim because, inter alia, the claim is based on the unsupportable inference that O'Hare and Koester knew that Lightship had violated a highly technical, ambiguous contract. In light of the complexity and ambiguity of the ICA, the lack of any prior interpretation of the ICA, and the absence of any communication from Verizon on this issue, it would be futile to permit Plaintiff an opportunity to amend the Complaint. In re Bristol-Myers Squibb Sec. Litig., 312 F.Supp. 2d at 570 (dismissing complaint with prejudice where complexity of GAAP standards at issue belied any allegation of conscious misbehavior or

---

[27] Plaintiff's claim here that Defendants failed to disclose that GWI accounted for ninety percent of Lightship's access revenues in Maine (see Complaint ¶ 83) is analogous to the allegation in Leykin. Just as plaintiffs in that case did not allege that Cox and Comcast had ceased to do business with At Home during the relevant period, Plaintiff here has not alleged that GWI ceased to be its customer.

[28] Assuming arguendo Plaintiff's Complaint somehow can be read to allege an actual loss, the Complaint nevertheless must be dismissed on loss causation grounds because it is devoid of any sufficiently specific allegation that such loss was caused by the alleged misrepresentations. Plaintiff alleges that Defendants failed to disclose a number of different purportedly improper billing practices, namely, maintaining a local calling area in Maine that differed from Verzon's, "double billing" Verizon and third-parties who originated a call, and providing VNXX services in the states of Maine, New Hampshire and Vermont. See Complaint ¶¶ 52-54. In an obvious effort to muddy the waters, however, Plaintiff has combined all of these "Undisclosed Lightship Billing Practices" into one amorphous whole and alleged that such billing practices inflated the EBITDA figures on which its purchase price was based. Under Dura Pharmaceuticals and its progeny, such general allegations are plainly insufficient. Plaintiff "must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." Lentell, 396 F.3d at 175 (emphasis in original). "A plaintiff must show that the economic harm that is suffered occurred as a result of the alleged misrepresentation." Id. at 173, citing Citibank N.A. v. K.H. Corp., 968 F.2d 1489, 1495 (2d Cir. 1992) (emphasis in original). Plaintiff has not done so and its Complaint must be dismissed for this reason as well.

recklessness); Harrison v. Rubenstein, 2007 WL 582955, at *20 (S.D.N.Y. 2006) (dismissal of securities fraud claims with prejudice appropriate where amendment was futile); Small, 2006 WL 2708448, at *16 (dismissal with prejudice of securities fraud claims where allegations regarding defendants' contractual interpretation was not so unreasonable as to establish scienter). Even if the Maine PUC were someday to conclude that the ICA mandated Lightship's LCAs to mirror Verizon's, such a conclusion cannot support a compelling inference that, years earlier, the Individual Defendants committed a fraud.

In the alternative, Plaintiff should be precluded from amending its Complaint unless and until the threshold issue – that Lightship was required by the ICA to maintain the same LCAs in Maine as Verizon – is litigated before the Maine PUC. As discussed in detail in the JPM Memo., the Third Circuit recently agreed with Verizon that a dispute concerning the interpretation of an interconnection agreement must be heard in the first instance by the relevant state regulatory agency. See JPM Memo. § II, discussing Core Communications, Inc. v. Verizon Pennsylvania, Inc., 2007 WL 2059093, at *10 (3d. Cir. 2007) (dismissing complaint for breach of interconnection agreement because "interpretation and enforcement actions that arise after a state commission has approved an interconnection agreement must be litigated in the first instance before the relevant state commission").

## VII.    The Other Claims Against the Individual Defendants Should be Dismissed.

For the reasons stated in Sections III through VI of the JPM Memo., the other claims against the Individual Defendants must be dismissed.

## Conclusion

For the foregoing reasons, Defendants Jeffrey Koester and Kevin O'Hare

respectfully request that this motion to dismiss be allowed.


Dated:   September 17, 2007
         New York, New York



                        Respectfully submitted,



                        DREIER LLP


                        By: _____/s/_____
                            Joseph M. Pastore III, Esq.  (JP-1717)

                            499 Park Avenue
                            New York, New York 10022
                            (212) 328-6100
                            jpastore@dreierllp.com

                            *  *  *
                            One Landmark Square, 20th Floor
                            Stamford, Connecticut 06901
                            (203) 425-9500

                            *Attorney for Defendants*
                            *Kevin O'Hare and Jeffrey Koester*

David B. Mack, Esq.  (*Pro Hac Vice forthcoming*)
Sean Carnathan, Esq.  (*Pro Hac Vice forthcoming*)
O'Connor, Carnathan and Mack LLC
8 New England Executive Park, Suite 310
Burlington, Massachusetts  01803

## CERTIFICATE OF SERVICE

I certify that on September 17, 2007 a copy of the foregoing Motion to

Dismiss filed electronically.  Notice of this filing will be sent by e-mail to all parties by

operation of the Court's electronic filing system.  Parties listed below may access this

filing through the Court's system.

Nicholas W. Lobenthal
John Michael Teitler
Teitler & Teitler
1114 Avenue of the Americas
45th Floor
New York, NY 10036
(212) 997-4400
Fax: (212)-997-4949
Email: nwlobenthal@teitler.com
Email: jmteitler@teitler.com
*Attorneys for One Communications Corp.*

Mark D. Resnick
The Resnick Law Group, P.C.
Old City Hall
45 School Street
Boston, MA 02108
(617) 711-8383
Fax: (508) 749-6031
*Attorneys for One Communications Corp.*

Scott H. Angstreich
Kellogg, Huber, Hansen, Todd & Evans & Figel PLLC
(DC)
1615 M Street, N.W., Suite 400
Washington, DC  20036
(202) 326-7983
Email: sangstreich@khht.com
*Attorneys for Verizon New England Inc.*

Paul E. Summit, Esq.
Sullivan & Worcester
One Post Office Square
Boston, Massachussetts 02109
*Attorneys for The Megunticook Fund II, L.P. and the*
*Megunticook Side Fund II, L.P.*

Nicholas J. Panarella, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York, 10178
*Attorneys for Mellon Investor Services LLC*

Jayne S. Robinson, Esq.
Robinson & McDonald LLP
61 Broadway
New York, New York 10006
*Attorneys for J.P. Morgan SBIC LLC & Sixty Wall Street*
*SBIC Fund, L.P.*