# Exhibit 1

Jeffrey A. Masoner
Vice President – Interconnection Services Policy & Planning



**Network Services**
2107 Wilson Blvd., 11th Floor
Arlington, VA 22201

Telephone:  703/974-4610
Facsimile:  703/974-0314
jeffrey.a.masoner@verizon.com

January 16, 2002

John Lozzi
Lightship Telecom, LLC
Vice President – Marketing & Regulatory Affairs
1301 Virginia Drive, Suite 120
Ft. Washington, PA 19034

Re:  Requested Adoption Under the FCC Merger Conditions

Dear Mr. Lozzi:

Verizon New England Inc., d/b/a Verizon Maine, f/k/a New England Telephone and
Telegraph Company, d/b/a Bell Atlantic - Maine ("Verizon"), has received your letter
stating that, pursuant to paragraph 32 of the BA/GTE Merger Conditions ("Merger
Conditions"), released by the FCC on June 16, 2000 in CC Docket No. 98-184, Lightship
Telecom, LLC ("Lightship") wishes to provide services to customers in Verizon's service
territory in the State of Maine by adopting the voluntarily negotiated terms of the
Interconnection Agreement between Level 3 Communications, LLC  ("Level 3")and
Verizon New York Inc., f/k/a New York Telephone Company ("Verizon New York")
that was approved by the New York Public Service Commission as an effective
agreement in the State of New York, as such agreement exists on the date hereof after
giving effect to operation of law (the "Verizon New York Terms").

I understand that Lightship has a copy of the Verizon New York Terms which, in any
case, are attached hereto as Appendix 1.  Please note the following with respect to
Lightship's adoption of the Verizon New York Terms.

1.      By Lightship's countersignature on this letter, Lightship hereby represents and
        agrees to the following three points:

        (A)     Lightship agrees to be bound by and adopts in the service territory of
                Verizon, the Verizon New York Terms, as they are in effect on the date
                hereof after giving effect to operation of law, and in applying the Verizon
                New York Terms, agrees that Lightship shall be substituted in place of
                Level 3 Communications, LLC and Level 3 in the Verizon New York
                Terms wherever appropriate.

(B)     Notice to Lightship and Verizon as may be required or permitted under the Verizon New York Terms shall be provided as follows:

To Lightship:

Attention: Kevin J. Ohare
President and CEO
1301 Virginia Drive, Suite 120
Ft. Washington, Pennsylvania 19034
Telephone Number: 215-641-1875
Facsimile Number: 215-641-0531
Internet Address: kohare@lightshiptel.com

To Verizon:

Director-Contract Performance & Administration
Verizon Wholesale Markets
600 Hidden Ridge
HQEWMNOTICES
Irving, TX  75038
Telephone Number:  972-718-5988
Facsimile Number:  972-719-1519
Internet Address:  wmnotices@verizon.com

with a copy to:

Vice President and Associate General Counsel
Verizon Wholesale Markets
1320 N. Court House Road
8th Floor
Arlington, VA  22201
Facsimile:  703/974-0744

(C)     Lightship represents and warrants that it is a certified provider of local telecommunications service in the State of Maine, and that its adoption of the Verizon New York Terms will only cover services in the service territory of Verizon in the State of Maine.

2.     Lightship's adoption of the Verizon New York Terms shall become effective on January 23, 2002.  Verizon shall file this adoption letter with the Maine Public Utilities Commission ("Commission")  promptly upon receipt of an original of this letter, countersigned by an authorized officer of Lightship.   The Level 3/Verizon New York agreement is currently scheduled to terminate on September 30, 2002.

3.      As the Verizon New York Terms are being adopted by Lightship pursuant to the Merger Conditions, Verizon does not provide the Verizon New York Terms to Lightship as either a voluntary or negotiated agreement. The filing and performance by Verizon of the Verizon New York Terms does not in any way constitute a waiver by Verizon of any position as to the Verizon New York Terms or a portion thereof. Nor does it constitute a waiver by Verizon of any rights and remedies it may have to seek review of the Verizon New York Terms, or to seek review of any provisions included in these Verizon New York Terms as a result of Lightship's election pursuant to the Merger Conditions.

4.      Lightship's adoption of the Verizon New York Terms pursuant to the Merger Conditions is subject to all of the provisions of such Merger Conditions. Please note that the Merger Conditions exclude the following provisions from the interstate adoption requirements: state-specific pricing, state-specific performance measures, provisions that incorporate a determination reached in an arbitration conducted in the relevant state under 47 U.S.C. Section 252, provisions that incorporate the results of negotiations with a state commission or telecommunications carrier outside of the negotiation procedures of 47 U.S.C. Section 252(a)(1), and provisions from the Level 3/Verizon New York agreement that are not required pursuant to Section 251(c) of the Telecommunications Act of 1996 (the "Act"). Verizon, however, does not oppose Lightship's adoption of the Verizon New York Terms at this time, subject to the following reservations and exclusions:

(A)     Verizon's standard pricing schedule for interconnection agreements in Maine (as such schedule may be amended from time to time) (attached as Appendix 2 hereto) shall apply to Lightship's adoption of the Verizon New York Terms. Lightship should note that the aforementioned pricing schedule may contain rates for certain services the terms for which are not included in the Verizon New York Terms or that are otherwise not part of this adoption. In an effort to expedite the adoption process, Verizon has not deleted such rates from the pricing schedule. However, the inclusion of such rates in no way obligates Verizon to provide the subject services and in no way waives Verizon's rights under the Merger Conditions.

(B)     Lightship's adoption of the Verizon New York Terms shall not obligate Verizon to provide any interconnection arrangement or unbundled network element unless it is feasible to provide given the technical, network and Operations Support Systems attributes and limitations in, and is consistent with the laws and regulatory requirements of the State of Maine and with applicable collective bargaining agreements.

(C)     On January 25, 1999, the Supreme Court of the United States issued its decision on the appeals of the Eighth Circuit's decision in Iowa Utilities Board. The Supreme Court modified several of the FCC's and the Eighth Circuit's rulings regarding unbundled network elements and pricing

requirements under the Act. *AT&T Corp. v. Iowa Utilities Board*, 119 S. Ct. 721 (1999). Certain provisions of the Verizon New York Terms may be void or unenforceable as a result of the Supreme Court's decision of January 25, 1999, the United States Eighth Circuit Court of Appeals' decision in Docket No. 96-3321 regarding the FCC's pricing rules, and the current appeal before the Supreme Court of the United States regarding the FCC's UNE rules. Moreover, nothing herein shall be construed as or is intended to be a concession or admission by Verizon that any provision in the Verizon New York Terms complies with the rights and duties imposed by the Act, the decisions of the FCC and the Commissions, the decisions of the courts, or other law, and Verizon expressly reserves its full right to assert and pursue claims arising from or related to the Verizon New York Terms.

(D)     Lightship's adoption of the Verizon New York Terms does not include any provisions related to reciprocal compensation, which provisions are not subject to the interstate adoption requirements under the Merger Conditions. For example, reciprocal compensation provisions constitute state-specific pricing, which as described above, is exempt from the interstate adoption requirements in the Merger Conditions. Also, because the obligation to pay reciprocal compensation is found in Section 251(b)(5), reciprocal compensation provisions are outside the scope of Merger Conditions' requirement permitting adoptions of provisions required to be provided under Section 251(c). Moreover, even if the Merger Conditions were misconstrued as encompassing not only items subject to Section 251(c), but also items subject to Section 251(b), it would still not obligate Verizon to permit the interstate adoption of compensation terms pertaining to Internet Traffic. The FCC found that Internet Traffic constitutes "information access" outside the scope of the reciprocal compensation obligations set forth in Section 251(b)(5).[1] Thus, even if the Level 3/Verizon New York agreement has, or is mistakenly construed as containing, a voluntary commitment to pay compensation on Internet traffic, that commitment would be entirely outside the scope of the interstate adoption provisions of the Merger Conditions.[2] Please contact Verizon at your earliest convenience to supplement Lightship's adoption with an agreement regarding reciprocal compensation.[3]

---

[1] Order on Remand and Report and Order, In the Matters of: Implementation of the Local Competition Provisions in the Telecommunications Act of 1996 and Intercarrier Compensation for ISP-Bound Traffic, CC Docket No. 99-68 (rel. April 27, 2001) ("*FCC Remand Order*") ¶44.

[2] In addition, any reasonable amount of time permitted for adopting interconnection agreement provisions that invoke a compensation mechanism for internet traffic under the FCC's rules implementing section 252(i) of the Act (47 C.F.R. § 51.809(c)) has expired. These rules implementing section 252(i) of the Act apply to interstate adoptions under the Merger Conditions as well. *See, e.g.*, Merger Conditions ¶32 (such adoptions shall be made available "under the same rules that would apply to a request under 47 U.S.C. § 252(i)").

[3] For your convenience, an industry letter distributed by Verizon explaining its plans to implement the *FCC Remand Order* can be viewed at Verizon's Customer Support Website at URL www.verizon.com/wise (select Verizon East Customer Support, Resources, Industry Letters, CLEC).

(E)     Lightship's adoption does not include any terms that were arbitrated in the Verizon New York Terms.

5.     Verizon reserves the right to deny Lightship's adoption and/or application of the Verizon New York Terms, in whole or in part, at any time:

(A)     when the costs of providing the Verizon New York Terms to Lightship are greater than the costs of providing them to Level 3;

(B)     if the provision of the Verizon New York Terms to Lightship is not technically feasible;

(C)     if Verizon otherwise is not obligated to permit such adoption and/or application under the Merger Conditions or under applicable law.

6.     Should Lightship attempt to apply the Verizon New York Terms in a manner that conflicts with paragraphs 3-5 above, Verizon reserves its rights to seek appropriate legal and/or equitable relief.

In the event that a voluntary or involuntary petition has been or is in the future filed against Lightship under bankruptcy or insolvency laws, or any law relating to the relief of debtors, readjustment of indebtedness, debtor reorganization or composition or extension of debt (any such proceeding, an "Insolvency Proceeding"), then: (i) all rights of Verizon under such laws, including, without limitation, all rights of Verizon under 11 U.S.C. § 366, shall be preserved, and Lightship's adoption of the Verizon New York Terms shall in no way impair such rights of Verizon; and (ii) all rights of Lightship resulting from Lightship's adoption of the Verizon New York Terms shall be subject to and modified by any Stipulations and Orders entered in the Insolvency Proceeding, including, without limitation, any Stipulation or Order providing adequate assurance of payment to Verizon pursuant to 11 U.S.C. § 366.

Please arrange for a duly authorized representative of Lightship to sign this letter in the space provided below and return it to the undersigned.

Sincerely,

VERIZON NEW ENGLAND INC. D/B/A VERIZON MAINE

Jeffrey A. Masoner
Vice President – Interconnection Services Policy & Planning

Reviewed and countersigned as to points A, B, and C of paragraph 1:

LIGHTSHIP TELECOM, LLC

By _____

Title _____

Attachment

c:    Stephen Hughes - Verizon (w/out attachments)

**INTERCONNECTION AGREEMENT**

**Dated as of November 1, 2000**

**by and between**

**VERIZON NEW YORK**

**F/k/a BELL ATLANTIC - NEW YORK**

**and**

**Level 3 Communications, LLC**

Level 3/BELL ATLANTIC Interconnection Agreement for New York

# TABLE OF CONTENTS

Page

1.0 DEFINITIONS ............................................................................................................ 2

2.0 INTERPRETATION AND CONSTRUCTION ..................................................... 8

3.0 SCOPE ...................................................................................................................... 8

4.0 INTERCONNECTION AND PHYSICAL ARCHITECTURE ......................... 8
  4.1 INTERCONNECTION ACTIVATION............................................................................11
  4.2 TRUNK TYPES AND INTERCONNECTION POINTS ....................................................8
  4.3 PHYSICAL ARCHITECTURES ...................................................................................8
  4.4 ALTERNATIVE INTERCONNECTION ARRANGEMENTS .............................................8
  4.5 INTERCONNECTION IN ADDITIONAL LATAS ...........................................................8

5.0 TRANSMISSION AND ROUTING OF TELEPHONE EXCHANGE SERVICE TRAFFIC (PURSUANT TO SECTION 251(C)(2)) AND COMPENSABLE INTERNET TRAFFIC ...............8
  5.1 SCOPE OF TRAFFIC .................................................................................................8
  5.2 TRUNK GROUP CONNECTIONS AND ORDERING ......................................................8
  5.3 SWITCHING SYSTEM HIERARCHY AND TRUNKING REQUIREMENTS .......................8
  5.4 SIGNALING .............................................................................................................8
  5.5 GRADES OF SERVICE ...............................................................................................8
  5.6 MEASUREMENT AND BILLING .................................................................................8
  5.7 INTERCARRIER COMPENSATION ARRANGEMENTS – SECTION 51(B)(5).................19
  5.8 CALL DETAIL ..........................................................................................................8

6.0 TRANSMISSION AND ROUTING OF EXCHANGE ACCESS TRAFFIC PURSUANT TO 251(C)(2) 8
  6.1 SCOPE OF TRAFFIC .................................................................................................8
  6.2 ACCESS TOLL CONNECTING TRUNK GROUP ARCHITECTURE .................................8
  6.3 MEET-POINT BILLING ARRANGEMENTS ..................................................................8
  6.4 TOLL FREE SERVICE ACCESS CODE (E.G., 800/888/877) TRAFFIC .........................8

7.0 TRANSPORT AND TERMINATION OF OTHER TYPES OF TRAFFIC ...... 8
  7.1 INFORMATION SERVICES TRAFFIC............................................................................8
  7.2 BLV/BLVI TRAFFIC ...............................................................................................8
  7.3 TANDEM TRANSIT TRAFFIC SERVICE ("TRANSIT SERVICE")..................................8
  7.4 911/E911 ARRANGEMENTS ....................................................................................8

8.0 NUMBER RESOURCES, RATE CENTERS AND RATING POINTS ............ 8

9.0 NETWORK MAINTENANCE AND MANAGEMENT; OUTAGES .............. 8
  9.1 COOPERATION .........................................................................................................8
  9.2 RESPONSIBILITY FOR FOLLOWING STANDARDS......................................................8
  9.3 REPEATED OR WILLFUL INTERFERENCE OR IMPAIRMENT.........................................8
  9.4 OUTAGE REPAIR STANDARD ...................................................................................8
  9.5 NOTICE OF CHANGES -- SECTION 251(C)(5) ............................................................8

10.0 JOINT NETWORK IMPLEMENTATION AND GROOMING PROCESS; INSTALLATION, MAINTENANCE, TESTING AND REPAIR..................................................................8
  10.1 JOINT NETWORK IMPLEMENTATION AND GROOMING PROCESS ...............................8
  10.2 INSTALLATION, MAINTENANCE, TESTING AND REPAIR ...........................................8
  10.3 INITIAL REQUIREMENTS AND FORECASTING FOR TRUNK PROVISIONING...................35

Level 3/BELL ATLANTIC Interconnection Agreement for New York

10.4    DEMAND MANAGEMENT FORECASTS ................................................................8

**11.0    UNBUNDLED ACCESS** ..............................................................................................8

11.1    BA's PROVISION OF NETWORK ELEMENTS .......................................................8
11.2    LOOP TRANSMISSION TYPES .........................................................................8
11.3    NETWORK INTERFACE DEVICE .......................................................................8
11.4    UNBUNDLED SWITCHING ELEMENTS ...............................................................8
11.5    INTEROFFICE TRANSMISSION FACILITIES .........................................................8
11.6    OPERATIONS SUPPORT SYSTEMS ....................................................................8
11.7    LIMITATIONS ON UNBUNDLED ACCESS .............................................................8
11.8    AVAILABILITY OF OTHER NETWORK ELEMENTS ON AN UNBUNDLED BASIS ...........8
11.9    PROVISIONING OF LOOPS ..............................................................................8
11.10   MAINTENANCE OF LOOPS .............................................................................8
11.11   COMBINATIONS OF NETWORK ELEMENTS .........................................................8

**12.0    RESALE -- SECTIONS 251(C)(4) AND 251(B)(1)** .............................................8

12.1    AVAILABILITY OF RETAIL RATES FOR RESALE ...................................................8
12.2    AVAILABILITY OF WHOLESALE RATES FOR RESALE ..............................................8
12.3    AVAILABILITY OF SUPPORT SERVICES AND BRANDING FOR RESALE ........................8
12.4    ADDITIONAL TERMS GOVERNING RESALE AND USE OF BA SERVICES .......................8

**13.0    COLLOCATION -- SECTION 251(C)(6)** ...........................................................8

**14.0    NUMBER PORTABILITY -- SECTION 251(B)(2)** ...............................................8

14.1    SCOPE ......................................................................................................8
14.2    PROCEDURES FOR PROVIDING LNP ("LONG-TERM NUMBER PORTABILITY") ............8
14.3    PROCEDURES FOR PROVIDING NP THROUGH FULL NXX CODE MIGRATION ...............8

**15.0    DIALING PARITY -- SECTION 251(B)(3)** .........................................................8

**16.0    ACCESS TO RIGHTS-OF-WAY -- SECTION 251(B)(4)** .....................................8

**17.0    DATABASES AND SIGNALING** ...........................................................................8

**18.0    COORDINATED SERVICE ARRANGEMENTS** ...................................................8

18.1    INTERCEPT AND REFERRAL ANNOUNCEMENTS ...................................................8
18.2    COORDINATED REPAIR CALLS .........................................................................8
18.3    CUSTOMER AUTHORIZATION ...........................................................................8

**19.0    DIRECTORY SERVICES ARRANGEMENTS** .......................................................8

**20.0    RATES AND CHARGES; ASSURANCE OF PAYMENT** .........................................8

**21.0    INSURANCE** ......................................................................................................8

**22.0    TERM AND TERMINATION** ..............................................................................8

**23.0    DISCLAIMER OF REPRESENTATIONS AND WARRANTIES** ...............................8

**24.0    INDEMNIFICATION** ...........................................................................................8

**25.0    LIMITATION OF LIABILITY** ..............................................................................8

**26.0    PERFORMANCE STANDARDS FOR SPECIFIED ACTIVITIES** ............................8

SV033099

Level 3/BELL ATLANTIC Interconnection Agreement for New York

**27.0    COMPLIANCE WITH LAWS; REGULATORY APPROVAL** ...............................................................8

28.0    MISCELLANEOUS   8

disputed amount give notice to the Billing Party of the amounts it disputes ("Disputed Amounts") and include in such notice the specific details and reasons for disputing each item. The Non-Paying Party shall pay when due (i) all undisputed amounts to the Billing Party and (ii) all Disputed Amounts into an interest bearing escrow account with a third party escrow agent mutually agreed upon by the Parties.

28.8.4   If the Parties are unable to resolve the issues related to the Disputed Amounts in the normal course of business within thirty (30) days after delivery to the Billing Party of notice of the Disputed Amounts, each of the Parties shall appoint a designated representative who has authority to settle the dispute and who is at a higher level of management than the persons with direct responsibility for administration of this Agreement. The designated representatives shall meet as often as they reasonably deem necessary in order to discuss the dispute and negotiate in good faith in an effort to resolve such dispute. The specific format for such discussions will be left to the discretion of the designated representatives, however all reasonable requests for relevant information made by one Party to the other Party shall be honored.

28.8.5   If the Parties are unable to resolve issues related to the Disputed Amounts within thirty (30) days after the Parties' appointment of designated representatives pursuant to Section 28.8.4, or if either Party fails to appoint a designated representative within thirty (30) days of the end of the thirty (30) day period referred to Section 28.8.4, then either Party may file a complaint with the Commission or any other authority of competent jurisdiction to resolve such issues or proceed with any other remedy pursuant to law or equity.

28.8.6   The Parties agree that all negotiations pursuant to this Section 28.8 shall remain confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and state rules of evidence.

28.8.7   Charges which are not paid by the due date stated on BA's bill shall be subject to a late payment charge.  The late payment charge shall be an amount specified by BA which shall not exceed a rate of one and one half percent (1 1/12%) of the overdue amount (including any unpaid previously billed late payment charges) per month.

28.9    Dispute Resolution

Except as otherwise provided in this Agreement, any dispute between the Parties regarding the interpretation or enforcement of this Agreement or any of its terms shall be addressed by good faith attempts at conducting good faith negotiation between the Parties, in the first instance. Should such negotiations fail to resolve any dispute under this Agreement in a reasonable time (given, among other things, the circumstances giving rise to the dispute, the scope of perceived harm to the Parties, and the perceived threat to the services provided to Customers), either Party may initiate an appropriate action in any regulatory or judicial forum of competent jurisdiction.

28.10   Notices

SV033099

# AMENDMENT NO. 1

## to the

## INTERCONNECTION AGREEMENT

### between

## VERIZON NEW ENGLAND INC.
### d/b/a
## VERIZON MAINE

### and

## LIGHTSHIP TELECOM, LLC

THIS AMENDMENT No. 1 (this "Amendment") is made this 25th day of January 2002 (the "Effective Date"), by and between Verizon New England Inc., d/b/a Verizon Maine, f/k/a New England Telephone and Telegraph Company, d/b/a Bell Atlantic - Maine, a New York corporation ("Verizon") and Lightship Telecom, LLC, a Delaware corporation ("Lightship"). (Verizon and Lightship may be hereinafter referred to, each individually, as a "Party" and, collectively, as the "Parties"). This Amendment covers services in State of Maine (the "State").

## WITNESSETH:

**WHEREAS**, pursuant to an adoption letter dated January 16, 2002 (the "Adoption Letter"), Lightship adopted into the State of Maine, the interconnection agreement between Level 3 Communications, LLC and Verizon New York Inc., f/k/a New York Telephone Company in the State of New York (the "Terms"); and

**WHEREAS**, pursuant to paragraph 32 of the BA/GTE Merger Conditions, reciprocal compensation arrangements are not adoptable from one state jurisdiction to another state jurisdiction;

**NOW, THEREFORE**, in consideration of the mutual promises, provisions and covenants herein contained, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.      The Parties agree that the terms and conditions set forth in Attachment 1 and the rates in Appendix A, attached hereto and made a part of this Amendment, shall exclusively govern the Parties' provisions of reciprocal compensation arrangements and that any rates, terms and/or conditions related to reciprocal compensation that are contained in the Terms shall have no application to this Amendment.

Attachment 1 - Reciprocal Compensation

1.    Reciprocal Compensation Arrangements Pursuant to Section 251(b)(5) of the Act.

    1.1.    Reciprocal Compensation.

        1.1.1.    The Parties shall compensate each other for the transport and termination of Reciprocal Compensation Traffic delivered to the terminating Party in accordance with Section 251(b)(5) of the Act at the rates stated in Appendix A to this Amendment.  These rates are to be applied at the Lightship-IP for traffic delivered by Verizon for termination by Lightship, and at the Verizon-IP for traffic delivered by Lightship for termination by Verizon.  Except as expressly specified in this Agreement, no additional charges shall apply for the termination from the IP to the Customer of Reciprocal Compensation Traffic delivered to the Verizon-IP by Lightship or the Lightship-IP by Verizon.  When such Reciprocal Compensation Traffic is delivered over the same trunks as Toll Traffic, any port or transport or other applicable access charges related to the delivery of Toll Traffic from the IP to an end user shall be prorated to be applied only to the Toll Traffic.  The designation of traffic as Reciprocal Compensation Traffic for purposes of Reciprocal Compensation shall be based on the actual originating and terminating points of the complete end-to-end communication.

    1.2.    Traffic Not Subject to Reciprocal Compensation.

        1.2.1.    Reciprocal Compensation shall not apply to interstate or intrastate Exchange Access, Information Access, or exchange services for Exchange Access or Information Access.

        1.2.2.    Reciprocal Compensation shall not apply to Internet Traffic.

            1.2.2.1.    The determination of whether traffic is Reciprocal Compensation Traffic or Internet Traffic shall be performed in accordance with Paragraphs 8 and 79, and other applicable provisions, of the FCC Internet Order (including, but not limited to, in accordance with the rebuttable presumption established by the FCC Internet Order that traffic delivered to a carrier that exceeds a 3:1 ratio of terminating to originating traffic is Internet Traffic, and in accordance with the process established by

the FCC Internet Order for rebutting such presumption before the Commission).

    1.2.3.   Reciprocal Compensation shall not apply to Toll Traffic, including, but not limited to, calls originated on a 1+ presubscription basis, or on a casual dialed (10XXX/101XXXX) basis.

    1.2.4.   Reciprocal Compensation shall not apply to Optional Extended Local Calling Area Traffic.

    1.2.5.   Reciprocal Compensation shall not apply to special access, private line, or any other traffic that is not switched by the terminating Party.

    1.2.6.   Reciprocal Compensation shall not apply to Tandem Transit Traffic.

    1.2.7.   Reciprocal Compensation shall not apply to Voice Information Services Traffic.

1.3.   The Reciprocal Compensation charges (including, but not limited to, the Reciprocal Compensation per minute of use charges) billed by Lightship to Verizon shall not exceed the Reciprocal Compensation charges (including, but not limited to, Reciprocal Compensation per minute of use charges) billed by Verizon to Lightship.

2.   <u>Other Types of Traffic.</u>

2.1   Notwithstanding any other provision of this Agreement or any Tariff: (a) the Parties' rights and obligations with respect to any intercarrier compensation that may be due in connection with their exchange of Internet Traffic shall be governed by the terms of the FCC Internet Order and other applicable FCC orders and FCC Regulations; and, (b) a Party shall not be obligated to pay any intercarrier compensation for Internet Traffic that is in excess of the intercarrier compensation for Internet Traffic that such Party is required to pay under the FCC Internet Order and other applicable FCC orders and FCC Regulations.

2.2   Subject to Section 2.1 above, interstate and intrastate Exchange Access, Information Access, exchange services for Exchange Access or Information Access, and Toll Traffic, shall be governed by the applicable provisions of this Agreement and applicable Tariffs.

2.3     For any traffic originating with a third party carrier and delivered by Lightship to Verizon, Lightship shall pay Verizon the same amount that such third party carrier would have been obligated to pay Verizon for termination of that traffic at the location the traffic is delivered to Verizon by Lightship.

2.4     Any traffic not specifically addressed in this Agreement shall be treated as required by the applicable Tariff of the Party transporting and/or terminating the traffic.

3.     <u>Interconnection Points</u>

3.1     The IP of a Party ("Receiving Party") for Measured Internet Traffic delivered to the Receiving Party by the other Party shall be the same as the IP of the Receiving Party for Reciprocal Compensation Traffic under Section 4 of the Terms.

3.2     Except as otherwise set forth in the applicable Tariff of a Party ("Receiving Party") that receives Toll Traffic from the other Party, the IP of the Receiving Party for Toll Traffic delivered to the Receiving Party by the other Party shall be the same as the IP of the Receiving Party for Reciprocal Compensation Traffic under Section 4 of the Terms.

3.3     The IP for traffic exchanged between the Parties that is not Reciprocal Compensation Traffic, Measured Internet Traffic or Toll Traffic, shall be as specified in the applicable provisions of this Agreement or the applicable Tariff of the receiving Party, or in the absence of applicable provisions in this Agreement or a Tariff of the receiving Party, as mutually agreed by the Parties.

4.     <u>Traffic Measurement and Billing over Interconnection Trunks</u>

4.1     For billing purposes, each Party shall pass Calling Party Number (CPN) information on at least ninety-five percent (95%) of calls carried over the Interconnection Trunks.

4.1.1     As used in this Section 4, "Traffic Rate" means the applicable Reciprocal Compensation Traffic rate, Measured Internet Traffic rate, intrastate Switched Exchange Access Service rate, interstate Switched Exchange Access Service rate, or intrastate/interstate Tandem Transit Traffic rate, as provided in the Verizon's standard pricing schedule for interconnection agreements in Maine that was attached to the Verizon/Lightship adoption letter dated January 16, 2002, an applicable Tariff, or, for Measured Internet Traffic, the FCC Internet Order.

or discrepancies.  Each Party agrees to provide the necessary Traffic data in conjunction with any such audit in a timely manner.

4.4     Nothing in this Agreement shall be construed to limit either Party's ability to designate the areas within which that Party's Customers may make calls which that Party rates as "local" in its Customer Tariffs.

<u>Appendix B – Amendment Glossary</u>

1.    General Rule

1.1    The provisions of Sections 1.2 through 1.4 and Section 2 apply with regard to this Amendment only.

1.2    Unless the context clearly indicates otherwise, when a term listed in this Amendment Glossary is used in the Amendment (including its Attachment and Appendices), the term shall have the meaning stated in this Amendment Glossary. A defined term intended to convey the meaning stated in this Amendment Glossary is capitalized when used. Other terms that are capitalized, and not defined in this Amendment Glossary shall have the meaning stated in the Act. Additional definitions that are specific to the matters covered in the Terms may appear in that provision. To the extent that there may be any conflict between a definition set forth in this Amendment Glossary and any definition in the Terms, the definition set forth in this Amendment Glossary shall control with respect to interpretation of this Amendment.

1.3    Unless the context clearly indicates otherwise, any term defined in this Amendment Glossary which is defined or used in the singular shall include the plural, and any term defined in this Amendment Glossary which is defined or used in the plural shall include the singular.

1.4    The words "shall" and "will" are used interchangeably throughout the Amendment and the use of either indicates a mandatory requirement. The use of one or the other shall not confer a different degree of right or obligation for either Party.

2.    Definitions

<u>Act</u>. The Communications Act of 1934 (47 U.S.C. §151 et seq.), as from time to time amended (including, but not limited to, by the Telecommunications Act of 1996).

<u>Customer</u>.    A third party residence or business end-user subscriber to Telephone Exchange Services provided by either of the Parties.

Extended Local Calling Scope Arrangement.  An arrangement that provides a Customer a local calling scope (Extended Area Service, "EAS"), outside of the Customer's basic exchange serving area.  Extended Local Calling Scope Arrangements may be either optional or non-optional.  "Optional Extended Local Calling Scope Arrangement Traffic" is traffic that under an optional Extended Local Calling Scope Arrangement chosen by the Customer terminates outside of the Customer's basic exchange serving area.

FCC.  The Federal Communications Commission.

FCC Regulations.  The unstayed, effective regulations promulgated by the FCC, as amended  from time to time.

FCC Internet Order.  Order on Remand and Report and Order, In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Intercarrier Compensation for ISP Bound Traffic, FCC 01-131, CC Docket Nos. 96-98 and 99-68, (adopted April 18, 2001).

Internet Traffic.  Any traffic that is transmitted to or returned from the Internet at any point during the duration of the transmission.

Merger Order.  The FCC's Order "In re Application of GTE Corporation, Transferor, and Bell Atlantic Corporation, Transferee, For Consent to Transfer of Control of Domestic and International Section 214 and 310 Authorizations and Application to Transfer of a Submarine Cable Landing License", Memorandum Opinion and Order, FCC CC Docket No. 98-184, FCC 00-221 (June 16, 2000), as modified from time to time.

Measured Internet Traffic.  Dial-up, switched Internet Traffic originated by a Customer of one Party on that Party's network at a point in a Verizon local calling area, and delivered to a Customer or an Internet Service Provider served by the other Party, on that other Party's network at a point in the same Verizon local calling area.  Verizon local calling areas shall be as defined by Verizon.  For the purposes of this definition, a Verizon local calling area includes a Verizon non-optional Extended Local Calling Scope Arrangement, but does not include a Verizon optional Extended Local Calling Scope Arrangement.  Calls originated on a 1+ presubscription basis, or on a casual dialed (10XXX/101XXXX) basis, are not considered Measured Internet Traffic.

Reciprocal Compensation.  The arrangement for recovering, in accordance with Section 251(b)(5) of the Act, the FCC Internet Order, and other applicable FCC orders and FCC Regulations, costs incurred for the transport and termination of Reciprocal Compensation Traffic originating on one Party's network and terminating on the other Party's network (as set forth in Attachment 1 to this Amendment.

Reciprocal Compensation Traffic.  Telecommunications traffic originated by a Customer of one Party on that Party's network and terminated to a Customer of the other Party on that other Party's network, except for Telecommunications traffic that is interstate or

intrastate Exchange Access, Information Access, or exchange services for Exchange Access or Information Access. The determination of whether Telecommunication traffic is Exchange Access or Information Access shall be based upon Verizon's local calling areas as defined by Verizon. Reciprocal Compensation Traffic does <u>not</u> include: (1) any Internet Traffic; (2) traffic that does not originate and terminate within the same Verizon local calling area as defined by Verizon; (3) Toll Traffic, including, but not limited to, calls originated on a 1+ presubscription basis, or on a casual dialed (10XXX/101XXXX) basis; (4) Optional Extended Local Calling Scope Arrangement Traffic; (5) special access, private line, Frame Relay, ATM, or any other traffic that is not switched by the terminating Party; (6) Tandem Transit Traffic; or, (7) Information Service Traffic. For the purpose of this definition, a Verizon local calling area includes a Verizon non-optional Extended Local Calling Scope Arrangement, but does not include a Verizon optional Extended Local Calling Scope Arrangement.

<u>Switched Exchange Access Service</u>. The offering of transmission and switching services for the purpose of the origination or termination of Toll Traffic. Switched Exchange Access Services include but may not be limited to: Feature Group A, Feature Group B, Feature Group D, 700 access, 800 access, 888 access and 900 access.

<u>Tariff</u>.

    a) Any applicable Federal or state tariff of a Party, as amended from time-to-time; or

    b) Any standard agreement or other document, as amended from time-to-time, that sets forth the generally available terms, conditions and prices under which a Party offers a Service.

<u>Toll Traffic</u>. Traffic that is originated by a Customer of one Party on that Party's network and terminates to a Customer of the other Party on that other Party's network and is not Reciprocal Compensation Traffic, Measured Internet Traffic, or Ancillary Traffic. Toll Traffic may be either "IntraLATA Toll Traffic" or "InterLATA Toll Traffic", depending on whether the originating and terminating points are within the same LATA.

<u>Traffic Factor 1</u>. For traffic exchange via Interconnection Trunks, a percentage calculated by dividing the number of minutes of interstate traffic (excluding Measured Internet Traffic) by the total number of minutes of interstate and intrastate traffic. ([Interstate Traffic Total Minutes of Use {excluding Measured Internet Traffic Total Minutes of Use} ÷ {Interstate Traffic Total Minutes of Use + Intrastate Traffic Total Minutes of Use}] x 100). Until the form of a Party's bills is updated to use the term "Traffic Factor 1," the term "Traffic Factor 1" may be referred to on the Party's bills and in billing related communications as "Percent Interstate Usage" or "PIU."

<u>Traffic Factor 2</u>. For traffic exchange via Interconnection Trunks, a percentage calculated by dividing the combined total number of minutes of Reciprocal Compensation Traffic and Measured Internet Traffic by the total number of minutes of intrastate traffic. ([{Reciprocal Compensation Traffic Total Minutes of Use + Measured Internet Traffic Total Minutes of Use} ÷ Intrastate Traffic Total Minutes of Use] x 100).

Until the form of a Party's bills is updated to use the term "Traffic Factor 2," the term "Traffic Factor 2" may be referred to on the Party's bills and in billing related communications as "Percent Local Usage" or "PLU."

<u>Voice Information Services Traffic</u>.  IntraLATA switched voice traffic, delivered to a service that provides [i] recorded voice announcement information or [ii] a vocal discussion program open to the public.