# Exhibit 4

V032800

**INTERCONNECTION AGREEMENT UNDER SECTIONS 251 AND 252 OF THE TELECOMMUNICATIONS ACT OF 1996**

**Dated as of June 14, 2000**

by and between

**NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY,
d/b/a
BELL ATLANTIC – NEW HAMPSHIRE**

and

**LIGHTSHIP TELECOM, LLC**

BA-NH/Lightship
Based on GNAPS Agreement dated 9/1/98

V012800

# INTERCONNECTION AGREEMENT UNDER SECTIONS 251 AND 252 OF THE TELECOMMUNICATIONS ACT OF 1996

This Interconnection Agreement (this "Agreement"), under Sections 251 and 252 of the Telecommunications Act of 1996 (the "Act"), is effective as of the 14th day of June, 2000 (the "Effective Date"), by and between New England Telephone and Telegraph Company, d/b/a Bell Atlantic – New Hampshire ("BA"), a New York corporation with offices at 185 Franklin Street, Boston, Massachusetts 02110, and Lightship Telecom, LLC ("Lightship"), a Delaware corporation with offices at 70 West Oakland Avenue, Suite 306, Doylestown, Pennsylvania 18901 (each individually, a "Party" and, collectively, the "Parties").

WHEREAS, Lightship has requested, pursuant to Section 252(i) of the Act, that BA make available to Lightship Interconnection, services and unbundled Network Elements upon the same terms and conditions as provided in the Interconnection Agreement (and any amendments thereto that have been approved under applicable law) between Global NAPs, Inc. and BA, dated as of September 1, 1998, for New Hampshire, approved by the New Hampshire Public Utilities Commission under Section 252 of the Act, copies of which agreement and any subsequent amendments thereto that have been approved under applicable law being attached hereto as Appendix 1 (the "Separate Agreement");  and

WHEREAS, BA has undertaken to make such terms and conditions available to Lightship hereby only because of, and to the extent required by, Section 252(i) of the Act.

NOW, THEREFORE, in consideration of the mutual provisions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lightship and BA hereby agree as follows:

**1.0   Incorporation of Separate Agreement  and  Appendix 2 by Reference**

1.1   Except as expressly stated herein, the terms and conditions of the Separate Agreement, as it is in effect on the date hereof after giving effect to operation of law, and of Appendix 2 attached hereto, are incorporated by reference in their entirety herein and form an integral part of this Agreement.

1.2   References in the Separate Agreement to Global NAPs, Inc. or to GNAPS shall for purposes of this Agreement be deemed to refer to Lightship.

1.3   References in the Separate Agreement to the "Effective Date", the date of effectiveness thereof and like provisions shall for purposes of this Agreement be deemed to refer to the date first written above.  Unless terminated earlier in accordance with the terms of the Separate Agreement, this Agreement shall continue in effect until the later of the date (a) of the expiration of the initial term of the Separate Agreement (which, for the avoidance of any doubt, is September 1, 2001) or (b) the Separate Agreement is otherwise terminated or expires.

V012800

    1.4    All references in the Separate Agreement to "800/888" shall be deleted in their entirety and replaced with the following: "800/888/877".

    1.5    All usage data to be provided pursuant to Sections 6.3.8 and 6.3.9 of the Separate Agreement shall be sent to the following address on behalf of Lightship:

>Lightship Telecom, LLC
>Kevin O'Hare
>1301 Virginia Drive, Suite 120
>Fort Washington, PA 19034

    1.6    All certificates or other proof of insurance to be sent to BA under Section 21.0 of the Separate Agreement shall be sent to the following address:

>Director - Interconnection Services
>Bell Atlantic – Telecom Industry Services
>Room 1423
>1095 Avenue of the Americas
>New York, New York 10036

    1.7    All notices, affidavits, exemption-certificates or other communications to Lightship under Section 29.6 of the Separate Agreement shall be sent to the following address:

>Lightship Telecom, LLC
>Kevin O'Hare
>70 West Oakland Avenue, Suite 306
>Doylestown, Pennsylvania 18901

    1.8    All notices, affidavits, exemption-certificates or other communications to BA under Section 29.6 of the Separate Agreement shall be sent to the following address:

>Tax Administration
>Bell Atlantic Corporation
>1095 Avenue of the Americas
>Room 3109
>New York, New York 10036
>Telephone: (212) 395-1280
>Facsimile: (212) 597-2915

    1.9    Notices to Lightship under Section 29.10 of the Separate Agreement shall be sent to the following address:

>Lightship Telecom, LLC
>Kevin O'Hare
>70 West Oakland Avenue, Suite 306

V012800

Doylestown, Pennsylvania 18901

1.10    Notices to BA under Section 29.10 of the Separate Agreement shall be sent to the following address:

>Director - Interconnection Services
>Bell Atlantic Wholesale Markets
>1095 Avenue of the Americas
>Room 1423
>New York, NY  10036
>Facsimile:  212/704-4381

with a copy to:

>Bell Atlantic Network Services, Inc.
>Attn: Jack H. White, Jr.,
>    Associate General Counsel
>1320 N. Court House Road, 8th Floor
>Arlington, Virginia 22201
>Telephone: (703) 974-1368
>Facsimile:  (703) 974-0744

with a copy to:

>Bell Atlantic – New Hampshire
>Attn: General Counsel
>14th Floor
>185 Franklin Street
>Boston, Massachusetts

1.11    Schedule 4.0 set forth at Appendix 2 hereto shall replace and supersede in their entirety Schedule 4.0 of the Separate Agreement.

**2.0    Clarifications**

2.1    BA has advised Lightship that BA disputes the applicability of the Separate Agreement's Reciprocal Compensation arrangements to traffic that is transmitted to or returned from the Internet at any point during the duration of its transmission ("Internet Traffic") (herein the "Disputed Issue").  Lightship believes that the Separate Agreement's Reciprocal Compensation arrangements apply to Internet Traffic but acknowledges that the Parties disagree as to the meaning of the Separate Agreement with respect to the Disputed Issue, and that BA's execution and delivery of this Agreement does not constitute a voluntary adoption or reaffirmation of the Separate Agreement, an admission that any provision of the Separate Agreement (or Lightship's interpretation thereof) is lawful or reasonable, or a release or waiver

V012800

of BA's claims and defenses pertaining to the Disputed Issue. The entry into, filing and performance by the Parties of this Agreement does not in any way constitute a waiver by either Party of any of the rights and remedies it may have to seek review of any of the provisions of this Agreement or the Separate Agreement, or to petition the Commission, other administrative body or court for reconsideration or reversal of any determination made by any of them, or to seek enforcement or review in any way of any portion of this Agreement or the Separate Agreement in connection with the Disputed Issue or Lightship's election under 47 USC § 252(i).]

      2.2    The Parties agree that if any judicial or regulatory authority of competent jurisdiction determines (or has determined) that BA is not required to furnish any service or item or provide any benefit to Telecommunications Carriers otherwise required to be furnished or provided to Lightship hereunder, then BA may, at its sole option, avail itself of any such determination by providing written notice thereof to Lightship.

      2.3    Notwithstanding anything to the contrary contained in this Agreement, the Parties agree that BA shall only be required to provide combinations and any services related to its provision of combinations to the extent (a) required by Applicable Law or (b) mutually agreed to by the Parties in writing after the date hereof.

      2.4    Notwithstanding any other provisions of this Agreement, BA shall have no obligation to perform under this Agreement until such time as Lightship has obtained a Certificate of Public Convenience and Necessity ("CPCN") or such other Commission authorization as may be required by law as a condition for conducting business in the State of New Hampshire as a local exchange carrier.

V032800

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first set forth above.

| LIGHTSHIP TELECOM, LLC | BELL ATLANTIC – NEW HAMPSHIRE |
|---|---|
| By: *[signature]* | By: *[signature]* |
| Printed: Kevin M O'Hare | Printed: Jeffrey A. Masoner |
| Title: President + CEO | Title: Vice-President - Interconnection Services Policy & Planning |

BA-NH/Lightship
Based on GNAPS Agreement dated 9/1/98

# INTERCONNECTION AGREEMENT UNDER SECTIONS 251 AND 252 OF THE TELECOMMUNICATIONS ACT OF 1996

### Dated as of September 1, 1998

by and between

**BELL ATLANTIC - NEW HAMPSHIRE**

and

**GLOBAL NAPS, Inc.**

**TABLE OF CONTENTS**

| Section | | Page |
|---|---|---|
| 1.0 | DEFINITIONS | 2 |
| 2.0 | INTERPRETATION AND CONSTRUCTION | 13 |
| 3.0 | SCOPE | 13 |
| 4.0 | INTERCONNECTION PURSUANT TO SECTION 251(c)(2) | 14 |
| 4.1 | Scope | 14 |
| 4.2 | Physical Architecture | 16 |
| 4.3 | Technical Specifications | 17 |
| 4.4 | Interconnection in Additional LATAs | 18 |
| 4.5 | Frame Relay Interconnection | 19 |
| 5.0 | TRANSMISSION AND ROUTING OF TELEPHONE EXCHANGE SERVICE TRAFFIC PURSUANT TO SECTION 251(c)(2) | 19 |
| 5.1 | Scope of Traffic | 19 |
| 5.2 | Switching System Hierarchy | 19 |
| 5.3 | Trunk Group Architecture and Traffic Routing | 20 |
| 5.4 | Signaling | 20 |
| 5.5 | Grades of Service | 20 |
| 5.6 | Measurement and Billing | 20 |
| 5.7 | Reciprocal Compensation Arrangements -- Section 251(b)(5) | 21 |
| 6.0 | TRANSMISSION AND ROUTING OF EXCHANGE ACCESS TRAFFIC PURSUANT TO 251(c)(2) | 23 |
| 6.1 | Scope of Traffic | 23 |
| 6.2 | Trunk Group Architecture and Traffic Routing | 23 |
| 6.3 | Meet-Point Billing Arrangements | 23 |
| 6.4 | 800/888 Traffic | 27 |
| 7.0 | TRANSPORT AND TERMINATION OF OTHER TYPES OF TRAFFIC | 28 |
| 7.1 | Information Services Traffic | 28 |
| 7.2 | Tandem Transit Service | 29 |
| 7.3 | 911/E911 Arrangements | 30 |
| 7.4 | Frame Relay Service Traffic | 32 |
| 8.0 | NUMBER RESOURCES, RATE CENTERS, AND RATING POINTS | 33 |
| 9.0 | NETWORK MAINTENANCE AND MANAGEMENT; OUTAGES | 35 |
| 9.1 | Cooperation | 35 |
| 9.2 | Responsibility for Following Standards | 35 |

| | | |
|---|---|---:|
| 9.3 | Interference or Impairment | 35 |
| 9.4 | Repeated or Willful Noncompliance | 35 |
| 9.5 | Outage Repair Standard | 36 |
| 9.6 | Notice of Changes - Section 251(c)(5) | 36 |
| 9.7 | Fraud | 36 |

10.0 JOINT NETWORK IMPLEMENTATION AND GROOMING PROCESS, INSTALLATION, MAINTENANCE, TESTING & REPAIR 37
| | | |
|---|---|---:|
| 10.1 | Joint Network Configuration and Grooming Process | 37 |
| 10.2 | Installation, Maintenance, Testing and Repair | 37 |
| 10.3 | Network Reliability Council | 37 |
| 10.4 | Forecasting Requirements for Trunk Provisioning | 38 |
| 10.5 | Demand Management Forecasts | 39 |

11.0 UNBUNDLED ACCESS -- SECTION 251(c)(3) 40
| | | |
|---|---|---:|
| 11.1 | Available Network Elements | 40 |
| 11.2 | Unbundled Local Loop ("ULL") Types | 40 |
| 11.3 | Unbundled Switching Elements | 42 |
| 11.4 | Unbundled Inter Office Facilities | 42 |
| 11.5 | Operations Support Systems | 42 |
| 11.6 | Limitations on Unbundled Access | 42 |
| 11.7 | Availability of Other Network Elements on an Unbundled Basis | 43 |
| 11.8 | Provisioning of Unbundled Local Loops | 43 |
| 11.9 | Maintenance of Unbundled Network Elements | 44 |
| 11.10 | Other Terms and Conditions Including Rates and Charges | 45 |

12.0 RESALE -- SECTIONS 251(c)(4) and 251(b)(2) 46
| | | |
|---|---|---:|
| 12.1 | Availability of Wholesale Rates for Resale | 46 |
| 12.2 | Availability of Retail Rates for Resale | 46 |
| 12.3 | Additional Terms Governing Resale and Use of BA Services | 46 |

13.0 COLLOCATION -- SECTION 251(c)(6) 48
| | | |
|---|---|---:|
| 13.6 | Dedicated Transit Service | 48 |

14.0 NUMBER PORTABILITY -- SECTION 251(b)(2) 50
| | | |
|---|---|---:|
| 14.1 | Scope | 50 |
| 14.2 | Procedures for Providing INP Through Remote Call Forwarding | 51 |
| 14.3 | Procedures for Providing INP Through Route Indexing | 52 |
| 14.4 | Procedures for Providing INP Through Full NXX Code Migration | 52 |
| 14.5 | Other Interim Number Portability Options | 52 |
| 14.6 | Receipt of Terminating Compensation on Traffic to INP'ed Numbers | 52 |
| 14.7 | Recovery of INP Costs Pursuant to FCC Order and Rulemaking | 53 |

15.0 DIALING PARITY -- SECTION 251(b)(3) 54

16.0 ACCESS TO RIGHTS-OF-WAY -- SECTION 251(b)(4) 54

17.0 DATABASES AND SIGNALING 54

18.0 COORDINATED SERVICES ARRANGEMENTS 56
    18.1 Intercept and Referral Announcements 56
    18.2 Coordinated Repair Calls 56
    18.3 Customer Authorization 56

19.0 DIRECTORY SERVICES ARRANGEMENTS 58
    19.1 Directory Listings and Directory Distributions 58
    19.2 Directory Assistance and Operator Services 59
    19.3 Directory Assistance Call Completion 60
    19.4 Directory Assistance Credits 61
    19.5 Direct Access to Directory Assistance 61
    19.6 Inward Operator Services 61
    19.7 Operator Services 62
    19.8 0+ Mechanized Operator Calls (Calling Card, Collect, Bill to Third Number) 63
    19.9 0- Operator Handled Calls (Calling Card, Collect, Bill to Third Number) 63
    19.10 Operator Emergency Bulletin Service 64
    19.11 Operator Passthrough Service 64

20.0 COORDINATION WITH TARIFF TERMS 65

21.0 INSURANCE 66

22.0 TERM AND TERMINATION 67

23.0 DISCLAIMER OF REPRESENTATIONS AND WARRANTIES 67

24.0 CANCELLATION CHARGES 68

25.0 INDEMNIFICATION 68

26.0 LIMITATION OF LIABILITY. 70

27.0 PERFORMANCE STANDARDS FOR SPECIFIED ACTIVITIES 71
    27.1 Performance Standards 71
    27.2 Performance Reporting 71

28.0 COMPLIANCE WITH LAWS; REGULATORY APPROVAL 72

29.0 MISCELLANEOUS 73
    29.1 Authorization 73

| | | |
|---|---|---:|
| 29.2 | Independent Contractor | 73 |
| 29.3 | Force Majeure | 73 |
| 29.4 | Confidentiality | 74 |
| 29.5 | Choice of Law | 75 |
| 29.6 | Taxes | 75 |
| 29.7 | Assignment | 75 |
| 29.8 | Billing and Payment; Disputed Amounts | 75 |
| 29.9 | Dispute Resolution | 77 |
| 29.10 | Notices | 77 |
| 29.11 | Section 252(i) Obligations | 78 |
| 29.12 | Joint Work Product | 78 |
| 29.13 | No Third Party Beneficiaries; Disclaimer of Agency | 78 |
| 29.14 | No License | 79 |
| 29.15 | Technology Upgrades | 79 |
| 29.16 | Survival | 80 |
| 29.17 | Entire Agreement | 80 |
| 29.18 | Counterparts | 80 |
| 29.19 | Modification, Amendment, Supplement, or Waiver | 80 |
| 29.20 | Successors and Assigns | 80 |
| 29.21 | Publicity and Use of Trademarks or Service Marks | 80 |
| 29.22 | Restructured/New Rates | 80 |
| 29.23 | Integrity of BELL ATLANTIC Network | 81 |

1.45	"InterLATA Service" is As Defined in the Act.

1.46	"IntraLATA Toll Traffic" means those intraLATA calls that are not defined as Local Traffic in this Agreement.

1.47	"Line Side" means an End Office Switch connection that provides transmission, switching and optional features suitable for Customer connection to the public switched network, including loop start supervision, ground start supervision, and signaling for basic rate ISDN service.

1.48	"Local Access and Transport Area" or "LATA" is As Defined in the Act.

1.49	"Local Exchange Carrier" or "LEC" is As Defined in the Act.  The Parties to this Agreement are or will shortly become Local Exchange Carriers.

1.50	"Local Traffic", means traffic that is originated by a Customer of one Party on that Party's network and terminates to a Customer of the other Party on that other Party's network, within a given local calling area, or expanded area service ("EAS") area, as defined in BA's effective Customer tariffs, or, if the Commission has defined local calling areas applicable to all LEC's, then as so defined by the Commission.

1.51	"Main Distribution Frame" or "MDF" means the ultimate point at which outside plant facilities terminate within a Wire Center, for interconnection to other telecommunications facilities within the Wire Center.

1.52	"Meet-Point Billing" or "MPB" means an arrangement whereby two or more LECs jointly provide to a third party the transport element of a Switched Exchange Access Service to one of the LECs' End Office Switches, with each LEC receiving an appropriate share of the transport element revenues as defined by their effective Exchange Access Tariffs.

1.52a	"Meet-Point Billing Traffic" means traffic that is subject to an effective Meet-Point Billing arrangement.

1.53	"Network Element" is As Defined in the Act.

1.54	"Network Interface Device" or "NID" means the BA-provided interface terminating BA's telecommunications network on the property where the Customer's service is located at a point determined by BA.

1.54a	"Network-to-Network Interface (NNI)" specifies how a Frame Relay Switch sends and receives data from another  Frame Relay network. The NNI Port Connection provides connection of a Frame Relay Trunk, including 56 and 64 kbps DDS, 1.536 Mbps/DS1, 45 Mbps/DS3 and CIS Cross Connects, to Bell Atlantic's XA-FRS Network.

  1.64 "Rate Demarcation Point" means the point where network access recurring charges and BA responsibility stop and beyond which Customer responsibility begins, determined in accordance with FCC rules and BA standard operating practices.

  1.65 "Rating Point" or "Routing Point" means a specific geographic point identified by a specific V&H coordinate.  The Rating Point is used to route inbound traffic to specified NPA-NXXs and to calculate mileage measurements for the distance-sensitive transport charges of switched access services.  Pursuant to Bell Communications Research, Inc. ("Bellcore") Practice BR 795-100-100 (the "Bellcore Practice"), the Rating Point may be an End Office location. or a "LEC Consortium Point of Interconnection."  Pursuant to that same Bellcore Practice, each "LEC Consortium Point of Interconnection" shall be designated by a common language location identifier ("CLLI") code with (x)KD in positions 9, 10, 11, where (x) may be any alphanumeric A-Z or 0-9.  The Rating Point must be located within the LATA in which the corresponding NPA-NXX is located.  However, the Rating Point associated with each NPA-NXX need not be the same as the corresponding Rate Center Point, nor must it be located within the corresponding Rate Center Area, nor must there be a unique and separate Rating Point corresponding to each unique and separate Rate Center.

  1.66 "Reciprocal Compensation" is As Described in the Act, and refers to the payment arrangements that recover costs incurred for the transport and termination of Reciprocal Compensation Traffic originating on one Party's network and terminating on the other Party's network.

  1.67 "Reciprocal Compensation Call" or "Reciprocal Compensation Traffic" means a Telephone Exchange Service Call completed between the Parties, which qualifies for Reciprocal Compensation pursuant to the terms of this Agreement and prevailing Commission or FCC rules that may exist.

  1.68 "Route Indexing" means the provision of Interim Number Portability through the use of direct trunks provisioned between end offices of BA and GNAPS over which inbound traffic to a ported number will be routed.

  1.69 "Service Control Point" or "SCP" means a node in the Common Channel Signaling network to which informational requests for service handling, such as routing, are directed and processed.  The SCP is a real time database system that, based on a query from a service switching point and via a Signaling Transfer Point, performs subscriber or application-specific service logic, and then sends instructions back to the SSP on how to continue call processing.

  1.70 "Signaling Transfer Point" or "STP" means a specialized switch that provides SS7 network access and performs SS7 message routing and screening.

  1.71 "Single Bill/Multiple Tariff" shall mean that one bill is rendered to the IXC from all LECs who are jointly providing access service.  A single bill consists of all rate elements applicable to access services billed on one statement of charges under one billing account

Service," is As Defined in the Act.  Telephone Exchange Service generally provides the Customer with a telephonic connection to, and a unique telephone number address on, the public switched telecommunications network, and enables such Customer to place or receive calls to all other stations on the public switched telecommunications network.

1.85    "Telephone Exchange Service Call" or "Telephone Exchange Service Traffic" means a call completed between two Telephone Exchange Service Customers of the Parties located in the same LATA, originated on one Party's network and terminated on the other Party's network where such call was not carried by a third Party as either a presubscribed call (1+) or a casual dialed (10XXX) or (101XXX) call.  Telephone Exchange Service Traffic is transported over Traffic Exchange Trunks.

1.86    "Telephone Toll Service"  (or "Toll Traffic") , is As Defined in the Act and means traffic that is originated by a Customer of one Party on that Party's network and is not Local Traffic or Ancillary Traffic.  Toll Traffic may be either "IntraLATA Toll Traffic" or "InterLATA Toll Traffic", depending on whether the originating and terminating points are within the same LATA.

1.87    "Transit Traffic" means any traffic that originates from or terminates at GNAPS's network, "transits" BA's network substantially unchanged, and terminates to or originates from a third carrier's network, as the case may be.  "Transit Service" provides GNAPS with the ability to use its connection to a BA Tandem for the delivery of calls which originate or terminate with GNAPS and terminate or originate from a carrier other than BA, such as another CLEC, a LEC other than BA, or a wireless carrier.  In these cases, neither the originating nor terminating Customer is a Customer of BA.  This service is provided through BA's Tandems and applies only where the terminating End Office of the third carrier subtends the BA Tandem. "Transit Traffic" and "Transit Service" do not include or apply to traffic that is subject to an effective Meet-Point Billing arrangement.

1.88    "Trunk Side" means a Central Office Switch connection that is capable of, and has been programmed to treat the circuit as, connecting to another switching entity (e.g. another carrier's network).  Trunk Side connections offer those transmission and signaling features appropriate for the connection of switching entities.

1.89    "Unbundled Local Loop" or "ULL" or "Loop" means a transmission path that extends from the Main Distribution Frame, DSX panel or functionally comparable piece of equipment in the Customer's serving End Office to the Rate Demarcation Point (or network interface device (NID) if installed) in or at a Customer's premises. The actual loop transmission facilities used to provide an ULL may utilize any of several technologies.

1.90    "Undefined Terms" means the Parties acknowledge that terms may appear in this Agreement which are not defined and agree that any such terms shall be construed in accordance with their customary usage in the telecommunications industry as of the effective date of this Agreement, except that any undefined term herein shall be interpreted in accordance with the definition or its use in the FCC Interconnection Order and the FCC Further Interconnection Order.

applicable Tariffs, in direct proportion to the minutes of use of calls passed with CPN information.

       5.6.3  If the originating Party does not pass CPN on more than ten percent (10%) of calls, or if the receiving Party lacks the ability to use CPN information to classify on an automated basis traffic delivered by the other Party as either Local Traffic or Toll Traffic, and the originating Party chooses to combine Local and Toll Traffic on the same trunk group, it will supply an auditable Percent Local Use ("PLU") report quarterly, based on the previous three months' traffic, and applicable to the following three months.  If the originating Party also chooses to combine Interstate and Intrastate Toll Traffic on the same trunk group, it will supply an auditable Percent Interstate Use ("PIU") report quarterly, based on the previous three months' terminating traffic, and applicable to the following three months.  In lieu of the foregoing PLU and/or PIU reports, the Parties may agree to provide and accept reasonable surrogate measures for an agreed-upon interim period.

       5.6.4  Measurement of billing minutes for purposes of determining terminating compensation shall be in conversation seconds.

    **5.7**    **Reciprocal Compensation Arrangements -- Section 251(b)(5)**

       Reciprocal Compensation arrangements address the transport and termination of Reciprocal Compensation Traffic.  BA's delivery of Traffic to GNAPS that originated with a third carrier is addressed in subsection 7.3.  Where GNAPS delivers Traffic (other than Reciprocal Compensation Traffic) to BA, except as may be set forth herein or subsequently agreed to by the Parties, GNAPS shall pay BA the same amount that such carrier would have paid BA for termination of that Traffic at the location the Traffic is delivered to BA by GNAPS.  Compensation for the transport and termination of traffic not specifically addressed in this subsection shall be as provided elsewhere in this Agreement, or if not so provided, as required by the Tariffs of the Party transporting and/or terminating the traffic.

       5.7.1  Nothing in this Agreement shall be construed to limit either Party's ability to designate the areas within which that Party's Customers may make calls which that Party rates as "local" in its Customer Tariffs.

       5.7.2  The Parties shall compensate each other for the transport and termination of Reciprocal Compensation Traffic in an equal and symmetrical manner at the rates provided in the Pricing Schedule (Exhibit A hereto), as may be amended from time to time in accordance with Exhibit A and subsection 20.1.2 below or, if not set forth therein, in the applicable Tariff(s) of the terminating Party, as the case may be.  These rates are to be applied at the GNAPS-IP for traffic delivered by BA, and at the BA-IP for traffic delivered by GNAPS.  No additional charges, including port or transport charges, shall apply for the termination of Reciprocal Compensation Traffic delivered to the BA-IP or the GNAPS-IP, except as set forth in Exhibit A.  When Reciprocal Compensation Traffic is terminated over the same trunks as Switched Exchange Access Service, any port or transport or other applicable access charges related to the Switched Exchange Access Service shall be prorated to be applied only to such other Switched Exchange

BA – NH/Global NAPS             21

Access Service.

       5.7.2.1   Each Party will pay to the other Party a blended reciprocal compensation rate as specified in Exhibit A for Reciprocal Compensation Traffic delivered to the other Party's IP in each LATA.

       5.7.2.2  Intentionally Omitted.

       5.7.2.3 The Parties stipulate that they disagree as to whether traffic that originates on one Party's network and is transmitted to an Internet Service Provider ("ISP") connected to the other Party's network ("ISP Traffic") constitutes Local Traffic as defined herein, and the charges to be assessed in connection with such traffic.  The issue of whether such traffic constitutes Local Traffic on which reciprocal compensation mush be paid pursuant to the 1996 Act is presently before the FCC in CCB/CPD 97-30 and may be before a court of competent jurisdiction.  The Parties agree that the decision of the FCC in that proceeding, or as such court, shall determine whether such traffic is Local Traffic (as defined herein) and the charges to be assessed in connection with ISP Traffic.  If the FCC or such court determines that ISP Traffic is Local Traffic, as defined herein, or otherwise determines that ISP Traffic is subject to reciprocal compensation, it shall be compensated as Local Traffic under this Agreement unless another compensation scheme is required under such FCC or court determination.  Until resolution of this issue, BA agrees to pay GNAPS Reciprocal Compensation for ISP traffic (without conceding that ISP Traffic constitutes Local Traffic or precluding BA's ability to seek appropriate court review of this issue) pursuant to the Commission's Order in Case 97-C-1275, dated March 19, 1998, as such Order may be modified, changed or reversed.

       5.7.4 The Reciprocal Compensation arrangements set forth in this Agreement are not applicable to Switched Exchange Access Service.  All Switched Exchange Access Service and all Toll Traffic shall continue to be governed by the terms and conditions of the applicable federal and state Tariffs.

       5.7.5  Compensation for transport and termination of all Traffic which has been subject to performance of INP by one Party for the other Party pursuant to Section 14 shall be as specified in subsection 14.5.

       5.7.6 The designation of Traffic as IntraLATA or non-IntraLATA for purposes of compensation shall be based on the actual originating and terminating points of the complete end-to-end call, regardless of the entities involved in carrying any segment of the call.

       5.7.7 If GNAPS declines BA's request to provide a technically feasible and geographically relevant IP pursuant to subsection 4.1.4, BA shall be entitled to End Office rate treatment for the termination of Reciprocal Compensation Traffic that would have been delivered to such IP.

**6.0      TRANSMISSION AND ROUTING OF EXCHANGE ACCESS TRAFFIC PURSUANT TO 251(c)(2)**

BA – NH/Global NAPS        22

# AMENDMENT NO. 4

to the

## INTERCONNECTION AGREEMENT

between

### VERIZON NEW ENGLAND INC., D/B/A VERIZON NEW HAMPSHIRE,

### F/K/A NEW ENGLAND TELEPHONE AND TELEGRAPH

### D/B/A BELL ATLANTIC – NEW HAMPSHIRE

and

### LIGHTSHIP TELECOM, LLC

This Amendment (the "Amendment") to the Interconnection Agreement between Verizon New England Inc., d/b/a Verizon New Hampshire, f/k/a New England Telephone and Telegraph d/b/a Bell Atlantic – New Hampshire and Lightship Telecom, LLC for the state of New Hampshire (the "Agreement") is effective June 14, 2001.

Notwithstanding any possible contrary construction of this Agreement, Internet Traffic shall not be eligible for payment of Reciprocal Compensation under this Agreement. The Parties' rights and obligations with respect to any intercarrier compensation that may be due in connection with their exchange of Internet traffic shall be governed by the Order on Remand and Report and Order, *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Intercarrier Compensation for ISP Bound Traffic*, FCC 01-131, CC Docket Nos. 96-98 and 99-68.

IN WITNESS WHEREOF, the Parties hereto have caused this Amendment to be duly executed and delivered by their duly authorized representatives.

**Lightship Telecom, LLC**

By: _/s/ Kevin McHara_
Printed: Kevin M. O'Hara
Title: President & CEO

**Verizon New England Inc., d/b/a Verizon New Hampshire**

By: _/s/ Jeffrey A. Masoner_
Printed: Jeffrey A. Masoner
Title: Vice-President - Interconnection Services Policy & Planning

11105