Exhibit E



November 17, 2006

Mellon Investor Services LLC
Newport Office Center VII
480 Washington Blvd.
Jersey City, New Jersey 07310
Attention: Michael Battista

Stephan Oppenheimer
CCMP Capital Advisors, LLC
245 Park Avenue, 16th Floor
New York, New York 10167-2403

James D. Houghton
c/o Megunticook Management
143 Newbury Street, 6th Floor
Boston, MA 02116

Kevin O'Hare
64 Springs Drive
Doylestown, PA 18901

Dear Sirs,

Reference is made to (a) that certain Agreement and Plan of Merger, dated as of March 21, 2005 (the "Merger Agreement"), by and among One Communications Corp. (as successor in interest to CTC Communications Group, Inc., a Delaware corporation, which merged with and into such company on June 30, 2006) ("Acquirer"), CTC Communications Acquisition Corp., a Delaware corporation and wholly-owned subsidiary of Acquirer ("Merger Sub"), and Lightship Holding, Inc., a Delaware corporation (the "Company"), (b) that certain Escrow Agreement, dated as of May 20, 2005 (the "Escrow Agreement"), by and among, the Acquirer, members of the Stockholder Representative Committee signatories thereto (collectively, the "Stockholder Representatives"), as representatives of the former stockholders of Lightship (the "Holding Stockholders"), and Mellon Investor Services LLC, a New Jersey limited liability company (the "Escrow Agent"), (c) Acquirer's October 11, 2005, October 31, 2005, November 21, 2005, December 12, 2005 and October 6, 2006 letters to the Stockholder Representatives and the Escrow Agent (each a "Claim Letter" and collectively "Claim Letters"); and (d) Stephan P. Oppenheimer's October 21, 2005, November 14, 2005, December 5, 2005, December 22, 2005 and July 21, 2006 letters to Acquirer and Escrow Agent on behalf of the Stockholder Representatives (each a "Stockholder Representative Letter" and, collectively, the "Stockholder Representative Letters").

1

This letter shall constitute an additional Claim Notice pursuant Section 8(d) of the Merger Agreement and a further Notice of Claim pursuant to section 2(e) and Section 4 of the Escrow Agreement given by Acquirer on behalf of itself and Merger Sub. Terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Escrow Agreement.

Acquirer has incurred, and in good faith reasonably believes that it will in the future incur, Losses (as defined in the Merger Agreement) in an amount that exceeds $20,000,000.00. These losses arise from, and are proximately caused by, tortious conduct, conduct constituting breach of contract, and violations of federal securities laws, arising from misrepresentations, omissions, and the intentional effort to obscure from Acquirer material facts associated with what Acquirer later learned were Lightship Telecom LLC's ("Lightship") wrongful and illegal business practices in Maine, New Hampshire and Vermont. Supporting documentation is attached hereto as Exhibit "A". These Losses are summarized as follows.

Acquirer has discovered, following a lengthy investigation, that prior to Closing, Lightship was engaged in illegal conduct, primarily in Maine, but also in Vermont and New Hampshire, through which it charged Verizon higher rates for certain types of telecommunications traffic, in contravention of its interconnection agreement ("ICA") with Verizon, its various tariffs, FCC implementation rules, and the rulings and policies of the Maine Public Utilities Commissions ("PUC"). These illegal higher charges resulted in an artificial increase in Lightship's revenues, and consequently in grossly over-inflated margin and EBITDA. Because synergized EBITDA was the primary valuation mechanism used by Acquirer in valuing the Company, and because Acquirer paid a purchase price equal to approximately seven times synergized EBITDA for the Company, the inflated EBITDA value caused a fraudulent inflation of the purchase price. An adjustment to the Company's EBITDA to reflect the correct value for the subject traffic in the above referenced jurisdictions indicates the Company's EBITDA was overvalued by approximately $700,000.00 per month.

The subject conduct (the "Fraudulent Conduct") can be summarized as follows. First, Acquirer has discovered that Lightship had been charging intrastate access charges rather than reciprocal compensation to Verizon for non-ISP bound traffic originating on Verizon's network, based on local calling areas designed by Lightship, rather than by Verizon. The Lightship defined local calling areas were significantly smaller that their Verizon counterparts. This conduct was contrary to the terms of Lightship's ICA[1], and violated general principles of tariff interpretation. It was also inconsistent with judicial interpretations of the FCC's *ISP Remand Order* and underlying FCC policy, as well as the Maine PUC's orders. Lightship should have been charging Verizon reciprocal compensation for all non-ISP bound traffic originating on Verizon's network and terminating on Lightship's network within the same non-optional calling area.

---

[1] For example, Amendment No. 1 to the Lightship-Verizon interconnection agreement provides, in its definition of Reciprocal Compensation Traffic subject to the reciprocal compensation rate, that "determination of whether Telecommunications traffic is Exchange Access or Information Access shall be *based upon Verizon's local calling areas as defined by Verizon.*" (emphasis supplied) See, Exh. A.

2

For ISP bound traffic in Maine, Lightship's conduct was also impermissible. Acquirer discovered that Lightship had been charging Verizon intrastate access charges for this traffic, where the traffic originated and terminated within the same Verizon local calling areas, but in different, smaller, Lightship defined calling areas. This conduct was inconsistent with the FCC's *ISP Remand Order*, and the policies of the Maine PUC.

Acquirer also discovered that Lightship was billing Verizon reciprocal compensation or intrastate access charges for traffic that originated on the network of a third carrier and transited Verizon's network before terminating on Lightship's network, where Verizon was not serving as an interexchange carrier for that traffic. This practice also disregarded the definition of "Reciprocal Compensation Traffic" in Amendment No. 1 of the ICA, and has provided Verizon with grounds upon which to claim that it has been fraudulently billed. In addition, Lightship appears in some instances to have been billing *both* the third party originating carrier and Verizon for the same charges for the same functions, in violation of Lightship's interstate access tariff.

Finally, Acquirer has also learned that Lightship was offering VNXX services in Maine, Vermont and New Hampshire for ISP bound traffic terminating to an ISP outside the local calling area of the calling party, a practice prohibited in all three states.

The knowledge of this illegal conduct of its business operations in Maine, Vermont and New Hampshire was at all times prior to Closing exclusively within Lightship's control. Prior to the parties execution of the Merger Agreement, Acquirer engaged in detailed and reasonable due diligence. During the diligence period, Acquirer on numerous occasions requested clarification and explanation regarding Lightship's traffic patterns for its operations in Maine, New Hampshire, and Vermont. Lightship provided the requested explanations on multiple occasions, all of which supported its numerous representations that its business practices in Maine, New Hampshire and Vermont were in all respects appropriate and legitimate. These representations frequently were false. On other occasions, Lightship Representatives and certain Holding Stockholders deliberately omitted material facts which would have either revealed the illegal conduct, or which would have lead Acquirer to its discovery. Acquirer has since discovered documents which clearly show that Lightship's senior management, including at least some Holding Stockholders, actively discussed how to respond to inquiries regarding these issues from Acquirer's diligence team, in a manner which would conceal the true facts. The evidence strongly supports a finding that the Company and Lightship both negotiated and executed the Merger Agreement with full knowledge that they were concealing material facts crucial to the transaction, facts which Acquirer sought to discovery prior to signing and then again prior to Closing, facts which would have caused Acquirer to dramatically reduce the purchase price it would have been willing to pay, or which might have caused Acquirer not to proceed with the transaction at all.

Actionable representations by certain Holding Stockholders and Lightship's employees, agents and controlling persons, in addition to the representations and warranties set forth in the Merger Agreement, can generally be categorized as follows.

*Representations Regarding Lightship's EBITDA*: Lightship representatives and certain Holding Stockholders made representations to Acquirer regarding Lightship's

3

EBITDA, including calculations of EBITDA which incorporated the inflated earnings arising from Lightship's illegal use of self-defined calling areas in Maine, and other improper practices in Maine, New Hampshire and Vermont. Those representations were false at the time they were made, and the evidence clearly indicates that the Company, Lightship and certain Holding Stockholders were aware of their falsity.

*Representations Regarding Traffic Patterns In Maine*: When Acquirer inquired about Lightship traffic patterns in Maine, New Hampshire and Vermont, those inquiries were directed to Lightship representatives and certain Holding Stockholders, and included requests for explanation of those traffic patterns. Lightship representatives and certain Holding Stockholders provided explanations for these traffic patterns, and none of them disclosed the true facts. To the extent that these Lightship representatives and certain Holding Stockholders responded with statements of what they claimed were existing facts but which were in fact false, those statements constitute actionable fraud. To the extent that these statements and explanations by Lightship representatives and certain Holding Stockholders omitted material facts which would have revealed their falsity, Lightship representatives and certain Holding Stockholders engaged in fraudulent concealment of those material facts, and/or omitted those material facts from their explanations in blatant disregard of an obvious duty of disclosure.

*Representations Regarding The Lawful Conduct Of Lightship's Business*: Throughout the diligence process, Lightship representatives and certain Holding Stockholders repeatedly represented to Acquirer that all of Lightship's business operations were in compliance with applicable laws, regulations, and contract commitments. Those statements were false at the time they were made because Lightship's use of self defined calling areas in Maine and other wrongful and illegal practices in Maine, New Hampshire and Vermont violated, *inter alia*, applicable Maine, New Hampshire and Vermont statutes and regulations, and the terms and conditions under which it was continuing to do business with Verizon in those states. Those statements were made either with knowledge of their falsity, or made under circumstances where with the exercise of reasonable care Lightship representatives and certain Holding Stockholders should have known of their falsity.

The subject Fraudulent Conduct has created a vast array of potential civil, and in some cases criminal liability for Acquirer, its officers and directors.[2] By way of example only, Verizon could now file a complaint with the Maine PUC for violation of Lightship's tariff. The PUC has authority to levy fines for violations of state law and can also order disgorgement of profits realized as a result of these violations. The Fraudulent Conduct also exposes Acquirer to claims against Lightship under Section 208 of the Communications Act of 1934 for violation of federal law and FCC implementing regulations and to the concomitant FCC administrative fines. Verizon also consequently has claims against Acquirer, for all amounts improperly billed by Lightship in the above referenced illegal scenarios.[3]

---

[2] By way of example only, criminal exposure could arise, *inter alia*, from a charge of conspiracy to defraud the United States under 18 U.S.C. §371. Federal prosecution could take the form of a charge that Lightship defrauded the government of a significant portion of the USF payments rightly due by affirmatively disguising a large portion of its telecommunications revenue as enhanced/information services.

[3] The precise amount of this over billing has not been precisely determined at the time. It is substantial.

4

The multiple misrepresentations and omissions violative of the duty of disclosure at issue here were deliberate, and constitute nothing less than actionable fraud. They also violate federal securities laws and Security and Exchange Commission rules, including, *inter alia*, 15 U.S.C. § 78(j)(b) and SEC Rule 10b-5. Lightship's conduct also constitutes multiple breaches of representations, warranties, and pre-closing covenants contained in the Merger Agreement, including but not limited to, Sections 4(e)(i), 4 (e)(ii), 4(e)(iii), 4(e)(v), 4(h)(i-iv), 4(j), 4(k)(iii), and pre-closing covenants contained, *inter alia*, in Sections 5(c)(xv, xx), 5(e), and 5(g). Because these claims arise from Lightship conduct that was both illegal and fraudulent, no time, source of recovery, Indemnification Basket, Indemnification Cap, or aggregate loss limitations apply. *See*, Merger Agreement, Section 8(f)(viii).

This letter is submitted without prejudice to any of the rights and remedies of Acquirer and Merger Sub under the Merger Agreement, the Escrow Agreement or any other Transaction Document or applicable law. Without limiting the foregoing, Acquirer and Merger Sub expressly reserve all of their rights and remedies with respect to the Funds and the Escrowed Property, including, without limitation, the right to recover from the Escrow Account the aggregate amount of losses claimed under the Claim Letters. Moreover, nothing in the Claim Letters or the Exhibits thereto or this letter (including, without limitation, the Stockholder Representatives' access to Messrs. Zeitvogel or, Koester and/or Ms. Knott or Ms. Bergeron) shall constitute (a) an admission or suggestion that any of the Claim Letters did not constitute a valid and effective Claim Notice under the Merger Agreement or Notice of Claim under the Escrow Agreement, (b) a waiver of any rights or remedies of Acquirer or Merger Sub relating to, arising from, any failure or waiver of any rights or remedies of Acquirer or Merger Sub relating to, or arising from, any failure of the Stockholder Representatives to deliver a valid Objection in a timely and proper manner, as required by the Merger Agreement and the Escrow Agreement, or (c) an admission as to any of the matters or allegations contained in the Stockholder Representatives' Letters, all of which are expressly reserved.

Very truly yours,

One Communications Corp., as successor in interest to
CTC Communications Group, Inc.

By: _____
Name: James P. Prchetta, Jr.
Title: Executive Vice President and General Counsel

5

cc:   Kleinbard, Bell & Brecker LLP
      1900 Market Street, Suite 700
      Philadelphia, Pennsylvania 19103
      Attention: Ralph J. Mauro, Esq.

      Mark Resnick, Esq.
      Fee, Rosse & Lanz, P.C.
      Old City Hall
      45 School Street, 2nd Floor
      Boston, MA 02108