TEITLER & TEITLER
John M. Teitler (JM-3111)
Nicholas W. Lobenthal (NL-1451)
1114 Avenue of the Americas
New York, NY 10036

*Attorneys for Plaintiff One Communications Corp.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE ONE COMMUNICATIONS CORP.                )
                                              )      MASTER FILE
                                              )      07 Civ. 3905 (LTS)(AJP)
                                              )
                                              )
                                              )
This Document Relates To: Both Actions        )
                                              )

**MEMORANDUM OF LAW OF ONE COMMUNICATIONS CORP.**
**IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    Regulatory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.    Lightship's Inflated CABS Billings To Verizon . . . . . . . . . . . . . . . . . . . . 8

    C.    Kreitler Uncovers A Massive Billing "Error" Leading To Significant
        Overcharges And The Officer Defendants Instruct Him Not To Fix It . . . . . . . . 9

    D.    JP Morgan and Megunticook Decide To Sell By Means Of False Statements
        Reflecting Inflated EBITDA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    E.    Lightship's Continued Inflation of Verizon CABS Billing in the January 2005
        Power Point Presentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    F.    "Fraud With Foresight": Despite Kreitler's Clear Analysis And Warnings, The
        Officer Defendants Deliberately Implement And Conceal More Improper And
        Illegal CABS Billing Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    G.    More False Statements About EBITDA And CABS . . . . . . . . . . . . . . . . . . 15

    H.    Defendants O'Hare, JP Morgan And Megunticook Enter Into An Agreement
        To Conceal The CABS Billing Practices From CTC . . . . . . . . . . . . . . . . . . 16

    I.    Lightship Uses Unlawful VNXX Billing To Inflate EBITDA . . . . . . . . . . . . . 20

    J.    Lightship Uses Double Billing To Inflate EBITDA . . . . . . . . . . . . . . . . . . . 20

    K.    Misrepresentations In The Merger and Escrow Agreements . . . . . . . . . . . . . . 21

    L.    Lightship Continues To Conceal CABS Billing Practices Between The
        Signing Of The Merger Agreement And The Closing Of The Sale . . . . . . . . . . 22

    M.    Fraud Relating to GWI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

GOVERNING STANDARDS ON A MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . . 24

I.    THE COMPLAINT ADEQUATELY PLEADS RULE 10B-5
      VIOLATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      A.    Defendants Made Specific Material Misrepresentations . . . . . . . . . . . . 26

      B.    CTC Reasonably Relied on Defendants' Material Misrepresentations . . 34

            1.    Representations In The Merger Agreement . . . . . . . . . . . . . . . . 34

            2.    Representations Outside The Merger Agreement . . . . . . . . . . . 36

      C.    Defendants Are Responsible For The Material Misrepresentations . . . . 38

      D.    Defendants Acted With Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

            1.    Selling Shareholders Have Motive And Opportunity To Commit
                  Fraud When They Deceive An Acquirer Into Overpaying  . . . . . 45

            2.    Defendants' Ignoring Warnings That Their Conduct Was Improper
                  Constitutes Strong Circumstantial Evidence of Conscious
                  Misbehavior Or Recklessness . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

                        *Officer Defendants* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

                        *Defendants JP Morgan And Megunticook* . . . . . . . . . . . 58

                        *Core Business Doctrine (All Defendants)* . . . . . . . . . . . 61

      E.    Control Person Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

            1.    Primary Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

            2.    Actual Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

            3.    Culpable Participation/Scienter . . . . . . . . . . . . . . . . . . . . . . . . 69

      F.    Loss Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

      G.    Primary Liability Through Active Participation In A Scheme To Defraud
            In Violation of Rule 10b-5(a) and/or (c) . . . . . . . . . . . . . . . . . . . . . . . 73

II.   THE INDEMNIFICATION CLAIM IS ADEQUATELY PLED . . . . . . . . . . . 75

III.  THIS COURT HAS SUBJECT MATTER JURISDICTION
      OVER ALL OF THE CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

A.    Federal Subject Matter Jurisdiction Over Federal Securities Fraud Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

    1.    Federal Courts Have Exclusive Jurisdiction . . . . . . . . . . . . . . . . 80

    2.    This Court's Jurisdiction Is Not Contingent on Defendants' Bringing An Action Before the Maine, Vermont Or New Hampshire PUCs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

    3.    This Court Is Capable Of Adjudicating The Claims Asserted (Which Are Not Nearly As Complex As JP Morgan Suggests) . 87

        *The ICA's Requirement to Use Verizon's Local Calling Areas to Determine When Reciprocal Compensation/ISP-Bound and Intrastate Access Charges Apply* . . . . . . . . . 88

        *Lightship's VNXX Billings* . . . . . . . . . . . . . . . . . . . . . . . . 90

        *Double-Billing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

B.    Supplemental Jurisdiction Over Counts II Through VI . . . . . . . . . . . . 93

IV.    THE COMMON LAW FRAUD CLAIM IS ADEQUATELY PLED . . . . . . . . 93

V.    THE NEGLIGENT MISREPRESENTATION CLAIM IS ADEQUATELY PLED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

VI.    THIS COURT HAS JURISDICTION OVER MEGUNTICOOK . . . . . . . . . . . 97

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

## TABLE OF AUTHORITIES

*In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . 63

*AIG Global Securities Lending Corp. v. Bank of America Securities, LLC,*
  2005 WL 2385854 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 47

*In re Alstom SA Sec. Litig.,* 454 F. Supp. 2d 187 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . 67

*American High-Income Trust v. AlliedSignal,* 329 F. Supp. 2d 534 (S.D.N.Y. 2004) . . . . . 64-65

*In re American Bank Note Holographics, Inc., Sec. Litig.,*
  93 F. Supp. 2d 424 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*In re Ancor Communications, Inc.,* 22 F. Supp. 2d 999 (D. Minn. 1998) . . . . . . . . . . . . . . . . . 62

*In re AOL Time Warner, Inc. Sec., Litig.,* 503 F. Supp. 2d 666 (S.D.N.Y. 2007) . . . . . . . . . . . 74

*Atlantic Alliance Telecomm., Inc. v. Bell Atl.,*
  2000 U.S. Dist. LEXIS 19649 (E.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*In re Atlas Air Worldwide Holdings, Inc., Sec. Litig.,* 324 F. Supp. 2d 474 (S.D.N.Y. 2004) . . 62

*ATSI Communications, Inc. v. The Shaar Fund, Ltd.,* 493 F.3d 87 (2d Cir. 2007) . . . . . . . . . . 38

*AT&T Comms. Of Illinois, Inc. v. Illinois Bell Tel. Co.,*
  1998 U.S. Dist. LEXIS 12925 (N.D. Ill. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*AT&T Commn'cs. of Ohio, Inc. v. Ohio Bell Tel. Co.,* 29 F. Supp. 2d 855 (S.D. Ohio 1998) . . 83

*In re Axis Capital Holdings Ltd. Sec. Litig.,* 456 F. Supp. 2d 576 (S.D.N.Y. 2006) . . . . . . . . . 50

*Bank of New York v. F.D.I.C.,* 453 F. Supp. 2d 82 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . 76

*Bell Atl. Md., Inc. v. MCI WorldCom,* 240 F.3d 279 (4th Cir. 2001) *rev'd Verizon Md., Inc. v.
Pub. Serv. Comm'n of Md.*, 525 U.S. at 642. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Bell Atl. Va., Inc. v. WorldCom Techs. of Va., Inc.,* 70 F.Supp.2d 620 (E.D.Va. 1999) . . . . . . 83

*BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., Inc.,*
  317 F.3d 1270 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81, 83

*In re Biopure Corp. Derivative  Litig.,* 424 F. Supp. 2d 305 (D. Mass. 2006) . . . . . . . . . . . . 61

*In re BISYS Sec. Litig.,* 397 F. Supp. 2d 430 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . 41, 43, 63, 69

*Borden, Inc. v. Spoor Behrins Campbell &Young, Inc.,* 735 F. Supp. 587 (S.D.N.Y.1990) . . . . 66

*Buy This, Inc. v. MCI Worldcom Communications, Inc.,*
     209 F. Supp. 2d 343 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Byrnie v. Town of Cromwell, Bd. of Ed.*, 243 F.3d 93 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . 58

*Catton v. Defense Tech. Sys., Inc.,* 2006 WL 27470 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . 34

*CBS Inc. v. Ziff-Davis Publ. Co.,* 75 N.Y.2d 496 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*CDX Liquidating Trust v. Venrock Associates,* 2005 WL 3953895 (N.D. Ill. 2005) . . . . . . . . 54

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
     511 U.S. 164 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Channel Master Corp. v. Aluminum Ltd. Sales*, 4 N.Y.2d 403 (1958) . . . . . . . . . . . . . . . . . . . 93

*In re Charter Communications Sec. Litig.,* 443 F.3d 987 (8th Cir. 2006) . . . . . . . . . . . . . . . . . 75

*In re Cinar Corp. Sec. Litig.*, 186 F. Supp. 2d 279 (E.D.N.Y. 2002) . . . . . . . . . . . . . . 33, 35, 37

*In re Citigroup, Inc., Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . 44

*In re CitiSource, Inc. Sec. Litig.*, 694 F. Supp. 1069 (S.D.N.Y.1988) . . . . . . . . . . . . . . . . . . . 65

*In re Columbia Sec. Litig.*, 155 F.R.D. 466 (S.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Compass Aeorspace Corp. v. Alinabal Holdings Corp.*, 2000 WL 572472 (S.D.N.Y. 2000) . . . 53

*In re Complete Mgmt. Inc. Sec. Litig.,* 153 F. Supp. 2d 314 (S.D.N.Y. 2001) . . . . . . . . . . . . . 47

*Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807 (S.D.N.Y. 2006) . . . . . . . . . . . . . 44, 48, 64, 93

*Contact Comm'ns, v. Qwest Corp.,* 246 F. Supp. 2d 1184 (D.Wyo. 2003) . . . . . . . . . . . . . . . . 82

*In re Converium Holding AG Sec. Litig.*, 2007 WL 2684069 (S.D.N.Y. 2007) . . . . 25, 51, 53, 55

*Core Comm'ns, Inc v. Verizon Pa., Inc.*, 423 F. Supp. 2d 493 (E.D. Pa. 2006) *aff'd in part, vacated in part and remanded by Core Communications, Inc. v. Verizon Pennsylvania, Inc.,*
     493 F.3d 333 (3rd Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84, 85, 86

*Cosmas v. Hassett,* 886 F.2d 8 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 61, 63

*Cromer Finance Ltd. v. Berger*, 137 F. Supp. 2d 452 ( S.D.N.Y. 2001) . . . . . . . . . . . . . . . 70, 97

*Cyber Media Group, Inc. v. Island Mortgage Network, Inc.*,
   183 F. Supp. 2d 559 (E.D.N.Y.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*D'Alessio v. NYSE, Inc.*, 258 F.3d 93 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*Darquea v. Jarden Corp.*, 2007 WL 2584744 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 45

*Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954 (1986) . . . . . . . 36

*In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597 (S.D.N.Y. 2002) . . . . . . . . . . . . . . 69

*Dietrich v. Bauer*, 126 F. Supp. 2d 759 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 70

*DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242 (2d Cir. 1987) . . . . . . . . . . . . . 41

*Dura Pharmaceuticals, Inc. v. Proudo*, 544 U.S. 336 (2005) . . . . . . . . . . . . . . . . . . . . . . . 71, 72

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
   343 F.3d 189 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 71, 72

*In re Emex Corp. Sec. Litig.*, 2002 WL 31093612 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . 66

*Epstein v. Itron, Inc.*, 993 F. Supp. 1314 (E.D. Wash. 1998), *abrogated on other grounds by*
   *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir.1999) . . . . . . . . . . 62

*ESI Montgomery County, Inc. v. Montenay Int'l Corp.*, 1996 WL 22979 (S.D.N.Y. 1996)
   *abrogation on other grounds recognized by In re Global Crossing, Ltd. Sec. Litig.*,
   2005 WL 2990646 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*In re Flag Telecom Holdings, Ltd. Securities Litigation*,
   308 F. Supp. 2d 249 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Food & Allied Service Trades Dep't v. Millfield Trading Co.*,
   841 F. Supp. 1386 (S.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 68

*Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC*,
   479 F. Supp. 2d 349 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*Funke v. Life Financial Corp.*, 237 F. Supp. 2d 458 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . 57

*Gabriel Capital L.P. v. Natwest Finance, Inc.*,
   94 F. Supp. 2d 491 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 25, 37, 41, 59, 70, 94

*In re Gaming Lottery Securities Litig.*, 1998 WL 276177 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . 62

*Ganino v. Citizens Util. Co.*, 228 F.3d 154 (2d Cir. 2000) . . . . . . . . . . . . . 24-25, 26, 46, 50, 66

*Geologic Solutions, Inc. v. Aether Systems, Inc.*,
    14 Misc. 3d 1230(A), 836 N.Y.S.2d 492 (Sup. Ct. N.Y. County 2006) . . . . . . . . . . . . 34

*Glidepath Holding B.V. v. Spherion Corp.*, 2007 WL 2176072 (S.D.N.Y. 2007) . . . . . 57, 63, 71

*In re Global Crossing, Ltd., Sec. Litig.*,
    322 F. Supp. 2d 319 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . 25, 26, 27, 28, 40, 42, 73, 74

*Global NAPS, Inc. v. Verizon New England, Inc.*, 444 F.3d 59 (1st Cir. 2006) . . . . . . . . . . . . 91

*Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Greenwald v. Orb Commc'ns & Mktg.*, 192 F. Supp. 2d 212 (S.D.N.Y. 2002) . . . . . . . . . . . . 72

*Griffin v. Paine Webber, Inc.*, 84 F. Supp. 2d 508 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . 65

*Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*In re Health Management Sys. Inc. Sec. Citig.*, 1998 WL 283286 (S.D.N.Y. 1998) . . . . . . . . . 50

*Heard v. City of New York*, 82 N.Y.2d 66 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Hobart v. Schuler*, 55 N.Y.2d 1023 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . 68

*Hooker Chem. & Plastics Corp. v. International Minerals & Chem. Corp.*, . . . . . . . . . . . . . . . 77
    90 A.D.2d 991 (4th Dep't 1982)

*Huss v. Loftus*, 143 A.D.2d 114 (2d Dep't 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Ill. Bell Tel. Co. v. Worldcom Techs., Inc.*, 179 F.3d 566 (7th Cir. 1999) . . . . . . . . . . . . . . . . 82

*In re Independent Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741 (S.D.N.Y. 2001),
    *abrogation on other grounds recognized by In re IPO Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47-48

*Indiana Bell Tel. Co., Inc. v. McCarty,* 30 F. Supp. 2d 1100 (S.D. Ind. 1998) . . . . . . . . . . . . 83

*Intermedia Commc'ns, Inc. v. BellSouth Telecomms., Inc.,*
    173 F. Supp. 2d 1282 (M.D. Fla. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC,*

223 F. Supp. 2d 474 (S.D.N.Y. 2002), *rejected on other grounds by ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 49 F. 3d 87 (21 Civ. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Iowa Utilities Bd. v. FCC*, 120 F.3d 753 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*In re IPO Sec. Litig.*, 241 F. Supp. 2d 281
(S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 33, 48, 50, 57, 64, 69, 70

*JHW Greentree Capital L.P. v. Whittier Trust Co.,*
2005 WL 3008452 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42, 64

*In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 621 (S.D.N.Y. 2005) . . . . . . . . . 50, 51

*Kalin v. Xanboo, Inc.*, 2007 WL 273546 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Kalnit v. Eichler*, 85 F. Supp. 2d 232 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 49, 52

*Kimmell v. Schaefer*, 89 N.Y.2d 257 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Kronisch v. United States*, 150 F.3d 112 (2d Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996) . . . . . . . . . . . . . . . . . . . 93

*Landis v. N. Am. Co.,* 299 U.S. 248 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 162 (S.D.N.Y.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Leventhal v. Tow*, 48 F. Supp. 2d 104 (D. Conn. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*In re Livent Noteholders Sec. Litig.*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001) . . . . . . . . . . . . 50, 69

*Luce v. Edelstein*, 802 F.2d 49 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

*Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310 (2d Cir. 1993) . . . . . . . . . . . . . . . . 36

*McDaniel v. Bear Stearns & Co., Inc.*, 196 F. Supp. 2d 343 (S.D.N.Y. 2002) . . . . . . . . . . . . . 94

*Merrill Lynch & Co., v. Allegheny Energy*, 500 F.3d 171 (2d Cir. 2007) . . . . . . . . . 33, 34, 35, 72

*Nanopierce Technologies, Inc. v. Southridge Capital Management LLC*,
    2003 WL 22052894 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Nash v. Kornblum*, 12 N.Y.2d 42 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.*,
    339 F.2d 440 (2d Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Nelson v. Stahl*, 173 F. Supp. 2d 153 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 25, 47, 93

*New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 318 (1995) . . . . . . . . . . . . . . . . . 93-94

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Novak v. Kasaks*, 216 F. 3d 300 (2d Civ. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 56, 57

*In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . 41, 43

*In re Omnicom Group Inc. Sec. Litig.*, 2007 WL 2376170 (S.D.N.Y. 2007) . . . . . . . . . . . . . . 28

*In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133 (S.D.N.Y. 1999) . . . . . . . . . . . . . 42

*In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . 69

*In re Parmalat  Sec. Litig.*, 376 F. Supp. 2d 472 (S.D.N.Y. 2005) . . 39, 64, 67, 69, 71, 72, 73, 74

*Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225 (S.D.N.Y. 2000) . . . . . . . . . . . . . 42

*Polycast Technology Corp. v. Uniroyal, Inc.*, 728 F. Supp. 926 (S.D.N.Y. 1989) . . . . . . . . 47, 51

*Polycast Technology Corp. v. Uniroyal, Inc.*, 792 F. Supp. 244 (S.D.N.Y. 1992) . . . . . . . . . . 47

*Primavera Familienstiftung v. Askin*, 1996 WL 580917 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . 65

*In re Pronetlink Sec. Litig.*, 403 F. Supp. 2d 330 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . 65

*Propper v. Clark*, 337 U.S. 472 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81, 87

*P.R. Telephone Co. v. Telecommunications Regulatory Board of P.R.*,
    189 F.3d 1 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . 48

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 207 F. Supp. 2d 292 (S.D.N.Y. 2002) . . . . . . . 46

*Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38 (2d Cir. 1978) . . . . . . . . . . . . . . . . . . . 52

*Rothman v. Gregor*, 220 F. 3d 81 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 54

*Samsung Elects. Co. v. Rambus, Inc.*, 439 F. Supp. 2d 524 (E.D. Va. 2006) . . . . . . . . . . . . . . 58

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*,
        75 F.3d 801 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Scalp & Blade, Inc. v. Advest, Inc.*, 722 N.Y.S.2d 639, 640 (4th Dept. 2001) . . . . . . . . . . . . . 97

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) . . . . . . . . . . . . . . . . 41, 42, 51, 60

*Schottenfeld Qualified Assoc. v. Workstream, Inc.*, 2006 WL 4472318 (S.D.N.Y. 2006) . . . . . 46

*SEC v. Hawk*, 2007 WL 2257321 (D. Nev. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*SEC v. Zandford*, 535 U.S. 813 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Sedona Corp. v. Ladenburg Thalmann & Co.*, 2005 WL 1902780 (S.D.N.Y. 2005) 25, 26, 63, 96

*Sedona Corp. v. Ladenburg Thalmann & Co.*, 2006 WL 2034663 (S.D.N.Y. 2006) . . . . . . . . . 69

*In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir.1999) . . . . . . . . . . . . . . . . . . . . 63

*Simpson v. AOL Time Warner*, 452 F.3d 1040 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . 73, 75

*In re Solv-Ex Corp. Sec. Litig.*, 210 F. Supp. 2d 276 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . 42

*Southern New England Tel. Co. v. Global NAPs, Inc.*,
        2007 WL 3102034 (D. Conn. Oct. 19, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Southwestern Bell Tel. Co. v. Brooks Fiber Commc'ns of Okla., Inc.*,
        235 F.3d 493 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Southwestern Bell Tel. Co. v. Pub. Util. Comm'n of Tx.*, 208 F.3d 475 (5th Cir. 2000) . . . . . . 82

*In re Starpower Communications, LLC*, 15 F.C.C.R. 11277 (2000) . . . . . . . . . . . . . . . . . . . . . 84

*Stevelman v. Alias Research, Inc.*, 174 F.3d 79 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 127 S. Ct. 1873 (2007) . . . . . 75

*Suez Equity Investors LP v. Toronto-Dominion Bk.*, 250 F.3d 87 (2d Cir. 2001) . . . 39, 47, 96, 97

*In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . 65

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) . . . . . . . . . . . . 24, 45, 54, 60

*This Is Me, Inc. v. Taylor*, 157 F.3d 139 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*TON Services, Inc. v. Qwest Corp.*, 493 F.3d 1225 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . 86

*Transit Rail, LLC v. Marsala*, 2007 WL 2089273 (W.D.N.Y. 2007) . . . . . . . . . . . 36, 37, 60, 93

*TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*TVT Records v. The Island Def Jam Music Group*, 412 F.3d 82 (2d Cir. 2005) . . . . . . . . . . . . . 76

*Two Guys from Harrison-N.Y. v. S.F.R. Realty Assoc.*, 63 N.Y.2d 396 (1984) . . . . . . . . . . . . . 32

*UniCredito Italiano SPA v. JPMorgan Chase Bank*,
    288 F. Supp. 2d 485, 502 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*United Stated v. Winstar Corp.*, 518 U.S. 839 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Verizon Md., Inc. v. Global NAPS, Inc.*, 377 F.3d 355 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . 87

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 525 U.S. 635 (2002) . . . . . . . . . . . . . . . . 81, 82

*In re Vivendi Universal S.A. Sec. Litig.*, 381 F. Supp. 2d 158 (S.D.N.Y. 2003) . . . . . . . 41, 46, 51

*In re Vivendi Universal S.A. Sec. Litig.*, 2004 WL 876050 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . 67

*Waltree Ltd. v. ING Furman Selz L.L.C.*, 97 F. Supp. 2d 464 (S.D.N.Y. 2000) . . . . . . . . . . . . 34

*In re Westinghouse Sec. Litig.*, 90 F.3d 696 (3d Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Wight v. Bank America Corp.*, 219 F.3d 79 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*The Winer Family Trust v. Queen*, 2004 WL 2203709  (E.D. Pa. 2004) . . . . . . . . . . . . . . . . . . 67

*In re World Access, Inc. Sec. Litig.*, 119 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000) . . . . . . . . . 43

*In re Worldcom Sec. Litig.*, 2003 WL 21488087 (S.D.N.Y. 2003) . . . . . . . . . . . . . 39, 52, 73, 75

*In re Xerox Sec. Litig.*, 165 F. Supp. 2d 208 (D. Conn. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*In re Xethanol Corp. Sec. Litig.*, 2007 WL 2572088 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . 53, 55

## **Other:**

17 C.F.R. § 230.405 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

17 C.F.R. § 240.10b-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 73

15 U.S.C. §78aa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

15 U.S.C. § 78t(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

15 U.S.C. § 78u-4(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80, 81, 82, 83, 84

28 U.S.C. §1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81, 83, 93

47 U.S.C. § 153(16) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

47 U.S.C. § 153(48) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

47 U.S.C. § 252(e)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81, 82, 83

Rule 8A of the Federal Rules of Civil Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Rule 9B of the Federal Rules of Civil Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 93

_____The Motions to Dismiss of Defendants JP Morgan SBIC LLC, Sixty Wall Street

SBIC Fund, L.P. (collectively, "JP Morgan"), The Megunticook Fund II, L.P., The Megunticook

Side Fund II, L.P. (collectively "Megunticook"), and Kevin O'Hare and Jeffrey Koester

(collectively the "Officer Defendants")  must be denied, because the Plaintiff, One

Communications Corp. ("One Communications," successor in interest to CTC Communications

Group, Inc., and CTC Communications Acquisition Corp. ("CTC")) has met its burden of

sufficiently pleading each and every cause of action and liability theory contained in its

Complaint.

## PRELIMINARY STATEMENT

This case is about the Defendants'[1] deliberate and surreptitious manipulation of

Lightship Telecom LLC's (together with Lightship Holding, Inc. ("LHI") hereinafter

"Lightship") inter-carrier billings both prior to and after an employee's uncovering of over-

billing errors to avoid having to restate Lightship's past financial performance and thus to allow

it to close a sale based on an inflated purchase price.  There is no question on this motion to

dismiss that, under the direction of the Officer Defendants and with the knowledge and approval

of Defendants JP Morgan and Megunticook, Lightship knowingly overbilled Verizon as part of a

deliberate scheme to maintain inflated revenues and EBITDA in order to deceive CTC into

overpaying for Lightship.  There is compelling evidence that O'Hare and Koester and the other

controlling Defendants caused Lightship to abandon its own  practices and those in the industry

by replacing recognized local calling areas with ones of its own choosing to inflate revenue and

---

[1]      References to "Defendants" are to the moving Defendants as distinguished from nominal Defendant escrow agent Mellon Investor Services LLC ("Mellon" or "Escrow Agent") and declaratory judgment Defendant Verizon New England, Inc. ("Verizon").  By letter dated December 11, 2007, Defendant JP Morgan SBIC LLC informed the Plaintiff that its name had changed to JP Morgan Investment, LLC.

conceal material facts from both Verizon and CTC while CTC was conducting diligence. Defendants did so in the face of actual knowledge that their actions were improper. Further inflating revenue and EBITDA, Defendants improperly billed Verizon when they were also billing another carrier for the same call termination and for VNXX traffic.

Far from being unduly complex, this case is strikingly simple. The Complaint alleges that, collectively, Defendants owned over 91 percent of Lightship. In the Fall of 2004, Defendants JP Morgan and Megunticook communicated directly with CTC about the possibility of selling Lightship. After a period of negotiations and diligence, CTC agreed to purchase all of Defendants' interests by way of a cash-out merger, with a purchase price based upon a multiple of Lightship's EBITDA.

Lightship's EBITDA consisted of revenue earned from two sources: retail customers and other telecommunications providers. Even before the sale and diligence, Defendants improperly inflated the revenue they received from other carriers both by wrongfully billing Verizon for some traffic and by billing Verizon for VNXX traffic. During diligence, a Lightship employee "blew the whistle" on further billing errors that dramatically inflated revenues from Verizon. Rather than correcting the "errors," Defendants implemented new local calling areas ("LCAs") smaller than those allowed by the governing agreements in order to reinflate those revenues.

Lightship could charge approximately 70 times more for terminating a "long distance" call than it could for terminating a "local" call (in Maine, approximately 5 cents per minute versus less than a tenth of a cent for the incremental minute). Thus smaller LCAs meant substantially increased revenues without any additional costs to Lightship. Shifting 10 million

minutes per month to the higher charge meant $500,000 per month more in revenue -- $6 million per year.

During diligence, Defendants lied repeatedly and omitted to disclose information. The Merger Agreement itself contains the most blatant misrepresentation: that the financials provided to CTC "fairly presented" Lightship's financial condition and that Lightship was in compliance with all applicable laws. The moving Defendants do not address those misrepresentations anywhere in their 138 pages of briefs and so for purpose of this motion do not contest their falsity.[2] Defendants also made numerous other misrepresentations that are actionable in their own right.[3]

Defendant JP Morgan's representative Stephan Oppenheimer and Defendant Megunticook's representative Thomas Matlack, along with Defendants O'Hare (Lightship's Chief Executive Officer and Chairman of its Board of Directors) and Koester (Lightship's Chief Operating Officer), were the architects and deal-drivers who controlled the sale of Lightship, the diligence process, the misrepresentations and the omissions.[4] They had the greatest financial interest in Lightship (JP Morgan owned 54.6 percent while Megunticook owned 22.5 percent)

---

[2]    Instead, they focus on two *other* representations and in the process grossly misrepresent the contents of one of them.

[3]    Defendants' assertion that the Court should disregard any misstatements not written into the Merger Agreement ignores the relevant merger clauses, which acknowledge that extra-contractual representations that were consistent with the representations contained in the Merger Agreement had been made to CTC.

[4]    Plaintiff has not sued the sole outside/independent director of Lightship or individuals or companies that merely owned Lightship shares. One Communications has only sued those individuals and entities who made direct misrepresentations and exerted actual control over the transaction and its associated disclosures.

3

and reaped the largest benefits.

As a result of the fraud, CTC purchased Lightship based on EBITDA that was false.  CTC only overpaid by more than $20 million and received a company whose true cash flow is far lower than represented.  No prospective buyer would have agreed to the transaction -- let alone at the price paid -- knowing the facts.  The losses arising from the acquisition, the annual loss of cash flow, and the significant legal and regulatory exposure for the over charges are all damages directly and foreseeably attributable to Defendants.

Defendants offer a host of technical arguments for why they should not be held to account.  The most remarkable of these is the insistence that Defendants lacked scienter because the telecommunications law is as a matter of law incomprehensible to telecommunications professionals and to their outside counsel.  The further implication is that this Court is not able to understand the claims asserted.  *E.g.*, Officer Defendants' Mem. at 26; JP Morgan Mem. at 34-35.  The argument is absurd on its face.  There is at least a question of fact whether these sophisticated telecommunications executives and private equity investors could have known and/or did in fact know that Lightship could not secretly implement novel practices in violation of its agreements and rulings by agencies and commissions.  The absurdity is especially manifest given Defendants' specific representations in the Merger Agreement and elsewhere that Lightship was acting properly and lawfully.  If Defendants were truly as ignorant as they now claim, making such representations was the height of recklessness.  This Court can so rule.

## BACKGROUND

Lightship was founded in or about June 1998.  Between 1999 and 2002, Lightship was capitalized primarily by two private equity giants: Defendants JP Morgan and Megunticook.

4

At the time of CTC's acquisition of Lightship, JP Morgan and Megunticook owned 54.6% and 22.5% of Lightship respectively, *see* Affirmation of Jayne S. Robinson ("Robinson Aff.") Ex. 8 (CIM, discussed *infra*, at __), collectively controlled four of the six board seats and were both actively involved in oversight of Lightship's finances and operations. Compl. ¶¶ 26-32, 34. The JP Morgan Directors were Oppenheimer and William Stuek. The Megunticook Directors were Matlack and James Houghton. Defendant O'Hare was also a Director. The single "independent" Director was Steven Skinner. *See* Declaration of Nicholas W. Lobenthal ("Lobenthal Decl.") Ex. A (resolution of the Board of Directors, one of the transaction documents by which the merger was effected and thus incorporated by reference into the Complaint).

Lightship commenced operations in Maine, New Hampshire, Vermont and Massachusetts in 1998. Compl. ¶ 27. Lightship's revenue from its operations in Maine shortly became the largest single component of its revenue stream. *Id*.

A.    **Regulatory Background**

Two types of communications providers offer service in the traditional telephone system. The first, *local exchange carriers* ("LECs"), transports calls within *local calling areas* ("LCAs"). Consumers typically refer to LECs as local telephone companies. Generally speaking, an incumbent local exchange carrier ("ILEC") is a local phone company that provided monopoly local telephone service before passage of the Telecommunications Act of 1996 ("Telecommunications Act"). Verizon is an ILEC. A competitive local exchange carrier ("CLEC") is a local exchange carrier other than an ILEC. Lightship is a CLEC. *Id.* ¶ 16. All LECs, both CLECs and ILECs, generate revenue from two different sources: by billing their own end user customers and by billing other telecommunications carriers.

The second type, *interexchange carriers* ("IXCs"), transports calls between local exchanges and relies on the LECs at the local exchanges for access to consumers (*i.e.*, to bring a call to the IXC from the calling party or from the IXC to the called party). Consumers typically refer to IXCs as long-distance telephone companies and to interexchange calls as "long distance" calls. Interexchange calls are also sometimes referred to as "toll calls" because they result in a charge in addition to the local telephone charge. Depending on the nature of a particular call, a single carrier may operate as a LEC, an IXC or both. *Id.* ¶ 17.

*Reciprocal Compensation and Access Charges*

*Local Calls*: When one LEC terminates a call that originated with another LEC's customer in the same local calling area, the terminating LEC receives a "*reciprocal compensation*" payment or a negotiated alternative from the originating LEC; however, if the terminating LEC's customer is an internet service provider ("ISP"), the terminating LEC may receive from the originating LEC an ISP-bound payment capped under Federal Communications Commission ("FCC") decisions at $0.0007 per minute. *Id.* ¶ 18.

*Long Distance Calls:* When a LEC either originates or terminates a traditional call that crosses from one LCA to another, it receives an "*access charge*" payment from the IXC (which may be a LEC) that carried the call. *Smaller LCAs result in more calls that originate and terminate in different LCAs, thus generating relatively higher "access" charges, while larger calling areas result in more calls originating and terminating in the same area, leading to generally less costly "reciprocal compensation" charges.* Depending on whether the call crosses State lines, the LEC will charge either an *intrastate* access charge or an *interstate* access charge. *Id.* ¶ 19. In 2004 and early 2005, Lightship had tariffed intrastate access charges of

6

approximately 5 cents per minute for terminating an intrastate long distance call. This was approximately 70 times higher than the FCC's maximum ISP-bound compensation rate. Compl. ¶¶ 18, 65.

Whether a LEC terminating a call can receive reciprocal compensation (or, where appropriate, ISP-bound compensation) or an intrastate or interstate access charge depends on the locations of the calling and called parties and on the geographic definition of the LCAs in which those calling and called parties are located. For billing purposes, carriers use *carrier access billing systems* ("CABS") to track call origination, duration and termination, and to determine whether reciprocal compensation (or, where appropriate, ISP bound compensation) or access charges apply to the call. *Id.* ¶ 20.

*Interconnection Agreements*

ILECs share their facilities in certain situations, lease portions of their networks to other LECs in certain situations and interconnect their networks with other carriers. *Id.* ¶ 21. The agreements by, and through, which LECs interconnect and exchange traffic between their networks are called *interconnection agreements* ("ICAs"). *Id.*

As a CLEC, Lightship had established ICAs in Maine, New Hampshire, and Vermont with Verizon (the largest ILEC in those States). Those ICAs provided in detail how carrier access billing between Lightship and Verizon were determined. In addition, certain billing practices were prohibited, either by the relevant ICA, rulings of the state utility regulatory boards, the FCC and/or its implementing rules or regulations, and in some instances, Federal and State law.

Lightship and Verizon were each obligated to process their call data pursuant to

7

the rules set forth in the ICAs, and provide the other with electronic invoices.  This system

worked as long as both parties (a) used the same LCAs, (b) agreed on whose LCA definitions

applied in the relevant geographical areas and (c) maintained accurate and updated data.  The

Complaint alleges that (a) Lightship failed to adopt filed changes to the LCAs which over time

caused it to substantially overbill Verizon, (b) discovered errors in its systems that also caused

over-billing and realized that correcting the problem would sharply decrease EBITDA and (c)

elected to redefine its LCAs to further reduce the size of its LCAs to inflate revenue all for the

purpose of consummating a sale to CTC at an inflated sale price.

        B.      **Lightship's Inflated CABS Billings To Verizon**

        Under  Lightship's ICA with Verizon in Maine (the "Maine ICA") – as well as the

Verizon-Lightship ICAs in New Hampshire and Vermont -- Lightship was expressly required to

use LCAs defined by Verizon to determine whether a call was local, and thus subject to

reciprocal compensation, or long distance, and thus subject to access charges.  *See* Compl.  ¶¶

33, 37.  According to the Maine ICA:

> [t]he determination of whether Telecommunication traffic is
> Exchange Access or Information Access shall be based upon
> Verizon's local calling areas *as defined by Verizon*.

*Amendment No. 1 to the Interconnection Agreement between Verizon New England Inc. d/b/a

Verizon Maine and Lightship Telecom, LLC*, App. B (Robinson Aff. Ex. 7) (emphasis supplied).[5]

In Maine, New Hampshire and Vermont, Lightship used a database known as a "city-to-city

table" to convert information about the beginning and ending points of each call into carrier

---

     [5]      "Exchange access" is defined "the offering of access to telephone exchange
services or facilities for the purpose of the origination or termination of telephone toll services."
47 U.S.C. § 153(16) (copy attached).

access bills.  *Id*. ¶ 38.

      **C.**      **Kreitler Uncovers A Massive Billing "Error" Leading To Significant
Overcharges And The Officer Defendants Instruct Him Not To Fix It**

      As set forth in greater detail below, prior to October 2004, Lightship had failed to
update certain data in the city-to-city table necessary for it to calculate the proper inter-carrier
charges to Verizon.  The data discrepancies were favorable to Lightship because they used
smaller LCAs, thereby causing more traffic to be billed to Verizon at the higher "access" rates.
In addition to those discrepancies, Lightship's billing managers discovered a significant set of
these and other billing errors at the very moment when Lightship's controlling shareholders were
trying to sell the company to CTC.

      At least one Lightship billing manager, Darren Kreitler, then Lightship's Manager
of CABS Billing**,**  noticed an unexpected spike in access billing revenue  in Maine.  *Id.* ¶ 39.
Mr. Kreitler discovered that, when Verizon had expanded its LCAs in Maine in late 2003 as the
Maine PUC had required it to do, Lightship had not updated its own city-to-city tables to mirror
the newly expanded Verizon LCAs.  *Id*. ¶ 40.  In addition, Mr. Kreitler discovered that because
Lightship's city-to-city table was sensitive to spellings and format and the spelling and format of
cities had not been kept current with the spelling and format used in the Local Exchange Routing
Guide ("LERG"), Lightship was charging higher "access" rates for calls that were local, rather
than long distance.  *Id*. ¶ 43.  As a result, a substantial amount of traffic was subjected
improperly to terminating "access" charges rather than lower "reciprocal compensation" or ISP-
bound charges.  *Id*. ¶ 40-45.

      Mr. Kreitler had informed his superior, Defendant Koester, that the Maine ICA

required Lightship to use the larger, current Verizon-defined LCAs, and informed him that he

had corrected the city-to-city table, and the effect of that correction on Lightship's intercarrier

billings to Verizon.  Realizing that correcting this improper billing would lower Lightship's

inter-carrier access revenues, and negatively impact EBITDA, Defendant Koester and Lightship's

Chief Financial Officer, Bill Wilson, along with other Lightship senior management, decided to

create a *new* city-to-city table using even smaller LCAs in order to sustain the revenue

information that Lightship had disclosed to CTC in the "CIM" discussed below.  Defendant

Koester specifically instructed Mr. Kreitler and the other billing managers to make no changes to

Lightship's billing practices.  *Id.* ¶¶ 38-52.

> **D.    JP Morgan and Megunticook Decide To Sell By
> Means Of False Statements Reflecting Inflated EBITDA**

In or about October 2004 – Defendant O'Hare and other senior Lightship

executives were working with a business broker to create a confidential information

memorandum (the "CIM," Robinson Aff. Ex. 8) to market Lightship.  In November 2004,

Lightship's investment bank/broker, Q Advisors LLC ("Q Advisors"), delivered the CIM to

Kenneth Peterson, Chairman of the Board of Columbia Ventures Corporation ("Columbia

Ventures"), CTC's ultimate parent, who was conducting negotiations on CTC's behalf.  *Id.* ¶¶

36, 55-56.  The CIM repeatedly highlighted Lightship's impressive earnings:

- "Industry Leading financial & Operating Metrics.  Lightship is one of the few – if not the only – ICPs that has been able to achieve EBITDA profitability on a revenue of less than $100 million.  The company's current gross margins of 58 percent and its adjusted EBITDA margins of approximately 10 percent rival or exceed those of much larger players that have the benefit of scale.  The company achieved this unique margin and profitability position by reinforcing its leadership within its operating footprint and by focusing its sales efforts on potential customers that could be served over its existing network.  In addition, the company has created a very efficient back office that utilizes

10

Lightship's proprietary Admin system to streamline operations and processes. Lightship's focused approach has resulted in compound annual revenue growth of 35% from 2002A[ctual] to 2004E[stimated], competitive with, if not exceeding, its peer group. From 2003A to 2004E, adjusted EBITDA growth was approximately 42%."  (Page 5)

- "Lightship ensures the accuracy of the invoices it sends to its customers by maintaining the billing function in-house. . . . Only by meticulously controlling customer call records can a service provide maximum value to its customers."  (Page 13)

- "Amidst this growth, management has remained attentive to maintaining a profitable enterprise, as evidenced by Lightship's achievement of positive EBITDA and net income in 2002 and 2004 respectively."  (Page 23)

- EBITDA was approximately $5.4 million in 2003; estimated to be approximately $8 million in 2004; estimated to be approximately $11.8 million in 2005; and estimated to be approximately $18.3 million in 2006.  Adjusted EBITDA margins were estimated to be approximately 18.8 percent in 2004.  Adjusted EBITDA growth was estimated to be approximately 42 percent from 2003 to 2004.  (Pages 27-30 & 33)

- "CABS.  As a result of bringing a significant number of lines on-net and thus increasing the traffic that remains on the expanded network, Lightship estimates it will generate meaningful additional monthly revenue."  (Page 36)

Because of this emphasis Lightship placed on historical and projected EBITDA (Compl. ¶¶ 61-62), Defendants clearly had a motive to inflate intercarrier billings to Verizon and to conceal the dramatic overstatement of CABS billings that Mr. Kreitler uncovered.

Preliminary discussions regarding the terms of the deal, pricing, and timetables occurred between CTC and, among others, Defendants O'Hare, JP Morgan and Megunticook. *Id*. ¶ 63.  In early December 2004, CTC contacted Q Advisors, requesting more information about Lightship's CABS billing.  *Id*. ¶ 64.  Q Advisors responded:

> Lightship receives CABS revenue for terminating calls on its network originated by non-customers. *Interstate makes up 14% of total revenue, intrastate makes up 6% of total revenue and Recip Comp makes up 2% of total revenue.*
>
> Lightship's current average intrastate access charge is

11

approximately $0.0536 per minute and its current average IXC/LD
rate is approximately $0.0172. The blended rate on a weighted per
minute basis is currently $0.0329. These rates incorporate the
FCC-mandated rate decrease that took place earlier this year.
*Lightship's CABS revenues were largely shielded from this rate
drop because of an increase in minutes as a result of overall
growth. As indicated in the [CIM], Lightship's business has
doubled in size in the past 24 months. This increase in traffic
volume compensated for any drop in the FCC rates.*

The Maine interstate rate will drop in June 2005 from $0.053 to
$0.018 which is reflected in the projections. *Lightship does not
anticipate any changes in other rates, and, as a result, the
Company's financial projections do not contemplate any changes
in access rates over the forecast period.*

*Id*. ¶ 65-66 (emphasis supplied).

Mr. Peterson emailed CTC's nonbinding interest and affirmed the materiality of
the Lightship financial data: "assuming the accuracy of the historical numbers presented," the
valuation of Lightship would be $55 million to $60 million. *Id*. ¶ 68. On January 7, 2005,
CTC's investment advisory firm proposed a purchase price assuming "a minimum 2004 EBITDA
of $9.4 million and a 2005 EBITDA of $13.3 million. *Id*. ¶ 69.

High level Columbia Ventures and CTC personnel including Mr. Peterson began
conducting direct negotiations with Defendants O'Hare, JP Morgan and Megunticook and other
members of Lightship's senior management. Oppenheimer and Matlack were directly involved
in the negotiation and diligence process. Conference calls addressing important aspects of both
the deal terms and CTC's diligence requests frequently included O'Hare, Oppenheimer and
Matlack. Defendants JP Morgan and Megunticook directly responded to certain CTC diligence
requests. Through their representatives, Defendants JP Morgan and Megunticook at all times
had a direct, detailed working knowledge of, and involvement in, the negotiations and diligence

12

and were aware of particularly important diligence issues raised by CTC which had the possibility of impacting the pricing of the deal relating to Lightship's billing practices and inter-carrier compensation revenues in Maine. *Id*. ¶¶ 70-72.

      **E.    Lightship's Continued Inflation Of Verizon CABS
             Billing In The January 2005 Power Point Presentation**

      On January 17, 2005, Lightship made a narrated PowerPoint presentation to the CTC diligence team. This first day of due diligence included formal presentations by Defendants O'Hare and Koester, CFO Wilson, Lightship's Executive Vice President of Sales, Richard Kendall, and Lightship's Executive Vice President of Marketing and Customer Relations, Rainer Gawlick. *Id*. ¶ 75. Disregarding Mr. Kreitler's warnings about inflated CABS billings, the PowerPoint included the false statements regarding Lightship's finances and false assurances of the integrity of its CABS billings:

> 2004 Projected EBITDA of $10.0MM; 19% EBITDA margin; Lightship is one of the few - if not the only - ICP that has been able to achieve EBITDA profitability on a revenue base of less than $100 million.

> Advantacs Carrier Access Billing System overview. Switched access billing - Summarized CABS records are matched against various database files to compute the actual switched access element charges; Reciprocal compensation - Terminating local and IntraLATA traffic is billed-Originating traffic is reported for validation purposes.

> Profit Management Program Milestones - Sept. 2004 Engaged industry consultants to analyze Interconnection Agreements and conduct audit for revenues and cost savings; Jan. 2005 - Engaged industry consultants to assist Lightship in implementing formal program structure with appropriate processes and procedures.

*Id*. ¶ 76.

      CTC submitted a letter of intent on February 11, 2005. Defendant O'Hare and JP Morgan's and Megunticook's representatives each reviewed this letter of intent. *Id*. ¶ 82.

F.    **"Fraud With Foresight": Despite Kreitler's Clear Analysis And Warnings, The Officer Defendants Deliberately Implement And Conceal More Improper And Illegal CABS Billing Practices**

After Mr. Kreitler had discovered the database billing errors discussed above and corrected the city-to-city table for errors in spelling and format, he generated the first bill using the corrections on or about March 1, 2005, for the month of February 2005.  The result was a highly material reduction in access billings revenue.  *Id.* ¶ 45.  He reported the results to Lightship's finance department.  *Id.* ¶ 46.

Defendant Koester learned of the resulting loss of the revenue immediately. Koester's solution was simple and fast: he promptly instructed Mr. Kreitler and at least one other Lightship billing manager to reverse the corrections.  Defendant Koester told Mr. Kreitler that Lightship "could not afford" the revenue loss and that "it doesn't matter" if the bills were correct, "we need to find a way to increase revenues back to where they were."  Mr. Kreitler warned Koester that the revenue could not be restored except by "putting an incorrect table" into the system.  Koester responded that if Kreitler could not find a way to do it, Koester would.  *Id.* ¶ 47.

Several days later, Defendant Koester informed Mr. Kreitler and several other Lightship billing managers that Lightship would "replace" the lost revenue by creating a new Lightship city-to-city table populated with smaller LCAs.  The smaller LCAs that Lightship used did not adhere to the Verizon-defined LCAs, in clear violation of the governing ICA.  *Id.* ¶ 48.

In or about March 2005, Mr. Kreitler met with Defendants Koester and O'Hare and CFO Wilson.  Mr. Kreitler warned that these Lightship-created LCAs were at variance with the LCAs defined by Verizon and the Maine PUC.  Dismissing the warning, O'Hare and Wilson endorsed and approved Koester's plan to utilize the new billing protocols.  *Id.* ¶ 49.  Defendant

14

Koester explained the new billing protocols to Mr. Kreitler in detail.  Far from correcting past

billing errors, they changed the city-to-city table to *further reduce* the size of Lightship's LCAs.

The effect was a further *increase* in Verizon access in clear violation of the Maine ICA. *Id.* ¶ 50.

Mr. Kreitler again warned Defendant Koester that the Maine ICA simply did not

allow this practice.  Defendant Koester again instructed Mr. Kreitler to implement the changes

and said that the decision had already been made and that Mr. Kreitler should "let me [Koester]

worry about that." *Id*. ¶ 51.  Mr. Kreitler and others at Lightship dutifully implemented the

improper billing practices in or about March 2005.  The new protocols restored Lightship's

revenue to the levels which existed prior to Mr. Kreitler's corrections of the "error."  *Id*. ¶ 52.

### G.    More False Statements About EBITDA And CABS

Throughout the due diligence process, repeated questions regarding Lightship

billing practices were responded to with false and misleading information.  Requests for

information and the responses were discussed by Defendant O'Hare, CFO Wilson, Defendant

Koester, Defendants JP Morgan and Megunticook's respective representatives, and other

members of Lightship's senior management, each of whom participated in interstate conference

calls and exchanged e-mails with CTC and therein provided false, materially misleading

information regarding Lightship billing practices. *Id*. ¶ 86.

Specific requests for information regarding Lightship's compliance with its ICAs

were made by various CTC employees, including CTC Vice President of Regulatory Affairs and

Compliance Pamela Hintz, CTC Senior Vice President and General Counsel James P. Prenetta,

Jr., and Peterson, in telephone conference calls and e-mails throughout February and March

2005.  Lightship repeatedly falsely assured CTC that it was in full compliance with its ICAs

15

including in statements made by Defendant Koester and Gawlick in conference calls in February

and March 2005. *Id*. ¶ 87. In fact, Lightship was not in compliance with its Maine ICA because

it was using specious self-defined LCAs in violation of Lightship's own, and industry practice.

Throughout February and March 2005, Defendants JP Morgan's and

Megunticook's respective representatives, Oppenheimer and Matlack, provided CTC with

information regarding Lightship's finances, billings, revenue, market dpositions, and historical

financial results, along with projections based on purportedly accurate revenue models and

EBITDA calculations, all of which in fact were intentionally inflated. *Id*. ¶ 84

On or about March 9, 2005, Q Advisors emailed Lightship's consolidated income

statements for January 2005, including monthly EBITDA, which were intentionally inflated as

set forth above. *Id*. ¶ 85.

**H.     Defendants O'Hare, JP Morgan And Megunticook Enter Into An
        <u>Agreement To Conceal The CABS Billing Practices From CTC</u>**

At approximately the same time as Koester was re-inflating Maine access billings

back to the levels before Kreitler's correction of the city-to-city tables, on March 10, 2005,

responding to questions posed by CTC, Defendant Megunticook's representative Matlack e-

mailed CTC and Defendant JP Morgan: "[W]e are very confident in our CABS position and do

not feel there is an exposure here." *Id*. ¶ 88.

Two days later, on March 12, 2005, Oppenheimer, Matlack and O'Hare e-mailed

each other regarding whether and how to respond to CTC's ongoing requests for Lightship access

billing information. CTC's questions were not limited to so-called "UNE-P" CABS billings. As

set forth below, Defendant JP Morgan's representative Oppenheimer suggested that additional

16

information on Lightship's CABS should not be provided because further exploration of the issue might lead to more questions. *Id*. ¶ 89. Defendant JP Morgan asks the Court to consider these emails, contending they prove the absence of any specific representations concerning CABS billings except relating to "UNE-P" billings which are not at issue here.

A handful of e-mails are not proof, let alone of a negative, and not on a motion to dismiss. Moreover, the evidentiary record propounded by Defendant is incomplete. Many of these e-mails have never previously been seen by Plaintiff and the proffered email chain contains redactions (*see* Robinson Aff. Ex. 11) and so are both incomplete and out of context. It is also not clear what other e-mails are within the Defendants' possession or whether any other emails are missing from Lightship's server. *See* Lobenthal Decl. ¶ 9.

In any event, rather than "proving" as a matter of fact any defense, the e-mails actually corroborate the Complaint by showing that the statement that Megunticook (with JP Morgan copied thereon) and management were "very confident in our CABs position" was in fact made (and not retracted) when UNE-P was *not* the only CABS subject being discussed.

| | |
|---|---|
| March 10 10:46 | Matlack wrote to CTC's principal, Peterson (with copies to Oppenheimer and O'Hare among others to ensure that all parties understood that Megunticook was speaking collectively and with the authorization of JP Morgan and management), "We are very confident in our CABs position and do not feel there is an exposure here. If you want to take Friday to crystallize your views on these issues that is fine. But if you want to talk to anyone on our team we would ask that you call Kevin O'Hare and no one else." Robinson Aff. Ex. 10 (pages unnumbered).

Matlack now claims that he has no "expertise whatever" in the world of telecommunications. *See* Megunticook Mem. at 10. But, in this email he held himself out to be experienced enough and informed enough by Lightship management to be "confident" about CABS billing practices. |

17

| | |
|---|---|
| March 11 (morning) | Peterson wrote to Matlack, Oppenheimer, O'Hare and Quinn among others seeking clarification concerning UNE-P billing at 4:50 a.m. *Id*. The UNE-P issue was resolved after follow up emails on March 11 at 4:50 a.m., 9:10 a.m., 9:22 a.m., 9:30 a.m., 9:35 a.m., 9:41 a.m. and 9:42 a.m. *Id*. |
| March 11 8:10 p.m. | *Thereafter*, Prenetta reminded O'Hare (copying Oppenheimer and Matlack) that CTC still had not received responses to all of its access billings questions: "I am still looking to talk about the specific issues that I left you a message on concerning CTC's Nov 1, 2004 bills. Can you call me on that . . . ." Robinson Aff. Ex. 11 at page 4 of 7. In an effort to better understand Lightship's CABS billing, CTC had initiated a review of its own bill from Lightship. The purpose of that review was to use CTC's bill to better understand all of Lightship's CABS billing practices. |
| March 11 9:10 p.m. | Oppenheimer emailed O'Hare (with a copy to Matlack and Quinn) asking whether, if Lightship limited the response to questions CTC might have based on its own November 2004 Lightship bill, there would be any "determinants of value" or "create more questions?" *Id*. |
| March 12 10:43 a.m. | O'Hare reported back to Oppenheimer, Matlack and Quinn: "I have asked Jim [Prenetta] to specify the question and provide a copy of the bill he is looking at. If I can help I will but at this stage can not possibly imagine that it is value affecting. There has been no previous indication of concern on an issue with our carrier bill *to CTC*. I wrote Jim an email a while ago and have not yet heard back from him on this." *Id*. (emphasis supplied). |
| March 12 11:13 a.m. | Oppenheimer approved: "Obviously they should not need any more info at this point" – meaning regarding CTC's own bill. *Id*. |
| March 12 11:47 a.m. | But this agreed upon strategy of limiting responses to issues raised by CTC's own bill did not work. After speaking to CTC, O'Hare wrote that there was a problem with the strategy of limiting responses to non-"value affecting" issues related to CTC's own bill: |

> They have concerns because our CABS bills look different than theirs and *wants [sic] to make sure we are not overbilling our carrier customers*.

Clearly aware that there were issues unrelated either to UNE-P or to Lightship's November bill to CTC that had been raised by CTC and as to which CTC was expecting answers, O'Hare wrote that he would consult with Nick Zeitvogel and Defendant Koester and then report back to JP Morgan's and Megunticook's

18

representatives Oppenheimer and Matlack before taking any further steps ("*I will push to get an answer for ourselves ASAP.*").   *Id.* at 3 of 7 (emphasis supplied).

March 12      Seven minutes later, JP Morgan's representative Oppenheimer made clear he
11:54 a.m.    expected to be fully informed by O'Hare as to all material facts:

> *I think it is right to get an answer for us internally first, to understand it, but not communicate it to the other side until then.*  Unless others disagree, because of the time it will take to get an answer and then to discuss if/how a response is warranted, I recommend telling Prenetta in an email, cc'g everyone, that they have had this information for a while and they should be prepared to meet our deadline tomorrow without an answer to that question.

> *Id.* (emphasis supplied).

O'Hare apparently proceeded to do exactly what he said he would do:  he consulted (again) with Koester and "got an answer" and then reported back to JP Morgan's and Megunticook's representatives so that they would  "understand".  The next email follows at least one oral conversation whose specific contents are presently unknown but during which Lightship's CABS billings to Verizon were the subject.  Lightship's investment banker Quinn thereafter wrote to O'Hare, Oppenheimer and Matlack dated March 12 at 3:17 p.m., proposing yet a new strategy – one consistent with his and their having been fully informed about Lightship's CABS billings practices.  Quinn wrote that, henceforth, Lightship should provide no new information to CTC on the subject. At most, Lightship would confirm information that CTC had *already* received:

> After talking with Kevin [O'Hare] I agree with Stephen [Oppenheimer] but think the response to Prenetta copied to his whole group should be[] I have sent you 2 emails on your Bill question. *We will try to answer it but we need complete information which you have not provided. . . . If you give me the information I need to answer your question we will try to answer it.*

19

In a cynical postscript, Quinn added, "I think we need to make the wood chucks [*i.e.*, CTC staff conducting diligence] look disorganized and it [is] best coming from Kevin [O'Hare]." *Id*. at 2 of 7.

Later that day, Oppenheimer proposed another phone call among himself, Matlack, O'Hare and Quinn. *Id.* After that, there was at least one other e-mail which JP Morgan has redacted and whose contents can only be guessed at. *Id.* CTC does not know what other relevant emails now exist only on JP Morgan's server.

### I.    Lightship Uses Unlawful VNXX Billing To Inflate EBITDA

Lightship provided VNXX service to its ISP customers, which enabled remote dial-up users to dial in without incurring long-distance charges. *See* Compl. ¶¶ 24, 53. Providing this service violated unambiguous State law, as did Lightship's practice of charging Verizon terminating access charges for that traffic. *See id.* at ¶ 53.[6] At no time did Lightship disclose this to CTC.

### J.    Lightship Uses Double Billing To Inflate EBITDA

To further inflate its EBITDA, Lightship engaged in double-billing "[w]ith respect to local traffic that originated on the network of a third party carrier, transited Verizon's network, and then terminated on Lightship's network." *Id.* ¶ 53. For this category, Lightship improperly billed both Verizon and also the third party carrier for the same reciprocal compensation charges." *Id.* In other words, when another telecommunications company ("Carrier A") used

---

[6]    A customer can obtain a telephone number with a prefix (the "NXX" code) associated with a local calling area in which the customer is not physically located. Calls between the customer and end users located in that distant local calling area appear to be "local" for billing purposes. This service is known as "virtual NXX" or "VNXX" because the customer has only a virtual presence, as opposed to a physical presence, in the LCA. *See Id.* ¶¶ 22-23.

Verizon's network to send traffic to Lightship, Lightship sent the corresponding inter-carrier

compensation bill to both Carrier A and also to Verizon when it had the right to bill only one of

them.  Lightship did not send just a portion of the bill to Carrier A and the remainder to Verizon;

rather, it billed both parties for the whole amount.  This resulted in overstating Lightship's

intercarrier revenues, which increased Lightship's reported EBITDA.

### K.    Misrepresentations In The Merger and Escrow Agreements

JP Morgan and Megunticook ask this Court to rule that none of them made

inquiry into the true state of Lightship's CABS billings and none of them was informed on that

subject or knew what Koester and O'Hare knew because the representations at issue were made

solely by Lightship, not by them.  The facts show otherwise.

On March 18, 2005, Defendants JP Morgan and Megunticook, through their

Directors Oppenheimer and Matlack, and Defendant O'Hare, each directly caused Lightship to

make the alleged misrepresentations in the Merger Agreement by voting as Directors to approve

the Agreement and Plan of Merger reflecting the anticipated transaction (the "Merger

Agreement") and sale transaction with CTC.  *Id.* ¶ 90.

> The Board of Directors approve the Merger Agreement . . . and
> authorizes any Officer of the Company . . . All actions previously
> taken by any director, officer, employee or agent of the Company .
> . . in connection with or related to the matter set forth in as
> reasonably contemplated or implied by the foregoing actions be,
> and each of them hereby is, adapted, ratified, confirmed and
> approved in all respects as the acts and deeds of the Company.

Lobenthal Decl. Ex. A.

On March 21, 2005 – the same day CTC and Lightship executed the Merger

Agreement – the Holding Stockholders including JP Morgan, Megunticook, O'Hare and Koester

entered into a Voting Agreement that was also disclosed to CTC in which they approved "all transactions contemplated" (Section 2) and represented and warranted that each Holding Stockholder had reviewed and understood the Merger Agreement (Section 3(e)). *See* Voting Agreement, Lobenthal Decl. Ex. B. The moving Defendants completely omit to call to the Court's attention the Voting Agreement in the 138 pages of moving papers.

The Merger Agreement (as specifically authorized by Defendants O'Hare, JP Morgan and Megunticook on March 18 and as specifically reviewed, understood and approved by all four of the Defendants on March 21) contained at least seven separate misrepresentations. *Id.* ¶¶ 93-95; Robinson Aff. Ex. 1 (Merger Agreement §§ 4(e)(i)-(iii), 4(h), 4(i), 4(k)(iii)). One has to search footnote 7 in the Officer Defendants' Memorandum for any reference to many of these alleged misrepresentations in the moving papers.

Finally, in the Merger Agreement as approved by the Voting Agreement, JP Morgan, Megunticook, O'Hare and Koester all agreed personally to indemnify CTC for breaches of the misrepresentations under certain circumstances. Compl. ¶ 91.

L.    **Lightship Continues To Conceal CABS Billing Practices Between The Signing Of The Merger Agreement And The Closing Of The Sale**

On or about May 11, 2005, Lightship's CFO Wilson emailed CTC copies of audited financial statements for 2003 and 2004 together with a working capital calculation as of year-end 2004. This financial information included Lightship's 2004 annual EBITDA which was incorrectly inflated by $2.4 million to $3.6 million -- between 25 percent and 37 percent of total 2005 EBITDA of just over $11 million -- as a result of various undisclosed Lightship billing practices including CABS billings, VNXX billings and double billings. *Id.* ¶ 96.

22

On or about May 13, 2005, Lightship CFO Wilson emailed CTC copies of various Lightship financial information, including consolidated statements of operations for the period January 2005 through April 2005. This financial information included Lightship's 2004 and 2005 projected EBITDA, both of which were inflated by $2.4 million to $3.6 million annually -- 25 percent to 37 percent. *Id.* ¶ 97.

On May 20, 2005, the transaction closed. CTC paid approximately $67 million in cash. The purchase price reflected an agreed upon valuation of approximately seven times Lightship's stated EBITDA. *Id.* ¶ 100

**M.    Fraud Relating to GWI**

In or about October 2004, the largest ISP in Maine, Great Works Internet ("GWI"), entered into a contract with Lightship for Lightship to provide all of GWI's telecommunications services, by and through which GWI's thousands of customers would access the internet. By January 2005, inter-carrier compensation stemming from calls bound for GWI constituted Lightship's single largest source of revenue in Maine. *Id.* ¶ 35. The concentration of a large amount of revenue with GWI, in Lightship's largest revenue producing State, presented a greater risk that Lightship's lucrative Maine revenues could suddenly decrease, than would be the case if that revenue were generated by a stable, broader mix of customers. Had CTC been aware of these circumstances, additional and intensive diligence would have been directed at the quality of that customer relationship and the contractual arrangements in place. *Id.* ¶ 83.

Instead of disclosing its heavy reliance on traffic and revenue generated by a single customer, in the November 2004 CIM, Lightship misrepresented: "The Company's top twenty customers account for less than 15% of total revenue." Robinson Aff. Ex. 8 (CIM) at 20.

23

Because the inter-carrier compensation Lightship was billing with respect to calls to GWI accounted for Lightship's single largest source of revenue in Maine, Lightship should have disclosed GWI in connection with its top twenty customers.

Q Advisors' December 10, 2004 letter, misstated that Lightship's CABS revenues were largely shielded from a rate drop "because of an increase in minutes as a result of overall growth. As indicated in the [CIM], Lightship's business has doubled in size in the past 24 months. This increase in traffic volume compensated for any drop in the FCC rates." *See id.* ¶¶ 65-66. The claim that FCC mandated rate drops were "shielded" by "overall growth" was false and misleading because Lightship did not disclose that "overall growth" resulted almost exclusively from Lightship's contract with GWI, and hence were not "shielded" but were in fact relatively exposed. *Id.* ¶ 67

In February 2005, CTC specifically requested information to determine whether various Lightship revenues depended upon a stable, broad mix of customers, or upon a less stable, smaller number of customers. CTC requested: (1) a list of significant customers including long-term or future contracts; (2) a list of top 100 customers on a revenue basis with identification of total monthly billings; and (3) a list of top ten internet customers. In its responses, Lightship failed to identify access revenues related to calls to GWI as the source of 90 percent of its Maine access revenues. Compl. ¶ 83.

## GOVERNING STANDARDS ON A MOTION TO DISMISS

On a Rule 12(b)(6) motion, the factual allegations must be taken as true and all reasonable inferences must be drawn in favor of the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007); *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 161 (2d

Cir. 2000) (same); *Sedona Corp. v. Ladenburg Thalmann & Co.*, 2005 WL 1902780, at *4

(S.D.N.Y. 2005) (Swain, J.); *Gabriel Capital L.P. v. Natwest Finance, Inc.*, 94 F. Supp. 2d 491,

495 (S.D.N.Y. 2000) (*citing Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999)).  The

Court  "may not 'weigh the evidence that might be presented at trial,'" *In re Converium Holding

AG Sec. Litig.*, 2007 WL 2684069, at *3 (S.D.N.Y. 2007) (citation omitted), and "must not

dismiss the action unless it appears beyond doubt that the plaintiff can prove no set of facts in

support of his claim which would entitle him to relief."  *Nelson v. Stahl*, 173 F. Supp. 2d 153,

162 (S.D.N.Y. 2001) (Swain, J.) (citations omitted).  The issue is not whether the plaintiff will

ultimately prevail but whether the plaintiff is entitled to offer evidence to support the claims.  *In

re Global Crossing, Ltd., Sec. Litig.*, 322 F. Supp. 2d 319, 327 (S.D.N.Y. 2004).

> A motion to dismiss under Rule 12 should be granted only if it
> appears *beyond doubt* that the plaintiff can prove no set of facts in
> support of his claim which would entitle him to relief. ...
>
> The task of the court in ruling on a Rule 12(b)(6) motion is merely
> to assess the legal feasibility of the complaint, not to assay the
> weight of the evidence which might be offered in support thereof...
> Courts may not consider matters outside the pleadings but may
> consider documents attached to the pleadings, documents
> referenced in the pleadings, or documents that are integral to the
> pleadings. ...

*In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 331-32 (S.D.N.Y. 2003) (citations and internal

quotations omitted).  The Private Securities Litigation Reform Act ("PSLRA") does not change

these standards.  The court must still "draw all reasonable inferences from the particular

allegations in the plaintiff's favor, while at the same time requiring the plaintiff to show a strong

inference of scienter."  *Id*.

## I.    THE COMPLAINT ADEQUATELY PLEADS RULE 10b-5 VIOLATIONS

The elements of securities fraud based on misstatements or omissions in violation

of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5(b) promulgated

thereunder are that:

> Defendants:  (1) made misstatements or omissions of material fact;
> (2) with scienter; (3) in connection with the purchase or sale of
> securities; (4) upon which plaintiffs relied; and (5) that plaintiffs'
> reliance was the proximate cause of injury.

*Sedona*, 2005 WL 1902780, at * 10; *Ganino*, 228 F.3d at 161 (same); 17 C.F.R. § 240.10b-5(b).

The purpose of Section 10(b) was to:

> "substitute a philosophy of full disclosure for the philosophy of
> caveat emptor and thus to achieve a high standard of business
> ethics in the securities industry."  To better achieve this end, the
> [SEA] is "to be construed not technically and restrictively, but
> flexibly to effectuate its remedial purposes."

*Global Crossing*, 322 F. Supp. 2d at 328 (citations omitted).

The Complaint meets all of the requirements for pleading the elements of Rule

10b-5(a), (b) and (c) claims under Fed. R. Civ. Pro. Rules 8(a) and 9(b) and the PSLRA.

### A.    Defendants Made Specific Material Misrepresentations

Defendants made numerous false statements of fact that were intended to, and did,

deceive CTC as to intercarrier billing revenue upon which EBITDA was calculated and failed to

disclose VNXX or double billing.[7]  The contents of the fraudulent statement, the speaker, where

---

[7]    A statement or omission is material if it "would have been viewed by the
reasonable investor as having significantly altered the 'total mix' of information made available."
*TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  CTC paid $67 million for
Lightship, reflecting an agreed upon multiple of seven times EBITDA. Compl. ¶ 100.
Lightship's EBITDA was inflated by between $2.4 million and $3.6 million.  *Id.*, ¶ 98.  Thus,
CTC overpaid by between $16.8 and $25.2 million or between 25 percent and 37 percent. *See*

and when the statements were made and why the statements were fraudulent are specified. These

statements were made prior to the Merger Agreement, in the Merger Agreement and during the

period between execution of that Agreement in March 2005 and the closing in May 2005 to

prevent CTC from exercising its termination rights prior to the closing under Section 9 of the

Merger Agreement. The alleged specific misrepresentations are:

> *Merger Agreement Section 4(e)(i)-(iii):* Compliance with permits and licenses.

This representation was false because charging intrastate access charges for

internet traffic originating and terminating in the same LCA violated both the FCC's *ISP Remand*

*Order,* Maine PUC rules and Lightship's Maine tariff and could have led to revocation or

suspension of Lightship's authority to provide service in the State. ME. Stat. tit. 35A § 1511

(1987).

> *Merger Agreement Section 4(h)(i-ii):* (1) Financial records fairly presented its financial
> condition and were complete, correct and maintained in accordance with sound business
> practices and GAAP and (2) no material undisclosed liabilities.

The financial statements did not conform to GAAP and did not fairly present the

financial condition of the company because Lightship presented as "revenue" money that it did

not have a right to collect. *E.g.*, Statement of Financial Accounting Concepts ("Concept") No. 5

¶¶ 83 & 84 (revenue is earned when the entity is entitled to the benefits of the revenue); *Global*

*Crossing*, 322 F. Supp. 2d at 340 n. 18 (Concepts 1, 2 & 5 require disclosure to contain sufficient

information to enable potential users to meaningfully evaluate cash flows, to be reliable,

---

*generally Ganino*, 228 F. 3d at 163 (earnings reports are among most relevant documents to
investors); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714 n. 14 (3d Cir. 1996) ("5-10 percent
of net income is widely used as a general materiality criterion in the accounting profession" and
misstatements are often material at even lower levels).

transparent, truthful, to accurately reflect performance and accurately to reflect the business

operations in terms of revenue).[8]  Lightship's EBITDA was fraudulently inflated by improper

CABS billings, VNXX billings and double billings.

Numerous pre-Merger Agreement consistent representations highlighted

Lightship's CABS revenues and tied Lightship's financial strength to EBITDA largely composed

of those revenues.  These provide context as to what these misrepresentations regarding the

accuracy of the financial statements were intended to, and did, mean.

●    The November 2004 CIM (1) presented historical and projected EBITDA, (2)

claimed that it achieved gross margins exceeding "those of much larger players that have the

benefit of scale" by means of various efficiencies,  (3) claimed compound annual revenue growth

of up to 42%, (4) claimed to "ensure[] the accuracy of the invoices it sends to its customers" and

(5) highlighted "Lightship's achievement of positive EBITDA and net income in 2002 and 2004

respectively."

●    The December 2004 letter represented (1) that interstate CABS

_____

[8]    Generally accepted accounting principles ("GAAP") are the official standards
adopted by the AICPA, a private professional association, through three successor groups it
established: the Committee on Accounting Procedure, the Accounting Principles Board, and the
Financial Accounting Standards Board ("FASB").  GAAP represents the range of reasonable
alternatives for accounting presentation and the SEC treats the FASB's standards as authoritative.
*See Ganino*, 228 F.3d at 160 n.4.  Whether or not a particular practice conformed to GAAP
"cannot be determined in advance of the development of the record.  Eventually evidence on
industry practice or expert testimony are likely to shed light on this question, but at the current
procedural phase, the plaintiffs' assertion that they were not generally accepted must be taken as
true."  *Global Crossing*, 322 F. Supp. 2d at 339-40 & n.18 (compliance with GAAP does not
necessarily guarantee fair presentation; "evidence on industry practice or expert testimony are
likely to shed light" on issue of compliance with GAAP); *see also In re Omnicom Group Inc.
Sec. Litig.*, 2007 WL 2376170, at *13 (S.D.N.Y. 2007) (it is for trier of fact to determine
reasonableness of accounting decisions even if they complied with GAAP).

revenue accounted for 14% of total revenue and intrastate CABS revenue accounted for 6% of total revenue, (2) that "Lightship's CABS revenues were largely shielded" from rate drops because of an increase in minutes as a result of overall growth," (3) that the "increase in traffic volume compensated for any drop in the FCC rates," (4) a forecast for rate drops in Maine that reflected only a "step down" of Lightship's rates, not the possibility that Lightship's improper CABS billings should require additional rate corrections.

●      The January 2005 Powerpoint (1) purported to provide financial results for 2003-04 and projected financial results for 2005-07, (2) claimed Lightship was "one of the few - if not the only - ICP that has been able to achieve EBITDA profitability on a revenue base of less than $100 million," (3) claimed that Lightship's billing practices had been "audited" by an industry consultant, and (4) claimed that Lightship's procedures were "appropriate" and validated by industry experts.

●      Telephone conference calls and e-mails throughout February and March 2005 assured that Lightship was in full compliance with its ICAs.  These included comments made by Defendant Koester in telephone conference calls in February and March 2005.

●      Throughout February and March of 2005, Defendants JP Morgan and Megunticook, among others, had provided CTC with information regarding Lightship's finances, billings, revenue, market positions, and historical financial results, including monthly revenue reports, along with projections based on revenue models and EBITDA calculations.

All of the aforesaid emphasized the soundness of Lightship's CABS revenues and billings as a major source of its EBITDA.  In this context, the representation in the Merger Agreement that the financials fairly presented operations fraudulently reaffirmed these prior

29

misrepresentations and failed accurately to present Lightship's financial condition.

> ***Merger Agreement Section 4(h)(iii):*** Lightship falsely represented that its operations subsequent to those financial statements were conducted in the ordinary course of business (defined in the definition section of Merger Agreement as both in the "ordinary course of business in the industries in which the business is conducted" and also Lightship's own "consistent with past custom and practice") and without material adverse change.

> ***Merger Agreement Section 4(i):***    Except as set forth on Schedule 4(i), the Company had complied in all material respects and was currently in compliance in all material respects with all applicable laws.

Lightship was in breach of the Maine ICA, was deceiving Verizon about its bill

and, in the middle of the sale process, was radically changing its own practice and departing from

industry practice by instituting novel LCAs to mask the true level of access billings.

> ***Merger Agreement Section 4(k)(iii):*** All contracts set forth on attached schedules 4(k)(i) and 4(k)(ii) ("Customer Agreements") were in full force and effect and Lightship was not in material default under any such contract, nor did any conditions exist that, with notice or lapse of time or both, would constitute a material default under any such contract.   In the attached schedule 4(k)(ii) – misnamed in a typographical error "schedule 4(k)(iii)" – Lightship further represented:

>> Currently all of Lightship's interconnection agreements with Verizon have expired*. Per industry practices, Lightship and Verizon continue to operate pursuant to the terms of the interconnection agreements on a month-to-month basis.  In addition, per industry practice, Lightship and Verizon will continue to operate on a month-to-month basis pursuant to the terms of the interconnection agreements until the agreements are negotiated.*  Lightship expects to renegotiate these agreements once the TRRO implementation has completed.  Lightship has not received notice from Verizon of Verizon's intent to terminate the month-to-month operation of these interconnection agreements.

Robinson Aff. Ex. 2 (emphasis added).  This representation was patently false because, at the

time of the sale, Lightship was not in compliance with the terms of its Maine ICA.[9]

JP Morgan argues that, even though the Maine ICA was the single most important agreement to which Lightship was a party, it was excluded from the Section 4(k)(iii) representation because the Maine ICA was omitted from the Schedules.  *See* JP Morgan Mem. at 13-14.  To support that argument, JP Morgan takes unwarranted liberties with the Merger Agreement.  JP Morgan appears to be arguing:  (1) that the Maine ICA discussion block-quoted above is part of a Schedule called Schedule 4(k)(iii) that is not referenced anywhere in the Merger Agreement and/or (2) that the discussion of the Maine ICA is "free floating" and not part of any Schedule.  Neither theory is reasonable.

*First*, the Verizon ICAs are discussed in the Schedule of customer agreements that provides detail for the representation in Section 4(k)(iii) of the Agreement.  Section 4(k)(iii) of the Agreement refers to two attached Schedules: 4(k)(i) and 4(k)(ii).  At the back of the Agreement under the heading "Schedule 4(k)" one finds Schedules 4(k)*(i)* and 4(k)*(iii)*.  There is no Schedule 4(k)*(ii)*.  "Schedule 4(k)*(iii)* - Customer Agreements" is obviously a misprint/typographical error for "Schedule 4(k)*(ii)* - Customer Agreements," which is the name given to the Schedule containing "customer agreements" in Section 4(k)(ii) of the Agreement.  Schedule 4(k)*(iii)* – read, Schedule 4(k)*(ii)* – discusses the Verizon ICA as quoted above. [10]

---

[9]      JP Morgan incorrectly claims that the Complaint does not allege that the representation in Schedule 4(k)[ii] was false as to Lightship's ICAs with Verizon.  *See* JP Morgan Mem. at 14.  Schedule 4(k)[ii] represents that Lightship "continue[d] to operate pursuant to the terms of the interconnection agreements."  The Complaint alleges that Lightship was not operating pursuant to the terms of those agreements.  Compl. ¶¶ 37-53.

[10]      For Schedule 4(k)*(iii)* not to be a typographical error would require numerous improbable and illogical findings that the parties intended there to be no Schedule 4(k)(ii); and for the numeration of the Schedules to skip a number; and for there to be *no* Schedule of

*Second*, the Verizon ICA text is not "free floating" (*i.e.*, divorced from both of the 4(k) Schedules). *All* of Lightship's material contracts are listed in the Schedules. *See* schedule 4(k)(i)(F) - "other material contracts." The Verizon ICA is unquestionably material. It must therefore be reflected in one of the 4(k) Schedules. Under no interpretation could it omitted from both Schedule 4(k)(i) and Schedule 4(k)(ii)/4(k)(iii).

*Third*, regardless of where it is located, the Verizon discussion is an actionable misrepresentation because Lightship was not following industry practices nor was it operating pursuant to its ICAs. Accordingly, the representation was false.

**Megunticook's March 10, 2005 E-mail**:  Matlack's email to CTC stating: "We are very confident in our CABs position and do not feel there is an exposure here".

In point of fact, Lightship and its principals knew that Lightship's CABS billings to Verizon reflected a flawed city-to-city table and that the company was instituting novel billing systems based on illegal self-defined LCAs. As set forth above, the e-mail was not limited to Lightship's UNE-P CABS billings and was never retracted or so limited.

**May 11, 2005 Email:**  CFO Wilson e-mailed CTC the audited financial statements for Lightship for 2003 and 2004.

**May 13, 2005, Email:**  CFO Wilson e-mailed CTC Lightship financial information including consolidated statement of operations for the period January 2005 through April 2005.

---

Customer Agreements to which the compliance representation in the Merger Agreement would apply; and conversely that there would be a Schedule gratuitously setting forth customer agreement information for no purpose and without referent to the text of the Agreement. Such an interpretation would render the structure and specific provisions of the Agreement meaningless – including the representation that Lightship was in compliance with an attached Schedule of customer agreements. *See Two Guys from Harrison-N.Y. v. S.F.R. Realty Assoc.*, 63 N.Y.2d 396, 403 (1984) (court should "avoid an interpretation that would leave contractual clauses meaningless") (citations omitted); *Nash v. Kornblum*, 12 N.Y.2d 42 (1962) (contracts are governed by intent of parties rather than "scrivener's error").

These financials inflated Lightship's 2003 and 2004 annual EBITDA by $2.4 million to $3.6 million, and 2005 EBITDA by $200,000 to $300,000 per month. *Id*. ¶ 97.

\*

All of the foregoing misrepresentations created a duty on the part of Lightship and the Defendants to disclose the truth regarding Lightship's CABS billings.

> An "untrue statement," i.e., a misstatement that comprises a half-truth or a whole lie (as opposed to an omission), is always misleading because a speaker, having begun to speak, is obliged to do so completely and truthfully. Thus, to the extent that Defendants are accused of misstatements, they unquestionably had a duty to disclose. . . . "Silence, or omission to state a fact, is proscribed only in certain situations: first, where the defendant has a duty to speak, secondly, where the defendant has revealed some relevant, material information even though he had no duty (*i.e.*, a defendant may not deal in half-truths).") . . . .

*IPO*, 241 F. Supp. 2d at 380-81 (citations and footnotes omitted).

The false representations contained within the Merger Agreement are not, as Defendants contend, barred by the contract claims. "A plaintiff may elect to sue in fraud on the basis of misrepresentations that breach express warranties" and "'[a] warranty is not a promise of performance but a statement of present fact.'" *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 177, 183-84 (2d Cir. 2007) (misrepresentation of financial information). Fraud does not evaporate "merely because the same fraudulent statements that induced the contract now appear in it." *In re Cinar Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 287-88, 303 (E.D.N.Y. 2002) (agreement misrepresented that financial statements fairly presented financial condition of company; "Once you have told someone that you hold title to the Brooklyn Bridge . . . , executing a contract to sell it that states you have title to the Brooklyn Bridge does not make your

33

prior statement any less fraudulent, nor does it convert the fraud into a breach of contract.").

B.    **CTC Reasonably Relied on Defendants' Material Misrepresentations**

Reasonable reliance is not generally a proper motion to dismiss issue. *Catton v. Defense Tech. Sys., Inc.*, 2006 WL 27470, at \*9 (S.D.N.Y. 2006); *Waltree Ltd. v. ING Furman Selz L.L.C.*, 97 F. Supp. 2d 464, 469 (S.D.N.Y. 2000) (declining to dismiss although some facts indicated reliance to be unreasonable); *AIG Global Sec. Lending Corp. v. Banc of America Sec., LLC*, 2005 WL 2385854, at \*9 n.5 (S.D.N.Y. 2005) ("The issue of whether an investor reasonably relied on a defendant's misrepresentations is a fact-intensive inquiry that cannot be decided on this motion to dismiss."); *Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*, 223 F. Supp. 2d 474, 485 (S.D.N.Y. 2002) ("[A] plaintiff bringing a federal securities fraud claim, under ordinary circumstances, need only plead that he relied on misrepresentations made by the defendant to survive a motion to dismiss since the reasonableness of his reliance implicates factual issues whose resolution would be inappropriate at this early stage.") (citations omitted), *rejected on other grounds by ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) .

1.    **Representations In The Merger Agreement**

A purchaser is entitled reasonably to rely on the accuracy of specifically negotiated representations and warranties contained in a contract. *See Merrill Lynch*, 500 F.3d at 181 ("The warranties ... entitled Allegheny to rely on them without further investigation or sleuthing.") (citations omitted); *CBS Inc. v. Ziff-Davis Publ. Co.*, 75 N.Y.2d 496, 503 (1990) (a warranty "is intended precisely to relieve the promisee of any duty to ascertain the fact for himself"); *Geologic Solutions, Inc. v. Aether Systems, Inc.*, 14 Misc. 3d 1230(A), 836 N.Y.S.2d

34

492 (Sup. Ct. N.Y. County 2006) ("A buyer that obtains an express warranty from a seller in a

contract is entitled to rely upon the seller's promise as to the truth of the warranted

information.").

   According to Megunticook's fanciful reading of the Complaint, reliance was

unreasonable because CTC could have discovered the true facts.  *See* Megunticook Mem. at 27-

28.  In fact, "no amount of sophistication or due diligence could have helped" Plaintiff uncover

Koester's and O'Hare's fraudulent manipulation of LCAs.  *Cinar*, 186 F. Supp. 2d at 314.

Lightship created special data tables to perpetrate and conceal its fraud from both Verizon and

CTC and certainly never gave CTC access to that information.  Lightship never disclosed to CTC

that it was double billing Verizon for traffic that originated from third party carriers, or that

traffic to a single ISP accounted for a disproportionate amount of its intercarrier revenue, or that

it was utilizing VNXX arrangements that were contrary to Maine PUC decisions and rules.

   Megunticook's argument runs counter to recent Second Circuit law establishing

that a purchaser may rely on a contractual representation without further diligence and may

continue to rely unless reliance is "utterly unreasonable, foolish or knowingly blind."  *Merrill*

*Lynch*, 500 F.3d at 181-182 (reversing dismissal of a fraud claim where the plaintiff  "could have

discovered the truths . . . had it pursued its due diligence 'with a little more pizzazz.'").

   Further, Megunticook's defense is precluded by Section 6(d) of the Merger

Agreement which states that "[t]he rights and remedies of [CTC] will not be impaired by any

investigation conducted by or on behalf of [CTC] with respect to Lightship, the Business or the

Transactions or any knowledge acquired or capable of being acquired by [CTC] . . . . "

   Finally, CTC's reasonable reliance needs to be judged in the context of Section

5(c) of the Merger Agreement, in which Lightship covenanted that if prior to closing it acquired

knowledge of circumstances constituting a breach of a representation made within the scope of

the Merger Documents, CTC would be notified.  The disclosure Schedules attached to the

Merger Agreement were to be updated with respect to any matter that, if existing or known at the

date of the Agreement, would have been required to be set forth or listed in any such schedule.

## 2.    Representations Outside The Merger Agreement

The Merger Agreement specifically acknowledged (1) statements had been made

by Defendants both before the after the Merger Agreement that were consistent with Lightship's

representations in the Agreement and also (2) statements would be made by Lightship after the

Merger Agreement was executed and prior to closing.  Defendants, as sophisticated private

equity firms and individuals, are not entitled to any greater protection than that for which they

bargained.

Reliance on misrepresentations made prior to the Merger Agreement (*e.g.*

Megunticook's March 2005 email and the other CABS and EBITDA representations that

provided context for the Merger Agreement and other subsequent representations) is not barred

by the general merger clause in Sections 10(c) of the Merger Agreement and in related

transaction documents.  *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315-16 (2d

Cir. 1993) (under New York law, general merger clause does not preclude parol evidence of

fraud in the inducement; " where specificity has been lacking [in the merger clause], dismissal of

the fraud claim has been ruled inappropriate"); *Deerfield Commc'ns Corp. v. Chesebrough-*

*Ponds, Inc.*, 68 N.Y.2d 954 (1986) (under New York law, fraud claim not barred by general

merger clause); *Transit Rail, LLC v. Marsala*, 2007 WL 2089273, at *9-10 (W.D.N.Y. 2007)

(under both Federal securities law and common law, general merger clause does not preclude recovery based upon precontractual representations);[11] *Cinar*, 186 F. Supp. 2d at 313-14 (under New York law, merger clause must specifically disclaim reliance on particular parol representation in order to bar claim of fraud in the inducement; specific representations in purchase agreement combined with general merger clause do not constitute specific disclaimer of other representations).

By the same token, reliance is not barred by Section 6(d) of the Merger Agreement, which expressly acknowledges the continued viability of representations made by parties other than Lightship prior to the Merger Agreement that were "consistent with" and/or duplicative of representations made in the Merger Agreement itself.

> No Person has been authorized by the Lightship Companies
> to make any representation or warranty regarding the
> Lightship companies or the Business in connection with the
> Transactions that is *inconsistent with or in addition to* the
> representations and warranties expressly set forth in this
> Agreement or in any of the other Transaction Documents.

(emphasis added).  The extra-contractual representations at issue here are certainly not "inconsistent with or in addition to the representations and warranties expressly set forth in" the Merger Agreement.  *See also Hobart v. Schuler*, 55 N.Y.2d 1023 (1982) (alleged misrepresentation not contradicted by specific representations and therefore not barred by merger clause); *Gabriel Capital*, 94 F. Supp. 2d at 508 (disclaimer that no person has been authorized to

---

[11]    In *Transit Rail*, the merger clause was far more specific than the one in the Agreement here.  It recited that no extra-contractual representations had been made not only by the company but also by its officers, employees, agents, affiliates etc.; any and all representations were superseded; and the plaintiff was not relying on any representations made by any person or entity except those in the contract.  Nonetheless, it did not bar reliance on extra-contractual representations.  Here, by contrast, the merger clauses are far more narrow.

make representation did not preclude reliance on precontractual representations by insiders and affiliates).[12]

**C.**    **Defendants Are Responsible For The Material Misrepresentations**

The Officer Defendants supervised Lightship's CABS billing and made the decision not to correct the errors that Mr. Kreitler discovered.  Defendants JP Morgan and Megunticook were driving the sale of Lightship to CTC and, as the principal selling shareholders, were part of the very small core of individuals who personally negotiated and benefitted from the deal and personally supervised the diligence.  Each of the Defendants participated in Lightship's disclosure to CTC regarding its CABS billings and each made its involvement known to CTC, which relied on that involvement.  Each  indemnified CTC for breaches of the representations and warranties contained in the Merger Agreement.

---

[12]    *In Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996), cited by Defendants, the merger clause was specific and uneqivocal: the seller made no representations outside of the contract as to certain enumerated specific subjects as to which the plaintiff later tried to sue.  In this case, Section 6(d) of the Merger Agreement specifically acknowledges that persons other than the seller *did* make representations.

Similarly, *Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 196 (2d Cir. 2003) (interpreting Rule 10b-5 by reference to New York law case regarding reliance), merely stands for the proposition that a general merger clause can bar a sophisticated party's reliance for purposes of a claim on extra-contractual representations where (*not* the case here) the party failed to insist that such representations be incorporated into the contract itself.  But that rule has no applicability here.  CTC  *did* insist that the extra-contractual representations be reaffirmed in the Merger Agreement.

In *ATSI Communications, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007), unlike here, the contract recited that "the only promises, restrictions, and warranties to the transaction were those set forth in the transaction documents."  The disclaimer of extra-contractual representations was unqualified.  Here, by contrast, the general merger clause in Section 10(c) only barred reliance on other representations made by Lightship itself (the "party") and is silent about representations made by the moving Defendants.  Section 6(d) acknowledged representations by Defendants to the extent consistent with those made by Lightship.

38

Defendants all contend that, because they did not personally make the fraudulent statements at the heart of the Complaint, they cannot be liable under Rule 10b-5. Each therefore seeks to be dismissed for failure to specify their statements and pursuant to the holding of *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177-78 (1994), that there is no "aiding and abetting" liability under Section 10(b). But the moving Defendants misstate well-settled law. *Central Bank* "did not affect the contours of a primary violation of Section 10(b)." *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 499 (S.D.N.Y. 2005).

Defendants JP Morgan and Megunticook can and should be held responsible for the misstatements made by Lightship because they – through their agents, Oppenheimer and Matlack[13] – had knowledge of and directly participated in Lightship's disclosures and misrepresentations. Further, Defendants JP Morgan, Megunticook and O'Hare negotiated the terms of the Merger Agreement and then on March 18, 2005, directly caused Lightship to approve and enter into the Merger Agreement in their capacities as Directors controlling five of six seats on the Board. All Defendants ratified the Merger Agreement through the Voting Agreement on March 21, 2005, after having been directly involved in the negotiation of the representations and the diligence process. Each Defendant represented to CTC in Sections 3(e) and (f) of the Voting Agreement that each had reviewed the Merger Agreement (a principal source of the alleged misrepresentations in this case) and that each:

> has sufficient knowledge and experience in financial and business

---

[13]     JP Morgan and Megunticook are liable under principles of agency for the acts of their agents. *Suez Equity Investors LP v. Toronto-Dominion Bk.*, 250 F.3d 87, 100-01 (2d Cir. 2001); *In re Worldcom Sec. Litig.*, 2003 WL 21488087, at *9 (S.D.N.Y. 2003).

matters to be capable of evaluating the merits and risks of this
[Voting] Agreement and the Merger Agreement *and the
transactions contemplated hereby and thereby*, and he, she or it
fully understands the significance and effects of this [Voting]
Agreement and the Merger Agreement, and understands and
*consents to the transactions contemplated hereby and thereby*.
Such Holding Stockholder acknowledges that CTC and the Merger
Sub would not have entered into the Merger Agreement without
such Holding Stockholder's agreement to be bound by the terms
and provisions of this [Voting] Agreement and that CTC and
Merger Sub are *relying upon the truth and accuracy of the
representations and warranties set forth herein in executing the
Merger Agreement*.

Lobenthal Decl. Ex. B (emphasis supplied).   The "transactions" to which Defendants

"consented" included the making of representations and warranties to CTC and indemnification

for breaches of those representations and warranties set forth therein.  Finally, each of the

Defendants agreed to indemnify CTC for breaches of the Merger Agreement's representations.

Accordingly, those fraudulent misrepresentations were directly attributed and attributable to

Defendants at the time (indeed, in advance) of their dissemination.

As such:

[A] plaintiff may state a claim for primary liability under section
10(b) for a false statement (or omission), even where the statement
is not publicly attributed to the defendant, where the defendant's
participation is substantial enough that s/he may be deemed to have
*made* the statement, and where investors are sufficiently aware of
defendant's participation that they may be found to have *relied* on
it as if the statement had been attributed to the defendant.

*Global Crossing,* 322 F. Supp. 2d at 333 (strict requirement of public attribution "would allow

those primarily responsible for making false statements to avoid liability by remaining

anonymous, and thus would 'place a premium on concealment and subterfuge rather than on

compliance with federal securities laws'") (*citing In re Lernout & Hauspie Sec. Litig.*, 230 F.

40

Supp. 2d 152, 166-67 (D. Mass. 2002)).

Additionally, Defendants were all (1) insiders or affiliates of Lightship and (2) participated in the offer of the securities including the circulation of false and misleading statements based on improper and inflated Verizon CABS billings. *In re Scholastic Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (fraud claim properly stated despite lack of express attribution of statement to defendant who was "in a position both to access confidential information and to control the extent to which it was released to the public"); *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247-48 (2d Cir. 1987) (no specific connection required between fraudulent misrepresentations and "insiders or affiliates participating in the offer of the securities in question"); *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986) ("no specific connection between fraudulent representations in the Offering Memorandum and particular defendants is necessary where, as here, defendants are insiders or affiliates participating in the offer of the securities in question."); *Gabriel Capital*, 94 F. Supp. 2d at 502 (same; disclaimer in offering memorandum did not state that insiders/affiliates made no representations, only that they made no warranty about the accuracy or completeness of the representations," which does not undermine the contention that the underwriters "drafted the Offering Memorandum and made the representations contained therein").

- Defendants O'Hare and Koester held high level positions within Lightship. *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 441 & n.54 (S.D.N.Y. 2005); *In re Vivendi Universal S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 192 (S.D.N.Y. 2003) (corporate insider with active daily role liable under group pleading doctrine); *In re NTL Sec. Litig.*, 347 F. Supp. 2d 15, 22 n.26 (S.D.N.Y. 2004) (insiders with direct involvement in daily affairs of the company).

- Defendants O'Hare and Koester had actual knowledge of Kreitler's allegations regarding Lightship's false and fraudulent CABS billing practices and were personally involved in

41

the perpetration and concealment of those billing practices.  *See JHW Greentree Capital L.P. v. Whittier Trust Co.*, 2005 WL 3008452, at *6 (S.D.N.Y. 2005) (defendant willfully ignored allegations regarding false and fraudulent billing practices).

- JP Morgan and Megunticook were actively involved in overseeing the financial condition and operations of Lightship (Compl. ¶¶ 28, 31) and all aspects of the sale process including the decision not to disclose the truth about Lightship's CABS billings to Verizon.  *Id.* ¶¶ 63 (involvement in preliminary deal discussions), 70 (direct negotiations with high level CTC representatives), 71 (direct involvement in diligence process), 82 (reviewed letter of intent), 84 (directly involved in providing information to CTC regarding Lightship finances, billings, revenue, market positions and historical financial results); Robinson Aff. Exs. 10 & 11.  *See Scholastic*, 252 F.3d at 76 (defendant was "primarily responsible" for communications with investors, "was involved in the drafting, producing, reviewing and/or disseminating of the false and misleading statements" and "had access to internal corporate documents and reports . . . , conversed with other officers and employees and attended management and committee meetings"); *Luce*, 802 F.2d at 52, 55 ("no specific connection between fraudulent representations in [an] Offering Memorandum and particular defendants is necessary where, as here, defendants are insiders or affiliates participating in the offer of the securities in question."); *Global Crossing,* 322 F. Supp. 2d at 334 (allegations that defendants reviewed every public filing, earnings release and quarterly financial report; materially assisted in the preparation of all public financial disclosures including relating to financial issues; and prepared, directed, controlled, helped create or materially assisted in preparing false statements were sufficient to state primary violation where defendants role was well known to investors who could easily have relied on its involvement even where a particular statement was not publicly attributed to them); *In re Solv-Ex Corp. Sec. Litig.*, 210 F. Supp. 2d 276, 283 (S.D.N.Y. 2000) (individuals who participated in preparation of allegedly fraudulent documents "at the highest level" can be held liable under group pleading doctrine); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 142 (S.D.N.Y. 1999) (attributing statements under group pleading doctrine to insider defendants who "had knowledge of the fraud and assisted in its perpetration by, inter alia, drafting, reviewing and/or disseminating the statements"); *Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225, 238 (S.D.N.Y. 2000) (private equity and investment bank defendants liable under group pleadings because "intimately involved both in negotiating the Offer and in drafting the allegedly fraudulent Solicitation and Tender Offer Statement").

- Defendants JP Morgan and Megunticook held themselves out to CTC as having access to confidential inside information regarding billing practices.  *E.g.*, Robinson Aff. Ex. 10, pages unnumbered (3/10/05 Matlack e-mail: "We are very confident in our CABs position and don't feel there is an exposure here."; 3/12/05 Oppenheimer e-mail: "Obviously they should not need any more info at this point").

- Defendants O'Hare, JP Morgan and Megunticook actually consulted with Defendant

42

Koester at the critical moment in the diligence process on the exact issue that made this lawsuit necessary. *See Luce*, 802 F.2d at 55 (securities fraud claims adequately pleaded under group pleadings doctrine against not only general partners who created Offering Memorandum but also their affiliates and individual principals and directors of general partners and affiliates); *JHW Greentree*, 2005 WL 3008452, at *6 (fraud based on alleged misrepresentations in the Merger Agreement would be sufficiently pleaded under "group pleading doctrine" if director had either been involved in day-to-day operations or been "directly involved in negotiating or drafting the Merger Agreement."); *In re American Bank Note Holographics, Inc., Sec. Litig.*, 93 F. Supp. 2d 424, 444 (S.D.N.Y. 2000) (citing "interlocking financial, managerial and business relationships" including fact that individual operated in "dual capacity" to attribute statements made by subsidiary to parent for purposes of pleading fraud with specificity).

On these facts, there is a "'presumption that statements in prospectuses, registration statements, annual reports, press releases or other group-published information are the collective work of those individuals with direct involvement in the everyday business of the company.'" *BISYS*, 397 F. Supp. 2d at 438 ("some corporate documents, including SEC filings and the like, generally are not created by a single authority, but by a group of corporate insiders involved in the daily management of the company.") (*citing In re NTL,*, 347 F. Supp. 2d at 22 n.26 (insiders with direct involvement in the daily affairs of the company are responsible for statements made in corporate documents by others)).[14]

> While it is true that there can be no aider and abettor liability under 10(b) and Rule 10b-5, grouping defendants together in the complaint does not in itself make the allegations defective. It is well settled that plaintiffs may engage in so-called group-pleading under 10(b) and Rule 10b-5; nothing in the PSLRA has altered that doctrine.

*American Bank Note,* 93 F. Supp. 2d at 442 (citation omitted). "Identifying the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or

---

[14]    The "group pleading doctrine" was unaffected by the PSLRA. *In re BISYS*, 397 F. Supp. 2d at 439 n.42 (majority view; gathering cases).

omissions in group-published documents such as annual reports, which presumably involve collective actions of corporate directors or officers.  *In re World Access, Inc. Sec. Litig.*, 119 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000) (*citing Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir. 1987)).

To the extent that it is a requirement of the "group pleading doctrine" and not merely a requirement of scienter, the Complaint also alleges numerous specific facts demonstrating the knowledge and/or reckless disregard of the Defendants at the time that the statements made were false.  *See ESI Montgomery County, Inc. v. Montenay Int'l Corp.*, 1996 WL 22979, at *4 (S.D.N.Y. 1996) *abrogation on other grounds recognized by In re Global Crossing Sec. Litig.*, 2005 WL 2990646 (S.D.N.Y. 2005).[15]

**D.    Defendants Acted With Scienter**

The Complaint more than satisfies the requirements of the PSLRA that it allege facts giving rise to a strong inference of fraudulent intent, which may be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citations omitted);  15 U.S.C. § 78u-4(b)(2).   Scienter allegations are not subject to "exacting scrutiny" and are satisfied by "conclusory allegations if they are supported by facts giving rise to a strong inference of

---

[15]    The allegations concerning each Defendant's scienter are discussed *infra* in Section I[D].  Note that this Court, like others, has treated the issue of scienter separately from the group pleading doctrine.  *See In re Citigroup, Inc., Sec. Litig.*, 330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004) (Swain, J.) ("Although the group pleading doctrine may be sufficient to link the individual defendants to the allegedly false statements, Plaintiff must also allege facts sufficient to show that the Defendants had knowledge that the statements were false at the time they were made.").

fraudulent intent." *Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807, 819-20 (S.D.N.Y. 2006).

*See* Fed. R. Civ. Pro. 9(b) ("Malice, intent, knowledge, and other condition of mind of a person

may be averred generally."); *Wight v. Bank America Corp.*, 219 F.3d 79, 91 (2d Cir. 2000) ("a

plaintiff cannot realistically be expected to plead a defendant's actual state of mind").

       In *Tellabs v. Makor Issues & Rights, Ltd.,* the Supreme Court clarified what is

required under the PSLRA  to plead facts giving rise to a strong inference of scienter.  In

assessing the strength of the inference, courts shall consider "competing plausible nonculpable

explanations, yet 'the inference that the defendant acted with scienter need not be irrefutable, *i.e.*,

of the smoking gun genre, or even the "most plausible of competing inferences.'" 127 S.Ct. at

2510 & n. 5; *accord Darquea v. Jarden Corp.*, 2007 WL 2584744, at *1-2 (S.D.N.Y. 2007)

(even where no one single allegation would compel inference of fraud, all allegations viewed

"holistically" may adequately allege scienter).

      **1.**    **Selling Shareholders Have Motive And Opportunity To Commit**
               **Fraud When They Deceive an Acquirer Into Overpaying**

       Quite simply, Defendants' motive to defraud CTC is the most obvious single

aspect of this case.  Defendants had a basic and concrete motive both initially to inflate

improperly the level of revenues (by failing to match Verizon's LCAs areas for intercarrier

compensation purposes, billing Verizon for VNXX termination, and double billing Verizon for

termination of transit traffic originated by third party carriers) and then to maintain those levels

of revenues by concealing the additional erroneous billing practices they discovered during the

deal's due diligence process through the use of new, even smaller local calling areas of

Lightship's own choosing.  These improper billing practices artificially and improperly inflated

both revenues and EBITDA.  A substantial part of Lightship's EBITDA resulted from improper billing practices and the purchase price was determined based on a multiple of EBITDA.

To allege motive and opportunity, Plaintiff must allege merely that "defendants could realize concrete benefits from a fraudulent act (motive) and that defendants had the means of committing the fraudulent act (opportunity)."  *Kalnit v. Eichler*, 85 F. Supp. 2d 232, 242 (S.D.N.Y. 1999), *aff'd,* 264 F.3d 131, 139 (2d Cir. 2001 ) (although it is not sufficient to allege motives shared by all directors and officers (*e.g.*, keeping their jobs), "motive [is] sufficiently pleaded where plaintiff alleged that defendants misrepresented corporate performance to inflate stock prices while they sold their own shares."); *Ganino*, 228 F.3d at 170 (same).  The allegations of the Complaint more than satisfy the requirement to state "concrete benefits" realized by Defendants from their fraudulent acts.

The Defendants' desire to consummate the sale to CTC falls squarely within recognized motive for securities fraud.  Numerous cases have held that the desire to inflate stock price in order to consummate a sales transaction or to obtain a better price in that transaction constituted a concrete motive for fraud.

A concrete motive is also present where the defendant allegedly inflated the price of stock it intends to use as the currency to acquire other companies.  *Rothman v. Gregor*, 220 F. 3d 81, 93 (2d Cir. 2000) (motive adequately pled);  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 271 (2d Cir.1993) (motive to misrepresent status of strategic alliance talks to inflate stock price thereby lessening dilutive effect of potential rights offering);  *Schottenfeld Qualified Assoc. v. Workstream, Inc.*, 2006 WL 4472318 (S.D.N.Y. 2006) (motive to maintain stock price to consummate other transactions); *Vivendi*, 381 F. Supp. 2d at 185 ("defendants were motivated to

46

inflate company stock prices as a means to effectuate a specific acquisition that would not

otherwise be possible without fraudulently inflating stock prices."); *RMED Int'l, Inc. v. Sloan's*

*Supermarkets, Inc.*, 207 F. Supp. 2d 292 (S.D.N.Y. 2002) ("[D]efendants had a motive to inflate

artificially the value of Sloan's stock in order to use the stock to acquire other companies."); *In*

*re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 327-28 (S.D.N.Y. 2001) (same);

*Nelson*, 173 F. Supp. 2d at 168 (motive to "acquire and reallocate the equity" in companies).

      In *Polycast Technology Corp. v. Uniroyal, Inc.*, 792 F. Supp. 244 (S.D.N.Y.

1992),  Uniroyal sold its Plastics subsidiary to plaintiff.  Plaintiff alleged that the subsidiaries'

financial reports were inflated.  The defendants included a private equity firm that indirectly

owned one third of Uniroyal and the two general partners of that firm.  The Court ruled that

defendants' motive to commit fraud was "manifest":

> The motive of Rice and Dubilier to commit fraud upon a purchaser
> of a Uniroyal asset such as Plastics is manifest. Rice and Dubilier
> managed all the C & D Entities.  Those entities held a 32.5%
> equity interest in Uniroyal. . . . To maximize a return to the C & D
> entities, it was necessary to maximize the sale price of a Uniroyal
> asset like Plastics.

*Id.* at 256-57; *Polycast Technology Corp. v. Uniroyal, Inc.*, 728 F. Supp. 926, 936 (S.D.N.Y.

1989) (allegations of "beneficial interest in Uniroyal's assets implicitly establish motive";

allegations of defendants' involvement in the preparation of the offering memorandum "support

the inference of knowledge").  *See also Suez*, 250 F.3d at 100 (corporate defendants who

allegedly induced others to invest, "as creditors or equity holders in the company, had a motive

for fraud based upon their own at-risk investments"); *AIG Global*, 2005 WL 2385854, at *9

("motive is adequately pleaded where the plaintiffs allege that the defendant sold its own shares

while at the same time misrepresenting corporate performance in order to inflate stock prices";

investor substantially reduced its own risk exposure by inducing plaintiffs to purchase their

securities); *In re Independent Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 766

(S.D.N.Y. 2001) (motive assist its parent's sale of its shares of the company, receiving $12.3

million in proceeds and escaping liability on a guarantee), *abrogated on other grounds by In re*

*IPO Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003).

> While "mere ownership [of stock] in the absence of profit-taking does not

establish motive," *IPO*, 241 F. Supp. 2d at 367, such ownership coupled with large sales of stock

most certainly does. *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 85-86 (2d Cir. 1999)

(allegations that insiders sold off "large portions" of their holdings are "probative of motive,

which we have recognized supports a strong inference of fraudulent intent"). That is precisely

the case here: all of the Defendants sold all of their stake in Lightship, collectively worth tens of

millions of dollars, as part of the transaction. In *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611

(S.D.N.Y. 2007), defendants had a concrete motive in an IPO wherein they received a portion of

any money generated by sales of their shares over the initial allotment.

> Thus, "by creating sufficient demand for Refco stock at the time of the
> IPO, these Defendants received an extra cash payment from the sale of
> shares dedicated to cover the oversubscription." (*Id.*) . . . . By
> fraudulently concealing the uncollectible receivables, they could drive up
> demand for Refco shares, which would result in purchases of shares from
> which defendants would be directly compensated. This is a concrete
> benefit directly flowing from the alleged fraud, and is accordingly
> sufficient to give rise to a strong inference of motive.

*Id.* at 646; *see also Compudyne*, 453 F. Supp. 2d at 826 (profiting from unusual insider

transactions is highly probative of motive); *IPO*, 241 F. Supp. 2d at 365-68 & n.111 ("a plaintiff

may plead motive by alleging that a corporate insider sold significant amounts of personal stock

after the allegedly fraudulent misstatement or omission was made."; while no *per se* rule exists,

sales ranging from 11 percent to 100 percent have been held to be unusual).

Defendants misconstrue the governing law when they argue that motive requires

that the defendant receive a concrete benefit not equally available to other shareholders.  That

statement may be correct but only *in the specific context of lawsuits in which shareholders are

the plaintiffs*.  Courts have easily dismissed shareholder lawsuits where the alleged motive was a

desire to benefit the plaintiff shareholders since a defendant cannot be accused of having  a

motive to defraud the very class of persons whom the defendant was trying to benefit.  *See, e.g.*,

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801,

814 (2d Cir. 1996).  The cases cited by Defendants all involved plaintiffs who were not the

intended target of the fraud attempting to show motive by pointing to a generalized fraudulent

intent or fraudulent intent directed to others.  Those cases establish only that, to satisfy the

motive requirement, the fraudulent intent must have been specifically directed to the specific

plaintiff asserting it was defrauded.  Where (as here) Plaintiff's interests were *directly adverse* to

Defendants', the controlling receipt of a concrete benefit by means of a fraud directly targeted at

Plaintiff does show motive.

The Second Circuit recognized this distinction explicitly in *Kalnit v. Eichler*, 264

F.3d 131, 141 (2d Cir. 2001).  In *Kalnit*, defendants allegedly failed to disclose efforts to secure a

second, better takeover offer than the offer that had been announced.  Plaintiff was a shareholder

who sold before the second, higher offer became public.  The court held that the defendant-

shareholders' efforts to increase shareholders returns did not evidence motive to defraud

49

shareholders who would "benefit from a superior transaction". *Id.* at 141.   The same

circumstances would, however, have alleged a motive to defraud a counter-party to the

transaction.   *Id.* ("any intent to defraud [acquirer] Comcast cannot be conflated with an intent to

defraud the [plaintiff] shareholders.").   *Kalnit* thus stands squarely for the proposition also

announced in other cases that "motive" to defraud must be targeted at the plaintiff.   A

generalized motive not directed to any one party, or motive directed to a party other than the

plaintiff, will not establish scienter.   *See In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595,

621 (S.D.N.Y. 2005) (bank's motive to earn large fees is not scienter in lawsuit brought by

shareholder; distinguishing another case, *In re Livent Noteholders Sec. Litig.*, 151 F. Supp. 2d

371 (S.D.N.Y. 2001)*, on the grounds that *Livent* involved "the motive of a bank, CIBC" to

defraud the plaintiff, not CIBC's own shareholders).   Here, the alleged fraud was directed

squarely at CTC.[16]

---

[16]        The other cases cited by Defendants also involved a lack of nexus between the
motive and the plaintiff.  None holds that when shareholders deceive an acquirer, they lack
"motive" in an action brought by the acquirer.  In *Ganino*, 228 F.3d at 170, the plaintiffs were
shareholders.  The fraud complained of was designed to benefit them. In *In re Axis Capital
Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 594-96 (S.D.N.Y. 2006), the individual
defendant's motives were to keep their jobs, increase their compensation and generally maintain
higher stock prices, and the alleged insider stock sales of the insurance broker were not
"unusual." In *JP Morgan Chase*, 363 F. Supp. 2d at 619-23, the court emphasized that the test
for when scienter is adequately pled is whether the motive is "commonly shared".  Corporate
insiders were not motivated to harm shareholders where the alleged motives were to keep stock
prices high to facilitate corporate acquisitions, to earn corporate profits, to minimize corporate
debt, to earn bonuses, and generally to profit from transactions.  In *Leventhal v. Tow*, 48 F. Supp.
2d 104, 114-15 (D. Conn. 1999), shareholders sued officers and directors.  The court rejected
"motive" based on defendants' desire to benefit the corporation as a whole, such as selling debt
to nonparties at lower interest rate.  (If the plaintiffs had been acquirers of the debt, rather than
shareholders, there could have been a nexus between the alleged motive and the alleged harm.)
As to motive particular to the defendants, while some of the insiders did sell their stock, others
did not, undermining the claim that the purpose of the nondisclosure was to enable insiders to
sell stock at inflated prices.  Finally, in *In re Health Management Sys. Inc. Sec. Litig.*, 1998 WL

There is no dispute as to opportunity.  *See IPO*, 241 F. Supp. 2d at 369 (entities who were "intimately involved" in the sale process had the opportunity to discover the alleged scheme and commit the material misstatements and omissions); *JP Morgan Chase*, 363 F. Supp. 2d at 619 (opportunity can be inferred from access to confidential information); *Polycast*, 728 F. Supp. at 936 (participation in preparation of offering memorandum).

> **2.     Defendants' Ignoring Warnings That Their Conduct Was Improper Constitutes Strong Circumstantial Evidence of Conscious Misbehavior Or Recklessness**

Conscious misbehavior "encompasses deliberate illegal behavior."  *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).  "A strong inference of scienter exists where there are allegations that a defendant 'knew facts or had access to information suggesting that [the company's] public statements were not accurate.'"  *Converium*, 2007 WL 2684069, at *2. Fraudulent intent may be inferred from failure to mention a significant, sudden, recent but averted negative financial event in connection with disclosure.  *See Vivendi*, 381 F. Supp. 2d at 185.

Recklessness encompasses (1) highly unreasonable conduct representing an extreme departure from the standards of ordinary care such that the danger was either known or so obvious that the defendant must have been aware of it, (2) an egregious refusal to see the obvious or investigate the doubtful, (3) knowledge of facts or access to specifically identified information contradicting public statements such that defendants "knew or, more importantly, should have known that they were misrepresenting material facts" (4) failure to review or check information that defendants had a duty to monitor and (5) ignoring obvious signs of fraud.  *In re*

------

283286, at *6 (S.D.N.Y. 1998), the alleged insider stock sale was not "unusual."

*Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (recklessness pled where defendants

"knew facts or had access to non-public information contradicting their public statements");

*Novak*, 216 F.3d at 308-09 (corporate officials are responsible for revealing "those material facts

reasonably available to them," for failing to review or check information they had a duty to

monitor and for ignoring obvious signs of fraud) (*citing Cosmas v. Hassett*, 886 F. 2d 8, 12 (2d

Cir. 1989) (statements about sales to China were reckless when defendants knew or should have

known that Chinese import restrictions were in place), *Goldman v. Belden*, 754 F.2d 1059, 1063,

1070 (2d Cir. 1985) (making positive predictions despite fact that defendants knew or should

have known of facts revealing "grave uncertainties"), *Rolf v. Blyth, Eastman Dillon & Co.*, 570

F.2d 38, 47-48 (2d Cir. 1978) (statement made by defendant was reckless when defendant never

actually investigated) and *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998) (reliance on

"obviously evasive and suspicious statements made to him" by corporate official was reckless);

*see also Kalnit*, 264 F.3d at 142 (same);*Worldcom*, 2003 WL 21488087, at *7 (S.D.N.Y. 2003)

(failure to review documents that one has a duty to review is recklessness).[17]

        Defendants all claim that, as a matter of law, the Court should determine at this

preliminary stage that none of them acted with scienter because they were ignorant of the fact

that Lightship's CABS billings to Verizon were false, fraudulent and represented an extreme

departure from Lightship's own and industry billing practices and could not have known that

what they were doing was wrong.  There is no basis for any such finding that the Officer

---

[17]     JP Morgan is simply wrong when they state that allegations that they "should have
known" merely states a claim for negligence. *See* JP Morgan Mem. at 19 n. 15. *E.g.*, *Cosmas v.
Hassett*, 886 F. 2d 8, 12 (2d Cir. 1989).  The "knew or should have known" standard is a
common formulation used by this and every other Court to denote recklessness under the Federal
securities laws.

Defendants' self-professed ignorance was genuine, let alone at this stage, particularly if they are taken at their word, their actions were reckless given their ignorance.

Whether or not it was reasonable to overrule and/or ignore the information, analysis and warnings of Kreitler is a fact question that cannot be determined by the Court on a motion to dismiss. *In re Xethanol Corp. Sec. Litig.*, 2007 WL 2572088, at *3 (S.D.N.Y. 2007) (Defendants' contention that they were entitled to disregard warnings of company employee that statements were false because warnings were "whining" and "sour grapes" was not more compelling than other inferences and therefore did not support dismissal); *Compass Aerospace Corp. v. Alinabal Holdings Corp.*, 2000 WL 572472, at *1, 3 (S.D.N.Y. 2000) (whether company should have disclosed pessimistic forecasts prepared by its employee was a question of fact precluding summary judgment).[18]  Defendants unquestionably "had access to information suggesting that" the EBITDA figures provided to CTC were inaccurate, an allegation that gives rise to a strong inference of scienter. *In re Converium,* 2007 WL 2684069 at *2.  Defendants knew that if CTC discovered that Lightship had implemented its own LCAs to generate excess revenue or that Lightship charged two carriers for the same call, CTC would not have closed the transaction (Lightship "cannot afford the loss of revenue").  There can be no doubt that, as a matter of law, conscious misconduct encompasses such deliberate unlawful behavior.

It is important to note that JP Morgan, Megunticook and the Officer Defendants -- evidently counting on the fact that Verizon had not discovered their CABS billing fraud and expecting CTC to be unethical and greedy enough to continue it -- indemnified CTC against

---

[18]      There, a merger clause in stock purchase agreement did not preclude the plaintiff "from basing its federal securities claims on alleged oral misrepresentations".  *Id*. *3.

breaches of the representations in the Merger Agreement.  As such, Defendants' claim not to have been aware of the facts requires one to assume that two sophisticated private equity investors entered into an indemnification without first utilizing their access to inside information regarding operations.  That inference is particularly unwarranted given the fact that Oppenheimer was himself a named defendant in a fraud case at this time.  *CDX Liquidating Trust v. Venrock Associates*, 2005 WL 3953895 (N.D. Ill. 2005).[19]  The competing inference that Oppenheimer and Matlack assured themselves that they had knowledge of Lightship's CABS billings practices and made a calculated gamble that they would be better off with a sale than without a sale is far stronger.

*Officer Defendants*

Defendants Koester and O'Hare knew that it was illegal, improper, and a departure from Lightship's own practices and those of the industry in general for Lightship to utilize self-defined LCAs because Kreitler told them so.

- In or about 2004, Mr. Kreitler told Koester that the Maine ICA required Lightship to use Verizon's larger current LCAs.  However, Koester, Wilson, and other Lightship senior management decided that no change should be made, and that Lightship would continue to use smaller LCAs. Compl. ¶ 41.

- In early January 2005, Mr. Kreitler received inquiries from Verizon questioning the CABS billings.  Kreitler directly informed Koester.  Koester instructed Kreitler to conceal from Verizon the billing practices.  *Id.* ¶ 74.

- After Mr. Kreitler corrected spelling and formatting errors in the city-to-city table, Koester told Kreitler that Lightship "could not afford" the revenue loss despite being told this would require use of an "incorrect [CABS billing] table," and either created or directed the creation of a new city-to-city table that used even smaller LCAs.  Kreitler also told O'Hare that these practices were at variance with the Maine PUC's requirements

---

[19]    This Court may take judicial notice of the fraud claims that were pending against Oppenheimer as public records.  *Rothman*, 220 F.3d at 92.

and again told Koester that Lightship could not use its own LCAs.  Koester told Kreitler that the decision had been made. *Id.* ¶¶ 42-51.

Under *Tellabs*, plaintiffs must "must plead facts rendering an inference of scienter at least as likely as any plausible opposing inference."  127 S. Ct. at 2513 (emphasis in original).  The Court's job at this stage is not to assess the weight of the evidence in evaluating the competing inferences.  *Xethanol*, 2007 WL 2572088, at *3 (scienter cogently and compellingly pleaded where company employees, including those who reported directly to one of the defendants, allegedly warned that company statements were false); *Converium*, 2007 WL 2684069, at *3 (allegation that misrepresentations were at odds with other information sufficiently alleges that misrepresentation was made with scienter).  Here, the only competing inferences are whether O'Hare and Koester, two experienced senior executives of a telecommunications company, (1)  genuinely and reasonably, but mistakenly, believed that new billing practices specially created and instituted for the first time in the middle of the sale of the company because the company could not afford the loss of revenue and that departed from the company's past, and industry-wide, practices were actually appropriate and lawful despite being told otherwise or (2) whether they knew, or recklessly failed to investigate whether their novel billing practices created and instituted during the sale process were prohibited by the contract but hoped that neither Verizon nor CTC would discover the truth until after the sale was final and the funds released from escrow.[20]  Because it is by far more likely that Lightship's experienced

---

[20]    The Officer Defendants had no right to defraud Verizon even if Verizon did not detect the fraud. Incredibly, they argue that, since they successfully overbilled Verizon, the Court should find that what they did was proper.  Officer Defendants' Mem. at n. 21 ("The fact that Verizon never raised this issue for approximately seventeen months following (and for years thereafter) speaks volumes as to ICA's ambiguity.").  The Officer Defendants forget that Verizon did question their bills and that Koester instructed Kreitler to mislead Verizon as to the reason

telecommunications executives and their private equity partners knew the requirements of Lightship's contracts, Plaintiff has more than met its pleading requirements. In fact, the Complaint expressly alleges that "Kreitler told Koester that the Maine ICA did not allow Lightship to define its own LCAs." Compl. ¶ 51.

Even if the Court were to determine at the pleadings stage that O'Hare and Koester did not have *conscious knowledge* of committing a fraud, *recklessness* is alleged. The Officer Defendants ask the Court to take judicial notice of the supposed fact that it is "ludicrous" that non lawyers "can be charged with 'knowing' what this highly technical, complex [ICA] agreement required". Officer Defendants' Mem. at 26; *see also* JP Morgan Mem. at 34 (arguing that the Telecommunications Act is a "morass" and "'a model of ambiguity or indeed even self-contradiction'").[21] Yet Kreitler had expertise in this area, since he was a Lightship billing manager whose job was to implement billing -- and who reported directly to Lightship COO Koester. *Id*. ¶ 40. O'Hare and Koester do not claim they consulted their outside counsel*, see* JP Morgan Mem. at 20; Robinson Aff. Ex. 6, or even Mr. Gawlick, who purportedly had some responsibility in this area, *see* Officer Defendants' Mem. at 28. As such, the defense of good faith reliance on advice of counsel, *see Buy This, Inc. v. MCI Worldcom Commc'ns, Inc.*, 209 F. Supp. 2d 343 (S.D.N.Y. 2002), is wholly inapplicable and would be turned on its head here where there was no reliance on counsel at least for purposes of this motion. There is no defense

---

for the high charges. Compl. ¶ 74.

[21]    As set forth above, the Maine Verizon ICA clearly provides that the determination of the applicable form of intercarrier compensation (reciprocal compensation or ISP-bound compensation or access charges) depends on the geographic scope of LCAs as defined by Verizon.

of good faith refusal to consult with counsel when one is ignorant about a subject. The Officer

Defendants' ignorance – if any – was deliberate, calculated, premeditated, willful and hence

reckless. *See Novak*, 216 F.3d at 308-09 (recklessness encompasses failure to investigate the

doubtful, failure to review or check information that defendants had a duty to monitor, ignoring

obvious signs of fraud, making statements at odds with "grave uncertainties" and failing to

investigate);[22] *Glidepath Holding B.V. v. Spherion Corp.*, 2007 WL 2176072, at *15 (S.D.N.Y.

2007) ("'An egregious refusal to see the obvious, or to investigate the doubtful, may in some

cases give rise to an inference of recklessness.'") (citation omitted); Compl. ¶¶ 49-51, 88. The

suggestion that this Court give blanket immunity to commit fraud in areas governed by complex

rules does not reflect sound policy.[23]

        The Officer Defendants' heavy reliance on *Funke v. Life Financial Corp.*, 237 F.

Supp. 2d 458, 468-70 (S.D.N.Y. 2002) is unwarranted. There is no similarity between a

company continuing what is later determined to be the incorrect accounting treatment and a

company that adopts a completely novel practice that its own senior billing managers warn runs

counter to the applicable rules. Crediting the allegations of the Complaint, the Officer

Defendants' "alleged conduct was so obviously manipulative (and material . . . ) that it could not

---

[22]     In *Novak*, after discussing the problem and refusing to make changes because doing so would "damage the Company's financial prospects," the defendants knowingly approved procedures which violated the company's own policy. 216 F.3d at 311. Here, the Officer Defendants devised new practices that radically departed from the Company's prior practices because Lightship "could not afford" the revenue loss.

[23]     The Officer Defendants half-heartedly argue in effect that consultation with their outside regulatory counsel would have been futile. *See* Officer Defendants' Mem. at 3 (arguing that the ICA "has never been interpreted by any authority or in any formal or even informal proceeding"). That is certainly a matter of fact. Their failure to do so was reckless or evidence that they believed what they were doing was not permitted under applicable rules.

have been done inadvertently." *In re IPO*, 241 F. Supp. 2d at 360. This is no less true even if some elements of their new Verizon CABS billing practices are ultimately determined to be lawful under the ICA since it is the failure to disclose a material fact that is the gravamen of the securities fraud claims. *Id.* ("even if parts of the alleged scheme consisted of permissible stabilization practices . . . , the failure to disclose that conduct would have evinced an intent to defraud.").

To "prove" their innocent motive, Defendants have cited emails sent by individuals while at Lightship whose source is unclear and some of which may no longer be on the Lightship server. *See* Lobenthal Decl. ¶ 9. Any destruction of emails in anticipation of future litigation may require a negative inference of consciousness of guilt. *See, e.g., Samsung Elects. Co. v. Rambus, Inc.*, 439 F. Supp. 2d 524 (E.D. Va. 2006) (destruction of emails prior to filing of claim constituted spoliation); *Byrnie v. Town of Cromwell, Bd. of Ed.*, 243 F.3d 93, 108 (2d Cir. 2001) ("documents destroyed years before suit brought could reasonably be found to have been destroyed in anticipation of litigation where fear of potential future litigation plausibly motivated the spoliation.") (*citing Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir.1998)).

### Defendants JP Morgan and Megunticook

As set forth above, in early March 2005, JP Morgan and Megunticook held themselves out as being knowledgeable about Lightship's CABS billing practices to the extent of expressing views about the amount of disclosure that was appropriate and also having a high degree of confidence in those billing practices. See Robinson Aff. Ex. 10 ("We are very confident"; "Obviously they should not need any more info at this point"). Their confidence reflected the fact that their respective representatives were the leading drivers of Lightship's deal

58

team, were consulted throughout the transaction, negotiated the Merger Agreement together with its representations, actively participated in the diligence process, voted as Directors to cause Lightship to enter into the Merger Agreement, approved of the Merger Agreement in the Voting Agreement and agreed personally to be liable for breaches of the representations and warranties. JP Morgan and Megunticook cannot credibly claim ignorance of whether or not the representations made were truthful without at minimum admitting to recklessness:

> Plaintiffs are not merely alleging that NatWest and McDonald failed to discover that some analyst reports relied on false assumptions. Rather, plaintiffs allege that NatWest and McDonald drafted the Offering Memorandum, prepared the slides, and attended the road show, all of which contained a large number of false or misleading representations contradicted by basic source documents or obvious facts. Because the true facts could be found in such obvious sources, NatWest and McDonald either knew that their representations were false or misleading when they were made or, at least, acted with reckless disregard as to whether their representations were false or misleading. Thus, the facts alleged in the Amended Complaint, if true, create a strong inference of fraudulent intent.

*Gabriel Capital*, 94 F. Supp. 2d at 506. It is simply too late for them to claim that they were actually ignorant, had a low degree of confidence and had no basis for recommending or agreeing to terminate disclosure.

Oppenheimer and Matlack, were not typical "outside" directors. The emails show they were deeply involved in the exact areas at issue here:

- On March 11, after the UNE-P issues had been resolved, CTC's Prenetta reminded O'Hare that CTC had outstanding questions regarding CABS. Robinson Aff. Ex. 11 at page 4 of 7. Oppenheimer asked O'Hare to confirm that issues raised by a review of CTC's own November Lightship bill (as opposed to Verizon's bill) were not "determinants of value" and would not "create more questions".

- After Prenetta told O'Hare that CTC's questions were not limited to CTC's own November Lightship bill, O'Hare told Oppenheimer and Matlack that he would consult with Nick Zeitvogel and Koester and report back to Oppenheimer and Matlack before taking any further steps. Again, Oppenheimer approved: *"I think it is right to get an answer for us internally first, to understand it, but not communicate it to the other side until then." Id.* at 3 of 7.

The clear inference from the emails and subsequent events is that O'Hare followed through and spoke to Zeitvogel and Koester about the Verizon CABS billing practices and then reported back to Oppenheimer and Matlack. The inference that JP Morgan and Megunticook learned from O'Hare about the Verizon billing practices at this time (or earlier) is at least as strong as any opposing inference. *See Tellabs*, 127 S. Ct. at 2510; *Transit Rail*, 2007 WL 2089273, at *12.

The inference that O'Hare did in fact talk to Koester and then reported back to the control group is even stronger in light of the next email, where JP Morgan, Megunticook and O'Hare agreed on the need to terminate disclosure. Adopting this strategy was consistent with knowing that what Lightship was doing was indefensible. Only three hours after O'Hare promised to talk to Zeitvogel and Koester and then report back to JP Morgan and Megunticook, Quinn indicated that the parties had had oral communications and proposed a new strategy to the control group that he believed they would understand: Lightship would not provide any new information to CTC. Rather, Lightship would only respond to information that CTC already had:

> After talking with Kevin [O'Hare] I agree with Stephen [Oppenheimer] but think the response to Prenetta copied to his whole group should be. I have sent you 2 emails on your Bill question. We will try to answer it but we need complete information which you have not provided. . . . If you give me the information I need to answer your question we will try to answer it.

There is no evidence that JP Morgan or Megunticook thereafter wrote Quinn to ask the reasons

60

for the change of strategy.  They knew why disclosure had to be terminated.

Based on these and other facts, the Complaint adequately alleges strong circumstantial evidence of conscious behavior or recklessness.  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (allegations of specific internal company data that undercut public statements sufficiently alleged recklessness); *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 480 (S.D.N.Y. 1994) (noting sophistication of corporate spokesman and fact that statement was made when he was actively involved in negotiations, thereby tending to disprove inadvertence).[24]

*Core Business Doctrine (All Defendants)*

Lightship's Verizon CABS billing was at the absolute core of Lightship's business, accounting for somewhere between 25 percent and 37 percent of EBITDA.  As Defendant Koester put it, Lightship simply "could not afford" the loss of revenue in the middle of a sale premised on multiples of EBITDA.

Section 4(h) of Merger Agreement represented and warranted that Lightship had in place "a system of internal controls and procedures to provide assurances that all material information regarding the Lightship Companies' operations and financial condition is communicated to the Lightship Company's management, including their executive officers".

As such, there is a "strong inference" that all Defendants had actual knowledge of

---

[24]    Megunticook's claim that Matlack had no "expertise whatever" in the telecommunications field, Megunticook Mem. at 10, is disturbing on any number of levels including for what it says about the recklessness of Matlack's statement about CABS, and tends to confirm, especially when read in light of his profession of "confidence" in Lightship's CABS billings, that he was being fully advised by Lightship management regarding CABS issues.  As such, it supports the inference that O'Hare told Matlack what O'Hare knew about CABS billings including Mr. Kreitler's explicit warning that what Lightship was doing was illegal and improper.

these false and fraudulent billing practices. *Cosmas v. Hassett*, 886 F.2d 8, 12-13 (2d Cir. 1989) (fact that import restrictions "apparently eliminated a potentially significant source of income for the company" created a "strong inference" that the directors knew about the restrictions for purposes of pleading scienter); *In re Biopure Corp. Derivative Litig.*, 424 F. Supp. 2d 305 (D. Mass. 2006) (courts impute to a company's officers and directors knowledge of information putting "a company's primary product or service . . . in jeopardy) ; *In re Atlas Air Worldwide Holdings, Inc., Sec. Litig.*, 324 F. Supp. 2d 474 (S.D.N.Y. 2004) ("Knowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued."); *In re Xerox Sec. Litig.*, 165 F. Supp. 2d 208, 222-23 (D. Conn. 2001) ("The problems Xerox was having, the plaintiffs allege, affected the company's 'core operations' . . . . Thus, Defendants were aware of those problems by virtue of their responsibilities within the company, and must either intentionally or recklessly have failed to report the company's true condition to the investing public."); *In re Ancor*, 22 F. Supp. 2d 999, 1005 (D. Minn. 1998) ("The $30 million contract with Sequent was undeniably the most significant contract in Ancor's history. The revenue expected pursuant to the Sequent contract would have been extraordinary for Ancor based on the revenue of its preceding fiscal years . . . . knowledge of the potential incompatibility, within the context of this highly significant contract, may be imputed to Defendants and supports a strong inference of scienter")*;* *In re Gaming Lottery Sec. Litig.,* 1998 WL 276177, at *7 (S.D.N.Y. 1998) (CEO, CFO/controlling shareholder who had responsibility for overseeing the preparation and dissemination of financial reports and access to information provide "strong circumstantial

evidence" of scienter).  *See also Epstein v. Itron, Inc.*, 993 F. Supp. 1314, 1326 (E.D. Wash. 1998) ("As the Second Circuit has noted, the fact that a particular matter constitutes a significant source of income to a company can establish a strong inference that the company and its relevant officers knew of easily discoverable additional facts that directly affected the source of that income.  In other words, facts critical to a business' core operations or an important transaction are generally so apparent that their knowledge may be attributed to the company and its key officers.") (citing *Cosmas, supra*), *abrogated on other grounds by In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir.1999).  *See also Glidepath*, 2007 WL 2176072 (viewing facts in light most favorable to plaintiff and drawing all reasonable inferences, it is "inconceivable" that defendant was unaware of employment status of key player at the time statement was made regarding employment status).[25]

E.    **Control Person Liability**

JP Morgan and Megunticook (but not the Officer Defendants, who were the CEO and COO of Lightship, respectively) assert that the allegations of their "control" of Lightship are insufficient to state a claim under Section 20(a) of the Securities and Exchange Act of 1934, as amended, 15 U.S.C. § 78t(a).

"To state a claim under 20(a) a plaintiff must allege both a primary violation and

---

[25]    In *In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973 (S.D.N.Y. 2004), the "core business doctrine" did not provide a strong inference of scienter because the complicated disputed practice was not alleged to be at the "core" of the business and there was an absence of an allegation of "particular and concrete information" with a "readily quantifiable impact" that could have been available to the defendants.  Here, by contrast, Lightship's $2 to $3 million of inflated Verizon CABS revenue was highly material to its 2005 annual EBITDA of approximately $11.8 million.  Further, Lightship's own billing manager had no trouble determining that the Undisclosed Billing Practices were improper (Compl. ¶¶ 41, 47, 51) and he quantified them for the benefit of Koester and O'Hare.  Compl. ¶¶ 45, 49.

control over the primary violator." *In re BISYS*, 397 F. Supp. 2d at 450. In addition, proving

Section 20(a) liability requires "that the controlling person was in some meaningful sense a

culpable participant in the fraud perpetrated by the controlled person." *Sedona Corp. v.*

*Ladenburg Thalmann & Co.*, 2005 WL 1902780, at *16 (S.D.N.Y. 2005) (Swain, J.) (*quoting*

*Ganino*, 228 F.3d at 170). "Whether a person is a 'controlling person' is a fact-intensive inquiry,

and generally should not be resolved on a motion to dismiss." *Compudyne*, 453 F. Supp. 2d at

829 (*quoting In re Oxford health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 143 (S.D.N.Y. 1999)).

Section 20(a) allegations merely need give notice to defendants pursuant to Rule

8(a) rather than the more particularized requirements of the PSLRA or Rule 9(b). *Parmalat,* 376

F. Supp. 2d at 516 n. 219; *IPO*, 241 F. Supp. 2d at 298, 322-23, 396-97. The allegations of the

Complaint in this case easily surpass those threshold requirements for notice pleading.

### 1.    Primary Violation

Lightship made numerous false and fraudulent representations in the Merger

Agreement. *See, e.g., JHW Greentree Capital*, 2006 WL 1080395, at *4 (making

misrepresentations in a merger agreement constitutes securities fraud).[26]    These primary

violations are adequately pleaded notwithstanding the fact that Lightship is not a named

Defendant. *See* Megunticook Mem. at 30.

*First*, Lightship is actually a party to this action. The Lightship operating

---

[26]    It is not necessary to plead that LHI controlled its operating subsidiary Lightship Telecom LLC. The Merger Agreement containing numerous misrepresentations is signed by LHI and entered into by both LHI and Lightship Telecom LLC. *See* Merger Agreement at 1, 59. Accordingly, Megunticook simply misconstrues the transaction and the fraud by arguing that Plaintiff bears the "extra burden" of showing "that LHI controlled Lightship [LLC]." *See* Megunticook Mem. at 31 n. 28.

company became an indirect but wholly-owned subsidiary of One Communications as a result of the merger.

Second, the majority of courts follow the same approach as this Court in *American High-Income Trust v. AlliedSignal*, 329 F. Supp. 2d 534 (S.D.N.Y. 2004), and do not require the controlled entity to be a party to the litigation. *Id.* at 549 (upholding allegation of control person liability for executives of Breed, a non-party company); *In re CitiSource, Inc. Sec. Litig.*, 694 F. Supp. 1069 (S.D.N.Y. 1988) ("[T]he liability of the primary violator is simply an element of proof of a section 20(a) claim, and . . . liability need not be actually visited upon the primary violator before a controlling person may be held liable for the primary violator's wrong."); *Primavera Familienstiftung v. Askin*, 1996 WL 580917 (S.D.N.Y. 1996) ("[W]hether or not the alleged controlled person is named as a defendant, a plaintiff is required to sufficiently allege primary violations of the securities laws by the controlled person as an element of a section 20(a) claim"); *see also SEC v. Hawk*, 2007 WL 2257321 (D. Nev. 2007) ("the majority of courts to address the issue have concluded that it is not necessary to join the primary violator in an action against a control person.") (collecting cases); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 285 (3d Cir. 2006) ("[T]here is no requirement in the language of either statute that the controlled person be named as a defendant as a predicate to imposing liability upon the controlling individual defendants.").[27]

---

[27]    The two cases cited by Megunticook for the proposition that Lightship must be a Defendant are not only in the minority but do not support dismissal here. In *Griffin v. Paine Webber, Inc.*, 84 F. Supp. 2d 508, 516 (S.D.N.Y. 2000), the court declined to dismiss and instead granted leave to replead to add the controlled entity, which was then in the midst of a bankruptcy, as a "nominal" defendant. The court did not provide its reasons but may have been ensuring that the bankrupt entity would receive notice. That decision contains no reasoning that would in any way require joining Lightship (which is wholly owned by Plaintiff and has adequate notice).

65

2.    **Actual Control**

JP Morgan's and Megunticook's control over the sale of Lightship could not be clearer.  The Complaint is replete with allegations of explicit influence and control over the exact transaction in question by Oppenheimer and Matlack.[28]

JP Morgan and Megunticook owned 54.6 percent and 22.5 percent of Lightship's stock, respectively.  They held four of the six seats on Lightship's Board of Directors.  *See Ganino,* 228 F.3d at 164 n. 7 (ownership of 20 percent or more of voting stock should lead to a presumption that an investor has the ability to exercise significant influence over the investee); *In re Emex Corp. Sec. Litig.*, 2002 WL 31093612, at * 10 (S.D.N.Y. 2002) (45 percent ownership leads to "reasonable inference" of control; board membership together with participation in allegedly false and misleading statements are sufficient to allege control); *Dietrich v. Bauer*, 126 F. Supp. 2d 759, 765-66 (S.D.N.Y. 2001) (control depends on "ability to direct the actions of the controlled person, and not on the active exercise thereof"); *Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.*, 735 F. Supp. 587, 591 (S.D.N.Y.1990) (sole ownership "strongly suggest[s] that they had the potential power to influence and direct the activities of [violator].").[29]

---

Similarly, in *In re Pronetlink Sec. Litig.*, 403 F. Supp. 2d 330 (S.D.N.Y. 2005), the Court simply followed *Griffin* without analysis and the plaintiffs never had reason to challenge the ruling because the Court required addition of a nominal defendant but held that in "all other respects, the Section 20(a) and 20A claims are adequately pleaded."  403 F. Supp. 2d at 337.

[28]    JP Morgan seeks to avoid a finding of control by recasting the fraud as one directed to Verizon based on Lightship's billing practices.  *See* JP Morgan Mem. at 30-31.  Billing practices would be the *gravaman* of a complaint by Verizon.  One Communications' claim for fraud is based on Defendants' lying to it about the source, character and amount of Lightship's revenues.

[29]    *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 308 F. Supp. 2d 249, 274 (S.D.N.Y. 2004), the primary case upon which Megunticook relies, acknowledges that

JP Morgan's and Megunticook's domination of the Board of Directors together with their active involvement in overseeing the financial condition and operations of Lightship also constitutes Section 20(a) "control." Compl. ¶¶ 28, 31. *See, e.g., No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 945-46 (9th Cir. 2003) (majority shareholder with power to seat directors and officers); *In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187, 212 (S.D.N.Y. 2006) (parent who controlled selection of subsidiary's directors and its financial reporting); *In re Parmalat*, 376 F. Supp. 2d at 515-17 (parent/subsidiary relationship coupled with allegations of ownership of majority of stock and subsidiary acting in parent's interest); *The Winer Family Trust v. Queen*, 2004 WL 2203709, *23 (E.D. Pa. 2004) (defendants were involved in corporation's financial matters and the making of material misstatements); *In re Vivendi Universal S.A. Sec. Litig.*, 2004 WL 876050, *9 (S.D.N.Y. 2004) ("The SEC defines 'control' as 'the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.") (*quoting* 17 C.F.R. § 230.405).[30]

---

controlling stock ownership can be sufficient to support inference of Section 20(a) control. In *Flag*, unlike here, there were no allegations of actual control over any fraudulent conduct. Additionally, it should be noted that *Flag*'s definition of "control," which considers insufficient allegations that an individual was the CEO of the primary violator, has not been adopted by other courts in this District.

[30]    JP Morgan relies heavily on *Food & Allied Service Trades Dep't v. Millfield Trading Co.*, 841 F. Supp. 1386, 1391 (S.D.N.Y. 1994), even though in that case, unlike here, the defendant had nothing to do with the day-to-day operations of the company and had no involvement whatever in the "preparation or review" of the allegedly fraudulent statements. JP Morgan, by contrast, was actively involved in operations. Compl. ¶¶ 28, 31. Moreover, JP Morgan, as a specialist in private equity investments, played a direct and active role in the sale process and, in the middle of the diligence process, obtained detailed, inside information about Lightship's CABS billings supplied to them by among others Lightship's president, O'Hare.

- At the very outset, in December 2004, Oppenheimer and Matlack established their influence over and direct participation in the negotiation of the terms of sale of Lightship by participating in the preliminary discussions with CTC.  Compl. ¶ 63.

- In January 2005, when high level CTC representatives began direct negotiations with Lightship, Oppenheimer and Matlack again participated directly in those negotiations.  *Id.* ¶ 70.

- Throughout the diligence period (January through March 2005), Oppenheimer and Matlack participated in numerous interstate conference telephone calls and exchanged emails with CTC personnel conducting due diligence, each at times answering questions on behalf of Lightship and providing information regarding Lightship's billing practices.  *Id.* ¶¶ 71, 84, 86.

- In March 2005, Matlack and Oppenheimer were in direct communication with O'Hare who reported to them on his communications with Koester and also Kreitler on the specific issue of the Verizon CABS bills.  After communicating directly with O'Hare, Oppenheimer and Matlack possessed detailed, inside information regarding Lightship's CABS billings to Verizon and each asserted "control" over the response to CTC's diligence inquiries.

JP Morgan's and Megunticook's control over the sales process was not mere happenstance; it was required by the very nature of the transaction itself.  JP Morgan and Megunticook were cashing out their private equity stakes in Lightship, which they had effectively created and managed.  Thus, the players with the most significant interests in that process, the deal price and insuring that the transaction was consummated, were JP Morgan and Megunticook.  The Merger Agreement and related documents explicitly bind and benefit all the Defendants as Holding Stockholders.  Those documents literally could not have been drafted, negotiated and executed without Defendants' approval and consent.

Contrary to Defendants' protestations, Defendants are the very types of entities for which Section 20(a) liability was designed.  *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1577 (9th Cir. 1990) ("Section 20(a) . . . was intended 'to prevent evasion' of the law" by among

68

others "controlling shareholders and corporate officers, who would not be liable under

*respondeat superior* because they were not the actual employers."; control person liability was

enacted to expand upon common law *respondeat superior* liability).[31]

### 3.    Culpable Participation/Scienter

It is unresolved whether "culpable participation" must be pled or whether the

absence thereof is an affirmative defense in this Circuit.  *See Bisys*, 397 F. Supp. 2d at 451 (not

necessary to plead culpable participation); *Sedona Corp. v. Ladenburg Thalmann & Co.*, 2006

WL 2034663, at *2 (S.D.N.Y. 2006) (Swain, J.) (noting division among the courts).  Assuming

*arguendo* that there is a duty to plead culpable participation, *but see In re Parmalat Sec. Litig.,* ,

375 F. Supp. 2d 278, 307-09 (S.D.N.Y. 2005); *Parmalat*, 376 F. Supp. 2d at 515-16; *Bisys*, 397

F. Supp. 2d at 451 (lack of culpable participation is an affirmative defense to be pleaded and

proved by defendants); *IPO*, 241 F. Supp. 2d at 298, 396 & n.179 (culpable participation is

matter to be proven at trial and may be pleaded in accordance with Fed. R. Civ. Pro. 8(a)),[32] those

Courts that require some form of culpable participation have held that allegations that the

defendant "knew or should have known" or was reckless suffice to state a claim.  *See, e.g., In re*

---

[31]    Defendants' reliance on cases involving mere stock ownership or directorships without actual participation in management and/or the underlying fraud are inapposite.  *See, e.g., Food & Allied Serv. Trades Dep't v. Millfield Trading Co.*, 841 F. Supp. 1386, 1391 (S.D.N.Y. 1994) (outside director did not "possess[] a controlling block of [company's] stock" and was not involved in either day-to-day operationspreparing fraudulent materials); *In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597, at *7 (S.D.N.Y. 2002) (bare allegation of 22 percent ownership insufficient without actual participation "especially given the 43 percent ownership share of Deutsche Telekom by the Federal Republic of Germany").

[32]    JP Morgan cites *Kalin v. Xanboo, Inc.*, 2007 WL 273546, at *12 (S.D.N.Y. 2007), but is silent about that Court's discussion in that decision of the split within the Circuit.  *See* JP Morgan Mem. at 31-32.

*Livent Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 417 (S.D.N.Y. 2001) ("recklessness is the

appropriate minimum standard of culpability that plaintiffs must plead under § 20(a)"); *In re*

*Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597, at *7 (S.D.N.Y. 2002) (pleading

requirements satisfied "where facts are pled with sufficient particularity that a strong inference is

raised that the section 20(a) control person knew or should have known that the controlled person

was engaging in fraudulent conduct."); *Cromer*, 137 F. Supp. 2d at 484 (same); *Dietrich v.*

*Bauer*, 126 F. Supp. 2d 759, 765-66 (S.D.N.Y.2001) (same); *Gabriel Capital*, 122 F. Supp. 2d at

428 (recklessness).  Here, there is no question that each of the Defendants "participated" in the

fraud alleged.  If indeed scienter is an element of "culpability" (*but see In re IPO*, 241 F. Supp.

2d at 182 (equating "culpability" to *actus reus* rather than *mens rea*)), the Complaint easily

surpasses either threshold as set forth above.

      **F.**      **Loss Causation**

          CTC properly alleges both transaction and loss causation.  Defendants'

misrepresentations were intended to, and did cause, CTC directly and proximately to purchase

Lightship.  Had correct and complete information been disclosed to CTC, including that CTC

would be buying a basket of claims for returns of overcharges – CTC would not have purchased

Lightship, let alone at the price paid, which included approximately seven times the annualized

overcharges.  *Id.* ¶¶ 105, 116.  The exact risk concealed by the misrepresentations – that

Lightship's revenues were overstated due to its overcharges – is what has materialized here and

caused CTC's damages.  CTC's losses are not just the discovery of undisclosed liabilities but,

more importantly, the diminished revenue stream from Lightship.  In their Agreement, the Parties

recognized that "losses" also includes "Liabilities," including indebtedness or obligation

"whether known or unknown, asserted or unasserted, absolute or contingent, accrued or

unaccrued, liquidated or unliquidated, and whether due or to become due."  Merger Agreement at

2.  Additionally, Verizon has now counterclaimed in both this action and in 07 Civ. 5440 for

refunds of the very overbilling alleged in the Complaint.

   Accordingly, CTC properly averred both that it would not have entered into the

transaction but for the misrepresentations and "that the damages suffered by [CTC were] a

foreseeable consequence of any misrepresentation or material omission."  *Emergent Capital Inv.

Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 198 (2d Cir. 2003)  (while "purchase-time

value disparity, standing alone, cannot satisfy the loss causation pleading requirement," in that

case plaintiff "specifically asserted a causal connection between the concealed information – *i.e.*,

the executive's history – and the ultimate failure of the venture.").  *See Glidepath*, 2007 WL

2176072, at *17 (loss causation adequately pleaded where alleged concealment related to "reason

the business failed"); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (citations

omitted) (loss must be both foreseeable and also caused by the materialization of the concealed

risk –  the misstatement or omission concealed something that, when disclosed, negatively

affected value); *In re Parmalat*, 376 F. Supp. 2d at 510 (loss causation satisfied "if such conduct

had the effect of concealing the circumstances that bore on the ultimate loss").[33]

   Defendants' reliance on *Dura Pharmaceuticals, Inc. v. Proudo*, 544 U.S. 336

(2005), and similar rulings is misplaced.  In *Dura*, plaintiffs allegedly purchased securities for

more than their "true value" due to defendants' misrepresentations.  *Id.* at 342-43.  Plaintiffs did

---

[33]  "Transaction causation" is satisfied by CTC's alleged reliance on Defendants'
misrepresentations and is not contested by Defendants.  *See Lentell*, 396 F.3d at 172.

not allege that the share price dropped when the truth was discovered. *Id.* at 347. Accordingly, plaintiffs did not allege that they had suffered any actual economic harm. *Id. See also Lentell*, 396 F.3d at 175 ("There is no allegation that the market reacted negatively to a corrective disclosure . . . ").

Here, by contrast, Plaintiff has suffered a loss of revenue proximately caused by the exact matter that was concealed. That loss of revenue results in a reduction in the value of Lightship. See *Emergent Capital*, 343 F.3d at 198 (plaintiffs did show loss causation; holding that allegation of "pump and dump" scheme sufficient to allege loss causation).[34] In public securities cases, the injury occurs when and if the price drops as a result of the discovery of the truth underlying the fraud. *See Dura*, 544 U.S. at 342 ("[A]s a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss .... [I]f ... the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."). In this case, Lightship is not a publicly traded company. The proper measure of damage is what CTC based its purchase price on - - a multiple of EBITDA. CTC purchased a company that purportedly earned a certain annual revenue stream. It is allegedly receiving between $2.4 million and $3.6 million less per year. There can be no question that the harm has materialized. *See generally Merrill Lynch*, 500 F.3d at 183 ("[I]n securities cases there is a presumption that shares are purchased for the purpose of investment and their true value to the investor is the price at which they may later be sold. Allegheny's fraud claim, by contrast,

---

[34]    In *Greenwald v. Orb Commc'ns & Mktg.*, 192 F. Supp. 2d 212, 227 (S.D.N.Y. 2002), the plaintiff did not allege "economic default or other economic loss in respect of the security he purchased, or any disparity between what he paid for that security and whatever he would claim to have been its true value."). That is simply not the case here.

72

involves the sale of a business  . . . ").[35]

      Moreover, the Complaint incorporates by reference a letter, dated November 17, 2006, provided by One Communications to the Stockholders' Committee giving notice of the harm caused by Defendants' fraud.  Compl. ¶ 106.  Verizon has now in this action asserted a counterclaim for recovery of the amounts overcharged.  Accordingly, there is further evidence of loss causation.  *See Suez Equity,* 250 F.3d at 98 (misrepresentation caused loss because "it caused the investors to overestimate the value of their purchase" and because failure was "within the zone of risk created by their misrepresentation"); *In re Parmalat*,  376 F. Supp. 2d at 510 ("In short, the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission.  As the Court noted in its earlier opinion, loss causation does not, as the defendants would have it, require a corrective disclosure followed by a decline in price.") (citations omitted).

    **G.**    **Primary Liability Through Active Participation In A
Scheme To Defraud In Violation Of Rule 10b-5(a) and/or (c)**

      To state a claim based on deceptive practices in violation of Rule 10b-5(a) or (c), there is no requirement of an alleged misleading statement or omission,  Rather, plaintiffs must allege the use of "any device, scheme, or artifice to defraud" or an "act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(a) & (c).  *See Parmalat,* 376 F. Supp. 2d 502-03; *Global Crossing*, 322 F. Supp. 2d at 329; *In re Worldcom Sec. Litig.*, 2003 WL

---

    [35]    Although the allegations in *Merrill* involved common law fraud rather than securities fraud, the Second Circuit's analysis of proximate causation is relevant here because, as in *Merrill*, there is no presumption of resale here.

21488087 (S.D.N.Y. June 25, 2003).  "[A] non-speaking actor who engages in a 'scheme to

defraud' has used or employed a deceptive device within the meaning of § 10(b)."  *Simpson v.*

*AOL Time Warner*, 452 F.3d 1040, 1047 (9th Cir. 2006) (*citing SEC v. Zandford*, 535 U.S. 813,

821-22 (2002)).

> We hold that to be liable as a primary violator of § 10(b) for
> participation in a "scheme to defraud," the defendant must have
> engaged in conduct that had the principal purpose and effect of
> creating a false appearance of fact in furtherance of the scheme.  It
> is not enough that a *transaction* in which the defendant was
> involved had a deceptive purpose and effect; the defendant's *own*
> *conduct* contributing to the transaction or overall scheme must
> have had a deceptive purpose and effect.

*Id*. at 1048.

All of the Defendants are alleged to have engaged in an "act, practice, or course of

conduct which operates or would operate as a fraud" by directly authorizing and concealing

Lightship's billing practices.  The decision to impermissibly revise the city-to-city table to use

smaller LCAs in the middle of the process of selling Lightship had as its dual purposes the sale

of Lightship at an inflated price and the wrongful collection of revenue from Verizon.  JP

Morgan and Megunticook are equally responsible as the "chief architect[s] and executor[s]" of

the decision not to disclose either the discovery of prior period billing errors or the institution of

new billing practices to CTC.  "Conduct by the defendant that does not have a principal

legitimate business purpose, such as the invention of sham corporate entities to misrepresent the

flow of income, may have a principal purpose of creating a false appearance."  *Id*. at 1050 & n. 5.

 *See In re Parmalat,* 376 F. Supp. 2d 502-05 (Rule 10b-5(a) and (c) primary liability predicated

on participation in a "device", "scheme," "artifice," "act," "practice" or "course of conduct" that

74

operates to defraud; bank's "regular factoring and securitization of worthless invoices were deceptive devices or contrivances" under Rule 10b-5(c)); *In re Global Crossing*, 322 F. Supp. at 336 (allegations that defendant "masterminded the misleading accounting," "actively participated" in structuring the transaction, was "intimately involved in all" accounting functions, directly participated in the creation of misleading disclosure "leaves no doubt as to its potential liability as a primary violator under section 10(b)."); *In re Worldcom*, 2003 WL 21488087, at *10 (defendants who contribute to scheme to defraud with scienter can be held liable). *Cf. In re Charter Commc'ns Sec. Litig.*, 443 F.3d 987 (8th Cir. 2006), *cert. granted sub nom. Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 127 S. Ct. 1873 (2007) (distinguished in *Simpson,* 452 F.3d at 1050).

## II.    THE INDEMNIFICATION CLAIM IS ADEQUATELY PLED

Because the nominal selling entity (Lightship) would cease to exist as a source of recovery after Closing, Defendants, as "Holding Stockholders," undertook as a matter of contract to indemnify CTC for breaches of those representations.[36]  The representations and warranties "survive the Closing."  Merger Agreement § 8(a).

> Subject to the limitations set forth in Section 8(f), from and after the Closing Date the Holding Stockholders agree to indemnify, defend and hold harmless CTC, the Surviving Corporation, the Company and their respective directors, managers and officers, stockholders, representatives, agents and employees (collectively the "CTC Indemnified

---

[36]    There is a difference between Megunticook's indemnity exposure and that of the other Defendants.  The parties agreed to escrow a portion of the purchase price to cover certain potential CTC claims for indemnification.  Megunticook does not participate in the escrow. Nonetheless, all Defendants, including Megunticook, are obligated to indemnify CTC for Losses related to fraud or illegal activities by Lightship up to their respective shares of the total purchase price.  Merger Agreement § 8(f)(viii).

> Parties"), from and against all Losses based upon, incurred
> in connection with, arising out of or otherwise in respect of
> (i) subject to the terms of Section 8(a), any inaccuracy in or
> any breach of any representation or warranty of Holding
> contained in this Agreement or in any other Transaction
> Document, and (ii) any breach of any covenant, obligation
> or agreement of Holding contained in this Agreement, any
> other Transaction Document or other document or
> instrument contemplated by this Agreement.

*Id.* § 8(b).  All of the Defendants are Holding Stockholders.  *Id.* § 1 (Holding Stockholders are

"holders as of the date hereof and as of the Closing Date, of all the outstanding shares"); *see also*

Voting Agreement, Sched. I, Lobenthal Decl. Ex. B (identifying shareholders).   All of the

Defendants ratified the Merger Agreement and thereby bound themselves to the indemnity by

executing the Voting Agreement, including Section 3 thereof.  Lobenthal Decl. Ex. B.

Defendant Megunticook's erroneous argument that it was "specifically and

consciously exempted from liability by the Merger Agreement" from the indemnification claim

since it is has no interest in the escrowed funds, *see* Megunticook Mem. at 7-8 & 38, is patently

incorrect.  In the circumstances alleged here involving "fraudulent and illegal" actions, the

indemnification is not limited to the escrowed funds and hence the indemnitees include

Megunticook.  Merger Agreement § 8[f](viii).  Megunticook undertook to indemnify CTC

pursuant the indemnification provisions of the Merger Agreement when Megunticook signed the

Voting Agreement in which it ratified the Merger Agreement.  *TVT Records v. The Island Def*

*Jam Music Group*, 412 F.3d 82 (2d Cir. 2005) ("Under New York law, all writings which form

part of a single transaction and are designed to effectuate the same purpose must be read

together, even though they were executed on different dates and were not all between the same

parties."); *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998) (same); *Bank of New York*

*v. F.D.I.C.*, 453 F. Supp. 2d 82, 99 (D.D.C. 2006) ("transaction documents – as the very name suggests – formed part of a single transaction") (applying New York law) (internal quotations omitted).[37]

JP Morgan's argument that this claim should be dismissed in favor of the 5440 action, *see* JP Morgan Mem. at 58 (inadvertently referring to it as 07 Civ. 3905), has been rendered moot by the parties' Stipulation, and the Court's proposed Order, to consolidate the two actions. In any event, this action was filed first in this Court, and was filed long before the counterclaim in 07 Civ. 5440 in which the Defendants in this case were first brought into that case.

## III.    THIS COURT HAS SUBJECT MATTER JURISDICTION OVER ALL OF THE CLAIMS

### A.    Federal Subject Matter Jurisdiction Over Federal Securities Fraud Claim

JP Morgan argues that to the extent that Plaintiff's claims depend on interpretation of Lightship's Verizon ICA, they must first be brought before the state public utility commissions ("PUC") that approved the Maine ICA. JP Morgan describes this argument

---

[37]    The rule that transaction documents are read together is particularly applicable where, as here, merger clauses in the various documents explicitly refer to the other transaction documents. *See, e.g., United Stated v. Winstar Corp.*, 518 U.S. 839, 862 (1996) ("The SAA thereby incorporated Bank Board resolution No. 81-710, by which the Board had ratified the SAA."); *Hooker Chem. & Plastics Corp. v. International Minerals & Chem. Corp.*, 90 A.D.2d 991 (4th Dep't 1982) (integration clause "renders the other agreements (exhibits) part of the joint venture agreement."); *Huss v. Loftus*, 143 A.D.2d 114 (2d Dep't 1988) (same). The Voting Agreement stated in Section 14 that it "together with the Merger Agreement and the other Transaction Documents constitute the entire agreement among the Parties." The Stockholder Representative Agreement recites in Section 12 that it "together with the Merger Agreement and the other Transaction Documents constitute[d] the entire agreement among the parties." The Confidentiality, Non-Competition and Non-Solicitation Agreement has similar language in Section 6. *See* Lobenthal Decl. Exs. B, C & D.

77

as "jurisdictional" and argues that Courts have uniformly found that they "lack jurisdiction to hear interconnection agreement claims absent a prior state commission determination."  JP Morgan Mem. at 36.  For multiple reasons, this argument is simply wrong, and the cases upon which it relies are wholly inapposite.

Incredibly, the Stockholder Representative Committee ("SRC") – which purports to represent Defendant JP Morgan and other shareholders (but not Megunticook) in the related case of Civil Action Number 07 Civ. 5440, and which is in turn represented by the same counsel that is representing JP Morgan in this action (Robinson & McDonald LLP) – has taken the opposite position in that case.  The SRC – of which Oppenheimer on behalf of JP Morgan was the chairman – brought a complaint in New York Supreme Court (later removed by Plaintiff One Communications to this Court as 07 Civ. 5440) alleging that Defendants JP Morgan, O'Hare and Koester and other SRC members are entitled to release of escrowed funds.[38]  That Complaint specifically alleged that One Communications had raised Federal securities fraud violations arising out of Lightship's "'wrongful and illegal business practices'" in violation of the ICA as a reason for objecting to the release of the escrowed funds.[39]  JP Morgan's counsel sought a

---

[38]    By letter dated December 11, 2007, Defendant JP Morgan notified Plaintiff that Mr. Oppenheimer had been replaced as chair of the SRC.  At the time of the SRC lawsuit, however, JP Morgan's representative Oppenheimer was the chair of the SRC.

[39]    One Communications' actual notice of claim letter specifically referred to violations of the Maine ICA as the predicate for the fraud claim:  The subject conduct (the "Fraudulent Conduct") can be summarized as follows.  First, Acquirer has discovered that Lightship had been charging intrastate access charges rather than reciprocal compensation to Verizon for non-ISP bound traffic originating on Verizon's network, based on local calling areas designed by Lightship, rather than by Verizon.  The Lightship defined local calling areas were significantly smaller than their Verizon counterparts.  This conduct was contrary to the terms of Lightship's ICA and violated general principles of tariff interpretation.  It was also inconsistent with judicial interpretations of the FCC's ISP Remand Order and underlying FCC policy, as well

declaration in New York State Supreme Court -- not before the Maine, Vermont or New

Hampshire PUCs -- that the very same Federal securities fraud claim involving ICA violations

"lacked merit" and that the SRC's members were "entitled to payments from the escrow fund".

Lobenthal Decl. Ex. F (Complaint in SRC action, ¶¶ 26, 39, 45).  Obviously, there was no

impediment to the New York State Supreme Court adjudicating the terms of the ICA for

purposes of the SRC's contract claims; the same is equally true of Plaintiff's Federal securities

fraud and other claims.  The purported "complexity" of the ICA issues certainly do not create any

impediment; Federal courts routinely adjudicate "complex" disputes including those involving

regulated industries.

   JP Morgan is speaking out of both sides of its mouth by arguing that (1) this Court

lacks the ability to adjudicate the Federal securities fraud dispute in 07 Civ. 3905 without first

submitting it to a PUC but (2) the State Supreme Court has the ability to adjudicate the identical

Federal securities fraud dispute in 07 Civ. 5440 without first submitting it to a PUC.

   Even if the Third Circuit's recent *Core* decision did require exhaustion of

administrative remedies in this context (although as explained below it does not), that

requirement is only "an affirmative defense rather than a jurisdictional bar" and was waived in

this case.  *Southern New England Tel. Co v. Global NAPS, Inc.*, 2007 WL 3102034 (D. Conn.

Oct. 19, 2007).  Both of the parties to the ICA have made their claims in this proceeding and

Defendant JP Morgan commenced the SRC suit in New York State Supreme Court. *See id.* at

*13-14 (litigants "forfeited their right to assert this defense because they have forgone extensive

---

as the Maine PUC's orders.  Lobenthal Decl. Ex. E (letter of James P. Prenetta, Jr., dated
November 17, 2006).

opportunities to litigate it").

Defendants cannot cite a single case remotely standing for the proposition that, in this procedural posture, where both parties to the ICA agree that the case does not require adjudication before the PUC and where the non-party to the ICA who is asserting PUC jurisdiction has already commenced a non-PUC proceeding seeking adjudication of the same issue, a Federal court lacks jurisdiction and we are aware of no such case. Here, both of the parties to the ICA (Verizon and Lightship) claim there was an improper billing by Lightship (Verizon Counterclaim ¶¶ 20, 22 (improper billing of calls), 31 (improper billing of VNXX), 33 (improper billing of transit)) and hence there is no dispute to be referred to a PUC. The only way that the ICA is even relevant is as proof of (or an affirmative defense to) the Federal securities and other claims asserted – which Plaintiffs surely have the right to vindicate. As discussed below, this is no different than when a Federal securities law claim turns on the interpretation of non-Federal law.

### 1.    Federal Courts Have Exclusive Jurisdiction

The fundamental error in the Defendants' argument lies in its bewildering contention that this Court somehow lacks subject matter jurisdiction over a Federal securities fraud claim because the fraud involved matters subject to Federal and state telecommunications law. No provision of Federal law divests this Court of jurisdiction over securities fraud issues simply because they may involve state-regulated telecommunications revenue.

Under 28 U.S.C. § 1331, the district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." The Securities and Exchange Act "vests in federal courts *exclusive jurisdiction* over claims alleging violations of the

securities laws and actions 'brought to enforce any liability or duty created by [the Exchange Act] or the rules and regulations thereunder.'"  *D'Alessio v. NYSE, Inc.*, 258 F.3d 93, 104 (2d Cir. 2001) (quoting 15 U.S.C. §78aa).  Plaintiff's Federal securities claims "arise under" Federal law and accordingly this Court has jurisdiction over them and also over Plaintiff's common law causes of action that "are so related to" the federal claims "that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. §1367.

The fact that Plaintiff's securities claims *also* implicate issues of state or Federal telecommunications law does not change the jurisdictional analysis.

> Where a case involves a nonconstitutional federal issue . . . the necessity for deciding which depends upon the decision on an underlying issue of state law, the practice in federal courts has been, when necessary, to decide both issues.

*Propper v. Clark*, 337 U.S. 472, 490 (1949).  This is particularly true where, as here, the underlying issue is *not* purely one of state law.[40]  In this context, "[t]he resolution of each issue need not depend completely upon an interpretation of federal law" in order for a federal court to have jurisdiction.  *BellSouth*, 317 F.3d at 1278 ("For purposes of 28 U.S.C. § 1331 jurisdiction, all that is required is that there be an arguable claim under federal law," and a federal court may properly review "any related issue of state law under its pendant state jurisdiction.").

Against this backdrop, JP Morgan's argument essentially reduces to the claim that even though this Court would *otherwise* have jurisdiction under Section 1331, the

---

[40]    State commissions like the Maine PUC operate under the Telecommunications Act as "deputized federal regulator[s]" authorized to exercise regulatory power and ensure compliance with *federal law*.  *See BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Services*, 317 F.3d 1270, 1277-78 (11th Cir. 2003) (quoting *MCI Telecomms. Corp. v. Illinois Bell Tel. Co.*, 222 F.3d 323, 344 (7th Cir. 2000)).

Telecommunications Act of 1996 , 47 U.S.C. § 252 (the "1996 Act"), *divested* this Court of that

jurisdiction.  The Supreme Court squarely rejected this reading in *Verizon Md., Inc. v. Pub. Serv.*

*Comm'n of Md.*, 525 U.S. 635 (2002).  In the case below, the Fourth Circuit had held – in a now-

reversed case upon which JP Morgan nonetheless purports to rely, *see* JP Morgan Mem. at 36

n.23 – that state courts (rather than Federal courts) should review state commission orders

relating to ICAs.[41]  However, the Supreme Court disagreed, holding that "even if § 252(e)(6) [47

U.S.C. § 252(e)(6)] does not *confer* jurisdiction [in the district courts], it at least does not *divest*

the district courts of their authority under 28 U.S.C. § 1331."  *Verizon*, 525 U.S. at 642.

Most of the other cases cited by JP Morgan concern the same irrelevant issue

addressed in *Bell Atlantic* – the extent to which Section 252(e)(6) of the Communications Act of

1934 as amended by the 1996 Act, confers jurisdiction on Federal district courts to review state

PUC orders concerning the formation or enforcement of ICAs in disputes between the parties to

the ICA.[42]  But this case is not an action either appealing the state commission approval of an

---

[41]      *Bell Atlantic Maryland Inc. v. MCI Worldcom*, 240 F.3d 279, 304 (4th Cir. 2001),
*rev'd Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 525 U.S. at 642.

[42]      *See P.R. Telephone Co. v. Telecommunications Regulatory Board of P.R.*, 189
F.3d 1 (1st Cir. 1999) (state commission order not reviewable in federal court because, under §
252, "it was insufficiently linked to the parties' interconnection agreement"); *Bell Atl. Md., Inc.
v. MCI WorldCom*, 240 F.3d 279, 304 (4th Cir. 2001) ("§256(e)(6) confers jurisdiction on federal
courts to review State commission 'determinations' made under §252 'to determine whether the
agreement . . . meets the requirements of section 251 and this section [252].'"); *Southwestern
Bell Tel. Co. v. Pub. Util. Comm'n of Tx.*, 208 F.3d 475, 482-83 (5th Cir. 2000) (holding that
under § 252(e)(6) a federal court may review a state commission action with respect to an ICA
for compliance with both state and federal law); *Ill. Bell Tel. Co. v. Worldcom Techs., Inc.*, 179
F.3d 566, 573 (7th Cir. 1999) (finding jurisdiction under §252(e)(6) to review Commission order
for compliance with federal law); *Iowa Utilities Bd. v. FCC*, 120 F.3d 753, 804 & n.24 (8th Cir.
1997) ("[W]e believe that the enforcement decisions of state commissions would  . . . be subject
to federal district court review under subsection 252(e)(6)."); *Southwestern Bell Tel. Co. v.
Brooks Fiber Comm'ns of Okla., Inc.*, 235 F.3d 493, 497 (10th Cir. 2000) (finding jurisdiction

ICA or for enforcement of an ICA under 47 U.S.C. § 252(e)(6).  *None* of those cases even

remotely involves Federal District Courts being divested by the 1996 Act of their exclusive

Federal subject matter jurisdiction over Federal securities laws claims and at least one suggests

the contrary -- that Federal Courts would properly have jurisdiction over claims raised pursuant

to 28 U.S.C. § 1331.[43]  The cases cited by JP Morgan are simply not pertinent to this Court's

---

under §252(e)(6) to review state commission decisions interpreting or enforcing ICAs).

       The cited district court cases are similarly irrelevant, addressing solely the extent of the grant of federal subject matter jurisdiction under § 252(e)(6) of the Telecommunications Act, rather than under 28 U.S.C. § 1331.  *See Contact Commc'ns, v. Qwest Corp.*, 246 F. Supp. 2d 1184, 1188-90 (D. Wyo. 2003) (in a suit between parties to an ICA, assessing jurisdiction under § 252(e)(6) over claims for breach of an ICA); *Intermedia Commc'ns, Inc. v. BellSouth Telecomms., Inc.*, 173 F. Supp. 2d 1282, 1286-87 (M.D. Fla. 2000) (in a dispute between the two parties to an ICA, claims for breach of an ICA must be presented to the state commission before a federal court has jurisdiction over the matter pursuant to § 252(e)(6)); *Atl. Alliance Telecomm., Inc. v. Bell Atl.*, 2000 U.S. Dist. LEXIS 19649, at *8-12 (E.D.N.Y. Apr. 19, 2000) (claims regarding ICA negotiations between the parties thereto must be presented to state commissions for arbitration under § 252(b) before a federal court has jurisdiction pursuant to § 252(e)(6)); *Bell Atl.-Va., Inc. v. WorldCom Techs. of Va., Inc.*, 70 F.Supp.2d 620, 625-26 (E.D.Va. 1999) (in a dispute between the parties to an ICA, claims for breach of an ICA must be presented to the state commission before a federal court has jurisdiction over the matter pursuant to § 252(e)(6)); *AT&T Comm'ns of Ohio, Inc. v. Ohio Bell Tel. Co.*, 29 F. Supp. 2d 855, 856-57 (S.D. Ohio 1998) (same); *AT&T Comm'ns Of Illinois, Inc. v. Illinois Bell Tel. Co.*, 1998 U.S. Dist. LEXIS 12925, at *10-14 (N.D. Ill. Aug. 17, 1998) (in a dispute between parties to an ICA, claims requesting interpretation of ICA must be presented to the state commission before a federal court has jurisdiction over the matter pursuant to § 252(e)(6)); *Indiana Bell Tel. Co. v. McCarty*, 30 F. Supp. 2d 1100, 1103-04 (S.D. Ind. 1998) (counterclaims by one party to an ICA requesting interpretation of ICA in response to an appeal by the other party of a state commission's approval of the same ICA must be presented to the state commission before a federal court has jurisdiction over the matter pursuant to § 252(e)(6)).

      [43]     Indeed, only one – *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., Inc.*, 317 F.3d 1270, 1278 (11th Cir. 2003) – even addressed Federal court jurisdiction under § 1331 at all.  As discussed above, that case actually held the Federal courts *can* review whether a state commission order violates Federal law "as well as any related issue of state law under its pendant state jurisdiction."

subject matter jurisdiction over this Federal securities law case pursuant to 28 U.S.C. § 1331 and the Securities Exchange Act.

Indeed, apart from Eleventh Circuit's *BellSouth* decision – which, as discussed above plainly *supports* this Court's jurisdiction to hear Plaintiff's claims – the only circuit court decision cited that even addresses Federal jurisdiction under § 1331 is *Core Communications, Inc. v. Verizon Pennsylvania, Inc.*, 493 F.3d 333 (3d Cir. 2007). *Core* is plainly distinguishable here, as *Core* again involved a dispute between the two parties to a contract. In *Core*, the plaintiff sued Verizon in Federal court for breach of an ICA. The district court determined that "*it had federal question and diversity jurisdiction over the action* under 28 U.S.C. §§ 1331 and 1332," but that *Chevron* deference to the FCC's ruling in *Starpower Communications, LLC*, 15 F.C.C.R. 11277 (2000), required the plaintiff to seek enforcement of the ICA before the PUC before resorting to the Federal courts. *See Core Commc'ns, Inc v. Verizon Pa., Inc.*, 423 F. Supp. 2d 493, 500 (E.D. Pa. 2006) (emphasis added). The Third Circuit agreed, observing first that "[t]he precise claim at issue in this appeal . . . is Core's claim for breach of the [ICA]." *Core*, 493 F.3d at 340. Accordingly, the court held, due regard for *Starpower* required the conclusion that "interpretation and enforcement actions that arise after a state commission has approved an interconnection agreement must be litigated in the first instance before the relevant state commission." *Id.* at 344.

But unlike *Core* – or any of the other cases on which JP Morgan relies – this case simply is *not* "a pure claim for breach of an interconnection agreement." *Id.* at 341. This is Federal securities fraud case arising under the Securities Exchange Act which vests exclusive original jurisdiction in this Court. State commissions do not have original subject matter

jurisdiction over Federal securities claims.  JP Morgan cites no law suggesting that they do.

   For the same reason, the FCC's *Starpower* decision is inapplicable here.  In that proceeding, the FCC found only that "a dispute arising from [ICAs] and seeking interpretation and enforcement of those agreements is within the states' 'responsibility' under section 252."  15 F.C.C.R. at 11279.  The dispute in the present case arises under Federal securities law and thus is not within the states' responsibility.  The Third Circuit recognized this principle in *Core* by flatly rejecting the dismissal of Core's non-ICA claims, including a fraud claim and claims raised under the 1996 Act.  *See Core*, 493 F.3d at 344-45 (appellate court order); *Core*, 423 F. Supp. 2d 493, 496 (district court order, identifying claims).[44]

> ### 2.   This Court's Jurisdiction Is Not Contingent on Defendants' Bringing An Action Before The Maine, Vermont or New Hampshire PUCs

   The peculiarity of JP Morgan's "jurisdictional" argument is underscored by its claim that before *Plaintiff* can litigate Federal securities fraud claims in Federal court, "all claims based on 'Billing Practices'" must "first be presented *by Verizon* to the state commissions."  JP Morgan Mem. at 35.  (emphasis added).  JP Morgan cites no case in which a plaintiff's right to redress under Federal law has *ever* depended on whether some *other* private party decides to

---

[44] As JP Morgan notes, Plaintiff's subsidiary Choice One has argued (correctly) in another case that state commissions have jurisdiction over interconnection disputes between the parties to an ICA.  See JP Morgan Mem. at 40 (citing *Verizon New York v. Choice One Communications of New York*, 499 F.Supp.2d 326 (S.D.N.Y. 2007)).  While JP Morgan shrieks that Plaintiff has taken a contrary position in this litigation, JP Morgan is again comparing apples and oranges.  The *Choice One* case involved an interconnection dispute between the parties to the ICA.  As discussed in n. 41 and accompanying text, such disputes belong before State commissions in the first instance, and JP Morgan has presented a long list of decisions so holding.  As explained in great detail in the text, unlike the *Choice One* case, this is not merely a dispute between parties to the interconnection agreement over its terms; Plaintiff in this case has presented securities law claims over which this Court unquestionably has jurisdiction.

bring some *other* claim before some *other* tribunal – and for good reason.  Such a regime – under which a private party's ability to vindicate its rights is contingent on the unrelated judgments and priorities of some other private party – would offend the rule of law fundamentally.[45]

This case in fact demonstrates why Plaintiff's ability to vindicate its rights under the Securities and Exchange Act cannot be predicated upon either Verizon or Defendants bringing an action before one or more PUCs.  Plaintiff has suffered injury because of the violations of the Securities and Exchange Act regardless of whether or not there could have been a PUC proceeding.

We note that if *arguendo* there were issues in this case that could or should be decided by a State commission, at most this Court would refer those issues while keeping jurisdiction over the Federal securities fraud claims.  *See Core*, 493 F.3d at 344-45 (appellate court order).  *Dismissing* Plaintiff's Federal claims while awaiting State commission action on issues relating to ICAs would, as a result of the statute of limitations, unfairly eliminate Plaintiff's claims.[46]  Again, JP Morgan provides no precedent for such an approach.

---

[45]    *Cf. Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936) ("Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both."); *Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.*, 339 F.2d 440, 441-42 (2d Cir. 1964) (quoting *Landis*).

[46]    *Cf. TON Services, Inc. v. Qwest Corp.*, 493 F.3d 1225 (10th Cir. 2007) ("Dismissal of an action pending primary jurisdiction referral is appropriate when the parties will not be prejudiced or 'unfairly disadvantaged.'  Where damages are sought and the relevant statute of limitations might preclude relief, however, a stay is likely to be preferable.").  Although it is certainly not what it says, perhaps JP Morgan could be understood to argue that this Court could somehow defer to the State commissions on specific telecommunications *issues* without dismissing outright.  That possibility is, however, difficult to square with JP Morgan's argument that this Court should *dismiss* Plaintiff's securities fraud claims pending some sort of State commission action because subject matter jurisdiction has been diverted and is absent.

JP Morgan's "jurisdictional" argument is also difficult to square with the fact that Defendants are not parties to any ICA.  In each of the cited cases, the courts were presented with an actual contract dispute between the parties to an ICA and were obliged to consider which forum (Federal court or PUC) should address that dispute.  Those cases provide no guidance whatsoever here because none of the Defendants is a party to the Maine ICA.  Indeed, the parties to the Maine ICA – Lightship and Verizon – *agree* that Defendants' actions should be adjudicated in Court and Defendants waived their right to proceed before a PUC (if they had one) by commencing the mirror-image SRC lawsuit in New York State Supreme Court.  JP Morgan's cases do not support the illogical proposition that the Maine PUC has jurisdiction to interpret an ICA merely to accommodate the preferences of a nonparty who wishes to avoid Federal jurisdiction and may prefer some other forum.

### 3.    This Court Is Capable Of Adjudicating The Claims Asserted (Which Are Not Nearly As Complex As JP Morgan Suggests)

Both to establish their purported absence of scienter and also to obtain dismissal of this entire case for purported lack of subject matter jurisdiction, JP Morgan vigorously contends that the Federal securities fraud claims are so "complex" and "ambiguous" that this Court requires the assistance of the Maine PUC to figure them out.  That is nonsense.

Federal courts address complicated issues of state law all the time.  *See, e.g., Propper*, 337 U.S. at 490 (although "[t]he state law issue . . . was concededly difficult and unsettled" and "a method may have existed for obtaining an adjudication on the issue from the Illinois courts," the federal courts had properly addressed and decided it).  That is particularly true here, because the 1996 Act is Federal law at its core and the Federal courts are charged with

overseeing this Federal regime.  *See Verizon Md.*, 535 U.S. at 642; *see also Verizon Md., Inc. v. Global NAPS, Inc.*, 377 F.3d 355, 365 (4th Cir. 2003) ("State utility commissions have a role in this regime, but that role is subject to federal oversight.").

Despite JP Morgan's best efforts to cast this disagreement as an impenetrable fog of arcane communications law and unresolved state policy controversies, the issues in this case are no more – and are in fact probably far less – complicated than in the typical case in which a Federal court reviews the accounting or disclosure practices of modern corporations or a PUC's enforcement decision under an ICA.

*The ICA's Requirement to Use Verizon's Local Calling Areas to Determine*
*When Reciprocal Compensation/ISP-Bound and Intrastate Access Charges Apply*

Defendant JP Morgan betrays either a fundamental misunderstanding or disingenuousness by suggesting that the Maine ICA language requiring application of "Verizon's local calling areas" covers only the classification of "exchange access traffic" not " reciprocal compensation traffic".  *See* JP Morgan Mem. at 43-44.   Exchange access traffic and reciprocal compensation traffic are two sides of the same coin: if standard voice traffic doesn't fall into the first basket, it necessarily falls into the second.  Suggesting that the Maine ICA's requirement to use Verizon LCAs applies to exchange access traffic but not reciprocal compensation traffic is like insisting that sunset marks the end of the day but not necessarily the beginning of the night. In any event, it is the improper billing of intrastate access charges that is at issue.

The Maine ICA expressly made clear that traffic between Verizon's LCAs in Maine was subject to intrastate access charges and not reciprocal compensation.  The ICA's definition of "Reciprocal Compensation Traffic" states *both*:

- "[t]he determination of whether Telecommunication traffic is Exchange Access or Information Access shall be based upon Verizon's local calling areas as defined by Verizon" and

- "Reciprocal Compensation Traffic does <u>not</u> include: . . . (2) traffic that does not originate and terminate within the same Verizon local calling area as defined by Verizon."

Robinson Aff. Exs. 6 & 7 (*Amendment No. 1*, at Appendix B (definition of Reciprocal Compensation Traffic)).[47]  Yet, as the Complaint alleges, by manipulating the city-to-city table to use smaller LCAs, Defendants caused Lightship to bill Verizon intrastate access charges for calls within the same Verizon local calling area.  Compl. ¶ 38-52.  Although Defendants claim that nothing required Lightship to adjust its LCAs for intercarrier compensation purposes when Verizon did so (JP Morgan Mem. at 48), they fail entirely to reconcile this claim with the express language of the ICA.[48]

---

[47]    Defendants also incorrectly suggest that the exclusion of "Toll Traffic" from the definition of reciprocal compensation is inconsistent with the exclusion of traffic between Verizon local calling areas.  In fact, it is consistent.  While the ICA defines Toll Traffic as "Traffic that is originated by a Customer of one Party on that Party's network and terminates to a Customer of the other Party on that other Party's network and is not Reciprocal Compensation Traffic, Measured Internet Traffic or Ancillary Traffic," the term "toll traffic" is commonly understood to mean long distance service. *See e.g.* 47 U.S.C. § 153(48)(defining "telephone toll service" to be "telephone service between stations in different exchanges for which there is made a separate charge not included in contracts with subscribers for exchange service").  Thus, the exclusion of "Toll Traffic" from the definition of "Reciprocal Compensation Traffic" reinforces that traffic within a local calling area is subject to reciprocal compensation and not intrastate access.

[48]    Defendants' citation to Attachment 1 § 4.4 also fails to support their claim that the ICA does not require use of Verizon's LCAs for determining intercarrier compensation.  Section 4.4 by its express terms reserves the right of each party to determine how it will charge its own Customers (*i.e.*, their end user customers, *see* ICA Appendix B § 2 (definition of "Customer")), for calls, not how it will charge the other interconnected carrier (a "Party," not a "Customer" under the ICA).  This Section is irrelevant to determining the appropriate amount of intercarrier compensation.

89

Further, Defendants caused Lightship to bill Verizon intrastate access charges for calls within the same Verizon LCA even though Maine law makes clear that Lightship cannot charge access charges for terminating calls that originate and terminate within the same local calling area. Access charges are specifically defined by Maine PUC rules as "those charges and rates . . . that an interexchange carrier . . . must pay in order to provide intrastate interexchange service in Maine." 65-407 CMR Chapter 280, § 2(A) (emphasis supplied).[49] Maine's rules define "interexchange service" as "the provision of facilities or services for the carriage of interexchange traffic."

Defendants' attempt to invent ambiguity as to the scope of Verizon's LCAs also fails. *See* JP Morgan Mem. at 47-48. Maine's rules explicitly set the boundaries of Verizon's Basic-Service Calling Area – which the rules expressly defined as "the local (non-interexchange) calling area" of the caller's home exchange. 65-407 CMR Chapter 204, § 2(A). The rules make clear that this is the area covered by flat-rate calling under the Premium option: "the BSCA includes all of the exchanges that are included in the calling option with the largest flat-rate calling area." *Id*. Thus, by definition under the Maine rules, calls within the BSCA are not "Extended Local Calling Scope Arrangements" as defined in the ICA, because they do not "provide a Customer a local calling scope . . . outside the Customer's basic exchange serving area." Moreover, because calls within the BSCA are by definition "non-interexchange," intrastate access charges cannot apply.

*Lightship's VNXX Billings*

---

[49]     *See also* 65-407 CMR Chapter 280 §§ 7-8 (requiring interexchange carriers to pay access charges, and LECs to file access rates with the PUC).

JP Morgan engages in a similar effort to befuddle the Court in connection with the VNXX traffic issue here.[50]  Plaintiff's Complaint alleges that Lightship provided VNXX service to its ISP customers, which enabled remote dial-up Internet users to dial in without incurring long-distance charges.  *See* Compl. ¶¶ 24, 53. In 1999, the Maine PUC specifically ruled that a VNXX service (which the Commission described as "equivalent to foreign exchange service") was not a local exchange service, but was an "interexchange" service provided by the carrier serving the ISP, rather than the carrier serving the originating caller.  *Investigation Into Use of Central Office Codes (NXXs) by New England Fiber Communications, LLC d/b/a Brooks Fiber*, Maine PUC Docket Nos. 98-758, 99-593, 1999 Me. PUC LEXIS 475, *21-*23 (June 22, 1999) ("*Brooks Fiber*")("[T]raffic that originates in areas to which Brooks's non-Portland area CO codes are assigned and that terminates in Brooks's Portland area exchange is interexchange traffic.")  The PUC then prohibited the use of local telephone numbers to provide VNXX service. *Investigation Into Use of Central Office Codes (NXXs) by New England Fiber Communications, LLC d/b/a Brooks Fiber*, Maine PUC Docket Nos. 98-758, 99-593, 2000 Me. PUC LEXIS 487, at *13 (June 30, 2000) ("*Brooks Fiber*") ("NXX codes are to be used only for the purpose of providing facilities-based local exchange service.")  Lightship's provision of this service thus violated unambiguous State law.  *See* Complaint at ¶ 53.  In addition, because Lightship was the interexchange carrier with respect to such traffic, Lightship could not bill Verizon intrastate

---

[50]     Lightship offered a service in which a customer could obtain a telephone number with a prefix (the "NXX" code) associated with a local calling area in which the customer is not physically located.  Calls between the customer and end users located in that distant local calling area appear to be "local" for billing purposes.  This service is known as "virtual NXX" or "VNXX" because the customer has only a virtual presence, as opposed to a physical presence, in the LCA.  *See* Compl. ¶¶ 22-23.

access charges with respect to such traffic.  *See* 65-407 CMR Chapter 280, §§ 2(A), 7, 8; *see also*

*Brooks Fiber 1999 Order*, *13; *Global NAPS, Inc. v. Verizon New England, Inc.*, 444 F.3d 59,

72 (1st Cir. 2006) (Federal law does not preempt state regulatory authority over the charges

applicable to interexchange VNXX ISP-bound traffic).

       Faced with clear state law and unambiguous allegations that Lightship violated it,

JP Morgan veers off on irrelevant tangents in an effort to gin up complexities and imagined state

policy controversies.  *See* JP Morgan Mem. at  49-52.  It argues that regulation of VNXX

presents an ongoing controversy in Maine because the Maine PUC terminated a VNXX-related

investigation in 2005.  *See id.* at 50 & n.30.  But, the decision to close that investigation has no

bearing on the underlying law unambiguously set forth in the Maine PUC's *Brooks Fiber*

decision, *supra.*

*Double-Billing*

       Without any ambiguity whatsoever, the Complaint alleges that Lightship engaged

in double-billing "[w]ith respect to local traffic that originated on the network of a third party

carrier, transited Verizon's network, and then terminated on Lightship's network."  Compl. ¶ 53.

For this category of traffic, "Lightship improperly billed both Verizon and also the third party

carrier for the same reciprocal compensation charges."  *Id.*  Double-billing is fraudulent whether

it arises in the telecommunications context or elsewhere.

       Plaintiff's allegations are so clear, in fact, that it is hard to understand what JP

Morgan is attempting to argue in its motion.  The motion presents a host of hypothetical

questions that, according to JP Morgan, would help clear things up, *see* JP Morgan Mem. at 52,

but there is nothing murky about the allegations.  With respect to a very specific subcategory of

92

traffic (*i.e.*, "local traffic that originated on the network of a third party carrier, transited Verizon's network, and then terminated on Lightship's network"), Lightship billed two separate parties for the same fees. This billing practice unlawfully inflated Lightship's revenues and EBITDA and defrauded Plaintiff.

> **B.      Supplemental Jurisdiction Over Counts II Through VI**

District Courts have supplemental jurisdiction "'over all other claims that are so related to claims in the action with [the courts'] original jurisdiction that they form part of the same case or controversy.'" *Nelson*, 173 F. Supp. 2d at 169 (*quoting* 28 U.S.C. § 1367(a)). Because the other counts of the Complaint arise from the same nucleus as the Federal securities fraud claims, this Court should opt to exercise jurisdiction over those counts. *See Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 359 n. 67 (S.D.N.Y. 2007) ("While plaintiffs do not assert federal claims against these defendants, the Court has supplemental jurisdiction over the aiding and abetting claims pursuant to 28 U.S.C. § 1367, as they are intimately related to and involve substantially the same facts as the federal securities fraud claims . . . ").

## IV.      THE COMMON LAW FRAUD CLAIM IS ADEQUATELY PLED

It is black letter law that to establish a claim for fraud, "the plaintiff must prove a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996) (*citing Channel Master Corp. v. Aluminum Ltd. Sales*, 4 N.Y.2d 403 (1958); *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 318

(1995)). "The pleading requirements for common law fraud under New York law, while essentially the same as . . . securities fraud claims under Section 10(b) and Rule 10b-5, are subject to the particularity standards of Fed. R. Civ. P. 9(b), rather than the more exacting standards of the PSLRA." *Transit Rail, LLC v. Marsala*, 2007 WL 2089273, at * 9 (W.D.N.Y. 2007) (*citing Cyber Media Group, Inc. v. Island Mortgage Network, Inc.*, 183 F. Supp. 2d 559, 580 (E.D.N.Y.2002)); *see also Compudyne*, 453 F. Supp. 2d at 831-32 (same). Accordingly, the common law fraud claims should be sustained for the same reasons the securities fraud claims should be sustained.

The common law fraud claims should be sustained for an additional reason as well. Under New York law, Defendants who aid and abet fraud are also liable. "The elements of a claim for aiding and abetting common law fraud are "(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud.'" *UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 502 (S.D.N.Y. 2003) (Swain, J.) (*quoting Gabriel Capital*, 94 F. Supp. 2d at 511). Accordingly, even assuming *arguendo* that one or more of the Defendants had not directly participated in making the misrepresentations at issue here, such Defendant would still be liable for the assistance he or it provided to the fraudulent scheme. It is beyond question that all of the Defendants participated in concealing Lightship's billing practices during CTC's diligence; that concealment is actionable as aiding and abetting. *UniCredito*, 288 F. Supp. 2d at 502 ("Substantial assistance exists where (1) a defendant affirmatively ... conceals ... the fraud ...") (*citing McDaniel v. Bear Stearns & Co., Inc.*, 196 F. Supp. 2d 343, 352 (S.D.N.Y. 2002)).

94

**V.    THE NEGLIGENT MISREPRESENTATION CLAIM IS ADEQUATELY PLED**

The Complaint meets the New York requirements for pleading negligent misrepresentation.  As discussed above, Defendants made false statements to CTC in a context where it was obvious to all concerned that CTC would be relying upon those statements in deciding whether to close the transaction.  Accordingly, CTC has met the first requirements for pleading its claim.  *Heard v. City of New York*, 82 N.Y.2d 66 (1993) ("There must be knowledge or its equivalent that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that if false or erroneous he will because of it be injured in person or property.").

Defendants focus on Plaintiff's obligation to prove that Defendants had a duty to speak with care, what is sometimes referred to as a "special relationship."  *Id.* at 74 ("the relationship of the parties, arising out of contract or otherwise, must be such that in morals and good conscience the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care").  Defendants are mistaken in implying that a special relationship cannot exist in the context of buyers and sellers.  Courts have held that sellers can be held to duty of care in situations where they had reason to know that the buyer was relying on the accuracy of their representation.  *Kimmell v. Schaefer*, 89 N.Y.2d 257 (1996); *Suez Equity,* 250 F.3d at 102.  In *Kimmell*, defendant was the Chairman of the board of directors of a company seeking investors in its cogeneration plants.  *Kimmell*, 89 N.Y.2d at 260-61.  Defendant approached plaintiffs and convinced them to invest in the project based in part on false revenue projections.  *Id.* at 262.  Defendant was liable for negligent misrepresentation even though he did not know that projections were inaccurate because plaintiffs were found to have reasonably relied

95

on defendant's representations.  *Id.* at 264-65.  The situation here is indistinguishable from those

in *Kimmell* and *Suez*.  Defendants made representations about Lightship's business knowing that

CTC would rely on those representations.  Accordingly, Defendants' statements were "deliberate

representations that give rise to a duty to speak with care."  *Suez*, 250 F.3d at 103 (internal

quotations omitted).

Defendants' claim that the Martin Act precludes liability for negligent

misrepresentation is no more convincing and is unsupported by the very precedent they cite.  In

*Nanopierce Technologies, Inc. v. Southridge Capital Management LLC*, 2003 WL 22052894

(S.D.N.Y. 2003), the court held that claims regarding sales of securities outside New York State

do not fall within the ambit of the Martin Act.  *Nanopierce*, at *5-6 ("[T]he shadow cast by the

Martin Act against the common law background conforms precisely to the outlines of the Martin

Act itself, and therefore does not eclipse claims based on out-of-state transactions . . . . New

York courts did not intend to eviscerate New York's common law causes of action, except where

those causes of action fell squarely within the range of cases on which the Attorney General has

been empowered to act."); *see also Sedona Corp. v. Ladenburg Thalmann & Co.*, 2005 WL

1902780, at *21 (S.D.N.Y. 2005) (Swain, J.) ("a finding 'that the transactions were . . . 'within or

from' New York, [is] a nexus expressly required under the Martin Act") (*quoting Lehman Bros.*

*Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 162

(S.D.N.Y.2001)).

This transaction involved the sale of securities of a Delaware company with its

business centered in New England.  Plaintiff is a Delaware corporation with its principal place of

business in Massachusetts.  Defendants cite to no event recounted in the Complaint that is

alleged to have occurred in New York.  Megunticook has even argued that its ties are so

attenuated that there is no personal jurisdiction over it in New York.  Megunticook Mem. at 38-

39.  Accordingly, the Martin Act does not apply.  At most, Defendants may be able to argue that

there is a factual question about the applicability of the Martin Act to be determined at a later

stage of the proceeding.[51]

## VI.    THIS COURT HAS PERSONAL JURISDICTION OVER MEGUNTICOOK

Megunticook acknowledges that in this Circuit minimum contacts within the

United States is sufficient to support personal jurisdiction in securities cases but argues against

such jurisdiction anyway.  *See* Megunticook Mem. at 38-39.  Obviously, there is no need for the

Court to dwell on an argument raised merely for the purpose of preserving an issue for appeal.

Worse, Megunticook's argument is not just legally unsupported but is also founded on yet

another misreading of the Merger Agreement and its related documents.

Megunticook's recurring theme is that Megunticook was a stranger to the Escrow

Agreement in which parties agreed to New York jurisdiction.  *See* Megunticook Mem. at 9

("Including Megunticook was, quite literally, an afterthought by Plaintiff, two years after CTC

had deliberately excluded them from the Merger Agreement . . .").  Megunticook is simply wrong

that it has "never submitted (through the Escrow Agreement, or any other document) to the

_____

[51]    We also note that this Court has declined to follow the precedent of *Scalp & Blade, Inc. v. Advest, Inc.*, 722 N.Y.S.2d 639, 640 (4th Dept. 2001) and *Cromer Fin. Ltd. v. Berger*, 2001 WL 1112548, at *4 (S.D.N.Y. 2001) regarding whether the Martin Act should preempt negligent misrepresentation claims related to the sale of securities.  Accordingly, we raise that issue merely to preserve it and note that the Second Circuit has explicitly left open the possibility that the Martin Act does not preempt such claims.  *Suez*, 250 F.3d at 102 ("We do not reach the Martin Act question.   The New York Court of Appeals has not yet addressed this issue, and the lower court cases cited by defendant do not explore the issue with the level of depth that would justify a ruling by us in the first instance.").

personal jurisdiction of this Court." Megunticook Mem. at 8. Megunticook signed the Voting

Agreement[52] in which it agreed to the sole jurisdiction of Federal and State courts in New York.

Voting Agreement § 7. Additionally, Megunticook stipulated that personal service of the

Complaint on it was proper. Lobenthal Decl. Ex. G.

---

[52]     Paragraph 13 of the Complaint alleging jurisdiction imprecisely grouped
Megunticook with the other Defendants as having agreed to jurisdiction in the Escrow
Agreement. Megunticook is not a party to the Escrow Agreement because it does not participate
in the escrowed fund. Megunticook submitted to jurisdiction in the Voting Agreement and also
in other transaction documents. That oversimplification has been corrected in CTC's Amended
Counterclaim filed in Civil Action 07 Civ. 5440.

## CONCLUSION

For all of the foregoing reasons, it is respectfully submitted that the Motions be denied in their entirety.

Dated:  New York, NY
        December 17, 2007

TEITLER & TEITLER


By s/ Nicholas W. Lobenthal _____
        John M. Teitler (JT-3111)
        Nicholas W. Lobenthal (NL-1451)

1114 Avenue of the Americas
New York, NY 10036
Telephone (212)  997-4400
Facsimile (212) 997-4949
Jmteitler@teitler.com
Nwlobenthal@teitler.com

Attorneys for Plaintiff One Communications Corp.

Mark S. Resnick, Esq., *Pro Hac Vice*
The Resnick Law Group, P.C.
Old City Hall
45 School Street
Boston, MA  02108
Of Counsel.

99