## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ———————————————— )<br>)<br>IN RE ONE COMMUNICATIONS CORP. )<br>)<br>)<br>)<br>This Document Relates To: )<br>)<br>07 Civ 3905 )<br>)<br>———————————————— ) | MASTER FILE<br>07 Civ 3905 (LTS) (AJP)<br>ECF |

## THE MEGUNTICOOK DEFENDANTS' REPLY
## IN SUPPORT OF THEIR MOTION TO DISMISS

Ira K. Gross (IG-6834)
*igross@sandw.com*
Paul E. Summit (PS-6263)
*psummit@sandw.com*
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA  02109
(617) 338-2800

Of Counsel:

Philip Rakhunov
*prakhunov@sandw.com*
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA  02109
(617) 338-2800


*Attorneys for The Megunticook Fund II, L.P. and
The Megunticook Side Fund II, L.P.*

February 15, 2008

Table of Contents

Page

Table of Authorities ............................................................................................... ii

Introduction ............................................................................................................1

I.     One Cannot Rely On Statements Outside Of The Merger Agreement ...............2

     A.    The March E-mails ............................................................................4

II.    One Has Failed To Adequately Plead Scienter...................................................8

     A.    The Generalized "Motive" Of A High Stock Price Is Insufficient ..........9

     B.    Recklessness .....................................................................................11

          1.    Core Business Doctrine........................................................12

III.   The Representations And Warranties Of The Merger Agreement ....................14

IV.   Section 20 Controlling Person Liability .........................................................18

V.    Conclusion. ...................................................................................................20

# TABLE OF AUTHORITIES

## Federal Cases

ATSI Commc'ns Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) .......................3, 4

Acito v. IMCERA Group, Inc., 47 F.3d 47 (2d Cir. 1995)..........................................9

In re Alstom SA Securities Litigation, 454 F. Supp. 2d 187 (S.D.N.Y. 2006)..............19

Am. High-Income Trust v. Alliedsignal, 329 F. Supp. 2d 534 (S.D.N.Y. 2004) ..........20

In re Ancor Commc'ns, Inc., 22 F. Supp. 2d 999 (D. Minn. 1998)..............................13

In re Atlas Air Worldwide Holdings, Inc. Securities Litigation,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004).....................................................................13

In re BISYS Securities Litigation, 496 F. Supp. 2d 384 (S.D.N.Y. 2007) ....................8

In re Bayou Hedge Fund Litigation, Nos. 06-MDL-1755, 06-CV-2943,
    2007 WL 2319127 (S.D.N.Y. July 31, 2007) ........................................................11

In re Biopure Corp. Derivative Litigation, 424 F. Supp. 2d 305 (D. Mass. 2006) ......13

In re CINAR Corp. Securities Litigation, 186 F. Supp. 2d 279 (E.D.N.Y. 2002)..........4

In re Carter-Wallace Securities Litigation, 220 F.3d 36 (2d Cir. 2000) .......................13

Chill v. General Electric Co., 101 F.3d 263 (2d Cir. 1996)..........................................9

In re Complete Management Inc. Securities Litigation,
    153 F. Supp. 2d 314 (S.D.N.Y. 2001)....................................................................10

Compudyne v. Shane, 453 F. Supp. 2d 807 (S.D.N.Y. 2006) ......................................10

Cosmas v. Hassett, 886 F.2d 8 (2d Cir. 1989) ............................................................13

Deutsche Telecom AG Securities Litigation, No. 00 CIV 9475,
    2002 WL 244597 (S.D.N.Y. Feb. 20, 2002)..........................................................18

DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242 (2d Cir. 1987) ............18

In re Digital Island Securities Litigation, 357 F.3d 322 (3d Cir. 2004)........................13

Epstein v. Itron, Inc., 993 F. Supp. 1314 (E.D. Wash. 1998) ......................................13

In re Flag Telecom Holdings, Ltd. Securities Litigation,
    308 F. Supp. 2d 249 (S.D.N.Y. 2004)..........................................................................19

Food & Allied Serv. Trades Department v. Millfeld Trading Co.,
    841 F. Supp. 1386 (S.D.N.Y. 1994)............................................................................19

Gabriel Capital L.P. v. Natwest Fin. Inc., 94 F. Supp. 2d 491 (S.D.N.Y. 2000)............................18

In re Gaming Lottery Securities Litigation, Nos. 96 CIV 5567, 7527, 7936,
    1998 WL 276177 (S.D.N.Y May 29, 1998) ...............................................................13

In re Global Crossing, Ltd. Securities Litigation,
    322 F. Supp. 2d 319 (S.D.N.Y. 2004)........................................................................18

In re Global Crossing, Ltd. Securities Litigation,
    No. 02 Civ. 910, 2005 WL 1881514 (S.D.N.Y. Aug. 5, 2005) ............................2, 20

Guerra v. Teradyne Inc., No. Civ. A. 01-11789, 2004 WL 1467065
    (D. Mass. Jan. 16, 2004) .............................................................................................9

Hallberg v. Am. Agencies General Agencies, Inc.,
    No. 04-C-3245, 2005 WL 563211 (N.D. Ill. Mar. 8, 2005) ........................................9

In re Health Management Systems, Inc. Securities Litigation,
    No. 97 Civ. 1865, 1998 WL 283286 (S.D.N.Y. June 1, 1998)....................................9

In re Initial Public Offering, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) ................................10, 19-20

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001) ..............................................................................9

Knollenberg v. Harmonic, Inc., 152 Fed. Appx. 674 (9th Cir. 2005)............................................10

Luce v. Edelstein, 802 F.2d 49 (2d Cir. 1986)...............................................................................18

Mailer v. RKO Teleradio Pictures, Inc., 332 F.2d 747 (2d Cir. 1964) ..........................................17

Manufacturers Hanover Trust Co. v. Yanakas, 7 F.3d 310 (2d Cir. 1993).....................................4

Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000) ..............................................................................9

In re National Century Fin. Enters., Inc., No. 2:03-MD-1565,
    2007 WL 1362695 (S.D. Ohio May 7, 2007) ...........................................................18

In re Openwave Systems Securities Litigation,
    No. 07 CIV. 1309, 2007 WL 3224584 (S.D.N.Y. Oct. 31, 2007) ...............................8

In re Oxford Health Plans, Inc. Securities Litigation, 187 F.R.D. 133
(S.D.N.Y. 1999)..................................................................................................18

In re Parmalat Securities Litigation, 376 F. Supp. 2d 472 (S.D.N.Y. 2005) ...................................19

In re Philip Services Corp. Securities Litigation, 383 F. Supp. 2d 463
(S.D.N.Y. 2004)..................................................................................................18

Polar International Brokerage Corp. v. Reeve, 108 F. Supp. 2d 225
(S.D.N.Y. 2000)..................................................................................................18

Polycast Tech. Corp. v. Uniroyal, Inc., 792 F. Supp. 244 (S.D.N.Y. 1992)..................................10

RMED International, Inc. v. Sloan's Supermarkets, Inc.,
207 F. Supp. 2d 292 (S.D.N.Y. 2002)..................................................................10

Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000)...............................................................9, 10

SEC v. First Jersey Sec., Inc., 101 F.3d 1450 (2d Cir. 1996).........................................................19

In re Scholastic Corp. Securities Litigation, 252 F.3d 63 (2d Cir. 2001) .....................................17

Schottenfeld Qualified Associates, L.P. v. Workstream, Inc.,
No. 05 CV 7092, 2006 WL 4472318 (S.D.N.Y. May 4, 2006).............................10

In re Solv-Ex Corp. Securities Litigation, 210 F. Supp. 2d 276 (S.D.N.Y. 2000) ........................18

Stevelman v. Alias Research, Inc., 174 F.3d 79 (2d Cir. 1999) ....................................................10

Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87 (2d Cir. 2001)..................10

Tellabs v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007)...............................................8, 10

Transit Rail, LLC v. Marsala, No. 05-CV-0564,
2007 WL 2089273 (W.D.N.Y. July 20, 2007)........................................................4

United States v. Falcone, 257 F.3d 226 (2d Cir. 2001) ................................................................10

In re Vivendi Universal, S.A. Securities Litigation,
381 F. Supp. 2d 158 (S.D.N.Y. 2003)..................................................................10

In re Vivendi Universal S.A. Securities Litigation, No. 03 CIV. 2175,
2004 WL 876050 (S.D.N.Y. Apr. 22, 2004)..........................................................19

In re Xerox Corp. Securities Litigation, 165 F. Supp. 2d 208 (D. Conn. 2001)............................13

**State Cases**

Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954 (1986) .........................4

Passantino v. Board of Education, 383 N.Y.S.2d 639 (App. Div. 1976).......................................12

RAG Am. Coal Co. v. Cyprus Amaz Minerals Co.,
    750 N.Y.S.2d 284 (App. Div. 2002).....................................................................................17

Ruttenberg v. Davidge Data Sys. Corp., 626 N.Y.S.2d 174 (App. Div. 1995) .............................17

**Statutes**

The Private Securities Litigation Reform Act of 1995,
    15 U.S.C. § 78u-4, *et seq*. ...............................................................................2, 8, 9, 12

**Other**

The American Heritage Dictionary 925 (3d ed. 1996) ................................................................12

Defendants The Megunticook Fund II, L.P. and The Megunticook Side Fund II, L.P. ("Megunticook") did not commit fraud, and One Communications Corp. ("One") is not able to allege fraud. Once the Complaint's "conclusions" are set aside, and the single strand of misrepresentation alleged against Megunticook is examined, there is nothing left of Plaintiff's Complaint against Megunticook. The fevered rhetoric of One's Memorandum of Law (the "Opp.") is no substitute for <u>factual</u>, <u>particularized</u> allegations in the Complaint ("Cmpl.").

The only substantive allegations[1] in the Complaint mentioning Megunticook or its principal Thomas Matlack are that: Matlack was a Lightship Director and received reports tracking Lightship's financial condition, Cmpl. ¶¶31,34; in October 2004, Matlack reviewed a confidential information memorandum to be provided to potential Lightship purchasers; he was involved in the negotiations with CTC (that is, One) throughout the deal, starting in December 2004, Cmpl. ¶70; the primary pricing mechanism for the purchase price was to be a multiple of Lightship's EBITDA, Cmpl. ¶63; Matlack had a detailed working knowledge of the negotiations and the diligence process, and was aware of important issues raised in due diligence which impacted the pricing of the deal, including information on Lightship's billing practices, Maine intercarrier compensation revenues, and historical and projected EBITDA, Cmpl. ¶71; on March 10, 2005, Matlack sent an e-mail to CTC, stating "[W]e are very confident in our CABS position and do not feel there is an exposure here." Cmpl. ¶88.

That is it. There is just *one* affirmative statement ("confident in our CABS position"); we have shown that to be utterly irrelevant. There is not a single particularized allegation suggesting that Matlack knew of the supposed Kreitler episodes; had any day to day responsibility for the

---

[1] Paragraphs 31, 32, 34, 36, 63, 70, 71, 79, 81, 82, 84, 86, 88, 89, and 98.

company; had any knowledge of the supposed improper billing practices; made any misrepresentation; or did anything to deceive One.

Moreover, as we demonstrated in the Megunticook Memorandum, a) One agreed that any pre-merger statements were extinguished and supplanted by the Representations and Warranties of the Merger Agreement; thus, no party can be held liable for pre-merger statements; b) Megunticook was not a party to the Merger Agreement; c) Megunticook (alone among the defendants) never agreed in *any* document to be bound by the Merger Agreement; and thus d) Megunticook simply cannot, and does not, bear any responsibility for the Representations and Warranties of the Merger Agreement.[2]

This is the kind of strike suit that the PSLRA[3] was designed to terminate in its infancy.[4]

## I.    ONE CANNOT RELY ON STATEMENTS OUTSIDE OF THE MERGER AGREEMENT

The Merger Agreement has two sweeping integration clauses:

This Agreement…constitute[s] the entire agreement among the Parties and supersedes any prior understandings, agreement, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.  September 17, 2007 Affirmation of Jayne S. Robinson ("JSR Aff."), Ex. 2, § 10(c).

Each of the CTC Entities acknowledges that the Lightship Companies do not make, and have not made, any representations or warranties relating to the Lightship Companies or the Business, *including[5] in the Offering Memorandum or any presentation relating to the Lightship Companies or the Business given in*

---

[2] Though the Complaint provides simply *no* basis in any event to conclude that there were misrepresentations here, whether pre-merger, or in the Merger Agreement.

[3] The Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, *et seq.*

[4] To avoid duplication, we hereby refer to, and incorporate by reference, the legal arguments set forth in co-defendants' principal and reply briefs, including for example: a) the arguments by defendant J.P. Morgan ("Morgan") in connection with In re Global Crossing, Ltd. Sec. Litig., No. 02 Civ. 910, 2005 WL 1881514 (S.D.N.Y. Aug 5, 2005) (Lynch, J.), on the distinction between service as a director of Lightship and as a principal of Megunticook, on "group pleading," and on the count of negligent misrepresentation; and b) the arguments set forth by the individual defendants as to the irrelevance of the Voting Agreement to this case, and loss causation.

[5] Unless otherwise indicated, all emphasis is supplied.

*connection with the Transactions*, other than those expressly set forth in this Agreement. *No Person has been authorized* by the Lightship Companies to make *any representation or warranty regarding the Lightship companies* or the business in connection with the Transactions that is inconsistent with *or in addition to* the representations and warranties expressly set forth in this Agreement or in any of the other Transaction Documents. <u>Id.</u>, § 6(d).

But One says that pre-merger statements can be relied on because they "provided context…." Opp. at 36. Less than a year ago, the Second Circuit rejected that premise. In <u>ATSI Commc'ns Inc. v. Shaar Fund, Ltd.</u>, 493 F3d 87, 105 (2d Cir. 2007), plaintiff brought an action based partly on statements preceding execution of certain purchase and sale agreements that contained a merger clause similar to that here. <u>Id.</u>, at 94-95. The Court "quickly dispose[d]" of plaintiff's argument that it could have reasonably relied on such statements:

> Where the plaintiff is a sophisticated investor and an integrated agreement between the parties does not include the misrepresentation at issue, the plaintiff cannot establish reasonable reliance on that misrepresentation. <u>Id.</u>, at 105.

The Court, concluding that the plaintiff was a sophisticated investor, barred reliance on pre-sale statements. Plaintiff buries this recent, dispositive Second Circuit case in a footnote (Opp. at 38, n.12), and says that the integration clauses at issue here "only barred reliance on other representations made by Lightship itself and is silent about representations made by the moving Defendants." <u>Id.</u> That fails. First, Plaintiff's theory of liability depends on conflating Megunticook and Lightship, given Matlack's outside directorship. Second, Section 6(d) states that "no person" was "authorized" to make any statement "inconsistent with *or in addition to*" the representations and warranties of the Agreement. In One's tortured reading, this language *preserves* pre-contractual representations by "persons" other than Lightship, since the representations were "consistent with" those in the Agreement. <u>Id.</u> at 37. One's argument is

frivolous; but the "in addition" language ends the discussion.  The representations and warranties in the Agreement were *exclusive*.[6]

A.    The March E-mails

One's only particularized allegation about a supposedly misleading *Megunticook* representation is:

> On March 10, 2005, Matlack sent an e-mail to Peterson, Prenetta, other CTC employees, and Oppenheimer.  In this e-mail Matlack stated, inter alia, "[W]e are very confident in our CABS position and do not feel there is any exposure here." Cmpl. ¶88.

We have demonstrated that Matlack was referring only to intra-LATA toll traffic terminating on Lightship's UNE-P lines, Megunticook Memorandum of Law ("Mem.") at 17-20; and that the statement was part of a discussion leading up to the UNE-P-related representation that became Section 4(e)(5), as to which there is no issue in this lawsuit.  First, One altered the language when "quoting" it in the Complaint (see discussion in Mem. at 18), and then attempted to confuse the context of Matlack's statement to make it appear that he was making a statement relevant to Section 4(e)(5).

Now, with its Section 4(e)(5) misquotation exposed, One has abandoned its claim for a supposed "breach" of Section 4(e)(5); and concedes that UNE-P billings "are not at issue here." Opp. at 17.  One *still* contends, however, that Matlack was referring to CABS issues broader than

---

[6] The case law cited by Plaintiff in fact also supports dismissal.  See Mfrs. Hanover Trust Co. v. Yanakas, 7 F.3d 310, 315-16 (2d Cir. 1993) (when the contract states that a contracting party disclaims the existence of reliance upon certain representations outside of the contract, that party will not be allowed to claim that he was defrauded into entering the contract in reliance on those representations); Transit Rail, LLC v. Marsala, No. 05-CV-0564, 2007 WL 2089273, *9-10 (W.D.N.Y. July 20, 2007) (plaintiff cannot rely on allegedly fraudulent extra-contractual representations that are specifically disclaimed in the purchase agreements); Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954 (1986) (claim of fraud, based on a representation of fact collateral to the contract, but which was the inducement for entering into the contract, was not barred by a general merger clause).  See also In re CINAR Corp. Sec. Litig., 186 F. Supp. 2d 279, 313-14 (E.D.N.Y. 2002) (fraud claim dismissed based on general merger clause in a multi-million dollar transaction executed following negotiations between sophisticated business parties).  As to Plaintiff's argument that it is improper to consider reliance on a motion to dismiss, ATSI (dismissing based on reliance) is a complete answer.

Intra-LATA toll traffic terminating on Lightship's UNE-P lines. One's effort just exposes how empty One's fraud case really is.

The Matlack e-mail was sent on March 10, 2005. One now concedes that

> The UNE-P issue was resolved after follow up e-mails on March 11 at 4:50 a.m., 9:10 a.m., 9:30 a.m., 9:35 a.m., 9:41 a.m., and 9:42 a.m. Opp. at 18.

This suggests that One accepts the unavoidable: Matlack's e-mail pertained to (irrelevant) UNE-P billing issues. But One says that later e-mails "corroborate" the Complaint by showing that Matlack's e-mail was "made (and not retracted) when UNE-P was *not* the only CABS subject being discussed." Id. at 17. One seems to argue that Matlack's March 10 e-mail relates to an e-mail chain that commenced subsequently, on the evening of March 11, with questions by Prenetta (of CTC) about CTC's own bill from Lightship. But the chain that begins at night on March 11, and ends on March 12, is a separate chain;[7] and is meaningless to this litigation. Given One's extraordinary attention to the chain in their Opposition, we review it below. But we note in advance (and the Court will surely observe) that the e-mail chain has *nothing* to do with the supposed "improper billing practices" which are the gravamen of One's lawsuit.

At 8:10 p.m. on March 11, Prenetta (of CTC) e-mailed Kevin O'Hare, asking: "Kevin, I am still looking to talk about specific issues that I left you a message on concerning CTC's Nov. 1, 2004 bills…." JSR Aff. Ex. 11, at 4. Oppenheimer (of Morgan) then wrote to O'Hare, Quinn (Lightship's investment banker), and Matlack:

---

[7] Indeed, in the Complaint, One segregated it as a separate e-mail chain; see Complaint at ¶ 89 ("On March 12, 2005, in an e-mail chain between, *inter alia,* Oppenheimer, Matlack and O'Hare, these individuals discussed….").

What questions are these and are you ok with this? Are they determinants of value? Is it worth the time and can they be answered quickly or will they create more questions? Id.

O'Hare responded:

I have asked [Prenetta] to specify the question and provide a copy of the bill he is looking at. If I can help I will but at this stage can not possibly imagine that it is value affecting. There has been no previous indication of concern on an issue with our carrier bill to CTC. Id.

Oppenheimer responded:

Sounds good....Obviously they should not need any more info at this point. Id.

One calls this e-mail exchange an "agreed upon strategy of limiting responses to issues raised by CTC's own bill." Opp. at 18. This is fiction. Prenetta asked O'Hare about "CTC's Nov. 1, 2004 bills"; and the discussion pertained naturally to that.

One then asserts that:

After speaking to CTC, O'Hare wrote that there was a problem with the strategy of limiting responses to non-'value affecting' issues related to CTC's own bill:

'They have concerns because our CABS bills look different than theirs and *wants [sic] to make sure we are not overbilling our carrier customers.*'

Clearly aware that there were issues unrelated either to UNE-P or to Lightship's November bill to CTC that had been raised by CTC and as to which CTC was expecting answers, O'Hare wrote that he would consult with Nick Zeitvogel [a Lightship employee] and Defendant Koester and then report back to JP Morgan's and Megunticook's representatives Oppenheimer and Matlack before taking any further steps (*"I will push to get an answer for ourselves ASAP."*) Opp. at 18-19 (emph. in original).

Note the "paraphrasing," characterization, and selected quotation. Here is the actual text. On March 12, at 11:47 a.m., O'Hare wrote to Oppenheimer, Matlack and Quinn:

I spoke to Prenetta. He has detailed questions on our CABS bill to CTC....They have concerns because our CABS bills look different than theirs and wants [sic] to make sure we are not overbilling our carrier customers. I don't know any more than that at this point. My biggest complaint on this issue is that they have had this information for some time and they could have asked for a review of this sooner. I won't know if there is any sort of problem until I review this bill with

Nick and Koester....Obviously I will push to get an answer for ourselves ASAP. JRS Aff. Ex. 11, at 3.

Oppenheimer replied:

> I think that is right to get an answer for us internally first, to understand it, but not communicate it to the other side until then....Unless others disagree, because of the time it will take to get an answer and then to discuss if/how a response is warranted, I recommend telling Prenetta in an email, cc'g everyone, that they have had this information for a while and they should be prepared to meet our deadline tomorrow without an answer to that question. Id.

Nothing in these e-mails suggests that "there were issues unrelated either to UNE-P or to Lightship's November bill to CTC that had been raised by CTC," Opp. at 18; or that there was a "strategy of limiting responses." (In fact, there is nothing of any relevance to this lawsuit).

One next selectively quotes portions of an e-mail from Quinn to O'Hare, Matlack and Oppenheimer, sent on March 12, at 3:17 p.m. Id. at 19. The complete e-mail (with the omitted portions in bold) is as follows:

> After talking with Kevin I agree with Stephen but think the response to Prenetta copied to his whole group should be. I have sent you 2 e-mails on your Bill question. We will try to answer it but we need complete information which you have not provided. **You have had this bill since Oct 2004 and you have done an exhaustive analysis on our CABS stuff.**
>
> If you give me the information I need to answer your question we will try to answer it. **Quite frankly we do not see how this relates to the issues that are being debated.** I think we need to make the wood chucks look disorganized and it best coming from Kevin. **I am this close to calling up ATN** [another potential buyer] JSR Aff. Ex. 11, at 2.

This e-mail again focuses on the narrow issue of the CABS bill from Lightship to CTC.[8]

*There is nothing pertaining to the supposed improper billing practices of the Complaint.* And these e-mails are One's "smoking gun" against Megunticook!

---

[8] And the omitted language demonstrates that Lightship in fact did provide CTC with all the information that it sought; that this issue was immaterial to the transaction; and that the defendants were "this close" to pulling the plug on the deal and contacting another potential buyer.

## II.    ONE HAS FAILED TO ADEQUATELY PLEAD SCIENTER

Rhetoric and conclusory allegations about "the defendants," do not substitute for particularized fact allegations.

The PSLRA is a "check against abusive litigation by private parties," which, if "not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." Tellabs v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2504 (2007). The PSLRA has effectively shifted the burden to plaintiffs "to acquire *particularized* knowledge of a party's scienter prior to obtaining discovery." In re BISYS Sec. Litig., 496 F. Supp. 2d 384, 387 (S.D.N.Y. 2007). The PSLRA requires plaintiffs to state *with particularity* both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.* the *individual defendant's* intention to deceive, manipulate, or defraud. Tellabs, 127 S. Ct. at 2504. Thus, to survive this motion, the inferences of scienter that One attempts to make must "be more than merely plausible or reasonable – [they] must be cogent and at least as compelling as any opposing inference[s] of nonfraudulent intent." Id. at 2505.

Several months ago, a District Court here emphasized the high burden that plaintiffs must meet post-Tellabs to plead scienter adequately. In re Openwave Sys. Sec. Litig., No. 07 CIV. 1309, 2007 WL 3224584 (S.D.N.Y. Oct. 31, 2007) (Cote, J.), the Court dismissed the action as to a defendant who was the CFO, Executive VP, and Chairman of the Audit Committee, and who was alleged to have *signed* financial statements containing misrepresentations. Notwithstanding all of that, the conclusory allegations of scienter based on "position" were not enough:

> [i]n particular, because the role and responsibilities of the audit committee – other than signing financial statements – are nowhere described in the Complaint, it is impossible to discern whether [defendant] had any duty to monitor the dating of option grants, or whether he had access to meetings or documents *that might have alerted him to the alleged backdating* [of stock options]. Id., 2007 WL 3224584, at *12.

A.    The Generalized "Motive" Of A High Stock Price Is Insufficient

In this Circuit, securities fraud plaintiffs cannot allege a defendant's scienter based on motives possessed by virtually all similarly situated persons or entities. Kalnit v. Eichler, 264 F.3d 131, 141 (2d Cir. 2001); Novak v. Kasaks, 216 F.3d 300, 307-08 (2d Cir. 2000). Motives such as the desire for a corporation to appear profitable, the desire to keep stock prices high to increase officer compensation, and the desire to achieve the most lucrative acquisition proposal have all been squarely rejected as insufficient to create an inference of scienter.[9] One's assertion that Megunticook's "desire to consummate the sale to CTC falls squarely within recognized motive [sic] for securities fraud," Opp. at 46, flies squarely against this well-established principle. The general motive "of maintaining the stock price in order to maintain the reputation of the company and facilitate mergers and acquisitions" is insufficient to satisfy the scienter requirement since "such motives can be ascribed to virtually all corporate officers and directors."[10]

Absent *any* particularized fact allegations against Megunticook, Kalnit's teaching is especially appropriate. Plaintiff's position comes down to this: despite the absence of any allegations against Megunticook suggesting scienter and notwithstanding the PSLRA and

---

[9] Chill v. Gen. Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996) (desire to sustain the appearance of profitability or of the success of an investment held insufficient); Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995) (desire to maintain high stock price in order to increase executive compensation held insufficient); Kalnit, 264 F.3d at 141 (desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired, and is insufficient to create the requisite inference of scienter).

[10] Guerra v. Teradyne Inc., No. Civ. A. 01-11789, 2004 WL 1467065, at *27 (D. Mass. Jan. 16, 2004); Rothman v. Gregor, 220 F.3d 81, 93 (2d Cir. 2000) (generalized allegations of a desire to achieve favorable terms in a merger or acquisition insufficient); In re Health Mgmt. Sys., Inc. Sec. Litig., No. 97 Civ. 1865, 1998 WL 283286, at *6 n.4 (S.D.N.Y. June 1, 1998) ("Desire to consummate corporate transaction does not constitute a motive for securities fraud."); Hallberg v. Am. Agencies Gen. Agencies, Inc., No. 04-C-3245, 2005 WL 563211 (N.D. Ill. Mar. 8, 2005) (the "boilerplate allegations" that defendants could make a better deal, and thus enjoy more profits from a stock sale, by not disclosing the final financial statements or the possibility of an IPO, are not enough to plead scienter).

Tellabs, Megunticook can be sued successfully for securities fraud because it had, as a "motive" to defraud, the same motive possessed by every other significant shareholder of any company being acquired, a good share price. The case law rejects One's position.

One string-cites cases (see Opp. at 46-51); but distorts or omits their facts. No circumstance that led the courts in the cited cases to find legally cognizable motive to commit fraud is present here: (i) Megunticook is not alleged to have inflated the stock of Lightship to use as currency to acquire other companies;[11] (ii) Megunticook is not alleged to have inflated the price of Lightship in order to escape the negative consequences of a risky investment;[12] and (iii) Megunticook is not alleged to have been involved in insider trading.[13] Plaintiff fails the Second Circuit "motive and opportunity" tests.

---

[11] See, e.g., Rothman, 220 F.3d at 93 (motive to acquire other companies using fraudulently inflated stock as the consideration); RMED Int'l, Inc. v. Sloan's Supermarkets, Inc., 207 F. Supp. 2d 292 (S.D.N.Y. 2002) (same); Schottenfeld Qualified Assocs., L.P. v. Workstream, Inc., No. 05 CV 7092, 2006 WL 4472318 (S.D.N.Y. May 4, 2006) (motive to artificially inflate the stock of the corporation, in order to go on a "buying binge" of other companies, which in turn resulted in substantial inflated bonus payments for CEO and CFO); In re Vivendi Universal, S.A. Sec. Litig., 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) (defendants motivated to inflate company stock prices as a means to effectuate a specific acquisition of another company that would not otherwise be possible and that would result in bonus worth more than two and a half times defendant's normal salary); In re Complete Mgmt. Inc. Sec. Litig., 153 F. Supp. 2d 314, 327-28 (S.D.N.Y. 2001) (motive to inflate the value of stock to use as currency to purchase other medical practices, and "unusual insider trading activity" was present).

[12] See, e.g., Polycast Tech. Corp. v. Uniroyal, Inc., 792 F. Supp. 244, 256 (S.D.N.Y. 1992) (defendants, who directly controlled and owned 32.5% of the Uniroyal's stock were motivated to artificially inflate the price of the Uniroyal asset being sold because Uniroyal was "saddled [] with $900 million in debt"); Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87 (2d Cir. 2001) (creditors and major equity holders in the company had a motive to fraudulently conceal highly detrimental facts about the company's principal, which rendered the company's stock worthless, to induce plaintiff to invest in the company in order to cover their own at-risk investments).

[13] One's attempt to equate the private sale of Lightship to "insider trading" is wide of the mark. Insider trading occurs when a corporate insider trades in his corporation's securities on the basis of material, non-public information, thus taking "unfair advantage of … uninformed … stockholders," see United States v. Falcone, 257 F.3d 226, 229 (2d Cir. 2001); not where the shareholders of a company sell the whole company, through a sale of all of the company's stock; see Knollenberg v. Harmonic, Inc., 152 Fed. Appx. 674, 682 (9th Cir. 2005) (exercise of options and sale of stock in connection with a merger is not insider trading). Thus, the cases upon which One relies are all classic insider trading cases and are easily distinguished. See Stevelman v. Alias Research, Inc., 174 F.3d 79, 85 (2d Cir. 1999); Compudyne v. Shane, 453 F. Supp. 2d 807, 826 (S.D.N.Y. 2006); In re Initial Public Offering, 241 F. Supp. 2d 281, 365-68 & n.111 (S.D.N.Y. 2003).

B.    Recklessness

One faces two "stiff challenges" in pleading a 10(b) violation based on recklessness –
"the strength of the recklessness allegations must be greater than that of allegations of garden-
variety fraud, *and* the inference of recklessness must be at least as compelling as any opposing
inferences." In re Bayou Hedge Fund Litig., Nos. 06-MDL-1755, 06-CV-2943, 2007 WL
2319127, at *8 (S.D.N.Y. July 31, 2007) (emph. in original).  As to an Outside Director, a
complaint must make *specific* allegations, *with some factual basis*, that the outside director took
part in preparing the misleading documents; or was involved in the company's day-to-day
management.

Lacking particularized facts, Plaintiff resorts to invented facts and inferences.  First, One
*implies* that Matlack knew of the alleged Kreitler episode.[14]  The Complaint shows otherwise.
One nevertheless asserts that "whether or not it was reasonable to overrule and/or ignore the
information, analysis and warning of Kreitler is a fact question that cannot be determined" on a
motion to dismiss.  Opp. at 53.  But that "fact question" is never reached as to Matlack, who
knew nothing about Kreitler's supposed "warning."

Second, One speculates wildly on Matlack's state of mind, and what was (supposedly)
going on behind the scenes.  Here are a few of the more egregious examples:

> Defendants knew that if CTC discovered that Lightship had implemented its own
> LCAs to generate excess revenue or that Lightship charged two carriers for the
> same call, CTC would not have closed the transaction.  Id.

> It is important to note that JP Morgan, Megunticook and the Officer Defendants –
> evidently counting on the fact that Verizon had not discovered their CABS billing

---

[14]  See Opp. at 51-53, One generally lumps all defendants together, and suggests that all defendants
"ignored warnings" (see Subhead, Opp. at 51); that all defendants knew of the alleged statement by Koester that
Lightship "cannot afford the loss of revenue" resulting from Kreitler's LCA changes; and that all defendants were
"counting on the fact that Verizon had not discovered their CABS billing fraud...."  There are no Complaint
citations, needless to say.

fraud and expecting CTC to be unethical and greedy enough to continue it –
indemnified CTC against breaches of the representations in the Merger
Agreement. Id. at 53-54.

The competing inference that Oppenheimer and Matlack assured themselves that
they had knowledge of [] CABS billings practices and made a calculated gamble
that they would be better off with a sale than without a sale is far stronger. Id.

The clear *inference* from the e-mails and subsequent events is that O'Hare
followed through and spoke to Zeitvogel and Koester about the Verizon CABS
billing practices and *then reported back to* Oppenheimer and *Matlack*. The
*inference that* JP Morgan and *Megunticook learned* from O'Hare about the
Verizon billing practices at this time (or earlier) is at least as strong as any
opposing inference... *The inference* that O'Hare did in fact talk to Koester and
then *reported back to the control group* is even stronger in light of the next email,
where JP Morgan, Megunticook and O'Hare agreed on the need to terminate
disclosure. Adopting this strategy was *consistent with* knowing that what
Lightship was doing was indefensible. Id. at 60.

Note all the windy speculation. There are no *facts* – the vital precursor to inferences. An

"inference" is "the act of reasoning *from factual knowledge or evidence*." The American

Heritage Dictionary 925 (3d ed. 1996). The PSLRA stands for the importance of particularized

fact allegations from which *realistic inferences* can be drawn. There are simply no *facts* from

which to "infer" that Matlack learned anything about improper billing practices – if such indeed

existed.[15]

    *1.    Core Business Doctrine.*

One argues that the "core business doctrine" substitutes for particularized fact allegations

against Megunticook; and is sufficient to create the "strong inference" that Megunticook had

"actual knowledge of these false and fraudulent billing practices." Opp. at 61.

---

[15] A New York court once commented, about an equally "imagined" scenario: "The inferences drawn,
therefor, present as tenuous an argument as did the remarks of Stephen Douglas which Abraham Lincoln demolished
by saying they were 'as thin as the homeopathic soup that was made by boiling the shadow of a pigeon that had been
starved to death." Passantino v. Bd. of Educ., 383 N.Y.S.2d 639, 642 (App. Div. 1976).

First, One's assertion that "Lightship's Verizon CABS billing was at the absolute core of Lightship's business, accounting for somewhere between 25 percent and 37 percent of EBITDA" is not alleged in the Complaint and must be disregarded. Second, the cases cited by One are easily distinguished. In each, the complaint alleged: (i) an unequivocal misrepresentation by a corporation with respect to its primary business; *and* (ii) such particularized fact allegations of intense involvement by an individual defendant as to create a strong inference of recklessness.[16] Here, One has failed to plead that Matlack made any statements regarding the allegedly improper billing practices, that Matlack was involved with or responsible for such Lightship billing practices, or that Matlack was involved in the day-to-day affairs of Lightship.

Plaintiff had to show that Megunticook's conduct was, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or *so obvious that the defendant must have been aware of it.*" In re Carter-Wallace Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000); see also In re Digital Island Sec. Litig., 357 F.3d 322, 332 (3d Cir. 2004) (scienter requires misrepresentation so recklessly made that the mental state approaches conscious deception). Plaintiff has not remotely approached this demanding standard.

---

[16] See, e.g., Cosmas v. Hassett, 886 F.2d 8, 12-13 (2d Cir. 1989) (pre-PSLRA; directors reckless with respect to knowledge of China import restrictions, where sales to China were repeatedly publicly touted *by the directors*, as a significant part of the business); In re Biopure Corp. Derivative Litig., 424 F. Supp. 2d 305 (D. Mass. 2006) (reckless regarding knowledge of an FDA hold on clinical approval of corporation's primary product); In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474 (S.D.N.Y. 2004) (knowledge of accounting irregularities resulting from failure to timely recognize impairment of value of company's planes, which resulted in a $281.4 million restatement, attributed to high level corporate officers who signed SEC filings containing the financial statements); In re Xerox Corp. Sec. Litig., 165 F. Supp. 2d 208 (D. Conn. 2001) (Defendants found to be actually aware of blatant lies about operational problems, including the inability to process sales orders, absence of skilled employees, inability to deliver equipment to customers); In re Ancor Comme'ns, Inc., 22 F. Supp. 2d 999 (D. Minn. 1998) (alleged knowledge of technological incompatibility between company's product and product of its biggest ever customer; plaintiffs adequately alleged that defendants, all top *officers*, had discussions about these incompatibilities); In re Gaming Lottery Sec. Litig., Nos. 96 CIV 5567, 7527, 7936, 1998 WL 276177 (S.D.N.Y May 29, 1998) (CEO/CFO responsible for obtaining regulatory approval, knew they had not done so, and failed to disclose to the investors); Epstein v. Itron, Inc., 993 F. Supp. 1314 (E.D. Wash. 1998) (touted technology which was the core business of the company, and which was known to high level *officers* to be not feasible).

## III.  THE REPRESENTATIONS AND WARRANTIES OF THE MERGER AGREEMENT

Megunticook is not a party to the Merger Agreement; Megunticook is excluded from the indemnification scheme created by the Merger Agreement; and Megunticook, alone among the defendants, never agreed to be bound by any of the terms of the Merger Agreement.  Assuming purely for argument's sake that there was a breach of the Representatations and Warranties, Plaintiff has no basis on which to sue Megunticook for them.

As explained in the Memorandum, the Merger Agreement created an "Indemnification Escrow" carved out from the amounts to be paid by CTC to certain other shareholders.  Under the Merger Agreement and the Stockholder Representative Agreement ("SRA"), those shareholders (but *not* Megunticook) agreed to "indemnify, defend and hold harmless" CTC against certain "Losses" by means of the Indemnification Escrow.  The Merger Agreement also directed that a Stockholder Representative Committee ("SRC") (that did *not* include Megunticook) be formed to act for these shareholders regarding their rights to the "Indemnification Escrow."  JSR Aff. Ex. 2, at ¶ 8(c).  And all of the "Holding Stockholders" except Megunticook agreed to execute and deliver the SRA that would "confirm[] their agreement to be bound by the terms of this Agreement."  Id.

One's Complaint was based on the mistaken idea that Megunticook was a party to the SRA.  Cmpl. at ¶13.[17]  On this basis, Plaintiff sued Megunticook for breach of its supposed indemnification obligations, citing the Indemnification Escrow.  Cmpl. ¶¶136-142.

---

[17] The Complaint says:  "In the Escrow Agreement, the Megunticook Entities, O'Hare and Koester submitted to personal jurisdiction in this Court with respect to any action, suit or proceeding relating to or arising from the Escrow Agreement. The Escrow Agreement was entered into as a part of the sale of LHI to CTC."  Id.

On page 98 of the Opposition, One finally admits that its Paragraph 13 "imprecisely grouped Megunticook with the other Defendants"; and acknowledges that "Megunticook is not a party to the Escrow Agreement...."

One has now acknowledged that Megunticook has no role in the Indemnification Escrow. In One's world of ever-shifting allegations, however, One now contends that "all of the defendants" (Opp. at 76) are Holding Stockholders for purposes of Section 8(b) (the Merger Agreement's indemnification provision). This is wrong. Section 8 (b) reads, in relevant part:

> Subject to the limitations set forth in Section 8(f)... *the Holding Stockholders* agree to indemnify... the "CTC Indemnified Parties," from and against all Losses...On or before the Closing...Holding shall deliver to CTC the Stockholder Representative Agreement, executed and delivered by all of the Holding Stockholders (*other than Holding Stockholders who hold only Series CC Preferred and no other Capital Stock of Holding*) which...*confirms their agreement to be bound by the terms of this Agreement.* JRS Aff. Ex. 2, § 8(b).

The first sentence of Section 8(b) has no limitation on "Holding Stockholders";[18] taken alone, it seems to include all Holding Stockholders, including Megunticook, in indemnification obligations. But that is the only sentence that *appears* to place indemnification obligations on Megunticook. *All the other relevant references in the Merger Agreement and the other transaction documents demonstrate that that sentence is merely sloppy drafting:* that is, a mistake.

The subsequent language in the same Section 8(b) carefully excludes those shareholders who hold "Series CC Preferred and no other Capital Stock of Holding" (that is, Megunticook) from the indemnifying "Holding Stockholders." And Section 8(b) goes on to say that this circumscribed group of Holding Stockholders – a group that excludes Megunticook – are the ones who will execute the SRA, and who will "agree" to be "bound by the terms of this Agreement." Thus, by its own terms, Megunticook was *not* "bound by the terms" of the Merger Agreement. The first sentence of Section 8(b) was, simply, a drafting error.

---

[18] "Holding Stockholders" is defined in the Merger Agreement as the "holders...of all of the [shares of Lightship]."

That is plain merely from a reading of the complete Section 8(b).  Any doubt at all, however, is surely resolved by an examination of other provisions of the Merger Agreement and SRA.  Immediately following the Merger Agreement's Section 8(b) comes Section 8(c):

> Pursuant to the [SRA], a committee shall be named as the agent and representative of *all of the Holding Stockholders*…for purposes of receiving on their behalf all notices under this Agreement, the Indemnification Escrow Agreement and the Paying Agent Agreement….  Id., § 8(c)(i).

There is no question – and One has conceded – that Megunticook has no relationship to the SRA.  And yet here again is an imprecise reference to "all of the Holding Stockholders…" when the Agreement *clearly* meant to exclude Megunticook.

The SRA itself recognized, of course, that Megunticook was not a "Holding Stockholder" for indemnification purposes:[19]

> This Stockholder Representative Agreement is made and entered into…by and among [Lightship] and the members of the Stockholder Representative Committee…on behalf of certain holders of the Capital Stock of Holding (*except for those holders of Holding's Series CC Convertible Preferred Stock who are not also holders of Series AA Convertible Preferred Stock or Series BB Convertible Preferred Stock*) (collectively, the "Holding Stockholders")….  JSR Aff. Ex. 3, Preamble.

Indeed, the Complaint itself concedes that "Holding Stockholders" excluded Megunticook for purposes of indemnification.  It says that the Stockholders' Committee was formed "to represent the interests of *the Holding Stockholders* in the escrowed funds."  Cmpl. ¶103.  In other words:  the Holding Stockholders are those with interests in the escrowed funds – *not* Megunticook.

There is yet further evidence in the Merger Agreement itself.  Section 8(f)(iii) states that

---

[19] Thus, Megunticook has played no role in connection with the activities of the Stockholder Representative Committee; for example, Megunticook had and has no part in the dispute over the Escrow Fund that led to the filing of the SRC action against One, No. 07 Civ. 5440 (LTS).

[e]xcept as provided in Section 8(f)(viii) no indemnification shall be required to be made *by the Holding Stockholders* for the amount of the CTC Indemnified Parties' Losses that exceed the Indemnification Escrow.  JSR Aff. Ex. 1, § 8(f)(iii).

Again "Holding Stockholders" refer only to those who have contributed to the "Indemnification Escrow."  Thus:  the first sentence of Section 8(b) should have included the limiting "Series CC" language that would have explicitly excluded Megunticook.  The Merger Agreement and the Stockholder Representative Agreement cannot logically be construed in any other fashion.[20]

Under New York law, a contract must be interpreted to give full meaning and effect to all of its provisions.  RAG Am. Coal Co. v. Cyprus Amax Minerals Co., 750 N.Y.S.2d 284 (App. Div. 2002); Ruttenberg v. Davidge Data Sys. Corp., 626 N.Y.S.2d 174, 178 (App. Div. 1995) (it is a recognized rule of construction that a court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect).  Contracts may not be interpreted in such a way as to frustrate and distort the intentions of the parties.  Mailer v. RKO Teleradio Pictures, Inc., 332 F.2d 747, 748 (2d Cir. 1964).  In interpreting a disputed clause, the courts must look to its intended significance and "not attempt a woodenly technical parsing of language to create a meaning wholly at variance from that which the parties plainly intended."  Id.[21]

---

[20] One itself argues that mistakes crept into the transaction documents.  In One's words: "Section 4(k)(iii) of the Agreement refers to two attached schedules:  4(k)(1) and 4(k)(ii)…There is no Schedule 4(k)(ii).  'Schedule 4(k)(iii) – Customer Agreements" is *obviously a misprint/typographical error* for 'Schedule 4(k)(ii) – Customer Agreements'….  Opp. at 31.  One then argues that any interpretation other than a typographical error "would render the structure and specific provisions of the Agreement meaningless…."  Id. at n.10.  And One cites cases for the precise legal propositions set forth in this Reply immediately above.

[21] One attempts to make Megunticook legally responsible for the alleged misrepresentations of the Merger Agreement by arguing that "Defendants were all (1) insiders or affiliates of Lightship and (2) participated in the offer of the securities including the circulation of false and misleading statements based on improper and inflated Verizon CABS billings."  Opp. at 41.  One then string-cites cases for its proposition.  Each is easily distinguished, and actually mandates dismissal.  In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76 (2d Cir. 2001) (fraudulent

Count V of the Complaint must be dismissed.[22]

## IV.    SECTION 20 CONTROLLING PERSON LIABILITY

One has failed to plead the elements of a primary securities fraud violation.

First, an outside directorship, combined with less than a one-fourth ownership of

Lightship, does not amount to "control."[23]  Plaintiff cites no case for the proposition that an

entity that held a 22.5% stake in a company, had the power to appoint two outside directors (of

---

statements properly pled as attributable to defendant where defendant was vice president for finance and investor relations; was involved in the drafting, producing, reviewing and/or disseminating of the false and misleading statements; had access to internal corporate documents and reports relating to trade sales and return data, conversed with other officers and employees and attended management and committee meetings; and helped prepare the books analyzing data and commenting on sales trends); DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247-48 (2d Cir. 1987) (fraudulent statements in an Offering Memorandum soliciting investment in a limited partnership attributed to the general partner of the limited partnership); Luce v. Edelstein, 802 F.2d 49, 55 (2d Cir. 1986) (same); Gabriel Capital L.P. v. Natwest Fin., Inc., 94 F. Supp. 2d 491, 502 (S.D.N.Y. 2000) (statements in Offering Memorandum attributable to defendants where the two defendants were alleged to have arranged the financing of certain debt securities being marketed, actually prepared the Offering Memorandum, which "prominently list[ed] both [defendants] as two of the four initial purchasers," and went on road shows to sell the debt securities to plaintiffs and others); In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 334 (S.D.N.Y. 2004)("undisputed, as a matter of public record" that the audit reports containing the fraudulent information were prepared by the defendant); In re Solv-Ex Corp. Sec. Litig., 210 F. Supp. 2d 276, 283 (S.D.N.Y. 2000) (false statements in SEC filings were signed by each of the defendants); In re Oxford Health Plans, Inc. Sec. Litig., 187 F.R.D. 133, 142 (S.D.N.Y. 1999) (statements in SEC filings attributed to CEO, Executive VP, CFO, president and other high level executives in charge of running the company); Polar Int'l Brokerage Corp. v. Reeve, 108 F. Supp. 2d 225, 238 (S.D.N.Y. 2000) (construing the group pleading doctrine as applying only to *clearly cognizable corporate insiders with active daily roles* in the relevant companies or transactions).

[22] Even though One insists in the "main text" of its Opposition that the first sentence of Section 8(b) pertains to Megunticook, it seems later to back away from that position. It says, in footnote 36, that there is "a difference between Megunticook's indemnity exposure and that of the other Defendants"; and appears to suggest that Megunticook has indemnification obligations only for Losses related to "fraud or illegal activities" by virtue of Section 8(f)(viii) of the Merger Agreement. But even this "concession" by One is wrong on two counts: First: the initial sentence of Section 8(b), quoted above, states: "Subject to the limitations set forth in Section 8(f)…the Holding Stockholders agree to indemnify…." Thus, Section 8(f)(viii) pertains only to the "Holding Stockholders" who are referenced in Section 8(b). As we have demonstrated above, there is no logical way to construe that first sentence except to exclude the "Series CC" shareholders, *i.e.*, Megunticook. Plaintiff simply cannot escape the fact that Megunticook did not sign the Merger Agreement; never agreed to be bound by the Merger Agreement; and was deliberately excluded from the indemnification scheme created by the Merger Agreement. And second: contrary to One's assertion, Section 8(f)(viii) of the Merger Agreement does not obligate Megunticook or anybody else to (as One says) "indemnify One up to its respective share of the total purchase price, for Losses arising out of fraud or illegal activities…" See Opp. at 75 n.36. Section 8(f)(viii) does not create any *affirmative* indemnification obligations; rather, it simply removes any otherwise applicable limitations that may have arisen from the provisions of the Merger Agreement on indemnification in the event of fraud.

[23] Deutsche Telecom AG Sec. Litig., No. 00 CIV 9475, 2002 WL 244597 (S.D.N.Y. Feb. 20, 2002); In re Nat'l Century Fin. Enters., Inc., No. 2:03-MD-1565, 2007 WL 1362695 (S.D. Ohio May 7, 2007); In re Philip Services Corp. Sec. Litig., 383 F. Supp. 2d 463 (S.D.N.Y. 2004).  One simply ignored these cases rather than respond to them.

seven) to the board and was not alleged to have been involved in the day-to-day management of the business, had "control" over a primary securities fraud violator under Section 20.[24]

To try to salvage its Section 20 claim, One makes the bald assertion that it does not need to show that Megunticook controlled Lightship, but only that Megunticook controlled the *sale* of Lightship. Opp. at 66. One asserts that Matlack "established [his] influence over and direct participation in the negotiation of the terms of sale of Lightship by participating in the preliminary discussions with CTC," Opp. at 68; Matlack "possessed detailed, inside information regarding Lightship's CABS billings to Verizon and [] asserted 'control' over the response to CTC's diligence inquiries." Id. Such assertions are not grounded in the Complaint, and they say nothing about Matlack's alleged involvement in the management of Lightship or in the alleged fraud.

Moreover, One's argument is inconsistent with the language and interpretation of Section 20. Section 20 imposes liability on "so-called 'controlling persons' of *entities* in violation of the Act," who are not themselves primary violators. Food & Allied Serv. Trades Dep't v. Millfeld Trading Co., 841 F. Supp. 1386, 1389 (S.D.N.Y. 1994).[25] Thus, allegations of control under this section "must be substantial." In re Flag Telecom Holdings, Ltd. Sec. Litig., 308 F. Supp. 2d 249, 274 (S.D.N.Y. 2004); see also In re Initial Pub. Offering Sec. Litig., 241 F.

---

[24] See e.g., In re Alstom SA Sec. Litig., 454 F. Supp. 2d 187, 212 (S.D.N.Y. 2006) (defendant had direct supervisory control over primary violator; exercised direct control over selection of board of directors; exercised direct control over the financial reporting, and specifically over the conduct which constituted the underlying fraud); In re Parmalat Sec. Litig, 376 F. Supp. 2d 472, 515-17 (S.D.N.Y. 2005) (Section 20 defendant owned *96.6%* of the primary violator); In re Vivendi Universal S.A. Sec. Litig., No. 03 CIV. 2175, 2004 WL 876050, at *9 (S.D.N.Y. Apr. 22, 2004) (Section 20 control pleaded where defendants were CEO and CFO of corporation and the alleged fraudulent scheme was CEO's "brainchild and pet project").

[25] Control over such an entity may be established by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996), quoting 17 C.F.R. § 240.12b-2 (quotations omitted).

Supp. 2d 281, 392 n.178 (S.D.N.Y. 2003) ("Section 20 serves as a statutory form of *respondeat superior*"); In re Global Crossing, Ltd. Sec. Litig., No. 02 CIV. 910, 2005 WL 1881514, at *12 (S.D.N.Y. Aug. 5, 2005) (to allege control, plaintiff must show *both* that defendant "possessed the power to direct or cause the direction of the management and policies of a person" *and* that defendant had "actual control over the transaction in question.")  Because the Complaint fails to allege facts showing that Megunticook had a controlling interest in Lightship, or that Matlack participated in the daily affairs of Lightship, or that Matlack participated in, or had knowledge of, the alleged improper billing practices, the Section 20 claim must be dismissed.

One also attempts to lump the Morgan and Megunticook defendants together for the purposes of its argument.  See Opp. at 67.  To plead a Section 20 claim adequately, One must allege "that *each* defendant was a controlling person" and "that *each* defendant was [a] culpable participant in the fraud."  Am. High-Income Trust v. Alliedsignal, 329 F. Supp. 2d 534, 549 (S.D.N.Y. 2004) (Swain, J.).

## V.    CONCLUSION.

For the reasons stated above, the motion to dismiss should be granted in its entirety and the Complaint should be dismissed with prejudice.

{B0723275}

THE MEGUNTICOOK FUND II, L.P., and
THE MEGUNTICOOK SIDE FUND II, L.P.,

By their attorneys,

/s/ Ira K. Gross
Ira K. Gross (IG-6834)
*igross@sandw.com*
Paul E. Summit (PS-6263)
*psummit@sandw.com*
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA  02109
(617) 338-2800

Of Counsel:

Phillip Rakhunov
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA  02109
(617) 338-2800
*prakhunov@sandw.com*