UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                   :

IN RE ONE COMMUNICATIONS CORP.       :     MASTER FILE
                                                 :     07 Civ. 3905 (LTS)(AJP)

This Document Relates To:  07 Civ. 3905   :

                                                 :     ECF

One Communications Corp., Plaintiff       :

                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## REPLY MEMORANDUM OF LAW
## IN SUPPORT OF THE JP MORGAN
## DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

ROBINSON & McDONALD LLP
61 Broadway, Suite 1415
New York, New York  10006
Tel.:  212 953-3400
Fax.:  212 953-3690

Attorneys for Defendants
JP Morgan SBIC LLC and
Sixty Wall Street SBIC Fund, L.P.

## **TABLE OF CONTENTS**

Page

I.    THE COMPLAINT FAILS TO STATE A §10(B) CLAIM ..............................................2

    A.    The Complaint Fails To Allege A
        Misrepresentation By The JP Morgan Defendants ...................................................2

        1.    The Allegations of the Complaint Are Insufficient .....................................3

        2.    The "Group Pleading" Doctrine Does Not Apply........................................7

        3.    The Supreme Court Has Rejected Plaintiff's
                "Active Participation" Theory....................................................................8

    B.    Plaintiff Cannot Allege Reasonable Reliance On Alleged
        Misrepresentations During The Due Diligence Process ..........................................9

    C.    The Complaint Fails to Allege A Strong
        Inference of Scienter ...........................................................................................10

II.    THE COMPLAINT FAILS TO STATE A §20(a) CLAIM...............................................13

    A.    The JP Morgan Defendants Did Not "Control" Lightship ......................................13

    B.    The Complaint Fails To Allege "Culpable Participation".......................................16

III.    THE COMPLAINT FAILS TO STATE A NEGLIGENT
      MISREPRESENTATION CLAIM....................................................................................17

    A.    The Necessary "Special Relationship" Is Absent...................................................17

    B.    The Martin Act Preempts The Negligent Misrepresentation Claim .......................19

CONCLUSION...................................................................................................................20

# TABLE OF AUTHORITIES

Page

<u>CASES</u>

<u>American High-Income Trust v. Allied Signal</u>,
329 F. Supp.2d 534 (S.D.N.Y. 2004)................................................13

<u>ATSI Communications, Inc. v. The Shaar Fund, Ltd.</u>, 493 F.3d 87 (2007) .............................9, 10

<u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955 (2007)........................................1, 17

<u>Bond Opportunity Fund v. Unilab Corp</u>, 2003 WL 21058251
(S.D.N.Y. 2003), <u>aff'd</u> <u>mem.</u> 87 Fed. Appx. 772 (2004) ................................7

<u>Dura Pharmaceuticals, Inc. v. Brouda</u>, 544 U.S. 336 (2005)....................................9

<u>Emergent Capital Investment Management, LLC v. Stonepass Group, Inc.</u>,
343 F.3d 189 (2d Cir. 2003)........................................9, 10

<u>In re Emex Corp. Sec. Litig.</u>, 2002 WL 31093612 (S.D.N.Y. 2002) ...........................14

<u>Ganino v. Citizens Utilities Co.</u>, 228 F.3d 154 (2d Cir. 2000) ...............................14, 16

<u>In re Global Crossing, Ltd. Sec. Litig.</u>,
2005 WL 1881514 (S.D.N.Y. 2005)........................................6, 7, 14
2005 WL 2990646 (S.D.N.Y. 2005).........................................7

<u>Harsco Corp. v. Segui</u>, 91 F.3d 337 (2d Cir. 1996) ........................................10

<u>Kalnit v. Eichler</u>, 264 F.3d 131 (2d. Cir. 2001)........................................11

<u>Kimmell v. Schaefer</u>, 89 N.Y.2d 257 (1996) ...............................................17, 18

<u>Lapin v. Goldman Sachs Group, Inc.</u>, 506 F. Supp.2d 221 (S.D.N.Y.)........................16

<u>Novak v. Kasaks</u>, 216 F.3d 300 (2d Cir. 2000) ........................................11

<u>Polar Int'l Brokerage Corp v. Reeve</u>,
108 F. Supp. 2d 225 (S.D.N.Y. 2000)........................................7

<u>In re Refco, Inc. Sec. Litig.</u>, 503 F. Supp 2d 611 (S.D.N.Y. 2007)...........................8, 10

<u>Rothman v. Gregor</u>, 220 F.3d 81, 90 (2d Cir. 2000)........................................10

Sedona Corp. v. Ladenburg Thalmann & Co., Inc.,
2005 WL 1902780 (S.D.N.Y. 2005)..........................................................................19
2006 WL 2034633 (S.D.N.Y. 2006)..........................................................................16

Southland Secur. Corp. v. Inspire Ins. Solutions, Inc.,
365 F. 3d 353 (5th Cir. 2004) ....................................................................................7

Stoneridge Investment Partners, LLC v. Scientific-Atlantic, Inc.,
128 S. Ct. 761 (2008)..................................................................................................8

Suez Equity Investors v. Toronto-Dominion Bank,
250 F.3d 87 (2d Cir. 2001)..................................................................................18, 19

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| IN RE ONE COMMUNICATIONS CORP. | : | MASTER FILE |
| | : | |
| This Document Relates To:  07 Civ. 3905 | : | 07 Civ. 3905 (LTS)(AJP) |
| | : | |
| One Communications Corp., Plaintiff | : | ECF |
| | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## REPLY MEMORANDUM OF LAW
## IN SUPPORT OF THE JP MORGAN DEFENDANTS'
## MOTION TO DISMISS THE COMPLAINT

The baseless allegations of fraud in this case harm the reputations of innocent parties and

have in terrorem value far beyond their actual worth.  Defendants JP Morgan SBIC LLC (now known as

JP Morgan Investment LLC) and Sixty Wall Street SBIC Fund, L.P. (collectively, "JP Morgan

Defendants") are entitled to have this Court rule on the sufficiency of those allegations, even if the Court

decides (as we submit it should) that the underlying issues on which the fraud claim is based must be

adjudicated before the relevant state utility commissions in the first instance.  When the rhetoric,

speculation, generalizations and conclusions are stripped away, Plaintiff's Complaint fails just about every

test laid down by Congress, the Supreme Court[1] and the Second Circuit for judging the sufficiency of

these federal securities law claims.[2]

---

[1]    Plaintiff even misstates the governing standard on a Rule 12(b)(6) motion to dismiss, Pl. Mem. 25, completely overlooking the Supreme Court's decision in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007), which announced the following new standard:  Plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." Id. at 1965 (citations omitted).  The complaint must allege "enough facts to state a claim to relief that is plausible on its face," not merely "conceivable." Id. at 1974.

[2]    We rely on the main briefs regarding dismissal of the common law fraud claim, as well as the indemnity/breach of contract and declaratory judgment claims, and the customer concentration issue involving Great Works Internet, as to which Plaintiff has not argued anything new.  We also rely on the reply briefs being submitted by the other moving defendants.  The jurisdictional issues stemming from the unique regulatory context in which the claims here arise (as to which Verizon New England Inc. ("Verizon") has filed a separate brief) are addressed in the Joint Reply of the moving defendants submitted herewith.

I.

## THE COMPLAINT FAILS TO
## STATE A §10(b) CLAIM

A.    The Complaint Fails To Allege A
      Misrepresentation By The JP Morgan Defendants

Both Rule 9(b) and, especially, PSLRA demand a high degree of particularized facts regarding alleged misrepresentations, specifying in detail who, what, when, where and why a representation was false. JPM Mem. 6-8. Yet the Complaint here fails to allege *any* misrepresentation by the JP Morgan Defendants. It contains only the broadest generalizations about alleged misrepresentations outside the Merger Agreement, and the representations in the Merger Agreement were explicitly made by Lightship alone. When the Merger Agreement provides that no Lightship Executive Officer who signs the Merger Agreement "(i) is making any representations or warranties of Holding [Lightship] in his or her individual capacity or (ii) shall have any personal liability for any representations or warranties of Holding set forth herein," JSR Aff. Ex. 1, §1 (p. 11), then ipso facto the JP Morgan Defendants, who did not sign the Merger Agreement and are even further removed from Lightship than its Executive Officers, cannot be charged with making those representations.

In an effort to hold the JP Morgan Defendants liable for any misrepresentation anywhere, Plaintiff's brief completely distorts what a related Voting Agreement actually provides,[3] what the Complaint actually alleges, and what the "group pleading" doctrine actually applies to (if it applies at all after PSLRA). Pl. Mem. 38-44. Plaintiff also trots out a theory of "scheme" or "participation" liability that the Supreme Court has flatly rejected.

---

[3]    This issue is discussed in the reply brief of the Individual Defendants.

1.     <u>The Allegations of the Complaint Are Plainly Insufficient</u>[4]

In three bullet points (Pl. Mem. 42-43), Plaintiff outlines the allegations for its claim that

the JP Morgan Defendants, through their designee on the Lightship Board (Stephan Oppenheimer),

committed securities fraud.[5]  In the first bullet point, Plaintiff argues that "JP Morgan . . . [was] actively

involved in . . . all aspects of the sale process including the decision not to disclose the truth about

Lightship's CABS billings to Verizon." Pl. Mem. 42. This assertion is both conclusory and wholly

unsupported by any allegation in the Complaint, which makes only the most general references to Mr.

Oppenheimer as one of many participants in the negotiation and due diligence process.[6] There are no

particularized allegations that Mr. Oppenheimer was privy to any undisclosed "truth" about Lightship's

CABS billing to Verizon, or that he made any representation relating to Verizon billing.  The assertion

that a defendant was involved in a decision not to disclose the truth is a classic conclusory statement that

adds nothing in the way of particularity.  It is tantamount to saying "defendant was involved in a fraud."

In the second bullet point, Plaintiff asserts, "Defendants JP Morgan and Megunticook held

themselves out to CTC as having access to confidential inside information regarding billing practices."

Pl. Mem. 42.  In support of this statement, Plaintiff inexplicably quotes a March 12, 2005 *internal* email

from Mr. Oppenheimer to Lightship and Megunticook personnel stating, "Obviously, they [Plaintiff]

---

[4]  Plaintiff concedes that its common law fraud claim is subject to Rule 9(b), and (with the exception of aiding and abetting liability) stands or falls with the securities fraud claim.  Plaintiff's argument in support of an aiding and abetting claim (which is not pleaded as such) comes down to a single conclusory assertion in its brief: "It is beyond question that all of the Defendants participated in concealing Lightship's billing practices during CTC's due diligence; that concealing is actionable as aiding and abetting." Pl. Mem. 94.  The only thing that is "beyond question" is Plaintiff's inability to allege with particularity facts -- as opposed to unfounded assumptions and conclusions -- that make out any viable fraud claim against the JP Morgan Defendants.

[5]  The allegations against the JP Morgan Defendants are identical to those against the Megunticook Defendants described at pages 1-2 of the Megunticook brief, with one exception:  In place of Mr. Matlack's "we are confident" email, Mr. Oppenheimer sent two *internal* emails saying, "Obviously they [Plaintiff] should not need any more info at this point," and "I recommend telling Prenetta [Plaintiff's general counsel] in an email, cc'g everyone, that they have had this information for a while and they should be prepared to meet our deadline tomorrow without an answer to that question." Cplt. ¶89; JSR Aff. Ex. 11.  Mr. Oppenheimer did not even make these statements to Plaintiff, and if he had, they would not have been deceptive or actionable. JPM Mem. 24 & n.19.

[6]  <u>See</u> Cplt. ¶¶ 63 ("preliminary discussions"), 70 ("negotiations and discussions"), 71 ("negotiation and diligence process;" "[c]onference calls"), 82 (unspecified "information"), 84 ("information" about various topics; unspecified "projections").

should not need any more info at this point." JSR Aff. Ex. 11. Plaintiff fails to explain how this innocuous statement, which was not even addressed to Plaintiff, amounts to the JP Morgan Defendants holding "themselves out to CTC as having access to confidential inside information regarding billing practices," or constitutes a misrepresentation about billing practices.

Plaintiff also refers to a March 10, 2005 email (JSR Aff. Ex. 10) from the Megunticook designee, Mr. Matlack, but on its face nothing in that email supports an inference that Mr. Oppenheimer had any knowledge of any undisclosed "truth" about Lightship's Verizon billing or made any misrepresentation. Mr. Matlack's email was about a particular aspect of billing that is not in dispute (the UNE-P lines issue), where later in the email chain Lightship's management gave *direct assurances* to Plaintiff and the Lightship directors, and where Lightship made a specific representation in the Merger Agreement that Plaintiff no longer even contends was false. JPM Mem. 11-13; Pl. Mem. 17.

In its third and last bullet point addressed to the JP Morgan Defendants, Plaintiff asserts, "Defendants O'Hare, JP Morgan and Megunticook actually consulted with Defendant Koester at the critical moment in the diligence process on the exact issue that made this lawsuit necessary." Pl. Mem. 42-43. Here, Plaintiff does not even cite the Complaint. Assuming that Plaintiff is again drawing on the March 12 email chain (JSR Aff. Ex. 11), its effort must fail. As discussed at length in our opening brief, the email chain simply cannot support an inference that Mr. Oppenheimer either was made aware of a problem with Lightship's billing to Verizon or that he misrepresented or concealed any information about that billing. JPM Mem. 21-24.

The email chain says that Kevin O'Hare, Lightship's CEO, was going to speak with Mr. Koester and another Lightship employee, Nick Zeitvogel, about questions concerning a Lightship bill to Plaintiff (not Verizon). There is nothing in the email chain, or in any allegation by Plaintiff, about whether this discussion occurred, what, if anything, was said to Mr. O'Hare, or what, if anything, he told Messrs. Oppenheimer and Matlack. And as for "the exact issue that made this lawsuit necessary,"

nowhere in its 40 page Complaint or 99 page brief has Plaintiff alleged at all -- much less with the particularity required -- what questions Plaintiff raised that provoked this e-mail chain. If the questions Plaintiff asked went to the "exact issue that made this lawsuit necessary," why hasn't Plaintiff spelled that out?

Finally, there is no allegation about what, if anything, *was ever said to Plaintiff about these questions*. Was something said? Was nothing said? Was false information provided? Was accurate information provided? Surely, Plaintiff must know exactly what was said to it, by whom and to what effect. That is precisely the type of particularity required under Rule 9(b) and PSLRA but glaringly absent here. What we are actually left with is this: (1) Plaintiff raised unspecified questions about its own four month old bill (not even a bill to Verizon). (2) The company's CEO undertook to get answers as best he could. (3) We don't know the upshot. That *any* party should have to defend a fraud case on this basis would be laughable if it wasn't so serious. The kind of supposition and innuendo that Plaintiff relies on is completely at odds with PSLRA, Rule 9(b) and every Supreme Court and Second Circuit case that has considered why particularity is required in a §10(b) case -- to protect innocent defendants from having to defend against baseless fraud charges like these.

Plaintiff also fails to plead any facts from which a finding could be made that the JP Morgan Defendants are liable for Mr. Oppenheimer's actions.[7] The allegations about Mr. Oppenheimer clearly involve his role as a director of Lightship.[8] The only allegations about the JP Morgan Defendants

---

[7]  Plaintiff asserts in purely conclusory fashion that the JP Morgan Defendants "are liable under principles of agency for the act of their agents," i.e, Mr. Oppenheimer. Pl. Mem. 39, n.13.

[8]  See Cplt. ¶28 ("The JP Morgan Entities at all times thereafter maintained designees on the LHI Board who were actively involved in overseeing the financial condition and operations of Lightship"); ¶34 ("By January 2004, Stephan Oppenheimer ('Oppenheimer') was serving as the JP Morgan Entities' designee on LHI's Board." "Throughout their respective terms as Directors, Oppenheimer and Matlack [the Megunticook designee] received reports tracking Lightship's financial condition and operations."); ¶36 (in or about October 2004, "Lightship retained an investment banking firm, Q Advisors LLC ('Q Advisors'), to explore a possible sale of the company. Throughout October 2004, O'Hare [Lightship's CEO and Chairman], in consultation with Oppenheimer and Matlack] met with Q Advisors . . ."); ¶63 (in December 2004, preliminary discussions occurred between Plaintiff and Lightship's investment banker, "senior management, Oppenheimer and Matlack (all on behalf of Lightship and LHI)."); ¶70 (Plaintiff's high level personnel "began conducting direct negotiations and discussions with O'Hare,

on this score are that they appointed Mr. Oppenheimer to the Lightship Board and that he was their

"representative." Cplt. ¶¶71, 81, 84. The Complaint does not even allege that Mr. Oppenheimer was an

employee of the JP Morgan Defendants (which, even if true, would be inadequate standing alone to state a

claim for vicarious liability).

Judge Lynch's analysis of this issue in In re Global Crossing, Ltd. Sec. Litig., 2005 WL

1881514 (S.D.N.Y. 2005), is particularly instructive. Dismissing a claim for primary §10(b) liability

against Microsoft based on the acts of employees it appointed to the board of a company, AGC, in which

it held stock, the Court noted that those directors "had fiduciary duties to act on behalf of the shareholders

of AGC itself, not on behalf of the entities that appointed them. Thus, when they acted as directors of

AGC, they were not acting within the scope of their employment with Microsoft and Softbank." Id. at *3.

Citing the familiar principle that an employer is only responsible for an employee's actions within the

scope of employment, the Court ruled that the directors "cannot be presumed to have been acting at the

direction of their outside employers in their capacities as AGC directors. Nor can it simply be alleged in

conclusory fashion that they did so act. Concrete factual allegations are necessary to establish agency and

control." Id. at *4. "[P]leading an employment relationship is insufficient to establish agency between

Microsoft and Softbank and its employees in their capacities as directors of an independent corporation."

Id. at *9. Neither the employment relationship, nor the fact that the employees had been appointed to the

board by Microsoft was sufficient "to create an inference that Microsoft and/or Softbank controlled [the

individuals] in their capacities as AGC's directors." Id. Recognizing that "Delaware courts have

'consistently . . . rejected' the argument that a director lacks independence from the person who nominated

or appointed him as a director," the Court held that appointing an employee to the board of a Delaware

---

Oppenheimer, Matlack and the other members of Lightship senior management regarding due diligence
information and the terms and structure of the transaction"); ¶71 (certain requests "were addressed by Oppenheimer
and Matlack on Lightship's behalf"); ¶82 (Plaintiff's letter of intent to purchase Lightship was "reviewed by all
appropriate Lightship executives and directors, including O'Hare, Wilson, Oppenheimer and Matlack."); ¶86
(various "requests for information and the responses thereto were discussed by O'Hare, Wilson, Koester,
Oppenheimer and Matlack and other members of Lightship's senior management.") (emphasis added throughout).

company was insufficient to establish liability on the part of the appointing company. Id. at *10 (citations

omitted).

Judge Lynch's analysis is directly on point. Even if the Complaint had sufficiently alleged

that Mr. Oppenheimer himself committed a primary violation -- which it most assuredly does not -- the

allegations that the JP Morgan Defendants appointed Mr. Oppenheimer to the Board of Lightship, a

Delaware corporation (JSR Aff. Ex. 1, p. 1), and that he was their "representative" or "agent" are plainly

insufficient to state a claim for primary §10(b) liability against the JP Morgan Defendants for Mr.

Oppenheimer's actions.[9]

## 2.    The "Group Pleading" Doctrine Does Not Apply

Without being able to allege any specific misrepresentation by the JP Morgan Defendants,

Plaintiff argues that it is entitled to attribute to them statements made by Lightship in the Merger

Agreement and elsewhere on the basis of the "group pleading" doctrine. Described as "extremely limited

in scope," Polar Int'l Brokerage Corp v. Reeve, 108 F. Supp. 2d 225, 237 (S.D.N.Y. 2000), the doctrine

"allows plaintiffs to rely on a presumption that statements in prospectuses, registration statements, annual

reports, press releases, or other group-published information, are the collective work of those individuals

with direct involvement in the everyday business of the company." Id. (internal quotations omitted).

Because it does away with the specificity required by PSLRA, a number of courts have held that the

group pleading doctrine has not survived PSLRA. See, e.g., Southland Secur. Corp. v. Inspire Ins.

Solutions, Inc., 365 F. 3d 353, 364-65 (5th Cir. 2004); Bond Opportunity Fund v. Unilab Corp, 2003 WL

21058251, at *4 (S.D.N.Y. 2003) (group pleading eliminated by PSLRA as to directors), aff'd mem. 87

---

[9]  Reiterating his ruling in a later opinion in Global Crossing, 2005 WL 2990646 (S.D.N.Y. 2005), Judge Lynch noted that "plaintiffs point to no case where a corporation has been held liable on a theory of respondeat superior for the actions of its employees in their capacities as independent directors sitting on the board of a different corporation." Id. at *6.

Fed. Appx. 772 (2004).[10]  But even if group pleading has survived, it would have no application here

because Lightship was not a public company, there were no group-published documents,[11] and neither the

JP Morgan Defendants nor Mr. Oppenheimer, as an outside director, were involved in the day-to-day

operations of Lightship.  To the extent this doctrine has any viability after PSLRA, it would still not serve

to make the JP Morgan Defendants liable for Lightship's representations.

3.     The Supreme Court Has Rejected Plaintiff's "Active Participation" Theory

Finally, Plaintiff's argument that it has alleged primary liability against the JP Morgan

Defendants through Mr. Oppenheimer's "active participation" in a scheme to defraud, Pl. Mem. 73, has no

viability after the Supreme Court flatly rejected that theory last month in Stoneridge Investment Partners,

LLC v. Scientific-Atlantic, Inc., 128 S. Ct. 761 (2008).

Stoneridge resolved a conflict in the circuit courts "respecting when, if ever, an injured

investor may rely upon §10(b) to recover from a party that neither makes a public misstatement nor

violates a duty to disclose but does participate in a scheme to violate §10(b)."  Id. at 767.  The Supreme

Court held that there is no right of action under §10(b) against a party who knowingly participates in a

scheme to defraud where it neither makes a misstatement, nor violates a duty to disclose, nor otherwise

engages in deceptive acts on which the plaintiff reasonably relies.  Before liability may attach to any

defendant, that party's own conduct "must satisfy *each* of the elements or preconditions for liability."  Id.

at 769 (emphasis added).  As the Court found, the "participation in a scheme" theory suffers from the

defect of permitting liability for the statements or actions of others: "In our view this approach does not

answer the objections that petitioners did not in fact rely upon respondents' *own* deceptive conduct."  Id.

at 770 (emphasis added).  Thus, what is required is a misstatement, omission or deceptive act by the

---

[10]   The Second Circuit has not yet ruled on the issue, although a number of courts in this district continue to
recognize the doctrine in a limited way.  See In re Refco, Inc. Sec. Litig., 503 F. Supp 2d 611, 642 (S.D.N.Y. 2007).
[11]   Not only are there no public documents analogous to annual reports prepared by corporate insiders and
disseminated to the public, here the Merger Agreement recites that *Plaintiff and Lightship* "have participated *jointly*
in the negotiation and drafting of this Agreement."  JSR Aff. Ex. 1, §1(b) (p. 12) (emphasis added).

defendant itself *and* reasonable reliance on that act by the plaintiff. Participation in the misrepresentations of others -- which is all Plaintiff's conclusory allegations against the JP Morgan Defendants amount to -- is insufficient for liability under §10(b).[12]

B.    Plaintiff Cannot Allege Reasonable Reliance On Alleged
      Misrepresentations During The Due Diligence Process

        Plaintiff's express warranty and acknowledgement in §6(d) of the Merger Agreement that there were no representations outside the Merger Agreement eliminates reasonable reliance on any extra-contractual representations under three controlling Second Circuit cases cited in our main brief. JPM Mem. 17-18.[13] The Lightship transaction was large and complex, encompassing the sale of a business for tens of millions of dollars through a reverse merger. Plaintiff, a sophisticated telecommunications company, conducted extensive due diligence with its own legal, regulatory and operational personnel, assisted by investment bankers and New York counsel. The transaction was consummated through multiple transaction documents, including a 58-page, single-spaced written Merger Agreement with numerous articles, subsections, definitions, schedules and attachments, and over 60 separate multi-pronged paragraphs of representations and warranties by Lightship, coupled with a merger and integration

---

[12]   Plaintiff also gives short shrift to another recent Supreme Court case, Dura Pharmaceuticals, Inc. v. Brouda, 544 U.S. 336, 341 (2005), on the §10(b) elements of "economic loss" and "loss causation," which rejected *exactly* the premise on which Plaintiff proceeds here -- that the alleged misrepresentations caused the purchase price for Lightship to be inflated. Cplt. ¶¶100-101, 105, 113, 116. The Supreme Court held that an "'artificially inflated purchase price' is not itself a relevant economic loss." Id. at 347-348. See also Emergent Capital Investment Management, LLC v. Stonepass Group, Inc., 343 F. 3d 189, 198 (2d Cir. 2003) ("purchase-time value disparity, standing alone, cannot satisfy the loss causation pleading requirement;" "Purchase at an inflated price is nothing more than transaction causation.") The §10(b) claim should be dismissed for lack of "loss causation" alone, as discussed more fully in the reply brief of the Individual Defendants.

[13]   ATSI Communications, Inc. v. The Scharr Fund, Ltd., 493 F.3d 87, 105 (2d Cir. 2007) ("ATSI is clearly a sophisticated investor. Accordingly, to the extent ATSI's causes of action are based on alleged misrepresentations made during negotiations preceding the defendants' investment, those claims are barred by the merger clauses."); Emergent, 343 F.3d at 195 ("In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them."); and Harsco Corp. v. Segui, 91 F.3d 337, 339 (2d Cir. 1996), (answering affirmatively "central issue" of "whether parties who negotiate at arm's length for the sale and purchase of a company can define the transaction in a writing so as to preclude a claim of fraud based on representations not made, and explicitly disclaimed, in that writing.") Plaintiff's unsuccessful attempt to distinguish these cases by distorting the plain meaning of its §6(d) acknowledgement is dealt with in the reply brief of the Individual Defendants.

clause and an express acknowledgement by Plaintiff that there were no extra-contractual representations by Lightship and that no one was authorized to make any representations other than those in the Merger Agreement.  Under Harsco, ATSI and Emergent, Plaintiff's argument that it could reasonably rely on extra-contractual representations does not pass the straight face test.

C.    The Complaint Fails To Allege
      A Strong Inference Of Scienter[14]

As the Second Circuit has explained:

> [W]hat is required when endeavoring to plead facts supporting a strong inference of scienter by showing motive and opportunity is not a bare invocation of "magic words such as 'motive and opportunity'" but an allegation of facts showing the type of particular circumstances that our case law has recognized will render motive and opportunity probative of a strong inference of scienter.

Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000), quoting Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000).[15]  Plaintiff alleges a motive to inflate the acquisition price. Cplt. ¶114; Pl. Mem. 45 et seq. However, that motive cannot be ascribed to Mr. Oppenheimer because there is no allegation that he was a Lightship shareholder or sold any shares.[16]  Thus, Mr. Oppenheimer, whose alleged fraudulent intent must be shown, did not receive even the general benefit received by all the Lightship stockholders -- much less a concrete benefit personal to him.  All that can be said about Mr. Oppenheimer is that he had "motive" to comply with his duty as a director of a Delaware company to achieve the best price for the sale of the company for the benefit of all the Lightship shareholders.  That cannot possibly give rise to a strong inference of scienter on Mr. Oppenheimer's part.

Moreover, a desire to get the best price for one's stock as part of the sale of a company is a

---

[14]  As to the absence of scienter here, we also rely on the reply brief of the Megunticook Defendants.

[15]  A plaintiff must allege particularized facts showing "a motive that is concrete and personal to the defendant charged with making the misstatement or omission." Refco, 503 F. Supp. 2d at 645. Motives that can be ascribed generally to corporate officers and directors, or that are commonly shared by the innocent as well as the guilty do not meet PSLRA's requirement that, in order to deter meritless lawsuits, a "strong inference" of scienter must be shown. Id.

[16]  The Transaction Documents on the which the Complaint relies (and which Plaintiff has now submitted on this motion) show that Mr. Oppenheimer did not own any Lightship shares. Lobenthal Decl. Ex. B (p. S-22).

commonly shared motive that does not give rise to a strong inference of scienter,[17] as the Second Circuit

held in Kalnit v. Eichler, 264 F.3d 131 (2d. Cir. 2001), a case on which Plaintiff purports to rely. Pl.

Mem. 50. Affirming a dismissal for failure to allege a strong inference of scienter, the Second Circuit

reiterated that "[m]otives that are generally possessed by most corporate directors and officers do not

suffice; instead, plaintiff must assert a concrete and personal benefit to the individual defendants resulting

from the fraud." 264 F.3d at 139. The Court held that the very motive Plaintiff alleges here does *not*

establish scienter:

> As we noted earlier, *achieving a superior merger* benefited all shareholders, including the
> defendants. Additionally, the *desire to achieve the most lucrative acquisition proposal* can be
> attributed to virtually every company seeking to be acquired. *Such generalized desires do not
> establish scienter.*

Id. at 141 (emphasis added). Kalnit demonstrates the inadequacy of Plaintiff's motive allegation to

establish a strong inference of scienter.

      As an alternative to motive, Plaintiff argues for two implausible inferences of scienter from

the scant facts it has alleged against the JP Morgan Defendants. The first "inference" reaches such an

illogical conclusion that it is entitled to no weight whatsoever. It goes as follows: Oppenheimer and

Matlack were appointed to the Board by "sophisticated private equity investors." Those investors agreed

to the indemnity provisions of the Merger Agreement (which in theory would cover a claim by Verizon).

The indemnity would not have been given unless Oppenheimer and Matlack looked into "operations" and

made themselves "aware of the facts." Therefore, Oppenheimer and Matlack must have looked into

Lightship's billing practices. Pl. Mem. at 53-54. This reasoning actually establishes an inference of

innocence: The indemnity was given because the investors did not think there was anything wrong with

---

[17] None of Plaintiff's cases (Pl. Mem. 48-49) involves a defendant's sale of shares, together with all other
shareholders, as part of the sale of the business; they involve what are essentially allegations of illegal insider
trading. See, e.g., Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000). Those circumstances are a far cry from a
private sale of business transaction like this one, where a sophisticated buyer knows that insiders are selling their
stock and are motivated to get the best price, and proceeds accordingly.

Lightship's billing practices. That is a much more logical inference than Plaintiff's nonsensical one: Defendants discovered the allegedly fraudulent billing practices *and indemnified anyway*.[18]

        The only other "inference" urged by Plaintiff is nothing but rank speculation. Plaintiff points to the email chain (JSR Aff. Ex. 11) regarding its own last minute questions about a bill from Lightship which is discussed at length in our opening brief. JPM Mem. 22-24. From this email exchange, Plaintiff would have the Court draw the following "inferences": After Plaintiff raised unspecified questions about a four month old bill it had received from Lightship, Mr. O'Hare spoke to his operational people, learned something -- completely unspecified -- about the *Verizon* billing (which wasn't even the topic of discussion), reported back to Mr. Oppenheimer and Mr. Matlack that Lightship's billing to Verizon was fraudulent, and they *then* made a decision not to disclose the fraud to Plaintiff. This wild-eyed wishful thinking is not inferential -- it is just a completely made up assumption that a fraud occurred. Moreover, it seems to turn on the idea that a "strategy" of nondisclosure was agreed on *after* Mr. O'Hare spoke with his people. Pl. Mem. 60-61. But the email chain does not support that. *Before* Mr. O'Hare even said he needed to speak with his people, when Mr. Oppenheimer had just been told that the issue could not possibly have anything to do with value, Mr. Oppenheimer wrote that Plaintiff "should not need any more info at this point." Shortly after that (in fact, only *7 minutes* after Mr. O'Hare said he needed to speak with his people, who were out of town), Mr. Oppenheimer suggested telling Plaintiff that "they should be prepared to meet our deadline tomorrow without an answer to that question." There was no change of strategy, and there is nothing in this e-mail chain that suggests any fraudulent intent on Mr. Oppenheimer's part. It is not an inference to guess that somebody learned of a fraud -- that is called rank speculation.

        Neither the motive alleged in the Complaint nor the so-called inferences from the one

---

[18] Plaintiff's gratuitous and unfounded assertions about greed and unethical behavior, and mudslinging about people in the financial world who serve as directors and, as part of the cost of doing business, are often the target of frivolous litigation, have no place here. Pl. Mem. 53-54.

specific fact alleged about Mr. Oppenheimer (nor anything else) comes anywhere close to demonstrating the strong inference of scienter that is essential to stating a §10(b) claim under PSLRA.

## II.

## THE COMPLAINT FAILS TO
## STATE A §20(a) CLAIM

A.    The JP Morgan Defendants Did Not "Control" Lightship

Plaintiff's main response to the JP Morgan Defendants' showing that the Complaint does not adequately allege their control of Lightship within the meaning of §20(a) is to say that *together* the JP Morgan Defendants *and* Megunticook owned a majority of Lightship's stock and *together* "held four of the six seats on Lightship's Board of Directors." Pl. Mem. 66. The JP Morgan Defendants and Megunticook are wholly unrelated independent entities, and there is no allegation otherwise. As this Court held in American High-Income Trust v. Allied Signal, 329 F. Supp.2d 534 (S.D.N.Y. 2004) (Swain, J.), *each* of the unrelated defendants must be evaluated separately for control: "To state a 'controlling person' claim under Section 20(a), Plaintiffs must plead 1) a primary violation by [the controlled entity]; 2) that *each defendant* was a controlling person; and 3) that *each defendant* was [a] culpable participant in the fraud." Id. at 549 (emphasis added).

The Complaint admits that the JP Morgan Defendants had the power to appoint only two out of six (actually seven) directors comprising the Lightship Board. Cplt. ¶28.[19] A shareholder who does not control a majority of the Board of Directors does not have a *controlling* block of stock. The

---

[19]    The Lightship Shareholders Agreement (a Transaction Document under the Merger Agreement) provides that neither the JP Morgan Defendants nor the Megunticook Defendants could alone appoint more than two out of seven directors (or well less than one-third of the Board). JSR Reply Aff. Ex. A, §3.1.

The same Shareholders Agreement also includes a long list of corporate actions as to which neither the JP Morgan Defendants nor the Megunticook defendants could act alone. For example, a super-majority vote of shareholders was required for such actions as: the authorization or issuance of shares; declaration of dividends; authorization of any merger or any sale of substantially all of the assets of the company; amendment of the Certificate of Incorporation or By-laws; acquisition of assets; changing the equity compensation of management. Moreover, there were also actions, such as borrowing money over a certain amount, that the Company was not permitted to take without the approval of a majority of the Board, i.e., the JP Morgan designees alone could not approve such actions. Id. §3.9(b).

-13-

Second Circuit[20] and Southern District[21] cases cited by Plaintiff on the issue of "control" through stock ownership and Board representation are not to the contrary.

The Complaint also does not allege that the JP Morgan Defendants directly managed Lightship, or otherwise controlled or directed its day-to-day operations. Rather, Plaintiff argues that the JP Morgan Defendants' Board designee (1) was involved in "overseeing" the financial condition and operations of Lightship (Pl. Mem. 67; Cplt. ¶28); and (2) together with Megunticook's designee "controlled" the process by which Lightship was sold to Plaintiff (Pl. Mem. 68). That a shareholder designates a director who in turn fulfills his fiduciary duty by generally overseeing at the Board level the affairs of the company can by no means give rise to an inference that the entity designating such Board members *itself* "controls" the company. The Court in Global Crossing held that merely having the power to appoint directors of another company does not give rise to an inference that the appointing entity controls such directors or company; specific fact allegations to that effect are necessary. 2005 WL 1881514, at **9-10, 12. There are no allegations in the Complaint about any effort by the JP Morgan Defendants to control Mr. Oppenheimer, or any other designee, as a director of Lightship.

---

[20]  Plaintiff claims that Ganino v. Citizens Utilities Co., 228 F.3d 154 (2d Cir. 2000), stands for the proposition that ownership of only 20% of the voting stock should lead to "a presumption" that an investor has significant influence over the company, directing the Court's attention to p. 164, fn.7 of that case. Pl. Mem. 66. That portion of Ganino has to do with the concept that, as a matter of generally accepted accounting principles ("GAAP"), a company is normally required to include in its own financial statements its share of the income or loss of companies in which it has a 20% share. That GAAP accounting principle has no relationship to the analysis of control under §20(a). It is misleading for Plaintiff to suggest to this Court that the Second Circuit has held that a 20% ownership interest establishes control under §20(a). Plaintiff cites no such authority in the Second Circuit.

[21]  None of the five Southern District cases cited by Plaintiff (Pl. Mem. 66-67) undermines or contradicts the self-evident proposition that the right to appoint only two Board members out of six (or seven) cannot, by itself, give rise to an inference of control under §20(a). Four of the five cases involved alleged control persons that were the *sole* shareholders of the allegedly controlled entity, or parent companies that owned a majority of the stock and *also* had power to control the Board of the subsidiaries.

Plaintiff suggests that the fifth case, In Re Emex Corp. Sec. Litig., 2002 WL 31093612 (S.D.N.Y. 2002), stands for the proposition that a mere 45% ownership interest in a primary violator, with board membership, is itself a sufficient allegation of control under §20(a). Plaintiff does not tell the Court that there were *two* 45% shareholders who were themselves controlled, in whole or in part, by the individual defendants (the CEO, CFO and two directors of Emex), as to whom the Court had already found control adequately alleged. 2002 WL 31093612, at *1. The Court found the allegations sufficient to support a reasonable inference of control by the two *affiliated* shareholders (who together owned 90%). By contrast here, no one associated with Lightship owned, or in any way controlled, the JP Morgan Defendants, whose ownership was also much less.

-14-

The paragraphs of the Complaint to which Plaintiff refers regarding the allegation that the JP Morgan Defendants (with Megunticook) controlled the sales process (Pl. Mem. 68; Cplt. ¶¶63, 70, 71, 84, 86) are similarly devoid of any allegation that the JP Morgan Defendants did anything to control or influence Mr. Oppenheimer as a Board member of Lightship. Moreover, such allegations *themselves* make clear that Plaintiff at all times understood that Mr. Oppenheimer was acting as a director of Lightship and on behalf of Lightship. See, e.g., Cplt. ¶¶63, 71 and n.8, supra. There are *no* factual allegations suggesting that, in carrying out his duties as a director of Lightship, Mr. Oppenheimer was operating within the scope of an agency relationship with the JP Morgan Defendants. The Complaint alleges that Mr. Oppenheim was the designee of the JP Morgan Defendants on the Board, period. That allegation is insufficient to plead control as a matter of law.

Even assuming arguendo that Mr. Oppenheimer was operating as an agent of the JP Morgan Defendants (Pl. Mem. 39, n.13), and not, as alleged in the Complaint, as a director of Lightship, the allegations of the Complaint that Plaintiff points to would *still* not be sufficient to state a §20(a) claim against the JP Morgan Defendants:

- Mr. Oppenheimer and Mr. Matlack participated in preliminary discussions and negotiations with Plaintiff about the sale. Cplt. ¶¶63, 70.

- Mr. Oppenheimer and Mr. Matlack exchanged e-mails with Plaintiff about the due diligence, "each at times answering questions *on behalf of Lightship* and providing information regarding Lightship's billing practices [Cplt.] ¶¶71, 84, 86."

Pl. Mem. 68 (emphasis added). Such allegations clearly do not give rise even to an inference that Mr. Oppenheimer "controlled" the sales process. Having some discussions and e-mail correspondence, and providing unspecified information about a broad topic like "billing," in no way even *suggests* such control. The last bullet point that Plaintiff includes as evidence of "control" (Pl. Mem. 68), unlike the others, bears no citation to the Complaint and makes speculative assertions about Mr. Oppenheimer's supposed knowledge of Lightship's billing that have been addressed above. In sum, the §20(a) claim must

-15-

be dismissed because the Complaint (1) admits that the JP Morgan Defendants did not control the

Lightship Board, (2) does not allege that they controlled Mr. Oppenheimer as a Lightship director, and (3)

does not allege that Mr. Oppenheimer controlled Lightship.

B.    The Complaint Fails To Allege "Culpable Participation"

To "establish a prima facie case" under §20(a), a plaintiff must also show that the alleged

controlling person was "'in some meaningful sense [a] culpable participant[] in the fraud perpetrated by

[the] controlled person[].'" SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1472 (2d Cir. 1996);

Ganino v. Citizens Utilities Co., 228 F.3d 154, 170 (2d Cir. 2000) (same).  In what we believe is one of

the most recent and comprehensive decisions in the Southern District on the pleading requirement with

respect to culpable participation, Judge Karas thoroughly surveyed the law and concluded that under

PSLRA "culpable participation" must be pled "with the same particularity as scienter under Section

10(b)." Lapin v. Goldman Sachs Group, Inc., 506 F. Supp.2d 221, 244-249 (S.D.N.Y. 2006).

While there is conflicting authority in the Southern District, including this Court's decision

in Sedona Corp. v. Ladenburg Thalmann & Co., Inc., 2006 WL 2034633 (S.D.N.Y 2006), we respectfully

submit that the reasoning of the Court in Lapin is persuasive.  The rule more in line with Supreme Court

and Second Circuit precedent is that culpable participation necessarily involves a culpable state of mind

(i.e., conscious or reckless behavior) which, under PSLRA, must be pleaded with particularity.  Plaintiff

has not come close to pleading any sort of culpable participation of the JP Morgan Defendants, and

Plaintiff's purely conclusory assertion that "there is no question that each of the Defendants 'participated'

in the fraud alleged" (Pl. Mem. 70) is both untrue and entitled to no weight.

Even were this Court to conclude that "culpable participation" need be pled only in

accordance with Rule 8(a), the Complaint still falls short.  There are no allegations of any kind that the JP

Morgan Defendants did or knew anything about Lightship's billing practices (and Mr. Oppenheimer's

actions or knowledge cannot be attributed to the JP Morgan Defendants because he was acting, and

-16-

receiving information, as a director of Lightship, not as an agent of the JP Morgan Defendants).  Finally,

even if Mr. Oppenheimer's actions or knowledge were attributed to the JP Morgan Defendants, there are

no *factual* allegations in the Complaint of Mr. Oppenheimer's having *any* knowledge of fraud that rise

above the level of conclusory speculation, and certainly none that meet the standard set forth by the

Supreme Court in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965, 1974 ("labels and conclusions,

and a formulaic recitation" are insufficient under Rule 8(a); fact allegations "must be enough" to raise

claim "above the speculative level;" facts must state a claim "plausible on its fact," not merely

"conceivable").  For all of the reasons set forth above Plaintiff's §20(a) claim must be dismissed.[22]

### III.

### THE COMPLAINT FAILS TO STATE A
### NEGLIGENT MISREPRESENTATION CLAIM

A.    The Necessary "Special Relationship" Is Absent

Setting up a strawman, Plaintiff argues that Defendants are "mistaken in implying that a

special relationship cannot exist in the context of buyers and sellers." Pl. Mem. 95.  Defendants did not

argue that there can *never* be instances where a seller takes on a sufficient "special relationship" to a buyer

such that a claim for negligent misrepresentation will lie.  Plaintiff's suggestion -- that such a relationship

exists simply because a seller "had reason to know that the buyer was relying on the accuracy of their

representation" (id.) -- is too broad,[23] and misstates Kimmell v. Schaefer, 89 N.Y.2d 257 (1996).

In Kimmell, the New York Court of Appeals defined the kind of "special relationship"

necessary for a negligent misrepresentation claim:

> [L]iability for negligent misrepresentation has been imposed only on those persons who possess
> unique or specialized expertise, or who are in a special position of confidence and trust with the
> injured party such that reliance on the negligent misrepresentation is justified.

---

[22]  The JP Morgan Defendants also rely on the reply brief of the Megunticook Defendants on the issue of control.
[23]  Both because there were no representations by the JP Morgan Defendants and because there was no reasonable reliance on them by Plaintiff, this argument is beside the point.

89 N.Y. 2d at 263. The existence of a special relationship is determined by weighing the following three factors: "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." Id. at 264.[24]

Here, there are no "exceptional" circumstances of the kind found in Kimmell. Plaintiff itself, as a major telecommunications company, possessed the unique and specialized expertise to evaluate Lightship, spending months doing just that in due diligence with its own specialized team of legal, regulatory and operational personnel and outside investment bankers and lawyers. The hapless investors in Kimmell are a far cry from Plaintiff, and the lawyer-CPA-Chairman-CFO defendant in Kimmell -- who specifically assured the investors he was soliciting that they could rely on him -- is a far cry from the JP Morgan Defendants and their outside director on the Lightship Board who made no representations whatsoever to Plaintiff.

Plaintiff also relies on Suez Equity Investors v. Toronto-Dominion Bank, 250 F.3d 87 (2d Cir. 2001). Applying the Kimmell factors, the Second Circuit in Suez held that "conclusory allegations" as to some defendants were insufficient to plead a special relationship but that specific factual allegations as to other defendants[25] took the relationship "beyond the typical arm's length business transaction." Id. at

---

[24] The Court of Appeals affirmed the finding of a "special relationship" in Kimmell on the following facts: Defendant (a lawyer, CPA and former chief financial officer of Pepsico who had become the Chairman and CFO of the subject company) personally solicited plaintiffs, vouched for their investment in his company, and was "uniquely situated" to evaluate the economics of a project crucial to the company's operations. 89 N.Y.2d at 264. Defendant "met with each plaintiff," "personally represented" that the project would generate income, "urged" plaintiffs to rely on the erroneous projections he had commissioned, and told one of the plaintiffs "that he could provide 'hot comfort' should plaintiff entertain any reservations about investing." Id. at 265. Defendant "personally requested" the erroneous projections, represented that they were "reasonable and generated after a 'thorough discussion with our West Coast Administrator,'" sent them to plaintiffs *and* received a $20,000 cash commission for his efforts. Id. The Court of Appeals concluded that in these circumstances, defendant owed plaintiffs the "exceptional" duty of care required to sustain a negligent misrepresentation claim. Id. at 264.

[25] Those defendants initiated the contact with plaintiff; induced plaintiff not to perform due diligence; repeatedly vouched for the truth of the information provided to plaintiff; held themselves out as possessing special knowledge; and knew that plaintiffs were seeking specific information about the company's founder in order to determine

-18-

103. Plaintiff here alleges nothing remotely resembling the facts alleged in <u>Suez</u> or <u>Kimmell</u>, and nothing beyond what the Second Circuit termed "the typical arm's length business transaction" that is insufficient to sustain a claim for negligent misrepresentation.

B.    <u>The Martin Act Preempts The Negligent Misrepresentation Claim</u>

Other than to preserve the point (Pl. Mem. 97, n.51), Plaintiff does not take serious issue with the proposition in our main brief that under New York law, as this Court held in <u>Sedona</u>, "common law claims of negligent misrepresentation . . . arising from securities fraud are preempted by the Martin Act." 2005 WL 1902780, at *21. Instead, Plaintiff argues that there is a question -- for another day -- whether there is a sufficient nexus with New York to render the Martin Act applicable.

It is indisputable, from the Complaint and the transaction documents on which it relies, that the underlying transaction here was one "within or from" New York within the meaning of the Martin Act and this Court's <u>Sedona</u> decision, and that Plaintiff's claims arise under and are governed by New York substantive law, including the Martin Act:

- *The Merger Agreement itself is a New York agreement.* It is governed by and construed under the substantive laws of New York without giving effect to choice of law provisions. The New York courts have irrevocable and exclusive jurisdiction of any actions arising out of or relating to the Merger Agreement or any other Transaction Document, and the parties waived any defense or objection of improper venue or inconvenient forum to any action brought in New York. JSR Aff. Ex. 1, §10(h), (m) (p.57-58).

- *Pursuant to the Merger Agreement, the Closing of the Transactions* -- that is, "the Merger and the performance by each of the Parties of its respective obligations under this [Merger] Agreement and any other Transaction Documents to which it is a party" -- *took place in New York.* JSR Aff. Ex. 1, §1(a) (p. 11), §2(b) (p. 12).

- *Many of the other agreements that comprise the Transaction Documents are also expressly agreed to be New York agreements* governed by and construed under the substantive laws of New York without giving effect to conflict of law provisions, and the parties irrevocably and exclusively agreed to resolve all claims and actions arising out of or relating to many of those agreements in the courts of New York. <u>See</u> Voting Agreement §§6, 7; Paying

---

whether to invest and supplied information for that purpose while discouraging plaintiff from conducting their own investigation of the founder. <u>Suez</u>, 250 F.3d at 103-04. That type of specific factual pleading -- as opposed to conclusory labels -- alleged a special relationship.

Agent Agreement §22(a); Stockholder Representative Agreement §5; Closing Agreement §8; Escrow Agreement §7(j).  JSR Reply Aff. Exs. B-F.

Finally, the Complaint alleges that the JP Morgan Defendants themselves are entities with their principal places of business in New York.  Cplt. ¶3.  Mr. Oppenheimer's place of business was also in New York. See, e.g., JSR Aff. Ex. 4, §7(d)(ii) (p. 8).  Thus, to the extent any wrongful acts are actually alleged against the JP Morgan Defendants, those acts emanated from New York.  The foregoing factors demonstrate more than a sufficient nexus with New York for purposes of the Martin Act.  Accordingly, because the Martin Act applies and preempts this claim, Plaintiff's negligent misrepresentation claim must be dismissed.

## CONCLUSION

For the reasons stated herein, in the JP Morgan Defendants' main Memorandum of Law, and in the Joint Reply with respect to Jurisdiction submitted herewith, the Complaint against the JP Morgan Defendants should be dismissed with prejudice.

Dated: New York, New York
February 15, 2008

Respectfully submitted,

Jayne S. Robinson
K. Ann McDonald

ROBINSON & McDONALD LLP
61 Broadway, Suite 1415
New York, New York  10006
Tel.:  212 953-3400
Fax.:  212 953-3690

Attorneys for Defendants
JP Morgan SBIC LLC and
Sixty Wall Street SBIC Fund, L.P.

-20-

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 15, 2008, a copy of the foregoing Reply Memorandum of Law in Support of the JP Morgan Defendants' Motion to Dismiss the Complaint was filed electronically.  Notice of this filing will be sent by e-mail to the following by operation of the Court's electronic filing system, who may access this filing through the Court's system:

> John Michael Teitler, Esq.
> Nicholas W. Lobenthal, Esq.
> Teitler & Teitler
> 1114 Avenue of the Americas
> New York, New York  10036
>> Attorneys for One Communications Corp.

> Mark S. Resnick, Esq.
> The Resnick Law Group, P.C.
> Old City Hall
> 45 School Street
> Boston, Massachusetts  02108
>> Attorneys for One Communications Corp.

> Paul E. Summit, Esq.
> Ira Gross, Esq.
> Sullivan & Worcester
> One Post Office Square
> Boston, Massachusetts  02109
> Email:  Psummit@sandw.com
>> Attorneys for The Megunticoook Fund II, L.P. and
>> The Megunticook Side Fund II, L.P.

> David B. Mack, Esq.
> O'Connor, Carnathan and Mack LLC
> 8 New England Executive Park
> Suite 310
> Burlington, Massachusetts  01803
> Email:  dmack@ocmlaw.net
>> Attorneys for Kevin O'Hare and Jeffrey Koester

Joseph M. Pastore, III, Esq.
Dreier LLP
One Landmark Square, 20th floor
Stamford, Connecticut  06901
     Attorneys for Kevin O'Hare and Jeffrey Koester

Scott H. Angstreich, Esq.
Joseph Solomon Hall, Esq.
William David Sarratt, Esq.
Kellogg, Huber, Hansen, Todd & Evans PLLC (DC)
1615 M Street, N.W., Suite 400
Washington, D.C.  20036
     Attorneys for Verizon New England Inc.

Nicholas J. Panarella, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York  10178
     Attorneys for Mellon Investor Services LLC

Jayne S. Robinson