UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

|  |  |
|---|---|
| IN RE ONE COMMUNICATIONS CORP. | : MASTER FILE<br>: 07 Civ. 3905 (LTS)(AJP) |
| This Document Relates To:  07 Civ. 3905 | : ECF |
| One Communications Corp., Plaintiff | : **REPLY AFFIRMATION**<br>: **OF JAYNE S. ROBINSON** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

JAYNE S. ROBINSON, an attorney duly admitted to practice in New York, affirms under penalty of perjury as follows:

1.    I am a partner in the law firm Robinson & McDonald LLP, attorneys for defendants JP Morgan SBIC LLC and Sixty Wall Street SBIC Fund, L.P. (the "JP Morgan Defendants"). I submit this reply affirmation in support of the motion of the JP Morgan Defendants, as well as the motions of the Megunticook defendants and the individual defendants, to dismiss the Complaint as to each of them, in order to place before the Court on these motions certain documents referred to in the Complaint on which Plaintiff relies.

2.    Annexed hereto as Exhibits A through F are excerpts from the following Transaction Documents under the Merger Agreement (the full agreements, of which Plaintiff has a set, are available for the Court's review):

| | |
|---|---|
| Exhibit A | Amended and Restated Shareholders Agreement of Lightship Holding, Inc. §§1, 3.1, 3.9. |
| Exhibit B | Voting Agreement §§6, 7. |
| Exhibit C | Paying Agent Agreement §22(a). |
| Exhibit D | Stockholder Representative Agreement §5. |
| Exhibit E | Closing Agreement §8. |
| Exhibit F | Escrow Agreement §7(j). |

3.    Annexed hereto as Exhibit G are letters from Verizon to Lightship dated February 16, 2006 and March 23, 2006 (almost a year after Lightship was acquired by Plaintiff), "disputing charges totaling $544,788.72" on an invoice dated February 1, 2006, and "disputing charges totaling $505,352.50" on an invoice dated March 1, 2006, respectively.  These letters are part of a lengthy Exhibit 12 to my original Affirmation on these motions, and are being submitted separately for the Court's convenience.  To the best of my information and belief, the apparent redactions in these letters were made by Plaintiff before it sent the letters to the Stockholder Representative Committee as attachments to its November 17, 2006 letter (contained in Exhibit 12).

Dated: New York, New York
        February 15, 2008

_____
Jayne S. Robinson

# Exhibit A

# AMENDED AND RESTATED

# SHAREHOLDERS AGREEMENT

## LIGHTSHIP HOLDING, INC.

5200/52983-222  LALIB1/482152 v8

## AMENDED AND RESTATED SHAREHOLDERS AGREEMENT

AMENDED AND RESTATED SHAREHOLDERS AGREEMENT, dated as of February 8, 2002, by and among, Lightship Holding, Inc., a Delaware corporation (the "Company"), and the Persons named in Schedule A (the "Shareholders"). The Shareholders Agreement dated December 27, 2000 between the Company and certain of the Shareholders is hereby amended and restated in its entirety. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Certificate of Incorporation.

### WITNESSETH:

WHEREAS, the Company and the Shareholders desire to enter into this Amended and Restated Shareholders Agreement for the purposes of regulating certain aspects of the relationships among the Shareholders and the Company; and

WHEREAS, it is in the best interests of the Company and the Shareholders that such aspects of their relationship be so regulated;

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Section 1.    DEFINITIONS. As used in this Agreement, the following terms shall have the following respective meanings (such meanings being equally applicable to both the singular and plural form of the terms defined):

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries Controls, is controlled by or is under common control with such Person and, as to any Person that is an individual, such individual's spouse, parents, siblings and children. Without limiting the generality of the foregoing, an "Affiliate" of a Person shall include any limited partnership the general partner of which is an Affiliate of such Person (or if such Person is a limited partnership, of such Person's general partner).

"Agreement" means this Shareholders Agreement, including all amendments, modifications and supplements hereto and any exhibits or schedules to any of the foregoing.

"Annual Operating Budget" has the meaning ascribed thereto in Section 2.

"Audit Committee" means the Audit Committee of the Board of Directors of the Company.

"Bankruptcy" shall mean the "Bankruptcy" of a Person and shall be deemed to have occurred upon the happening of any of the following:

(a)     The valid appointment of a receiver or trustee to administer all or a substantial portion of a Person's assets;

(b)     The filing by a Person of a voluntary petition for relief under the Bankruptcy Code or of a pleading in any court of record admitting in writing its inability to pay its debts as they become due;

(c)     The making by a Person of a general assignment for the benefit of creditors;

(d)     The filing by a Person of an answer admitting the material allegations of, or its consenting to or defaulting in answering, a petition for relief filed against it in any proceeding under the Bankruptcy Code; or

(e)     The entry of an order, judgment or decree by any court of competent jurisdiction, granting relief against a Person in a proceeding under the Bankruptcy Code.

"Bankruptcy Code" shall mean Title 11 of the United States Code, as now constituted or hereafter amended, or any other applicable federal, state or foreign bankruptcy, debtor relief or similar law.

"Bylaws" means the Bylaws of the Company in the form of Exhibit B.

"Certificate of Incorporation" means the Amended and Restated Certificate of Incorporation of the Company in the form of Exhibit A.

"Committees" has the meaning ascribed thereto in Section 3.2.

"Common Stock" means, collectively, the Voting Common Stock and the Nonvoting Common Stock.

"Compensation Committee" means the Compensation Committee of the Board of Directors of the Company.

"Controls" including, with correlative meanings, the terms "controlled by" and "under common control with," means, as to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Convertible Securities" means any evidence of indebtedness, shares (other than Common Stock) or other securities convertible into or exchangeable or exercisable for Common Stock.

"Entity" means any corporation, partnership, joint venture, unincorporated association, trust, limited liability company or any other similar organization.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Securities" means (i) securities offered to the public pursuant to a Qualified IPO; (ii) 4,872,949 shares of Series AA Preferred or options of other securities issuable pursuant to the Management Equity Plan and any shares issuable upon exercise or conversion thereof; (iii) shares of Common Stock issuable upon the conversion of any Preferred Stock; (iv) any shares of capital stock issued to the Company's shareholders in connection with any stock split, stock dividend or recapitalization; (v) any shares of Common Stock issued as a dividend in accordance with Section 1(a) of the Certificate of Incorporation; (vi) 2,500,000 shares of Series CC Preferred issued to The Megunticook Shareholders in connection with the Megunticook Shareholders' obligation to purchase such shares pursuant to the Purchase Agreement; (vii) 190,000 shares of Series CC Preferred issued to the Houghton Group in connection with the Houghton Group's obligation to purchase such shares under the Purchase Agreement; and (viii) 333,339 shares of Common Stock issuable upon exercise by GECC of that certain Warrant issued by the Company in connection with the GECC Loan Agreement.

"GECC" means General Electric Capital Corporation.

"GECC Loan Agreement" means that First Amended and Restated Loan and Security Agreement dated as of September 26, 2000, as amended and restated as of February 8, 2002, by and between the Company, Lightship Telecom LLC, GECC and certain other parties thereto.

"Houghton Group" means James R. Houghton, James D. Houghton, Donald McNaughton and Alta Associates.

"Incapacity" means, as to any Person, the Bankruptcy of such Person.

"Institutional Investors" means, collectively, the JPM Related Shareholders, the Megunticook Related Shareholders, and, if and when Telegraph Hill becomes a Shareholder, Telegraph Hill, and any permitted transferee of any Shares held by the JPM Related Shareholders, the Megunticook Related Shareholders and Telegraph Hill.

"JPM Related Shareholders" means, collectively, the JPM Shareholders and, with respect to any Shares transferred by any JPM Shareholder, any transferee thereof.

"JPM Shareholders" means, collectively, JPMIC and Sixty Wall.

"JPMIC" means J.P. Morgan SBIC LLC, a Delaware limited liability company.

"Management Equity Plan" has the meaning set forth in Section 3.10.

"Management Shareholders" means Kevin O'Hare, David Jorgensen and Jeffrey Koester.

"Megunticook Fund" means The Megunticook Fund II, L.P., a Delaware limited partnership.

"Megunticook Related Shareholders" means, collectively, the Megunticook Shareholders and, with respect to any Shares transferred by any Megunticook Shareholder, any transferee thereof.

"Megunticook Shareholders" means, collectively, Megunticook Fund and Megunticook Side Fund.

"Megunticook Side Fund" means The Megunticook Side Fund II, L.P., a Delaware limited partnership.

"Nonvoting Common Stock" means the Series Y Nonvoting Common Stock, par value $0.0001 per share, of the Company.

"Nonvoting Series BB Preferred" means the Nonvoting Series BB Convertible Preferred Stock of the Company, par value $0.0001 per share.

"Nonvoting Series CC Preferred" means the Nonvoting Series CC Convertible Preferred Stock of the Company, par value $0.0001 per share.

"Offered Securities" means, other than Excluded Securities, any shares of capital stock of the Company, including without limitation any Common Stock and Preferred Stock, whether now authorized or not, or any Convertible Securities.

"Permitted Business" means telephone and telephone related services, including but not limited to local exchange access, long distance service, international service, calling cards, internet access and other high-speed data applications to customers located within the Northeast and Mid-Atlantic United States and such activities as may be incidental thereto.

"Person" means an individual or Entity.

"Preferred Stock" means, collectively, the Series AA Preferred, the Series BB Preferred, and the Series CC Preferred.

"Pro Rata Share" of a Shareholder means the percentage determined by dividing the amount of Common Stock and Convertible Securities, on an as converted basis, owned by such Shareholder by the total aggregate amount of the then outstanding Common Stock of the Company (including all Convertible Securities on an as if converted to Common Stock basis).

"Purchase Agreement" means that certain Securities Purchase Agreement by and among the Company and the shareholders of the Company party thereto dated as of February 8, 2002.

"Qualified IPO" means an underwritten initial public offering of shares of the Common Stock (i) at a public offering price per share that is not less than five times the Series CC Purchase Price (as adjusted for stock splits, stock combinations and similar events), (ii) in which the gross proceeds to the Company are not less than $25 million and (iii) consummated prior to the fifth anniversary of the Closing Date (as defined in the Purchase Agreement).

"Securities Act" means the Securities Act of 1933, as amended.

"Series AA Preferred" means the Series AA Convertible Preferred Stock of the Company, par value $0.0001 per share.

"Series AA Shareholders" means Shareholders holding shares of Series AA Preferred and shares of Common Stock that have been issued upon the conversion of Series AA Preferred.

"Series BB Majority Holders" means the holders of at least a majority of the then outstanding shares of Series BB Preferred.

"Series BB Preferred" means collectively the Voting Series BB Preferred and the Nonvoting Series BB Preferred.

"Series BB Shareholders" means Shareholders holding shares of Series BB Preferred and shares of Common Stock that have been issued upon the conversion of Series BB Preferred.

"Series CC Preferred" means, collectively, the Voting Series CC Preferred and the Nonvoting Series CC Preferred.

"Series CC Shareholders" means Shareholders holding shares of Series CC Preferred and shares of Common Stock that have been issued upon the conversion of Series CC Preferred.

"Series CC Supermajority Holders" means the holders of at least two-thirds of the then outstanding shares of Series CC Preferred and shares of Common Stock that have been issued upon the conversion of Series CC Preferred.

"Shareholders" means the persons listed on Schedule A.

"Shares" means, collectively, Preferred Stock and Common Stock.

"Sixty Wall" means Sixty Wall Street SBIC Fund, L.P., a Delaware limited partnership.

"Telegraph Hill" means Telegraph Hill Communications Partners, L.P., a Delaware limited partnership.

"Voting Common Stock" means the Series X Voting Common Stock of the Company, par value $0.0001 per share.

"Voting Series BB Preferred" means the Voting Series BB Convertible Preferred Stock of the Company, par value $0.0001 per share.

"Voting Series CC Preferred" means the Voting Series CC Convertible Preferred Stock of the Company, par value $0.0001 per share.

"Voting Stock" means capital stock of any class or series of the Company, the holders of which are entitled to participate generally in the election of the members of the Company's board of directors.

Section 2.    Annual Operating Budget.

Not later than sixty (60) days prior to the end of each fiscal year, the Company shall deliver to each Institutional Investor and each member of the Board of Directors of the Company, a draft copy of the annual operating budget for the then upcoming fiscal year (the budget eventually adopted or deemed to be adopted by the Board of Directors being referred to herein as the "Annual Operating Budget"). The Annual Operating Budget for each fiscal year shall be approved by the Board of Directors no later than January 31st of such fiscal year, and in the absence of such timely approval, the applicable year in the business plan attached to the First Amended and Restated Loan and Security Agreement by and among the Company, Lightship Telecom LLC and GECC, shall be deemed approved and adopted by the Board of Directors as the Annual Operating Budget for such fiscal year.

Section 3.    Voting.

3.1    Board of Directors. Each Shareholder shall vote (or shall cause to be voted) all shares of Voting Stock owned or controlled by such Shareholder (including any shares of Voting Stock hereafter acquired), at any regular or special meeting of shareholders of the Company, shall take all action by written consent in lieu of such meeting of shareholders, and shall take all other actions necessary, to ensure:

(a)    That the Board of Directors of the Company shall consist of seven (7) members and one (1) nonvoting observer, except as otherwise provided in Section 3.1(d) and Section 6.3 hereof, which nonvoting observer(s) shall have the right to attend quarterly meetings of the Board of Directors and may be invited to other meetings of the Board of Directors, provided, however, that the Board of Directors may excuse such nonvoting observer(s) from portions of such meetings, in the Board of Directors' reasonable discretion; and

(b)    That there shall be elected as such seven (7) members of such Board of Directors:

(i)    Two (2) individuals (the "JPM Designees") designated by the JPM Related Shareholders holding a majority of the shares of Voting Stock held by the JPM Related Shareholders. The initial JPM Designees shall be John Van Hooser and Matthew Niehaus.

(ii)    Two (2) individuals (the "Megunticook Designees") designated by the Megunticook Related Shareholders holding a majority of the shares of Voting Stock held by the Megunticook Shareholders. The initial Megunticook Designees shall be Thomas Matlack and James Houghton.

(iii)    Two (2) individuals (the "Independent Designees") designated by the Series CC Supermajority Holders, and acceptable to the Chief Executive Officer of the Company (whose acceptance shall not be unreasonably withheld).

(iv)    The Chief Executive Officer of the Company.

(c)    That there shall be appointed one (1) nonvoting observer to the Board of Director designated by the Megunticook Designees (the "Megunticook Observer"). The initial Megunticook Observer shall be Michelle Fortier.

(d) There may be appointed one (1) nonvoting observer to the Board of Directors designated by GECC (the "GECC Observer") on the terms and subject to the conditions contained in the GECC Loan Agreement. The initial GECC Observer shall be Keith Min.

3.2    Committees of the Board of Directors. The Company shall establish an Audit Committee and a Compensation Committee (together, the "Committees") of the Board of Directors of the Company. A majority of the members of each Committee shall be comprised of members of the Board of Directors who are not employees of the Company. Without limiting the generality of the foregoing, the Compensation Committee shall include one JPM Designee and one Megunticook Designee, and the Audit Committee shall include one Megunticook Designee. In addition, the Chief Executive Officer of the Company shall have the right, but not the obligation, to be a member of all Committees. Each Committee shall have the powers and duties set forth in the resolutions of the Board of Directors of the Company authorizing the establishment of such Committees, and notwithstanding the foregoing, the Compensation Committee shall have complete authority over and relating to any and all compensation decisions of any kind, including without limitation equity compensation, vesting arrangements or severance arrangements of any person.

3.3    Removal. A director designated by any Shareholder and elected or appointed pursuant to Section 3.1 shall be removed (with or without cause), (i) if those Shareholders holding a

3.7    Further Assurances.  In order to effectuate the provisions of this Section 3, each Shareholder hereby agrees that when any action or vote is required to be taken by such Shareholder pursuant to this Agreement, such Shareholder shall use its best efforts to call, or cause the appropriate officers and directors of the Company to call, a special or annual meeting of shareholders of the Company, as the case may be, or execute or cause to be executed a consent in writing in lieu of any such meetings pursuant to the Delaware General Corporation Law ("DGCL"), to effectuate any such shareholder action. In addition, if any Shareholder shall fail to vote as required by the specific terms of this Section 3, such Shareholder shall be deemed to have irrevocably constituted and appointed each of the other Shareholders as such Shareholder's proxy coupled with an interest to vote such Shareholder's Voting Stock on a pro rata basis in accordance with the terms of this Section 3.

3.8    Subsidiaries.  The Company covenants and agrees that none of the Company's subsidiaries shall (i) take any material action (including, without limitation, any action described in Section 3.9 below) that requires the consent of the Board of Directors or the shareholders of such subsidiary or (ii) enter into any arrangement or agreement with any of its officers, directors or employees, unless, in each case, such action or arrangement or agreement has been approved by the Board of Directors of the Company or, in the case of any matter referred to in clause (ii), the Compensation Committee of the Board of Directors of the Company. The Company shall take any and all actions as may be necessary, including the voting of all shares of its subsidiaries held by it or the giving of written consent in lieu thereof, to cause each subsidiary to comply with the provisions of this Section 3.8.

3.9    Certain Voting Issues.  (a) In addition to any provisions in the Certificate of Incorporation, the Company shall not without first obtaining the approval (by vote or written consent, as provided by law) of the Series CC Supermajority Holders or, if the Megunticook Shareholders have not fulfilled their obligation to fund the amounts due at the Second Closing (as defined in the Purchase Agreement) on or before the Second Closing Date (as defined in the Purchase Agreement), the Series BB Majority Holders (notwithstanding the foregoing, if (1) the Megunticook Shareholders fulfill their obligations to fund the amounts due at the Second Closing within 30 days of the Second Closing Date, and (2) any default under the GECC Loan Agreement arising from such failure to fund has been waived in writing by GECC, then upon the satisfaction of (1) and (2) above, such approval rights shall revert back to the Series CC Supermajority Holders):

(i)    create, authorize, designate or issue any shares of any class or series of capital stock of the Company or any securities that are directly or indirectly convertible into or exercisable for any class or series of capital stock of the Company, other than Excluded Securities;

(ii)    authorize or increase, or permit any subsidiary to authorize or increase, the authorized number of shares of, or issue any shares of any class or series of capital stock, options, warrants or other rights to acquire any such capital stock, of the Company or any subsidiary of the Company, other than Excluded Securities;

(iii)    effect, or cause any subsidiary to effect, any liquidation, dissolution or winding up of the Company or any subsidiary, or initiate a proceeding for the Bankruptcy of the Company or any subsidiary;

(iv)    declare or pay any dividend on (including a dividend payable in stock of the Company), make any other distribution with respect to, effect any redemption of or repurchase, any shares of any class or series of capital stock of the Company or any other securities that are convertible into or exercisable for such capital stock other than nominal payments in connection with the repurchase or redemption of capital stock (at a price not to exceed the cost per share) from employees of the Company whose employment has been terminated;

(v)    authorize or effect any merger or consolidation of the Company with or into any other corporation or other Person; sell, lease, exchange or otherwise dispose of, in a single transaction or a series of related transactions, all or substantially all of the assets of the Company or any subsidiary, any material assets of the Company or any subsidiary, or any material intellectual property licenses; or effect any recapitalization of the Company or any subsidiary; or cause any subsidiary to take any of the actions set forth in this subsection (v);

(vi)    amend, repeal or change, directly or indirectly, any of the provisions of the Certificate of Incorporation or the Bylaws of the Company or any subsidiary of the Company in any respect;

(vii)    acquire any assets or properties of any kind or make any investment of any kind (however structured) in any enterprise (however structured), or cause any subsidiary to make such an acquisition or investment, other than in the ordinary course of business consistent with past practice;

(viii)    undertake, or cause to be undertaken, any action which could adversely effect the Series CC Preferred;

(ix)    effect any change to the rights, preferences, or privileges of the Series CC Preferred (whether by merger, consolidation, recapitalization, operation of law or otherwise) including, without limitation, any increase in the authorized number of shares of Series CC Preferred;

(x)    acquire the capital stock or other equity securities of any Entity or all or substantially all of the assets of a Person or Entity;

(xi)    grant equity compensation to the Chief Executive Officer, any other officer or any other key employee of the Company or any of its subsidiaries in amounts or in any manner other than as determined by the Compensation Committee; or

(xii)    amend the Management Equity Plan.

(b) In addition to any provisions in the Certificate of Incorporation, the Company shall not without first obtaining the approval of a majority of the Board of Directors, which must include the Megunticook Designees and the JPM Designees, provided, however that the approval of the Megunticook Designees shall not be required if the Megunticook Shareholders have not fulfilled their obligation to fund the amounts due at the Second Closing on or before the Second Closing Date (notwithstanding the foregoing, if (1) the Megunticook Shareholders fulfill their obligations to fund the amounts due at the Second Closing within 30 days of the Second Closing Date, and (2) any default under the GECC Loan Agreement arising from such failure to fund has been waived in writing by GECC, then upon the satisfaction of (1) and (2) above, such approval rights shall be automatically restored to the Megunticook Designees):

(i) (1) borrow money (other than in the ordinary course of business consistent with past practice) or otherwise raise debt capital (however structured) or (2) make any capital expenditure in an amount greater than $100,000, unless such capital expenditure has been provided for in the Annual Operating Budget;

(ii) engage independent auditors;

(iii) approve any Annual Operating Budget;

(iv) cause a change in the purpose of the Company or any subsidiary or to cause or allow any thereof to engage in any business other than a Permitted Business; or

(v) grant monetary compensation (as opposed to compensation in the form of equity) to the Chief Executive Officer of the Company, any other officer or any other key employee of the Company or any of its subsidiaries in amounts or in any manner other than as determined by the Compensation Committee of the Board of Directors of the Company.

(c) In addition to any provisions in the Certificate of Incorporation, the Company shall not, without first obtaining the approval (by vote or written consent as provided by law) of the Series BB Majority Holders, effect any change to any of the rights, privileges or preferences of the Series BB Preferred.

3.10    Management Equity Plan. Subject to the prior written approval of the Series CC Supermajority Holders, the Board of Directors shall establish an incentive equity plan pursuant to which key employees, officers and consultants of the Company will be allowed to acquire, either through direct grant or through grant of options, up to an aggregate of 4,872,949 shares of Series AA Preferred (the "Management Equity Plan").

Section 4.    Representations, Warranties, and Covenants.

4.1    Covenants Applicable to Delivery of Financial Information. The Company hereby agrees that so long as any shares of Preferred Stock or Common Stock are held by any of the Institutional

Exhibit B

**EXECUTION COPY**

# VOTING AGREEMENT

**THIS VOTING AGREEMENT** (this "**Agreement**") is entered into as of March 21, 2005 by and among **CTC COMMUNICATIONS GROUP, INC.**, a Delaware corporation ("**CTC**"), **CTC COMMUNICATIONS ACQUISITION CORP.**, a Delaware corporation and a wholly-owned Subsidiary of CTC ("**Merger Sub**"), **LIGHTSHIP HOLDING, INC.**, a Delaware corporation ("**Holding**"), and each of the holders of capital stock of Holding set forth on **Schedule I** attached hereto (each, a "**Holding Stockholder**" and collectively, the "**Holding Stockholders**"). CTC, Merger Sub, Holding and the Holding Stockholders are sometimes referred to individually herein as a "**Party**" and collectively as the "**Parties**." Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Merger Agreement (as defined below).

**WHEREAS**, CTC, Merger Sub and Holding have entered into an Agreement and Plan of Merger, dated as of the date hereof (the "**Merger Agreement**"), which provides, among other things, for the merger (the "**Merger**") of Merger Sub with and into Holding, with the result that Holding, as the surviving corporation in the Merger, will become a wholly-owned subsidiary of CTC;

**WHEREAS**, the Holding Stockholders are the record and beneficial owners of 2,635,592 shares of Series AA Preferred, 10,679,753 shares of Voting Series BB Preferred, and 13,921,451 shares of Series CC Preferred of Holding, constituting 97.25% of all issued and outstanding Series AA Preferred, 98.49% of all issued and outstanding Voting Series BB Preferred and 99.50% of all issued and outstanding Series CC Preferred, respectively, on a fully diluted basis, as more particularly described on **Schedule I** attached hereto (each, a "**Share**" and collectively, the "**Shares**"); and

**WHEREAS**, as a condition precedent to execution of the Merger Agreement, the Holding Stockholders have agreed to execute and deliver this Agreement.

**NOW, THEREFORE**, in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.     **Restrictions on Disposition of Shares; Exclusivity.**

    (a)    From and after the date hereof until the earlier to occur of the termination of the Merger Agreement in accordance with **Section 9** thereof or the Effective Time, each of the Holding Stockholders agrees not to sell, transfer, pledge, assign, encumber or dispose of, or to enter into any Contract, option or other agreement with respect to the sale, transfer, pledge, assignment, encumbrance or disposition of, or permit a Lien to exist on or grant any proxy with respect to (each, a "**Transfer**") any interest in any of the Shares, now owned or hereafter acquired, beneficially or of record by such Holding Stockholder, including without limitation, a disposition effected through dividend, liquidation, distribution or otherwise, except for the conversion of Shares in accordance with the terms of the Merger Agreement. Notwithstanding anything to the contrary contained herein, the Parties acknowledge and agree that to the extent any of the provisions of this Agreement violates or otherwise conflicts with any provisions of the

relief, without the necessity of posting any bond or other security, in any court of competent jurisdiction. Each Holding Stockholder agrees to waive the defense in any such Action that CTC has an adequate remedy at law, and not oppose, legally or otherwise, the propriety of equitable performance as a remedy.

5. **Further Assurances**. Each of the Holding Stockholders shall execute and deliver such additional instruments and other documents and shall take such further actions as may be reasonably necessary to effectuate, carry out and comply with all of such Holding Stockholder's obligations under this Agreement. Without limiting the generality of the foregoing, none of the Parties hereto shall enter into any Contract (or alter, amend or terminate any existing Contract) or transaction if such action would reasonably be expected to interfere with the ability of any Party to effectuate, carry out and comply with all of the terms of this Agreement.

6. **Governing Law**. This Agreement shall be governed by and construed in accordance with the substantive Laws of the State of New York without giving effect to any choice or conflict of Law provision (whether of the State of New York or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New York.

7. **Submission to Jurisdiction**. Each of the Parties irrevocably submits to the jurisdiction of any state or federal court sitting in New York, New York, in any Action arising out of or relating to this Agreement and agrees that all claims in respect of the Action may be heard and determined in any such court. Each Party also agrees not to bring any Action arising out of or relating to this Agreement in any other court. Each of the Parties waives any defense or objection of improper venue or inconvenient forum to the maintenance of any Action so brought and waives any bond, surety, or other security that might be required of any other Party with respect thereto.

8. **Succession and Assignment**. This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors, heirs and legal representatives and permitted assigns. Nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement. No Party may assign or delegate either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other Party.

9. **Counterparts**. This Agreement may be executed in counterparts (including by means of facsimile), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

10. **Headings**. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

11. **Notices**. All demands, notices, requests, consents and other communications required or permitted under this Agreement shall be given in the manner set forth in Section 10 of the Merger Agreement.

Exhibit C

EXECUTION COPY



**Mellon Investor Services**

*A Mellon Financial Company*$^{SM}$

PAYING AGENT AGREEMENT

among

CTC COMMUNICATIONS GROUP, INC.,

MELLON INVESTOR SERVICES, LLC

and the members of the

STOCKHOLDER REPRESENTATIVE COMMITTEE

signatory hereto

NY01/STONM/996496.9

**THIS PAYING AGENT AGREEMENT** (this "Agreement") among CTC Communications Group, Inc., a Delaware corporation (the "Company"), Mellon Investor Services LLC, a New Jersey limited liability company ("Mellon"), and the members of the Stockholder Representative Committee signatory hereto (collectively, the "Stockholder Representative Committee"), is dated as of May 16, 2005.

1.    *Appointment.*

(a)    The Company hereby appoints Mellon to act as paying agent with respect to the surrender of certificates for shares of capital stock (the "Shares") of Lightship Holding, Inc., a Delaware corporation (the "Target") for cancellation, the cancellation of outstanding options to purchase Shares of Target ("Options") and the payment, in accordance with the Share Entitlement Schedule (as defined below), of cash amounts for each Share and each Option in connection with the Agreement and Plan of Merger (the "Merger Agreement"), dated as of March 21, 2005 by and among the Company, CTC Communications Acquisition Corp., a Delaware corporation and a wholly owned subsidiary of the Company ("Merger Sub"), and the Target, providing for the merger of Merger Sub with and into the Target (the "Merger"). Mellon hereby accepts such appointment in accordance with and subject to the terms and conditions set forth in this Agreement.

(b)    The time at which the Merger becomes effective is referred to in this Agreement as the "Effective Time." The Company shall inform Mellon of the Effective Time at least three Business Days prior thereto. For purposes of this Agreement, a "Business Day" means any day other than a Saturday, a Sunday, a day on which commercial banks are authorized by law to be closed in the Commonwealth of Massachusetts or the States of New York or New Jersey or a day on which the New York Stock Exchange is not open for trading.

(c)    The Company has furnished Mellon, prior to the date hereof, with copies of the letter of transmittal (the "Letter of Transmittal") to accompany certificates for Shares when surrendered for cash and the related Guidelines for Certification of Taxpayer Identification Number on Substitute Form W-9. On May 13, 2005 Mellon mailed the Letter of Transmittal, together with a return envelope, to holders of Shares of record as of May 12, 2005 (the "Record Date").

(d)    The Company delivered to Mellon prior to the date hereof a list showing, as of the Record Date, the following information (with an undertaking on the part of the Target to update such information to the extent it changes between the Record Date and the Effective Time): (1) the names and addresses of record of all holders of Shares and the number of Shares of each class and series of such Shares of Target held by each holder of Shares (including each such holder's taxpayer identification number ("TIN")), (2) the names and addresses of record of all holders of Options ("Optionholders") and the number of Options held by each Optionholder (including each such holder's TIN), (3) the certificates (giving certificate numbers) representing Shares that have been or are, as of such date, lost, stolen, destroyed or replaced or restricted as to transfer (noting the text of the restrictive legends applicable thereto) or with respect to which a stop transfer order has been noted, and (4) a letter from Target certifying which holders of Shares or Options have certified that their TINs are correct and, with respect to each holder who has not

agent shall affect the termination of this Agreement or the discharge of Mellon as paying agent hereunder. Upon any such termination, Mellon shall be relieved and discharged of any further responsibilities with respect to its duties hereunder. Upon payment of all outstanding fees and expenses hereunder, Mellon shall promptly forward to the Company or its designee any certificate for Shares, Letter of Transmittal or other document that Mellon may receive after its appointment has so terminated.

21.    *Force Majeure.*    Neither Mellon nor the Company shall not be liable for any failure or delay arising out of conditions beyond its reasonable control including, but not limited to, work stoppages, fires, civil disobedience, riots, rebellions, storms, electrical, mechanical, computer or communications facilities failures, acts of God or similar occurrences.

22.    *Miscellaneous.*

(a)    This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to conflict laws rules or principles. Mellon and the Company and the Stockholder Representative Committee irrevocably submit to the jurisdiction of any state or federal court sitting in New York, New York, in any action arising out of or relating to this Agreement and agree that all claims in respect of the action may be heard and determined in any such court. Mellon, the Stockholder Representative Committee and the Company also agree not to bring any action arising out of or relating to this Agreement in any other court and hereby waive any defense or objection of improper venue or inconvenient forum to the maintenance of any action so brought and waive any bond, surety, or other security that might be required of any other party with respect thereto.

(b)    No provision of this Agreement may be amended, modified, or waived, except in writing signed by all parties hereto.

(c)    In the event that any claim of inconsistency between this Agreement and the terms of the Merger Agreement arise, as they may from time to time be amended, the terms of the Merger Agreement shall control, except with respect to the duties, liabilities and rights, including compensation and indemnification, of Mellon as paying agent, which shall be controlled by the terms of this Agreement.

(d)    If any provision of this Agreement shall be held illegal, invalid, or unenforceable by any court, this Agreement shall be construed and enforced as if such provision had not been contained herein and shall be deemed an Agreement among us to the full extent permitted by applicable law.

(e)    This Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the respective successors and assigns of the parties hereto.

(f)    This Agreement may not be assigned by any party without prior written consent of the other parties hereto.

(g)    Sections 13, 14, 15, and 19 hereof shall survive termination of this Agreement.

NY01/STONM/996496.9

# Exhibit D

## STOCKHOLDER REPRESENTATIVE AGREEMENT

THIS STOCKHOLDER REPRESENTATIVE AGREEMENT (this "**Agreement**") is made and entered into as of May 16, 2005, by and among **LIGHTSHIP HOLDING, INC.**, a Delaware corporation ("**Holding**"), and the members of the Stockholder Representative Committee set forth on the signature page hereto (the "**Committee**") on behalf of certain holders of the Capital Stock of Holding (except for those holders of Holding's Series CC Convertible Preferred Stock who are not also holders of Series AA Convertible Preferred Stock or Series BB Convertible Preferred Stock) (collectively, the "**Holding Stockholders**"). Holding and the Committee are sometimes referred to individually herein as a "**Party**" and collectively as the "**Parties**."

### WITNESSETH

**WHEREAS**, Holding has entered into an Agreement and Plan of Merger, dated as of March 21, 2005 (the "**Merger Agreement**"), by and among Holding, CTC Communications Group, Inc., a Delaware corporation ("**CTC**") and CTC Communications Acquisition Corp., a Delaware corporation and a wholly-owned Subsidiary of CTC ("**Merger Sub**"), providing for the merger (the "**Merger**") of Merger Sub with and into Holding, with the result that Holding, as the Surviving Corporation in the Merger, will become a wholly-owned subsidiary of CTC (all capitalized terms used but not defined herein shall have the meanings assigned to them in the Merger Agreement); and

**WHEREAS**, the Merger Agreement requires that the Committee be constituted and appointed as agent, representative and attorney-in-fact for and on behalf of the Holding Stockholders in connection with the transactions contemplated by the Merger Agreement and the Indemnification Escrow Agreement.

**NOW, THEREFORE**, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.    **Establishment of Committee.**

    (a)    **Members/Term.** The Committee shall consist of three members, selected as follows:  (i) one individual designated by J.P. Morgan SBIC LLC in its sole discretion (the "**JPM Designee**"), (ii) one individual designated by Osprey Partners LLC in its sole discretion (the "**Osprey Designee**"), and (iii) Kevin O'Hare. The initial members of the Committee shall be Stephan Oppenheimer as the JPM Designee, James D. Houghton as the Osprey Designee and Kevin O'Hare. Each member shall serve until the earlier of his or her resignation or removal or the appointment of a successor. J.P. Morgan SBIC LLC and Osprey Partners LLC shall have the sole right of designation, removal, and replacement with respect to the JPM Designee and the Osprey Designee, respectively

    (b)    **Manner of Acting.** The act of a majority of the members of the Committee (which majority must include the affirmative vote of the JPM Designee) shall constitute the act of the entire Committee, and shall be binding upon all Committee members and the Holding Stockholders.

hereby relieved from any liability to any Person for any acts done by them in accordance with such decision, act, consent or instruction of the Committee.

(d)    Set forth on Schedule A hereto is a complete and accurate list of each Holding Stockholder's name, tax identification number, address and the percentage of funds such Holding Stockholder shall be entitled to receive upon distributions made by the Escrow Agent to the Committee for or on behalf of the Holding Stockholders.  The Committee may assume without independent inquiry that the facts set forth in Schedule A are true and correct in all material respects and that Schedule A has not been and is not required to be amended.  The Committee shall promptly release all funds received from the Escrow Agent to the Holding Stockholders in accordance with the percentages set forth in Schedule A, subject to the adjustments set forth herein.

3.    **Third Party Beneficiaries.**  The Holding Stockholders and the Committee acknowledge and agree that each of CTC, Merger Sub, and the Surviving Corporation has an interest in assuring that actions required under this Agreement are taken in accordance with the terms and conditions set forth herein, and each of CTC, Merger Sub and the Surviving Corporation shall therefore be deemed to be third party beneficiaries of and under this Agreement for all purposes.

4.    **Compensation/Expenses/Indemnification.**  Committee members shall be entitled to compensation for services rendered and reimbursement of all reasonable expenses (including the cost of errors and omissions insurance and attorneys' fees and expenses) incurred in their capacity as Committee members either (a) out of any portion of Indemnification Escrow that has been validly released by the Escrow Agent to the Committee in accordance with the terms of Section 8(f)(ix) of the Merger Agreement and the terms of the Indemnification Escrow Agreement, or (b) from each Holding Stockholder in that percentage set forth opposite such Holding Stockholder's name on Schedule A.  The Holding Stockholders shall severally indemnify and hold harmless the Committee members from any and all Losses arising out of or in connection with the performance of their obligations as Committee members while acting in good faith, and in the exercise of reasonable judgment and any act done or omitted to be done pursuant to the written advice of counsel shall be conclusive evidence of such good faith.  Notwithstanding any other provision contained herein, no Holding Stockholder shall be responsible for Losses in excess of the portion of the Payment Fund that such Holding Stockholder receives under the Merger Agreement.

5.    **Governing Law.**  This Agreement shall be governed by and construed in accordance with the substantive Laws of the State of New York without giving effect to any choice or conflict of Law provision (whether of the State of New York or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New York.

6.    **Succession and Assignment.**  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors, heirs and legal representatives and permitted assigns.  Nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement.  No Party may assign or delegate either this

# Exhibit E

## CLOSING AGREEMENT

THIS CLOSING AGREEMENT (this "**Agreement**"), is entered into as of the 20th day of May, 2005, by and among CTC COMMUNICATIONS GROUP, INC., a Delaware corporation ("**CTC**"), CTC COMMUNICATIONS ACQUISITION CORP., a Delaware corporation and a wholly-owned Subsidiary of CTC ("**Merger Sub**"), and LIGHTSHIP HOLDING, INC., a Delaware corporation ("**Holding**").

## W I T N E S S E T H :

WHEREAS, CTC, Merger Sub and Holding entered into that certain Agreement and Plan of Merger, dated as of March 21, 2005 (the "**Merger Agreement**", with capitalized terms used but not otherwise defined herein having the respective meanings given to them in the Merger Agreement), pursuant to which Merger Sub is to merge with and into Holding on the terms and subject to the conditions set forth in the Merger Agreement; and

WHEREAS, closing of the transactions contemplated by the Merger Agreement is occurring on the date hereof, and in connection therewith, the Parties desire to set forth their understandings regarding certain matters set forth herein;

NOW THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and intending to be legally bound, the Parties agree as follows:

1.    <u>Closing Date</u>.  Pursuant to Section 2(b) of the Merger Agreement, Closing of the Transactions is occurring as of the date hereof, which date shall constitute the "Closing Date" under the Merger Agreement.

2.    <u>Termination of Plan</u>.  CTC hereby waives the condition to the obligations of the CTC Entities to consummate the Merger set forth in Section 7(b)(xi) of the Merger Agreement to the extent, and only to the extent, such provision requires Holding, prior to the Closing, to terminate, or cause to be terminated, the 401(k) plan.

3.    <u>Working Capital</u>.

a.    Attached hereto as <u>Exhibit 1</u> is the Parties' agreed-upon determination of the "Required Working Capital Amount" as referred to in Section 2(f)(iv)(D) of the Merger Agreement.

b.    Attached hereto as <u>Exhibit 2</u> is the Lightship Estimate delivered by Lightship on May 17th, 2005.  Attached hereto as <u>Exhibit 3</u> is the revised Disagreement Notice of CTC, which replaces the original Disagreement Notice provided by CTC on May 18th, 2005, and which shall be deemed delivered by CTC as of May 18th, 2005, in accordance with Section 2(f)(ii) of the Merger Agreement.

4.    <u>Appraisal Rights</u>.  Holding represents and warrants to CTC that Holding is not aware of any stockholder of Holding that has demanded or intends to demand an appraisal for

any of such stockholder's Holding Shares as contemplated by the provisions of Section 2(d)(ix) of the Merger Agreement.

5.    Supplemental Disclosure.  CTC hereby waives the condition to the obligations of the CTC Entities to consummate the Merger set forth in Section 7(b)(iii) of and Section 7(b)(xiv) of the Merger Agreement to the extent, and only to the extent, the Officer's Certificate delivered by Holding pursuant to Section 7(b)(xiv) of the Merger Agreement does not conform to the requirements of said Section 7(b)(iii) and Section 7(b)(xiv); *provided, however*, that none of the CTC Indemnified Parties waives any right to indemnification under Section 8 of the Merger Agreement based upon, incurred in connection with, arising out of or otherwise in respect of any of the matters referred to in said Officer's Certificate.

6.    Representations of the Parties.  Each Party represents that (a) it has the requisite power and authority to enter into this Agreement, (b) the execution and delivery by it of this Agreement have been authorized by all necessary action on its part, and (c) this Agreement has been duly executed and delivered by it and, assuming this Agreement constitutes the legal, valid and binding obligation of the other Parties, constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except to the extent such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditor's rights generally, and (ii) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity).

7.    Construction of Agreement.  The Parties acknowledge and agree that this Agreement constitutes a Transaction Document for all purposes of the Merger Agreement and the other Transaction Documents.  In the event of any conflict or inconsistency between any provision of this Agreement and any provision of the Merger Agreement, the provisions of this Agreement shall govern and control.  Except as expressly stated herein, the Merger Agreement is hereby ratified and confirmed and shall continue unmodified and in full force and effect.  Without limiting the foregoing, no provisions of the Merger Agreement or any other Transaction Document, and no rights or remedies of any Party relating to any thereof, are amended, modified, waived, diminished or impaired, other than to the extent expressly set forth in this Agreement.

8.    Governing Law; Counterparts.  This Agreement shall be governed by and construed in accordance with the substantive Laws of the State of New York without giving effect to any choice or conflict of Law provision (whether of the State of New York or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New York.  This Agreement may be executed in counterparts (including by means of facsimile), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

*[signature page follows]*

# Exhibit F

## ESCROW AGREEMENT

ESCROW AGREEMENT (the "Escrow Agreement"), dated as of May __, 2005, among CTC COMMUNICATIONS GROUP, INC., a Delaware corporation ("Acquirer"), the members of the Stockholder Representative Committee signatories hereto (collectively "Representative"), as representatives of the former stockholders of LIGHTSHIP HOLDING, INC., a Delaware corporation ("Company"), and MELLON INVESTOR SERVICES LLC, a New Jersey limited liability company (the "Escrow Agent").

WHEREAS, CTC Communications Acquisition Corp., a Delaware corporation and wholly-owned subsidiary of Acquirer ("Merger Sub"), the Acquirer and Company have entered into an Agreement and Plan of Merger, dated as of March 21, 2005 (the "Merger Agreement"), whereby the Merger Sub will merge with and into the Company and each share of the currently outstanding capital stock of the Company will be converted into the right to receive cash in accordance with the Merger Agreement; and

WHEREAS, pursuant to the Merger Agreement, Acquirer, Merger Sub and the Company have agreed that at the Closing (as defined in the Merger Agreement) immediately available funds in the aggregate amount of $7,000,000 (the "Funds") will be transferred to the Escrow Agent for deposit into an escrow account (the "Escrow Account") to be established in accordance with this Escrow Agreement; and

WHEREAS, except for the holders of Dissenting Shares (as defined in the Merger Agreement), the former stockholders of the Company (except for those holders of the Company's Series CC Convertible Preferred Stock who are not also holders of the Company's Series AA Convertible Preferred Stock or Series BB Convertible Preferred Stock) (the "Shareholders") have executed or will execute a Letter of Transmittal and a Stockholder Representative Agreement in connection with the Merger Agreement and their surrender of shares in the Company in exchange for cash, have agreed in the Letter of Transmittal and the Stockholder Representative Agreement to be bound by the terms of this Escrow Agreement, and have granted authority to the Representative to act on their behalf for all purposes relevant to this Agreement; and

WHEREAS, Acquirer and Representative desire to appoint Mellon Investor Services LLC to act as Escrow Agent for the Funds and any other funds deposited or held in the Escrow Account from time to time in accordance with this Escrow Agreement, including without limitation income or earnings thereon (collectively the "Escrowed Property").

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

Section 1.    Appointment of the Escrow Agent.

The Escrow Agent is hereby appointed, and hereby agrees to act, as the Escrow Agent hereunder upon the terms set forth herein, and to accept the Funds, deposit the Funds in the Escrow Account and otherwise perform the duties of the Escrow Agent expressly set forth in this Escrow Agreement. The Escrow Agent shall hold and safeguard the Funds and any other

prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the parties hereto to the fullest extent permitted by law, to the end that this Escrow Agreement shall be enforced as written.

(h)    No Interest of Third Parties. Except as expressly provided in Section 7(b), nothing in this Escrow Agreement, whether express or implied, shall be construed to give to any person or entity other than the parties hereto any legal or equitable right, remedy, interest or claim under or in respect of this Escrow Agreement or any funds escrowed hereunder.

(i)    Titles and Headings. Titles and headings to sections herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Escrow Agreement.

(j)    Applicable Law and Forum. This Escrow Agreement and all amendments, modifications and waivers thereof shall, in all respects, be governed by and construed and enforced in accordance with the internal laws (without regard to principles of conflicts of law) of the State of New York. Each party hereto hereby irrevocably submits to the personal jurisdiction of the state and federal courts located within the City and State of New York with respect to any action, suit or proceeding relating to or arising from this Escrow Agreement. Each party hereto irrevocably waives (i) any claim or defense based upon improper venue or inconvenient forum with respect to any action, suit or proceeding brought in any such court and (ii) the right to trial by jury in any action, suit or proceeding relating to or arising under this Escrow Agreement. Each party waives personal service of process and consents to the service of process by the manner set forth in Section 7(d), in addition to any other method of service of process permitted by applicable law.

(k)    Execution in Counterparts. This Escrow Agreement may be executed in one or more counterparts, each of which shall be an original and all of which, taken together, shall be considered one and the same agreement, and shall become a binding agreement when one or more counterparts have been signed by each party hereto and delivered to each other party or such party's representative.

(l)    Resignation or Replacement of Escrow Agent.

(i)    The Escrow Agent may at any time resign by giving not less than 30 days' notice to Acquirer and Representative, or may be removed jointly by Acquirer and Representative by giving not less than 30 days' notice to the Escrow Agent. Acquirer and Representative jointly shall designate a successor Escrow Agent prior to the expiration of any such thirty-day period by giving written notice to the Escrow Agent. The Escrow Agent shall promptly transfer the Escrowed Property to such designated successor, provided such successor agrees in writing to be bound by the terms hereof.

(ii)    Any person or entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any person or entity resulting from any merger, conversion or consolidation to which the Escrow Agent shall be a party, or any person or entity to which substantially all the stock transfer business of the Escrow Agent may be

- 10 -

Exhibit G

*Verizon Finance - Local Interconnection Billing*
*125 High Street*
*Boston, Massachusetts 02110*
*Phone: 617-743-2017*
*Fax: 617-743-2519*

**Bill Specialist**
**Brian Murray**
brian.k.murray@core.verizon.com

February 16, 2006

Lightship Telecomm
Attn: Darren Kreitler - CABS Billing
One Executive Park Drive
Bedford Executive Office Park
Bedford, NH 03110-6913
Facsimile: 2156419790
Email: dkreitler@lightship.com

Dear Darren Kreitler:

This letter is notification that Verizon - Maine is disputing charges totaling $544,788.72 on Invoice 024287F30106032 dated February 01, 2006 for account M91024287F 301.

INVOICE CHARGES DISPUTED

In accordance with the FCC's April 18, 2001 Order governing intercarrier compensation for Internet traffic, effective June 14, 2001, traffic exceeding a 3:1 ratio of terminating to originating traffic is presumed to be Internet traffic. In accordance with the order noted above, from June 14, 2001 through December 13, 2001 compensable Internet minutes are rated at $0.0015 per minute. From December 14, 2001 through June 13, 2003, compensable Internet minutes are rated at $0.0010 per minute. From June 14,2003 until the FCC takes further action, compensable Internet minutes are rated at $0.0007 per minute.

Lightship Telecomm billed Verizon for local and/or Internet traffic delivered from the following bill periods at the given rates per minute:

   From 12/1/2005 to 12/31/2005 at $.008/MOU
   From 1/1/2006 to 1/31/2006 at $.008/MOU

The disputed charges totaling $421,026.99, represent the difference between the amount that CLEC charged Verizon, and the amount due under the FCC's order.

Verizon is disputing $450.00 in Late charges. Verizon will not pay Late charges on balances that were previously disputed.

Verizon is disputing $123,307.34 for an imbalance in reported Minutes of Use (MOUs). During February 2006, Lightship Telecomm billed Verizon for terminating the following minutes:

8,189,578 MOU for EO Local Switching from 1/1/2006 to 1/31/2006

Based on data from Verizon's measurement systems, the traffic Lightship Telecomm terminated for Verizon was 6,437,994 MOUs.  Verizon is disputing the difference between the MOUs billed by Lightship Telecomm, and the Verizon measured MOUs.

Verizon wants to work with Lightship Telecomm in resolving outstanding billing disputes between our companies.  Please contact me at 617-743-2017 at your earliest convenience to discuss the disputes on this invoice.

Sincerely,


Brian Murray

*Verizon Finance - Local Interconnection Billing*
*125 High Street*
*Boston, Massachusetts 02110*
*Phone: 617-743-2017*
*Fax: 617-743-2519*

Bill Specialist
**Brian Murray**
brian.k.murray@core.verizon.co
m

March 23, 2006

Lightship Telecomm
Attn: Darren Kreitler - CABS Billing
One Executive Park Drive
Bedford Executive Office Park
Bedford, NH 03110-6913
Facsimile: 2156419790
Email: dkreitler@lightship.com

Dear Darren Kreitler:

This letter is notification that Verizon - Maine is disputing charges totaling $505,352.50 on Invoice 024287F30106060 dated March 01, 2006 for account M91024287F 301.

INVOICE CHARGES DISPUTED

In accordance with the FCC's April 18, 2001 Order governing intercarrier compensation for Internet traffic, effective June 14, 2001, traffic exceeding a 3:1 ratio of terminating to originating traffic is presumed to be Internet traffic. In accordance with the order noted above, from June 14, 2001 through December 13, 2001 compensable Internet minutes are rated at $0.0015 per minute. From December 14, 2001 through June 13, 2003, compensable Internet minutes are rated at $0.0010 per minute. From June 14,2003 until the FCC takes further action, compensable Internet minutes are rated at $0.0007 per minute.

Lightship Telecomm  billed Verizon for local and/or Internet traffic delivered from the following bill periods at the given rates per minute:

    From 1/1/2006 to 1/31/2006 at $.008/MOU
    From 2/1/2006 to 2/28/2006 at $.008/MOU

The disputed charges totaling $392,387.07, represent the difference between the amount that CLEC charged Verizon, and the amount due under the FCC's order.

Verizon is disputing $450.00 in Late charges.  Verizon will not pay Late charges on balances that were previously disputed.

Verizon is disputing $112,510.97 for an imbalance in reported Minutes of Use (MOUs).  During March 2006, Lightship Telecomm billed Verizon for terminating the following minutes:

7,478,216 MOU for EO Local Switching from 2/1/2006 to 2/28/2006

Based on data from Verizon's measurement systems, the traffic Lightship Telecomm terminated for Verizon was 5,873,724 MOUs. Verizon is disputing the difference between the MOUs billed by Lightship Telecomm, and the Verizon measured MOUs.

Verizon may request that Lightship Telecomm provide Records of the calls completed in a 24 hour period during the current Bill Period covered on this invoice. Verizon may also request that Lightship

Verizon wants to work with Lightship Telecomm in resolving outstanding billing disputes between our companies. Please contact me at 617-743-2017 at your earliest convenience to discuss the disputes on this invoice.

Sincerely,


Brian Murray

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2008, a copy of the foregoing Reply Affirmation of Jayne S. Robinson was filed electronically. Notice of this filing will be sent by e-mail to the following by operation of the Court's electronic filing system, who may access this filing through the Court's system:

John Michael Teitler, Esq.
Nicholas W. Lobenthal, Esq.
Teitler & Teitler
1114 Avenue of the Americas
New York, New York 10036
    Attorneys for One Communications Corp.

Mark S. Resnick, Esq.
The Resnick Law Group, P.C.
Old City Hall
45 School Street
Boston, Massachusetts 02108
    Attorneys for One Communications Corp.

Paul E. Summit, Esq.
Ira Gross, Esq.
Sullivan & Worcester
One Post Office Square
Boston, Massachusetts 02109
Email: Psummit@sandw.com
    Attorneys for The Megunticoook Fund II, L.P. and
    The Megunticook Side Fund II, L.P.

David B. Mack, Esq.
O'Connor, Carnathan and Mack LLC
8 New England Executive Park
Suite 310
Burlington, Massachusetts 01803
Email: dmack@ocmlaw.net
    Attorneys for Kevin O'Hare and Jeffrey Koester

Joseph M. Pastore, III, Esq.
Dreier LLP
One Landmark Square, 20th floor
Stamford, Connecticut 06901
    Attorneys for Kevin O'Hare and Jeffrey Koester

Scott H. Angstreich, Esq.
Joseph Solomon Hall, Esq.
William David Sarratt, Esq.
Kellogg, Huber, Hansen, Todd & Evans PLLC (DC)
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
    Attorneys for Verizon New England Inc.

Nicholas J. Panarella, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178
    Attorneys for Mellon Investor Services LLC

Jayne S. Robinson