DREIER LLP
Joseph M. Pastore III, Esq. (JP-1717)
499 Park Avenue
New York, New York 10022
(212) 328-6100

O'CONNOR, CARNATHAN AND MACK LLC
David B. Mack, Esq.  *(Admitted Pro Hac Vice)*
Sean Carnathan, Esq.  *(Admitted Pro Hac Vice)*
8 New England Executive Park, Suite 310
Burlington, Massachusetts  01803

*Attorneys for Defendants Kevin O' Hare and Jeffrey Koester*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____
                                                     )
IN RE ONE COMMUNICATIONS CORP  )        MASTER FILE
                                                     )        07 Civ 3905 (LTS)
                                                     )        (AJP)
                                                     )
This Document Relates To: 07 Civ 3905    )
                                                     )
_____)


**INDIVIDUAL DEFENDANTS' REPLY MEMORANDUM**

# TABLE OF CONTENTS

I.      Plaintiff's Reasonable Reliance Argument Ignores Second Circuit Law. ......................... 1

II.     Plaintiff did not Bargain for a Specific Representation Concerning the ICA..................... 4

III.    Plaintiff Has Not Alleged Actionable Misstatements Attributable to Either
        Individual Defendant. .................................................................................................. 6

    A.   The Individual Defendants Explicitly Did Not Make any of the Representations
         in the Merger Agreement. ....................................................................................... 6

    B.   The Group Pleading Doctrine is Inapplicable to this Case. ............................................ 6

    C.   The Voting Agreement is a Red Herring. .......................................................................... 8

IV.     Plaintiff's Scienter Arguments are Devoid of Merit. ........................................................ 9

    A.   The "Motive and Opportunity" Cases Plaintiff Cites Are Inapposite................................ 9

    B.   Darren Kreitler, Expert in Regulatory and Legal Affairs? ............................................ 10

    C.   There are Innocent Inferences Substantially More Compelling Than Any
         Purported Inference of Scienter. .................................................................................. 15

V.      Plaintiff's Assertion that It Has Alleged Loss Causation is Without Merit..................... 17

Attachment A

# TABLE OF AUTHORITIES

## Federal Cases

*ATSI Communications, Inc. v. The Shaar Fund, Ltd.*
   493 F.3d 87 (2d Cir. 2007) ........................................................................................... 1

*Bell Atlantic Corp. v. Twombly*
   127 S.Ct. 1955 (2007) ................................................................................................... 1

*Dresner v. Utility.com, Inc.*
   371 F.Supp.2d 476 (S.D.N.Y. 2005) ............................................................................ 2

*Emergent Capital Investment Mgmt, LLC v. Stonepath Group, Inc.*
   343 F.3d 189 (2d Cir. 2003) ......................................................................................... 2

*Harsco Corp. v. Segui*
   91 F.3d 337 (2d Cir. 1996) ........................................................................................... 2

*In re CINAR Corp. Sec. Litig.*
   186 F.Supp.2d 279 (E.D.N.Y. 2002) ........................................................................... 3

*In re Complete Mgmt Inc. Sec. Litig.*
   153 F. Supp. 2d 314 (S.D.N.Y. 2001) ......................................................................... 9

*In re Cross Media Marketing Corp. Sec. Litig.*
   314 F.Supp.2d 256 (S.D.N.Y. 2004) ............................................................................ 7

*In re Independent Energy Holdings PLC Sec. Litig.*
   154 F.Supp. 2d 741 (S.D.N.Y. 2001) ........................................................................... 9

*In re JP Morgan Chase Sec. Litig.*
   363 F.Supp.2d 595 (S.D.N.Y. 2005) .......................................................................... 10

*In re Pharmalat*
   376 F.Supp.2d 472 (S.D.N.Y. 2005) .......................................................................... 18

*In re Refco Sec. Litig.*
   503 F.Supp. 2d 611 (S.D.N.Y. 2007) ........................................................................... 7

*In re Vivendi Universal, S.A.*
   381 F.Supp.2d. 158 (S.D.N.Y. 2003) ......................................................................... 10

*Kalnit v. Eichler*
   264 F.3d 131 (2d Cir. 2001) ....................................................................................... 10

*Knollenberg v. Harmonic, Inc.*
   152 Fed. Appx. 674 (9th Cir. 2005) ............................................................................ 10

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*
   437 F.3d 588 (7th Cir. 2006) ........................................................................................ 7

*Manufacturers Hanover Trust Co. v. Yanakas*
   7 F.3d 310 (2d Cir. 1993) ............................................................................................. 3

*Merrill Lynch v. Allegheny Energy, Inc.*
   500 F.3d 171 (2d Cir. 2007) ............................................................................... 19

*Nelson v. Stahl*
   173 F.Supp.2d 153 (S.D.N.Y. 2001) ................................................................... 10

*Polycast Technology Corp. v. Uniroyal, Inc.*
   792 F.Supp. 244 (S.D.N.Y. 1992) ...................................................................... 10

*Rothman v. Gregor*
   220 F.3d 81 (2d Cir. 2000) .................................................................................... 9

*Southland Secs. Corp v. INSpire Ins. Solutions, Inc.*
   365 F.3d 353 (5th Cir. 2004) ............................................................................... 7

*Verizon New York Inc. v. Choice One Communications*
   Index No. 603280/2006 (N.Y. Sup. Ct. Dec. 20, 2007) ........................................ 5

## State Cases

*Bond Opportunity Fund v. Unilab Corp*
   2003 WL 21058251 (S.D.N.Y. May 9, 2003) ........................................................ 7

*Deerfield Communications Corp. v. Chesebrough-Ponds, Inc*
   68 N.Y.2d 954 (1986) ............................................................................................ 3

*Dura Pharmaceuticals, Inc. v. Broudo*
   544 U.S. 336 (2005).............................................................................................. 18

*In re Hansen Natural Corp. Sec. Litig.*
   2007 WL 3244646 (C.D. Cal. Oct. 17, 2007)........................................................ 7

*In re Openwave Systems Sec.Litig*
   2007 WL 3224584 (S.D.N.Y. Oct. 31, 2007) ...................................................... 13

*In re Top Tankers, Inc. Sec. Litig.*
   2007 WL 4563930 (S.D.N.Y. Dec. 18, 2007) ..................................................... 14

*In re Yukos Oil Co. Sec. Litig.*
   2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ...................................................... 10

*JHW Greentree Capital, L.P. v. Whittier Trust Co.*
   2005 WL 3008452 (S.D.N.Y. Nov. 10, 2005)........................................................ 7

*Schottenfeld Qualified Assoc. v. Workstream, Inc.*
   2006 WL 4472318 (S.D.N.Y. 2006)..................................................................... 10

*Transit Rail, LLC v. Marsala*
   2007 WL 2089273 (W.D.N.Y. July 20, 2007)........................................................ 3

In most 10b-5 cases, the plaintiff alleges that the price of the stock declined as a result of a restatement of earnings or an analogous accounting adjustment. There is typically no dispute that the alleged representations relied upon by the plaintiff were in fact misleading. In contrast, here Plaintiff builds its case on a foundation that is missing: that Lightship has breached the Verizon interconnection agreement ("ICA"). Absent this foundational support, Plaintiff's Section 10(b) claim collapses. Absent an established breach of the ICA, Plaintiff cannot sufficiently allege that there was a misrepresentation of Lightship's financial statements. Absent an established breach of the ICA, or even an alleged *reliable* opinion that such breach had occurred, Plaintiff cannot sufficiently allege any inference, let alone a strong inference, of scienter. And absent an established breach of the ICA, Plaintiff cannot sufficiently allege that it has suffered a loss, much less that it has suffered a loss proximately caused by a purported misrepresentation.

In an effort to reconstruct its claim, Plaintiff relies in its Opposition ("Opp.") on a combination of rhetoric, bald assertion, inaccurate recitation of fact and gross misinterpretation of law. The Opposition, however, does not alter the fact that the Complaint lacks "factual allegations . . . enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007). The Complaint must be dismissed.[1]

## I.    **Plaintiff's Reasonable Reliance Argument Ignores Second Circuit Law.**

The law is clear in the Second Circuit: a merger clause in a fully integrated agreement negotiated by sophisticated parties precludes a plaintiff from relying upon extra-contractual representations. ATSI Communications, Inc. v. The Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007); Emergent Capital Investment Mgmt, LLC v. Stonepath Group, Inc., 343 F.3d 189 (2d Cir.

---

[1] The Individual Defendants join in the Reply Memoranda of the JP Morgan Defendants and the Megunticook Defendants.

2003); Harsco Corp. v. Segui, 91 F.3d 337 (2d Cir. 1996).[2]  Plaintiff argues that this case does

not fall within this clearly delineated rule because the language of Section 6(d) of the Merger

Agreement is too generic. Opp. at 36-38. This argument ignores the most recent case on this

point, ATSI, where the relevant language was as follows:

> There are no restrictions, promises, warranties, or undertakings, other than those
> set forth or referred to herein. This Agreement, the Securities Purchase
> Agreement, the Escrow Instructions, the Preferred Shares and the Warrants
> supersede all prior agreements and undertakings among the parties hereto with
> respect to the subject matter hereof.

493 F.3d at 95.

> The language at issue here is substantially the same, if not more specific:

> **Representations and Warranties.** . . . Each of the CTC Entities acknowledges
> that the Lightship Companies do not make, and have not made, any
> representations or warranties relating to the Lightship Companies or the
> Business, *including in the Offering Memorandum or any presentation relating
> to the Lightship Companies or the Business given in connection with the
> Transaction,* other than those expressly set forth in this Agreement. No person
> has been authorized by the Lightship Companies to make any representation or
> warranty regarding the Lightship Companies or the Business in connection with
> the Transactions that is inconsistent with or in addition to the representations
> and warranties expressly set forth in this Agreement or in any of the other
> Transaction Documents.

Robinson Aff., Ex. 1 (emphasis added).

Moreover, the circumstances are virtually the same as in ATSI. This case, just like ATSI

(and Emergent Capital and Harsco), involves a vigorously negotiated agreement between

sophisticated parties competently represented by counsel, and the agreement contains numerous

specific representations. Plaintiff cannot avoid ATSI, and it relegates its unpersuasive analysis of

it to a footnote. See Opp. at 38 n.12.

---

[2] See also Dresner v. Utility.com, Inc., 371 F.Supp.2d 476, 491-92 (S.D.N.Y. 2005)(where
plaintiffs benefited from a series of detailed representations with defined boundaries, it was
unreasonable for plaintiffs to rely on representations made in advance of the merger agreement).

Instead, Plaintiff focuses on outdated and clearly distinguishable case law.  For example, Plaintiff cites Manufacturers Hanover Trust Co. v. Yanakas, 7 F.3d 310, 315 (2d Cir. 1993), for the proposition that parol evidence of fraud in the inducement is not precluded under New York law where the merger agreement lacked specificity.  Yanakas, however, involved a "preprinted form" that was merely a "generalized boilerplate exclusion." Id. at 317. The agreement in Yanakas was not the product of a negotiation between sophisticated parties.

Plaintiff's reliance on In re CINAR Corp. Sec. Litig., 186 F.Supp.2d 279 (E.D.N.Y. 2002) is similarly misplaced.  In CINAR, the court held that plaintiffs were not precluded from relying upon pre-contractual representations because they did not in the stock purchase agreement specifically disclaim reliance upon such representations. Id. at 313.  Rather, the agreement simply stated that "[it]...replaces and supersedes all prior agreements...between the parties...". Id. at 314 n.26.  Here, Plaintiff specifically acknowledged that Lightship did not make any representations concerning the company or the business.  CINAR is also readily distinguishable because the plaintiffs were relying upon SEC filings and financial representations in the stock purchase agreement, and defendant sought to dismiss the fraud claim on the basis that it was duplicative of the contract claim.[3]

Transit Rail, LLC v. Marsala, 2007 WL 2089273 (W.D.N.Y. July 20, 2007), likewise is readily distinguishable for several reasons.  First, the merger clause simply stated that no representations were made by the defendant, except those contained in the agreement. Id. at *10. Here, the Merger Agreement identifies the subjects of the representations with respect to which

---

[3]Plaintiff also cites Deerfield Communications Corp. v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954 (1986), a two page 1986 decision affirming a denial of a motion to dismiss a common law fraud in the inducement claim.  There is no discussion whatsoever concerning the language of the contract, the relationship of the parties or any of the other circumstances deemed critical to the analysis by the Second Circuit.

Plaintiff agreed it would not rely, namely representations "relating to the Lightship Companies or the Business, including in the Offering Memorandum or any presentation relating to the Lightship Companies or the Business given in connection with the Transaction." Contrary to Plaintiff's contention, therefore, the merger clause in Transit Rail was *not* "far more specific than the one in the Agreement here." Opp. at n.11.

Second, there was no indication in Transit Rail that plaintiff had negotiated through counsel an arm's length agreement with multiple specific representations, but rather had signed a more generic "investment agreement." And third, Plaintiff in Transit Rail relied in part on documents filed with the SEC, on which a plaintiff plainly is entitled to rely. The case at bar is clearly more analogous to the Second Circuit's decisions in ATSI, Harsco and Emergent Capital than they are to District Court Judge Curtin's opinion in Transit Rail.

## II.     Plaintiff did not Bargain for a Specific Representation Concerning the ICA.

If Plaintiff had wanted a representation about the possible breach of a Verizon ICA, or the possible liability to Verizon for any "Billing Practices," it knew how to ask for that, as the Merger Agreement contains specific representations that there was (1) no liability to Verizon for CABS billing of intra-LATA toll traffic on UNE-P lines, and (2) no material defaults under *other* contracts. [4] The very fact that Plaintiff demanded a specific "no liability" representation for the

---

[4] Regarding Section 4(e)(v) (which Plaintiff described as a representation that there was no liability to Verizon for "CABS billing of intercarrier compensation," Cplt. ¶94), Plaintiff now admits that the representation "relat[ed] to 'UNE-P' billings which are not at issue here." Opp. at 17. We also demonstrated that the Verizon interconnection agreements were not subject to the representation in Section 4(k)(iii) about the contracts set forth on the disclosure schedules being in full force and effect with no material defaults. Instead, as to the Verizon agreements *which had expired* and were not "in full force and effect", Lightship made an accurate and limited statement. No statement about "material defaults" was made. After first making a convoluted argument about this straightforward reading of Section 4(k), Plaintiff then argues that the statement about those expired contracts -- "[p]er industry practices, Lightship and Verizon continue to operate pursuant to the terms of the Interconnection Agreements on a month-to-

UNE-P issue demonstrates that potential liabilities to Verizon for billing issues were *not*

captured under the general representation in Section 4(h)(ii) that (except as disclosed) there were

no liabilities of the type required by GAAP to be reflected on the balance sheet.[5]  Plaintiff did

not get any representation about billing to Verizon beyond the UNE-P representation for one

simple reason.  Billing disputes, and charges of overbilling in breach of interconnection

agreements, are endemic to the telecommunications industry.  No company that dealt with

Verizon could ever give such a representation, and as a sophisticated telecommunications

company, Plaintiff was fully aware of that, as the following evidence amply demonstrates:

- Verizon and Lightship exchanged thousands if not tens or hundreds of thousands of calls a year.  Verizon routinely raised billing disputes.  See JSR Reply Aff. (Verizon form letters claiming more than $500,000 for overbilling in each of the months of January and February 2006).

- The Verizon interconnection agreements contemplate that billing disputes will arise and provide a whole set of procedures for handling them.  JSR Aff. Ex. 6, §28.8 (pp. 73-74).

- One of Plaintiff's own subsidiaries has been engaged for years in litigation where Verizon is claiming *more than $12 million* in overbilling.  *Verizon New York Inc. v. Choice One Communications*, Index No. 603280/2006 (N.Y. Sup. Ct. Dec. 20, 2007), Memorandum Decision at 2 (breach of interconnection agreement claim; Verizon "is seeking approximately $17 million in damages including $12.2 million under alleged overpayment Verizon New York paid

---

month basis" -- constitutes a false representation of "no material default."  Plaintiff has to stretch the plain meaning of this simple statement beyond all recognition to try to create a misrepresentation about Verizon where none exists.

[5] In its Opposition, Plaintiff argues that Lightship's financial statements were misleading (in violation of Section 4(h)(i) and (ii) of the Merger Agreement) because Lightship recognized revenues it was not entitled to collect, in violation of Statement of Financial Accounting Concepts No. 5, ¶¶83-84 ("Concept 5").  Opp. at 27.  Concept 5 plainly does not support such an argument.  The text of Concept 5 is available at www.fasb.org (click on "FASB Store").  Staff Accounting Bulletin 104, which interprets Concept No. 5, also demonstrates the invalidity of Plaintiff's argument.  SAB 104 is also available at the above-referenced website.  Even if some day it is determined that Lightship breached the ICA, it does not follow that Lightship in 2004 improperly recognized revenue.

Choice One between April 1, 2003 and September 23, 2005, and approximately $4.8 million in interest.")[6]

Because Plaintiff failed to bargain for a specific representation concerning the Verizon ICA, its Complaint must be dismissed.

## III.    Plaintiff Has Not Alleged Actionable Misstatements Attributable to Either Individual Defendant.

### A.    The Individual Defendants Explicitly Did Not Make any of the Representations in the Merger Agreement.

Assuming *arguendo* that Plaintiff has met its burden of pleading specific, actionable, false statements, Plaintiff has nonetheless proffered no valid argument for attributing any of those purported misrepresentations to either O'Hare or Koester. The Merger Agreement clearly and unambiguously stated that none of the representations or warranties therein was attributable to any of Lightship's officers or agents:

> "**to Holding's Knowledge**", "**known to**" or similar phrase, means the knowledge of an Executive Officer after reasonable inquiry given the nature of such individual's position and responsibilities; *provided, however,* that no such individual (i) is making any representation or warranties of Holding in his or her individual capacity or (ii) shall have any personal liability for any representations or warranties of Holding set forth herein.

Merger Agreement (Robinson Aff., Ex. 1), p.11 (emphasis in original).

Thus, the Merger Agreement, in and of itself, persuasively demonstrates that none of Lightship's officers, including the Individual Defendants, made any of the representations in the Merger Agreement. Since the Merger Agreement's representations are the only statements on which Plaintiff may reasonably rely, any claim against the Individual Defendants under Section 10(b) necessarily fails.

### B.    The Group Pleading Doctrine is Inapplicable to this Case.

---

[6]This decision is Attachment 1 to the letter of January 23, 2008 to this Court from Verizon's counsel.

Plaintiff cannot evade dismissal of the Complaint through the limited "group pleading" doctrine.[7] The group pleading doctrine only applies to collaborative, public statements made by the company – i.e., "prospectuses, registration statements, annual reports, press releases, or group-published information." In re Refco Sec. Litig., 503 F.Supp. 2d 611, 641 (S.D.N.Y. 2007). The duly negotiated Merger Agreement is not the sort of "group-published" document to which the doctrine is intended to apply. Plaintiff does not identify – and the Individual Defendants could not locate – a single case where a court held that the group pleading doctrine could apply to the contents of a contract drafted and negotiated by counsel after months of due diligence. The representations in the Merger Agreement cannot be attributed to either Individual Defendant merely as a result of their positions at Lightship. JHW Greentree Capital, L.P. v. Whittier Trust Co., 2005 WL 3008452, *6-7 (S.D.N.Y. Nov. 10, 2005)(defendant director "cannot be liable for the misrepresentations contained in the Merger Agreement since she did not sign that agreement").[8]

Applying the group pleading doctrine here also would contravene the obvious intent of the parties – reflected in the Merger Agreement's plain language – that "no such individual (i) is

---

[7] Courts in a number of circuits have held that Congress intended to eliminate the group pleading doctrine through enactment of the PSLRA. See, e.g., Southland Secs. Corp v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 364 (5th Cir. 2004) (group pleading "cannot withstand the PSLRA's specific requirement that the untrue statements or omissions be set forth with particularity as to 'the defendant'"); In re Cross Media Marketing Corporation Securities Litigation, 314 F.Supp.2d 256, 262 (S.D.N.Y. 2004); Bond Opportunity Fund v. Unilab Corp, 2003 WL 21058251, *4 (S.D.N.Y. May 9, 2003); see also In re Hansen Natural Corp. Sec. Litig., 2007 WL 3244646, *8(C.D. Cal. Oct. 17, 2007)(concluding that, based on Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588 (7th Cir. 2006), the group pleading doctrine did not survive the PSLRA). The Second Circuit has not yet spoken on this issue.

[8] Koester did not sign the Merger Agreement, in any capacity, and O'Hare signed the Merger Agreement only in his capacity as an officer of the company. Contrary to Plaintiff's unsubstantiated assertion in its Opposition, neither is alleged to have participated in the drafting of the Merger Agreement. Compare Opp. at 39 ("O'Hare negotiated the terms of the Merger Agreement . . ."), with Compl., ¶90 ("In March 2005, counsel for CTC and Lightship drafted [the Merger Agreement].") (emphasis supplied).

making any representation or warranties of Holding in his or her individual capacity or (ii) shall have any personal liability for any representations or warranties of Holding set forth herein."

### C.    The Voting Agreement is a Red Herring.

In a desperate effort to tie Koester and O'Hare (among other Defendants) to the Merger Agreement personally, Plaintiff relies on the Voting Agreement, which is not even referenced in the Complaint. Plaintiff contends that by signing the Voting Agreement, the Individual Defendants adopted as their own the representations in the Merger Agreement. See Opp. at 39-40. Plaintiff's argument, however, rests on a tortured and isolated interpretation of the innocuous language of that agreement.

First, such argument flies directly in the face of the plain language of the Merger Agreement, in which Plaintiff explicitly agreed that no such individual "(i) is making any representation or warranties of Holding in his or her individual capacity or (ii) shall have any personal liability for any representations or warranties of Holding set forth herein."

Second, it is clear from the plain and unambiguous text of Sections 1 and 2 of the Voting Agreement that its purpose was to ensure that the shareholders would not do anything to undermine the merger. Lobenthal Dec., Ex. B, §§1-2. Third, Section 3 of the Voting Agreement, on which Plaintiff heavily relies, simply affirms the shareholder's ownership of the stock and right to vote the stock. Lobenthal Dec., Ex. B, §3(a)-(d). It does not convey any intent on the part of the shareholders to adopt the representations in the Merger Agreement.[9]

---

[9] Plaintiff takes particular liberties with Section 3(f) of the Voting Agreement. Section 3(f) merely recites that the Stockholders acknowledge that the Voting Agreement is critical to CTC's entering into the Merger Agreement, and that "CTC and Merger Sub are relying on the truth and accuracy of the representations and warranties *set forth herein* [i.e., the representations in Section 3 of the Voting Agreement] in executing the Merger Agreement." Lobenthal Dec., Ex. B, §3(f)(emphasis added). This section, like the rest of the Voting Agreement, does not serve to bind the Individual Defendants personally to the representations *in the Merger Agreement*.

Thus, the Individual Defendants did not through the Voting Agreement "consent" to the representations in the Merger Agreement nor otherwise "ratify" the Merger Agreement.

**IV.    Plaintiff's Scienter Arguments are Devoid of Merit.**

**A.    The "Motive and Opportunity" Cases Plaintiff Cites Are Inapposite.**

The only "motive" ascribed to O'Hare and Koester that can be gleaned from the allegations in the Complaint is the generalized desire to maximize the value of their shares at the time of the merger. Compl., ¶114. Plaintiff contends that such motive, by itself, is sufficient to establish a strong inference of scienter. That is simply not the law, especially after Tellabs.

In hopes that this bare allegation may suffice, Plaintiff has furnished the Court with cases holding that the inflation of a company's share value in order to acquire another company may, *taken in the context of other motive allegations*, constitute a motive. Opp. at 45-47. None of these cases stands for the proposition that a desire to achieve the highest sale price, by itself, is sufficient to establish a strong inference of scienter. In the cases cited by Plaintiff, the court found that scienter had been adequately alleged because the defendants personally benefited *in some unique way* from their adverse material knowledge. In several cases, the individual defendants made insider trades (Koester and O'Hare made none).[10] In other cases, the

---

[10]  See, e.g., Rothman v. Gregor, 220 F.3d 81, 86 (2d Cir. 2000)(shares sold by individual defendants in connection with IPO); In re Complete Mgmt Inc. Sec. Litig., 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001)(insider sales on the public market by three officer defendants totaling over $6 million dollars); In re Independent Energy Holdings PLC Sec. Litig. 154 F.Supp. 2d 741, 769 (S.D.N.Y. 2001)(unusual insider trading). Plaintiff's extensive discussion of caselaw involving an inference of motive based on insider trading, Opp. at 48-49, is a complete nonsequitur. A basic requirement of any insider trading is that the defendant makes an "*unusual*" sale of some or all of his shares *on the public market*. See, e.g., In re Complete Mgmt Inc. Sec. Litig., 153 F.Supp.2d 314, 328 (publicly traded stock); In re Independent Energy Holdings PLC Sec. Litig.154 F.Supp.2d 741, 769 (S.D.N.Y. 2001) (same); Knollenberg v. Harmonic, Inc., 152 Fed. Appx. 674, 682 (9th Cir. 2005)(unpublished decision) (forced sale of stock in connection with merger is not insider trading).

defendants received bonuses or increased compensation (Koester and O'Hare received none).[11] The few remaining cited cases lack any persuasive precedential value.[12]

Plaintiff contends that <u>Kalnit</u> "stands squarely for the proposition also announced in other cases that 'motive' to defraud must be targeted at the plaintiff. A generalized motive not directed to any one party, or motive directed to a party other than the plaintiff, will not establish scienter." Opp. at 50. Plaintiff appears to be arguing that the burden of demonstrating motive may be different depending on the identity of the plaintiff. <u>Kalnit</u> does not stand for this proposition. Indeed, <u>Kalnit</u> states, in the very same paragraph quoted by Plaintiff, that the "the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired. Such generalized desires do not establish scienter." <u>Id</u>. at 141; <u>see also</u> <u>In re Yukos Oil Co. Sec. Litig.</u>, 2006 WL 3026024, *18-19 (S.D.N.Y. Oct. 25, 2006)(following <u>Kalnit</u> in requiring a "concrete and personal benefit" not attributable to all shareholders in order to establish motive based on a desire to maximize value in connection with an acquisition).

**B.    Darren Kreitler, Expert in Regulatory and Legal Affairs?**

---

[11] <u>See, e.g.</u>, <u>Schottenfeld Qualified Assoc. v. Workstream, Inc.</u>, 2006 WL 4472318, * 4 (S.D.N.Y. 2006)(officer defendants compensation tied directly to gross revenue growth); <u>In re Vivendi Universal, S.A.</u>, 381 F.Supp.2d 158, 185 (S.D.N.Y. 2003)(officer defendant given "concrete and personal benefit" in the form of a bonus worth more than $3 million . . . for boosting Vivendi's EBITDA more than 30% in 2001"); <u>Nelson v. Stahl</u>, 173 F.Supp.2d 153, 161 (S.D.N.Y. 2001)(cash payout to individual defendants from mortgage payoff that was not disclosed to stockholders).

[12] Plaintiff relies heavily on the two outdated <u>Polycast Technology Corp. v. Uniroyal, Inc.</u> opinions. Opp. at 47, citing <u>Polycast</u>, 792 F.Supp. 244, 248 (S.D.N.Y. 1992)(summary judgment decision); <u>Polycast</u>, 728 F. Supp. 926, 936 (S.D.N.Y. 1989)(decision on motion to dismiss). These pre-PSLRA cases merely hold, with virtually no analysis, that an interest in the asset being sold is sufficient to create motive. To the extent these decisions have not been rendered meaningless by the PSLRA and/or <u>Tellabs</u>, their reasoning has been squarely rejected by the Second Circuit. <u>See Kalnit v. Eichler</u>, 264 F.3d 131, 141 (2d Cir. 2001) ("mere ownership of stock" insufficient); <u>In re JP Morgan Chase Sec. Litig.</u>, 363 F.Supp.2d 595, 619 (S.D.N.Y. 2005) (requiring uncommon benefit).

In any event, assuming *arguendo* that Plaintiff has sufficiently alleged motive and opportunity, the allegations must establish a strong inference of intent, one that is at least as compelling as any opposing inference.  Plaintiff's argument that the allegations of the Complaint support a strong inference of fraudulent intent is based on a fundamentally flawed premise: that "Defendants Koester and O'Hare knew that it was illegal, improper and a departure from Lightship's own practices and those of the industry in general for Lightship to utilize self-defined LCAs *because Kreitler told them so.*"  Opp. at 54 (emphasis added).  There is simply no support for this blanket assertion in the Complaint itself, or any documents referenced in or attached to the Complaint.[13]

The Complaint alleges only the following:

- In late 2004 Darren Kreitler, a billing manager at Lightship, discovered that Lightship's LCAs in the State of Maine did not match Verizon's LCAs. Compl., ¶40.

- Kreitler contemporaneously brought this discrepancy to the attention of Koester (and non-defendant Bill Wilson, Lightship's CFO), and "informed Koester that the Maine ICA required Lightship to use the larger current LCAs to determine applicable intercarrier compensation." Compl., ¶41.

- At some undefined time, "a decision was made by Koester, Wilson and other Lightship senior management that no change should be made to the LCAs currently being utilized by Lightship" and "Koester instructed Kreitler and the other billing managers to make no changes to Lightship's billing practices." Id.

---

[13] Plaintiff repeatedly asserts in its Opposition that maintaining LCAs smaller than Verizon's was somehow novel and inconsistent with both Lightship's own practices and those of the industry in general.  Such assertion is not supported by the allegations in the Complaint.  The Complaint alleges that Lightship had maintained different LCAs since 2003.  Compl., ¶42. Lightship continued such practice through the date of the merger, and beyond.  Plaintiff's contention that Lightship suddenly changed its practice in anticipation of a merger is unfounded. Likewise, there is simply no allegation in the Complaint that Lightship's practice deviated from the industry practice, and the Court should disregard such a bald, unsubstantiated assertion. In fact, as Plaintiff itself acknowledges, intercarrier compensation is governed by the specific terms of an interconnection agreement.

- Kreitler then discovered that the discrepancy in the LCAs had existed since December 2003 and he noticed certain other errors in the CABS program. Compl., ¶¶42-44.

- Contrary to the instructions he had received, Kreitler changed Lightship's LCAs and fixed other CABS errors, and ran a bill reflecting these changes on or about March 1, 2005 (covering the month of February 2005). Compl., ¶45.

- As a result of the corrections, there was a drop in revenue, and Kreitler reported it to "Lightship's finance department." Compl., ¶46.

- Koester, upon learning of the resulting loss of revenue, instructed Kreitler to reverse the changes because the company "'could not afford' the revenue loss resulting from these corrections." Compl., ¶47.

- When Kreitler expressed his belief that the bills were being processed correctly, "Koester told Kreitler that 'it doesn't matter' and 'we need to find a way to increase revenues back to where they were.'" When Kreitler continued to protest, Koester told him that if he did not do it, he [Koester] would do it himself. Compl., ¶47.

- In or about March 2005, at the same time Koester and Kreitler had the above-mentioned conversation, Koester met with O'Hare and Wilson about the use of LCAs that differed from Verizon's LCAs. O'Hare and Wilson agreed with Koester and directed him to maintain the differing LCAs. Compl., ¶49.

- Koester then had another conversation with Kreitler, along the same lines as before, wherein Kreitler stated his belief that this practice violated the ICA and Koester said "let me worry about that." Compl., ¶51.

This is a nice story, with some added flavor in the form of a few juicy quotes. But these allegations establish only one thing: that *Darren Kreitler believed* that the ICA required Lightship to maintain LCAs identical to those of Verizon. Kreitler's subjective and inexpert opinion concerning the requirements of the ICA is the essential premise upon which Plaintiff's entire scienter argument is based. From there, Plaintiff asks the Court to infer that (a) the ICA did, in fact (or as a matter of law), prohibit this practice; and (b) that O'Hare and Koester either knew that the ICA did, in fact, prohibit this practice or recklessly assumed without doing any investigation that the ICA permitted such practice.

The allegations in and of themselves, however, simply do not support either of these inferences. Even assuming *arguendo* that Kreitler believed that the ICA required Lightship to use Verizon's LCAs, and that he stated his position to Koester and others, such allegations do not support the inference that the ICA in fact mandated the use of identical LCAs. Nor does the allegation that Koester expressed concern about the revenue impact support the inference that the ICA in fact required Lightship to maintain LCAs identical to Verizon's. Expressing concern about revenues --- a concern which every officer observing his fiduciary duty would express --- is not the same thing as confirming that the billing practice from which such revenues are derived violated a complex and ambiguous contract.[14]

Plaintiff does not allege, nor can it, that Kreitler had any responsibilities concerning regulatory or legal affairs. Nor does Plaintiff allege that he had any expertise concerning the interpretation or review of legal documents such as the ICA. The Complaint simply identifies Kreitler as a "billing manager," one of "several" at Lightship. Compl., ¶40.[15] Plaintiff nonetheless states in its memorandum, without support in the Complaint, that "Kreitler had expertise in this area, since he was a Lightship billing manager whose job was to implement billing -- and who reported directly to Lightship COO Koester." Opp. at 56. Plaintiff's assertion in its brief that Kreitler "had expertise in this area" should be disregarded. See In re Openwave Systems Securities Litigation, 2007 WL 3224584, *12 (S.D.N.Y. Oct. 31, 2007) (absent allegations describing duties and responsibilities of audit committee, court could not determine

---

[14] As explained in the Megun. Reply, Plaintiff's reliance on the "core business doctrine," Opp. at 61-62, to establish scienter is without merit.

[15] After reviewing Defendants' motions to dismiss, Plaintiff apparently recognized the import of Kreitler's job responsibilities, and accordingly gave him the official title "Manager of CABS Billing." See Opp. at 9.

whether defendant had responsibilities that would have alerted him to stock option back dating scheme).

Moreover, the fact that Kreitler reported to Koester, who himself had no alleged responsibilities with respect to regulatory or legal affairs, is meaningless. Given the absence of any allegations supporting an inference that it was Kreitler's job to review and opine on the meaning and application of interconnection agreements, Kreitler's opinion concerning this issue is entirely irrelevant to the scienter analysis. At best, Plaintiff's allegations support only an inference that Koester and O'Hare knew *that Kreitler believed* that Lightship should be using Verizon's LCAs.

By distinction, In re Top Tankers, Inc. Sec. Litig., 2007 WL 4563930 (S.D.N.Y. Dec. 18, 2007), is instructive on this point. In that case, the court, in finding that plaintiff had alleged facts supporting a "barely" cogent inference of scienter, emphasized that the defendant officers of the company had been advised *by Ernst and Young* that the financial statements did not comply with GAAP. Id. at *7-8 (emphasis added). The court therefore concluded that "defendants well knew, not just as a result of their positions, but from their independent auditors, about allegedly proper accounting values [that were not followed]." Id. at *7. Applying the reasoning of Top Tankers here, Plaintiff's scienter argument theoretically could be viable if the Complaint alleged that any of the defendants had been advised of the impropriety of Lightship's billing practices by Rainer Gawlick, whose duties included regulatory affairs, or by outside counsel. The court cannot infer the Individual Defendants' understanding of the intricacies of the ICA simply from their positions as officers of the company. Nor can such understanding be inferred from Darren Kreitler's stated opinion, absent allegations that Kreitler had expertise or responsibilities with respect to regulatory or legal affairs.

Nor can the Court reasonably infer recklessness from these bare allegations. Plaintiff does not allege any *facts* concerning the discussions between Koester and O'Hare and (non-defendant) Wilson once Kreitler brought the issue to Koester's attention. Plaintiff simply alleges that such conversations took place and from there asks the Court to *speculate* that O'Hare and Koester agreed with Kreitler but nonetheless consciously elected to ignore his opinion. Speculation is not enough to survive a motion to dismiss.[16]

### C.    There are Innocent Inferences Substantially More Compelling Than Any Purported Inference of Scienter.

In any event, the allegations in the Complaint, the documents incorporated or referenced therein, and common sense all support an innocent inference far more compelling than that suggested by Plaintiff -- that O'Hare and Koester believed, after proper investigation, that the ICA did not require Lightship to maintain LCAs identical to Verizon's. Such inference is supported by the following facts, all of which may be gleaned from the allegations in the Complaint, the documents referenced therein and common sense:

- From December 2003 through January 2005, a period of fourteen months, Lightship had been billing Verizon using different LCAs without incident. In an industry where sizeable monthly billing disputes are the norm, not the exception, the absence of a dispute with Verizon on the discrepancy of the LCAs supports

---

[16] Plaintiff devotes considerable attention to a series of emails from March 10 through March 12, 2005. See Opp. at 17-20, 54, 59-60 and Robinson Aff., Exs. 10-11. Much like the Koester-Kreitler exchange, these communications add little to the scienter analysis. Koester did not send or receive (or even was copied on) any of these emails, so no inference of intent may be attributed to him from these emails. As to O'Hare, at best these emails support the entirely innocent inference that he was frustrated with Plaintiff's last minute inquiries about issues Plaintiff's due diligence team had thoroughly investigated over the previous months. These emails do not even remotely support Plaintiff's pure speculation that O'Hare "followed through and spoke to Zeitvogel and Koester about the CABS billing practices" (Opp. at 60) but then decided to hide the truth. These inferences are examined in detail in the JPM and Megun. Reply Briefs.

the inference that O'Hare and Koester believed Lightship was not in fact violating the ICA;[17]

- Rainer Gawlick, not Darren Kreitler, was in charge of regulatory affairs for Lightship (see CIM, p. 24). It was not Kreitler's job to manage regulatory affairs or to interpret or analyze interconnection agreements.

- In September 2004 and January 2005, Lightship engaged industry consultants to analyze its Interconnection Agreements and to conduct an audit for revenues and cost savings, and to implement appropriate procedures. See January Power Point presentation, p. 72.[18]

- After speaking with Kreitler, Koester conferred with the management of Lightship as to whether the practice of maintaining different LCAs was improper, and a decision was made to maintain that practice. Rainer Gawlick, an officer of the company whose responsibilities included regulatory affairs, is part of the management team. CIM, p. 24. The fact that Koester did not confer with Kreitler or seek further guidance from him supports the inference that Kreitler did *not* have responsibility and expertise in this area.

---

[17]Billing disputes between telecommunications companies are exceedingly common. Mountain States Telephone and Telegraph Company, et al., Petition for Waiver and Stay of Refund Requirements, 2 FCC Rcd 699, 700 (1987). Indeed, the FCC has recognized that intercarrier "access disputes … are neither new nor unusual." Rather, these types of billing disputes "are the standard state of affairs." Id. No buyer of telecommunications assets like Plaintiff could credibly expect a seller to warrant that Verizon could never assert a billing dispute, prospectively or retroactively, or that -- given the complexities and uncertainties of the statutory, regulatory and contractual regime in which telecommunications companies operate -- it would not be successful. Intercarrier billing disputes are the rule, not the exception, in the industry. Even the most simplistic Westlaw or LEXIS research reveals that telecommunications companies literally have litigated many hundreds of intercarrier billing disputes in the federal courts in the last several years (after going through the required regulatory process). See cases cited at Attachment A. See also supra §II.

The prevalence of billing disputes involving significant sums of money also is reflected in Plaintiff's November 17, 2006 letter referenced in Paragraph 106 of the Complaint. Attached to that letter were dispute letters from Verizon dated February 16, 2006 and March 23, 2006 (to Kreitler as an employee of One Communications). Combined, such letters disputed more than $1,000,000.

[18] On Page 29 of its Opposition, Plaintiff states that the January 2005 PowerPoint Presentation "claimed that Lightship's billing practices had been 'audited' by an industry consultant, and … that Lightship's procedures were 'appropriate' and validated by industry experts." Plaintiff does not allege, nor assert, that these statements were in any way misleading. The vetting of Lightship's billing practices distinguishes this case from the "barely cogent" inference of intent found in Top Tankers, where the court clearly felt constrained to deny the motion to dismiss because the record nowhere revealed the subsequent Ernst & Young "comfort letter" defendants claimed to have received. Top Tankers, 2007 WL 4563930, at *9.

- The ICA itself is a technical morass, not a model of clarity. Indeed, even Verizon and Plaintiff differ in their interpretation of the contract. See Movants' Joint Reply, p. 13 n. 12; JPM Initial Brief, pp. 43-53.

- It is common knowledge that the telecommunications industry is heavily regulated and that telecommunications companies rely on inside and outside counsel (and industry consultants such as those engaged by Lightship in late 2004 and early 2005) with respect to matters such as interconnection agreements.

- The management of Lightship had thoroughly reviewed Lightship's CABS position, and, as Mr. Matlack stated in his email, "[did] not feel there [was] an exposure there."[19]

- For more than a year subsequent to the merger, Plaintiff, with Kreitler (and other Lightship billing managers) in its employ, continued the practice of using different LCAs. The Court may reasonably infer that Plaintiff similarly did not rely on Kreitler's opinion on matters other than "*implementation*" of billing practices. See Opp. at 56.

Thus, the Court may rationally infer from the above facts not only that the Individual Defendants believed that maintaining different LCAs did not violate the ICA, but also that they were justified in their position after deliberate inquiry. Such innocent inferences are cogent and significantly more compelling than any inference of fraudulent intent that conceivably could be drawn from the stated opinion of a billing manager with no alleged legal or regulatory expertise or responsibilities.

## V.    Plaintiff's Assertion that It Has Alleged Loss Causation is Without Merit.

Plaintiff contends that it has suffered an economic loss because (a) Verizon has now asserted a claim against it; and (b) there is a "diminished revenue stream from Lightship." Opp. at 70. Neither of these arguments changes the fact that the Complaint simply alleges a purchase of Lightship stock at an artificially inflated price, the sufficiency of which allegation Dura

---

[19] The Individual Defendants agree with Megunticook's characterization of Mr. Matlack's email as being limited to the issue of UNE-P lines. Accepting for the sake of argument Plaintiff's assertion that the email addresses a broader subject, such email supports the inference that Lightship had reviewed its CABS procedures (which review included independent audits by two industry consultants) and reasonably believed they were proper.

Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), emphatically rejects. A mere *claim* by Verizon, even if defined in the Merger Agreement as a loss, is not an economic loss for purposes of the securities laws. Plaintiff has pointed to no case, and research has revealed none, where a court deems sufficient an allegation that plaintiff has suffered a loss because some day it *may* have to pay a claim asserted against it. Moreover, even assuming *arguendo* that Verizon ultimately succeeds on its claim, such claim may (if none of the SRC's defenses applies) be covered by the indemnification escrow. There is no allegation, therefore, that a successful claim by Verizon for pre-merger billings necessarily would affect Plaintiff's bottom line.

Plaintiff's argument that it has suffered a loss in the form of a diminished revenue stream is similarly unavailing. Plaintiff simply has not alleged this in its Complaint. Even if it had alleged such a purported loss in the Complaint, it has not sufficiently alleged a causal connection between such diminished revenue stream and any purported decline in the value of the stock it purchased. Unlike in a well-plead securities fraud complaint, there has been no corrective disclosure and no market reaction to such disclosure in the form of a decrease in value of the stock or some other financial harm that obviously affected the value of the stock. As a result, each of the cases cited by Plaintiff is readily distinguishable. See, e.g., Emergent Capital, 343 F.3d 189, 198 (2d Cir. 2003) (causal connection between disclosure of concealed information and *failure of the venture*)(emphasis added); Glidepath, 2007 WL 2176072, *17 (S.D.N.Y. July 26, 2007) (disclosure of information led to *failure of the business*)(emphasis added); In re Pharmalat, 376 F.Supp.2d 472, 510 (S.D.N.Y. 2005)(revelation that assets included worthless invoices causally connected to the inability to service debt and the *financial collapse of the*

*company*)(emphasis added); <u>Suez Equity Investors</u>, 250 F.3d 87, 98 (2d Cir. 2001)(liquidity

crisis left the *stock worthless*) (emphasis added).[20]

  Plaintiff's Complaint, at bottom, contains the precise "artificially inflated purchase price"

allegations rejected by the Supreme Court in <u>Dura</u>, and by the courts in the Second Circuit.

Dated: February 15, 2008
   New York, New York

        Respectfully submitted,

        DREIER LLP

        By: _____/s/_____
        Joseph M. Pastore III, Esq.  (JP-1717)
        499 Park Avenue
        New York, New York 10022
        (212) 328-6100
        jpastore@dreierllp.com

        *   *   *

        One Landmark Square, 20th Floor
        Stamford, Connecticut 06901

David B. Mack, Esq.  (*Admitted Pro Hac Vice*)
Sean Carnathan, Esq.  (*Admitted Pro Hac Vice*)
O'Connor, Carnathan and Mack LLC
8 New England Executive Park, Suite 310
Burlington, Massachusetts  01803

*Attorneys for Defendants*
*Kevin O'Hare and Jeffrey Koester*

       TO:  ALL Counsel on Attached Service List

---

[20] Plaintiff, citing <u>Merrill Lynch v. Allegheny Energy, Inc.</u>, 500 F.3d 171 (2d Cir. 2007), argues that "there can be no question that the harm has materialized." Opp. at 72.  Relying on <u>Merrill Lynch</u>, Plaintiff appears to be arguing that where a securities fraud claim arises out a purchase of a business, the plaintiff need not allege that the value of that business subsequently declined. <u>Merrill Lynch</u> was not a securities fraud case and it does not even remotely stand for this proposition.  In fact, it stands for the opposite conclusion.  The Second Circuit expressly stated that *a securities fraud* plaintiff cannot under <u>Dura</u> satisfy loss causation through allegations that it overpaid for the stock. 500 F.3d at 183.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 15, 2008, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to the following by operation of the Court's electronic filing system, who may access this filing through the Court's system:

Nicholas W. Lobenthal
John Michael Teitler
Teitler & Teitler
1114 Avenue of the Americas
45th Floor
New York, NY 10036
(212) 997-4400
*Attorneys for One Communications Corp.*

Mark D. Resnick
The Resnick Law Group, P.C.
Old City Hall
45 School Street
Boston, MA 02108
(617) 711-8383
*Attorneys for One Communications Corp.*

Scott H. Angstreich
William D. Sarratt
Kellogg, Huber, Hansen, Todd & Evans & Figel PLLC (DC)
1615 M Street, N.W., Suite 400
Washington, DC  20036
(202) 326-7983
*Attorneys for Verizon New England Inc.*

Paul E. Summit, Esq.
Sullivan & Worcester
One Post Office Square
Boston, Massachusetts 02109
*Attorneys for The Megunticook Fund II, L.P. and the Megunticook*
    *Side Fund II, L.P.*

Nicholas J. Panarella, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York, 10178
(212) 808-7800
*Attorneys for Mellon Investor Services LLC*

Jayne S. Robinson, Esq.
Robinson & McDonald LLP
61 Broadway
New York, New York 10006
(212) 953-3400
*Attorneys for J.P. Morgan SBIC LLC & Sixty Wall Street*
*SBIC Fund, L.P.*


By:_____ /s/_____
        Joseph M. Pastore III, Esq.