UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

IN RE ONE COMMUNICATIONS CORP.,

                                      MASTER FILE
                                        No.  07 Civ. 3905 (LTS)(AJP)

This Document Relates to:

One Communications Corp., 07 Civ. 3905

--------------------------------------------------------x

## OPINION AND ORDER

APPEARANCES:

<table>
<tr><td>

TEITLER & TEITLER
 By: John Michael Teitler, Esq.
      Nicholas W. Lobenthal, Esq.
1114 Avenue of the Americas
New York, NY 10036

*Attorneys for Plaintiff*

</td><td>

ROBINSON & MCDONALD, LLP
 By:   Jayne Scimeca Robinson, Esq.
100 Park Avenue
New York, NY 10006

*Attorney for Defendants JP Morgan SBIC
LLC and Sixty Wall Street SBIC Fund, L.P.*

</td></tr>
<tr><td>

THE RESNICK LAW GROUP, P.C.
 By:   Mark S. Resnick, Esq.
Old City Hall
45 School Street
Boston, MA 02108

*Attorney for Plaintiff*

</td><td>

SULLIVAN & WORCESTER LLP (MA)
 By:   Ira K. Gross, Esq.
      Paul Eliot Summit, Esq.
One Post Office Square
Boston, MA 02109

*Attorneys for Defendants The Megunticook
Fund II, L.P. and The Megunticook Side Fund
II, L.P.*

</td></tr>
</table>

KELLOGG, HUBER, HANSEN, TODD &
EVANS PLLC (DC)
By:  Joseph Solomon Hall, Esq.
      Scott H. Angstreich, Esq.
      William David Sarratt, Esq.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036

*Attorneys for Defendants Verizon New
England Inc., Telephone Operating Company
of Vermont LLC and Northern New England
Telephone Operations LLC*

O'CONNOR, CARNATHAN AND MACK,
LLC
By:  David Mack, Esq.
      Joseph M. Pastore, III, Esq.
      Sean T. Carnathan, Esq.
8 New England Executive Park, Suite 310
Burlington, MA 01803

*Attorneys for Defendants Kevin O'Hare and
Jeffrey Koester*


KELLEY DRYE & WARREN, LLP (NY)
By:  Nicholas John Panarella
101 Park Avenue
New York, NY 10178

*Attorney for Nominal Defendant Mellon
Investor Services LLC*

LAURA TAYLOR SWAIN, United States District Judge

This Opinion and Order addresses motions to dismiss claims asserted in one of two consolidated actions.  In that action, originally styled One Communications Corp. v. JP Morgan SBIC LLC et al., 07 Civ. 3905 (LTS), Plaintiff One Communications Corp. ("Plaintiff"), successor in interest to CTC Communications Group, Inc. and CTC Communications Acquisition Corporation ("CTC"), seeking monetary relief, asserts claims under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Section 10(b)") and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), and related state common law claims (fraud/intentional misrepresentation and negligent misrepresentation), alleging fraudulent conduct in connection with Plaintiff's acquisition of Lightship Holding, Inc. ("LHI").  Named as defendants are JP Morgan SBIC, LLC ("JP Morgan SBIC"), Sixty Wall Street SBIC Fund, L.P. ("Sixty Wall Street"), The Megunticook Fund II, L.P. ("Megunticook Fund"), The Megunticook Side Fund II, L.P. ("Megunticook Side Fund"), Kevin O'Hare ("O'Hare") and Jeffrey Koester ("Koester"), who were major stockholders, officers and/or directors of Lightship Telecom LLC ("Lightship") and/or its affiliated holding company, Lightship Holding, Inc. ("LHI"), or are alleged to be associated with such stockholders, officers or directors.  Plaintiff also asserts claims under section 20(a) of the Securities Exchange Act of 1934 ("Section 20(a)") against JP Morgan SBIC, Sixty Wall Street, the Megunticook Fund and the Megunticook Side Fund.  In addition, Plaintiff brings a state law "breach of representations and warranties" claim against the aforementioned defendants and against nominal defendant Mellon Investors Services, LLC ("Mellon"), seeking the release of $7 million in funds held by Mellon as an escrow agent for the

purposes of indemnifying claims raised in connection with the merger, on the basis of the
aforementioned asserted violations of state and federal law.  Lastly, Plaintiff seeks a declaratory
judgment pursuant to 28 U.S.C. § 2201 against the same defendants and Verizon New England,
Inc. ("Verizon")[1] with respect to a billing contract entered into by Lightship and Verizon prior to
the acquisition.  The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 15
U.S.C. § 78aa.  The Court has supplemental jurisdiction of Plaintiff's remaining state law claims
pursuant to 28 U.S.C. § 1367.[2]

Each of three groups of defendants -- JP Morgan SBIC and Sixty Wall Street ("JP
Morgan Defendants"), Megunticook Fund and Megunticook Side Fund ("Megunticook
Defendants"), and O'Hare and Koester ("Individual Defendants") -- moves, pursuant to Rule
12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiff's claims in this action for
failure to state a claim and, pursuant to Federal Rule of Civil Procedure 9(b) and the Private

---

[1]     Verizon later sold its operations in Maine and New Hampshire to Northern New
England Telephone Operations LLC and its operations in Vermont to Telephone
Operating Company of Vermont LLC.  Both companies adopted the same
positions, defenses and counterclaims as Verizon and retained the same counsel as
Verizon, and all parties stipulated to their addition to the caption.  (See Docket
Entry No. 100.)

[2]     The second of the consolidated actions was originally filed in New York state
court and concerned the same escrow account mentioned above (hereinafter "the
second action").  In the second action, a committee comprising certain former
stockholders of Lightship (some of whom are defendants in the first action), the
"Stockholder Representative Committee" ("SRC"), asserted that One
Communications Corp. was wrongfully preventing Mellon from releasing the $7
million in funds from the escrow account.  One Communications Corp.
subsequently removed the action to this Court, see Stockholder Representative
Committee v. One Communications Corp. ("the SRC action"), 07 Civ. 5440
(LTS), asserting that original jurisdiction existed because the SRC's complaint
required resolution of questions of federal securities law, and that supplemental
jurisdiction consequently attached to the SRC's state law claims.

Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), for failure to plead

fraud with the requisite particularity.  In addition, the JP Morgan Defendants move, pursuant to

Rule 12(b)(1), to dismiss Plaintiff's claims for lack of subject-matter jurisdiction,[3] and the

Megunticook Defendants move pursuant to Rule 12(b)(2) for dismissal of the <u>One</u>

<u>Communications Corp.</u> Complaint on the basis of lack of personal jurisdiction and argue that

Plaintiff's escrow agreement claims should be dismissed as duplicative of claims brought in the

other action.

      The Court has considered thoroughly the arguments and submissions of the parties

in connection with these motions.  For the reasons that follow, Defendants' motions to dismiss

the Complaint in <u>One Communications Corp.</u> are granted.


<u>BACKGROUND</u>

      The Court construes all of Plaintiff's well-pleaded, non-conclusory allegations as

true in deciding a Rule 12(b)(6) motion to dismiss.  The allegations and background facts

material to the resolution of the pending motions are as follows.

      Local exchange carriers ("LEC's"), more commonly known as local telephone

companies, are communications providers that transport calls within particular local calling areas

---

[3]    The JP Morgan Defendants also assert, in addition to or in the alternative to their subject matter jurisdiction argument, a related argument based on the lack of exhaustion of administrative remedies and/or the doctrine of primary jurisdiction. <u>See, e.g.</u>, <u>Rural Telephone Serv. Co., Inc. v. Alltell Commcn's, Inc.</u>, No. 08-2052-JWL/JP, 2008 WL 2169444, *4 (D. Kan. May 23, 2008) (addressing argument similar to JP Morgan Defendants' argument raised in this case, noting potential confusion over whether the argument concerns "this court's lack of subject matter jurisdiction . . . or the doctrines of primary jurisdiction and/or exhaustion of administrative remedies").

("LCA's"), the geographic boundaries of which are defined by the LEC.  Broadly speaking, the federal Telecommunications Act, passed in 1996, requires LEC's that provided monopoly local telephone service in 1996 to enter into agreements with other LEC's that wish to provide services in those areas, thereby permitting and encouraging competition.  See 47 U.S.C. §§ 251, et seq. "Incumbent local exchange carriers" ("ILEC's") are LEC's that provided monopoly local telephone service before passage of the Telecommunications Act of 1996.  The LEC's that entered the market thereafter are referred to as "competitive local exchange carriers" ("CLEC's").  (Compl. ¶ 16.)

The agreements between ILEC's and CLEC's are known as interconnection agreements ("ICA's").  ICA's must be approved by the appropriate state public utility commission before they go into effect.  See 47 U.S.C. § 252(e)(1).  In general, ICA's provide that, when a call originating in one LEC is terminated by another LEC in the same LCA, the terminating LEC receives a "reciprocal compensation" payment from the originating LEC. (Compl. ¶¶ 18, 21.)  With respect to calls that are routed from one LCA to another (more commonly known as long distance calls), however, "access charges" are levied on the participating LEC's.[4]  (Compl. ¶¶ 17, 19.)  As would be expected, access charges are usually higher than reciprocal compensation fees.  (Id. ¶ 40.)

The billing systems used by LEC's, which keep track of the LCA's as defined by the LEC and others in order to determine how much other LEC's should be billed, pursuant to

---

[4]     More specifically, long distance calls must be routed through interexchange carriers (more commonly known as long distance telephone companies), which may or may not also be the originating or terminating LEC's.  (Compl. ¶ 17.)  The interexchange carriers levy access charges upon the LEC or LEC's that originate and terminate the calls running from one LCA to another.  (Id. ¶ 19.)

the ICA's, are known as "carrier access billing systems" ("CABS").  (Compl. ¶ 20.)

*Lightship*

Lightship Telecom LLC ("Lightship"), a communications provider, was formed in June 1998 and was therefore a CLEC, and operated in New Hampshire, Vermont, Massachusetts and Maine.  (Compl. ¶¶ 16, 27.)  Lightship Holding, Inc. ("LHI") is a corporation that was formed to hold 100 percent of the stock of Lightship.  (Compl. ¶ 26.)  Defendant O'Hare was chairman of the LHI board and Chief Executive Officer ("CEO") of Lightship at all relevant times, and Defendant Koester was the Chief Operating Officer ("COO") of Lightship at all relevant times.  (Id. ¶¶ 9, 10, 26.)

The JP Morgan Defendants and the Megunticook Defendants each had the right to designate two representatives to sit on the LHI board due to their investments in Lightship or LHI.  (Compl. ¶¶ 28-32.)  By January 2004, Stephan Oppenheimer ("Oppenheimer") was one of the representatives for the JP Morgan Defendants on the LHI board, and Thomas Matlack ("Matlack") was one of the representatives for the Megunticook Defendants.  (Id. ¶ 34.)  They were "actively involved in overseeing the financial condition and operations" of Lightship (id. ¶¶ 28, 31), and they "received reports tracking Lightship's financial condition and operations . . . [t]hroughout their respective terms" as directors.  (Id. ¶ 34.)

*Interconnection Agreement Between Lightship and Verizon - the Maine ICA*

Verizon was an ILEC in the state of Maine.  In or around January 2002, Lightship

entered into an ICA with Verizon covering the state of Maine ("Maine ICA").[5]  (See Decl. of

William David Sarratt dated Dec. 17, 2007, Ex. 1.)  In the section of the agreement relevant to

this action, each party was required to provide reciprocal compensation to the other for calls

constituting "Reciprocal Compensation Traffic."  (See id., Am. No. 1 § 1.1.1).  Reciprocal

compensation was to be determined in part based upon "Verizon's LCA's as defined by

Verizon."  (Id., Appendix B to Am. No. 1).


*Alleged Breach of the Maine ICA*

    Darren Kreitler ("Kreitler") was a billing manager for Lightship at all relevant

times.  Defendant Koester, the COO of Lightship, was his supervisor.  (Compl. ¶ 40.)  In late

2004, Kreitler discovered that Lightship's CABS were based on outdated Verizon LCA's that

were smaller than Verizon's then-current LCA's.  The discrepancies between the sizes of the

LCA's resulted in the assessment of access charges for calls that would have been subject to the

lower reciprocal compensation fees had they been determined based on the larger LCA's then in

use by Verizon.  (Id. ¶ 40.)  Kreitler told Koester that use of the smaller LCA's and consequent

higher billings to Verizon constituted a breach of the Maine ICA, but Koester decided not to

change Lightship's existing LCA definitions[6] and instructed Kreitler to conceal from Verizon the

fact that the higher access charges had anything to do with Lightship's use of the outdated,

---

    [5]  Technically, Lightship opted into an existing ICA between Verizon and Level 3
Communications, LLC.  Various provisions of the underlying ICA were adopted
by Lightship and Verizon and further modified by an "Amendment No. 1"
executed by Lightship and Verizon.  (Compl. ¶ 33.)

    [6]  The Complaint does not allege any reason for Koester's decision.

smaller LCA's rather than Verizon's then-current LCA's.  (Id. ¶¶ 41, 74.)

Kreitler nonetheless updated Lightship's LCA template to conform to the then-current Verizon definitions and prepared a preliminary billing for March 2005 that showed a substantial drop in revenue.[7]  After reviewing the new figures, Koester proposed that Lightship "replace" the lost revenues by creating new, even smaller LCA's for the purposes of assessing intercarrier compensation.  (Compl. ¶¶ 48-50.)  Kreitler and Defendant Koester met with Defendant O'Hare and Wilson, and "they discussed Lightship's use of the smaller Lightship-created LCAs which were at variance with the LCAs defined by Verizon . . . and Koester's plan to utilize the new billing protocols and have Lightship define its own LCAs."  (Id. ¶ 49.)  O'Hare and Wilson agreed to implement Koester's proposal.  (Id. ¶ 49.)  When Koester instructed Kreitler to create smaller LCA's pursuant to the plan, Kreitler again told Koester that the Maine ICA did not allow Lightship to define its own LCA's, but Koester ordered Kreitler to implement the plan anyway and to "let me [Koester] worry about that."  (Id. ¶ 51.)  Shrinking the LCA's in this manner resulted in an EBITDA increase of $200,000 to $300,000 a month, or $2.4 million to $3.6 million annually.[8]  (Id. ¶ 45.)

Plaintiff alleges that Lightship's revenues were consistently overstated because its billings were based on improper LCA definitions.  (See, e.g., Compl. ¶¶ 43, 59.)

---

[7]     Additional reasons for the drop in revenue, which are detailed in the Complaint, are not material for purposes of this opinion.

[8]     The Complaint does not allege how much extra revenue was earned as a result of Lightship's use of non-conforming LCA's prior to the shrinkage.

*Other Allegedly Improper Billing Practices*

The Complaint describes additional billing practices that Plaintiff alleges were improper.  With respect to local calls that originated with a third party, transited Verizon's network, and terminated with Lightship, Lightship engaged in "double billing," i.e., it billed both Verizon and the third party for the same reciprocal compensation charges.  (Compl. ¶ 53(a).)

During the relevant period, communications regulators in Maine, New Hampshire and Vermont implemented prohibitions on the use of "VNXX services" in connection with Internet usage.  VNXX services are services that allow customers from one LCA to dial Internet access phone numbers as if they were making calls from another LCA, thereby avoiding the payment of long distance charges; employing VNXX services in connection with Internet usage allowed certain customers to connect to the Internet without paying long-distance fees.  (Compl. ¶¶ 23-24.)  Notwithstanding these prohibitions, Lightship continued to provide VNXX service for Internet-bound traffic.  (Id. ¶ 53(b).)

Moreover, "[i]n contravention of Federal and state precedent," Lightship "levied terminating access charges on Verizon for calls that originated on Verizon's network and terminated on Lightship's via VNXX service provided by Lightship."  (Id. ¶ 53(c).)

The Complaint refers to these allegedly improper billing practices, as well as the aforementioned failure to conform to Verizon's current LCA definitions, as the "Undisclosed Lightship Billing Practices."  The Complaint alleges that "various of the Undisclosed Billing Practices" resulted, inter alia, in the improper inflation of Lightship's 2004 EBITDA, as reflected in the company's audited financial statements, by $2.4 million to $3.6 million, as well as the

inflation of the Company's 2005 EBITDA by $200,000 to $300,000 per month.[9]  (Compl. ¶¶ 96, 97.)

### *Sale of Lightship to CTC*

Around October 2004, Lightship began negotiations with CTC to explore a possible sale of LHI to CTC.  Numerous representations with respect to Lightship's EBITDA and CABS practices were allegedly made to CTC during the course of these negotiations.  In various conference calls prior to the merger, Koester represented to CTC that Lightship was in compliance with its ICA's.  (Compl. ¶¶ 86-87.)  O'Hare, Oppenheimer and Matlack were involved thoroughly in the negotiations with CTC.  (E.g., Compl. ¶¶ 63, 70, 71.)

### *The Merger Agreement*

In March 2005, a Merger Agreement providing for the sale of Lightship to CTC was drafted by counsel for CTC and Lightship.  (See Decl. of Jayne Robinson, dated Sept. 17, 2007, Exs. 1-2.)  On March 18, LHI's board of directors approved the Merger Agreement and the transaction with CTC.  The Merger Agreement was signed by O'Hare for Lightship on March 21. (Id. ¶ 90; Robinson Decl. Ex. 1.)

Pursuant to the agreement, CTC paid approximately $67 million in cash for all of LHI's stock; LHI was then merged into a CTC affiliate and became a wholly-owned subsidiary of CTC.  The purchase price "reflected an agreed upon valuation of approximately seven times

---

[9]     As noted above, the Complaint also alleges that the LCA shrinkage itself resulted in an inflated EBITDA of $200,000 or $300,000 per month, or $2.4 million to $3.6 million a year.

Lightship's stated EBITDA."  The transaction closed on May 20, 2005.  (Compl. ¶ 100.)

Plaintiff alleges that, had CTC known about the Undisclosed Lightship Billing Practices, it

would have paid a much lower price.  (Id. ¶ 105.)

            Citing, inter alia, the financial statements and other financial information that

included the allegedly inflated EBITDA figures, Plaintiff alleges that "[a] substantial portion of

the financial information contained in . . . materials supplied to CTC . . . through the closing of

the transactions, was false and materially misleading based in material part upon revenue

generated from the Undisclosed Lightship Billing Practices, including 2004 and 2005 EBITDA

inflated by $200,000 to $300,000 per month (or $2.4 million to $3.6 million per year)."  (Compl.

¶ 98.)  Plaintiff further alleges that "[u]nknown to CTC, the EBITDA figure upon which the

purchase price was determined incorporated and was based upon revenue unlawfully produced by

the Undisclosed Lightship Billing Practices and which was inflated by approximately [the same

amounts cited in the preceding sentence]."  (Id. ¶ 101.)  The Complaint includes no further

specific information regarding alleged inaccuracies in the financial statements.

            In connection with a general allegation that "The Lightship representations,

warranties and covenants set forth in the Merger Agreement . . . were false at the time the Merger

Agreement was executed [and] remained false throughout the remaining diligence period, and

. . . were false at the time the transaction closed,"[10] Plaintiff describes certain sections of the

Merger Agreement as follows.  In connection with the quotations from the Complaint the Court

here provides, as necessary in connection with its analysis, quotations from the referenced

---

[10]     (Compl. ¶ 99.)

portions of the Merger Agreement.[11]

In paragraph 92 of the Complaint, Plaintiff asserts that:

Section 4(h) of the Merger Agreement contained representations and warranties by LHI with respect to financial statements, undisclosed liabilities, and material adverse changes in the conduct of Lightship's business.  Lightship represented and warranted, inter alia, that financial statements attached to the Merger Agreement fairly presented the financial condition of Lightship as of the dates of those statements and that the results of its operations and changes in cash flow for the periods covered by the statements were in accordance with GAAP.[12]  LHI warranted that except as set forth in Schedule 4(h)(ii) of the Merger Agreement, it had no liabilities of a type required by GAAP to be reflected on a consolidated balance sheet, except for liabilities incurred in the ordinary course of business which in the aggregate were not material.  Lightship also warranted that its books of account and other material financial records were complete and correct in all material respects and had been maintained in accordance with sound business practices.  It also expressly stated that "the Lightship Companies have established and maintained a system of internal controls and procedures to provide assurances that all material information regarding the Lightship Companies' operations and financial condition is communicated to the Lightship Company's management, including their executive officers."  Finally, Lightship represented in this section that since its most recent financial statements, its operations had been conducted in the ordinary course of business and there had been no material adverse change.

The term "Ordinary Course of Business" was defined in the Merger Agreement as

the ordinary course of business in the industries in which the Business is conducted and in the manner in which the Business has been conducted, consistent with past custom and practice (including with respect to quantity and frequency).  Without limiting the foregoing, (i) "Ordinary Course of Business"

---

[11]    A full copy of the Merger Agreement was appended to Defendants' opposition papers (see Robinson Decl. Exs. 1-2).  Plaintiff does not dispute the authenticity of the document.

The Merger Agreement often refers to the "Lightship Companies," which includes both LHI and Lightship.  For the sake of simplicity, the Court will use the term "Lightship" when referring to both LHI's and Lightship's obligations under the Merger Agreement.

[12]    The term GAAP stands for "Generally Accepted Accounting Principles," the standard framework of guidelines used in financial accounting.

shall include the requirement that all expenditures made or incurred by the Lightship Companies in operating the Business consistent with past custom and practice will continue to be made, incurred and paid in the normal course, except to the extent expressly prohibited by the Agreement and (ii) the failure to make, incur or pay any such expenditures in the normal course shall be deemed to be not in the "Ordinary Course of Business".

(Robinson Decl. Ex. 1 at 8.)

The Complaint alleges in paragraph 93 that

Section 4(i) of the Merger Agreement addressed legal compliance.  In this section, LHI represented that except as set forth on a Schedule 4(i), the company had complied in all material respects and was currently in compliance in all material respects with all applicable laws.

In addition, paragraph 93 alleges that

Section 4(k)(iii) represented that all contracts set forth on schedules attached to the Merger Agreement were in full force and effect and that the applicable Lightship company was not in material default under any such contract, nor did any conditions exist that, with notice or lapse of time or both, would constitute a material default under any such contract.

The actual text of Section 4(k)(iii) reads as follows:

All of the Contracts set forth on **Schedule 4(k)(i) and (ii)** are valid, in full force and effect and binding upon the applicable Lightship Company party thereto and, to Holding's Knowledge, the other parties thereto, enforceable against the applicable Lightship Company in accordance with their respective terms; and the applicable Lightship Company is not in material default under any such Contract, nor, to Holding's Knowledge, does any condition exist that, with notice or lapse of time or both, would constitute a material default under any such Contract.

(Robinson Decl. Ex. 1 at 30.)  Schedule 4(k)(i) listed numerous contracts, but the only listed

contracts associated with Verizon or a Verizon-affiliated company consisted of a "Dedicated

Internet Access Service Agreement," a "Conduit License Agreement (New Hampshire)," and a

"Conduit License Agreement (Vermont)" (Robinson Decl. Ex. 2).  Section 4(k)(ii) of the Merger

Agreement provided that "**Schedule 4(k)(ii)** consists of two (2) CD ROMS provided by

Lightship to CTC, which list all customers which Lightship is currently billing for services, whether on a month-to-month basis or pursuant to a fixed-term contractual arrangement (collectively, the "**Customer Agreements**")[.]"  (Id. Ex. 1 at 30.)  Under the heading "Schedule 4(k)(iii) - Customer Agreements"[13] in the Disclosure Schedule to the Merger Agreement, the text reads: "See PDF files on CD-ROM containing all Customer Agreements as of February 15, 2005 and March 1, 2005[.]"  (Id. Ex. 2.)  There is no allegation that any of the specific Verizon contracts listed in Schedule 4(k)(i) was breached, and there is no allegation that the Maine ICA was a "Customer Agreement" enumerated on the CD-ROMs.  The text below the "Schedule 4(k)(iii)" heading also adds:

> Currently all of Lightship's interconnection agreements with Verizon have expired.  Per industry practices, Lightship and Verizon continue to operate pursuant to the terms of the interconnection agreements on a month-to-month basis.  In addition, per industry practice, Lightship and Verizon will continue to operate on a month-to-month basis pursuant to the terms of the interconnection agreements until the agreements are renegotiated. . . . Lightship has not received notice from Verizon of Verizon's intent to terminate the month-to-month operation of the interconnection agreements.

(Id.)

> Plaintiff alleges in paragraph 94 of the Complaint that:

> Section 4(e)(i), pertaining to permits and governmental licenses, represented that LHI had no knowledge suggesting that any such permits might be revoked.  Section 4(e)(ii) warranted that each of the Lightship Companies was in substantial compliance with terms and conditions of each company regulatory license and

---

[13]    The heading reads "Schedule 4(k)(iii)," but the "(iii)" is clearly a typographical error and meant to read "(ii)," since the heading immediately followed Schedule 4(k)(i), no such Schedule 4(k)(iii) is referenced in the Merger Agreement, the heading of Schedule 4(k)(iii), "Customer Agreements" was referenced specifically in connection with Schedule 4(k)(ii) in the Merger Agreement, and the text below the heading refers to a CD-ROM which was also referenced in Section 4(k) as comprising Schedule 4(k)(ii).

that no event had occurred that would result in any impairment of the rights of Lightship with respect to any such company regulatory licenses.  Section 4(e)(iii), LHI warranted that Lightship's operations were in substantial compliance with the terms and conditions of all regulatory licenses and that Lightship had not done anything or failed to do anything that could reasonably be expected to cause the loss of any company regulatory license.

Paragraph 94 continues,

Section 4(e)(v) provided that as of the closing date, none of the Lightship Companies had any liability to any affiliate of Verizon Communications, Inc. for CABS-related billing of intercarrier compensation.

The actual text of Section 4(e)(v), however, reads:

As of the Closing Date, none of the Lightship Companies has any Liability: (A) to any Affiliate of Verizon Communications, Inc. related to billing for CABS with respect to any intra-LATA [local access and transport area] toll traffic terminating on Lightship's UNE-P [unbundled network element platform] lines . . . .

(Robinson Decl. Ex. 1 at 25.)

Lastly, paragraph 95 of the Complaint asserts that:

Section 5(c) of the Merger Agreement contained pre-closing covenants by LHI. The Merger Agreement extended indemnification to breach of any covenant in the Agreement, and pursuant to Section 7(c) LHI delivered a closing certificate certifying Lightship's compliance with all covenants and obligations in the Agreement requiring compliance prior to closing.  In Section 5, LHI covenanted not to engage in any action with the intent to, or which could, directly or indirectly, adversely impact or materially delay the consummation of the transaction, or take any action intended or reasonably expected to result in non-satisfaction of any of the conditions of the merger.  LHI also covenanted that if prior to closing it acquired knowledge of a fact or circumstances constituting a breach of a representation, warranty or covenant or agreement made within the scope of the Merger Agreement or in any other transaction document, LHI would promptly notify CTC of the existence of any such fact or circumstance.  Finally, LHI covenanted that it would supplement or amend any of the disclosure schedules attached to the Merger Agreement with respect to any matter that, if existing or known at the date of the Agreement, would have been required to be set forth or listed in any such schedule.

*The Merger Clause in the Merger Agreement*

Although not mentioned in the Complaint, Section 6(d) of the Merger Agreement

is relevant to the determination of the instant Rule 12(b)(6) motions.  It reads, in relevant part:

> **Representations and Warranties.** . . . Each of the CTC Entities acknowledges
> that the Lightship Companies do not make, and have not made, any
> representations or warranties relating to the Lightship Companies or the Business,
> including in the Offering Memorandum or any presentation relating to the
> Lightship Companies or the Business given in connection with the Transactions,
> other than those expressly set forth in this Agreement.  No Person has been
> authorized by the Lightship Companies to make any representation or warranty
> regarding the Lightship Companies or the Business in connection with the
> Transactions that is inconsistent with or in addition to the representations and
> warranties expressly set forth in this Agreement or in any of the other Transaction
> Documents.

(Robinson Decl. Ex. 1 at 44.)

Section 3 of the Merger Agreement, also relevant to this analysis, contained

representations by CTC that it had the ability to meet its payment obligations in connection with

the merger, had consulted with counsel and advisers, and had obtained the books and records of

Lightship during the course of negotiations.  (See Robinson Decl. Ex. 1 at 20-21.)

## DISCUSSION

On a motion to dismiss a complaint, the Court accepts the factual allegations in the

complaint as true, and draws all reasonable inferences in the plaintiff's favor.  See Roth v.

Jennings, 489 F.3d 499, 501 (2d Cir. 2007).  The complaint must plead "enough facts to state a

claim to relief that is plausible on its face."  Ruotolo v. City of New York, 514 F.3d 184, 188 (2d

Cir. 2008) (quoting Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007)).  In addition,

the Court may consider any written instrument attached to the complaint, statements or documents

incorporated into the complaint by reference, and documents possessed by or known to the plaintiff

and upon which it relied in bringing the suit.  See Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir.

2000).  Accordingly, the Merger Agreement as proffered by Defendants may be considered by

the Court at this stage, as it is referenced by the Complaint and Plaintiff does not dispute the

authenticity of the copy produced by Defendants.

        To state a cause of action under Section 10(b) and Rule 10b-5, a plaintiff must

allege that "the defendant, in connection with the purchase or sale of securities, made a

materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on

defendant's action caused injury to the plaintiff."  Lawrence v. Cohn, 325 F.3d 141, 147 (2d Cir.

2003) (citation omitted).  With respect to materiality, "there must be a substantial likelihood that

the disclosure of the omitted fact would have been viewed by the reasonable investor as having

significantly altered the 'total mix' of information made available."  Basic Inc. v. Levinson, 485

U.S. 224, 231-32 (1988) (quotations and citations omitted).  In order to establish a prima facie

case of liability under Section 20(a), "a plaintiff must show: (1) a primary violation [of the

securities laws] by a controlled person; (2) control of the primary violator by the defendant; and

(3) 'that the controlling person was in some meaningful sense a culpable participant' in the

primary violation."  Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (quoting SEC v.

First Jersey Sec. Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)).

        Under Section 10(b) and Rule 10b-5 promulgated thereunder, Plaintiff "must

allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter,

(3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and

(5) that the plaintiff's reliance was the proximate cause of its injury."  ATSI Commc'ns, Inc. v.

Shaar Fund, Ltd., 493 F.3d 87, 105 (2d. Cir 2007) (citing Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000)).

   A complaint alleging securities fraud must satisfy Rule 9(b), which requires that "a party must state with particularity the circumstances constituting fraud . . . ."  Fed. R. Civ. P. 9(b).  Thus, with respect to any alleged misstatements, Rule 9(b) requires that the pleadings "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  ATSI Commcn's, 493 F.3d at 99 (citation omitted).  The PSLRA, which applies because the action is a private securities law action, similarly requires that, with respect to allegations of untrue statements of material facts or material omissions, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C.A. § 78u-4(b)(1) (West 1997).

   Where the plaintiff may only recover money damages upon proof that the defendant acted with a particular state of mind, such as scienter with respect to Section 10(b) claims, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Id. at § 78u-4(b)(2).  The plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.  See ATSI, 493 F.3d at 99 (citing Ganino v. Citizens Utils. Co., 228 F.3d 154, 168-69 (2d Cir.

2000)).  Moreover, "'in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences.'  For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and <u>at least as compelling</u> as any opposing inference one could draw from the facts alleged.'" <u>Id.</u> (quoting <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 127 S.Ct. 2499, 2510 (2007)).

### <u>Section 10(b) Claims</u>

#### <u>Only Merger Agreement Statements Are Actionable</u>

Because the Merger Agreement by its terms limits the representations on which Plaintiff could rely to those set forth in the agreement, the various statements allegedly made by Defendants in the time period leading up to the execution of the Merger Agreement are not actionable under Section 10(b).  In pleading reliance on alleged misrepresentations or omissions, Plaintiff must also put forth allegations that support the reasonableness of the reliance.  <u>See Emergent Capital Investment Mgmt., LLC v. Stonepath Group, Inc.</u>, 343 F.3d 189, 195 (2d Cir. 2003) (citing <u>Harsco Corp. v. Segui</u>, 91 F.3d 337, 342 (2d Cir. 1996)).  A plaintiff's reliance, in entering into a contract, on statements extrinsic to that contract is not reasonable if the contract specifically disclaims reliance on extra-contractual statements and the parties to that contract are sophisticated.  <u>See ATSI Commcn's, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 105 (2d Cir. 2007) (on motion to dismiss, "[w]here the plaintiff is a sophisticated investor and an integrated agreement between the parties does not include the misrepresentation at issue, the plaintiff cannot establish reasonable reliance on that misrepresentation."); <u>Emergent</u>, 343 F.3d at 195 (in assessing the reasonableness of a plaintiff's alleged reliance on a motion to dismiss, the court

"consider[s] the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them.") (citing Lazard Feres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1541-43 (2d Cir. 1997); Harsco, 91 F.3d at 345-46).

    Here, the parties are clearly sophisticated,[14] and Section 6(d) of the Merger Agreement provided that the parties disclaimed reliance on extra-contractual representations that were "inconsistent with or in addition to the representations and warranties expressly set forth" in the Merger Agreement.  Defendants' alleged extra-contractual representations, including Koester's representation that Lightship was in compliance with all ICA's, are clearly "in addition to" the representations in the Merger Agreement.  Therefore, Defendants' motions are granted to the extent they seek dismissal of Plaintiff's Section 10(b) claim insofar as it is premised on extra-contractual statements.

      _Representations in the Merger Agreement_

    The Section 10(b) claims premised on the representations in the Merger Agreement identified in the Complaint have been inadequately pled, because of Plaintiff's failure

---

[14]      The merger was a $67 million deal that was culminated after several months of negotiations.  CTC represented in Section 3 of the Merger Agreement that it had consulted with counsel and advisers, and had obtained Lightship's books and records during the course of negotiations.  See Emergent, 343 F.3d at 196 (plaintiff was a sophisticated investor, where it represented in an agreement that it could evaluate the risks of the transaction and where it secured information about the financial condition and operations of the company whose stock was purchased); Citibank, N.A. v. Plapinger, 66 N.Y.2d 90, 95 (N.Y. 1985) (dismissing fraud claim on the basis of a merger clause in agreement, where, "following extended negotiations between sophisticated business people, what has been hammered out is a multimillion dollar personal guarantee").

to explain, as required by Rule 9(b) and the PSLRA, why the representation in question was misleading, <u>see</u> 15 U.S.C.A. § 78u-4(b)(1) (West 1997) ("the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . . ."), and/or because of Plaintiff's failure to put forth sufficiently particularized allegations with respect to scienter.

       Plaintiff's mere recitation of the various provisions in Section 4(h) concerning financial statements and records does not suffice to explain why the representations would have been misleading to a reasonable investor.    Plaintiff cites to no GAAP provision that was allegedly violated, Plaintiff does not allege that the monies reflected in the financial statements were not actually received, and Plaintiff offers no explanation as to how any of the "material financial records" referenced in Section 4(h) were not "complete," "correct," or "maintained in accordance with sound business practices."  To the extent that the Complaint's generalized and repeated references to Lightship's EBITDA being artificially inflated by Lightship's alleged breach of the Maine ICA (<u>see</u> Compl. ¶ 98) may be construed as an explanation that Lightship's financial records were not therefore "correct," Plaintiff fails to explain how the EBITDA was incorrectly calculated, and there is no plausible factual explanation as to how this representation might be misleading to a reasonable investor, especially when another section of the Merger Agreement explicitly lists the contracts of which Lightship represented there was no material breach.  <u>See</u> <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 231-32 (1988) ("there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available").  The Complaint also lacks any explanation as to why the representation regarding internal controls

was misleading or false, nor is there any explanation as to how Lightship's operations were not conducted in the "Ordinary Course of Business" as it is defined in the Merger Agreement. Because of this lack of specificity, there is no plausible factual basis for Plaintiff's claim that Section 4(h) was materially misleading or fraudulent, and accordingly, Plaintiff fails to state a claim as to Section 4(h).

The Complaint alleges that Section 4(e)(v) of the Merger Agreement provided that, as of the closing date, Lightship represented that it had no liability to any affiliate of Verizon for CABS-related billing of intercarrier compensation. (Compl. ¶ 94.) The actual text of Section 4(e)(v), however, refers to liability to Verizon "related to billing for CABS with respect to any intra-LATA [local access and transport area] toll traffic terminating on Lightship's UNE-P [unbundled network element platform] lines . . . ." (Robinson Decl. Ex. 1 at 25.) Nothing whatsoever is alleged in the Complaint with respect to intra-LATA toll traffic or UNE-P lines. Similarly, nothing is alleged so as to demonstrate why Section 5, which concerns Lightship's assurances that the merger would be effectuated, was misleading. For these reasons, Plaintiff's Section 10(b) claim against Defendants is dismissed to the extent it is premised on Section 4(e)(v) or Section 5 of the Merger Agreement.

The Complaint also alleges that Lightship's representation in Section 4(k)(iii) was false, but fails to provide any specific explanation as to why it was false or misleading. (See Compl. ¶ 93.) Section 4(k)(iii) represented that Lightship was not in material breach of contracts listed in Schedules 4(k)(i) and 4(k)(ii); however, as explained above in the Background section, the list of contracts in Schedule 4(k)(i) did not include the Maine ICA with Verizon, and there is no allegation that the Maine ICA was listed in the CD-ROM's referenced in Schedule "4(k)(iii)."

Whether or not the paragraph under the Schedule "4(k)(iii)" heading indicating that all of
Lightship's interconnection agreements with Verizon had expired and were being continued on a
month-to-month operating basisis the basis for Plaintiff's contention that Section 4(k)(iii) was
false, the Complaint is devoid of any such explanation nor, contrary to the requirements of Rule
9(b) and the PSLRA, does the Complaint provide any further specific explanation of the Section
10(b) claim as it relates to Section 4(k)(iii).  Therefore, the Court must dismiss Plaintiff's Section
10(b) claims against Defendants to the extent they are premised on alleged falsity of Section
4(k)(iii) of the Merger Agreement.[15]

The Complaint also references Sections 4(i) and 4(e)(i)-(iii) of the Merger
Agreement, which concern Lightship's compliance with laws and regulations, and alleges that

---

[15]     Moreover, even if the Complaint had adequately explained why Section 4(k)(iii)
was misleading, it would still have failed to state a Section 10(b) claim premised
on Section 4(k)(iii).  The Complaint's allegations of Koester's participation in
several conference calls prior to the merger and his contribution to a PowerPoint
presentation to CTC do not sufficiently imply a regular and significant
involvement in the negotiations of the Merger Agreement terms on the part of
Koester such that the representations in the Merger Agreement should be
attributable to him.  With respect to scienter, the Complaint contains no
allegations suggesting that Oppenheimer or Matlack had anything to do with the
decision to further shrink the LCA's.  While the Complaint alleges that O'Hare
approved the shrinkage plan and knew that the new LCA's did not conform to
Verizon's LCA definitions, the Complaint does not allege with particularity that
O'Hare knew, should have known, or was told specifically by Kreitler or anyone
else that the non-conforming LCA's he was approving violated the Maine ICA.

Because Plaintiff has failed to state a federal claim requiring a determination as to
whether the Maine ICA was breached and the Court declines to exercise
supplemental jurisdiction of Plaintiff's state law claims, including any state law
claim premised on an alleged breach of the Maine ICA, the Court need not
address whether Plaintiff's action insofar as it relates to the Maine ICA should be
dismissed pursuant to Core Communications, Inc. v. Verizon Pennsylvania, Inc.,
493 F.3d 333 (3d Cir. 2007), or the doctrine of primary jurisdiction.

the double billing, Lightship's provision of VNXX services, and/or the allegedly inappropriate

levying of access charges on VNXX calls, all violated state laws.  However, the Complaint fails

to put forth any particularized allegations as to which Defendants, if any, were aware of the

existence of these practices or their illegality.  Plaintiff alleges that "[c]ertain CTC diligence

requests" (Compl. ¶ 71) were addressed by Oppenheimer and Matlack, but Plaintiff does not

specify what those requests were and, accordingly, no inference that the JP Morgan or

Megunticook Defendants should have known of any of these allegedly improper practices may be

drawn.  Nor can any inference of scienter be made from any of the allegations concerning

Defendants' representations made prior to the execution of the Merger Agreement, since none of

those representations are alleged to have concerned the issue of double billing or VNXX

services.  The Complaint's mere recitation of these practices (see Compl. ¶ 53), coupled with

conclusory allegations that Defendants were aware of these practices by virtue of their positions

or their access to unspecified financial documents, without more, fails to state with particularity

facts giving rise to a strong inference that any Defendant falsely represented, with scienter, that

Lightship was in compliance with relevant laws and regulations.  See In re Keyspan Corp. Sec.

Litig., 383 F. Supp. 2d 358, 387-88 (E.D.N.Y. 2003) (comparing cases, noting that an allegation

of access to general information by virtue of a defendant's position is insufficiently particularized

to suggest specific knowledge of material fact); Johnson v. NYFIX, Inc., 399 F. Supp. 2d 105,

115 (D.Conn. 2005) ("knew or should have known" allegation insufficient when unsupported by

particularized allegation).  Lastly, there is no allegation, particularized or otherwise, concerning

the extent of, or extra revenues generated by, these allegedly improper practices, that would

suggest that disclosure of these practices would have been material to a reasonable investor's

valuation of Lightship, in light of the total mix of information made available.[16]  Therefore,

Plaintiff's Section 10(b) claims against Defendants are also dismissed to the extent they are

premised on Sections 4(i) and 4(e)(i)-(iii) of the Merger Agreement.


*Section 20(a) claims*

           For the aforementioned reasons, Plaintiff has failed to plausibly allege a primary

violation of the securities laws; therefore, no cause of action under Section 20(a) is stated.  See

Ellison v. Amer. Image Motor Co., Inc., 36 F. Supp. 2d 628, 641 (S.D.N.Y. 1999) ("Having

failed to state a primary violation . . . [Plaintiff] cannot make out a claim for control person

liability . . . pursuant to § 20(a)").  Accordingly, Defendants' motions to dismiss are granted with

respect to Plaintiffs' Section 20(a) claims.


*State Law Claims*

           Having dismissed Plaintiffs' federal claims, the only claims over which the Court

has original jurisdiction, the Court declines to exercise supplemental jurisdiction of Plaintiffs'

remaining common law claims.  See 28 U.S.C. § 1367(c)(3); Valencia v. Lee, 316 F.3d 299, 307

(2d Cir. 2003).[17]

---

[16]    As noted in the Background section, the Complaint alleges that the 2005 shrinkage of the LCA's resulted in $200,000 to $300,000 of extra revenue per month, but does not allege how much extra revenue the double billing and VNXX practices generated.  The Complaint merely alleges that "various of the Undisclosed Lightship Billing Practices" (Compl. ¶¶ 96, 97) resulted in an extra $200,000 to $300,000 a month.

[17]    Because Plaintiff's claims are dismissed on the merits, the Court need not address the Megunticook Defendants' personal jurisdiction arguments.

CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss the Complaint in One Communications Corp. are granted. Plaintiff has not requested leave to replead its claims. Accordingly, the federal claims are dismissed with prejudice. The Court declines to exercise jurisdiction of the state law claims.

The Clerk of Court is respectfully requested to terminate Docket Entry Nos. 49, 50 and 57, enter judgment dismissing the federal claims and declining to exercise supplemental jurisdiction of the state common law claims raised in the member action captioned One Communications Corp. v. JP Morgan SBIC LLC, 07 Civ. 3905 (LTS), and to close that case.

In light of the resolution of case number 07 Civ. 3905 and the entry of judgment in that case, the December 18, 2007, Order of Consolidation is hereby terminated, and any further orders and filings pertaining to the SRC member action will be docketed under case number 07 Civ. 5440.

SO ORDERED.

Dated:      New York, New York
            March 31, 2009

                                        _____
                                        LAURA TAYLOR SWAIN
                                        United States District Judge